**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**LYNCHBURG DIVISION**

| | | |
|---|---|---|
| EMERSON CREEK POTTERY INC. | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 6:20-CV-0054-NKM |
| | ) | |
| v. | ) | |
| | ) | |
| COUNTRYVIEW POTTERY CO., | ) | |
| EMERSON CREEK EVENTS, INC., | ) | |
| CHRISTINA DEMIDUK, and | ) | |
| DAVID DEMIDUK | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

STATEMENT OF UNDISPUTED FACTS ................................................................. 3

SUMMARY JUDGMENT STANDARD .................................................................... 7

ARGUMENT .................................................................................................................. 8

   I.    Defendants Are Entitled To Summary Judgment Owing to Plaintiff's Acquiescence To Defendants' Use Of The EMERSON CREEK marks. ............................................................ 8

      A.   No licensing agreement existed between Plaintiff and any of the Defendants. .............. 9

      B.   Throughout Plaintiff and Defendants' 17-year relationship, Plaintiff repeatedly affirmed Defendants' use of its EMERSON CREEK marks. ................................................ 13

   II.   Had There Been A Licensing Agreement, Defendants Would Be Entitled To Summary Judgment Based On Plaintiff's Naked Licensing Of Its Mark. ................................................. 14

   III.   Even if Plaintiff Did Not Acquiesce Or Provide A Naked License, Defendants Did Not Infringe And Are Not Currently Infringing Plaintiff's Mark .................................................... 16

      A.   Defendants used EMERSON CREEK in connection with their shop with Plaintiff's consent and thus such use cannot be an infringement. ........................................................ 16

      B.   Defendants' restaurant and events services are not sufficiently related to Plaintiff's pottery as to result in a likelihood of confusion with the EMERSON CREEK POTTERY mark. ..................................................................................................................................... 18

CONCLUSION ............................................................................................................... 21

# TABLE OF AUTHORITIES

## CASES

*American Ass'n for Advancement of Science v. Hearst Corp.*, 498 F. Supp. 244, (D.D.C. 1980) 19

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) .......................................................... 7

*Anheuser–Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 320 (4th Cir.1992) ........................... 18

*Barcamerica Intern. USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589 (9th Cir. 2002) ........... 12

*CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263 (4th Cir. 2006) ........................... 20

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ...................................................................... 7

*Commc'ns Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245, 1252 (4th Cir. 1970) ....................... 19

*Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 368 (2d Cir. 1959) .................... 9, 14

*Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812 (3d Cir. 2006) ..................... 9, 15

*Dwinell-Wright Co. v. White House Milk Co.*, 132 F.2d 822, 825 (2d Cir. 1943) ....................... 13

*Eva's Bridal Ltd. v. Halanick Enterprises, Inc.*, 639 F.3d 788, 791 (7th Cir. 2011) ............... 9, 15

*Gander Mountain Co. v. Cabela's, Inc.*, 540 F.3d 827, 832–833, (8th Cir. 2008) ...................... 10

*Land O'Lakes Creameries, Inc. v. Oconomowoc Canning Co.*, 221 F. Supp. 576 (E.D. Wis. 1963) ........................................................................................................................................ 15

*Land O'Lakes Creameries, Inc. v. Oconomowoc Canning Co.*, 221 F. Supp. 576, (E.D. Wis. 1963), aff'd, 330 F.2d 667 (7th Cir. 1964) .............................................................................. 12

*Lone Star Steakhouse & Saloon v. Alpha of Virginia*, 43 F.3d 922, 930 (4th Cir.1995) ............. 17

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 259-260 (4th Cir.2007). ...................................................................................................................................................... 17

*Multi Time Mach., Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 937 (9th Cir. 2015) ........................ 7

*Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 44 U.S.P.Q.2d 1921 (4th Cir. 1997) ........................................................................................................................... 20

*Philip Morris, Inc. v. Imperial Tobacco Co.*, 251 F. Supp. 362 (E.D. Va. 1965), supplemental op., 282 F. Supp. 931 (E.D. Va. 1967), aff'd, 401 F.2d 179 (4th Cir. 1968) ............................ 11

*Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984) ........................................... 18

*Pro. Golfers Ass'n of Am. v. Bankers Life & Cas. Co.*, 514 F.2d 665 (5th Cir. 1975). .................. 9

ProFitness Physical Therapy Center v. Pro-Fit Orthopedic and Sports Physical Therapy P.C., 314 F.3d 62, 67, 65 U.S.P.Q.2d 1195 (2d Cir. 2002) ...................................................................... 13

*Sara Lee Corp v. Kayser-Roth Corp.*, 81 F.3d 455, 463-64 (4th Cir. 1996) ................................ 18

*Sheila's Shine Prod., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114 (5th Cir. 1973) ............................ 15

*SunAmerica Corp. v. Sun Life Assur. Co. of Canada*, 77 F.3d 1325 (11th Cir. 1996) ................ 13

*Taco Cabana Intern., Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1121, 19 U.S.P.Q.2d 1253, 1259 (5th Cir. 1991), judgment aff'd, 505 U.S. 763, 112 S. Ct. 2753, 120 L. Ed. 2d 615, 23 U.S.P.Q.2d 1081 (1992)............................................................................................................... 12

*Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, (6th Cir. 2002) ...................................... 20

*Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc*., 277 F.3d 253 (2d Cir. 2002) ...... 9

*United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134 (3rd Cir.1981) ............................ 10

*Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 304 (4th Cir. 2017) ............................................ 7

*Villanova Univ. v. Villanova Alumni Educ. Found., Inc.*, 123 F. Supp. 2d 293, 307 (E.D. Pa. 2000) ............................................................................................................................... 10, 11

*What-A-Burger Of Virginia, Inc. v. Whataburger, Inc. Of Corpus Christi, Texas*, 357 F.3d 441, 452 (4th Cir. 2004)............................................................................................................... 13

## STATUTES

15 U.S.C. §§ 1114, 1125(a) ........................................................................................................ 17

## RULES

Fed. R. Civ. P. 56(a) ..................................................................................................................... 7

## TREATISES

Restatement Third of Unfair Competition § 33 comment c (1995)................................................. 9

## <u>INTRODUCTION</u>

There is a business in Bedford, Virginia that calls itself Emerson Creek Pottery. It has been selling handmade pottery since 1977. Four states over and 728 miles away, in Oswego, Illinois, there is a restaurant and wedding venue business that also uses Emerson Creek to identify its business. The restaurant has been open in varyious forms since 2002 and the wedding venue, located on the same property as the restaurant, opened in 2010.

Under trademark law, if this were the end of the story, there would be no dispute. Two businesses that offer unrelated goods and services in distant territories under a similar mark would not normally raise a trademark concern. The problem, though, is that these businesses have a prior relationship, and one business is unhappy with how that relationship has ended. Rather than accept that the relationship has ended, that business has brought the pending action.

As is detailed in this memorandum, in 2000, prior to starting its restaurant and wedding venue services, Defendants Countryview Pottery Co. ("Countryview") and Christina Demiduk bought wholesale pottery from Plaintiff Emerson Creek Pottery Inc. ("ECP"). And in doing so, chose to adopt the EMERSON CREEK POTTERY mark for its shop in Oswego, Illinois from which it would sell candles, dish towels, pottery and related items. For 17 years, Countryview and ECP maintained a harmonious buyer/seller business relationship during which the only issues which arose were in connection with shipping and product costs.

During the 17 year relationship, Countryview expanded its business, first by opening a tearoom that would ultimately become a restaurant, and then by offering events services and venue rentals, for weddings, parties, celebrations and the like. Throughout this time, Defendants informed Plaintiff of the status and expansion of its business. Moreover, Defendants informed Plaintiff from the outset that they were using EMERSON CREEK POTTERY with their shop, and then, over the years, that they were using EMERSON CREEK POTTERY AND

1

TEAROOM with their shop, EMERSON CREEK EVENTS with their events and venue services, EMERSON CREEK WEDDINGS with their wedding and venue services, and EMERSON CREEK to generally identify all of their services. For 17 years, Plaintiff never raised any objections to Defendants' use of these marks or to the expansion of services provided by Defendants under these marks.

As Defendants' businesses expanded into event, Countryview's emphasis and interest in its retail shop waned.   As happens often with businesses, Countryview had evolved to the extent that its events business grew in stature and significance relative to its shop. As a result, Countryview continued to purchase pottery from ECP, but to a much lesser degree.

Ultimately, as the relationship came to an end, ECP decided, after 17 years of knowingly allowing Defendants to use the EMERSON CREEK marks which led Defendants to believe such use was not an issue, ECP demanded that Defendants cease all use of EMERSON CREEK with all aspects of their businesses, including not only the pottery shop, but also the restaurant, events and other related services that Defendants had started and grown on their own, services never offered or either contemplated by Plaintiff.

After 17 years acquiescing to Defendants' use of their EMERSON CREEK marks, Plaintiff cannot have a change of heart and demand that Defendants stop using them. Doing so is inequitable and not supported under the law.

There is no dispute as to the way in which this 17-year relationship has transpired. The only dispute is over the results from termination of the relationship. This matter is ripe for a decision by this Court. Defendants respectfully request that the Court grant  motion for summary judgment.

## STATEMENT OF UNDISPUTED FACTS

The following facts are not in dispute as demonstrated by the referenced pleadings and exhibits.

ECP sells pottery under its EMERSON CREEK POTTERY trademark at its store located in Bedford, Virginia and through its website. (Exhibit 1: James Leavitt Deposition, p. 8). It began selling pottery under that mark in 1977 and continues to do so today. (Exhibit 1, p. 8).

In mid 2000, Defendant Christina Demiduk, with her then-boyfriend Ronald Wehrli, visited the ECP store in Bedford, Virginia and met with James Leavitt, owner of ECP, to discuss ECP's pottery, a piece of property owned by Mr. Wehrli in Oswego, Illinois (the "Oswego Property"), and Ms. Demiduk and Mr. Wehrli's interest in purchasing ECP pottery to sell at a yet-to-be opened store at the Oswego Property. (Exhibit 2: Christina Demiduk Deposition, pp. 42, 50-54).

During that meeting, Mr. Wehrli purchased tens of thousands of dollars of pottery from ECP, and ECP arranged to have the pottery shipped to the Oswego Property. (Exhibit 2, pp. 51, 52, 60).  At some point after the mid 2000 meeting, Mr. Leavitt drafted a document entitled "Agreement Between Ron Wehrli and Emerson Creek Pottery". (Exhibit 3: Plaintiff's Documents, ECP 00782) which recites alleged terms between Mr. Wehrli and ECP regarding an outlet store in Naperville, Illinois. There is no evidence that this agreement was ever presented to Mr. Wehrli or any other party, or that the terms detailed in the alleged agreement had been discussed with any party. The document was not signed by any party to this dispute. (Exhibit 1, pp. 28-29). No agreement between the parties has been executed. (Exhibit 1, p. 29). The specific items discussed and potential future business relationship between ECP, Ms. Demiduk and Mr. Wehrli were not memorialized.

