Transcript of James Leavitt
Conducted on October 8, 2021                                    8

```
1       Q  Did you start the company?

2       A  I did.

3       Q  Could you tell me a little bit about it?

4       A  We started in 1977 making handmade pottery

5    and basically we have been in business ever since.

6       Q  Just doing pottery?

7       A  Yes.

8       Q  So you don't manufacture anything other

9    than pottery?

10      A  No.

11      Q  And do you provide any services other than

12   selling your pottery?

13      A  Like what?

14      Q  Well, how about repair of pottery?

15      A  No, not in general.

16      Q  And you don't operate -- let me rephrase

17   that.  Do you have a store?

18      A  Yes.

19      Q  And where is that located?

20      A  It's on the premises.

21      Q  I'm sorry?

22      A  It's on the premises near the
```

Defendants'
Exhibit 1

Transcript of James Leavitt
Conducted on October 8, 2021                              16

1        Q   Why not?

2        A   I don't think it's a worthwhile enterprise

3    at this point.

4        Q   Have you ever considered expanding your

5    business beyond pottery?

6        A   What do you mean by that exactly?

7        Q   Have you considered selling any products

8    other than pottery?

9        A   Sure.  We sell some candles at this point

10   as part of our line, yes.

11       Q   What else do you sell in your store?

12       A   In the store?

13       Q   Yes.

14       A   I think that they have soaps, some display

15   materials, baking mixes, that sort of thing.

16       Q   How about through the internet?  The same

17   type of products?

18       A   No, the internet is just pottery, and

19   candles.

20       Q   And candles?

21       A   Yes.

22       Q   And you just purchase those candles from a

Transcript of James Leavitt
Conducted on October 8, 2021                                17

1    third party?

2        A   No, we make them.

3        Q   Oh, you make them?

4        A   Uh-hmm.

5        Q   How long have you been making candles?

6        A   It's probably been going on a year, close

7    to it.

8        Q   Okay.  So I understand -- well, what

9    trademarks do you own?

10       A   Emerson Creek Pottery and the logo.

11       Q   Okay.  Anything else?  Any others?

12       A   I don't think so.  Garfield could speak to

13   that better.

14       Q   Okay.  Maybe we will notice Garfield for a

15   deposition sometime.

16           Do any of these retailers that you sell

17   your products to, are they authorized to use the

18   Emerson Creek Pottery name as part of their store

19   name?

20           MR. WILLETT:  Object to form.  Answer if

21   you can.

22       Q   Do you understand the question?

Transcript of James Leavitt
Conducted on October 8, 2021                    20

```
1              MR. WILLETT:  Object to form.

2        A  Not really, because those were urban

3    locations.  This was going to be another

4    farmhouse-type setting, similar to what we have on

5    our premises.

6        Q  So I guess my question is, were you

7    thinking in terms of them replicating what you

8    were doing in Bedford out in Illinois?

9        A  That's the way they represented it,

10   correct.

11       Q  And you agreed to that?

12       A  Yes.

13       Q  Can you describe for me how your

14   relationship with Christina Demiduk has evolved

15   since that first meeting?

16             MR. WILLETT:  Object to form.

17       A  That's a long story.  You know, we did a

18   lot of business together.  I thought we got along

19   well.  She communicated with me a lot over the

20   years, mostly by email, some with phone, about

21   what she was doing, what her plans were, what she

22   was buying from us.  I'd say over the years, more
```

Transcript of James Leavitt
Conducted on October 8, 2021                                    21

```
 1    recently we have not communicated very much.  She

 2    bought less pottery.

 3        Q   Is she buying any pottery today?

 4        A   No, it's been a couple of years since

 5    she's bought any.

 6        Q   The agreement that you had with

 7    Ms. Demiduk, was that ever reduced to writing?

 8        A   Yes.

 9        Q   When?

10        A   It goes right back to when we -- probably

11    right after we had met.

12        Q   Do you have a copy of that agreement?

13        A   Yeah, I think we produced it.

14            MR. LAUBSCHER:  I'm going to make a

15    request -- I don't remember seeing such an

16    agreement.  So if there is one, or if you produced

17    it, identify it, I'll be happy to look at it.

18    Otherwise I'm going to make a request that that

19    agreement be produced.

20            MR. WILLETT:  It has been produced.

21            MR. LAUBSCHER:  Okay.  Do you know the ECP

22    number?
```

1       MR. GOODRUM:  2672?  I will check just

2   real quick.

