**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**LYNCHBURG DIVISION**

| | | |
|---|---|---|
| EMERSON CREEK POTTERY INC. | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 6:20-CV-0054-NKM |
| | ) | |
| v. | ) | |
| | ) | |
| COUNTRYVIEW POTTERY CO., | ) | |
| EMERSON CREEK EVENTS, INC., | ) | |
| CHRISTINA DEMIDUK, and | ) | |
| DAVID DEMIDUK | ) | |
| | ) | |
| Defendants. | ) | |

**<u>DEFENDANTS MEMORANDUM IN OPPOSITION TO</u>**
**<u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

STATEMENT OF DISPUTED FACTS ....................................................................................... 1

ARGUMENT ............................................................................................................................... 3

    I.    Despite Plaintiff's allegations, a license never existed between the parties. ................... 3

        A.    Plaintiff did not grant Defendants permission to use its mark; Rather, Defendants used various EMERSON CREEK marks with various services as it wished and Plaintiff did not object. .............. 5

        B.    Plaintiff did not supervise and exercise control over Defendants' use of its mark ..................... 8

    II.    Plaintiff acquiesced to Defendants' use of EMERSON CREEK for 17 years, and thus Defendants' use of their EMERSON CREEK marks does not infringe any rights of Plaintiff. ............. 10

        A.    For 17 years, Plaintiff's actions implied that it accepted Defendants' use of their EMERSON CREEK marks and that it would not assert any trademark rights against Defendants. .................... 10

    III.    Had a license existed between the parties, Defendants would not be precluded from challenging Plaintiff's trademark rights due to Plaintiff's "naked licensing" of its mark. .................... 11

    IV.    Had a license existed between the parties, Defendants' sale of third-party pottery does not amount to breach of such a license. ....................................................................................... 13

    V.    Defendants' past use of EMERSON CREEK with pottery is not likely to cause confusion with Plaintiff's trademark rights ...................................................................................... 13

    VI.    Defendants' use of EMERSON CREEK with its restaurant and events services is not likely to cause confusion with Plaintiff's trademark rights ......................................................... 15

        A.    Other than demonstrating long-term use, Plaintiff has not provided evidence related to consumer perception of its mark. ........................................................................................ 15

        B.    Though both Plaintiff's and Defendants' marks include EMERSON CREEK, Plaintiff's inclusion of "POTTERY" is significant considering Plaintiff has almost exclusively sold pottery for more than 40 years. ........................................................................................................ 16

        C.    Defendants' restaurant and events services are not sufficiently related to Plaintiff's pottery goods. ........................................................................................................................ 17

        D.    Plaintiff's and Defendants' facilities and advertising are not similar. ....................... 18

        E.    Defendants used EMERSON CREEK in good faith in 2001 and continue to use it in good faith today. ............................................................................................................................ 18

        F.    Plaintiff's noted instances of mistaken identity do not amount to consumer confusion. .......... 20

CONCLUSION ........................................................................................................................... 22

# TABLE OF AUTHORITIES

## Cases

*American Ass'n for Advancement of Science v. Hearst Corp.*, 498 F. Supp. 244, (D.D.C. 1980) ..............................23

*Application of National Distillers & Chemical Corp.,* 49 C.C.P.A. 854, 297 F.2d 941, 947, 132 U.S.P.Q. 271 (1962) ................................................................................................................................................................................21

*Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358 (2d Cir. 1959) ........................................................11, 14

*Department of Parks and Recreation for State of California v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 78 U.S.P.Q.2d 1887 (9th Cir. 2006)..........................................................................................................................................11

*Duluth News-Tribune v. Mesabi Publ. Co.*, 84 F.3d 1093 (8th Cir. 1996) .................................................................23

*E. Remy Martin & Co., S.A. v. Shaw-Ross Intern. Imports, Inc.*, 756 F.2d 1525, 1530 (11th Cir. 1985) ...................19

*Heaton Distributing Co. V. Union Tank Car Co.*, 387 F.2d 477 (8th Cir. 1967) ........................................................11

*In re Viterra Inc.*, 671 F.3d 1358, 1362 (Fed. Cir. 2012) ..........................................................................................21

*Liberto V. D.F. Stauffer Biscuit Co., Inc.*, 441 F.3d 318 (5th Cir. 2006); *Ritchie v. Williams*, 395 F.3d 283 (6th Cir. 2005) ................................................................................................................................................................................11

*Philip Morris, Inc. v. Imperial Tobacco Co.*, 251 F. Supp. 362 (E.D. Va. 1965)........................................................11

*ProFitness Physical Therapy Center v. Pro-Fit Orthopedic and Sports Physical Therapy P.C.*, 314 F.3d 62, 67 (2d Cir. 2002)................................................................................................................................................................................12

ProFitness Physical Therapy Center v. Pro-Fit Orthopedic and Sports Physical Therapy P.C., 314 F.3d 62, 67, 65 U.S.P.Q.2d 1195 (2d Cir. 2002)...............................................................................................................................12

*Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190 (9th Cir. 2012) .........................................................19, 22

*RXD Media, LLC v. IP Application Dev. LLC,* 986 F.3d 361, 368 (4th Cir. 2021) .....................................................22

*Sheila's Shine Prod., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114 (5th Cir. 1973)...........................................................14

*Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 108 (4th Cir. 1991).....................................................11

*Streamline Production Systems, Inc. v. Streamline Manufacturing, Inc.*, 851 F.3d 440 (5th Cir. 2017)....................23

*Sullivan v. CBS Corp.*, 385 F.3d 772 (7th Cir. 2004) ................................................................................................19

*SunAmerica Corp. v. Sun Life Assur. Co. of Canada*, 77 F.3d 1325 (11th Cir. 1996)................................................12

*Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 160-161 (4th Cir. 2014) ........................................................20

*Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, (6th Cir. 2002) ....................................................................23

*United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134 (3rd Cir.1981)..............................................................6

*What-A-Burger Of Virginia, Inc. v. Whataburger, Inc. Of Corpus Christi, Texas*, 357 F.3d 441, 452 (4th Cir. 2004) ................................................................................................................................................................................12

## INTRODUCTION

Defendants Countryview Pottery Co., Emerson Creek Events Inc., Christina Demiduk, and David Demiduk, through counsel, oppose Plaintiff Emerson Creek Pottery, Inc.'s Motion for Summary Judgment. For the reasons set forth below, Defendants respectfully request the Court deny Plaintiff's motion in its entirety.

