CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
2/11/2022
JULIA C. DUDLEY, CLERK
BY: s/ A. Little
       DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| EMERSON CREEK POTTERY, INC., *Plaintiff*, v. EMERSON CREEK EVENTS, INC., et al. *Defendants*. | Case No. 6:20-cv-54 <br><br> MEMORANDUM OPINION <br><br> Judge Norman K. Moon |

## I. INTRODUCTION

This matter comes before the Court on the parties' cross-motions for summary judgment. (Dkt. 48, 50). The case is a trademark dispute between two companies: Emerson Creek Pottery (Plaintiff) and Emerson Creek Events (Defendant). Plaintiff also names the owners of Emerson Creek Events, Christina Demiduk and David Demiduk, as Defendants. Plaintiff's complaint requests relief for trademark infringement under the Lanham Act, unfair competition and false designation of origin under the Lanham Act, common law trademark infringement and unfair competition, and common law breach of Contract. (Dkt. 1 (Complaint) at ¶¶ 37–71).

The parties have both moved for summary judgment. Plaintiff argues that it is entitled to summary judgment on each of its claims on the theory that the parties had a licensing agreement, that Plaintiff terminated the license, that Defendants nonetheless continued to use the mark, and that Defendants are thus holdover licensees—and that no reasonable jury could determine otherwise. (Dkt. 50, 52). Defendants also move for summary judgment on all of Plaintiff's claims on the theory that there was never any formal licensing agreement between the parties, and that Plaintiff's permission for Defendants to use the name "Emerson Creek" was a "naked

license" that prevents Plaintiff from enforcing the trademark against Defendants. (Dkt. 48, 49).

For the reasons discussed below, the Court holds that there are genuine disputes of material fact with respect to all of the issues raised in the pleadings and will deny both parties' motions for summary judgment.

## II.  FACTUAL BACKGROUND

Plaintiff, Emerson Creek Pottery, operates a pottery manufacturing facility and a retail outlet in Bedford County, VA. (Ex. 1 to Dkt. 49 at 8). Jim Leavitt is presently the sole owner of Emerson Creek Pottery. (*Id.* at 10). The company has been in operation since 1977. (*Id.* at 8).

In 2001, Defendant Christina Demiduk and her then-boyfriend, Ronald Wehrli, visited Emerson Creek Pottery's store in Bedford. (Ex. 16 to Dkt. 52 at 34–38). There, they met with Leavitt and asked him whether he would be interested in them selling his pottery at a store they planned to open in Oswego, Illinois. (Ex. 1 to Dkt. 52 at 18–20; Ex. 16 to Dkt. 52 at 27–29). Leavitt agreed that they could sell his pottery and sold them tens of thousands of dollars of his pottery at a wholesale discount. (Ex. 2 to Dkt. 49 at 51, 52, 60). Plaintiff claims that at the time of the 2001 meeting, Leavitt, Demiduk, and Wehrli agreed that Leavitt would allow Demiduk and Wehrli to use the name "Emerson Creek Pottery" in accordance with a licensing agreement. Defendants claim that the parties never came to any such licensing agreement. (Dkt. 52 at 5–6; Ex. 1 to Dkt. 52 at 22–23; 53–55). After the meeting, Leavitt memorialized the terms of the agreement—at least as he understood them—in a document, but it is disputed whether he ever presented the document to Demiduk or Wehrli. (Ex. 19a to Dkt. 52 (the written document); Ex. 1 to Dkt. 52 at 53–54; Ex. 1 to Dkt. 49 at 28–29). Leavitt asserts that he did; Defendants contend that he did not. Cites.

In 2002, Christina Demiduk opened up the planned shop in Oswego, incorporated her

2

business in Illinois as "Countryview Pottery Co." and began operating under the name "Emerson Creek Pottery." (Ex. 16 to Dkt. 52 at 130–37). The shop sold the pottery that Demiduk and Wehrli had purchased from Leavitt, as well as other non-pottery items such as soap, candles, and towels. Demiduk continued to purchase pottery at a discounted rate from Leavitt. (*Id.* at 45–49).

