**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION**

| | |
|---|---|
| **EMERSON CREEK POTTERY, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No.: 6:20-CV-0054-NKM** |
| ) | |
| **COUNTRYVIEW POTTERY CO.,** ) | |
| **EMERSON CREEK EVENTS, INC.,** ) | |
| **CHRISTINA DEMIDUK, and** ) | |
| **DAVID DEMIDUK** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

<u>**PROPOSED JOINT PRETRIAL ORDER**</u>

Plaintiff Emerson Creek Pottery, Inc. ("ECP" or "Plaintiff") and Defendants Countryview

Pottery Co. ("Countryview"), Emerson Creek Events, Inc. ("Emerson Creek Events"), Christina

Demiduk ("Mrs. Demiduk"), and David Demiduk ("Mr. Demiduk")(collectively, "Defendants"),

by counsel, pursuant to the Pretrial Order [ECF No. 23], submit this proposed joint pretrial order

as follows:

I.      <u>**Contested Issues of Law that Require a Ruling Before Trial**</u>

   A.  **Motion *In Limine* and/or For Spoilation Inference**

   The Court has not yet ruled on Plaintiff's Motion in Limine and/or For Spoilation

Inference ("Motion *in Limine*") [ECF No. 83] regarding Defendants' failure to preserve and

produce certain electronic records.  The Motion *in Limine* requests the Court to enter an order:

   1.      Granting the Motion *in Limine*;

   2.      Foreclosing Defendants from arguing at trial that ECP's evidence of Defendants'

           use of the ECP Marks is insufficient, lacking in quantity, or is de minimis;

3.      Foreclosing Defendants from arguing at trial that ECP's evidence of Defendants' intent to cause confusion or Defendants' recognition that confusion is inevitable is insufficient, lacking in quantity, or is de minimis;

4.      Foreclosing Defendants from arguing at trial that ECP's evidence of actual confusion is insufficient, lacking in quantity or is de minimis;

5.      Foreclosing Defendants from arguing that a lack of documentary evidence from Defendants' records establishes that the factors of use, actual confusion, or intent were not satisfied;

6.      Awarding ECP its reasonable expenses incurred in making this motion, including attorneys' fees and costs; and

7.      Granting ECP such other and further relief the Court deems proper.

Defendants oppose the Motion *in Limine*.

## B.  Jury Instructions

The Parties both have filed competing jury instruction.

## II.   Essential Elements a Party Must Prove to Establish Any Claims and Relief Sought

### A.    Plaintiff's Statement:

The essential elements of Plaintiff's claims are as follows:

### 1.    Count I (Trademark Infringement); Count II (Unfair Competition and False Designation of Origin); Count III (Common Law Trademark Infringement")

To prove Counts I, II, and III, Plaintiff must establish: (1) Plaintiff owns a valid and protectable mark and (2) Defendants' unauthorized use of the mark is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants with Plaintiff, or as to the origin, sponsorship, or approval of Plaintiff's goods, services, or

commercial activities by Defendants.  The factors determinative of whether a likelihood of confusion exists are: (1) the strength or distinctives of the plaintiff's mark; (2) similarity of the two marks to consumers; (3) similarity of good or services that the marks identify; (4) similarity of the facilities used by the markholders; (5) similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public.

### 2.   Count IV (Breach of Contract)

To prove Count IV, Plaintiff must establish the existence of an express or implied license agreement and subsequent breach of that license agreement.  The essential elements for breach of contract are: (1) a legal obligation of Defendants to Plaintiff, (2) Defendants' violation or breach of that right or duty, and (3) consequential injury or damage to Plaintiff.

### 3.   Damages or Other Relief

i.   Permanently enjoining Defendants from:  (a) using the EMERSON CREEK or EMERSON CREEK POTTERY marks, or any mark confusingly similar to or a colorable imitation of these marks; (b) causing consumer confusion or mistake as to the source of Defendants good and services, or deceiving consumers to believe a connection, sponsorship, or approval between Defendants and Plaintiff; or (c) tarnishing, blurring, or diluting the reputation of Plaintiff's EMERSON CREEK and EMERSON CREEK POTTERY marks; and (d) making any express or implied representation that Plaintiff is affiliated with or sponsors or approves of Defendants or their products or services;

ii.   Directing Defendants to transfer control and ownership of all domain names and social media accounts that contain or consist of the mark EMERSON CREEK;

      **iii.**     Ordering Defendants to destroy all tangible or intangible material bearing the EMERSON CREEK or EMERSON CREEK POTTERY marks, or any mark confusingly similar to or a colorable imitation of these marks, in the possession, custody, or control of Defendants or their agents;

      **iv.**     Ordering Defendants to expressly abandoned federal trademark applications with serial numbers 87613773, 87613813, 88464124, and 88464155;

      **v.**     Ordering Defendants to withdraw Opposition No. 91241725 and any counterclaims in Opposition No. 91244057 before the Trademark Trial and Appeal Board of the U.S. Patent and Trademark Office;

      **vi.**     Ordering Defendants to cancel or amend all state and local business certificates, filings, or registrations that consist of or incorporate the EMERSON CREEK or EMERSON CREEK POTTERY marks, or any mark confusingly similar to or a colorable imitation of these marks;

      **vii.**     Directing Defendants to provide a full accounting of profits made by Defendants as a result of Defendants' business conducted using Plaintiff's EMERSON CREEK and EMERSON CREEK POTTERY marks, or any mark confusingly similar to or a colorable imitation of these marks;