In 2002, Countryview, owned by Ms. Demiduk, opened a shop on the Oswego Property and named it EMERSON CREEK POTTERY (the "Countryview Shop"). (Exhibit 2, p. 114). The shop included the pottery Mr. Wehrli had purchased from ECP as well as other non-ECP items, such as soaps, candles, towels, and other related goods. (Exhibit 2, p. 125). ECP did not assist Ms. Demiduk in opening the Countryview Shop nor did it inspect the shop or the goods sold in the shop for 17 years. (Exhibit 1, pp. 27, 33-34). Throughout this period, Countryview purchased pottery from ECP in bulk and at a discount to be sold in the Countryview Shop. (Exhibit 1, pp. 20-21, 31).

Between 2002 and 2004, after opening the Countryview Shop, Countryview expanded its business operations and opened a tearoom (the "Countryview Tearoom") in which tea, drinks and food items were sold. (Exhibit 2, pp. 195, 268). Certain drinks and food items were provided to customers with ECP pottery that Countryview had purchased from ECP. (Exhibit 2, pp. 195, 268). Around this time, Countryview adopted the EMERSON CREEK POTTERY AND TEAROOM mark to identify its shop and tearoom. (Exhibit 2, p. 240). For the years thereafter, correspondence between ECP and Countryview included purchasing, shipping and payment of invoices related to pottery, as well as Countryview sending updates to ECP and Mr. Leavitt related to the Countryview Tearoom. (Exhibit 1, pp. 32-33; Exhibit 4,ECP 00784-00906). At no point during this time did Mr. Leavitt or anyone from ECP visit the Countryview Shop or Tearoom or raise any issues relative to the use of EMERSON CREEK POTTERY or EMERSON CREEK POTTERY AND TEAROOM with the shop or tearoom. (Exhibit 1, pp. 27, 31-33, 89).

As a result of issues with its previous web developer, Countryview registered the "ecreekpotteryandtearoom.com" web domain in 2009 and operated a website at that address on which Countryview advertised its shop and tearoom services. (Exhibit 3, ECP 03101). Ms.

Demiduk informed ECP of its new domain address. (Exhibit 3, ECP 03101). ECP did not express any objections or concerns over registration and use of this domain nor did it inform Countryview that such actions must first be approved by ECP. ECP did not provide any instructions for use of or exercise any control over how EMERSON CREEK POTTERY, EMERSON CREEK, or any permutation of EMERSON CREEK should be displayed. ECP did not provide any instructions for or exercise any oversight or control over the general layout and theme of the website.

By 2010, Countryview was ready to expand its services once again. The business renovated a barn on the Oswego Property. (Exhibit 2, p. 207). This would become one of the sites of its events planning and venue rental services (Exhibit 2, p. 208), which ultimately would be offered by a new business, Emerson Creek Events, Inc. ("Emerson Creek Events"). Just as with past instances of her business growth and expansion, Ms. Demiduk would periodically update Mr. Leavitt regarding the many weddings she was handling in this space. (Exhibit 3, ECP 03150).

At no point during or after Ms. Demiduk's expansion of services under permutations of the EMERSON CREEK mark did ECP inquire as to the nature or quality of the services being provided by Countryview or Emerson Creek Events. ECP never requested any additional payment or other consideration for Emerson Creek Events' use of EMERSON CREEK with its services. ECP never visited Emerson Creek Events' venue or investigated any of the services offered under EMERSON CREEK until 2017. Since 2010, Emerson Creek Events has continually offered wedding and other events services under its EMERSON CREEK marks.

In 2012, 12 years after Defendants began using the EMERSON CREEK POTTERY mark, Mr. Leavitt became aware of issues with Google search results showing the address of the

ECP shop as that of the Countryview Shop in Illinois. (Exhibit 3, ECP 03101) Mr. Leavitt

contacted a web developer that was working for ECP and stated:

> I have allowed [Ms. Demiduk] to use our name, but never considered the
> problems that have arisen with Google. Actually I don't know what to do as it
> would cause [Ms. Demiduk] hardship to force her to change her name (and me
> sales), but on the other hand Google has made a mess of this, they should fix it.
> Maybe she could modify her URL? Do you have any ideas? It seems to me that
> since we both have different names, even though our name is part of hers, that
> Google ought to be able to distinguish between us.

(Exhibit 3, ECP 03101)

Following this exchange, Mr. Leavitt contacted Ms. Demiduk to raise the Google results

address issue. (Exhibit 3, ECP 03109). Mr. Leavitt subsequently contacted Ms. Demiduk to

request her help, and stated, "...I think it would be in both of our best interests for you to add '&

Tearoom' to all of you[r] citations as soon as possible to remove any confusion with search

engines and customers." (Exhibit 3, ECP 03131). Ms. Demiduk made this change and responded

to Mr. Leavitt, "[w]e corrected our name so it correctly lists Emerson Creek Pottery &

Tearoom...[s]o I assume our end of the issue has been taken care of since our business is

correctly identified with the right web address, business name, and address. Please let me know

if there is something on your end that does not seem correct." (Exhibit 3, ECP 03096). There is

no evidence that Mr. Leavitt raised any further issues in 2012, whether with use of EMERSON

CREEK POTTERY, EMERSON CREEK, or any other permutations that include EMERSON

CREEK. He addressed Google's address issues and left it at that.