3       MR. McLAUGHLIN:  Are you referring to the

4   agreement that's titled "Agreement between Ron

5   Wehrli and Emerson Creek Pottery" 3/23/01?  Is

6   that what you're identifying?

7       MR. GOODRUM:  Yeah.  What was the number

8   again, please, Ken?

9       MR. McLAUGHLIN:  782 to 783.  That's what

10  you're talking about; is that right?

11      MR. GOODRUM:  Yes, that's right.

12  BY MR. LAUBSCHER:

13    Q  So who are the parties to the agreement?

14    A  It was Ron Wehrli, who was the primary

15  financial backer.

16    Q  And yourself?

17    A  Yes.  And I would say Chris as they were

18  partners together, as far as I know.

19    Q  And what about your company?  Was it a

20  party to the agreement?

21    A  Well, yeah.  I mean, I consider myself the

22  representative of the company, so yeah.

Transcript of James Leavitt
Conducted on October 8, 2021                                  23

1        Q   Was this a license agreement?

2            MR. WILLETT:   Object to form.

3        A   Yeah, I would say it was, in a sense.

4        Q   And what trademark was being licensed?

5        A   I don't believe that that's actually

6    mentioned in there.  It would have been, I guess,

7    the assumption is it's Emerson Creek Pottery,

8    Emerson Creek.

9        Q   Are you saying both Emerson Creek Pottery

10   and --

11       A   We think of ourselves as both, so yes.

12       Q   When you say "we think of ourselves as

13   both," could you explain --

14       A   Well, we go by Emerson Creek and Emerson

15   Creek Pottery interchangeably.

16       Q   So in your advertising since you opened

17   the company, sometimes you use Emerson Creek

18   Pottery and sometimes you use Emerson Creek?

19       A   Probably, I'd have to go back and look,

20   you know.

21       Q   What are you currently using today?

22       A   Well, we're not currently advertising at

Transcript of James Leavitt
Conducted on October 8, 2021                              24

```
 1   the moment.
 2        Q   Well, on your signage and on your website,
 3   how are you identified?
 4        A   It's mostly as Emerson Creek Pottery.
 5        Q   Mostly or exclusively?
 6        A   I wouldn't -- without going through the
 7   website and looking at every page, I couldn't tell
 8   you.  But I would say mostly Emerson Creek
 9   Pottery.
10        Q   And was there a fee involved in connection
11   with this license?
12        A   No.
13        Q   Were there any royalty payments involved?
14        A   No.
15        Q   And what goods or services were authorized
16   to be provided under this agreement?
17        A   That they were going to sell -- the
18   understanding was they would sell our pottery.
19        Q   Were they allowed to sell anything else?
20        A   The understanding was no other pottery and
21   that the majority of the products in the store
22   would be our pottery, but there could be
```

Transcript of James Leavitt
Conducted on October 8, 2021                                    25

1   accessories that go along with it.

2       Q  Was there a term to this license?  In

3   other words, was it year to year?

4       A  No.

5       Q  Were there any provisions in the license

6   to resolve a breach if somebody didn't behave

7   under the terms of the agreement?

8       A  It was not a document drawn up by a lawyer

9   that had that kind of language in it, no.

10      Q  So there were no breach provisions in the

11  agreement?

12      A  Not directly.  I mean, part of it said

13  that they had to sell -- they had to do certain

14  things to keep using our name.

15      Q  Right, but I'm saying suppose they didn't

16  sell certain --

17      A  Well, the implication being if they didn't

18  do it, then they can't do it.  That's the

19  implication.

20      Q  Did the license authorize Mr. Wehrli and

21  Ms. Demiduk to manufacture pottery on their own

22  and sell it under the Emerson Creek Pottery mark?

1    A  No.

2         MR. WILLETT:  I would object just on the

3    grounds that he's referenced a document that

4    obviously hasn't been provided to him.  But

5    continue, answer if you can.