## STATEMENT OF DISPUTED FACTS

Plaintiff's "Statement of Undisputed Material Facts" includes both facts and arguments veiled as facts. Though Defendants do not dispute the existence of facts and assertions in Plaintiff's exhibits, Defendants dispute Plaintiff's mischaracterization as to what those facts and assertions mean. The documents speak for themselves. Set forth below are specific instances in which Defendants dispute Plaintiff's mischaracterizations of the facts.

Paragraph 2. Defendants do not dispute that Plaintiff has spent 40 years selling pottery under the EMERSON CREEK POTTERY mark, and do not dispute the contents of its "about us" an "history" webpages. Defendants dispute that such use amounts to nationwide recognition and substantial goodwill.

Paragraph 11.  Defendants do not dispute that a meeting took place, that Mr. Wehrli purchased pottery, or that Defendants' business plan in 2001 was to sell Plaintiff's pottery. Defendants dispute that Mr. Leavitt agreed to the use of EMERSON CREEK POTTERY for a store in Oswego, IL. Mr. Leavitt stated, "the idea was it would be another Emerson Creek Pottery outlet." Mr. Leavitt did not comment directly on use of the name. (Plaintiff's Ex. 1, Leavitt Dep. at 19:15-20).

Paragraph 12. Defendants do not dispute that the referenced document exists, and it includes the date: 3/23/01. There is no documentary evidence to support when the document was prepared. The document does not reference Defendants; it only purports to be an Agreement with

Ron Wehrli who is not a party to this litigation. It does not require Ron Wehrli to sell only Emerson Creek Pottery. Rather it states that the store would be "stocked with a minimum of 75% E.C.P. products." (Plaintiff's Ex. 19a, ECP 00782). Lastly, Mr. Leavitt does not even recall whether he sent this document to Defendants. (Plaintiff's Ex. 1, at 12-13).

Paragraph 46. Defendants do not dispute that Plaintiff hired a private investigator and that Defendant Countryview was selling third-party pottery. Defendant disputes Plaintiff's averments as to the quality of the pottery and the effect that pottery had on Plaintiff's reputation.

Paragraph 52. Defendants do not dispute the existence of their Facebook page, posted content on the page, or that third-parties have mistakenly posted on Plaintiff's Facebook page when they may have intended to post on Defendants' Facebook page. Defendants dispute Plaintiff's contention that this fact demonstrates consumer confusion.

Paragraph 53. Defendants do not dispute the existence of their Yelp and Trip Advisor pages. Defendants dispute Plaintiff's assertion that the pages demonstrate an inextricable relationship with and likelihood of confusion between the parties, and that the pages harm Plaintiff's brand.

Paragraph 55. Defendants do not dispute that both parties have received emails from third-parties attempting to contact the other party. Defendants dispute that this is evidence of confusion.

Paragraph 60. Defendants dispute that "anyone" searching the noted terms would be directed to Defendants' website. The cited portion of Plaintiff's exhibit states that searching the terms would "assist" someone in getting to Defendants' website. (Plaintiff's Ex. 66, Domanus Dep. at 73:17-75:7).

# ARGUMENT

Plaintiff has not presented evidence demonstrating that a trademark licensing agreement ever existed with any of the Defendants. The lack of a licensing agreement, written, oral, or otherwise, in combination with Plaintiff's knowing consent of Defendants' use of EMERSON CREEK POTTERY and EMERSON CREEK POTTERY AND TEA ROOM with its shop, restaurant and events services for 17 years[1] demonstrates Plaintiff's acquiescence to such use. Plaintiff cannot now, after Defendants have spent 17 years developing and expanding their businesses under the EMERSON CREEK mark, demand that Defendants stop using EMERSON CREEK in connection with its services.

Despite Plaintiff's acquiescence, Defendants have moved on from pottery sales and closed their retail shop. To be clear, the only services provided by Defendants are its restaurant and events services. These services are provided under the EMERSON, EMERSON CREEK and EMERSON CREEK EVENTS marks and promoted via Defendants' website at www.emersoncreek.com. There is no likelihood of confusion between Defendants' use of its EMERSON CREEK marks for its restaurant and events services in Oswego, Illinois and Plaintiff's use of EMERSON CREEK POTTERY for pottery in Bedford, Virginia.

## I. *Despite Plaintiff's allegations, a license never existed between the parties.*

Plaintiff contends that it entered into a trademark license agreement with Defendants. Plaintiff's support for this license is a document prepared by Plaintiff entitled "Agreement Between Ron Wehrli and Emerson Creek Pottery" and testimony from James Leavitt, owner of Emerson Creek Pottery, that Plaintiff and Defendants agreed to the terms outlined in that document. (Plaintiff's Ex. 19a, ECP 00782; Plaintiff's Ex. 1, Leavitt Dep., at 29:3-6). In footnote

---

[1] The marks were first used with Defendants' shop in 2001 and then with their restaurant and events services as the businesses expanded.

6 on page 21 of Plaintiff's brief, Plaintiff contends that the document is a written licensing agreement between the parties. Wishing does not make it so.