Between 2002 and 2004, Demiduk continued to expand her business, and eventually opened a tearoom, where she sold food and drinks, and began operating both the shop and tearoom under the name "Emerson Creek Pottery and Tearoom." (Ex. 2 to Dkt. 49 at 195, 268). In the years thereafter, Demiduk continued to regularly buy pottery from and communicate with Leavitt. (Ex. 1 to Dkt. 49 at 32–33; Ex. 4 to Dkt. 49). Demiduk would regularly apprise Leavitt of her plans for the store, such as what she was selling and what her marketing plans were. (Ex. 1 to Dkt. 52 at 20–21). Leavitt claims that he would regularly approve of her activities. (Ex. 1 to Dkt. 52 at 32–33, 61–62, 74–75, 82–84). Leavitt also asserts that he never, in this period, objected to any of Demiduk's plans for the store or her use of the name "Emerson Creek Pottery." (*Id.*).

In the following years, Demiduk continued to expand her business. In 2009, she registered the domain name "ecreekpotteryandtearoom.com," and notified Leavitt of her plan to operate at that domain, and he did not object. (Ex. 3 to Dkt. 49). In 2010, she opened up a renovated barn on the same property as the store and tearoom in Oswego, which she used as a wedding and events venue. (Ex. 2 to Dkt. 49). She operated the event space under a new business name: Emerson Creek Events, Inc. (*Id.*).

At some point around 2010, Christina Demiduk married, and her husband, David, became involved with the management of her businesses. (Ex. 16 to Dkt. 52 at 171, 207; Ex. 35 to Dkt. 52 at 21–24).

In 2012, Leavitt became concerned that Google search results for "Emerson Creek" were returning results for both his and Demiduk's companies. (Ex. 3 to Dkt. 49). He asked her to add "& Tearoom" to all of her references to her company's name, to which she agreed. (*Id.*). There were no issues between the parties for the next few years until 2017, when Leavitt again asked Demiduk to add "& Tearoom" when using her company's name due to continued confusion over online search results. (Ex. 35 to Dkt. 52 at 117–119; Ex. 47 to Dkt. 52).

In July 2017, Defendants placed their last order with Plaintiff. (Dkt. 1 at 9; Dkt. 13 at 12). In September 2017, Plaintiff, increasingly suspicious, hired a private investigator to go to Defendants' store in Oswego. (Ex. 1 to Dkt. 52 at 36–37; Ex. 48 to Dkt. 52). There, the private investigator observed that Defendants were selling third-party pottery, which Plaintiff believed to be in violation of their agreement. (*Id.*). In 2018, Leavitt demanded that Defendants stop using the name "Emerson Creek" categorically. (Ex. 50 to Dkt. 52; Ex. 1 to Dkt. 52 at 85–86; Ex. 16 to Dkt. 52 at 370–71).

After Leavitt asked Defendants to stop referring to themselves as "Emerson Creek," Demiduk asked her website developer to remove references to Emerson Creek Pottery (that is, Leavitt's Virginia business) from her website and marketing materials but continued to use the name "Emerson Creek" in general. (Ex. 63, 64 to Dkt. 52; Ex. 65 to Dkt. 52 at 133). She asked her website developer to purchase the domain names "emersoncreekevents.com" and "EmersonCreek.com" to add to the domain she already possessed, "ecreekpotteryandtearoom.com." (Ex. 67 to Dkt. 52). Demiduk expressed that she wanted to purchase those domain names before Leavitt was able to do so. (Ex. 64 to Dkt. 52; Ex. 65 to Dkt. 52 at 133). The website developer successfully purchased the domains, and Demiduk began using the address "@emersoncreek.com" for her company email.

4

Plaintiff filed a trademark application with the U.S. Patent and Trademark Office for the standard character mark "Emerson Creek Pottery" in 2015, which was registered as U.S. Trademark Reg. No. 4,835,569 in October 2015. (Ex. 11 to Dkt. 52). In September 2017, Defendants filed a trademark application for "Emerson Creek Pottery & Tearoom," which the USPTO denied based on a likelihood of confusion. (Ex. 13, 14 to Dkt. 52).