      **viii.**     Ordering Defendants, pursuant to 15 U.S.C. § 1116(a), to file with this Court and serve upon Plaintiff within thirty (30) days after entry of the injunction a written report under oath describing in detail the manner and form in which Defendants have complied with the injunction, including ceasing all offering of services under Plaintiff's name and marks as set forth above;

4

ix.      Ordering Defendants to pay a judgment in the amount of Plaintiff's actual

damages under 15 U.S.C. § 1117 and Virginia law, as well as Defendants' profits, and pre- and

post-judgment interest pursuant to 15 U.S.C. § 1117, in an amount to be proven at trial;

x.      Ordering Defendants to pay Plaintiff's reasonable attorneys' fees and costs

of this action under 15 U.S.C. § 1117 and/or Virginia law;

xi.      Ordering Defendants to pay a judgment for enhanced damages under 15

U.S.C. § 1117 and punitive damages under Virginia law as appropriate; and

xii.      Granting Plaintiff such other and further relief as the Court deems just and

proper.

**B.  Defendants' Statement**

The essential elements of Plaintiff's claims are:

**1.  Count I (Trademark Infringement); Count II (Unfair Competition and False Designation of Origin); Count III (Common Law Trademark Infringement")**

To prove Counts I, II, and III, Plaintiff must establish for each mark used by Defendants,

namely, EMERSON CREEK, EMERSON CREEK POTTERY, EMERSON CREEK POTTERY

& TEAROOM, and EMERSON CREEK EVENTS (Defendants' Marks) (1) Plaintiff owns a

valid and protectable mark; (2) Defendants' used each of Defendants Marks without

authorization; and (3) such use of each of Defendants' Marks is likely to cause confusion, or to

cause mistake, or to deceive as to the affiliation, connection, or association of Defendants with

Plaintiff, or as to the origin, sponsorship, or approval of Plaintiff's goods, services, or

commercial activities by Defendants.  The factors determinative of whether a likelihood of

confusion exists are: (1) the strength or distinctiveness of the plaintiff's mark; (2) similarity of

the two marks to consumers; (3) similarity of good or services that the marks identify; (4)

similarity of the facilities used by the mark holders; (5) similarity of advertising used by the

mark holders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public.

### 2.      Count IV (Breach of Contract)

Defendants agree with Plaintiff's stated elements of this claim.

### 3.      Damages or Other Relief

Judgment for Defendants on all counts and granting Defendants such other and further relief as the Court deems just and proper. Should Plaintiff prevail, Defendants contend that damages, costs and fees are not warranted.

### III.      Essential Elements of Defendants' Meritorious Defenses

### A. Plaintiff's Statement

The affirmative defenses at issue are as follows:

### 1.   Naked Licensing

Defendants argue that any license provided by Plaintiff to Defendants was a naked license.  Naked licensing means that Plaintiff failed to exercise adequate control over Defendants' use of the ECP Marks.  Plaintiff contends that it exercised consistent control over Defendants' use of the ECP Marks.  Plaintiff further argues that Defendants, as licensees, may not avail themselves of the naked licensing affirmative defense, as a licensee is estopped from contesting the validity of the license during the license arrangement.

### 2.   Acquiescence

Defendants argue the affirmative defense of acquiescence applies.  Plaintiff argues that because Defendants are holdover licensees they are estopped from asserting the defense of acquiescence.  Plaintiff further asserts that Defendants have not established one instance where Plaintiff informed Defendants that it would not exercise its trademark rights.

### B. Defendants' Statement

The affirmative defenses at issue are as follows:

#### 1. Acquiescence

Defendants argue that there was no licensing agreement between Plaintiff and Defendants. Thus the use of EMERSON CREEK, EMERSON CREEK POTTERY, EMERSON CREEK EVENTS, and other EMERSON CREEK marks by Defendants beginning in 2001 and with Plaintiff's knowledge amounts to acquiescence. Acquiescence can be implied by the actions, or lack thereof, of Plaintiff and does not require Plaintiff expressly informing Defendants that it would not exercise its trademark rights.

#### 2. Naked Licensing

Defendants argue that any license that might have existed between Plaintiff and Defendants amounts to naked licensing. Plaintiff argues that it exercised sufficient quality control over Defendants' use of its marks and that Defendants are estopped from the affirmative defense of naked licensing. Defendants argue that Plaintiff's did not assert any quality control standards or exercise sufficient quality control as required by trademark law. Defendants further argue that, although a licensee is often estopped from a naked licensing defense, when a licensor's control is sufficiently lacking, as it was with Plaintiff, Defendant may rely on the defense.

### IV.   <u>Material Facts and Theories of Liability or Defense</u>

### A. Plaintiff's Statement

#### Material Facts

The following is a summary of the primary material facts and theories that, while not exhaustive, encompass the primary facts that ECP intends to prove at trial:

In 1977, Jim Leavitt and his ex-wife Priscilla Palmer started ECP as a business making handmade pottery. Mr. Leavitt is currently the sole owner of ECP and operates its manufacturing facility and an outlet retail store in Bedford County, Virginia. ECP has "spent 40 years building a reputation of pottery that is handmade, high quality, in this country, American made," utilizing the ECP Marks. Over the years, ECP has achieved nationwide recognition for its quality, handcrafted, American-made brand pottery and as a result has accrued substantial goodwill therefrom. ECP sells its goods to consumers online at retail via its website and at its brick-and-mortar outlet store in Bedford.

In June 1985, the national news-magazine *The Studio Potter* published an article on ECP. Several years later, in September 1990, the *Roanoke Times & World-News* published an article about ECP, writing that "folks from Maine to Florida" had been purchasing their products and that ECP was "one of the fastest-growing makers of handcrafted pottery." In April 2019, Guide for Buying identified ECP as being one of the top ten websites to purchase handmade pottery online. As recently as October 2020, President Donald Trump invited Mr. Leavitt to the White House for "Made in America Day" and "Made in America Week" as the sole representative of Virginian industry. ECP consistently has been recognized on the Artisans Center of Virginia's Bedford Artisan Trail list.