Years continued to pass with Countryview and Emerson Creek Events using EMERSON

CREEK as a portion or as the entirety of marks to identify its businesses and services.

Ultimately, 17 years after first adopting EMERSON CREEK POTTERY, in 2017, Mr. Leavitt

began to raise concerns with Defendants' use of EMERSON CREEK POTTERY and

EMERSON CREEK with or without other terms. Initially, Mr. Leavitt stated "that 'Emerson Creek Pottery' is our trademarked name and you should only use it appropriately and with 'and Tea Room' when referring to your store." (Exhibit 3, ECP 03049). Then, in 2018, Mr. Leavitt demanded that Defendants stop using any of the Emerson Creek marks with its goods and services. (Exhibit 5: Plaintiff's Complaint, ¶ 32).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the pleadings and evidence show that there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the facts in question must be material; the existence of some alleged factual dispute is not sufficient. *Id* at 247-48. Moreover, where the moving party is the defendant, it is proper for the moving party to point out that there is a lack of evidence to support plaintiff's claim. *Celotex* at 325. In such an instance, the moving parties' burden of showing there is no genuine issue of material fact is discharged. *Id.*

Though trademark cases often involve questions of both law and fact, this does not preclude them from being decided as a matter of law. *See Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 304 (4th Cir. 2017). If the material facts are such that no reasonable fact finder could find for the nonmoving party, then summary judgment is appropriate. *See Multi Time Mach., Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 937 (9th Cir. 2015).

Here, with all facts taken in a light most favorable to Plaintiff, summary judgment in Defendants' favor is warranted.

## ARGUMENT

Defendants are entitled to summary judgement on each of Plaintiff's claims for separate yet related reasons. First, there was never a licensing agreement between Plaintiff and Defendants, and thus there was no agreement Defendants could have breached. Rather than Defendants' using the disputed marks through a license, Defendants used EMERSON CREEK POTTERY, EMERSON CREEK POTTERY AND TEAROOM, EMERSON CREEK, and other permutations that included EMERSON CREEK openly and continuously with the knowledge of Plaintiff, constituting Plaintiff's implied consent. Accordingly, Plaintiff acquiesced to Defendants' use of these marks and is thus now estopped from bringing any action against Defendants relative to trademark infringement or unfair competition.

Second, had there been a licensing agreement between the parties, Plaintiff would still have no right to bring this action because of its lack of any oversight over Defendants' use of the many EMERSON CREEK marks during the 17-year relationship between both parties. Such a lack of oversight amounts to "naked licensing", and when a trademark owner practices naked licensing, its rights in its mark are lost and thus cannot be enforced against another party.

Lastly, regardless of these defenses, there was no infringement by Defendants through their previous sales of pottery, and there is not a likelihood of confusion between Plaintiff's and Defendants' marks and respective goods and services now.

For these reasons, as expounded upon below, this Court should grant Defendants' motion for summary judgment as to each of Plaintiff's claims.

### I. Defendants Are Entitled To Summary Judgment Owing to Plaintiff's Acquiescence To Defendants' Use Of The EMERSON CREEK marks.

Plaintiff contends that an oral trademark license of all EMERSON CREEK marks used by Defendant, first with EMERSON CREEK POTTERY and then with other EMERSON

CREEK marks, existed between the parties throughout the entirety of the relationship between Plaintiff and Defendants. (Exhibit 5, ¶¶ 2, 17-20; Exhibit 1, p. 22-33). Plaintiff, though, has not produced any evidence to support such a license. Moreover, Plaintiff has not produced evidence that would support an implied license. Without a license, and with Plaintiff's consistent permission for Defendants to use EMERSON CREEK in differing forms for 17 years, Plaintiff has acquiesced to Defendants' use of EMERSON CREEK and cannot now require that they stop using their marks.

A. *No licensing agreement existed between Plaintiff and any of the Defendants.*

Among elements typically found in a licensing agreement, one element is always necessary: control by the licensor over the nature and quality of goods and/or services sold under the mark. *See, Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 368 (2d Cir. 1959); *Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc*., 277 F.3d 253 (2d Cir. 2002)*; Doeblers' Pennsylvania Hybrids, Inc. v. Doebler,* 442 F.3d 812 (3d Cir. 2006), as amended (May 5, 2006)*; Pro. Golfers Ass'n of Am. v. Bankers Life & Cas. Co.*, 514 F.2d 665 (5th Cir. 1975)*.* "The requirement of reasonable control is intended to maintain consistency in the quality of the goods or services marketed under the trademark by the licensor and its licensees by insuring that decision-making authority over quality remains with the owner of the mark." Restatement Third of Unfair Competition § 33 comment c (1995).

The necessary level of control will depend on the circumstances surrounding the licensing agreement, including the nature and quality of the goods and/or services, the relationship between the parties, customer expectations, and other factors. *See Eva's Bridal Ltd. v. Halanick Enterprises, Inc.*, 639 F.3d 788, 791 (7th Cir. 2011). Accordingly, control will change from case-to-case and is dependent on the specific facts. *Id.* However, the constant in all

trademark licenses is there must be at least *some* level of control. *Id.* Where there is no control over one party's use of another party's trademark, the license, or lack thereof, is a deceit on the public. *See Dawn Donut* at 367. Depending on the circumstances between the parties, lack of control may amount to one of two results: 1) a finding that there never was a license in the first place; or 2) "naked licensing" by the owner of the mark.