6    Q  I'm sorry.  Was your answer no?

7    A  Yeah.

8    Q  Thank you.  So the agreement authorized --

9    or let me rephrase that.

10        Did the agreement authorize Mr. Wehrli and

11   Ms. Demiduk to use both Emerson Creek Pottery and

12   Emerson Creek?

13   A  I would say yeah.

14   Q  Were there any restrictions as to how

15   either of those marks were to be used?  In other

16   words, in a stylized fashion or printing them in a

17   certain size?

18   A  It was not that kind of a detailed

19   agreement.

20   Q  Were there any restrictions as to how

21   either of those marks could be used in advertising

22   or promotion by the Demiduks -- or Mr. Wehrli and

Transcript of James Leavitt
Conducted on October 8, 2021                              27

```
1    Ms. Demiduk?
2        A  No, there is no mention of that, either
3    one.
4        Q  Did you ever visit the store that -- or
5    the shop that Mr. Wehrli and Ms. Demiduk opened?
6        A  No.
7        Q  Is the license still in effect today?
8        A  Yes, I would say it would be.  Well, I
9    take that back.  I believe at some point recently
10   when we told them they were in breach of it, but
11   up until that point it was.
12       Q  So you just used the term "breach," which
13   I mentioned earlier, and I asked you about breach
14   provisions in the license.  I think you --
15       A  There's nothing there, right, there's
16   nothing in that agreement that we're referring to.
17       Q  Right, so when notice was sent them that
18   they were in breach, but did the license still
19   continue in force after that?
20           MR. WILLETT:  Object to form.
21       A  Was it in force?
22       Q  Right.
```

Transcript of James Leavitt
Conducted on October 8, 2021                    28

```
 1       A   What do you mean by that?
 2       Q   Well, you entered into an agreement back
 3   in 2000; is that correct?
 4       A   Yes.
 5       Q   And is that agreement still in existence
 6   today?
 7           MR. WILLETT:   Object to form.
 8       A   I think that they were put on notice that
 9   they were in breach of it because of their
10   actions, so the answer would have to be no.
11       Q   So it's your understanding, then, that the
12   license has been terminated?
13       A   Correct.
14       Q   And they are no longer allowed to use
15   Emerson Creek or Emerson Creek Pottery?
16       A   Correct.
17       Q   How -- strike that.
18           Was this agreement signed by Mr. Wehrli
19   and Ms. Demiduk?   Her -- I think she had a
20   different name at that point, but I can't remember
21   what it was.
22       A   No.
```

Transcript of James Leavitt
Conducted on October 8, 2021                                29

```
 1      Q   It was not signed.  Was it signed by you?

 2      A   No.

 3      Q   Do you have any -- to your knowledge, did

 4  Mr. Wehrli and Ms. Demiduk agree to all of these

 5  points in the license?

 6      A   Yes.

 7      Q   Are there any written documents that would

 8  verify that they agreed to these terms?

 9          MR. WILLETT:  Object to form.

10      A   Not to my knowledge.

11      Q   Is Mr. Wehrli still involved in the

12  business?

13      A   No, I do not believe so, no.

14      Q   Can you tell me, describe for me briefly

15  what your relationship was with Mr. Wehrli during

16  the time that he was involved in the business?

17      A   We would talk from time to time.  We

18  didn't have a -- most of my dealings were with

19  Chris.

20      Q   Do you know what Mr. Wehrli's involvement

21  was in running the shop?

22      A   I believe he was mostly involved with
```

1    finances.

2       Q   Okay.  Do you know whether he made any

3    decisions as to what products were stocked in the

4    shop?

5       A   I don't have a way of knowing that.

6       Q   So most -- is it fair to say that most of

7    your dealings with Mr. Wehrli were in connection

8    with finances?

9       A   Yes.

10      Q   And that would be payment of -- for --

11      A   Invoices.

12      Q   -- pottery that they purchased from you?

13      A   Correct.

14      Q   Would you say that the -- Ms. Demiduk and

15   Mr. Wehrli were wholesale customers of yours?

16          MR. WILLETT:  Object to form.

17      A   In a sense they were, yes.

18      Q   Did you control -- have any control over

19   their pricing of the products that they purchased

20   from you, their pricing that they would pass along

21   to customers?