Note what is missing from the alleged Agreement: 1) It is not identified as a license; 2) Defendants are not parties thereto; 3) The agreement is not signed; 4) There is no identification of a licensed mark other than a reference to a DBA of Emerson Creek Pottery Outlet Store; 5) There is no identification of licensed goods and services; 6) There are no conditions of use; 7) There is no identification of royalties, nor any requirements for record-keeping or audits in connection therewith; 8) There is no term; 9) There are no termination provisions; and, most importantly 10) *There are no quality control provisions established by the licensor over the goods or services to be provided by the alleged licensee nor any restrictions or guidelines for the manner of use of the unidentified mark or marks.*

Note also that the "Agreement" does not prohibit the sale of products other than Emerson Creek Pottery Products. Nor is there any evidence of record to indicate that the Agreement was actually ever presented to anyone.

Plaintiff's contention that the "Agreement" constitutes a valid license between the parties is not supported by the facts.

As a fallback, Plaintiff contends that, if this document is not considered to be a valid written agreement between the parties, the document and the subsequent course of dealing between the parties demonstrates that a licensing agreement existed.[2] Again, wishing doesn't make it so.

---

[2] Plaintiff apparently does not contend that there was an oral license or implied license between the parties. In Plaintiff's summary judgment brief, it notes in paragraph 12 of its Statement of Undisputed Material Facts that Ms. Demiduk and Mr. Wehrli agreed to all points in the alleged written agreement between the parties, and notes in its Arguments section on page 21 that trademark licenses can be oral, but then proceeds to cite caselaw related to implied licenses. (Plaintiff's Summary Judgment Brief, p. 21). Due to the numerous citations related to implied licenses, and Plaintiff's arguments that follow, it appears as if Plaintiff contends that there was an implied license, rather than an oral license, and thus the licensing portion of this response brief relates to implied licenses.

As Plaintiff notes in its brief, for an implied license to be found, Plaintiff must have granted Defendants permission to use its mark and Plaintiff must have exercised reasonable control over Defendants use of the mark. *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134 (3rd Cir.1981).

    A.  *Plaintiff did not grant Defendants permission to use its mark; Rather, Defendants used various EMERSON CREEK marks with various services as it wished and Plaintiff did not object.*

Throughout the business relationship between the parties, Defendants used EMERSON CREEK in different forms to identify its shop, restaurant, and events services. (Plaintiff's Statement of Undisputed Material Facts ¶¶ 13, 18, 35, 52, 57). Defendants informed Plaintiff of such use. (Plaintiff's Statement of Undisputed Material Facts ¶ 18). This use was not *granted* by Plaintiff in response to a request from Defendants, and Plaintiff has not presented any documentary evidence of an actual grant of permission or evidence to demonstrate such a grant. The only evidence presented by Plaintiff that could be considered a grant is the aforementioned "Agreement Between Ron Wehrli and Emerson Creek Pottery". Plaintiff has not presented any evidence that any Defendant to this action ever received that document. The only documentary evidence presented by Plaintiff demonstrates that Defendants informed Plaintiff of their use of EMERSON CREEK and Plaintiff raised no objections.

In fact, Ms. Demiduk testified that during her initial meeting with Mr. Leavitt, she only wanted to purchase pottery from him as her supplier:

> He would be our supplier. I mean, we just wanted to buy pottery. We didn't want any restrictions. We wanted to close and open. So we were closed - - we wanted to close January, February, March, April, May - - open in May. Jim said, "I don't care what you do there." He didn't care what we did, just buy the pottery. So he was just a supplier to me.

> Exhibit. 1. C. Demiduk depo. Transcript, p. 44.

Moreover, Ms. Demiduk testified that Mr. Leavitt didn't care what she did:

Q.   [By Mr. Willett] And so through the course of either that first meeting or other conversations, I mean, you felt Jim [Leavitt] had a pretty good appreciation of the fact that you were a salesperson. You had the experience at Nordstroms. You know how to merchandise.

A.   I mean, our meeting was probably an hour. I don't know. I don't think he really cared. I think what Jim cared about is getting rid of a lot of inventory that he had, us writing the check. He didn't really care. He said, "I don't care what you do there."

Like, I would invite him up just to see what was going on. I was so proud of what we made at Emerson, and he didn't care. He said, "Oh, I'm not getting on a plane. I'm not driving there, no."

Q.   So just so I'm clear on this, it wasn't that he ever said, "Oh, I don't care what you're doing," it was that he didn't - - from your view, he didn't - - because he didn't come and visit or didn't go into the shop?

A.   He literally said to me at that first day at the meeting, because we were going to buy a Krispy Kreme Doughnut franchise when Krispy Kreme was just going; but the problem is we didn't want someone telling us what we could and couldn't do because we wanted to travel, we wanted our own schedule, and we wanted - - we didn't want someone - - we didn't want a partnership. So we wanted to do what we wanted to do."

Exhibit. 2, C. Demiduk depo. Transcript, p. 57-58.

Moreover, Mr. Leavitt testified as well that he did not exercise control over

Defendant's business:

Q.   [by Mr. Laubscher] Did you control - - have any control over [Defendants] pricing of the products that they purchased from you, their pricing that they would pass along to customers?

A.   No.



Q.   Are you aware that Ms. Demiduk used other names for her shop beyond Emerson Creek Pottery?

[Mr. Willett]:  Object to form.

A.   It was called Country View Pottery, I think.

Q.   Okay.  Did she ever use the mark "Emerson Creek Pottery & Tearoom"?

A.   Yes.

6

Q.     Did you object to that?

A.     No.

Q.     Was Emerson Creek Pottery & Tearoom one of the marks that was
       included in the license agreement from 2000?

A.     It was not directly in that agreement, but it would have fallen under the
       general terms of Emerson Creek Pottery and the uses of it, I would say.