### III. LEGAL STANDARD

Summary judgment is appropriate if the pleadings and evidence show that there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Though trademark cases often involve questions of both law and fact, this does not preclude them from being decided as a matter of law. *See Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 304 (4th Cir. 2017). With respect to each issue raised in the cross-motions, the Court must "view the evidence in the light most favorable to the nonmoving party" and "refrain from weighing the evidence or making credibility determinations." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). "Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

### IV. DISCUSSION

The parties move for summary judgment on several issues. Plaintiff moves for summary judgment on the existence of a licensing agreement (arguing that there is no dispute that there

was one), on the fact that Defendants are "holdover licensees," and on infringement (arguing that there is no dispute that Defendants infringed Plaintiff's mark). (Dkt. 50, 52). Plaintiff also moves for summary judgment on its breach of contract claim. (*Id.*)

In turn, Defendants also move for summary judgment on the existence of a licensing agreement and infringement (arguing that there is no material dispute that there *was not* a licensing agreement and that Defendants *did not* infringe Plaintiff's mark), and also moves for summary judgment on several related defenses: that Plaintiff extended a "naked license" and that Plaintiff acquiesced to Defendants' infringement. (Dkt. 48, 49).

### A. Existence of a Licensing Agreement

Plaintiff asserts two theories for the existence of a licensing agreement. First, Plaintiff asserts that there was an express licensing agreement created between Leavitt, Demiduk, and Wehrli during the 2001 meeting in Bedford. (Dkt. 52 at 21). Second, Plaintiff asserts that even if there was no express agreement, the parties' conduct created an implied license. (Dkt. 52 at 21–26). In turn, Defendants argue that there was never an enforceable licensing agreement between the parties, and that to the extent there was any licensing agreement, it was a "naked license" that prevents Plaintiff from asserting its rights in the mark. (Dkt. 49 at 8–16). Defendants also raise the equitable defense of acquiescence—that Plaintiff acquiesced to Defendants' use of "Emerson Creek" such that Plaintiff may not now assert its rights. (*Id.* at 8–13).

#### 1. Existence of an Express Agreement

"A trademark license is a contractual arrangement whereby a trademark owner permits another party to use its trademark under circumstances where, but for the license, the other party would be a trademark infringer." 2 Gilson on Trademarks § 6.01 (2021) at [2]; *see also Exxon Corp. v. Oxxford Clothes*, 109 F.3d 1070, 1076 (5th Cir. 1997) ("[N]ot all agreements

authorizing use of a protected mark may be categorized as 'licenses.' … [T]he essential inquiry is whether the right granted by the subject agreement permits an infringing use of the [mark]."). An express trademark licensing agreement can be written or oral. 2 Gilson on Trademarks § 6.02 (2021) at [1]–[2].

Here, Plaintiffs contend that the parties created an express licensing agreement at the beginning of their initial business relationship in 2001 (Dkt. 52 at 21), and Defendants contend that they did not. (Dkt. 49 at 8–9). Simply put, there is a clear dispute of fact about whether the parties created an express licensing agreement in 2001. Plaintiff asserts that the parties orally discussed the terms of the licensing agreement, and that Leavitt then reduced the terms of that agreement into a written document.[1] (Ex. 1 to Dkt. 52 at 19–20; Ex. 19a to Dkt. 52). Defendants, by contrast, attest that the only agreement was for Plaintiff to sell pottery to Defendants, not to license the name "Emerson Creek." (Dkt. 49 at 8–9; Dkt. 56 at 3–5). Each side has put forward *some* evidence that, if taken as true, would support their position with respect to the creation of an express licensing agreement. However, neither party has offered *undisputed* evidence of the existence or nonexistence of an express licensing agreement, written or oral.

A reasonable jury could find that the parties created an express license in 2001. A reasonable jury could also find that the parties never came to an express agreement. Therefore, the Court will not award summary judgment to either party on the existence (or lack thereof) of an express licensing agreement.

---

[1] The written agreement itself is insufficient to award Plaintiff summary judgment for at least two reasons. First, the written agreement is not conclusively a licensing agreement at all; by its terms, it appears to be a summary of the sales agreement between Leavitt, Demiduk, and Wehrli, which also places some restrictions on Defendants' use of the name "Emerson Creek Pottery" by making it contingent on Defendants stocking their store with a certain percentage of Plaintiff's pottery. (*See* Ex. 19a to Dkt. 52). Second, and especially notably, the parties' evidence gives rise to a genuine dispute of material fact whether Leavitt ever showed the document to Demiduk or Wehrli, and it is also disputed whether the terms in the written document accurately reflect the terms of the parties' prior oral agreement. (*See id.*; Ex. 1 to Dkt. 52 at 12–13; Dkt. 56 at 3–5).