In February 2015, ECP filed trademark application serial number 86/545,729 with the U.S. Patent and Trademark Office for the standard character mark EMERSON CREEK POTTERY, which registered as U.S. Trademark Reg. No. 4,835,568 on October 20, 2015, for "ceramic sculptures, vases, vessels, bowls, plates and pots; household containers for foods; mugs; serving platters; tea pots" with the generic term "pottery" disclaimed. ECP sells its

pottery at wholesale to hundreds of retailers in over thirty-five states.  Defendants do not object to ECP's use of the mark EMERSON CREEK POTTERY for pottery.

Defendant Mrs. Demiduk and her then-boyfriend Mr. Wehrli traveled to ECP's warehouse in Bedford and met with Mr. Leavitt to discuss the possibility of opening an ECP pottery shop in Oswego, Illinois.  Mrs. Demiduk (formerly Christina Barickman) at the time was dating Mr. Wehrli, a real estate developer in Naperville, Illinois.  Mr. Wehrli owned a parcel of land located at 5126 Stephens Road in Oswego, Illinois (the "Oswego Property"), adjacent to his residence which he shared with Mrs. Demiduk.  Prior to their arrival in Bedford, Mrs. Demiduk and Mr. Wehrli began renovating a farmhouse on the Oswego Property for the purpose of creating a business.  Mrs. Demiduk was experienced in retail and aspired to own a business.  In fact, before meeting Mr. Leavitt, Mrs. Demiduk was in the process of negotiating the purchase of a Krispy Kreme franchise.  During the meeting, Mrs. Demiduk asked if Mr. Leavitt "would be interested in having an Emerson Creek shop in Illinois."

Mr. Leavitt agreed that Mrs. Demiduk and Mr. Wehrli could use EMERSON CREEK POTTERY as the name for the Oswego shop, in accordance with a licensing arrangement.  As a result of the meeting, Mr. Wehrli purchased tens of thousands of dollars of ECP pottery for which Mr. Leavitt gave "a really good price."  The initial and exclusive purpose of Defendants' business following the Bedford meeting was to sell ECP pottery.

Shortly thereafter, Mr. Leavitt prepared a one-page document entitled "AGREEMENT BETWEEN RON WHERLI AND EMERSON CREEK POTTERY" to memorialize certain terms of the license arrangement reached at the Bedford meeting (the "Licensing Agreement"). The Licensing Agreement contains seven (7) numbered terms, followed by an "Appendix" with purchase price discount percentages, representing a significant discount off of wholesale pricing.

Included in those terms were ECP's requirements that Defendants, in exchange for using the ECP Marks, establish a business entity which would do business as Emerson Creek Pottery, sell ECP pottery exclusively, and keep the Oswego store stocked with a minimum of 75% ECP products.  In exchange, ECP agreed to supply pottery carried in its wholesale catalog to Defendants at the discounts of 30% off its wholesale rates.  Defendants' conduct conformed with the licensing arrangement for over 15 years.

Defendants incorporated Countryview Pottery Co. as an Illinois corporation on April 2, 2001, and opened for business under the name EMERSON CREEK POTTERY beginning in June 2001.  A Naperville Sun article dated August 15, 2001, reported: "During a visit to Virginia, Barickman had an opportunity to see the Emerson Creek Pottery, which was started in 1977 in the small studio of two artisans. Since that time, the homegrown pottery business has grown by leaps and bounds. The collective pieces are available in Virginia and various gift stores nationwide, but the Oswego location is the company's only retail store outside of Virginia." Defendants are quoted as saying "We're hoping to give a name for it in the Chicago area so people will recognize it."  Pictures of ECP pottery accompanied the article, with the main caption stating "their shop is the only retailer outside Virginia to offer the hand-painted Emerson Creek brand pottery."  Similarly, a Chicago Tribune article dated July 3, 2002 quotes Mrs. Demiduk "I had been wanting to open some kind of store, so I asked the owners if they would be interested in having an Emerson Creek shop in Illinois, and they said yes."  The article attributes Mrs. Demiduk as saying that "she receives a deep discount that allows her to sell Emerson Creek stoneware at lower prices than the pieces would in most gift shops."  The article reports "many have made the trip in search of the handpainted, glazed stoneware from the Blue Ridge Mountains that Barickman stocks in abundance."

Once open, Defendants ordered from ECP on a weekly basis.  Mrs. Demiduk and Mr. Leavitt continuously communicated via email and telephone regarding Mrs. Demiduk's activities, marketing, plans, and orders from ECP. The parties would often exchange ideas and product lines and discuss what items were or were not selling.  Mr. Leavitt and ECP responded to all requests from Defendants, including the creation of specialized products and lines.  The Parties consistently communicated regarding Defendants' sale of ECP pottery and use of the ECP Marks.  Mrs. Demiduk would "constantly" explain her marketing plans to Mr. Leavitt, requesting expansion of certain product lines and seeking permission in certain instances to expand or discount certain lines.  ECP knew Defendants carried handmade items and gifts from other vendors, but not any third-party pottery.  This understanding was confirmed by Mr. Wehrli. At some point in 2008, Mr. Wehrli and Mrs. Demiduk ended their relationship.  Mr. Wehrli gave Mrs. Demiduk the Oswego Property and the business.