In this instance, ECP's lack of control of EMERSON CREEK with Defendants' services demonstrably indicates that there was never a license in the first place. Though Plaintiff's complaint alleges that the parties entered an oral license when Christina Demiduk and Countryview first began using EMERSON CREEK POTTERY, Plaintiff has produced no evidence of such a license. Thus a license does not exist. *Gander Mountain Co. v. Cabela's, Inc.*, 540 F.3d 827, 832–833, (8th Cir. 2008). What ECP has produced is a document entitled "Agreement Between Ron Wehrli and Emerson Creek Pottery" which it contends led to the oral license. (Exhibit 1, pp. 23-33).  However, there is no evidence to demonstrate that the document was ever presented to any of the Defendants, and moreover, there is no evidence to demonstrate that the document was the basis for a later agreed upon oral license.

It is not sufficient to allege that there may have been discussions regarding a potential future license; there must be actual terms and an agreement. *See Gander Mountain,* 540 F.3d 827. Plaintiff may wish that there was an agreement it could rely on, and potentially ECP believed there was such a license, but without evidence to support an express license, one cannot be found. Under the uncontroverted facts, the only licensing agreement that *could* be found is an implied licensing agreement between ECP and the Defendants.

An implied license can arise where no express license is found but where the objective conduct of the parties supports a license. *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d

134 (3rd Cir.1981). Importantly, though, for an implied license to exist, there must be both permission to use the mark and *exercise of reasonable control over use of the mark. Villanova Univ. v. Villanova Alumni Educ. Found., Inc.*, 123 F. Supp. 2d 293, 307 (E.D. Pa. 2000). The presence of these two elements will demonstrate, regardless of the actual existence of a license, that both parties intended there to be a trademark license for the marks in question. *Id.* But, without both elements, an implied license does not exist. *Id.*

Throughout the entirety of the business relationship between the parties, ECP exercised no control over Defendants' use of its EMERSON CREEK MARKS with its shop, tearoom, restaurant, events, and other services. ECP never dictated to Defendants how the marks must be used with its services or how the marks were to be displayed, nor did it instruct Defendants on how the services offered under the marks must be provided or what standard of quality must be met. Plaintiff has offered no evidence to show how ECP exercised control over Defendants' services. The only way in which ECP received information relative to Defendants' use of the EMERSON CREEK marks and the many services offered under those marks was through correspondence *from Defendants to ECP*. This is not sufficient to meet the quality control requirement required by law. *Philip Morris, Inc. v. Imperial Tobacco Co.*, 251 F. Supp. 362 (E.D. Va. 1965), supplemental op., 282 F. Supp. 931 (E.D. Va. 1967), aff'd, 401 F.2d 179 (4th Cir. 1968).

To properly meet a trademark licensor's control requirement, courts in nearly all instances require a licensor to exercise actual control through its own actions, such as through expressly stated trademark usage standards and actual inspection of goods and/or services sold under the mark. *Philip Morris* 401 F.2d 179. Two companies *voluntarily exchanging information* is not sufficient to constitute quality control. *Id.*

In a minority of cases, courts have found adequate control when a licensor passively exercises control through action of its licensee. These cases, though, require a "special relationship" between the parties, which is only found in specific situations. Those situations are ones in which the parties are family members or can demonstrate a past business relationship in which a licensor can rely on a licensee's past levels of quality with its goods or services. *See Land O'Lakes Creameries, Inc. v. Oconomowoc Canning Co*., 221 F. Supp. 576, (E.D. Wis. 1963), aff'd, 330 F.2d 667 (7th Cir. 1964); *see also Taco Cabana Intern., Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1121, 19 U.S.P.Q.2d 1253, 1259 (5th Cir. 1991), judgment aff'd, 505 U.S. 763, 112 S. Ct. 2753, 120 L. Ed. 2d 615, 23 U.S.P.Q.2d 1081 (1992).

The business relationship between ECP and Defendants does not meet this special relationship standard. ECP and Defendants neither had nor have an intimate personal relationship, such as among family members, nor do they have a prior business relationship on which Plaintiff can rely to expect a certain level of quality. Because of this, for Plaintiff to adequately exercise quality control, it must have done so actively, and not simply relied on information voluntarily given by Defendants.

Not until 2017 did ECP hire an investigator to visit the Oswego Property and investigate the goods Defendants were selling. (Exhibit 5, ¶ 26). Notably, Plaintiff has never investigated Defendants' services. During the entirety of the parties' business relationship from 2001 to 2017, Defendants informed ECP of action they had taken or were taking with their business and with the use of EMERSON CREEK, without inquiry, instruction, oversight or objection from ECP. Plaintiff has produced no evidence demonstrating an active role in adequately assessing the quality and nature of Defendants' goods and services offered under its EMERSON CREEK marks. And, importantly, it does not matter if Defendants' goods and services were of high

quality. *See Barcamerica Intern. USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589 (9th Cir.

2002). The question is whether Plaintiff actually exercised control. *Id.*

Due to ECP's failure to exercise any quality control over Defendants' goods and services,

the two requisite elements of an implied licensing agreement have not been met. Thus, no

licensing agreement of Defendants' EMERSON CREEK marks existed between the parties.