22      A   No.

Transcript of James Leavitt
Conducted on October 8, 2021                                    31

```
 1      Q  But you did control obviously the prices
 2   of the products that you sold to them?
 3      A  Yes.
 4      Q  Were those products sold at a wholesale
 5   price?
 6      A  They're sold at a discount.
 7      Q  Was that the same discount that you -- or
 8   strike that.
 9         Do you provide the same discount to your
10   other retail outlets that purchase from you today?
11      A  No.
12      Q  Was that discount greater?
13      A  Yes.
14      Q  Are you aware that Ms. Demiduk used other
15   names for her shop beyond Emerson Creek Pottery?
16         MR. WILLETT:  Object to form.
17      A  It was called Country View Pottery, I
18   think.
19      Q  Okay.  Did she ever use the mark "Emerson
20   Creek Pottery & Tearoom"?
21      A  Yes.
22      Q  Did you object to that?
```

Transcript of James Leavitt
Conducted on October 8, 2021                              32

1      A   No.

2      Q   Was Emerson Creek Pottery & Tearoom one of

3  the marks that was included in the license

4  agreement from 2000?

5      A   It was not directly in that agreement, but

6  it would have fallen under the general terms of

7  Emerson Creek Pottery and the uses of it, I would

8  say.

9      Q   Do you know when Ms. Demiduk began using

10 Emerson Creek Pottery & Tearoom?

11     A   2004, 2006; I'm not sure.

12     Q   Did Ms. Demiduk ask you if she could

13 expand her pottery shop into -- adding on a

14 tearoom?

15     A   She told me that she was planning to.  She

16 kept me up with her ideas and plans to do all of

17 that; yes, I knew all about it.

18     Q   And you agreed to that?

19     A   I did.

20     Q   Did -- were you aware that she also

21 expanded into -- for the tearoom, into a

22 restaurant?

Transcript of James Leavitt
Conducted on October 8, 2021                                     33

1      A   Yep.

2      Q   Do you know when that was?

3      A   I don't remember what year, no.

4      Q   Did you object to her transitioning into a

5   restaurant?

6      A   Well, to me they were both the same, but

7   no, it would fall under the same category, yeah.

8      Q   Were you aware that Ms. Demiduk further

9   expanded her business to include hosting weddings?

10     A   Yes.

11     Q   Do you remember when that was?

12     A   It might have been 2010, 2011.

13     Q   And did you object to her use of --

14     A   I did not.  She told me of her plans in

15   some detail, yes.

16     Q   Okay.  Did you ever inspect the facility

17   that Ms. Demiduk was using to provide both the

18   restaurant services and the wedding hosting

19   services?

20     A   No, I did not.

21     Q   So I believe you testified earlier that at

22   some point Ms. Demiduk breached the agreement.

Transcript of James Leavitt
Conducted on October 8, 2021

34

```
1    Can you tell me exactly what activities she did
2    that breached the agreement?
3         MR. WILLETT:  Object to form.
4      A  Yeah, I discovered that she was selling
5    other pottery in her store.
6      Q  And what did you do when you discovered
7    she was selling other pottery?
8      A  That's when we sent her a notice that she
9    was in breach.
10     Q  And is that when the license was
11   terminated?
12     A  Yes.
13     Q  Do you recall when that was?
14     A  I think it was in the 2017 range.  I don't
15   remember the date.
16     Q  So between 2000 when you started your
17   relationship with Ms. Demiduk and Mr. Wehrli, and
18   2017 when you terminated the license, how would
19   you characterize, up until -- up until you found
20   that they were selling third-party pottery, how
21   was the relationship between you and the
22   defendants?
```

Transcript of James Leavitt
Conducted on October 8, 2021

50

1   right-hand portion of the first page, you'll see

2   there was an application filing date of April 5th,

3   2017.

4          Do you see that?

5      A   Uh-hmm.   Yes.

6      Q   Can you explain why you decided to file an

7   application on your logo in 2017 when you filed

8   the first application in 2015?