Q.     Did Ms. Demiduk ask you if she could expand her pottery shop into - -
       adding on a tearoom?

A.     She told me that she was planning to. She kept me up with her ideas and
       plans to do all of that; yes, I knew all about it.

Q.     And you agreed to that?

A.     I did.

Q.     Did - - were you aware that she also expanded into - - for the tearoom, into
       a restaurant?

A.     Yep.

Q.     Do you know when that was?

A.     I don't remember what year, no.

Q.     Did you object to her transitioning into a restaurant?

A.     Well, to me they were both the same, but no, it would fall under the same
       category, yeah.

Q.     Were you aware that Ms. Demiduk further expanded her business to
       include hosting weddings?

A.     Yes

Q.     Do you remember when that was?

A.     It might have been 2010, 2011.

Q.     And did you object to her use of - -

A.     I did not. She told me of her plans in some detail, yes.

Q.     Okay. Did you ever inspect the facility that Ms. Demiduk was using to
       provide both the restaurant and the wedding hosting services?

A.     No, I did not.

Q.     So between 2000 when you started your relationship with Ms. Demiduk
       and Mr. Wehrli, and 2017 when you terminated the license, how would

7

you characterize, up until - - up until you found that they were selling third-party pottery, how was the relationship between you and the defendants?

A.      I felt we had a good relationship.

Q.      Was there any time during that period that you told Ms. Demiduk that she couldn't do anything?

[Mr. Willett]:  Object to form.

A.      I don't recall.

Exhibit 3.  J. Leavitt depo. Transcript, p. 30-35.

### B.  *Plaintiff did not supervise and exercise control over Defendants' use of its mark.*

Plaintiff contends that it sufficiently exercised control over the goods and services offered by Defendants under EMERSON CREEK for two reasons: 1) Defendant provided information to Plaintiff regarding Defendants' growth and expansion of its businesses; and 2) Plaintiff manufactured the pottery it sold to Defendants. (Plaintiff's Summary Judgment Brief, pp. 23-25). Plaintiff's reliance on Defendants' information, though, is not sufficient under law, and Plaintiff's control (or lack thereof) over the goods it sold to Defendant does not speak to whether Plaintiff sufficiently controlled the quality of goods and services offered by Defendants through their shop.

According to Plaintiff's undisputed facts, Defendants used their EMERSON CREEK marks for 17 years before Plaintiff took any action to inspect the quality of the goods being sold by Defendants under the EMERSON CREEK mark. (Plaintiff's Statement of Undisputed Material Facts ¶ 46). For 17 years, Plaintiff did not know, on its own account, whether Defendants were selling goods and offering services that matched the quality of Plaintiff's goods. Despite this lack of oversight, Plaintiff contends that it has met its quality control requirement through unsolicited information provided by Defendants. Though Plaintiff might consider this form of oversight sufficient, the law states otherwise.

8

Federal circuits throughout the United States agree, though the level of quality control required for a trademark license will vary from case-to-case, the alleged licensor must actually exercise control. *See Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 108 (4th Cir. 1991).[3] Reliance on information provided by an alleged licensee is not sufficient to meet this requirement. *Philip Morris, Inc. v. Imperial Tobacco Co.*, 251 F. Supp. 362 (E.D. Va. 1965), supplemental op., 282 F. Supp. 931 (E.D. Va. 1967), aff'd, 401 F.2d 179 (4th Cir. 1968), cert. denied, 393 U.S. 1094 (1969).

Only when there is a "special relationship" between parties, will courts find sufficient quality control from Plaintiff's reliance on Defendants' actions. *See FreecycleSunnyvale v. Freecycle Network,* 626 F.3d 509, 519 (9th Cir. 2010). Such special relationships are found in instances when the parties are family members, the parties had previous dealings in which Plaintiff knew of Defendants' quality control, and where one party has legal control over another, such as with parent and subsidiary businesses.[4]

Plaintiff admits that it did not actively, on its own accord, inspect any of the goods offered by Defendants in their shop until 2017. And the relationship between Plaintiff and Defendants is not one of those "special relationships" that would allow Plaintiff to rely on Defendants' own quality control. Plaintiff and Defendants' relationship was actually fairly standard in the business world. Defendants ordered goods from Plaintiff, and Plaintiff

---

[3] *See also Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358 (2d Cir. 1959); *Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812 (3d Cir. 2006); *Liberto V. D.F. Stauffer Biscuit Co., Inc.*, 441 F.3d 318 (5th Cir. 2006); *Ritchie v. Williams*, 395 F.3d 283 (6th Cir. 2005); *Heaton Distributing Co. V. Union Tank Car Co.*, 387 F.2d 477 (8th Cir. 1967); *Department of Parks and Recreation for State of California v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 78 U.S.P.Q.2d 1887 (9th Cir. 2006).

[4] *See Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1017-1018 (9th Cir. 1985); *Beach Mart, Inc. v. L&L Wings, Inc.*, 2020 WL 5026742 (E.D. N.C. 2020). *Fabick, Inc. v. JFTCO, Inc.*, 2019 WL 1320298, *5 (W.D. Wis. 2019), aff'd, 944 F.3d 649 (7th Cir. 2019); *Hokto Kinoko Co. v. Concord Farms, Inc.*, 738 F.3d 1085, 1098 (9th Cir. 2013). *Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 824 (3d Cir. 2006).

manufactured and sold goods to Defendants for resale to the general public. Without adequate quality control by Plaintiff, no licensing agreement existed between the parties.