## 2. Existence of a License Created by the Parties' Conduct

Even if the parties did not form an express licensing agreement, they may still have formed an implied licensing agreement. *See* 2 Gilson on Trademarks § 6.02 (2021) at [3]; *Software Consultants, Inc. v. Rachakonda*, No. 1:15-cv-1145, 2016 WL 234845 at *4 (E.D. Va. Jan. 19, 2016). An implied licensing agreement "arises out of the objective conduct of the parties, which a reasonable man would regard as indicating that an agreement has been reached." *Allen–Myland v. Int'l Bus. Mach. Corp.*, 746 F. Supp. 520, 549 (E.D. Pa. 1990); *see also Diamonds Direct USA, Inc. v. BFJ Holdings, Inc.*, No. 3:12-cv-303, 2012 WL 2505282, at *3 (E.D. Va. June 28, 2012) ("[t]he existence of an implied trademark license is a factual issue which turns on the objective conduct of the parties."). There are two crucial considerations in determining whether an implied trademark license existed: (1) whether the alleged licensor granted the alleged licensee permission to use the mark, and (2) whether the alleged licensor exercised a reasonable degree of control over the alleged licensee's use of the mark. *United States Jaycees v. Philadelphia Jaycees,* 639 F.2d 134, 140 n.7 (3d Cir. 1981). Only the second consideration, the degree of control that Plaintiff exercised over Defendants' use of the mark, is in dispute here.

Plaintiff offers evidence that suggests Leavitt exercised control over Defendants' use of the name "Emerson Creek," or at least that he had the authority to do so. Plaintiff again notes the existence of Leavitt's written memorialization of his understanding of the terms of the 2001 agreement, which required Defendants to "keep the store stocked with a minimum of 75% [Plaintiff's] products in order to keep using [Plaintiff's] name on the store." (Ex. 19a to Dkt. 49). Plaintiff notes that Defendants regularly sent Plaintiff pictures of the Oswego store to show that Plaintiff followed that requirement. (Ex. 1 to Dkt. 52 at 20–21; Ex. 17 to Dkt. 52 at 33–35).

Plaintiff also notes that Defendants regularly apprised Plaintiff of Defendants' operations, sales figures, and visitor numbers, and that Plaintiff monitored Defendants' actions. (Ex. 1 to Dkt. 52 at 32–33, 61–62, 67, 74–75, 82–84).

In 2017, Plaintiff informed Defendants that "'Emerson Creek Pottery' is our trademarked name and you should only use it appropriately and with 'and Tea Room' when referring to your store" (Ex. 3 to Dkt. 49), but offers only one other example of Plaintiff exercising such direct control over Defendants' use of the mark between 2001 and 2017—a similar communication from Plaintiff to Defendants in 2012 asking that Defendants use "& Tearoom" in addition to "Emerson Creek Pottery." (*Id.*).

Plaintiff also notes that Plaintiff "was the sole entity designing and manufacturing its EMERSON CREEK marked pottery" and that Plaintiff was at all times "in direct control over the high quality of the ECP-marked pottery that Defendants sold in their shop[.]" (Dkt. 52 at 23). The Court does not credit this argument. Plaintiff's exclusive control over the quality of its pottery is not the same as its control over Defendants' general use of the name "Emerson Creek." Plaintiff's argument might be appropriate if Defendants were producing pottery using Plaintiff's mark and a trademark dispute arose, but that is not the issue here. The issue is Defendants' more general use of "Emerson Creek" to signify its shop, tearoom, and event space, much of which have little to do with the quality control Plaintiff exercised over its pottery. Nonetheless, the Court credits Plaintiff's arguments about the initial agreement between Leavitt, Demiduk, and Wehrli, as well as Plaintiff's arguments about Leavitt's ongoing involvement in overseeing Demiduk's business's expansion.