Mrs. Demiduk sent numerous photographs to Plaintiff that show the Oswego store exterior and interior with ECP pottery prominently on display.  One exemplary photograph shows a wagon sign bearing EMERSON CREEK POTTERY that was on display adjacent a road that leads to the Oswego shop.  Another photograph shows a rock bearing EMERSON CREEK POTTERY that was displayed in a public area outside the Oswego shop until 2021.

As the licensor/licensee relationship continued, Mrs. Demiduk discussed with Mr. Leavitt her decision to add a tearoom, which later expanded into a restaurant, and years after, to begin hosting weddings at the Oswego Property.  Defendants based the experience of the tearoom/restaurant upon their use of ECP pottery.  For example, the tearoom/restaurant's signature item was the "Flowerpot Salad," served in ECP flowerpot.  Defendants' promoted their use of ECP pottery to serve food in the tearoom/restaurant.  Mrs. Demiduk sent various emails to

Mr. Leavitt discussing tearoom business operations, her efforts to get Oprah Winfrey and President Bush to visit, and other marketing plans and efforts, as well as shop sales and orders. Mr. Leavitt supported Defendants' proposed business expansion, and set parameters for those ECP products to be sold. Defendants placed orders for ECP pottery earmarked exclusively for the tearoom/restaurant. Given the inextricable relationship between Defendants' retail operation and subsequent restaurant, Plaintiffs allowed use of EMERSON CREEK POTTERY & TEAROOM mark under the scope of the 2000 License Agreement.

Upon opening the tearoom, Mrs. Demiduk sent a copy of her 2004 "Emerson Creek Pottery" mailer to Mr. Leavitt which shows the shop and new tearoom, both with ECP pottery displayed throughout the shop and tearoom. Defendants also created a cookbook that includes numerous photos of food on ECP pottery served in the tearoom and sold in the shop, without inclusion of other pottery. Mrs. Demiduk sent Mr. Leavitt an advance copy of the cookbook for his consideration and comment. Not one email or photograph concerned the sale of third-party pottery. Indeed, Defendants predicated the expansion of their business on ECP pottery and the ECP brand. Defendants registered the domain www.ecreekpotteryandtearoom.com in 2009 and operated a website at that domain until at least May 2019. Defendants' pottery business, restaurant business, and events business were all on this website. Defendants' website in October 2009 prominently displayed images of ECP pottery, but not any third-party pottery or plateware, and touted their connection to ECP in Bedford, Virginia and that "all of the pottery is formed, fired, and painted in Bedford, Virginia."

A 2011 news article primarily covering Defendants' expansion plans highlights that "Emerson Creek is the only location in the Midwest to carry the entire line of Emerson Creek Pottery, which is made in Bedford, VA" including photos of ECP pottery in the shop, and

quoting Mrs. Demiduk as stating "a great product at a good price and was made in the U.S." and wanting to bring the idea of the product and original Virginia location back to Oswego.  As recently as 2017, a news article about Defendants' Oswego offerings to visitors, including yoga and the restaurant, is accompanied by a photo of ECP pottery in the shop and highlights that "the namesake pottery is made in Virginia" which is sold alongside other types of items—home décor, garden accessories, candles, jewelry, preserves and honey—inside the "pottery shop."

Defendants Mr. and Ms. Demiduk were married on the Oswego Property in October 2010, after which Defendants began hosting weddings for customers.  The idea to host weddings first came from customers.  Ms. Demiduk discussed the wedding business and plans with Mr. Leavitt.  In 2011, Defendants hosted about 15 weddings.  In February 2012, as evidenced by the Illinois Secretary of State records, Defendant Emerson Creek Events was incorporated for accounting purposes.  At that time, everything else on the Oswego Property referred to Emerson Creek Pottery and Tearoom.  Indeed, Defendants' business as a wedding and event venue consistently and publicly has been known as "Emerson Creek Pottery & Tearoom" by customers, third parties, and the media.  Defendants used ECP pottery in connection with the events business, including for example as decorations, as well as in connection with wedding photos and promotion materials on their website.  In addition to weddings, Defendants have had "yoga and wine" and "vintage markets" on the Oswego Property, advertised on the website.

Over the course of the license agreement, Defendants provided ECP with continuous updates, including from their website, allowing ECP to ensure conformity with the license agreement. Ultimately, in 2012, with the proliferation of the internet and with the use of tools like Google maps expanding rapidly, ECP noted instances of confusion and requested that Defendants identify themselves as "Emerson Creek Pottery & Tearoom" and not "Emerson

Creek Pottery" for purposes of Google maps.  Defendants immediately agreed to adhere to this request and made the change in short order.

On November 14, 2014, Mr. Leavitt emailed Mrs. Demiduk to inquire about a 33% decrease that he had observed in her sales numbers that year, explicitly asking her if she was carrying other pottery lines. At the time, Mr. Leavitt was not necessarily suspicious of Defendants, but rather inquiring why purchases of ECP pottery decreased substantially in 2014. Ms. Demiduk replied citing various reasons for the decrease including ECP pottery item availability and prices, as well as budgetary constraints due to small business operational issues like health insurance, property repair and maintenance, and cashflow, but notably did not disclose that she was selling third-party pottery or otherwise acknowledge Mr. Leavitt's question or concern as to whether she was selling third-party pottery.  From 2014 to 2017, Mr. Leavitt observed that Defendants' sales of ECP pottery continued to decline.