> B. *Throughout Plaintiff and Defendants' 17-year relationship, Plaintiff repeatedly affirmed Defendants' use of its EMERSON CREEK marks.*

Acquiescence in trademark law occurs when the owner of a trademark knowingly allows

another party to use its mark without objection. It arises through affirmative actions of the

trademark owner, resulting in an implied consent to use the mark. *See What-A-Burger Of*

*Virginia, Inc. v. Whataburger, Inc. Of Corpus Christi, Texas*, 357 F.3d 441, 452 (4th Cir. 2004)*;*

*see also SunAmerica Corp. v. Sun Life Assur. Co. of Canada*, 77 F.3d 1325 (11th Cir. 1996). For

acquiescence to be found, most courts have typically required three elements be present: 1) the

senior user actively represented that it would not assert a right or claim; 2) the delay between the

representation and the assertion of the right or claim was not excusable; and 3) the delay caused

the junior user undue prejudice. *See SunAmerica Corp 77 F.3d 1325.* The first two elements can

be implied in a business relationship in which the senior user works directly with the junior user

for an extended period of time without asserting rights over the mark, and in some instances even

encouraging the junior user with its use of the mark. *Id.* Courts will find undue prejudice when a

defendant reasonably relies on the senior user's actions. *ProFitness Physical Therapy Center v.*

*Pro-Fit Orthopedic and Sports Physical Therapy P.C.*, 314 F.3d 62, 67, 65 U.S.P.Q.2d 1195 (2d

Cir. 2002).

In essence, a plaintiff cannot imply to a defendant that the defendant's use of a mark is

acceptable, have the defendant rely on that implication, and then at a later date, sue the defendant

for infringement of the mark. *Dwinell-Wright Co. v. White House Milk Co.*, 132 F.2d 822, 825 (2d Cir. 1943).

Here, throughout the business relationship between both parties, Defendants informed Plaintiff of their business developments, first with the Countryview shop, and then with its tearoom, barn, and events businesses. Defendants informed Plaintiff of its use of EMERSON CREEK throughout the relationship, and Plaintiff, in response, did not object to such use, and, moreover, at times congratulated and encouraged Defendants in their business endeavors. (Exhibit 3, ECP Doc. No. 03106-03107). Plaintiff neither objected to nor took action to stop the use of EMERSON CREEK during that time. As noted, at times in 2012 when potential issues of confusion would arise, Plaintiff continued to imply through acceptance of Defendants' actions that Defendants could continue to use EMERSON CREEK. And Defendants, because of Plaintiff's lack of objections and its encouragement, continued to use their marks and grow their businesses in a good faith reliance that Plaintiff's actions amounted to a consent of such use.

Accordingly, because a licensing agreement did not exist between the parties, and because Plaintiff acquiesced to Defendants' use of the EMERSON CREEK marks for 17 years, Plaintiff is estopped from bringing its breach of contract, infringement and unfair competition claims. Defendants respectfully request that this Court grant summary judgment in favor of Defendants on all of Plaintiff's claims.

## II. Had There Been A Licensing Agreement, Defendants Would Be Entitled To Summary Judgment Based On Plaintiff's Naked Licensing Of Its Mark.

As noted above, in trademark licensing agreements, the trademark owner is required to exercise quality control over use of the trademark by the licensee. *See Dawn Donut,* 267 F.2d 358. Where a trademark license is found to exist, regardless of the terms of the licensing agreement, quality control is required. *Id.* If an agreement is found and quality control is not

14

expressly stated, it will be implied, and must be exercised. *Id.* Though Defendants contend, and the law supports, that there in fact was never a licensing agreement between the parties, even if there had been one, Plaintiff's quality control of Defendants' goods and services would be required, and where quality control is not adequately exercised, the result is a naked license and licensor's loss of rights in its mark. *Doeblers'* 442 F.3d 812.

As previously stated, courts normally will require at least some level of actual control by a licensor when assessing whether the level of control is adequate. *See Eva's Bridal Ltd.* at 791. In a limited number of cases, when there is a special relationship between the parties, courts have found adequate control when a licensor does not actively control licensee's goods or services, but instead relies on the licensee's own quality control standards. *Land O'Lakes Creameries,* 221 F. Supp. 576.

For the same reasons stated above regarding the lack of control by ECP and thus lack of an implied licensing agreement between the parties, ECP did not exercise adequate quality control over Defendants' services, and thus, in this instance, the result is that had there been a licensing agreement, that agreement would amount to a naked license. Again, there is not a special relationship between the parties such that ECP could rely on Defendants' own quality control standards to meet its quality control requirement, and there is no evidence of actual quality control by ECP of Defendants' goods and services until 2017.

Where, as here, there is a long failure to exercise quality control over a licensee's use of a mark with its goods or services, the result is that the licensor is estopped from bringing any action against the licensee. *See Sheila's Shine Prod., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114 (5th Cir. 1973).

15

As a result of Plaintiff's actions, it no longer has rights it can enforce against Defendants and is estopped from doing so. It is unnecessary to determine the specific territories in which Plaintiff has lost rights to its mark because at the very least, it has lost its right to the EMERSON CREEK POTTERY and EMERSON CREEK marks in the territory in which Defendants offer their goods and services. As a result of this loss, ECP is estopped from bringing the present action.