9          MR. WILLETT:   Object to form.   And object

10  to the extent it calls for the revelation of

11  attorney-client communications.   Answer if you can

12  without revealing such communications.

13     A   On the advice of my patent attorney.

14     Q   Okay.   And who was your patent attorney at

15  this time?

16     A   Garfield, uh-hmm.

17     Q   All right.   If you turn to the second

18  page, about -- there's three different breakdowns

19  where it describes goods and services followed by

20  the word "for."   And in the middle, kind of in the

21  middle of the page, you see it says "For retail

22  store services."

Transcript of James Leavitt
Conducted on October 8, 2021                              51

1           Do you see that?

2      A   Yes.

3      Q   And then below that, the next one for, it

4    says, "Restaurant services, rental of banquet and

5    social function facilities."

6      A   Uh-hmm.

7      Q   Do you provide retail store services for

8    ceramic -- featuring ceramic sculptures, et

9    cetera?

10     A   Retail, yes.

11     Q   And then how about the restaurant

12   services, banquet and social function facilities

13   for wedding receptions and birthday parties?

14        MR. WILLETT:  Object to form.

15     Q   Do you provide those services?

16     A   Not at this time.

17     Q   When you filed this application back in

18   2017, did you intend to use your logo mark in

19   connection with those services?

20        MR. WILLETT:  Same objection.

21     A   Possibly.

22     Q   Can you explain -- but are you currently

Transcript of James Leavitt
Conducted on October 8, 2021                                    52

1    providing the restaurant services, the rental of

2    banquet and social function facilities?

3         MR. WILLETT:  Same objection.

4         A  No.

5         Q  So what's -- I want to know why you

6    haven't -- you filed an application, you recited

7    those services four years ago.  Why has there been

8    a delay in actually using your mark in connection

9    with those services?

10        MR. WILLETT:  Object to form.

11        A  Well, a combination of factors:  Lack of

12   employees, management, et cetera.  It's hard to

13   run a small business and expand into other areas.

14        Q  As we sit here today, do you still intend

15   to use your logo mark in connection with these

16   restaurant services, the banquet and social

17   function facilities?

18        A  Possibly.

19        Q  What plans do you have currently to --

20        A  Currently, I don't have any formal plans

21   at the moment.

22        Q  At the time this application was filed,

Transcript of James Leavitt
Conducted on October 8, 2021                              53

```
 1    were you aware that the Demiduks were providing

 2    those types of services?

 3          MR. WILLETT:  Object to form.

 4      Q  And when I say "those types of services,"

 5    I mean the ones, the restaurant services, the

 6    banquet and social function facilities for wedding

 7    receptions and birthday parties.

 8          MR. WILLETT:  Same objection.

 9      A  Yes, they kept me informed of what they

10    were doing.

11      Q  Okay.  All right.  The next document.

12          (Exhibit 3 was marked for identification

13    and is attached to the transcript.)

14      Q  Now, this one has been previously marked

15    and ECP 00782 and 783.  Do you see that up in the

16    upper left-hand corner of the document?  Do you

17    see that?

18      A  Oh, yeah, I'm sorry.

19      Q  Have you seen this document before?

20      A  Yes.

21      Q  Was this the agreement that you testified

22    to earlier between yourself and -- or Emerson
```

Transcript of James Leavitt
Conducted on October 8, 2021                           89

```
 1      Q  And when did you send the investigators to

 2  inspect her shop to see if there were third-party

 3  sales of pottery?

 4      A  I think it was '17, '18.

 5      Q  So it was after this time?

 6      A  Yes, yes.

 7      Q  You didn't act on anything other than

 8  inquiring --

 9      A  Yeah.

10      MR. LAUBSCHER:  All right.  I don't think

11  I have any more questions, but if we could just

12  take a quick break, I want to touch base with Ken

13  just to make sure that I haven't overlooked

14  something that he might have wanted me to address.

15      (A recess was taken from 12:01 p.m. to

16  12:10 p.m.)

17      MR. LAUBSCHER:  I don't have any further

18  questions.

19      MR. WILLETT:  No questions.  He will read.

20      THE STENOGRAPHER:  I just need to ask you

21  on the record if you want this transcribed.

22      MR. LAUBSCHER:  Please.
```