## II.   *Plaintiff acquiesced to Defendants' use of EMERSON CREEK for 17 years, and thus Defendants' use of their EMERSON CREEK marks does not infringe any rights of Plaintiff.*

A trademark owner acquiesces to another party's use of its mark when the owner knowingly allows the other party to use the mark without objection. *See What-A-Burger Of Virginia, Inc. v. Whataburger, Inc. Of Corpus Christi, Texas*, 357 F.3d 441, 452 (4th Cir. 2004)*; see also SunAmerica Corp. v. Sun Life Assur. Co. of Canada*, 77 F.3d 1325 (11th Cir. 1996). For acquiescence to be found, most courts have typically required that three elements be present: 1) the senior user actively represented that it would not assert a right or claim; 2) the delay between the representation and the assertion of the right or claim was not excusable; and 3) the delay caused the junior user undue prejudice. *See SunAmerica Corp 77 F.3d 1325.* The first two elements can be implied in a business relationship in which the senior user works directly with the junior user for an extended period of time without asserting rights over the mark, and in some instances even encouraging the junior user with its use of the mark. *Id.* Courts will find undue prejudice when a defendant reasonably relies on the senior user's actions. *ProFitness Physical Therapy Center v. Pro-Fit Orthopedic and Sports Physical Therapy P.C.*, 314 F.3d 62, 67 (2d Cir. 2002).

### A.   *For 17 years, Plaintiff's actions implied that it accepted Defendants' use of their EMERSON CREEK marks and that it would not assert any trademark rights against Defendants.*

Plaintiff knew Defendants were using EMERSON CREEK POTTERY and then different iterations of EMERSON CREEK throughout the business relationship between the parties. (Plaintiff's Statement of Undisputed Material Facts ¶ 18). Defendants updated Plaintiff

constantly. (Plaintiff's Statement of Undisputed Material Facts ¶ 18). Not until 2017, 17 years after Defendant first started using EMERSON CREEK, did Plaintiff inform Defendants that it did not wish for Defendants to use EMERSON CREEK with its goods and services. (Plaintiff's Statement of Undisputed Material Facts ¶ 47).

As a result of Plaintiff's inaction for 17 years, Defendants reasonably believed that there was no issue with their use of EMERSON CREEK in any manner. If Plaintiff in fact had an issue with such use, it should have raised its concerns when Defendants adopted and expanded their various EMERSON CREEK marks[5]. Because of Plaintiff's years of acquiescence and the time and money Defendants have put into building their brand under the EMERSON CREEK marks, Defendants now have substantial goodwill associated with its marks in connection with its restaurant and events services - - services *not* provided by Plaintiff - - and to stop using the marks would cause significant harm to Defendants.

Due to Plaintiff's years of acquiescence, and Defendants reasonable reliance on that acquiescence in building its businesses and brand, Plaintiff cannot now force Defendants to stop using EMERSON CREEK.

### III.    *Had a license existed between the parties, Defendants would not be precluded from challenging Plaintiff's trademark rights due to Plaintiff's "naked licensing" of its mark.*

Plaintiff contends that because there was a license between the parties, Defendant is estopped from challenging Plaintiff's rights in its mark and from bringing this action. As discussed above, there was no license between the parties. However, had there been a license, Defendants would not be estopped from challenging Plaintiff's rights.

---

[5] Defendants first used EMERSON CREEK POTTERY with its shop, then EMERSON CREEK POTTERY AND TEAROOM with its shop, tearoom and restaurant, and then EMERSON CREEK with its restaurant and events services.

Again, under a valid trademark licensing agreement, a trademark owner is required to exercise quality control over use of the trademark by the licensee. *See Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358 (2d Cir. 1959). Where a trademark license is found to exist, regardless of the terms of the licensing agreement, quality control is required. *Id.* If an agreement is found and quality control is not expressly stated, it will be implied, and must be exercised. *Id.* Where a licensor does not adequately exercise such control, the result is a naked license and loss of licensor's rights in its mark. *Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 824 (3d Cir. 2006).

As set forth above, Plaintiff did not exercise adequate quality control over Defendants' shop, restaurant and events services. Moreover, Defendants never used "Emerson Creek Pottery Outlet Store as required by the Agreement. Plaintiff did not even control the manner or form of use of the alleged licensed mark. As a result, Plaintiff's alleged licensing of its mark amounts to a naked license and Plaintiff's loss of rights in its EMERSON CREEK POTTERY mark.

Plaintiff cites cases related to licensee estoppel in which courts have found that a licensee cannot challenge a licensor's rights in its mark. This may be the general rule, but this rule does not always apply, and it does not apply here.

In instances where there is a longtime failure to exercise quality control over a licensee's use of a mark with goods or services, the licensor is then estopped from bringing action against the licensee. *See Sheila's Shine Prod., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114 (5th Cir. 1973). In the present case, Plaintiff waited 17 years before asserting its rights under its registered EMERSON CREEK POTTERY mark. This long failure to exercise control demonstrates that any agreement between the parties is a naked license. As a result, Plaintiff should now be estopped from bringing this action.

**IV.** *Had a license existed between the parties, Defendants' sale of third-party pottery does not amount to breach of such a license.*

Even assuming that a license existed between the parties, Defendants' sale of third-party pottery does not amount to a breach thereof because according to the terms of the alleged agreement between Plaintiff and Defendants, third-party pottery could be sold in the shop. (Plaintiff's Ex. 19a, ECP 00782 and as set forth above).

Plaintiff contends that the document entitled "Agreement Between Ron Wehrli and Emerson Creek Pottery" (Plaintiff's Ex. 19a, ECP 00782) contains the terms of the agreement between the parties. (Plaintiff's Statement of Undisputed Material Facts ¶ 12). That document states that Ron Wehrli's shop would be "stocked with a minimum of 75% [Plaintiff's] products." Plaintiff contends that the agreement requires 100% of pottery in the shop to be Plaintiff's pottery. (Plaintiff's Statement of Undisputed Material Facts ¶ 12). The agreement, however, does not support this position. Again, this "agreement" was never signed and there is no documentary evidence that it was ever agreed to. But if Plaintiff is going to rely on it as the basis for a "written agreement" (Plaintiff's Arguments p. 21 footnote 6), then it must abide by the terms as they are actually stated. This "agreement" did not require 100% of the pottery to be Plaintiff's pottery. Thus, Defendants' miniscule sales of third-party pottery from its shop were not a breach of the alleged agreement.