Defendants offer evidence that suggests that Plaintiff did not exercise a reasonable degree of control over Plaintiff's use of the mark. (Dkt. 49 at 10–13). Defendants acknowledge that

9

Defendants would regularly apprise Plaintiff of Defendants' business operations, but argue that this was largely one-way correspondence from Defendants to Plaintiff to keep Plaintiff generally aware of what was going on in the Oswego store, and was voluntary, not a part of a licensing agreement. (*Id.* (citing Ex. 1, 3 to Dkt. 49)). Defendants further claim that Plaintiff never objected to Defendants' repeated business expansions, which were consistently communicated to Plaintiff. (Dkt. 52 at 11). The Court also notes the significant time gap between the initiation of the parties' relationship (in 2001) and the first clear evidence of Plaintiff instructing Defendants not to refer to themselves solely as "Emerson Creek Pottery" (in 2012). (Ex. 3 to Dkt. 49).

The parties have offered disputed evidence on either side of the reasonable degree of control issue. Thus, there are disputes of material fact about whether there existed an implied license for Defendants to use the mark "Emerson Creek Pottery" and permutations thereof, and the Court cannot award either party summary judgment on the issue.

### 3. Whether Defendants are Holdover Licensees

Plaintiff claims that because (in its understanding) there was either an express or implied license for Defendants to use Plaintiff's mark, and because Plaintiff terminated Defendants' license, and Defendants nonetheless continued to use the mark, that Defendants are "holdover licensees." (Dkt. 52 at 20). Indeed, where a licensor grants a licensee a license to use a mark, and then the licensor revokes the license (or it otherwise terminates), and the prior licensee continue to use the mark, the prior licensee infringes the licensor's mark. *See, e.g.*, *Century 21 Real Estate LLC v. All Prof'l Realty, Inc.*, 600 F. App'x 502 (9th Cir. 2015) (unpublished) (affirming finding of infringement when terminated franchisees continued to use mark without consent); *Two Men & A Truck Int'l, Inc. v. Fernsler*, 1998 WL 898864 (6th Cir. 1998) (unpublished). But the Court cannot award Plaintiff summary judgment on this issue because the Court has not determined

that there was a licensing agreement between the parties, and the Court cannot hold that Defendants were "holdover licensees" if it has not determined that there was a licensing agreement in the first place.

Thus, whether Defendants are holdover licensees is an issue for the jury.

### 4. Existence of a "Naked License"

Defendants assert that Plaintiff granted a "naked license" for Defendants to use Plaintiff's mark. (Dkt. 49 at 14–16). "'Naked licensing' occurs when the licensor fails to exercise adequate quality control over the licensee." *Beach Mart Inc. v. L&L Wings Inc.*, 784 F. App'x 118, 127 (4th Cir. 2019) (quoting *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 515 (9th Cir. 2010)). Such uncontrolled licensing may cause the trademark to stop functioning "as a symbol of quality and a controlled source." *Id.* In such a case, the court may find that the trademark has been abandoned and that cancellation of the trademark's registration is appropriate. *Barcamerica Int'l USA Trust v. Tyfield Imps., Inc.*, 289 F.3d 589, 598 (9th Cir. 2002); Restatement (Third) of Unfair Competition § 33 (Am. Law Inst. 1995); *see* 15 U.S.C. § 1064(3) (abandonment of a registered mark is grounds for cancellation of registration); *id.* § 1119 (court may order the cancellation of trademark registrations).

However, as Plaintiff notes, in certain cases a party attempting to assert the naked license doctrine may be estopped from doing so. "[A] licensee is estopped to contest the validity of the licensor's title during the course of the licensing arrangement," *Beach Mart*, 784 F. App'x at 127 (quoting *Prof'l Golfers Ass'n of Am. v. Bankers Life & Cas. Co.*, 514 F.2d 665, 671 (5th Cir. 1975)), because a licensee may not "enjoy the use of the licensed mark while at the same time challenging the mark as being invalid," 3 McCarthy on Trademarks & Unfair Competition § 18.63 (5th ed. June 2019 update); *see also John C. Flood of Va., Inc. v. John C.*

11

*Flood, Inc.*, 642 F.3d 1105, 1110–11 (D.C. Cir. 2011); *Creative Gifts, Inc. v. UFO*, 235 F.3d 540, 548 (10th Cir. 2000).