In February 2017, Mr. Leavitt inquired about Defendants' correcting social media confusion on Instagram from "emersoncreek" events.  Mr. Demiduk replied that it benefits both parties.  In response, Mr. Leavitt reminded Defendants that ECP owns the mark EMERSON CREEK POTTERY and instructed Defendants to use it appropriately and distinguish with "and Tea Room" when referencing their Oswego business.  On March 6, 2017, Mr. Leavitt again followed up with his concern over confusion from the "emersoncreekevents" Instagram, which Mr. Demiduk understood to mean that people were confusing Emerson Creek Events with ECP. On July 19, 2017, Defendants last placed an order with ECP for ECP pottery.

ECP hired a private investigator to go to the Oswego Property and make purchases in September 2017.  Only then did ECP discover that Defendants were carrying and selling a substantial amount of third-party pottery, including Chinese lines such as Mud Pie.  Such lower-

quality pottery being sold at Defendants' "Emerson Creek Pottery" store in Oswego was harmful to ECP's 40-year reputation for high-quality, American-made pottery.  Mr. Leavitt contacted Defendants requesting that Defendants change their name.  Defendants' counsel represented that "[his] clients have not offered any pottery under the 'Emerson Creek' mark other than that purchased from Emerson Creek."  This statement by Defendants' Counsel clearly was false.  On January 5, 2018, Plaintiff's counsel sent Defendants' counsel a letter expressly terminating Defendants' license to use Plaintiff's EMERSON CREEK mark in connection with pottery, as well as the tearoom restaurant and venue event services.  Only after termination, did ECP realize that Defendants had filed an application for EMERSON CREEK POTTERY & TEAROOM, which the UPSTO refused based on a likelihood of confusion with ECP's marks.

Defendants did not adhere to ECP's demand that they cease using the ECP Marks.  In January 2018, Mr. and Ms. Demiduk attended a tradeshow for gifts held in Las Vegas, for which they registered as a "non exhibiting manufacturer" under the company name "emerson creek pottery."  In February 2018, Defendants' website included a webpage for the Oswego shop which continued to prominently display images of ECP Pottery, but not any third-party pottery or plateware, and which touted "our namesake hand painted pottery" including the following passage: "All of our beautiful pottery is created and painted in Bedford, Virginia and is the original source of inspiration for the Pottery Shop and Tearoom that you enjoy today.  This family-owned company began in 1977 and has been producing functional pottery pieces ever since. Each piece is an authentic original as there is not a template or stencil used in the process. There is an Emerson Creek pottery piece for almost every use in your home!"

Not only did Defendants ignore ECP's termination of their license, they continued their infringement, with intent to cause actual customer confusion and damage ECP's business.

Defendants acted willfully and knew that they were infringing, or acted with indifference to, ECP's trademark rights. Defendants handle all of their social media in-house and for years have used that social media to advertise its services, prominently displaying ECP pottery. For example, Defendants' YouTube channel "Emerson Creek Pottery & Tearoom" hosted a video titled "Day in the Country" and a video titled "Emerson Creek Cookbook" that featured exclusively ECP pottery. Defendants have only used a single Facebook page for all their businesses, which they created about 10 years ago as "Emerson Creek Pottery and Tearoom" and only renamed to "Emerson Creek" in May 2021. Understandably, Facebook users have been confused with respect to the relationship, association or sponsorship between ECP and Defendants on ECP Facebook page "Emerson Creek Pottery."

Defendants' shop, restaurant and event venue services have shared the same Yelp and Trip Advisor business pages, which were listed as "Emerson Creek Pottery & Tearoom" and currently are listed as "Emerson Creek," demonstrating the inextricable relationship between the shop, restaurant, and event venue business, likelihood of confusion between ECP and Defendants, as well as the harm to Plaintiff's EMERSON CREEK brand by Defendants' conduct. As late as 2019, Defendants' Yelp photos featured ECP's pottery. Both parties have received numerous emails expressing actual confusion between ECP's Bedford and Defendants' Oswego businesses.

Defendants' conduct has caused and continues to cause this actual confusion. In addition to their in-house social media employees, Defendants retained the services of marketing consultants, Lindsay Winkler and Jonathan Domanus, for website design and electronic and print marketing materials. Post-termination, Mr. Demiduk emailed Ms. Winkler on April 23, 2019, asking her to change Defendants' domain name to "emersoncreekevents.com" but to purchase

16

and keep the domain name "ecreekpotteryandtearoom.com" as a redirect for their website.  Later that day, Mr. Demiduk emailed Ms. Winkler asking her to buy ownership of the domain name "ecreekpotteryandtearoom.com" for five years.  In the email, Mr. Demiduk expressed that "I don't think we would advertize [sic] the other names it would just be if someone types something else." Mr. Demiduk goes on to say in the email that "I also thought if we bought the other names Jim in Virginia couldn't."  After the redirects were put in place, anyone who emailed an address ending in @ecreekpotteryandtearoom.com or clicked on a bookmark to ecreekpotteryandtearoom.com would be sent to @emersoncreek.com or emersoncreek.com, respectively, without being notified of the redirect.  Thus, due to Mr. Demiduk directing Ms. Winkler and Mr. Domanus to keep the domain name of "ecreekpotteryandtearoom.com," anyone searching "emerson creek" and "pottery" on Google will ultimately be directed to the Defendants' website.

Mrs. Demiduk then emailed Ms. Winkler on April 24, 2019, requesting that she purchase the domain name "EmersonCreek.com" that day, saying that "we want it before it is taken."  Ms. Winkler texted Mrs. Demiduk that day to notify her that the Defendants had officially become the owners of the domain name "emersoncreek.com."  Following this exchange, Mr. Domanus transitioned Defendants' emails to the new address @emersoncreek.com.  Ms. Winkler also told Mrs. Demiduk that she would change the Defendants' postcards to reflect their new email address.  Indeed, Defendants' purchase of these URLs prevents anyone else from using them for their own websites.