No licensing agreement existed between the parties at any time during the parties' business relationship. Even if a licensing agreement did exist, Plaintiff did not exercise adequate quality control over Defendants' goods and services and thus is estopped from bringing this action. Accordingly, Defendants request that this Court grant this motion for summary judgment in favor of Defendants on all of Plaintiff's claims.

**III.    Even if Plaintiff Did Not Acquiesce Or Provide A Naked License, Defendants Did Not Infringe And Are Not Currently Infringing Plaintiff's Mark.**

Notwithstanding the above, Defendants' use of their EMERSON CREEK marks with restaurant and event services does not infringe Plaintiff's EMERSON CREEK POTTERY mark.

Plaintiff's EMERSON CREEK POTTERY trademark registration No. 4,835,568 recites "ceramic sculptures, vases, vessels, bowls, plates and pots, household containers for foods, mugs, serving platters, and tea pots"[1]. (Exhibit 5,). Defendants used their EMERSON CREEK marks with its retail shop and events services. Neither Defendants' use of EMERSON CREEK with the Countryview Shop, nor their use of EMERSON CREEK with restaurant/events services infringe Plaintiff's trademark rights.

*A.    Defendants used EMERSON CREEK in connection with their shop with Plaintiff's consent and thus such use cannot be an infringement.*

---

[1] As noted previously, Defendants contend that Plaintiff has lost certain rights in this mark through acquiescence or naked licensing, but for the sake of argument, Defendants acknowledge the existence of the '568 registration.

For there to be an infringement of Plaintiff's mark, Plaintiff must prove the following: 1) it owns a valid mark; 2) Defendants used the mark in commerce with goods or services *without Plaintiff's consent*; and 3) that such use is likely to cause confusion with customers. 15 U.S.C. §§ 1114, 1125(a); *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 259-260 (4th Cir.2007). Whether through acquiescence or a license, Defendants used their EMERSON CREEK marks for 17 years with Plaintiff's consent, express or implied. Beginning in March 2017, Plaintiff began raising concerns with Defendants' use of their EMERSON CREEK marks (Exhibit 5, ¶ 24), and then on January 5, 2018, Plaintiff sent a letter to Defendants demanding that they stop using EMERSON CREEK in all forms. (Exhibit 5, ¶ 32). Plaintiff contends that by selling third-party pottery, Defendants breached the alleged licensing agreement and infringed Plaintiff's trademark rights. Such allegations require actual use with goods and/or services without consent by ECP.

Between 2001 and 2018, Defendants used EMERSON CREEK alone or with other terms to identify its shop in which pottery, candles, hand towels and related items were sold. Plaintiff admits that it consented to this use but contends without proof or evidence that such consent was contingent on Defendants only selling ECP pottery in the Countryview Shop. (Exhibit 5, ¶ 17). The alleged Agreement of 2001 between ECP and Ron Wehrli (Exhibit 3, ECP 00782) states as item 4 that Ron Wehrli will stock the proposed store with "a minimum of 75% [ECP] products." That is, Plaintiff's alleged Agreement provides that up to 25% of the products to be sold in the shop could originate from other than Plaintiff. There were no prohibitions to the sale of third-party goods, pottery or otherwise.

Lastly, following Plaintiff's January 5, 2018 demand letter, Defendants began taking steps to discontinue its use of the EMERSON CREEK mark with pottery. (Exhibit 3, ECP

11693-11702, 12686, 12734-12735). Defendants ultimately closed the shop and are no longer selling pottery.

> B. *Defendants' restaurant and events services are not sufficiently related to Plaintiff's pottery as to result in a likelihood of confusion with the EMERSON CREEK POTTERY mark.*

During the entirety of the Plaintiff's and Defendants' business relationship, Defendants paid Plaintiff for Plaintiff's pottery. As Defendants' businesses evolved from a retail shop into restaurant and events services, Defendants ceased purchasing pottery from Plaintiff and thus there were no further payments from Defendants to Plaintiff. (Exhibit 1, pp. 22-33). The parties also did not agree to any explicit licensing agreement regarding Defendants' use of EMERSON CREEK with its restaurant and event services, nor was there an implied license. To the contrary, Plaintiff consented to the use of EMERSON CREEK with restaurant services beginning in 2002 and with event services beginning in 2010. In the absence of a license agreement, Defendants' use of their EMERSON CREEK marks with restaurant and events services did not inure to the benefit of Plaintiff.

A likelihood of confusion analysis to determine whether use of a mark constitutes trademark infringement requires consideration of a number of factors. *See Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984); *Sara Lee Corp v. Kayser-Roth Corp.*, 81 F.3d 455, 463-64 (4th Cir. 1996).[2] These factors are not meant to be rigidly applied, but rather are a guide for assessing whether there is a likelihood of confusion. *Anheuser–Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 320 (4th Cir.1992). Of the many potential factors, those most relevant in this case are the similarity of the marks and the similarity of the goods/services.

---

[2] In the Fourth Circuit, these factors often include: 1) the strength or distinctiveness of the mark; 2) the similarity of the two marks; 3) the similarity of the goods/services the marks identify; 4) the similarity of the facilities the two parties use in their businesses; 5) the similarity of the advertising used by the two parties; 6) the defendant's intent; 7) actual confusion; 8) the quality of the defendant's product; and 9) the sophistication of the consuming public.