**V.** *Defendants' past use of EMERSON CREEK with pottery is not likely to cause confusion with Plaintiff's trademark rights*

As Plaintiff notes in its brief, to prove trademark infringement, Plaintiff must show that it has a valid and protectable mark and that Defendants' unauthorized use of its marks creates a likelihood of consumer confusion. Plaintiff cites nine factors that are often relied on by courts in the Fourth Circuit in assessing a likelihood of confusion.

As discussed above, whether through acquiescence or naked licensing, Plaintiff does not have enforceable rights against Defendants. Regardless of whether Plaintiff has lost all rights in its mark, rights in its geographical territory, or the right to bring this action against Defendants, the result is that this action cannot be maintained and must be dismissed in favor of Defendants.

Considering for the sake of argument that Plaintiff has the right to bring this action against Defendants (i.e. it has valid, enforceable trademark rights in EMERSON CREEK POTTERY), Defendants' past use of EMERSON CREEK with pottery sales did not create a likelihood of confusion with Plaintiff's mark.

Until 2018 when Plaintiff demanded that Defendants stop using EMERSON CREEK to sell pottery, Plaintiff had no objection to Defendants' use of that mark and its many variations. Whether through acquiescence or license, Defendants had the right to use their EMERSON CREEK marks. Even through 2017, Plaintiff explicitly stated to Defendants that the use of EMERSON CREEK POTTERY AND TEAROOM was acceptable.

As early as 2014, Plaintiff realized that Defendants' purchases of Plaintiff's pottery was in decline. As Defendants' events business became more profitable, its retail shop diminished in importance.  Then, in January of 2018, Plaintiff demanded that Defendants stop using the mark. Defendants ultimately closed the retail shop and focused on its restaurant and events sales. As such, Defendants began taking steps to dissociate itself with pottery. This included removing pottery from its name, selling off the pottery it had in stock, removing prominent images of pottery from its advertising, and redirecting its previous website (which included "pottery") to its new website. Understandably, because Defendants had sold pottery for 17 years, winding down this portion of its business has taken time. Moreover, because many people in the Oswego, Illinois had purchased Plaintiff's pottery from Defendants, Defendants periodically received

inquiries from prior customers regarding replacing pieces of broken pottery. In those instances, Defendants have directed the inquiries to Plaintiff and its website.

Defendants are no longer selling pottery and continue to take steps to separate themselves from their 17 years of pottery sales. In light of these reasonable steps, Defendants have not and are not currently infringing any rights Plaintiff has in EMERSON CREEK POTTERY.

**VI.** ***Defendants' use of EMERSON CREEK with its restaurant and events services is not likely to cause confusion with Plaintiff's trademark rights***

Again, until 2018, Plaintiff had no issue with Defendants' use of EMERSON CREEK with its restaurant and events services, despite knowledge of such use. Plaintiff now contends that any use of EMERSON CREEK by Defendants with any of its services is likely to cause confusion as to source or sponsorship of Defendants' services. Plaintiff's main argument is that, after years of selling Plaintiff's pottery and using Plaintiff's pottery in advertising and with its restaurant services, Defendants' have created an inextricable connection with Plaintiff. This connection, Plaintiff contends, creates confusion as to source or sponsorship of Defendants restaurant and events services, regardless of any relation of these services with Plaintiff's goods.

What Plaintiff has actually demonstrated, though, is that Defendants *previously* used Plaintiff's pottery with its restaurant services, and Defendants included Plaintiff's pottery in advertising. Such use by Defendants is not surprising considering the previous business relationship between the parties. Plaintiff has not presented any evidence demonstrating that this past use will or is causing consumers to be confused as to the source or sponsorship of Defendants' services. Nor is there any evidence of lost sales of Plaintiff's pottery or any other financial damage to Plaintiff as a result of Defendants' business.

  A.  *Other than demonstrating long-term use, Plaintiff has not provided evidence related to consumer perception of its mark.*

Plaintiff has used its EMERSON CREEK POTTERY mark with pottery since 1977. (Plaintiff's Statement of Undisputed Material Facts ¶ 1). It waited until 2015 to register that mark with the US Patent and Trademark Office. (Plaintiff's Statement of Undisputed Material Facts ¶ 4). Plaintiff contends that its mark has "nationwide recognition" which has resulted in "substantial goodwill". (Plaintiff's Statement of Undisputed Material Facts ¶ 3). Plaintiff, though, has not presented any evidence of actual consumer nationwide recognition or substantial goodwill. Plaintiff's evidence of national recognition and goodwill is limited to two instances: a national pottery magazine and a post on a website highlighting pottery websites. Plaintiff's three other instances of media recognition are local, based on Plaintiff being a Virginia business. In total, Plaintiff has presented only five instances of media recognition over its more than 40 years in business.

The only level of strength that can be determined based on the facts presented is that Plaintiff's EMERSON CREEK POTTERY mark is, in its entirety, inherently conceptually distinctive for pottery.[6] Any commercial strength the mark may or may not have is not supported by the facts or evidence presented by Plaintiff. Contrary to Plaintiff's contention, this factor does not weigh heavily in its favor.