  As a preliminary matter, the Court holds that Defendants are not estopped from asserting that Plaintiff engaged in naked licensing, because the Court cannot, as discussed above, determine as a matter of law that a licensing agreement existed between the parties, and the Court cannot hold that Defendants "contest the validity of the licensor's title during the course of the licensing agreement" if the Court cannot definitively hold that there was a licensing agreement at all. *See Beach Mart*, 784 F. App'x at 127. Indeed, as an equitable doctrine, the Court has wide latitude in applying the licensee estoppel defense to the naked licensing doctrine, and the Court will not do so here. *Id.*; *see also John C. Flood of Va., Inc.*, 642 F.3d at 1110–11 (collecting cases on licensee estoppel).

  Although Defendants are not estopped from asserting the naked licensing doctrine, the Court cannot award Defendants summary judgment on the issue for the same reasons as discussed above with respect to the amount of control that Plaintiff exercised over Defendants' use of the mark. In order to prevail on their naked license defense, Defendants must show that Plaintiff "failed to exercise adequate quality control" over the mark. *Beach Mart*, 784 F. App'x at 127. That is a similar inquiry to whether Plaintiff "exercised a reasonable degree of control" in the context of the implied license analysis, discussed above. The Court points to the same reasons discussed above, then, in holding that there are disputes of material fact regarding whether Plaintiff "failed to exercised adequate quality control" over the mark: there is evidence that Plaintiff exercised some degree of control over Defendants' use of the mark (such as the restrictions in Leavitt's 2001 written document or in Leavitt's 2012 and 2017 demands that Defendants use "& Tearoom" when referring to their company), but there is also evidence that

12

Plaintiff did not exercise such control (such as Defendants' argument that Defendants repeatedly apprised Plaintiff of Defendants' many business expansions under the name "Emerson Creek," and that Plaintiff never objected to them).

In sum, Defendants are not estopped from raising the issue of naked licensing, but the Court cannot award summary judgment on the issue—it is one for the jury to decide.

### 5. Trademark Acquiescence

Defendants also raise the equitable defense of trademark acquiescence. (Dkt. 49 at 8, 13–14). Trademark acquiescence occurs when the plaintiff implicitly or explicitly assures the defendant that the plaintiff will not assert its trademark rights. 2 Gilson on Trademarks § 13.12 (2021) at [3]. "An infringement action may be barred by the doctrine of estoppel by acquiescence where the owner of the trademark, by conveying to the defendant through affirmative word or deed, expressly or impliedly consents to the infringement." *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 462 (4th Cir. 1996) (citing *Sweetheart Plastics, Inc. v. Detroit Forming, Inc.*, 743 F.2d 1039, 1046 (4th Cir. 1984)). The doctrine is not rigidly applied; rather, even where the plaintiff may have assured the defendant that the plaintiff would not assert its trademark rights, the doctrine will not be applied "where the likelihood of confusion is apparent." *Id*.

Here, Defendants note that throughout the course of the parties' relationship, Defendants repeatedly informed Plaintiff of Defendants' continuously expanding use of the name "Emerson Creek," and that Plaintiff did not object. (Dkt. 49 at 14 (citing Ex. 13 to Dkt. 49)). Plaintiff responds that the even if Plaintiff acquiesced to Defendants use of "Emerson Creek," that the likelihood of confusion is too strong to apply the doctrine. (Dkt. 62 at 3).

There are genuine disputes of material fact regarding whether Plaintiff did in fact acquiesce to Defendants' use of the mark. The Court notes the above-discussed disputes of fact

13

about whether, when, and in what manner Leavitt controlled Defendants' use of the mark in the first few years of the parties' business relationship (Ex. 1 to Dkt. 49 at 32–33, Ex. 4 to Dkt. 49; Ex. 1 to Dkt. 52 at 20–21, 32–33, 61–62, 74–75, 82–84), and notes in particular that Leavitt demanded that Defendants qualify their company's name with "& Tearoom" for the first time in 2012 (Ex. 3 to Dkt. 49), and several times again from 2017 onwards (Ex. 35 to Dkt. 52 at 117–19; Ex. 47 to Dkt. 52).