Over the "last couple years," Ms. Demiduk has asked Lindsay Winkler to remove references to Emerson Creek Pottery from the Defendants' website and mailers.  Ms. Demiduk believes that her website and social media still feature the name "Emerson Creek," which she

believes is "who we are" in reference to Defendants' business.  Defendants further continue to sell off their inventory of ECP pottery without authorization from ECP.

**Plaintiff's Theory of Liability**

> **1.     Infringement, Unfair Competition, and False Designation of Origin**

ECP is the owner of a valid federal trademark registration for the EMERSON CREEK POTTERY mark and common law rights to the EMERSON CREEK mark.  ECP formally licensed to Defendants the ECP Marks.  On January 5, 2018, however, ECP terminated the license and demanded that Defendants cease, desist, and forever refrain from using the ECP Marks and other marks that are comprised of or incorporate the ECP Marks, or which are confusingly similar thereto.  Defendants ignored ECP's request and continued their unauthorized use of the ECP Marks in connection with their restaurant and events services, causing confusion, mistake, and deception as to the affiliation, connection, or association of Defendants with ECP. Defendants acted willfully and knew that they were infringing, or acted with indifference to, ECP's trademark rights.

> **2.     Breach of Contract**

Defendants entered into a valid license agreement with ECP to use the ECP Marks. Alternatively, years of consistent dealing with ECP and ECP's exercise of reasonable control over Defendants' use of the ECP Marks constitute an implied license.  Whether express or implied, ECP terminated the license in 2018.  Nevertheless, Defendants continue to use the ECP Marks, and other marks that are comprised of or incorporate the ECP Marks, or which are confusingly similar thereto, in connection with their restaurant and event services.  Defendants' breach of the license agreement has damaged, and continues to damage, ECP.

B.     **Defendants' Statement**

**Material Facts:**

The following is a summary of the primary material facts and theories that, while not exhaustive, encompass the primary facts that Defendants intend to prove at trial:

ECP sells pottery under its EMERSON CREEK POTTERY trademark at its store located in Bedford, Virginia and through its website. It began selling pottery under that mark in 1977 and continues to do so today.

In mid 2000, Defendant Christina Demiduk, with her then-boyfriend Ronald Wehrli, visited the ECP store in Bedford, Virginia and met with James Leavitt, owner of ECP, to discuss ECP's pottery, a piece of property owned by Mr. Wehrli in Oswego, Illinois (the "Oswego Property"), and Ms. Demiduk's and Mr. Wehrli's interest in purchasing ECP pottery to sell at a yet-to-be opened gift shop on the Oswego Property.

During that meeting, Mr. Wehrli purchased tens of thousands of dollars worth of pottery from ECP, and ECP arranged to have the pottery shipped to the Oswego Property.  At some point after the mid 2000 meeting, Mr. Leavitt drafted a document entitled "Agreement Between Ron Wehrli and Emerson Creek Pottery" which recites alleged terms between Mr. Wehrli and ECP regarding an outlet store in Naperville, Illinois. This agreement was never presented to Mr. Wehrli or any of the Defendants, nor were the terms of the alleged agreement discussed with any Defendant. The document was not signed by any party to this dispute. No agreement between the parties has been executed. The specific items discussed and potential future business relationship between ECP, Ms. Demiduk and Mr. Wehrli were not memorialized.

In 2002, Countryview, owned by Ms. Demiduk, opened a shop on the Oswego Property and named it EMERSON CREEK POTTERY (the "Countryview Shop"). The shop included the

pottery Mr. Wehrli had purchased from ECP as well as other non-ECP items, such as soaps, candles, towels, and other related goods. ECP did not assist Ms. Demiduk in opening the Countryview Shop, it did not provide funds to open the shop, nor did it inspect the shop or the goods sold in the shop for 17 years. Throughout this period, Countryview purchased pottery from ECP in bulk and at a discount to be sold in the Countryview Shop.

Between 2002 and 2004, after opening the Countryview Shop, Countryview expanded its business operations and opened a tearoom (the "Countryview Tearoom") in which tea, drinks and food items were sold. Certain drinks and food items were provided to customers with ECP pottery that Countryview had purchased from ECP. Around this time, Countryview adopted the EMERSON CREEK POTTERY AND TEAROOM mark to identify its shop and tearoom. The expansion of Defendants' services and change in its service mark were both done on Defendants' on volition without seeking permission from Plaintiff and with no objection from Plaintiff.  For many years thereafter, correspondence between ECP and Countryview included purchasing, shipping and payment of invoices related to pottery.  In addition, Ms. Demiduk voluntarily send updates to ECP and Mr. Leavitt related to the Countryview Tearoom. At no point during this time did Mr. Leavitt or anyone from ECP visit the Countryview Shop or Tearoom or raise any issues relative to the use of EMERSON CREEK POTTERY or EMERSON CREEK POTTERY AND TEAROOM with the shop or tearoom. ECP did not inform Defendants of any quality control standards it must abide by in its shop or restaurant, or any standards for how EMERSON CREEK POTTERY or EMERSON CREEK POTTERY AND TEAROOM should be displayed and/or used with the services.

As a result of issues with its previous web developer, Countryview registered the "ecreekpotteryandtearoom.com" web domain in 2009 and operated a website at that address on

20

which Countryview advertised its shop and tearoom services. Ms. Demiduk informed ECP of its

new domain address. ECP did not express any objections or concerns over registration and use of

this domain nor did it inform Countryview that such actions must first be approved by ECP. ECP

did not provide any instructions for use of or exercise any control over how EMERSON CREEK

POTTERY, EMERSON CREEK POTTERY AND TEAROOM, EMERSON CREEK, or any

permutation of EMERSON CREEK should be used and/or displayed. ECP did not provide any

instructions for or exercise any oversight or control over the general layout and theme of the

website.

By 2010, Countryview was ready to expand its services once again. The Demiduks

renovated a barn on the Oswego Property. This would become one of the sites of its events

planning and venue rental services, which ultimately would be offered by a new business,

Emerson Creek Events, Inc. ("Emerson Creek Events"). Just as with past instances of her

business growth and expansion, Ms. Demiduk would periodically update Mr. Leavitt regarding

the many weddings she was handling in this space.

At no point during or after Ms. Demiduk's expansion of services under permutations of

the EMERSON CREEK mark did ECP inquire as to the nature or quality of the services being

provided by Countryview or Emerson Creek Events. ECP never requested any additional

payment or other consideration for Emerson Creek Events' use of EMERSON CREEK with its

services. ECP never visited Emerson Creek Events' venue or investigated any of the services

offered under EMERSON CREEK until 2017. Since 2010, Emerson Creek Events has

continually offered wedding and other events services under its EMERSON CREEK marks.

In 2012, 12 years after Defendants began using the EMERSON CREEK POTTERY

mark, Mr. Leavitt became aware of issues with Google search results showing the address of the

ECP shop as that of the Countryview Shop in Illinois. Mr. Leavitt contacted a web developer that was working for ECP and stated:

> I have allowed [Ms. Demiduk] to use our name, but never considered the problems that have arisen with Google. Actually I don't know what to do as it would cause [Ms. Demiduk] hardship to force her to change her name (and me sales), but on the other hand Google has made a mess of this, they should fix it. Maybe she could modify her URL? Do you have any ideas? It seems to me that since we both have different names, even though our name is part of hers, that Google ought to be able to distinguish between us.

Following this exchange, Mr. Leavitt contacted Ms. Demiduk to raise the Google results address issue. Mr. Leavitt subsequently contacted Ms. Demiduk to request her help, and stated, "...I think it would be in both of our best interests for you to add '& Tearoom' to all of you[r] citations as soon as possible to remove any confusion with search engines and customers." Ms. Demiduk made this change and responded to Mr. Leavitt, "[w]e corrected our name so it correctly lists Emerson Creek Pottery & Tearoom...[s]o I assume our end of the issue has been taken care of since our business is correctly identified with the right web address, business name, and address. Please let me know if there is something on your end that does not seem correct." There is no evidence that Mr. Leavitt raised any further issues in 2012, whether with use of EMERSON CREEK POTTERY, EMERSON CREEK, or any other permutations that include EMERSON CREEK. He addressed Google's address issues and left it at that.

Years continued to pass during which Countryview and Emerson Creek Events used EMERSON CREEK as a portion or as the entirety of marks to identify its businesses and services. Ultimately, 17 years after first adopting EMERSON CREEK POTTERY, in 2017, Mr. Leavitt began to raise concerns with Defendants' use of EMERSON CREEK POTTERY and EMERSON CREEK with or without other terms. Initially, Mr. Leavitt stated "that 'Emerson Creek Pottery' is our trademarked name and you should only use it appropriately and with 'and

Tea Room' when referring to your store." Then, in 2018, Mr. Leavitt demanded that Defendants stop using any of the Emerson Creek marks with its goods and services.

Since that time, Defendants have moved away from their pottery business. They have closed the shop which included pottery, they have removed "pottery" from their service marks and have taking significant steps to remove past associations Defendants have had with pottery. Defendants current services provided under EMERSON CREEK relate only to restaurant services and events services.

**Defendants' Theory of Defenses**

### 1.      Infringement, Unfair Competition, and False Designation of Origin

Plaintiff and Defendants did not enter into a valid trademark license agreement. Plaintiff knew of and acquiesced to Defendants' use of EMERSON CREEK, EMERSON CREEK POTTERY, EMERSON CREEK POTTERY & TEAROOM, and EMERSON CREEK EVENTS beginning in 2001 and continuing to filing of the pending action in 2020. Owing to the absence of an agreement and Plaintiff's acquiescence, Plaintiff is estopped from alleging infringement, unfair competition, and false designation of origin.

If there is deemed to be a valid trademark license agreement between the parties, that agreement only includes Defendants' use of EMERSON CREEK POTTERY with a pottery retail shop. The EMERSON CREEK POTTERY mark is no longer used by Defendants and the pottery shop is permanently closed. Plaintiff acquiesced to Defendants' use of EMERSON CREEK, EMERSON CREEK POTTERY, EMERSON CREEK POTTERY & TEAROOM, and EMERSON CREEK EVENTS with all other services offered by Defendants. Regardless of that acquiescence, there is no likelihood of confusion between ECP's marks for its goods and the

EMERSON CREEK marks used by Defendants for their restaurant services or their events services.

Lastly, if there is deemed to be a valid trademark license agreement between the parties for all uses of EMERSON CREEK, EMERSON CREEK POTTERY, EMERSON CREEK POTTERY & TEAROOM, and EMERSON CREEK with all of Defendants' services, Plaintiff did not exercise adequate quality control over Defendants' use of the marks, nor did Plaintiff exercise adequate quality control over Defendants' services. This lack of quality control amounts to naked licensing the result of which is Plaintiff being estopped from bringing these causes of action.

**2.      Breach of Contract**

Plaintiff and Defendants did not enter into a valid trademark license agreement and thus there was no contract to breach. If there is deemed to be a valid trademark license agreement, Defendants did not breach that agreement by selling third party pottery because there was no contractual requirement for Defendants to only sell ECP pottery.

**Contested Issues of Fact**

The Parties contend that there are no issues of disputed fact.  The Court in denying cross-motion for summary judgment identified the following issues of contested fact:

1.      Whether the Parties created and entered into an express license agreement.

2.      Whether Mr. Leavitt ever presented the terms of the licensing agreement in writing to Mrs. Demiduk or Mr. Wehrli.

3.      Whether the terms in the written licensing document accurately reflect the terms of the Parties' prior oral agreement.

4.      Whether the Parties' conduct created an implied license.

5.   Whether Plaintiff exercised reasonable control over Defendants' use of the ECP Marks.

6.   Whether the parties had a "special relationship."

7.   Whether Plaintiff knew of Defendants' quality control due to the parties' previous dealings.

8.   Whether Defendants are holdover licensees.

9.   Whether Defendants are using the EMERSON CREEK mark in good faith.

10.   Whether Defendants knew that they were infringing ECP's trademark rights.

11.   Whether Defendants acted with indifference to ECP's trademark rights.

## **Contested Issues of Law**

The parties contest the following issues of law:

1.   Whether a meeting of the minds existed as to the licensing agreement.

2.   Whether the conduct of the Parties constituted sufficient control to establish an implied license.

3.   Whether Defendants breached the license agreement.

4.   Whether Defendants are holdover licensees.

5.   Whether Defendants use of the ECP Marks constitutes trademark infringement under the Lanham Act.

6.   Whether Defendants' use of the ECP Marks is likely to cause consumer confusion as to the source or origin of goods and services.

7.   Whether Defendants use of the ECP Marks constitutes unfair competition or false designation of origin under the Lanham Act.

8.   Whether Defendants used the ECP Marks commercially in a manner that is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or

association of Defendants with Plaintiff, or as to the origin, sponsorship, or approval

of Defendants' goods, services, or commercial activities by Plaintiff.

9.  Whether Defendants misrepresented in advertising the nature, characteristics, quality,

or geographic origin of Defendants' good or services to consumers likely to be

damaged by the false designation of origin.

10. Whether Defendants use of the ECP Marks constitute trademark infringement under

the common law.

11. Whether the affirmative defenses of naked licensing and acquiescence apply.

12. Whether Defendants are estopped from asserting affirmative defenses of naked

licensing and acquiescence.

13. Whether Plaintiff is entitled to injunctive relief.

14. Whether Plaintiff has been damaged and in what amount.

15. Whether this is an exceptional case.[1]

---

[1] Under the Lanham Act, 15 U.S.C. § 1117(a), the "court in exceptional cases may award reasonable attorney fees to the prevailing party." In *Georgia-Pacific Consumer Products LP v. von Drehle Corp.*, 781 F.3d 710, 719–21 (4th Cir. 2015), involving a motion for attorney fees under the Lanham Act, the Fourth Circuit adopted the Supreme Court's interpretation of an "exceptional case" in an identical provision of the Patent Act in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, ___ U.S. ___, 134 S.Ct. 1749, 188 L.Ed.2d 816 (2014). Relying on *Octane Fitness*, the Fourth Circuit concluded that:

> a district court may find a case 'exceptional' and therefore award attorneys' fees to the prevailing party under § 1117(a) when it determines, in light of the totality of the circumstances, that (1) there is an unusual discrepancy in the merits of the positions taken by the parties, based on the non-prevailing party's position as either frivolous or objectively unreasonable; (2) the non-prevailing party has litigated the case in an unreasonable manner; or (3) there is otherwise the need in particular circumstances to advance considerations of compensation and deterrence.

*Georgia-Pacific*, 781 F.3d at 721 (internal citations & quotation marks omitted). Should this Court find this case exceptional and award Plaintiff its attorneys' fees and costs, Plaintiff will submit an appropriate lodestar petition together with its supplemental brief on damages. *See Choice Hotels Int'l, Inc. v. A Royal Touch Hosp., LLC (NC)*, 409 F. Supp. 3d 559, 570 (W.D. Va. 2019).

**Stipulations**

       The Parties will work to determine if any stipulations can be agreed upon and will inform the Court promptly once an agreement has been reached.

### **Plaintiff's Proposed Special Voir Dire Questions**

1.     Have you ever owned your own business?

2.     Have you ever worked for a small/family run business?

3.     Have you worked for a business that manufactured handmade products?

4.     Have you worked in retail or sales?

5.     Have you ever operated or maintained an internet website?  If so, for business or personal use?

6.     Have any of you used Google to advertise any product or services or to invite visits to a particular website?

7.     Do you have experience with online advertising or search engine optimization techniques?

8.     Do you use social media, such as Facebook, Instagram, YouTube, or Twitter?

9.     Have you used social media to advertise or search for a business or services?

10.    Do you own a federal trademark registration or common law trademark rights?

11.    Have you ever applied to register a trademark with the USPTO? If so, please explain what it was for, whether or not it was granted, and when it was.

12.    Has any person or business ever used your trademark in any way that was without your permission and contrary to the rights you owned?

13.    Have you ever been a licensee or licensor of a trademark?

14.    Have you ever been accused by any person or business of engaging in any activity that constituted infringement of a trademark, copyright, patent, or trade secret?

15.     Do you think it is unfair to reward a trademark owner for someone's infringement of their

        trademark?

16.     Do you believe that someone can continue doing something that they were licensed to do

        after the license is terminated?

17.     Have you ever purchased foreign versions of products made in this country?  How did the

        foreign products compare to the U.S. made version?


It is so ORDERED.

        Let the clerk send a copy of this Order to all counsel of record.


ENTERED this _____ day of _____, 202_.



_____
Norman K. Moon