While both parties' marks include EMERSON CREEK, Plaintiff's mark further includes the term POTTERY. Plaintiff's mark is a three-word mark, the third term describing Plaintiff's sole business. This difference is significant when construed in connection with the parties' respective businesses. Plaintiff does not use EMERSON CREEK without POTTERY.  It provides few goods other than pottery and does not provide any services other than in connection with the sale of pottery. (Exhibit 1, pp. 8, 16-17, 50-53).

Turning next to the similarities and dissimilarities of the goods and services provided by the parties in a likelihood of confusion analysis, there are two considerations: 1) whether the parties are competitors who offer the same goods or services; and 2) if not competitors, whether the goods or services are sufficiently related to cause an association between the parties and thus a likelihood of confusion. *See Commc'ns Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245, 1252 (4th Cir. 1970). And finding a likelihood of confusion from such an association must include an appreciable number of customers. *American Ass'n for Advancement of Science v. Hearst Corp.*, 498 F. Supp. 244, (D.D.C. 1980). Clearly, the parties are not competitors. Plaintiff manufactures and sells pottery. Defendants provide restaurant and event services. They operate in distinct geographic markets. Any sales of one party have no effect on the other. Any association between the parties ended with the termination letter sent by Plaintiff in January of 2018.

Turning to the respective goods and services, Defendants contend that they are not related. There is no evidence of record to demonstrate that pottery is often, or ever, associated with restaurant or events services in the minds of consumers nor has Plaintiff offered any evidence demonstrating instances in which third-party businesses sell pottery and offer restaurant/events services under the same mark. There is no evidence of actual or potential confusion with these disparate goods and services. The only connection that could hypothetically

19

arise between these goods and services is with the fact that restaurant/events services will include dinnerware. Whatever this connection might amount to, it is too tenuous to result in the goods/services being sufficiently related such that an *appreciable* number of consumers are likely to be confused.

Plaintiff contends, though, that it has evidence of actual confusion. (Exhibit 5, ¶ 34). This alleged confusion, though, consists of a few instances in which consumers messaged Plaintiff rather than Defendant. Such "confusion" is de minimis considering the two decades of concurrent use between the parties. *See Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 44 U.S.P.Q.2d 1921 (4th Cir. 1997). Moreover, the nature of the evidence itself, emails and social media posts, results in insignificant instances of misdirected messages which do not support actual confusion. *See Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, (6th Cir. 2002). In fact, Plaintiff's lack of any significant confusion in relation to Defendants' restaurant/events services during 17 years of coexistence followed by four years of concurrent use of marks including EMERSON CREEK for unrelated goods and services is relevant and will create a strong inference that there is not a likelihood of confusion. *CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263 (4th Cir. 2006).

As a matter of law, there can be no infringement for the period from 2001 to 2018 during which Plaintiff consented to Defendants' use of EMERSON CREEK POTTERY, EMERSON CREEK POTTERY AND TEA ROOM, EMERSON CREEK EVENTS, AND EMERSON CREEK.  From 2018 when Plaintiff terminated the alleged license to use their EMERSON CREEK marks, there is no infringement because Defendants ceased selling pottery and use of any marks including the word POTTERY and focused on its events business.

## <u>CONCLUSION</u>

There is no question that there was never a written, executed agreement between the parties. Further, Plaintiff has not presented any evidence that demonstrates even the possibility of an oral license. And because Plaintiff did not exercise control over Defendants' use of their marks with Defendants' goods or services, an implied license cannot be found under law. Without a license there can be no breach of an agreement.

There is also no question that Plaintiff knew of Defendants' use of their EMERSON CREEK marks. Defendants reasonably relied on Plaintiff's consent to use these marks, to its detriment, and thus under the doctrine of acquiescence, Plaintiff is estopped from bring its infringement and unfair competition claims.

Despite this, under the uncontroverted facts, even if there had been a licensing agreement properly executed by the parties, Plaintiff's failure to establish quality control provisions or exercise control over use of their EMERSON CREEK marks for 17 years amounts to a naked license, precluding Plaintiff from asserting rights against Defendants' use of their EMERSON CREEK marks.

Considering, *arguendo*, that acquiescence or naked licensing do not apply, Defendants did not infringe Plaintiff's trademark rights or breach an agreement. Defendants were never required to sell only ECP pottery, and when Plaintiff's requested Defendants stop using EMERSON CREEK with pottery, Defendants took reasonable steps to do so. Also, restaurant and events services offered under the EMERSON CREEK marks are not sufficiently related to pottery to cause infringement through a likelihood of confusion.

Accordingly, in light of the foregoing, Defendants respectfully request the Court grant summary judgment in favor of Defendants on all of Plaintiffs claims.

Respectfully submitted,


LAUBSCHER & LAUBSCHER, PC


_____/leljr/_____
Lawrence E. Laubscher Jr.
VSB No. 18680
llaubscher@laubscherlaw.com
1160 Spa Road, Suite 2B
Annapolis, MD  21403
(410) 280-6608 (Tel)
(410) 280-6758 (Fax)

Law Offices of McLaughlin & Associates, P.C.

____/ksmjr/_____
Kenneth S. McLaughlin, Jr.
IARDC No. 6229828
1 E. Benton Street, Suite 301
Aurora, IL 60505
(630) 230-8434
(630) 230-8435 fax
kmclaughlin@ma-lawpc.com

*Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

      I HEREBY CERTIFY that on December 16, 2021, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.


                                   /leljr/
                                  Lawrence E. Laubscher, Jr.
                                  Attorney for Defendants