> B. *Though both Plaintiff's and Defendants' marks include EMERSON CREEK, Plaintiff's inclusion of "POTTERY" is significant considering Plaintiff has almost exclusively sold pottery for more than 40 years.*

Plaintiff primarily sells pottery, which it does through its Bedford, Virginia shop, its website, and third-party retailers. (Plaintiff's Statement of Undisputed Material Facts ¶ 1, 6, 7). The use of "POTTERY" with its EMERSON CREEK POTTERY trademark notes the significance of pottery to its business. Though Plaintiff sells other related goods, pottery is its

---

[6] As Plaintiff has noted, it has disclaimed "pottery" as generic, but that does not remove it from the mark as a whole.

main area of business. (Plaintiff's Exhibit 1, pp. 8, 16-17). It has sold pottery for more than 40 years and has emphasized this by choosing to register EMERSON CREEK POTTERY - - notably not EMERSON CREEK - - in 2015. (Plaintiff's Statement of Undisputed Material Facts ¶ 4).

Defendants, on the other hand, do not sell pottery and do not include "pottery" with any of their EMERSON CREEK trademarks. Considering the differences between Plaintiff's goods and Defendants' services, as will be discussed below, the inclusion of "POTTERY" in Plaintiff's registered trademark is important when distinguishing Plaintiff's and Defendants' marks. There are undoubtedly similarities between the EMERSON CREEK portions of the marks, but, despite Plaintiff's assertions, the parties are not using the *same* marks.

### C. Defendants' restaurant and events services are not sufficiently related to Plaintiff's pottery goods.

Plaintiff argues that, regardless of objective relatedness of the goods and services, because Defendants previously used Plaintiff's pottery in advertising and with its restaurant services, amounting to "cross-marketing", there is an association between Plaintiff's pottery and Defendants' restaurant and events services, and thus they are related. This, though, is not a proper analysis to determine whether goods and services are related. *See Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190 (9th Cir. 2012); *E. Remy Martin & Co., S.A. v. Shaw-Ross Intern. Imports, Inc.*, 756 F.2d 1525, 1530 (11th Cir. 1985); *Sullivan v. CBS Corp.*, 385 F.3d 772 (7th Cir. 2004).

A proper relation analysis includes a determination of whether the goods and/or services would be considered related to consumers on their own merit. *See Rearden* 683 F.3d 1190. Unrelated goods and services do no become related simply because Defendants sell goods and offer services under the same or similar mark. *Id*. Evidence in support of relatedness often

17

includes third parties that offer the same goods and services, demonstrating that the goods and services travel in the same trade channels, or demonstrating that consumers perceive the goods and services as related. Plaintiff has offered no such evidence. Plaintiff's cross-marketing argument does not affect the relatedness of the goods and services.

> D. *Plaintiff's and Defendants' facilities and advertising are not similar.*

Plaintiff contends that because both parties advertise on their respective websites, and are on third-party websites such as Yelp, that advertising and facilities are similar. If this were sufficient to show similarity with these factors, then nearly every modern business would have similar facilities and advertising, rendering these factors meaningless.

The actual inquiry for these factors regards the design of facilities and advertising materials for each business, as well as channels of advertising. *See Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 160-161 (4th Cir. 2014). Plaintiff has not offered evidence to demonstrate that there are any similarities between Plaintiff's and Defendants' facilities or advertising. In fact, Plaintiff's and Defendants' advertising is not similar. This factor weighs against a likelihood of confusion.

> E. *Defendants used EMERSON CREEK in good faith in 2001 and continue to use it in good faith today.*

Plaintiff contends that Defendants' actions following its cease and desist letter of January 5, 2018 demonstrates Defendants' intent to cause consumer confusion. Those actions include Plaintiff's renewal of its website "ecreekpotteryandtearoom.com" and use of EMERSON CREEK with social media. Plaintiff also contends that it and the US Patent and Trademark Office ("USPTO") put Defendants on notice of their infringement, and thus any continued use of EMERSON CREEK amounts to an intent to confuse. Plaintiff, though, expressly told Defendants in March of 2017 that Plaintiff's trademark is EMERSON CREEK POTTERY and

that Defendants could use that mark so long as it was followed by "and Tea Room". (Plaintiff's Statement of Undisputed Material Facts ¶ 44). Setting aside Plaintiff's actual ability to control Defendants' use of EMERSON CREEK, Plaintiff confirmed that its mark was EMERSON CREEK POTTERY.  Thus, it was reasonable for Defendants to use other iterations of EMERSON CREEK that were not identical to EMERSON CREEK POTTERY. This does not amount to an intent to confuse.

Moreover, the USPTO's refusal to register Defendants' mark does not put Defendants on notice that its marks infringe Plaintiff's mark. First, a refusal from the USPTO does not equate to an infringement. The USPTO's *ex parte* examination is narrowly related to registration based on the existence, or lack thereof, of similar trademark records, and is not determinative as to the right to use a mark. *See In re Viterra Inc.*, 671 F.3d 1358, 1362 (Fed. Cir. 2012). Factors considered for an infringement analysis are often not relevant during the *ex parte* examination process. *See Application of National Distillers & Chemical Corp.,* 49 C.C.P.A. 854, 297 F.2d 941, 947, 132 U.S.P.Q. 271 (1962). Second, Defendants Countryview Pottery Co. and Emerson Creek Events, Inc. expressly abandoned their application because they no longer planned to use the EMERSON CREEK POTTERY & TEAROOM mark. As discussed above, Defendants were moving away from pottery and were no longer referring to their restaurant as a tearoom.[7]

Defendants have used EMERSON CREEK with Plaintiff's knowledge since 2001. When Plaintiff demanded in January 2018 that Defendants cease from using EMERSON CREEK, Defendants believed in good faith that they had the right to continue to use EMERSON CREEK based on Plaintiff's long-term acquiescence. Despite this belief and because of the exponential growth of its events business, Defendants took steps to stop selling and advertising pottery. It

---

[7] Had Defendants continued with the application, they believe they would have overcome the rejection, whether during examination or through an appeal with the Trademark Trial and Appeal Board.

renewed its ecreekpotteryandtearoom.com website, not to create confusion, but to redirect its restaurant and events customers to its new emersoncreek.com website. (And in fact, Defendants first attempted to purchase emersoncreekevents.com to use as its new domain name, but Plaintiff had already purchased that domain registration despite never having provided events services.) This does not demonstrate an intent to confuse or a recognition that confusion is inevitable. It is a recognition that consumers might have difficulty locating Defendants through their new website. Businesses often use this same redirect method when moving to a new web address.

Lastly, Plaintiff contends that cases in which an intent to confuse were found are analogous to this case. Specifically, Plaintiff cites *RXD Media, LLC v. IP Application Dev. LLC,* 986 F.3d 361, 368 (4th Cir. 2021) for "facts that are exactly analogous here." This is not the case. In *RXD Media*, one business began using a trademark though it knew of similar trademarks being used by another business. *Id.* The infringer even amended its website to mimic the trademark owner's advertising. The two businesses in that case had no prior business relationship. *Id.* The Court determined that the infringer knew or should have known of the confusion it would create when it adopted and began using the mark, and its use of advertising that mimicked the trademark holder's advertising demonstrated bad faith. *Id* at 374.

The businesses in the case at bar had a 17-year relationship prior to Plaintiff bringing this action. During that time, Defendants used their marks with knowledge of and without issue from Plaintiff. This relationship is not at all analogous to that from *RXD Media*.

Again, Defendants have continually used their marks in good faith owing to Plaintiff's long-term acquiescence. Defendants have not and do not intend to confuse consumers.[8]

*F.  Plaintiff's noted instances of mistaken identity do not amount to consumer confusion.*

---

[8] As stated numerous times, Defendant has moved away from pottery, Plaintiff's primary product, in an attempt to remove any potential confusion with Plaintiff's pottery business.

Plaintiff contends the record is replete with repeated and continued consumer confusion. Plaintiff has submitted Exhibit 60 to support this contention. (Plaintiff's Statement of Undisputed Material Facts ¶ 55). This exhibit shows customer six emails to Defendants relating to the purchase of pottery and to which Defendants directed the customers to Plaintiff.[9] Regardless, of whether there are six emails, or more, these emails in addition to social media posts noted by Plaintiff do not equate to confusion under trademark law. *See Duluth News-Tribune v. Mesabi Publ. Co.*, 84 F.3d 1093 (8th Cir. 1996). At best, these communications demonstrate consumer mistake.

Confusion under trademark law requires there be an appreciable number of consumers that are likely to be confused into making a purchasing decision. *See Duluth News-Tribune* 84 F.3d 1093; *Streamline Production Systems, Inc. v. Streamline Manufacturing, Inc.*, 851 F.3d 440 (5th Cir. 2017); *American Ass'n for Advancement of Science v. Hearst Corp.*, 498 F. Supp. 244, (D.D.C. 1980). And when actual confusion is alleged, this confusion must be more than a mere misdirected communication. *See Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, (6th Cir. 2002). Consumers must be confused into making purchases, whether they are confused as to the source of goods or they are confused as to an association between businesses. *Id.*

Plaintiff has not produced evidence of such confusion. Tellingly, Plaintiff has not presented survey evidence of confusion. What Plaintiff has presented is evidence of a limited number of consumers who mistakenly comment on the social media of one business when they meant to comment on the social media of another business, or customers or vendors who sent emails to one business when they meant to send emails to another. This type of mistake does not equate to confusion into making a purchasing decision. *ThermoScan, Inc.* 295 F.3d 623. As the

---

[9] Paragraph 55 notes additional documents; however these documents are not included in Exhibit 60.

parties continue to operate in their own markets, with Defendants no longer selling or associating with pottery, these mistaken communications will decrease.

When considering each factor as discussed above, Defendants' use of EMERSON CREEK with its restaurant and events services in Oswego, Illinois is not likely to cause confusion with Plaintiff's EMERSON CREEK POTTERY trademark for pottery in Bedford, Virginia.

## **CONCLUSION**

Defendants first began using EMERSON CREEK with their retail shop in 2001 and have since expanded to restaurant and events services. In every instance in which Defendants have modified their use of EMERSON CREEK, they informed Plaintiff, not out of any requirement or responsibility imposed by Plaintiff but out of a sense of pride in their accomplishments. Defendant Christina Demiduk in particular was a marketing expert and wanted to share her joy in growing her business with Mr. Leavitt. Not until 2017 did Plaintiff raise any issue with such use. The facts not in issue demonstrate that there was no license agreement between the parties. Plaintiff was a supplier of goods that were sold to Defendants for resale via Defendants' shop. The buyer seller relationship existed for 17 years, during which time Defendants expanded their services and adopted different formulations of Plaintiff's registered EMERSON CREEK POTTERY mark, *all without objection from Plaintiff.*

Defendants are not infringing Plaintiff's EMERSON CREEK POTTERY trademark. Defendant is not competing unfairly with Plaintiff.  There is no breach of any contract between Plaintiff and Defendants. Plaintiff acquiesced to Defendants' conduct.

Accordingly, Defendants respectfully request that the Court deny Plaintiff's summary judgment motion in its entirety.

Respectfully submitted,


LAUBSCHER & LAUBSCHER, PC


__/leljr/_____
Lawrence E. Laubscher Jr.
VSB No. 18680
llaubscher@laubscherlaw.com
1160 Spa Road, Suite 2B
Annapolis, MD  21403
(410) 280-6608 (Tel)
(410) 280-6758 (Fax)

Law Offices of McLaughlin & Associates, P.C.

____/ksmjr/_____
Kenneth S. McLaughlin, Jr.
IARDC No. 6229828
1 E. Benton Street, Suite 301
Aurora, IL 60505
(630) 230-8434
(630) 230-8435 fax
kmclaughlin@ma-lawpc.com

*Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 3, 2022, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

_____/leljr/_____
Lawrence E. Laubscher, Jr.
Attorney for Defendants