Therefore, the Court will not award summary judgment on acquiescence.

### B. Infringement

Both parties also move for summary judgment on infringement.

To prove trademark infringement under 15 U.S.C. § 1114, a party must show both that (1) it owns a valid and protectable mark, and that (2) another's use of the mark creates a likelihood of consumer confusion. *See Variety Stores, Inc. v. Wal-Mart Stores Inc.*, 888 F.3d 651, 660 (4th Cir. 2018). Defendants do not contest that Plaintiff has a valid and protectable mark. (Dkt. 49 at 16). Thus, the sole issue the Court must decide here at the summary judgment stage is whether there is a genuine dispute of material fact with respect to the likelihood of confusion. Under Fourth Circuit law, the Court looks to nine factors in determining whether a likelihood of confusion exists:

> (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace;
> (2) the similarity of the two marks to consumers;
> (3) the similarity of the goods or services that the marks identify;
> (4) the similarity of the facilities used by the markholders;
> (5) the similarity of advertising used by the markholders;
> (6) the defendant's intent;
> (7) actual confusion;
> (8) the quality of the defendant's product; and
> (9) the sophistication of the consuming public.

*Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 314 (4th Cir. 2017).

Plaintiff relies heavily on first, second, sixth, and seventh factors. (*See* Dkt. 52 at 31–37). With respect to the strength of the senior user's mark, Plaintiff notes that it has used the mark for 45 continuous years. (*Id.* at 31). With respect to the similarity of the marks, Plaintiff notes that the phrasing is essentially the same: both are "Emerson Creek." (*Id.* at 32). With respect to Defendant's intent, Plaintiff argues that Defendant intended to confuse the buying public. (*Id.* at 33–34). Particularly, Plaintiff notes that after Plaintiff sent Defendants a cease-and-desist demand in 2018, Defendants renewed their website, "ecreekpotteryandtearoom.com," to forward the viewer to "emersoncreek.com," in what Plaintiff characterizes as a deliberate attempt to confuse the viewer. (*Id.* at 34). Finally, with respect to actual confusion, Plaintiff notes that consumers have emailed or messaged over social media one or the other of the two "Emerson Creeks" over the years while intending to contact the other, evincing that consumers have suffered actual confusion over the similarity of the two names. (*Id.* at 36–37).

Defendants, on the other hand, note that Plaintiff and Defendants are in entirely different businesses; Plaintiff sells pottery, and Defendants run a gift shop, tearoom, and event space. (Dkt. 49 at 18–20).

In short, the Fourth Circuit's factors for determining likelihood of confusion point in different directions. Plaintiff has offered evidence showing actual confusion; potential customers have actually gotten the two companies' online profiles mixed up. On the other hand, Defendants have shown that Plaintiff and Defendants are in entirely different businesses. In short, the likelihood of confusion factors do not point strongly in one direction or the other, and a reasonable jury could come out either way on infringement.

Therefore, the Court will not award either party summary judgment on infringement.

### C. Breach of Contract

Plaintiff also moves for summary judgment on its breach of contract claim, arguing that "Defendants concede that they sold other lines of pottery and continued to use the Emerson Creek Pottery Marks following the termination of the license agreement." Dkt. 52 at 37.

Under Virginia law, the basic elements of a breach of contract claim are (1) a legal obligation of a defendant to the plaintiff; (2) a violation or breach of that right or duty; and (3) a consequential injury or damage to the plaintiff. *Brown v. Harris*, 467 S.E.2d 805, 807 (1996).

For the same reasons as discussed with respect to the alleged express and implied licenses, the Court will not award Plaintiff summary judgment on its breach of contract claim. There are disputed facts about whether the parties had a contract other than an ordinary sales contract at all, and, if they did have such a contract, what the terms of that contract were. If the Court cannot determine based on undisputed facts in the record what the terms of the alleged contract were, it cannot determine whether there was an undisputed breach or injury.

### V. CONCLUSION

For the reasons discussed above, in an order that will accompany this memorandum opinion, the Court will deny both parties' motions for summary judgment in full.

The Clerk of Court is directed to send a copy of this opinion to all counsel of record.

Entered this 11th day of February 2022.

*[signature]*
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE