UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Lynchburg DIVISION

```
* * * * * * * * * * * * * *
EMERSON CREEK POTTERY, INC.,* CIVIL ACTION 6:20-CV-00054
                            * FEBRUARY 22, 2022   9:38 A.M.
            Plaintiff,      * JURY TRIAL
                            * VOLUME I OF IV
vs.                         *
                            *
EMERSON CREEK EVENTS, INC., *
et al.,                     * Before:
                            * HONORABLE NORMAN K. MOON
            Defendant.      * UNITED STATES DISTRICT JUDGE
* * * * * * * * * * * * * * * WESTERN DISTRICT OF VIRGINIA
```

APPEARANCES:

For the Plaintiff:      GARFIELD BERNARD GOODRUM, ESQUIRE
                        Garfield Goodrum, Design Law
                        90 Canal Street, 4th Floor
                        Boston, MA 02114

                        HENRY IRVING WILLETT, III, ESQUIRE
                        Christian and Barton, LLP
                        909 East Main Street, Suite 1200
                        Richmond, VA 23219


For the Defendants:     KENNETH S. McLAUGHLIN, JR, ESQUIRE
                        Law Offices of McLaughlin
                        & Associates, PC
                        1 E. Benton Street, Suite 301
                        Aurora, IL 60505

                        LAWRENCE E. LAUBSCHER, JR., ESQUIRE
                        Laubscher & Laubscher, PC
                        1160 Spa Road, Suite 2B
                        Annapolis, MD 21403



Court Reporter:         Judy K. Webb, RPR
                        210 Franklin Road, S.W., Room 540
                        Roanoke, Virginia 24011
                        (540)857-5100 Ext. 5333

Proceedings recorded by mechanical stenography.
Transcript produced by computer.

1                          **WITNESS INDEX**

2    PLAINTIFF'S WITNESSES:                          PAGE NO.

3    **James Leavitt:**

4    Direct by Mr. Willett                              90

5                          **EXHIBIT INDEX**

6    **PLAINTIFF'S EXHIBITS:**              **MARKED**      **RECEIVED**

7    1                                                   106

8    2                                                   101

9    11                                                  128

10   12                                                  164

11   14                                                  184

12   15                                                  188

13   16                                                  202

14   22                                                  135

15   47                                                   97

16   48                                                   94

17   49                                                   91

18   53                                                  105

19   57                                                  119

20   79                                                  172

21   82                                                  200

22   87                                                  120

23   89                                                  146

24   171                                                 205

25   174                                                 159

1      **EXHIBIT INDEX (Continued)**

2  **PLAINTIFF'S EXHIBITS:**           **MARKED**           **RECEIVED**

3  178                                                        171

4  179                                                        173

5  182                                                        169

6  192                                                        180

7  193                                                        190

8  194                                                        156

9  195                                                        153

10 196                                                        152

11 198                                                        198

12 199                                                        176

13 202                                                        201

14 203                                                        182

15 204                                                        183

16 222                                                        108

17 225                                                        179

18 228                                                        112

19 232                                                        211

20 235                                                        193

21 237                                                        103

22 238                                                        174

23

24

25

1          (Court convened at 9:38 a.m.)

2              THE COURT:  Good morning.

3              MR. WILLETT:  Good morning.

4              MR. LAUBSCHER:  Good morning.

5              THE COURT:  All right.  Ready to call the case?

6              THE CLERK:  All right.  This is the *Emerson Creek*

7  *Pottery, Incorporated versus Emerson Creek Events,*

8  *Incorporated, Christina Demiduk, David Demiduk, and*

9  *Countryview Pottery Company*, Civil Case Number 6:20-CV-00054.

10             THE COURT:  Is the plaintiff ready?

11             MR. WILLETT:  Yes, Your Honor.

12             THE COURT:  Is the defendant ready?

13             MR. LAUBSCHER:  Yes, Your Honor.

14             THE COURT:  All right.  Is there any matter we need

15  to take up before the jury is called?

16             MR. WILLETT:  Henry Willett on behalf of the

17  plaintiff, Your Honor.  I don't believe so.

18             MR. LAUBSCHER:  Nothing from us, Your Honor.

19             THE COURT:  All right.  Call the jury then.

20         (Venire in at 9:40 a.m.)

21             THE COURT:  Good morning.  Thank you all for being

22  here today.  Before we begin the process of jury selection, I

23  will first give you a brief overview of some of the steps the

24  Court has taken and is taking to minimize the risk of the

25  spread of COVID-19.

1          First, standing orders of this Court require everyone

2    to wear a mask that covers their nose and mouth while in

3    public areas of the courthouse unless a court official

4    specifically directs otherwise.  That applies to everyone,

5    whether vaccinated or unvaccinated.

6          Second, the Court has ordered all persons in the

7    courtroom to practice social distancing except counsel,

8    litigants, and court staff.

9          Third, pursuant to the Court's standing orders, all

10   court employees, including judges, chambers staff, and staff

11   of the clerk's office, must either be vaccinated or conduct a

12   COVID-19 test at least weekly.

13         Fourth, this Court has specifically ordered that all

14   litigants, lawyers, witnesses, and court staff in this case

15   attest before coming into the courthouse that they're either

16   vaccinated or have tested negative within three days of their

17   appearance.  If there are any witnesses who can't meet these

18   rules, they would testify by Zoom.

19         And lastly, specifically for jurors, the Court will

20   have all jurors, of which the Court expects there will be

21   eight in number, to be masked at all times and will be seated

22   in the back row of the jury box, separated by protective

23   screens.  While the Court has not excluded unvaccinated

24   prospective jurors, the Court will require that all jurors,

25   vaccinated or not, comply with all of the aforementioned

1  rules.

2       I will say this:  I speak of the Court ordering this.

3  This is the standard procedure now throughout the Western

4  District, and, as far as I know, the federal courts in

5  Virginia.

6       One more matter before we begin the process of jury

7  selection.  I wish to give you a general overview of this case

8  so that you know what it is about and can better answer

9  questions for the attorneys.

10       This case is scheduled to last four days, including

11  today.  This case is a trademark and contract dispute.

12       The plaintiff is Emerson Creek Pottery, Inc., which

13  is a business located in Bedford, Virginia.

14       The defendants are Emerson Creek Events, Inc., which

15  is a business located in Oswego, Illinois, along with its

16  owners Christina Demiduk and David Demiduk.

17       The plaintiff claims that the defendants infringed

18  the plaintiff's trademark rights and breached a contract

19  between the parties.

20       A trademark is a type of intellectual property

21  consisting of a sign or mark that identifies a particular

22  product or service and distinguishes that product or service

23  from others.

24       In this case, the mark that the plaintiff claims the

25  defendants have infringed is the name, quote, "Emerson Creek

1  Pottery," end quote.  Specifically, the plaintiff alleges that

2  the parties had a licensing agreement for defendants to use

3  the name Emerson Creek Pottery, which was subject to certain

4  conditions.

5         The plaintiff claims that it revoked the licensing

6  agreement, but the defendants, nonetheless, continued to use

7  the name Emerson Creek Pottery, and the plaintiff claims that

8  the defendants' continued to use the name -- continued use of

9  the name constitutes trademark infringement.

10        On the other hand, the defendants claim that there

11  was never a licensing agreement between the parties.  Rather,

12  the defendants argue that the plaintiff allowed them to use

13  the name Emerson Creek Pottery without any conditions and that

14  the amounts -- and this amounts to acquiescence, which would

15  mean that plaintiff cannot assert its trademark rights against

16  the defendants.

17        In the alternative, the defendants argue that even if

18  there was a licensing agreement between the parties, that it

19  was a so-called naked license, meaning that the plaintiff did

20  not exercise sufficient control over the defendants' use of

21  the mark to now assert its trademark rights against the

22  defendants.

23        Separate from the trademark claim, plaintiff also

24  brought a breach of contract claim against the defendants.  As

25  I mentioned, the plaintiff argues that the parties had a

1    licensing agreement.  The plaintiff contends that the

2    defendants breached this agreement.  However, the defendants

3    contest that and argue instead that there was no licensing

4    agreement in the first place, and even if there was, the

5    defendants did not breach it.

6             If you are selected to serve on the jury, I will

7    explain the legal claims and defenses to you in more detail.

8             Soon I'm going to ask you some specific questions

9    about your qualifications to serve as jurors in this case.

10   Specifically -- and this case was set for -- this process --

11   or at least there are several reasons for these questions.

12   First, it may be that, although otherwise qualified, some of

13   you may not be eligible to sit in this particular case for any

14   variety of reasons.  We need to ask questions to determine

15   that.

16            Also, under the rules that govern jury selection in

17   this court, the parties play a role in choosing the jury that

18   is to try their case.  That is why we have more of you here

19   than we really need to sit on the jury.  Under the rules, the

20   parties are entitled to exercise strikes to eliminate persons

21   from the jury panel, and then the remaining jurors will hear

22   the case.

23            The parties need to know more about you in order to

24   make intelligent decisions about who to strike.

25            As I said before, if the Court, clerk, or counsel ask

1  you a question and you have a response, any response, please

2  raise your hand and they will call -- and I will call on you.

3  For example, if one of the lawyers for the parties asks, "Are

4  you here today to be considered to serve as a juror in the

5  case?" you would all raise your hand.  Do not feel awkward

6  about raising your hand and letting us know your response; it

7  is vital that you do.

8        When you respond to a question, please identify

9  yourself by name, and there may be some follow-up questions.

10 Also, if you feel your answer to any question is particularly

11 personal and you do not want to answer in front of everyone,

12 you may ask to speak to me and the attorneys privately.  I

13 would ask that you -- well, first, we don't want -- unless

14 it's a real personal question, I would encourage you to answer

15 without having to take the time for the private session.

16       Now we will begin the process of selecting a jury to

17 hear this case.  I'll ask the clerk to swear in the jurors.

18       THE CLERK:  Ladies and gentlemen, as your names are

19 called, please answer and announce your presence.

20       Jean Marie Barreto-Stults.

21       PROSPECTIVE JUROR BARRETO-STULTS:  Here.

22       THE CLERK:  Kimberly Kiser Bomar.

23       PROSPECTIVE JUROR BOMAR:  Here.

24       THE CLERK:  Zachary Ross Faulkner.

25       PROSPECTIVE JUROR FAULKNER:  Here.

1          THE CLERK:  Alison Jane Hartman.

2          PROSPECTIVE JUROR HARTMAN:  Here.

3          THE CLERK:  David Jesse Vincent Jackson.

4          PROSEPCTIVE JUROR:  Here.

5          THE CLERK:  Sandra Louise Kasey.

6          PROSPECTIVE JUROR KASEY:  Here.

7          THE CLERK:  Joyce Griffin Latimer.

8          PROSPECTIVE JUROR LATIMER:  Here.

9          THE CLERK:  Daniel Wayne Layne.

10         PROSPECTIVE JUROR LAYNE:  Here.

11         THE CLERK:  Elizabeth Creasy Masencup.

12         PROSPECTIVE JUROR MASENCUP:  Here.

13         THE CLERK:  Michelle Darlene Smith.

14         PROSPECTIVE JUROR SMITH:  Here.

15         THE CLERK:  Eddie Lee Spruce.

16         PROSPECTIVE JUROR SPRUCE:  Here.

17         THE CLERK:  Katina McCoy Whorley.

18         PROSPECTIVE JUROR WHORLEY:  Here.

19         THE CLERK:  Charles Robert Williamson.

20         PROSPECTIVE JUROR WILLIAMSON:  Here.

21         THE CLERK:  Ladies and gentlemen, if you will please

22    stand, raise your right hands and be sworn.

23      (Venire is sworn.)

24         THE CLERK:  Thank you.  You may be seated.

25         Ladies and gentlemen, in order to serve as a juror in

1  this Court you must be a citizen of the United States who has

2  attained the age of 18 years and has resided in the Western

3  District of Virginia for one year.

4        You must not be under charge or have been convicted

5  in any court, state or federal, of a crime punishable by

6  imprisonment for a period of more than one year, unless your

7  civil rights have been restored.

8        You must be able to read, write, and understand the

9  English language, and must be able to both physically and

10 mentally render efficient jury service.

11       Do you and each of you qualify on these grounds?  You

12 do?

13       VENIRE PANEL:  (Affirmative response.)

14       THE CLERK:  Ladies and gentlemen, I will now ask you

15 several questions concerning the case which is to be tried

16 today for the purpose of ascertaining whether you can hear the

17 facts fairly and impartially and render a just verdict.

18       As I call your names, Counsel, if you will please

19 stand.

20       The plaintiff is represented by Garfield B. Goodrum,

21 an attorney with Design Law in Boston, Massachusetts; and

22 Henry I. Willett, III, an attorney with Christian and Barton,

23 LLP, in Richmond, Virginia.

24       Okay.  You may be seated.

25       The defendants in this case are Emerson Creek Events,

1  Incorporated, Christina Demiduk, David Demiduk, and

2  Countryview Pottery Company.

3          The defendants are represented by Lawrence E.

4  Laubscher, Jr., an attorney with Laubscher & Laubscher, PC, in

5  Annapolis, Maryland, and Kenneth S. McLaughlin, Jr., an

6  attorney with the Law Offices of McLaughlin & Associates, PC.

7          Thank you.  You may be seated.

8          The purpose of my mentioning this is to ask each of

9  you whether you are related by blood or by marriage to any of

10  the parties you've just been introduced to in this action.  If

11  you are, please state so to the Judge.  You are not.  Thank

12  you.

13          Do you know of any reason why you cannot hear the

14  facts of this case fairly and impartially and render a just

15  verdict?  Thank you.

16          In a moment the Judge will ask you all some

17  additional questions, some of which will require an individual

18  response.  We ask that you please raise your hand and wait for

19  the microphone to be brought to you by the court security

20  officer so that the court reporter to my left can take

21  everything down that is being said.  In addition, please every

22  time you speak state your first and last name for the record.

23          Your Honor, I'll turn it over to you.

24          THE COURT:  Thank you.

25          Are any of you employees or employers or officers,

1  directors, or in any way connected with any party to the case?

2          Do any of you know any of the persons that have been

3  named in the case so far?

4          I see none.

5          I'm going to ask plaintiff's counsel to call the

6  names of the witnesses -- of its witnesses and ask you if you

7  know any of these witnesses.

8          MR. WILLETT:  Plaintiffs will be calling Jim Leavitt,

9  Trenda Leavitt, Elena Leavitt.  We will also be calling an

10 expert, Townsend Belisle.  We will also be calling some of the

11 defendants, David Demiduk and Christina Demiduk, who have

12 already been named; as well as some of their employees, Annie

13 Spratt, Karla Searl, and Kristen Gerwig.  And additionally,

14 there will be an individual named Ron Wehrli who will be

15 called.

16         THE COURT:  Thank you.  Defense counsel, the same.

17         MR. LAUBSCHER:  The defendants will be calling David

18 Demiduk, Chris Demiduk.  We also intend to call Mr. Leavitt,

19 and we will be calling Lindsay Winkler, Jonathan Domanus and

20 Ron Wehrli.

21         THE COURT:  I will say we'll all stay masked except

22 when we're speaking, and it will be appropriate to remove your

23 mask when you're speaking.

24         There may be times during the trial that you will be

25 sitting for an hour and a half, and most of the time what I do

1  is we sit for about an hour and a half and then take a break,

2  and then come back and sit another hour and a half, take

3  another, well, in the morning, then go to lunch, and then in

4  the afternoon repeat the same schedule.

5          Are any of you so, I don't want to say incapacitated,

6  but would that type of schedule be impossible for any of you

7  to sit through?  Okay.

8          It is estimated, you heard, that this case is going

9  to last four days, so the trial will occur on Tuesday through

10 Friday of this week.

11         Now, all service on juries, of course, is an

12 interruption and not convenient for anyone.  But is there

13 anyone that has such circumstances that they could not perform

14 the jury service for these four days?

15         All right.  I'm going to ask you some questions about

16 whether you've heard anything, read anything, or know anything

17 about this case from any source, and will ask you to indicate

18 to us the same way that we've asked you to respond.  When I

19 call on you, I want to know -- I only want to know if you've

20 heard something.  Do not say what you've heard, if you have

21 heard anything.

22         Have any of you heard or know anything about this

23 case from any source whatsoever?  I assume since none of you

24 have heard of the parties, you probably would not know

25 anything about it.  But it is important.

1          Did you raise your hand?  Somebody raise their hand?

2     All right.

3          Do any of you or have you done any business with

4     Emerson Creek Pottery here in Virginia or in Illinois?  Okay.

5          Have any of you owned a business or operated a small

6     business?

7          We'll start right here.  Your name?

8          PROSPECTIVE JUROR LATIMER:  I'm Joyce Latimer.

9          THE COURT:  And what is the nature of your business?

10         PROSPECTIVE JUROR LATIMER:  We operate an online

11    business with Amazon.

12         THE COURT:  All right.  Have you used -- well, that's

13    good.  Thank you.

14         Anyone else up there?  There was someone in the back.

15    If counsel -- I'll ask, you may ask follow-up questions if you

16    feel the need to.

17         PROSPECTIVE JUROR WHORLEY:  Katina Whorley, and I

18    operate an ecommerce online business as well.

19         THE COURT:  Okay.  Thank you.

20         PROSPECTIVE JUROR WILLIAMSON:  Charles Williamson.  I

21    have two retail pharmacies in Virginia.

22         THE COURT:  All right.  Thank you.

23         Have you used Google, Facebook, or similar services

24    to advertise any product or invite visits to your website?

25         And you, your name was?

1          PROSPECTIVE JUROR LATIMER:  Joyce Latimer.

2          THE COURT:  All right.  Anyone else?

3          PROSPECTIVE JUROR WHORLEY:  Katina Whorley.

4          THE COURT:  Okay.  The three prospective jurors who

5   had already --

6          PROSPECTIVE JUROR WILLIAMSON:  Charles Williamson.

7          THE COURT:  Okay.  Have any of you ever applied for

8   or owned a trademark?

9          Just say your name again, if you would.

10          PROSPECTIVE JUROR LATIMER:  Joyce Latimer.

11          THE COURT:  All right.  Thank you.  Anyone else?

12   Okay.

13          Has anyone ever been -- have you ever been accused of

14   infringing a trademark, copyright, pattern, or trade secret?

15          PROSPECTIVE JUROR LATIMER:  Joyce Latimer.

16          THE COURT:  All right.  Have you ever accused anyone

17   of using a trademark?

18          PROSPECTIVE JUROR LATIMER:  (Raises hand.)

19          THE COURT:  Anyone else?

20          Are any of you sensible of any bias or prejudice

21   against any party to the case?

22          Do any of you know of any -- do any of you know of

23   any reason you could not serve as a juror in this case and

24   render a verdict fair to both the plaintiff and the defendant?

25   If so, raise your right hand.

1            All right, do counsel have any follow-up questions?

2            MR. WILLETT:  Your Honor, Henry Willett on behalf of

3  the plaintiff.  If I may ask a couple of follow-up questions

4  to Ms. Latimer.

5            THE COURT:  All right.

6            MR. WILLETT:  Should I remove my mask?

7            THE COURT:  Yes.

8            MR. WILLETT:  Good morning, Ms. Latimer.  What type

9  of product was being sold on Amazon?

10           PROSPECTIVE JUROR LATIMER:  I'm Joyce Latimer.  The

11 product was popsicle molds.

12           MR. WILLETT:  And with those molds, did you sell

13 those in any other forum other than on Amazon?

14           PROSPECTIVE JUROR LATIMER:  No.

15           MR. WILLETT:  And do you continue to sell those?

16           PROSPECTIVE JUROR LATIMER:  Yes.

17           MR. WILLETT:  You mentioned that you had a trademark.

18 Do you have a trademark for those molds?

19           PROSPECTIVE JUROR LATIMER:  I do, and others.

20           MR. WILLETT:  And you mentioned that you had made a

21 claim that someone had infringed on your trademark.

22           PROSPECTIVE JUROR LATIMER:  Yes.

23           MR. WILLETT:  If you could briefly describe the

24 circumstances of that.

25           PROSPECTIVE JUROR LATIMER:  We were selling the

1  popsicle molds on Amazon and a Chinese seller trademarked it.

2  We fought the trademark because we had had the product before,

3  and we won.  We were able to get our trademark back.  So we

4  were kicked off of our listing because we infringed on their

5  trademark, and we were able to get the trademark back to us,

6  kicked them off the listing.

7          MR. WILLETT:  And when you answered "yes" to having

8  been accused of a trademark, it was that same dispute?

9          PROSPECTIVE JUROR LATIMER:  Yes.

10          MR. WILLETT:  Thank you.  No further questions of

11  this juror, Your Honor.  Would you like me to turn it over to

12  the defendants, because I might have a few for the other folks

13  who identified "yes"?

14          THE COURT:  Okay.

15          MR. LAUBSCHER:  We don't have any questions, Your

16  Honor.

17          THE COURT:  All right.

18          MR. WILLETT:  Your Honor, if I could also ask a few

19  questions of Ms. Whorley.

20          THE COURT:  Let him bring the mic up.

21          MR. WILLETT:  Oh, thank you.

22          Ms. Whorley, what type of ecommerce business do you

23  run?

24          PROSPECTIVE JUROR WHORLEY:  Custom apparel.

25          MR. WILLETT:  Custom apparel?

1        PROSPECTIVE JUROR WHORLEY:  Uh-huh.

2        MR. WILLETT:  And you still run it?

3        PROSPECTIVE JUROR WHORLEY:  Yes.

4        MR. WILLETT:  And do you only sell online?

5        PROSPECTIVE JUROR WHORLEY:  No.  I take custom orders

6   as well as selling online.

7        MR. WILLETT:  Do you have a retail shop?

8        PROSPECTIVE JUROR WHORLEY:  Not a physical shop, no.

9        MR. WILLETT:  You work out of your home?

10        PROSPECTIVE JUROR WHORLEY:  Uh-huh, yes.

11        MR. WILLETT:  How long have you done that for?

12        PROSPECTIVE JUROR WHORLEY:  About a year.  A year.

13        MR. WILLETT:  And what type of advertising do you do

14   for your custom apparel?

15        PROSPECTIVE JUROR WHORLEY:  Word of mouth, on social

16   media, and if you were to type in T-shirt that has such and

17   such design, my name may pop up.  The custom apparel name may

18   pop up on a Google search.

19        MR. WILLETT:  On a Google search?

20        PROSPECTIVE JUROR WHORLEY:  Uh-huh.

21        MR. WILLETT:  And do you sell on Amazon as well?

22        PROSPECTIVE JUROR WHORLEY:  No.  No.  My platform is

23   Shopify.

24        MR. WILLETT:  Great.  Thank you very much.

25        PROSPECTIVE JUROR WHORLEY:  You're welcome.

1          THE COURT:  Is that all?

2          MR. WILLETT:  That's all for that one, for that

3    juror, Your Honor.

4          THE COURT:  Anything?

5          MR. LAUBSCHER:  No questions, Your Honor.

6          THE COURT:  All right.  Of any other juror now?

7          MR. WILLETT:  Yes, Your Honor.  For Mr. Williamson,

8    just a few quick questions.

9          Mr. Williamson, where are your pharmacies located?

10          PROSPECTIVE JUROR WILLIAMSON:  Madison Heights and

11    Appomattox.

12          MR. WILLETT:  And how long have you run those

13    pharmacies?

14          PROSPECTIVE JUROR WILLIAMSON:  17 years in Appomattox

15    and five years in Madison Heights.

16          MR. WILLETT:  And I believe you indicated that you do

17    some advertising online?

18          PROSPECTIVE JUROR WILLIAMSON:  Yeah.

19          MR. WILLETT:  And what type of advertising online do

20    you do?

21          PROSPECTIVE JUROR WILLIAMSON:  We have a personal

22    website, and then pay services to drive Google searches and

23    that sort of thing.

24          MR. WILLETT:  Thank you.  No further questions of

25    that juror.

1           THE COURT:  All right.

2           MR. LAUBSCHER:  No questions, Your Honor.

3           THE COURT:  All right.  Any other follow-up questions

4    to any jurors?

5           MR. WILLETT:  None from the plaintiff, Your Honor.

6           THE COURT:  All right.  Based upon anyone's

7    experience now and any questions and answers you may have

8    heard, is there anything that you feel the Court should know

9    that would affect your service on the jury and prevent you

10   from rendering a verdict fair to both the plaintiff and the

11   defendants, a verdict based solely according to the law and

12   the evidence you hear in the courtroom?  If there's any

13   problem, just raise your hand.

14          All right.  Thank you.  We're ready.

15          Will there be any motions to strike for cause?

16          MR. WILLETT:  None from the plaintiff, Your Honor.

17          MR. LAUBSCHER:  Your Honor, we would like to

18   strike --

19          THE COURT:  Well, don't.

20          MR. LAUBSCHER:  Just for cause.

21          THE COURT:  Come forward.  Excuse me.

22      (Bench conference on the record with all counsel

23   present.)

24          MR. LAUBSCHER:  Ms. Latimer --

25          THE REPORTER:  I'm sorry, can he get closer to the

1 microphone?

2          MR. LAUBSCHER:  Ms. Latimer we would like to strike

3 for cause.

4          MR. McLAUGHLIN:  Her dispute had to do with a Chinese

5 company.  One of the allegations that they're going to raise

6 is that there were Chinese goods put into our client's

7 business, and we believe that that would prejudice her against

8 our client.

9          THE COURT:  What do you think?

10          MR. WILLETT:  Judge, I don't know that that's, to me,

11 that is a valid basis for striking for cause.  I mean,

12 obviously, I think it would be fair to ask her if she believes

13 she could be impartial.

14          THE COURT:  Well, I've asked her that several times.

15          MR. WILLETT:  And she said yes.

16          THE COURT:  So, no, I will not strike her for cause.

17 She said she could -- her answers indicated that she could be

18 fair and try the case solely according to the law and the

19 evidence in this case.  I will deny that.

20          MR. McLAUGHLIN:  Thank you, Your Honor.

21          THE CLERK:  We will start with our random list.

22      (End of bench conference.)

23          THE COURT:  The clerk may proceed.

24          THE CLERK:  Counsel, if you will remain with your

25 randomized list.

1      And I will remind the jurors, this morning when you

2  came in you may have been referred to by a certain jury

3  number, most likely in alphabetical order.  We are now working

4  off a randomized list, which jumbles everyone's names up.  So

5  if you were Juror Number 1, for example, you are no longer

6  Juror Number 1, so you can disregard the numbers.

7      I'm going to be seated during this process.

8      All right.  Plaintiffs, Juror Number 1 on the random

9  list, pass or challenge?

10      MR. WILLETT:  Pass.

11      THE CLERK:  Defendants, juror on the random list,

12  pass or challenge?

13      MR. LAUBSCHER:  Pass.

14      THE CLERK:  Defendants, Juror Number 2, pass or

15  challenge?

16      MR. LAUBSCHER:  Pass.

17      THE CLERK:  Plaintiff, Juror Number 2, pass or

18  challenge?

19      MR. WILLETT:  Pass.

20      THE CLERK:  Plaintiffs, Juror Number 3, pass or

21  challenge?

22      MR. WILLETT:  Pass.

23      THE CLERK:  Defendants, Juror Number 3, pass or

24  challenge?

25      MR. LAUBSCHER:  Pass.

1        THE CLERK:  Defendants, Juror Number 4, pass or

2  challenge?

3        MR. LAUBSCHER:  Pass.

4        THE CLERK:  Plaintiffs, Juror Number 4, pass or

5  challenge?

6        MR. WILLETT:  Challenge.

7        THE CLERK:  All right.  Plaintiffs, Juror Number 5,

8  pass or challenge?

9        MR. WILLETT:  Pass.

10        THE CLERK:  Defendants, Juror Number 5, pass or

11  challenge?

12        MR. LAUBSCHER:  Challenge.

13        THE CLERK:  Defendant, Juror Number 6, pass or

14  challenge?

15        MR. LAUBSCHER:  Pass.

16        THE CLERK:  Plaintiffs, Juror Number 6, pass or

17  challenge?

18        MR. WILLETT:  Challenge.

19        THE CLERK:  Plaintiff, Juror Number 7, pass or

20  challenge?  Plaintiff, Juror Number 7?

21        MR. WILLETT:  Sorry.  Pass.  I apologize.

22        THE CLERK:  That's okay.

23        Defendants, Juror Number 7, pass or challenge?

24        MR. LAUBSCHER:  Challenge.

25        THE CLERK:  Defendant, Juror Number 8, pass or

1 challenge?

2          MR. LAUBSCHER:  Pass.

3          THE CLERK:  Plaintiff, Juror Number 8, pass or

4 challenge?

5          MR. WILLETT:  Pass.

6          THE CLERK:  Plaintiff, Juror Number 9, pass or

7 challenge?

8          MR. WILLETT:  Challenge.

9          THE CLERK:  Defendants, Juror Number 10, pass or

10 challenge?

11          MR. LAUBSCHER:  Pass.

12          THE CLERK:  Plaintiffs, Juror Number 10, pass or

13 challenge?

14          MR. WILLETT:  Pass.

15          THE CLERK:  And I'll just note that plaintiffs are

16 out of strikes.  Thank you.

17          All right.  Plaintiff, Juror Number 11 I assume will

18 be pass.

19          MR. WILLETT:  Pass.

20          THE CLERK:  Thank you.

21          And Defendants, Juror Number 11?

22          MR. LAUBSCHER:  Challenge.

23          THE COURT:  Is that all the challenges?

24          THE CLERK:  Let's see.  Yes.  Let me see how many

25 we've got left.  One second.  We're one short.

1          THE COURT:  Okay.

2          THE CLERK:  Ladies and gentlemen, I will now call the

3   names of the jurors who are to serve in this case.  As your

4   names are called, please stand and remain in the courtroom

5   until directed by the judge.  Those whose names are not called

6   should remain seated until excused by the Court.

7          Kimberly Kiser Bomar, Zachary Ross Faulkner, Alison

8   Jane Hartman, David Jesse Vincent Jackson, Elizabeth Creasy

9   Masencup, Katina McCoy Whorley, and Charles Robert Williamson.

10          That is our seven jurors at this point.

11          THE COURT:  All right.  I'll let you jurors, I'm

12   going to ask that you go to the jury room, if you would.

13      (Jurors out at 10:19 a.m.)

14          THE COURT:  We have seven jurors.  Have any of the

15   jurors for the next panel arrived?

16          THE CLERK:  Yes, she's got everyone but four.

17          THE COURT:  Huh?

18          THE CLERK:  All but four have arrived.

19          THE COURT:  Well, has the next juror in order

20   arrived?

21          THE CLERK:  I don't know.  I don't have that

22   information.

23          THE COURT:  We only have to pick one more juror, as I

24   understand.

25          THE CLERK:  Arlene said that everyone is here for the

1    next --

2              THE COURT:  All right.  Send them on up.

3              THE CLERK:  She's working on the paperwork as well.

4    I'll need to get that from her.

5              Judge Moon, do you want to excuse the remaining

6    jurors?

7              THE COURT:  What?

8              THE CLERK:  Do you want to excuse the remaining

9    jurors?

10             THE COURT:  Ladies and gentlemen who are not serving

11   on the jury today, you're going to be excused at this time,

12   and we thank you very much for being here.  We could not have

13   gotten to this point in the case without your presence, and

14   you've performed a service by being here in spite of not

15   continuing to serve.  I'm going to excuse you at this time.

16   Thank you very much.

17             We'll be in recess for at least ten minutes.  We only

18   really need the first three or four people, I would think.

19             THE CLERK:  But you still have to generate the

20   paperwork either way.  I don't know.  I don't know who is

21   here.

22             THE COURT:  Y'all may rest.

23        (Recess taken from 10:22 a.m. until 10:47 a.m.)

24        (Court reconvened outside the presence of the jury.)

25             THE COURT:  All right.  I understand someone has a

1  matter to take up?

2      MR. WILLETT:  Yes, Your Honor.  Henry Willett again

3  on behalf of the plaintiff.  Just one quick point, Judge.

4  When you were giving your description to the jury, there are,

5  and it's in the complaint, there are two marks.  It's the

6  Emerson Creek Pottery mark and the Emerson Creek mark.  We

7  pled that both of those had been infringed, and I just wanted

8  to make that --

9      THE COURT:  Okay.  I was just trying to give them

10 sort of general information.

11     MR. WILLETT:  I understand.  When I say there are two

12 marks, I just didn't know how that would play.  That was the

13 only reason I bring it up.  I just wanted to make you are

14 aware of that.  Thank you.

15     THE COURT:  Okay.  Thank you.

16     We only need one more juror, so when we know who's

17 the first one or two on the random list, maybe we can let you

18 know and we'll focus on them rather than the whole group.

19     MR. LAUBSCHER:  If I may, if I may, Your Honor, I

20 still think it's important for us to know in case there's any

21 potential jurors --

22     THE COURT:  Take your mask off.  I can't --

23     MR. LAUBSCHER:  -- if there's any potential jurors

24 that we want stricken for cause.

25     THE COURT:  Right.

1          MR. LAUBSCHER:  We still need that opportunity.

2          THE COURT:  Yeah, of course.  That's what I mean.

3          MR. LAUBSCHER:  I understand what you're saying.

4          THE COURT:  If the first one on the random list

5 you're not striking for cause, so I would say focus on the

6 first three or four and we'll know.

7          MR. LAUBSCHER:  Right.

8          THE COURT:  Can you give them the random list?

9          THE CLERK:  Yes, they'll have a copy.

10          THE COURT:  You'll have a copy of the random list, so

11 if somebody is down, like, 13 or 14, certainly we won't need

12 to ask them a lot of questions.

13      (Pause in the proceedings.)

14          THE COURT:  Are we ready to call the jury?

15      (Venire in at 10:57 a.m.)

16          THE COURT:  Y'all may have a seat, if you will.

17          All right.  We're continuing the process here.

18          Thank you, ladies and gentlemen, for being here this

19 morning.  We're in the process of selecting the jury in this

20 case.  And I will just tell you that unless someone is

21 speaking, they're expected to wear the mask at all times, and

22 it must cover both your nose and mouth.

23          I'm going to give you an overview of what this case

24 is about.

25          This case is a trademark and contract dispute.  The

1  plaintiff is Emerson Creek Pottery, Inc., which is a business

2  located in Bedford, Virginia.  The defendants are Emerson

3  Creek Events, Inc., which is a business located in Oswego,

4  Illinois, along with its owners Christina Demiduk and David

5  Demiduk.

6         The plaintiff claims that the defendants infringed on

7  plaintiff's trademark rights and breached a contract between

8  the parties.  A trademark is a type of intellectual property

9  consisting of a sign or mark that identifies a particular

10  product or service and distinguishes that product or service

11  from others.

12         In this case the marks that the plaintiff claims the

13  defendants have infringed are the names, quote, "Emerson Creek

14  Pottery," end of quote, and, quote, "Emerson Creek," end of

15  quote.

16         Specifically, the plaintiff alleges that the parties

17  had a license and an agreement for defendants to use the name

18  Emerson Creek Pottery and Emerson Creek, which was subject to

19  certain conditions.

20         The plaintiff claims that it revoked the license and

21  agreement, but the defendants nonetheless continued to use the

22  names Emerson Creek Pottery and Emerson Creek.

23         Now, the plaintiff claims that the defendants

24  continued to use the name -- continued use of the name

25  constitutes trademark infringement.  On the other hand, the

1  defendants claim that there was never a licensing agreement

2  between the parties, rather, the defendants argue that the

3  plaintiff allowed them to use the names Emerson Creek and

4  Emerson Creek Pottery without any conditions and that this

5  amounts to acquiescence, which would mean that plaintiff

6  cannot assert its trademark rights against the defendants.

7          In the alternative, the defendants argue that even if

8  there was a licensing agreement between the parties, that it

9  was a so-called naked license, meaning that the plaintiff did

10 not exercise sufficient control over the defendants' use of

11 the mark to now assert its trademark rights against the

12 defendants.

13         Separate from the trademark claim, the plaintiff also

14 brought a breach of contract claim against the defendants.  As

15 I mentioned, the plaintiff argues that the parties had a

16 licensing agreement.  The plaintiff contends that the

17 defendants breached this agreement.  However, the defendants

18 contest that and argue instead that there was no licensing

19 agreement in the first place and that even if there was, the

20 defendants did not breach it.

21         If you are selected to serve on the jury, I will

22 explain the legal claims and defenses to you in more detail.

23         Soon I'm going to ask you some specific questions

24 about your qualifications to serve as jurors in this case.

25 Specifically, the process -- and there are several reasons for

1  these questions.  First, it may be that, although otherwise

2  qualified, some of you may not be eligible to sit on this

3  particular case for any variety of reasons.  We need to ask

4  questions to determine that.

5       Also, under the rules that govern jury selection in

6  this Court, the parties play a role in choosing the jury that

7  is to try the case.  That is why we have more of you here than

8  we really need to sit on the jury.

9       Under the rules, the parties are entitled to exercise

10  strikes to eliminate persons from the jury panel, and then the

11  remaining jurors will hear the case.  The parties need to know

12  more about you in order to make intelligent decisions about

13  who to strike.

14       As I said before, if the Court, clerk, or counsel ask

15  you a question and you have a response, any response, please

16  raise your hand and they will call on you.  For example, if

17  one of the lawyers or I ask you, "Are you here today to be

18  considered to serve on the jury in this case?" all of you

19  would raise your right hand.

20       I'm going to ask the clerk to swear the panel and

21  proceed.

22       THE CLERK:  Good morning, ladies and gentlemen.  As

23  your names are called, please answer to announce your

24  presence.

25       Jacqueline Renee Carlan.

1        PROSPECTIVE JUROR CARLAN:  Here.

2        THE CLERK:  Joan Sue Coblentz.

3        PROSPECTIVE JUROR COBLENTZ:  Here.

4        THE CLERK:  Mark Noel Falls.

5        PROSPECTIVE JUROR FALLS:  Here.

6        THE CLERK:  Nicholas Aaron Flores.

7        PROSPECTIVE JUROR FLORES:  Here.

8        THE CLERK:  Wanda Sue Floyd.

9        PROSPECTIVE JUROR FLOYD:  Here.

10       THE CLERK:  Craig Edward Froshaug.

11       PROSPECTIVE JUROR FROSHAUG:  Here.

12       THE CLERK:  Robert Melvin Hall.

13       PROSPECTIVE JUROR HALL:  Here.

14       THE CLERK:  Mark Nathan Heideman.

15       PROSPECTIVE JUROR HEIDEMAN:  Here.

16       THE CLERK:  Teresa Peregoy Jones.

17       PROSPECTIVE JUROR JONES:  Here.

18       THE CLERK:  Julia Ann Lovelace.

19       PROSPECTIVE JUROR LOVELACE:  Here.

20       THE CLERK:  Glenda Malzi.

21       PROSPECTIVE JUROR MALZI:  Here.

22       THE CLERK:  Jonathan Andrew Martin.

23       PROSPECTIVE JUROR MARTIN:  Here.

24       THE CLERK:  Edwin Lee Medley.

25       PROSPECTIVE JUROR MEDLEY:  Here.

1          THE CLERK:  Ian Rohme.

2          PROSPECTIVE JUROR ROHME:  Here.

3          THE CLERK:  Kirk Anthony Schultz.

4          PROSPECTIVE JUROR SCHULTZ:  Here.

5          THE CLERK:  Morgan Whittaker.

6          PROSPECTIVE JUROR WHITTAKER:  Here.

7          THE CLERK:  Thank you.

8          Now, ladies and gentlemen, will you please stand,

9    raise your right hands and be sworn.

10       (Venire is sworn.)

11          THE CLERK:  You may be seated.

12          Ladies and gentlemen, in order to serve as a juror in

13    this court you must be a citizen of the United States who has

14    attained the age of 18 and has resided in the Western District

15    of Virginia for one year.  You must not be under charge or

16    have been convicted in any court, state or federal, of a crime

17    punishable by imprisonment for a period of more than one year

18    unless your civil rights have been restored.  You must be able

19    to read, write, and understand the English language, and must

20    be able to both physically and mentally render efficient jury

21    service.

22          Do you and each of you qualify on these grounds?  You

23    do.

24          VENIRE PANEL:  (Affirmative response.)

25          THE CLERK:  Ladies and gentlemen, I will now ask you

1   several questions concerning the case which is to be tried

2   today for the purpose of ascertaining whether you can hear the

3   facts fairly and impartially and render a just verdict.

4          I will introduce counsel for the parties.

5          The plaintiff in this case is Emerson Creek Pottery,

6   Incorporated.  The plaintiff is represented by Garfield B.

7   Goodrum, an attorney with Design Law in Boston, Massachusetts.

8   And Henry I. Willett, III, an attorney with Christian and

9   Barten, LLP, in Richmond.

10          The defendants in this case are Emerson Creek Events,

11  Incorporated, Christina Demiduk, David Demiduk, and

12  Countryview Pottery Company.  The defendants are represented

13  by Lawrence E. Laubscher, Jr., an attorney with Laubscher &

14  Laubscher, PC, in Annapolis, Maryland, and Kenneth S.

15  McLaughlin, Jr., an attorney with the Law Offices of

16  McLaughlin & Associates, PC.

17          The purpose of my mentioning this is to ask each of

18  you whether you are related by blood or marriage to any of the

19  parties you have just been introduced to in this action.  If

20  you are, please state so to the Judge.  You are not?

21          Thank you.  In a moment the Judge will ask you all

22  some additional questions, some of which will require an

23  individual response.  We ask that you please raise your right

24  hand and wait for the microphone to be brought to you by the

25  court security officer before speaking so the court reporter

1 | here to my left can hear everything that is being said and

2 | take it down efficiently.  In addition, please state your

3 | first and last name each time you speak.

4 |         And, Your Honor, I will turn it over to you.

5 |         THE COURT:  All right.  Are any of you employees,

6 | agents, servants, or in any way connected with any of the

7 | defendants or the plaintiff in the case?

8 |         Are any of you officers, directors or otherwise

9 | associated with any of the parties to the case?

10 |         And do any of you know anything about the case

11 | already from what I've told you?

12 |         Do any of you know any of the parties to the case so

13 | far as you've heard?

14 |         All right.  I'm going to ask plaintiff's counsel to

15 | read the list of witnesses, and if you know any of these

16 | persons, raise your hand and let us know.

17 |         MR. WILLETT:  Thank you, Your Honor.

18 |         Good morning.  Our witnesses will be Jim Leavitt,

19 | Trenda Leavitt, Elena Leavitt, Christina Demiduk, David

20 | Demiduk.  The rest of the folks are not in the courtroom right

21 | now.  Lindsay Winkler, Jonathan Domanus, Townsend Belisle,

22 | Annie Spratt, Karla Searl, Kristen Gerwig.  Thank you.

23 |         THE COURT:  Do any of you know any of those persons?

24 |         All right.  I'll ask defense counsel if you have any

25 | witnesses who were not named?

1      MR. LAUBSCHER:  Actually, every witness that

2  Mr. Willett identified, not everyone, but all of our witnesses

3  are on Mr. Willett's list, so no additional names, Your Honor.

4      THE COURT:  All right.  Thank you.

5      There are many times during this trial when you will

6  be sitting for at least as long as an hour, hour and a half.

7  Our normal schedule is to take -- go for an hour and a half in

8  the morning, take a break, and then go again for an hour and a

9  half, and go to lunch and come back and repeat the afternoon

10  as we did the morning.

11      Any of you have any problem that would keep you from

12  sitting an hour and a half, as much as an hour and a half

13  without taking a break?  If not, thank you.

14      I think I've asked you this, but have any of you

15  heard anything about this case from any source whatsoever?

16      This case is set to go for four days, including

17  today, so it's scheduled to end on Friday.  I know it's an

18  inconvenience for anyone to serve on a jury, but do you know

19  of any reason or have any particular problem that it makes it

20  impossible for you to serve that length of time?  If you do,

21  please raise your hand.  Okay.

22      Are you aware of or have you ever shopped at any of

23  the plaintiff's or defendants' businesses?  There's one.

24      PROSPECTIVE JUROR SCHULTZ:  Kirk Schultz.  I visited

25  that site there in Bedford a couple of years ago with my

1  in-laws.  They purchased some merchandise.

2           THE COURT:  Okay.  All right.  Thank you.

3           Anyone else?

4           Well, we'll ask you, is there anything about that

5  experience that would affect your ability to serve and try

6  this case solely according to the law and the evidence?

7           PROSPECTIVE JUROR SCHULTZ:  Kirk Schultz.  No, sir.

8           THE COURT:  All right.  Thank you.

9           Have any of you ever owned or operated a small

10 business?

11          All right, the gentleman who just spoke.  And what is

12 the nature of your business?  State your name first.  I'm

13 sorry.

14          PROSPECTIVE JUROR MEDLEY:  I owned a manufacturing,

15 wood manufacturing company down below Altavista.  Edwin Medley

16 is my name.

17          THE COURT:  All right.

18          PROSPECTIVE JUROR MEDLEY:  I owned that company for

19 about 15 years.

20          THE COURT:  Right.

21          PROSPECTIVE JUROR MEDLEY:  I do have one other

22 problem.

23          THE COURT:  Yes, sir.

24          PROSPECTIVE JUROR MEDLEY:  I lost a lot of my hearing

25 and I thought I could do this, but I'm only getting about

1  20 -- no, 75 percent of what people are saying in here.  If

2  they're going to be wearing a mask, I'll understand even less.

3  I didn't realize --

4       THE COURT:  Well, we will allow persons to speak --

5  who are speaking not to wear a mask, to remove it while

6  they're speaking.  I don't know if that will help you, though.

7  Do you have a hearing problem?

8       PROSPECTIVE JUROR MEDLEY:  I've got a hearing aid,

9  but this amplification stuff is difficult.  I didn't realize

10 it would be that difficult when I answered my questionnaire.

11      THE COURT:  All right.  Thank you, sir.  We

12 appreciate that.

13      PROSPECTIVE JUROR SCHULTZ:  Kirk Schultz.  I have a

14 small landscape installation business since '07.

15      THE COURT:  All right.  Thank you.

16      PROSPECTIVE JUROR MALZI:  Glenda Malzi.  My husband

17 and I ran a home renovation business for a while, but we no

18 longer do that.

19      THE COURT:  All right.  Thank you.  Anyone else?

20      PROSPECTIVE JUROR COBLENTZ:  Joan Coblentz.  We own a

21 construction business and a mini storage.

22      THE COURT:  All right.  Thank you.  Have any of you

23 ever owned or operated or worked for a business that

24 manufactured homemade products?

25           Have you used Google, Facebook, or a similar service

1  to advertise a product or invite visits to a website?

2          Have you ever applied for or owned a trademark?

3          Have you ever been accused of infringing a trademark,

4  copyright, patent, or trade secret?

5          And have you ever accused anyone of infringing on a

6  trademark, copyright, patent, or trade secret?

7          Do any of you know of any reason you could not serve

8  as a juror in this case and render a verdict based solely

9  according to the law and to the evidence, the evidence you

10  hear here in the courtroom?

11          Are you sensible to any bias or prejudice against the

12  case or the parties, anything of that nature?

13          All right, I would ask counsel to come up to the --

14      (Bench conference on the record with all counsel

15  present.)

16          THE COURT:  All right.  Mr. Medley seems to be the

17  first person on the list.

18          THE CLERK:  Correct.

19          THE COURT:  And I think I would excuse him.  It seems

20  to me he can't --

21          MR. LAUBSCHER:  I would agree.

22          MR. WILLETT:  Yeah.

23          THE COURT:  So that means -- everyone has taken all

24  their strikes, right?

25          THE CLERK:  Correct.

1        THE COURT:  So that means that Teresa Jones is --

2        THE CLERK:  Next.

3        THE COURT:  -- the next juror.  Is that agreed?

4        MR. LAUBSCHER:  Yes, sir.

5        MR. WILLETT:  Yes.

6        MR. GOODRUM:  Your Honor, what about one or two

7   alternates?

8        THE COURT:  Well, we have two alternates.  We only

9   need six.

10        MR. GOODRUM:  Okay.  Thank you, Your Honor.

11        THE COURT:  So we normally -- we don't have anybody

12   designated in civil cases.

13        THE CLERK:  All right, so she's Juror 8.  No need to

14   do the striking process.  That's easy.

15      (End of bench conference.)

16        THE COURT:  You may call the juror.

17        Members of the jury, we'd already selected most of

18   the jury before you got here, so I'm going to release most of

19   you, all but one.

20        And if you would call the juror's name.

21        THE CLERK:  The name of the remaining juror to serve

22   in this case is Teresa Peregoy Jones.

23        THE COURT:  Where is she?

24        THE CLERK:  If you'll stand, please.  Back here in

25   the gallery.

1          THE COURT:  Ma'am, if you would come up and join the

2    other jurors in the jury room.

3          All right, you members of the jury panel, I'm going

4    to excuse you at this time.  Sorry to have inconvenienced you

5    this morning, but because of the COVID situation, we had to

6    bring the jurors in in groups, and we were able to use most of

7    the jurors already.  But, anyway, I'm going to release you at

8    this time.

9          We appreciate you coming.  You've performed a great

10   service by being here.  We couldn't have gotten a jury without

11   you, so thank you.  You're excused at this time.

12        (Venire members leave the courtroom.)

13        THE COURT:  All right.  Y'all may be seated.

14        All right.  At this time I'm ready to recall the

15   jury, and I have a preliminary instruction to read to them

16   before we begin, and we'll see how much time is left.

17        But how long do you think your opening statement will

18   be?

19        MR. WILLETT:  Judge, mine will be a little bit more

20   than a half an hour, probably about 35 minutes.

21        THE COURT:  All right.  At least we may get yours in

22   before lunch.

23        You may call the jury, and they'll all sit on the

24   back row.

25        (Jury in at 11:22 a.m.)

1        THE COURT:  All right.  You may swear the jury.

2        THE CLERK:  Ladies and gentlemen, please stand and

3   raise your right hands to be sworn.

4     (Jury is sworn.)

5        THE CLERK:  Thank you.  You may be seated.

6        THE COURT:  Thank you.

7        Ladies and gentlemen, now that you've been sworn,

8   there are some preliminary instructions I'm going to give you

9   concerning the trial.

10        This is a civil case.  In a civil case the party who

11  brings the lawsuit is called the plaintiff.  In this case the

12  plaintiff is Emerson Creek Pottery, Inc.  The party against

13  whom the suit is brought is called the defendant.  In this

14  case the defendants are Countryview Pottery Company, Emerson

15  Creek Events, Inc., Christina Demiduk, and Davis Demiduk.

16        You will sometimes hear me refer to "counsel."

17  Counsel is another way of saying attorney or lawyer.  I will

18  sometimes refer to myself as the "Court."

19        It will be your duty to find from the evidence what

20  the facts are.  You and you alone will be the judges of the

21  facts.  You will then have to apply to those facts the law as

22  I will give it to you.  You must follow that law whether you

23  agree with it or not.

24        Nothing I may say or do during the course of the

25  trial is intended to indicate or should be taken by you as

1  indicating what your verdict should be.

2        You are the judges of the facts, the credibility of

3  the witnesses, and the weight of the evidence.

4        You may consider the appearance and manner of the

5  witnesses on the stand; their intelligence; their opportunity

6  for knowing the truth and for having observed the things about

7  which they testified; their interest in the outcome of the

8  case; their bias; and if any have been shown, their prior

9  inconsistent statements, or whether they have knowingly

10 testified untruthfully as to any material fact in the case.

11       You may not arbitrarily disregard believable

12 testimony of a witness.  However, after you've considered all

13 the evidence in the case, then you may accept or discard all

14 or part of the testimony of a witness as you think proper.

15 You are entitled to use your common sense in judging any

16 testimony.  From these things and all other circumstances of

17 the case, you may determine which witnesses are more

18 believable and weigh their testimony accordingly.

19       I am now going to briefly summarize the plaintiff's

20 claims and defendants' defenses.  This summary is not

21 evidence.  This is only a preview of the issues.

22       Plaintiff claims that defendants infringed

23 plaintiff's trademarks and breached a contract, also referred

24 to as a trademark licensing agreement between plaintiffs and

25 defendant.

1       Defendant denies these claims.  Defendant denies the

2  plaintiff and the defendant ever entered into a trademark

3  licensing agreement.  Defendant also contends that plaintiff

4  acquiesced in defendants' use of the trademark and that

5  plaintiff granted defendants a naked license.

6       I will explain what each of these terms means.

7       A trademark is a type of intellectual property

8  consisting of a sign or mark that identifies a particular

9  product or service and distinguishes that product or service

10 from others.

11      Subject to certain defenses, a trademark owner may

12 enforce the right to exclude others from using trademarks in

13 an action for infringement.

14      A trademark licensing agreement is an agreement

15 between two or more parties where one party who holds the

16 trademark allows another party to use that trademark in

17 exchange for consideration, that is, in exchange for a promise

18 of something of value.

19      Trademark acquiescence occurs if the plaintiff

20 implicitly or explicitly assures the defendants that plaintiff

21 will not assert its trademark rights.

22      Naked licensing occurs when a party who holds a

23 trademark and licenses the trademark to another party fails to

24 exercise adequate control over the trademark.

25      In a civil case, the plaintiff has the burden of

1  proving its case by what is called the preponderance of the

2  evidence.  This means that the plaintiff has to produce

3  evidence which considered in the light of all the facts leads

4  you to believe that what the plaintiff claims is more likely

5  true than not.  To put it differently, if you were to put

6  plaintiff's and defendants' evidence on opposite sides of the

7  scales, the plaintiff would have to make the scales tip

8  somewhat on its side.  And if plaintiff fails to meet this

9  burden, the verdict must be for the defendants.

10          Defendants have raised several affirmative defenses.

11  The burden of proof for affirmative defense is on the

12  defendants.  The burden of proof for an affirmative defense is

13  the same as the one for plaintiff's claims, a preponderance of

14  the evidence.

15          The evidence from which you will find the facts will

16  consist of the testimony of witnesses, documents, and other

17  things received into the record as exhibits, and any facts

18  that the lawyers agree to or stipulate to, or that I may

19  instruct you to find.

20          Certain things are not evidence and must not be

21  considered by you.  I will list them now.

22          One:  Statements, arguments, and questions by lawyers

23  are not evidence.

24          Two:  Objections to questions are not evidence.

25  Lawyers have an obligation to their clients to make objections

1   when they believe evidence being offered is improper under the

2   rules of evidence.

3           You should not be influenced by the objection or by

4   the Court's ruling on it.  If the objection is sustained,

5   ignore the question.  If it is overruled, treat the answer

6   like any other.  If you are instructed that some item of

7   evidence is received for a limited purpose only, you must

8   follow that instruction.  Testimony or any matter that the

9   Court has excluded or told you to disregard is not evidence

10  and must not be considered.

11          Anything you may have seen or heard outside the

12  courtroom is not evidence and must be disregarded.  You are to

13  decide the case solely on the evidence presented here in the

14  courtroom.

15          There are two kinds of evidence, direct and

16  circumstantial.  Direct evidence is direct proof of a fact,

17  such as testimony of an eyewitness.  Circumstantial evidence

18  is proof of facts from which you may infer or conclude that

19  other facts exist.  I will give you further instructions on

20  these as well as other matters at the end of the case, but

21  keep in mind that you may consider both kinds of evidence.

22  You may also draw all reasonable and legitimate inferences and

23  deductions from the evidence.

24          As judges of the facts, it will be up to you to

25  decide which witnesses to believe, which witnesses not to

1  believe, and how much of any witness's testimony to accept or

2  reject.  This part of a jury's responsibility is referred to

3  as determining the credibility of the witnesses.

4          Among the factors you may properly consider in

5  deciding whether a particular witness is credible or

6  believable are:

7          One:  Whether the witness has any motive or reason

8  for being either truthful or untruthful;

9          Two:  Any interest the witness may have in the

10  outcome of the case;

11          Three:  Whether there is any appearance or indication

12  of bias or prejudice in the witness's testimony or conduct;

13          Four:  The extent to which other evidence supports or

14  contradicts the testimony;

15          Five:  Whether the witness is likely to recall or

16  have knowledge of the facts about which he or she is

17  testifying.

18          In considering the weight to be given to the

19  testimony of an expert witness, you should consider the basis

20  for the opinion and the manner by which the witness arrived at

21  it, and the underlying facts and data upon which the witness

22  relied.

23          Now a few words about your conduct as jurors.  First,

24  I instruct you that during the trial you are not to discuss

25  the case with anyone or permit anyone to discuss it with you.

1   This includes your family, friends, and those with whom you

2   work, as well as your fellow jurors.  Until you retire to the

3   jury room at the end of the case to deliberate on your

4   verdict, you simply are not to talk about this case.

5         Second, do not read or listen to anything relating to

6   this case in any way.  If anyone should try to talk to you

7   about it, bring it to the Court's attention promptly.

8         Third, do not try to do any research or make any

9   investigation about the case on your own.

10         Finally, do not form any opinion until all the

11   evidence is in.  Keep an open mind until you start your

12   deliberations at the end of the case.

13         If you wish, you may take notes during the trial, but

14   if you do, leave them in the jury room when you leave at

15   night.  And remember that they are for your own personal use.

16   Be careful not to get so involved in note taking that you

17   become distracted and miss part of the testimony.  Your notes

18   are only to aid your memory, and if your memory later differs

19   from your notes, rely on your memory.  Do not be unduly

20   influenced by the notes of other jurors.  A juror's notes are

21   not entitled to any greater weight than the recollection of

22   each juror concerning testimony.

23         I know that many of you use cell phones, Internet,

24   and other tools of technology.  You must not talk to anyone at

25   any time about this case or use these tools to communicate

1  electronically with anyone about the case.  As I said, this

2  includes your family and friends.

3      You may not use any technology or social media

4  related to learning anything about the case.  I expect you

5  will inform me as soon as you are aware of another juror's

6  violation of these instructions.  A juror who violates these

7  instructions jeopardizes the fairness of the proceeding and a

8  mistrial could result which would require the entire trial

9  process to start over.

10      The case will proceed as follows:  First, the lawyers

11  for each side may make opening statements.  What is said in

12  the opening statements is not evidence but is simply an

13  outline or summary to help you understand what each party

14  expects the evidence to show.  A party is not required to make

15  an opening statement.

16      After the opening statements, the plaintiff, Emerson

17  Creek Pottery, Inc., will present evidence in support of its

18  claims, and the lawyers for the defendant may cross-examine

19  the witness.  At the conclusion of the plaintiff's case,

20  defendants may also introduce evidence in opposition to

21  plaintiff's claims and in support of defendant's claims.  And

22  plaintiff's lawyers may cross-examine those witnesses.  The

23  parties may present evidence in rebuttal to evidence

24  introduced by the other side.

25      After the evidence is presented, I will instruct you

1  on the law and the plaintiffs and the lawyers will make their

2  closing arguments.  And I will tell you at this point, what is

3  said in closing arguments is not evidence; it is only the

4  attorney's opportunity to tell you -- argue to you what the

5  evidence shows.

6          And finally, I will instruct you on the law -- well,

7  I will instruct you before the jury instructions.

8          All right.  Counsel for the plaintiff may make its

9  opening statement.

10         MR. WILLETT:  Good morning.  Ladies and gentlemen, my

11  name is Henry Willett.  And I know we've been introduced, but

12  I'll say it again just for your memory.  With me today is my

13  co-counsel Garfield Goodrum, as well as my assistant, Ashley

14  Schmitz, who will be thankfully helping us with the technology

15  aspect of today.

16         As the Court said, we are here today representing the

17  plaintiff, Emerson Creek Pottery, Inc.  It's a family-owned

18  business from about 40 minutes from here in Bedford, Virginia.

19         Here with us today, and folks that you'll hear from

20  through the trial, are Jim Leavitt, seated there in the

21  middle; his wife, Trenda, to his right; and then to his left

22  his daughter, Elena.  Their son, William, may also make an

23  appearance at some point in time.

24         Before we start, I do want to state the obvious,

25  which is thank you for your service and attention to this

1  matter.  Appreciating the Judge's directives, this is not

2  necessarily a case you're going to see on the nightly news,

3  but it is a case that's obviously important to these parties,

4  and we do appreciate your attention here.

5       Mr. Leavitt started Emerson Creek Pottery in the

6  1970s.  And in 1977, 45 years ago, he and his former wife

7  moved to Bedford, Virginia, to the destination now known as

8  Emerson Creek.  While Mr. Leavitt is the president and owner

9  of Emerson Creek, he's also an artist, a creator, and he has

10 been creating this brand, his brand, Emerson Creek, for

11 decades now.  Emerson Creek is a destination.  It's the place

12 where his handcrafted pottery is made and where it's sold.

13      This case is about a life's work, Mr. Leavitt's life

14 work, his legacy, Emerson Creek, and protecting his brand.

15      As Judge Moon told you earlier, this case involves

16 trademarks.  Trademarks are brands, like Apple for computers

17 or Nike for shoes or Ford for cars.  They tell consumers who

18 stands behind the item they're buying and speak to quality and

19 craftsmanship.  People know that when they buy a Yeti cooler

20 they're going to perhaps pay a little more, or a lot, but that

21 brand stands behind the product that they're buying.  And

22 companies like the ones I have mentioned often have to go to

23 great lengths to protect their trademarks, their brands.

24      This document right here, Ashley will put it on the

25 screen, this is what a registered trademark looks like.  You

 1 can see the gold stamp.  You see the name "Emerson Creek

 2 Pottery, United States of America"; importantly, "United

 3 States Patent and Trademark Office."  This is the actual

 4 registration that Mr. Leavitt obtained.

 5         He got this, again, from the -- we'll call it the PTO

 6 or the U.S. Patent and Trademark Office, the USPTO.  But it's

 7 like a car title, a deed, or boat title.  And he got this

 8 documentation because for more than 45 years he and his fellow

 9 artisans have consistently painted or stamped his Emerson

10 Creek trademarks on every piece of Emerson Creek pottery

11 that's been made in Bedford, Virginia.  And these are the

12 trademarks -- go back one, Ash -- Emerson Creek and Emerson

13 Creek Pottery.  And this is what it looks like on the pottery.

14 And you'll get an opportunity to see these.

15         You can see the back there, there are stamps.  It's

16 hard for you to read from there, but they say, "Emerson Creek

17 Pottery, Bedford, Virginia," and then the year.  This one is

18 from 2008.  Again, these are handmade pieces of pottery made

19 in Bedford, Virginia.

20         This one from a little bit longer ago, reads just

21 like that, "Emerson Creek," and has '83 written in it.  At

22 that point they were hand painted.  And Mr. Leavitt will

23 testify that ultimately they got a stamp, and they changed

24 that stamp every year to reflect when the pottery was made.

25         This fact, this mark, protects the creator of a

1  product, a brand, and members of the public, consumers.  It

2  means that no one else can use that mark, that brand, unless

3  they have permission.  This is called a license.  You heard a

4  little bit about that already.  We'll talk about it in a

5  minute.

6       Trademarks do essentially do two things:  They

7  protect the owner and they protect the public, consumers from

8  confusion when buying goods and services.

9       We will present evidence over the course of the next

10  few days regarding Mr. Leavitt's trademark and the license

11  permission that Mr. Leavitt gave to the defendants to use his

12  Emerson Creek marks to sell Emerson Creek Pottery in a shop

13  called Emerson Creek Pottery in Oswego, Illinois.  The

14  evidence will also show that after years of using the Emerson

15  Creek mark in ways that Mr. Leavitt permitted, consistent with

16  the license, defendants breached that license agreement and

17  the evidence will show infringed those trademarks.

18       So what does that mean?  It means that the evidence

19  will show that the defendants used the trademarks, Emerson

20  Creek and Emerson Creek Pottery, in ways they weren't allowed

21  to.  Defendants were not strangers to Mr. Leavitt.  They were

22  folks that he had met and that he trusted.  He gave them

23  permission to use his trademarks to sell and promote his

24  pottery as long as they acted consistent with his brand, the

25  brand that he's built for over 45 years, and as long as they

1   didn't confuse consumers.

2       We've seen some examples of the pottery on the
3   screen.  Again, this is the pottery made at Emerson Creek.
4   Truly, no two pieces are exactly alike.  It's made in Bedford
5   by people who handle each piece, they shape each piece, and
6   ultimately, incredibly, each one of these is hand painted.
7   Elena will talk about the craft, the artistry that goes into
8   painting each and every one of these pieces of pottery.

9       Emerson Creek Pottery has been featured, as the
10  evidence will show, at Mount Vernon, Monticello, even the
11  Smithsonian.  Those designs have been sold in gift shops.  And
12  just this week, we will show you this, it was featured by
13  Martha Stewart.

14      Mr. Leavitt will explain how he came up with the
15  name, how he decided to call it Emerson Creek Pottery.  He
16  will tell you about the place in Massachusetts where he first
17  learned to throw pottery, to work it on the wheel.  He will
18  tell you about the creek that ran through the place.  It
19  actually turned out to be a brook, but it was Emerson Brook,
20  Emerson Creek.  That's where the name came from.  He chose
21  that name and, indeed, he kept that name when he and his then
22  wife, Priscilla, moved back to Virginia.

23      The evidence will show from that point in 1977 on
24  Mr. Leavitt grew Emerson Creek Pottery into a national and,
25  indeed, international business, using and selling his handmade

 1  pottery at retail and at wholesale around the country, and,

 2  indeed, around the world.

 3       He also, in addition to selling it retail, like gift

 4  shops, he also sells to consumers through his website, in

 5  addition to Amazon and through catalogs.  He will testify

 6  that, as you would expect, the Internet business has been an

 7  increasing part of his business, especially over the last 10

 8  to 15 years.

 9       Mr. Leavitt will talk about other recognitions that

10  he's received, the fact that he was invited to the White House

11  to display his pottery as part of a made in America goods

12  recognition, along with companies like CAT equipment, Stetson

13  hats, and Dubie maple syrup.  Mr. Leavitt built all of this by

14  himself, by his hands, with his family and his hardworking

15  staff, and he's held true to that trademark from the first

16  days back in 1977 when he moved back to Virginia.

17       So who are the defendants?  I'll start by telling you

18  how Mr. Leavitt and Ms. Demiduk met.

19       Chris Demiduk and her former boyfriend, Ron Wehrli,

20  were visiting family at Smith Mountain Lake.  Mr. Wehrli's

21  family had bought pottery from Emerson Creek before, and

22  Mr. Wehrli and Ms. Demiduk had been to Emerson Creek.  At the

23  time they met Mr. Leavitt, Ms. Demiduk and Mr. Wehrli were in

24  the process of fixing up a farmhouse back where they came from

25  in Oswego, Illinois -- it's outside of Chicago -- so that they

 1  could start a business, right?  And she will tell you the

 2  story about that, and you'll see it actually in some of the

 3  media.

 4       Ms. Demiduk had 14 years' experience in higher end

 5  retail sales, including Nordstrom, before deciding to open

 6  this business on the farm.  She had even at one point

 7  considered opening a Krispy Kreme franchise before focusing on

 8  the farm.  But instead of going with that Krispy Kreme

 9  franchise, she decided she wanted more flexibility, and that's

10  what she believed that a seasonal shop would offer her,

11  running a shop like Emerson Creek.

12       And so they decided, Mr. Wehrli and Ms. Demiduk, that

13  they would talk to Mr. Leavitt and see if he would let them

14  open an Emerson Creek pottery shop in Illinois.  The three of

15  them meet and discuss how it would work.  They discussed what

16  ultimately became a license agreement.  The evidence will show

17  that through these discussions, which, again, a license

18  agreement -- we'll talk about this.  There's no magic.  It's a

19  little different than something like this with the gold stamp.

20  It can be verbal, which it was in this case.  But the evidence

21  will show the terms weren't complicated, and they really

22  related to what she intended to do, that is, replicate Emerson

23  Creek, this destination where people would go and view and buy

24  pottery.  She was going to replicate that back in Illinois.

25       Mr. Leavitt will explain the terms to you, their

1   handshake agreement whereby he would allow them to use the

2   marks Emerson Creek and Emerson Creek Pottery to open that

3   shop, the shop to be called Emerson Creek Pottery in Illinois,

4   where they would sell his pottery along with accessories.

5   Just like Mr. Leavitt's shop back in Bedford, defendants'

6   Emerson Creek Pottery would be an outlet store, initially

7   selling seconds and overstocked Emerson Creek Pottery.

8           Because they would be calling the shop Emerson Creek

9   Pottery and filling it with his pottery, agreeing that

10  75 percent of the merchandise would be Emerson Creek Pottery,

11  Mr. Leavitt agreed that he would sell this pottery to them at

12  a significant discount, and, indeed, the evidence will show

13  that he agreed to discounts of 30 to 40 percent off of

14  wholesale.  And just to be clear, that means the discount

15  comes off of what he would sell to shops.  So that's a fairly

16  significant discount.  Mr. Leavitt agreed that he would

17  arrange for the shipping but that Ms. Demiduk and Mr. Wehrli

18  would be responsible for that cost.

19          Now, why is it important that defendants were opening

20  a shop called Emerson Creek Pottery?  Because it meant that

21  they would be selling Emerson Creek pottery.  They would be

22  representing the brand, promoting and selling Emerson Creek in

23  the Midwest.

24          Mr. Leavitt had met Ms. Demiduk, saw her skills as a

25  merchandiser, as a promoter, and decided that this would

1  indeed be to his benefit to do this license agreement so that

2  she could be his voice in the Midwest.

3          Just like the folks visiting Emerson Creek in

4  Bedford, Virginia, anyone who visited Emerson Creek Pottery in

5  Illinois could rest assure that they were getting high

6  quality, American made, handcrafted pottery; just like going

7  to the Nike outlet and knowing you're getting Nike shoes, not

8  Reebok, and certainly not an imitation.

9          At the end of the discussion, the parties agreed to

10 the licensing agreement, and Mr. Wehrli cut a check to

11 purchase some Emerson Creek Pottery that day, so that it could

12 be shipped back to Oswego and they could fill the store with

13 Emerson Creek Pottery.

14         While I've told you this story and Mr. Leavitt will

15 tell you this story, you can also read the story.  One

16 place -- a number of newspapers have featured Ms. Demiduk,

17 this article coming in 2002 from the *Chicago Tribune* where she

18 says, "I bought a set of pine cone patterned dishes from

19 Emerson Creek while I was visiting relatives in Bedford.  I

20 had been wanting to open some kind of store, so I asked the

21 owners if they would be interested in having an Emerson Creek

22 shop in Illinois, and they said, 'Yes.'"  Ms. Demiduk asked

23 the owners and they said "yes."  Ms. Demiduk told the same

24 thing to many newspapers, and we'll show you some of those,

25 over the years, and even put it on their website, identifying

Plaintiff's Opening Statement

1   the pottery as namesake pottery, Emerson Creek Pottery.

2          What the evidence will also show is that defendants,

3   and, really, Ms. Demiduk, was an experienced marketer, a

4   merchandiser with more than a decade of retail experience.

5   She also traveled the world, selling on cruise ships, in

6   addition to working at Nordstrom.  Mr. Leavitt appreciated

7   that sales experience, and more importantly, her passion for

8   the product, the Emerson Creek pottery, and her desire to

9   replicate this destination, off the beaten path, in Bedford,

10  Virginia, back in Oswego, Illinois.

11         Under Mr. Leavitt's watchful eye, Ms. Demiduk did

12  exactly that.  She replicated Emerson Creek in Illinois,

13  opening a pottery shop that bore the name Emerson Creek

14  Pottery in 2001, and selling Emerson Creek Pottery and

15  promoting the Emerson Creek brand throughout the Midwest.

16         From there, Ms. Demiduk started offering a

17  promotional tearoom and snacks at the location, because she

18  listened to her customers.  They said they enjoyed the country

19  location.  They would bring snacks, they would bring lunches.

20  And she, being an entrepreneur, said, "Well, I'll open a

21  tearoom."  This allowed her to get more folks to come to the

22  property and to promote her sale of the pottery.

23         She promoted this tearoom as a place great for

24  showers, parties, meetings, or just to relax on the porch.

25  And she did all of this under Mr. Leavitt's Emerson Creek

 1  Pottery mark, with a large roadside sign directing customers

 2  to the destination that was Emerson Creek, with Emerson Creek

 3  Pottery etched on a rock that stood on the location in Oswego,

 4  Illinois, on the way into the gift shop and, ultimately,

 5  tearoom.

 6          Additionally, she used the marks on menus and fliers

 7  and online advertising on her website.  We'll show you this

 8  exhibit and walk through it.  This is from one of her early

 9  websites that actually tells the story that I've told of how

10  her Emerson Creek Pottery came to be, of how Emerson Creek

11  Pottery, the destination, came to be in Illinois.

12          Emerson Creek Pottery and Mr. Leavitt were involved

13  every step of the way.  The evidence will show that there was

14  constant, and I mean constant, communication between

15  Mr. Leavitt here in Bedford and defendants in Oswego.  And you

16  heard the Judge say earlier this idea of control, this was the

17  control.  The evidence will show that Mr. Leavitt kept

18  apprised of everything that was happening through very

19  frequent e-mail and telephone conversations with Ms. Demiduk.

20  And she would discuss everything, and you'll get to see that.

21          This case happened a long time ago, or a lot of facts

22  in this case happened a long time ago, but fortunately we have

23  e-mails, fortunately we have websites, and you can read for

24  yourself what the parties discussed:  Her marketing efforts,

25  product selections, she would send him pictures of the store,

1   and, ultimately, the restaurant, the tearoom, and then

2   ultimately events.  She even made a cookbook.  And you'll get

3   to see that cookbook, and it's very well done.

4          Mr. Leavitt even created new pieces of pottery

5   requested by Ms. Demiduk.  She had ideas, and if it was a fit

6   for his brand, then he would use those ideas and he would make

7   that pottery so she could sell that Emerson Creek Pottery in

8   her shop in Illinois.

9          The evidence will show that Ms. Demiduk considered

10  herself a franchisee much like the Krispy Kreme store she

11  wanted to open.  She not only promoted the pottery, she

12  promoted Emerson Creek, soliciting other potential franchisees

13  and explaining to them exactly how it worked, that they -- and

14  you'll get to read this, that they too would need to stock

15  their shop with Emerson Creek pottery.  All the while,

16  Ms. Demiduk was mindful of her license and the need to get

17  Mr. Leavitt's approval, for example, before selling some extra

18  pottery that she had to another franchisee.  She knew she

19  needed to ask for that permission, and, Mr. Leavitt, thinking

20  it was reasonable, granted it.

21         Mr. Leavitt knew and approved of her marketing

22  efforts; that's why he gave her the license.  He wanted that

23  marketing to market Emerson Creek in the Midwest.  He knew of

24  and allowed her to sell -- to use his pottery to sell food in

25  the restaurant and to decorate Emerson Creek in Illinois.

1      He knew these things not only because Ms. Demiduk

2 told him in regular phone calls and e-mails, and sent him

3 photos.  But he also knew because Emerson Creek in Bedford was

4 on their mailing list and she regularly sent mailers.  And

5 we'll see some of those fliers that she would send before the

6 season, before May, when they would reopen after the winter

7 season in Illinois.

8      As technology grew, Mr. Leavitt, his employees, his

9 family members would monitor what the defendants were doing on

10 the Internet, Facebook, other forms of social media.

11 Importantly, reviews like Yelp, Tripadvisor, they would watch

12 all of that.

13      He knew of and approved defendants putting up that

14 large sign we saw with Emerson Creek Pottery, and ultimately

15 adding "and tearoom."  That was the name they wanted to --

16 they now had the tearoom.  She asked for permission, "Can I

17 call it Emerson Creek Pottery and Tearoom?"  He knew of this

18 and he granted it.  He knew of the fact that this was what led

19 customers, not just who were there to buy pottery, but folks

20 who were visiting the restaurant and folks who were there for

21 events, everyone who came would see this sign and know where

22 to turn to find the destination that was Emerson Creek Pottery

23 in Oswego, Illinois.

24      He knew that his pottery hung all over the walls and

25 decorated the inside of the shop and the restaurant, even the

1  outside.  He knew that the food served in the tearoom was

2  served on Emerson Creek Pottery.  And he approved of this

3  because he knew that those folks who were there would feel the

4  quality, how solid these pieces were, that it would promote

5  his pottery and the sales of his pottery.

6        He also knew that the destination created by his

7  pottery was used for weddings, started hosting weddings, and

8  this is from a video that you'll get to see.  Unfortunately,

9  when we show you the video, we don't have the sound anymore;

10  it's now been removed from YouTube.  But you'll get to see it.

11  It's a very well done video, and it sort of documents the life

12  of the product, the life of Emerson Creek Pottery in Illinois,

13  starting with the shop, to the tearoom, to the weddings and

14  events.

15        Speaking of weddings, Mr. Leavitt knew when

16  Ms. Demiduk married her husband, her now husband, Mr. Demiduk,

17  Dave Demiduk, and when the wedding business began, because his

18  pottery had helped to create and decorate picturesque scenes

19  on that property, a destination that had Emerson Creek Pottery

20  written on signs, decorating walls of the location, on menus,

21  posters, mailings, advertising, and, indeed, the website.  He

22  saw the pictures, had phone calls, and was able to monitor and

23  exercise control over what she was doing.  He knew, approved,

24  and allowed her to use these marks in this way, again so he

25  could promote and sell his own pottery.  This was good for his

1 business. That was the purpose of the license agreement, as

2 he will testify. He approved of what he liked and thought

3 would fit his brand, and in some instances he had to say no.

4       In 2009, Ms. Demiduk specifically asked Mr. Leavitt,

5 because of an issue that had happened with their website

6 provider, if they could change their former website from

7 www.ecreekpottery.com to what you see on the screen,

8 www.ecreekpotteryandtearoom.com. Mr. Leavitt agreed.

9       Again, all of this happens over a fairly lengthy

10 period of time, and so I apologize for taking so much time

11 this morning, but we do have a fair amount of evidence to

12 present and we'll do that as efficiently as possible, but I do

13 think it's helpful to see a timeline of those events.

14       Again, you can see here in 1977 the creation of

15 Emerson Creek in Bedford. You can see in 2001 the license

16 agreement, the meeting with Mr. Leavitt, the store opening

17 shortly thereafter, the tearoom opening in 2003, and then 2010

18 another important event, their nuptials and the beginning of

19 their events business.

20       So what happened? That sounds great. How did we end

21 up here? Here's what the evidence will show: As the Internet

22 became more and more of a medium for searching for things like

23 pottery and restaurants, confusion started to increase. You

24 know that control we were talking about that Mr. Leavitt had

25 exercised over the conduct of the defendants? Well, that

1  effort and diligence started to show this confusion for the

2  purchasing public and particularly online.  For example, the

3  problem with destinations is that they're off the beaten path,

4  so in 2012, when people started using Google Maps to get to

5  Emerson Creek, they began to get confused, looking for Bedford

6  and being directed to Oswego and vice versa.  Not great for

7  either company.

8           Because defendants had already been referring to

9  themselves as Emerson Creek Pottery and Tearoom, as we saw

10  from the website URL, Mr. Leavitt directed defendants that

11  they needed to change their listing through Google Maps from

12  Emerson Creek Pottery to Emerson Creek Pottery and Tearoom,

13  the evidence will show this, and that the response was, "We

14  will do whatever we need to do," cooperative and agreed, and

15  ultimately worked with Google to make that name change for the

16  listing.

17          In 2014, a couple of years later, Mr. Leavitt began

18  to notice that Ms. Demiduk, the defendants, were buying less

19  pottery.  So you'll see this from the correspondence we'll

20  show.  Both of them were very diligent in looking at the

21  sizing of her orders and how much pottery she would buy each

22  year to sell in that shop in Oswego.  And Mr. Leavitt, you'll

23  see the evidence will show, noticed that at this time in 2014

24  there had been a dip, a fairly significant dip, and he asked

25  her specifically, "Are you selling third-party pottery?"  And

1  you'll see -- you get to read it for yourself; you don't have

2  to hear it from him or hear it from her -- a lengthy

3  explanation of the factors: implicating sales, the cost of

4  running a small business, but not a single word about selling

5  third-party pottery, not a single word about selling pottery

6  other than the handcrafted Emerson Creek Pottery.  Indeed,

7  we'll show you the websites during this time period where they

8  continued to tout the story behind the creation of this

9  pottery, the namesake pottery.

10         Moving forward, defendants' sales continued to lack

11  while both parties' Internet presence increased.  Indeed,

12  Mr. Leavitt's Internet and online sales became a bigger

13  portion of his overall sales, and the restaurant and events

14  business became a bigger portion of defendants' business, the

15  destination of Emerson Creek Pottery and Tearoom.

16         The evidence will show that when Mr. Leavitt's

17  daughter, Elena, who you will hear from, created an Instagram

18  account for Emerson Creek Pottery in 2016, she had to use

19  underscores because defendants were already using Emerson

20  Creek Pottery.  At that time, you will see the correspondence,

21  Mr. Leavitt reminded the defendants that they needed to use

22  the "and tearoom," just like it appeared on the URL, and that

23  they should use that with all aspects of Emerson Creek so that

24  the public could keep Oswego and Bedford straight.

25         For 17 years Mr. Leavitt had communicated directly

1  with Ms. Demiduk regarding everything from sales to marketing

2  to everything else, but at that point, Mr. Demiduk took over

3  the discussions of how defendants could use Mr. Leavitt's

4  Emerson Creek mark.  Meanwhile, Ms. Demiduk did continue to

5  communicate with Mr. Leavitt regarding pottery sales and even

6  asked Mr. Leavitt if he would make her pottery using words and

7  phrases, something that she had just seen at a show in Las

8  Vegas.  The evidence will show that Mr. Leavitt looked into

9  this and responded, yeah, that he would make those patterns,

10 just send him the words.  And indeed he did make this pottery.

11        Unfortunately, the communications between Dave

12 Demiduk and Mr. Leavitt broke down, and ultimately lawyers

13 were involved.  In the course of these discussions, and you'll

14 see it, it's in writing, the question was asked were they

15 selling third-party pottery.  The answer was, "No, we're not

16 selling third-party pottery under the Emerson Creek mark."

17        Well, Mr. Leavitt found that hard to believe at that

18 point in time and he hired a private investigator.  You'll see

19 what he was given.  He sent that person to Illinois to see

20 what was being sold, and what was discovered there in the shop

21 carrying his name, the brand Emerson Creek Pottery, was

22 inexpensive, low quality, mass-produced pottery produced in

23 China.  You will see defendants' website and social media

24 post.  I'll take that.  And this is what was purchased.  This

25 is what was given to Mr. Leavitt from that shop.  This one

 1 | says "starters," but it's mass produced.

 2 |         But when we show you the website and we show you the

 3 | depictions, the advertising, what was shown to the world, to

 4 | Mr. Leavitt, you'll see this: handcrafted, American made,

 5 | namesake Emerson Creek Pottery.

 6 |         Mr. Leavitt will tell you he didn't want people going

 7 | into a store with the name Emerson Creek Pottery and buying

 8 | pottery believing it was the quality of Emerson Creek Pottery

 9 | when it's not.  He had worked too hard on his brand to allow

10 | that to happen.

11 |         At the same time, as this discovery and these

12 | discussions about the Internet and what defendants should be

13 | called, the evidence will show that the confusion continued to

14 | increase, and, ultimately, defendants refused to cooperate

15 | with Mr. Leavitt's request about their use of his trademarks.

16 | And the evidence will also show that not only did they refuse

17 | to cooperate, they initiated a campaign of their own to keep

18 | Mr. Leavitt from using his own marks.  Indeed, we'll show them

19 | to you, defendants filed applications for the Emerson Creek

20 | marks with the USPTO, the patent and trademark office that we

21 | talked about earlier.

22 |         At this point Mr. Leavitt will testify he had no

23 | choice, he was forced to terminate the license agreement which

24 | he did on January 5, 2018, specifically telling defendants

25 | that they were no longer authorized to use his mark, they no

1    longer had the permission that had been granted back in 2001.

2         Ultimately, defendants chose to disregard this

3    letter, and we will show you the evidence that will show they

4    continued to use the marks, and, indeed, continued selling

5    pottery.  To be clear, with the license agreement terminated

6    at that point in time, defendants, from Mr. Leavitt's

7    perspective, were not permitted to use the Emerson Creek

8    marks.  And as will be discussed at the conclusion of the

9    case, there are consequences for such actions.

10        You will hear from defendants' marketing consultants.

11   They'll be on Zoom, Ms. Winkler, Lindsay Winkler, and

12   Mr. Domanus, Jonathan Domanus.  They will tell you that upon

13   the instruction of the defendants after the termination of the

14   license, they were asked to buy a number of domain names using

15   Emerson Creek.

16        At the time, you saw the website before the license

17   was terminated, defendants had been using

18   ecreekpotteryandtearoom.com as they had specifically been

19   allowed to do.  At this point they go out and they buy

20   emersoncreekevents.com, Emerson Creek Cafe, and perhaps worse,

21   Emerson Creek Shop.

22        Why did they buy it?  Well, you'll see an e-mail in

23   which Mr. Demiduk says very clearly, and you can read these

24   words for yourself, that he wanted to buy those domains so Jim

25   in Virginia couldn't.  Defendants had licensed a brand from

1    Mr. Leavitt, they had duplicated a destination and provided

2    related promotional services: the restaurant, the weddings.

3         That didn't change the fact, as the evidence will

4    show, that that was still Mr. Leavitt's brand.  This means to

5    use the brand they either had to have the license agreement

6    and play by his rules or they couldn't use it.  Defendants

7    ultimately decided not to do this and that's why we're here

8    today.  We need to keep defendants from using what Mr. Leavitt

9    owns, and to compensate Mr. Leavitt for the profits that

10   defendants have gained from infringing on his property rights.

11        So when I sit down -- and y'all are probably ready

12   for me to sit down, because I think it's going to be lunchtime

13   after this, but bear with me for a couple minutes here.  When

14   I sit down, defendants' counsel will get the opportunity to

15   stand up and tell you their side of the story.  And you heard

16   the Judge talk about some theories, acquiescence and the idea

17   of naked licensing and control, and we've addressed a lot of

18   those.  But you might hear things like, "Jim didn't care.  Jim

19   gave up his rights.  Jim failed to control his brand.  Making

20   pottery and hosting weddings has nothing to do with -- you

21   know, pottery and weddings, or pottery and yoga, those don't

22   have anything to do with one another."  You might also hear

23   that defendants have closed their shop and won't sell pottery

24   anymore.

25        Let's address each of these very briefly.  First,

1  with respect to the notion that Mr. Leavitt didn't care, we're

2  here because of how much he cared.  The evidence will show the

3  constant e-mails between the parties, the willingness on his

4  part to consider those products requested by defendants,

5  saying no to certain design requests that didn't fit with the

6  mark but saying yes to many others, the concern when the

7  confusion arose, bringing this to their attention, the initial

8  cooperation and then later when things changed.  These were

9  efforts to protect his brand, and the evidence will establish

10 that Mr. Leavitt cared, and for 17 years he controlled the use

11 of his Emerson Creek marks.

12        Second, defendants will tell you that there's no

13 connection between pottery and food and banquets or wine and

14 yoga and so anyone can use Mr. Leavitt's Emerson Creek marks

15 to sell those things.  Going back to my Nike analogy, that's

16 like saying the licenses a retailer sells, we can give someone

17 the ability to sell shoes, and then you give them a license to

18 make an energy drink.  Obviously, the energy drink rode in on

19 the coattails of the brand, the Nike brand, for example, and

20 promoted it.  And once the license terminates, that retailer

21 doesn't get to go back and say, "Well, hey, I get to still

22 call myself Nike because you don't make an energy drink,

23 Nike."  No.

24        And that's what we have here.  That's what the

25 evidence will show.  Defendants used Mr. Leavitt's pottery,

1  his brand, for nearly 17 years to replicate the destination

2  that is Emerson Creek, and to promote that destination by

3  serving food on his pottery and holding events at the same

4  place, Emerson Creek.  Yet these are the very things, the food

5  service and the events, that you're going to hear are somehow

6  not related to pottery.

7          The restaurant and events were natural outgrowths of

8  selling pottery and promoting one another, and Mr. Leavitt

9  will talk about the control he exhibited over that and the

10 fact that he was excited that they were doing that, that they

11 were promoting his products.

12         Defendants depended on their connection between --

13 their business and Emerson Creek Pottery; we'll show that.

14 This is a sampling of their website, which shows all three of

15 these items listed together, the pottery, the tearoom, and the

16 barn.  They were self-perpetuating.  They were self-marketing.

17 Again, the evidence will show that Mr. Leavitt had replicated

18 what was built in Bedford and that these were ways of growing

19 and promoting that business even further.

20         You will also hear testimony from -- Your Honor

21 mentioned experts.  You'll hear from an expert, from a search

22 engine optimization expert.  He will show us how defendants'

23 continued use of Emerson Creek continues to cause confusion on

24 the Internet.

25         Plaintiffs used the Emerson Creek Pottery mark and

1  the actual pottery for 17 years to promote the restaurant and

2  to promote banquets and weddings and to build a destination

3  like Mr. Leavitt's in Bedford.  But now we'll tell you that

4  there is no connection between these events.  The evidence

5  will show that connection and the testimony of the expert will

6  explain the importance and why words do matter in searching on

7  the Internet.

8          Third, defendants recently started saying that they

9  have closed their shop and stopped selling any pottery.  So

10 what's the problem?  Well, the problem is that the evidence

11 will show that as recently as last summer they were continuing

12 to sell pottery now under the name Emerson Creek.  Moreover,

13 for years now defendants have sold this imitation pottery

14 under the name Emerson Creek Pottery, infringing Mr. Leavitt's

15 marks.

16         Defendants are responsible for those actions.

17 Additionally, and we've talked about the URLs earlier, in

18 addition to now changing their URL from Emerson Creek Pottery

19 and Tearoom to simply www.emersoncreek.com, the evidence will

20 show that Mr. Demiduk directed his vendor to register

21 ecreekpotteryandtearoom.com for five more years, even though

22 they're not using it.  Why?  So that folks could be

23 redirected, folks searching for Emerson Creek Pottery could be

24 redirected to their current website.  That's right, despite

25 the representations that they're no longer doing pottery

1    business, when you search for that and when you find their old

2    website, and we'll show you this, you're directed to their new

3    website.

4           So defendants are -- even though they characterize it

5    is as, "Well, we've dropped the 'and pottery,'" or "We've

6    dropped the 'tearoom,'" by continuing to use the mark, the

7    mark that they were licensed, Emerson Creek, we'll show that

8    they are continuing to do, in essence, what had been done

9    before.  And we'll show you that through the search engine

10   expert as well as their other marketing efforts.

11          The bottom line is that defendants' continued use of

12   Emerson Creek inappropriately suggests a relationship, a

13   sponsorship.  They had been this for so long, when you look at

14   it, and you'll see these examples on the Internet, it's easy

15   to say, "Oh, well, Mr. Leavitt in Bedford must be sponsoring

16   or promoting these events, because they're called Emerson

17   Creek."  Indeed, if you search "Emerson Creek," just the term

18   "Emerson Creek," and we'll show you these examples on the

19   Internet or social media, you'll get results to this day

20   mixing Mr. Leavitt with the defendants such that a normal

21   viewer could only conclude some form of connection.  In the

22   evidence you'll get to see that for yourselves, and the search

23   engineer will explain to you why this happens.

24          Indeed, as the evidence will show, the only way the

25   public at the end of the day will not confuse the two is if

1  defendants stop using this Emerson Creek mark.  And that's

2  what we're asking for at the end of the day.  If they continue

3  to do this, the evidence will show that at least on the

4  Internet and otherwise this confusion will continue.

5       And so at the end of the day, that's what we're

6  asking, that they no longer be allowed to use the Emerson

7  Creek mark, the mark that they had been licensed, and the mark

8  that was ultimately terminated in January of 2018, and that

9  Mr. Leavitt be made whole for the damage he suffered.

10       Thank you so much for your time and attention today,

11  and I appreciate it.  Thank you.

12       THE COURT:  All right.  Ladies and gentlemen of the

13  jury, I think at this point we'll take a lunch recess.  We try

14  to limit that to an hour, and so I'll ask you when you leave

15  for lunch to come back within the hour.  Do your best to be

16  here within an hour.  We'll work off that clock up there which

17  I think is generally pretty close.

18       And I don't know -- I know many of you are not

19  familiar with Lynchburg downtown, maybe, but when you go out,

20  the marshals on the door out front can direct you to where

21  there are places to eat lunch.  And there are a number within

22  several blocks.

23       So during the lunch recess do not discuss the case

24  with anyone, do not allow anyone to discuss it with you, and

25  do not remain within hearing of anyone discussing the case.

1    When you come back -- I think they should go to the

2  assembly room downstairs?

3    THE CLERK:  Yes.

4    THE COURT:  When you come back from lunch, go to the

5  assembly room downstairs that you reported to this morning,

6  and then you all will be brought up at the same time to the

7  jury room.

8    All right, we'll recess court now.  As I see that

9  clock up there, I think it's 20 after.  Is that correct?  All

10 right.

11    (Recess taken from 12:19 p.m. until 1:30 p.m.)

12    THE COURT:  Ready to recall the jury?  All right,

13 call the jury.

14    (Jury in at 1:31 p.m.)

15    THE COURT:  You may be seated.

16    And counsel for the defendant may proceed.

17    MR. LAUBSCHER:  So just to refresh your memory, my

18 name is Larry Laubscher, and I am one of the attorneys here on

19 behalf of the defendants.  And with us in the courtroom today

20 you see Chris Demiduk and Dave Demiduk, and they're the owners

21 of the other two defendants, Countryview Pottery and Emerson

22 Creek Events.

23    This case is very simple, and I think the evidence

24 will lead you to the proper conclusion.  We're dealing here

25 with two parties that are really American success stories.

1   Jim Leavitt started a business in 1977, Emerson Creek Pottery,

2   and he's developed that business and thrived and has a very

3   successful pottery business in Bedford, Virginia.

4          Chris Demiduk started a business in 2000, in Oswego,

5   Illinois.  And you can see on your screen, this is a Google

6   map showing you the distance between Oswego, Illinois, and

7   Bedford, Virginia.  According to Google Maps, it's 741 miles.

8          And Chris started this business with the idea of she

9   wanted to have a gift shop where she would sell various

10  products.  And because of their familiarity, as Mr. Willett

11  told you, having visited the plaintiff's facility in Bedford,

12  they were familiar with it and they thought that would be a

13  nice product to add to their gift shop.

14         So during this first meeting back in 2000, which was

15  Ron Wehrli, which was Ms. Demiduk's boyfriend at the time, and

16  Ms. Demiduk and Mr. Leavitt, they met at Emerson Creek Pottery

17  to discuss the purchase of pottery.  And, yes, they did reach

18  an agreement.

19         What was the agreement?  The agreement was, "We'll

20  purchase pottery from you, you ship it to us, and we'll pay

21  you for it."  So they were the vendor of a product, so one of

22  the vendors that Ms. Demiduk used in getting her business

23  started.  So she purchased various products from various

24  vendors, one of the vendors being Emerson Creek Pottery.

25         And as a result of that very first meeting, they

1  ended up buying a truckload of pottery, thousands of pieces

2  for thousands of dollars.  And it was all shipped, and they

3  paid for the shipping.  It was all shipped from Bedford,

4  Virginia, to Oswego, Illinois, and it sat for about a year

5  until Ms. Demiduk could actually get her gift shop opened.

6  And she and her dad renovated this house on the piece of

7  property that her boyfriend, Ron, had at the time and was

8  allowing her to use to get started with this business so she

9  could fulfill her dream.

10        The shop opened in 2001 and she named it Emerson

11  Creek Pottery, and she sold Emerson Creek pottery that she had

12  purchased and paid for from Emerson Creek Pottery.

13        Within a couple of years -- as Mr. Willett told you,

14  Ms. Demiduk was quite the entrepreneur, and within a couple of

15  years she expanded her business and opened a tearoom and

16  changed the name from Emerson Creek Pottery to Emerson Creek

17  Pottery and Tearoom.  And you've seen photographs of the wagon

18  out at the entryway to their property to direct people in so

19  they knew where it was, Emerson Creek Pottery and Tearoom.

20        Mr. Leavitt knew about this change in the business,

21  he knew about the change in the name, and he made no comment,

22  no objection, no demand of her that she come to him

23  first before she makes any changes to her business model.

24        So where the businesses digress a little bit is, from

25  2000, when they had the first meeting, Mr. Leavitt continued

1  to focus on his pottery business.  Ms. Demiduk, the

2  entrepreneur, not only had her gift shop business, but she

3  expanded into a tearoom, then a café, then a restaurant, and

4  then she added an events business to it around 2010, on this

5  piece of property, in addition to this house that she and her

6  father had renovated was a barn.

7        So by this point in the late 2000s, she and

8  Mr. Wehrli, her first boyfriend, who helped her get started by

9  basically financing the purchase of this pottery from

10 Mr. Leavitt, Dave Demiduk helped her renovate the barn and

11 turn it into an events venue.  And it was in that barn that

12 they got married and had the very first wedding event in the

13 events business.  That was in 2010.

14       And so now we have a business that started as a

15 pottery shop, grew into a pottery shop and tearoom, and then

16 grew further into an events business.  And for 17 years

17 Ms. Demiduk and Dave Demiduk would order pottery pursuant to

18 this agreement.  It was a handshake agreement, that was

19 Mr. Leavitt's actual words, this handshake agreement.  They

20 would place orders for pottery, Mr. Leavitt would fill the

21 orders, send them to Oswego, Ms. Demiduk and Mr. Demiduk would

22 pay for it and sell it.  So some of the pottery that they

23 purchased was sold through the gift shop.  Other pieces of

24 pottery are actually used in the tearoom, in the restaurant to

25 serve meals and whatnot.

1            All of the pottery that was sold under the Emerson

2    Creek Pottery trademark was Emerson Creek Pottery purchased

3    from Mr. Leavitt's company, Emerson Creek Pottery.

4            And I want to be clear on this.  So when you're shown

5    pottery that doesn't bear the Emerson Creek Pottery mark on

6    it, it means it's pottery that, yes, was sold by Ms. Demiduk

7    in her shop.  But there were no restrictions under this vendor

8    purchase agreement that she was restricted to only selling

9    Emerson Creek Pottery pottery.

10           So she sold what we'll call third-party pottery, but

11   she never had any pottery made and branded with the Emerson

12   Creek Pottery mark.  That was Mr. Leavitt's mark.  And so I

13   want to be clear on this, that she sold Emerson Creek Pottery

14   that she purchased from him and paid for, and then she sold

15   other pottery that she purchased from another vendor, that she

16   paid for, but she didn't rebrand it as Emerson Creek Pottery.

17   It was sold through an Emerson Creek Pottery store or Emerson

18   Creek Pottery and Tearoom, but it was never rebranded.

19           So this relationship went on very well for 17 years,

20   and the defendants kept purchasing pottery, Mr. Leavitt kept

21   sending the pottery, and they kept paying for it.  There's not

22   one piece of pottery of Emerson Creek Pottery originating from

23   Bedford, Virginia, not one piece that was not paid for by the

24   Demiduks, by the defendants.  They paid for everything.  They

25   didn't steal any; they used it and sold it.  They had so much

1  pottery.  They bought thousands of dollars -- pieces of

2  pottery, and tens of thousands of dollars of merchandise over

3  this 17-year period from the plaintiff.

4          So in 2018 they get a letter, and the letter was

5  written by Mr. Goodrum to Mr. McLaughlin, between the

6  attorneys, saying, "Your client breached the license agreement

7  and we're terminating it.  Your client breached the license

8  agreement and we're terminating it."  And they get the letter

9  and they said, "What license agreement?"

10          So you've heard a lot of talk already about license

11  agreements, and this is going to be a key point in this trial.

12  And a key piece of evidence is, was there a license agreement?

13  So I want to show you a very simple trademark license

14  agreement.  And if you look at it -- I need a screen.  I can't

15  see it.  Can you blow that up?

16          THE CLERK:  He would have to do it on his end.

17          MR. LAUBSCHER:  Well, in any event, I've seen it

18  before.  Because I've used -- this is a very simple license

19  agreement.  I've used this kind of standard form agreement to

20  fulfill many licenses on behalf of clients over the years.

21          But it starts out in the opening and it identifies

22  the parties, the licensor and the licensee.  The licensor is

23  the person who owns the trademark.  The licensee is the person

24  who's going to use the trademark.

25          And then it goes on and it will say -- I have to go

1  to my notes because I can't see it.

2      THE CLERK:  If you want to step over to the lectern,

3  you will have access to it over there.

4      MR. LAUBSCHER:  Perfect.

5      So you see there's these "whereas" clauses where they

6  identify the trademarks.  And, again, this is important,

7  because we have to know what mark is being licensed.

8      Now, the plaintiffs claim that they own Emerson Creek

9  Pottery, and Mr. Willett showed you their trademark

10  registration for Emerson Creek Pottery.  And we agree the

11  plaintiffs own Emerson Creek Pottery.  But they also claim

12  they own the mark Emerson Creek, and we challenge that.  We

13  don't agree that they own Emerson Creek.  So in a license

14  agreement where parties are discussing what the licensed mark

15  is going to be, we put it in there so there's no confusion or

16  argument over what mark you're allowed to use.  Okay?

17      So then it says "license grant."  And you can have an

18  exclusive license or a nonexclusive license.  An exclusive

19  license means you're the only one that's going to sell this

20  type of product, okay?  And you also identify what product or

21  what service is going to be sold under this licensed mark.  So

22  in this case it would have been pottery, and we would put that

23  in there.

24      And so you go down these terms and then you see

25  there's an ownership.  The licensee acknowledges that the

1  licensor owns the mark.

2       Next page.  And then you see a requirement in every

3  trademark license.  And this is what differentiates or makes

4  the trademark license stand out in relation to any other type

5  of contract that you might get involved in, is this whole

6  business of quality control.

7       Now, excuse me, I left my water over here.

8       So what's the key to a trademark license is the

9  licensor, the owner of the mark, has the ability, in fact the

10 requirement, to control the quality of the product or the

11 service, or both, it could be both, that is being sold under

12 the mark.  Because as Mr. Willett stated, you want to protect

13 the owner, the trademark owner, and consumers that when they

14 buy, you know, a licensed product, that it meets the quality

15 standard set by the trademark owner.  So.

16      If it's a product, normally you would require on,

17 generally, an annual basis that samples of the product are

18 shipped to the licensor so that the licensor can verify that

19 the licensed products are of the proper quality, that they

20 meet the proper standards.

21      If it's a service mark, typically the trademark

22 owner, the licensor, has the right to go out and inspect the

23 property, the service, to see what's being provided.  Suppose

24 it's a restaurant, are they doing the right quality of

25 service?  Is it a cleaning business?  Is the proper level of

1 service being provided?

2        So this quality control, it's very important and it's

3 in every license, every trademark license.

4        Then you have a royalty.  Typically, if I own a mark

5 and I'm allowing you to use it and you're selling products, I

6 need to get some compensation.  So you hear a lot about

7 5 percent, 7 percent, half percent.  That's negotiable.  But

8 once you agree on what the royalty is going to be paid, it

9 goes in the license.  Okay?

10        And you're required to keep records of your sales,

11 obviously, and the licensor wants to come out and be able to

12 verify how many widgets did you sell under my mark.  So you

13 keep records.

14        And then there's another paragraph, Form of Use.  And

15 this means that the licensee must print or display the mark,

16 or if it's a business on signage, in a manner that's

17 prescribed or defined by the licensor.  So the licensor, the

18 trademark owner, says how the mark must appear.  Sometimes

19 there's color restrictions, sometimes there's size things,

20 sometimes it's font, because it has that special look.

21        Mr. Willett told you about Nike.  You know, Nike, and

22 we're all familiar with the Nike or the Nike swoosh.  It has

23 to have the proper appearance.

24        Next page.

25        So then there's requirements about -- these are some

1 kind of standard things that aren't really relevant so much in

2 this case.  Look at Number 10, Term and Termination.

3 Typically, a license has a term.  If you're the licensor, you

4 want that licensee and you're letting that licensee have

5 exclusive use of your mark for a product category, you want to

6 make sure that that person, that licensee, is working hard and

7 selling enough products to make it worth your while, otherwise

8 you would rather go out and find another licensee.

9 　　　　　So you put a term in there.  Standard term is

10 normally three years.  But you also put termination provisions

11 in there.  If somebody doesn't meet the quality standards or

12 somebody doesn't sell a prescribed number within the first

13 year, the second year, et cetera, you have a way to get out of

14 that license, you can terminate it so that you can go find

15 another licensee that might be more successful.

16 　　　　　Licenses are often renewed.  If everything is going

17 well, they typically automatically renew for a year.

18 　　　　　But, again, these are all items that you would put in

19 that agreement as you are negotiating what the license is,

20 what the product is, what the services are, what the term is,

21 what the payments are going to be.

22 　　　　　And this is very important.  This is the signature

23 line.  This is where both parties sign the agreement, because

24 this is what we've agreed to.  Whatever is spelled out in all

25 of these terms, the license mark, the product, the royalty

 1  rate, the term, what you can and cannot do, if it's a service

 2  mark, what you can't sell, what you can't do under my mark,

 3  that would all go in there and you sign it because you agree

 4  to it.  And then once it's agreed, you don't have any dispute,

 5  because you both signed off on it.

 6          In this case we don't believe the evidence will show

 7  you anything resembling this very simple license agreement.

 8          I'll move back over here.

 9          So in 2018, this demand letter came.  "You've

10  breached the license.  We're terminating it.  Don't use my

11  mark anymore."  My client says, "What?  You've allowed us to

12  use these various marks with these various goods and services

13  over 17 years.  We can't -- you know, you're taking our

14  identity away from us."  And yet because my clients', the

15  defendants', events business and restaurant business was going

16  so well, their sales of pottery and attention to the gift shop

17  started to decline.

18          So from 2018 to the present, what's happened?  Okay.

19  Remember, January 2018 the demand letter comes out.  We're now

20  February 2022, okay?  Pottery shop is closed.  My client, in

21  recognition of Mr. Leavitt's and Emerson Creek Pottery's

22  ownership of the Emerson Creek Pottery mark, said, "Okay, we

23  won't be Emerson Creek Pottery."  And they go to their web

24  designer and say, "Please remove the references to pottery."

25          They close the pottery shop, admittedly only

Defendants' Opening Statement

1    recently, because they had this huge inventory of product that

2    they paid for sitting in inventory, and what could you do with

3    it?  They sold it.  It took a while because there was that

4    much.  But Mr. Leavitt was paid for every piece of pottery

5    that was sold after 2018, because it had been prepaid back --

6    the last order placed by the defendants was in 2017.  So he

7    was sitting on the money all this time while they're sitting

8    on inventory.

9           So then what happened?  In 2020, two and a half years

10   after the demand letter, the plaintiff sued the defendants.

11   Two and a half years.  If they were so concerned about

12   violations of licenses and trademark infringement, why didn't

13   they sue them back in 2018?  Why did they wait two and a half

14   years?

15          So here we are today with a thriving, successful

16   business in Oswego, Illinois.  It has a restaurant business

17   and an events business that operates under the mark Emerson

18   Creek.  And we have a very successful and thriving pottery

19   business in Bedford, Virginia, operating under Emerson Creek

20   Pottery.

21          Now, I don't see how whatever the defendants are

22   doing in Illinois, hosting a wedding, a birthday celebration,

23   serving lunch, how does that impact or negatively take away

24   sales from Mr. Leavitt in Bedford, Virginia?  By the same

25   token, how does any pottery sales that Mr. Leavitt has in

1  Bedford, Virginia, take away from anything that the defendants

2  are doing?  They don't compete.  So there's no damage, there's

3  no conflict.  The parties have gone their way and that should

4  be the end of it.

5      Thank you.

6      THE COURT:  All right.  The plaintiff may call your

7  first witness.

8      MR. WILLETT:  Thank you, Your Honor.  The plaintiff

9  calls James Leavitt.

10     THE COURT:  So there will be no confusion now,

11 there's been no motion about separating witnesses.

12     MR. WILLETT:  Excuse me?

13     THE COURT:  I say there's been no motion concerning

14 separation of witnesses.  I just don't want that issue to come

15 up.

16     MR. WILLETT:  Okay.

17     MR. McLAUGHLIN:  As far as them hearing the

18 testimony, Your Honor?

19     THE COURT:  Sir?

20     MR. McLAUGHLIN:  You're asking with respect to them

21 hearing the testimony of other witnesses?  We're okay if they

22 hear the testimony.

23     THE COURT:  Okay.

24     MR. WILLETT:  Where do you want him?

25     THE CLERK:  Right here.  Please raise your right hand

1   and be sworn.

2          JAMES LEAVITT, PLAINTIFF'S WITNESS, SWORN

3                       DIRECT EXAMINATION

4          THE CLERK:  You may be seated.

5   BY MR. WILLETT:

6   Q    Good afternoon, Mr. Leavitt.  If you could please

7   introduce yourself to the Court.

8   A    I'm James D. Leavitt.  I run Emerson Creek Pottery and

9   started it in 1977.

10  Q    And do you still run Emerson Creek Pottery, sir?

11  A    I do.

12  Q    I'll ask that you pull that mic a little closer.

13         THE COURT:  Can everyone hear him okay?

14  BY MR. WILLETT:

15  Q    I'll just repeat that question.  Do you still run --

16  A    Yes, I do.

17  Q    And where is your shop located, sir?

18  A    It's in Bedford County.

19  Q    You obviously heard the opening statements earlier.  I

20  would ask if you could tell the story of how did you come up

21  with the name Emerson Creek.

22  A    I came up with the name because I had started the pottery

23  back in Massachusetts when I was living in that area, and I

24  was living in an old house that was on a creek that we thought

25  was called Emerson Creek, and so we named the pottery after

1  the creek.  It turned out it was actually called Emerson

2  Brook.  But we stuck with the name creek because we didn't

3  know any better.

4  Q   And if Ashley could get the controls, and then I'm going

5  to show you a document that's previously been marked for

6  identification purposes as Exhibit 49, and that should appear

7  on your screen.

8  A   Uh-huh.

9  Q   And at this point I'll just ask if you can identify what

10 this document is?

11 A   That's our history page from our website.

12       MR. WILLETT:  At this time, Judge, I would move that

13 this Exhibit 49 be admitted.

14       MR. McLAUGHLIN:  No objection.

15       THE COURT:  It will be admitted.

16    (Plaintiff's Exhibit Number 49 was received.)

17 BY MR. WILLETT:

18 Q   So if we scroll, we obviously see the -- scroll down just

19 a little bit, we'll see the name Emerson Creek.  Is that the

20 house that depicts -- can you tell us what you see on the

21 picture?

22 A   It is.  The one at the top is the house that I was living

23 in, uh-huh.

24 Q   If Ashley will scroll down a little bit further, if you

25 can tell us what the next series of pictures, what we see

1  there?

2  A    That's the Emerson Brook, what we called Emerson Creek.

3  Q    Okay.  Great.

4       MR. WILLETT:  Ashley, if you could keep on scrolling.

5  BY MR. WILLETT:

6  Q    So we can go ahead and hold on that.

7       Next, I want to ask you, you talked earlier about coming

8  to Virginia.  Talk us through that.  How did you end up

9  learning your craft and ending up in Virginia?

10 A    Well, I actually grew up in Roanoke, went to high school

11 at Patrick Henry, and then I went to college in New York.  And

12 then some years later I went to Rhode Island School of Design,

13 studied art.  And at the time I was living in that area, I

14 started to learn pottery, become interested in it.

15 Q    Okay.  And if Ashley will keep scrolling here, we see

16 "Early design inspiration."  Can you tell us what we're

17 looking at here?

18 A    Yeah.  This is some early work that we did.  I started

19 the business with my wife at the time, and she came up with

20 the use of a -- using a Japanese brush to do the floral

21 designs.

22 Q    And when you say "a Japanese brush," you mean a

23 paintbrush?

24 A    Yeah.  It's called a sumi brush.  It's kind of a

25 different technique for decorating.

1          MR. WILLETT:  Ashley, if you could scroll down.

2     BY MR. WILLETT:

3     Q    And if you could tell us what we're seeing here in this

4     picture.

5     A    That's a photograph of a decorator doing our dogwood

6     design.

7     Q    And when you say "a decorator," that's the person -- the

8     person pictured here, that's who's actually painting that

9     pottery?

10    A    Exactly.  Everything is done freehand.  There's no

11    stencils.

12    Q    I want to talk about the -- when you moved back to

13    Virginia, you start the pottery shop.

14         MR. WILLETT:  And next I'm going to ask Ashley if she

15    can go to Exhibit 48.

16    BY MR. WILLETT:

17    Q    And if you can tell us what this is, sir.

18    A    Okay.  That's a video that we have on our website.  It

19    goes through the process of how we make the pottery.

20    Q    And this is an excerpt from your website?

21    A    It is.

22         MR. WILLETT:  And we would next move that the

23    document previously marked -- identified for identification

24    purposes as Exhibit 48 be admitted.

25         MR. LAUBSCHER:  No objection.

1          THE COURT:  It will be admitted.

2      (Plaintiff's Exhibit Number 48 was received.)

3          MR. WILLETT:  If you would scroll down a little bit

4  there.

5  BY MR. WILLETT:

6  Q    In that second paragraph there, I would ask if you could

7  read that, starting with, "Emerson Creek Pottery ceramic

8  pieces."

9  A    "Emerson Creek Pottery's ceramic pieces have been

10  featured at Mount Vernon, Monticello, Smithsonian.  Influenced

11  by the energy of Early American cobalt decoration, owner Jim

12  Leavitt founded Emerson Creek Pottery in 1977."

13  Q    What does that mean when it says that the pottery was

14  featured at Mount Vernon, Monticello, and Smithsonian?

15  A    We were featured in the gift stores at those places, and

16  in addition, we designed special patterns for Monticello that

17  they sell exclusively.

18  Q    For example, the special pattern that you described for

19  Monticello, is it a depiction -- what is that?

20  A    It's different floral decorations that we make for them

21  and nobody else.

22  Q    And how long ago did you start doing that for Monticello?

23  A    We've done it on and off for quite a few years.  The last

24  couple of years it's been pretty extensive.

25  Q    Now, we've talked a little bit about the painting and the

1   decorating of the pottery.  I would ask if you could just sort

2   of walk us through, and I'll turn back to further down,

3   Exhibit 48, the process for making the pottery.

4           MR. WILLETT:  If you would scroll down, please.

5   A    Yeah.  So when we make the pottery, we start with a --

6   either a hand-thrown or hand-carved piece that I would make,

7   and then I would do all the tool and die work so we can

8   reproduce it.  And we use -- mix our own clay with formulas

9   that we developed; prepare the clay.  The pieces are either

10  slip cast or pressed, which is what's called a RAM press.  And

11  then they have to be cleaned by hand, they have to be dried,

12  glazed by hand, either sprayed or dipped.  And then at that

13  point they go and each one is decorated by hand, and then

14  they're fired in a kiln, and we go through a quality control

15  process and they would be shipped out.

16  Q    Let me just ask you, for a piece of --

17          MR. WILLETT:  Your Honor, may I just grab one of

18  those?

19          THE COURT:  You may.

20  BY MR. WILLETT:

21  Q    For a piece of pottery like this, what is this called?

22  A    That's a handle plate.

23  Q    What is the design that we see here?

24  A    That's an onion design.

25  Q    And for a handle plate with the onion design, how long

1    would it typically take from creation to finished product?

2    A    Generally a few days.

3    Q    A few days?

4    A    Yeah.

5    Q    Next, I want to direct --

6         MR. WILLETT:  Ashley, if you could pull up

7    Exhibit 47.

8    BY MR. WILLETT:

9    Q    All right.  And there are a series of documents here.

10        MR. WILLETT:  Ashley, if you would just sort of flip

11   through so that Mr. Leavitt can identify what he's looking at

12   here.

13   A    Yeah, these are craft fairs that we would have been

14   involved with at the beginning.  When we were starting the

15   business, we did a lot of local craft fairs, and then larger

16   ones further away.  So that's what we're looking at here.  And

17   then later we started doing more and more wholesale work,

18   selling to stores, individual stores and such.

19   BY MR. WILLETT:

20   Q    And is it fair to say that if Ashley keeps scrolling down

21   a little bit further to, like, page 10, these are some of the

22   promotional materials that you had as well?

23   A    Right.  Yes.

24   Q    Newspaper articles?

25   A    Right, this is a newspaper article.  That's the original

1 studio that I built.

2       MR. WILLETT:  At this time, Your Honor, I would ask

3 that the document previously marked for identification

4 purposes as Exhibit 47 be admitted.

5       MR. LAUBSCHER:  No objection.

6       THE COURT:  It will be admitted.

7     (Plaintiff's Exhibit Number 47 was received.)

8 BY MR. WILLETT:

9 Q    Let me ask you, if we go down to the next page there,

10 page 11 of that PDF, what do we see depicted there, sir?

11 A    It's a picture of me, when I had long hair, throwing on

12 the wheel.

13 Q    When you say "throwing the wheel" --

14 A    Using a potter's wheel to make pottery.

15 Q    And the pottery that we see today, do you still throw it

16 on a wheel?  Or how is it made?

17 A    Yeah.  I do not, but I do make the original piece, what

18 we call a model, that we then use, run through a tool and die

19 process so it can be reproduced.

20       MR. WILLETT:  And if you scroll on down a little bit

21 to page 14.

22 BY MR. WILLETT:

23 Q    All right.  We'll turn that image for you so hopefully

24 you can see it a little better.

25       MR. WILLETT:  Okay.  You can't.

1   BY MR. WILLETT:

2   Q    I'm sorry about the side view here, but who is depicted

3   in that picture?

4   A    That's a picture of me and my ex-wife who started the

5   business with me.

6   Q    Okay.  And then if you scroll on down here a little

7   bit -- well, let me ask you, first of all, the piece that we

8   see there with the words "Emerson Creek," what is that?

9   A    That's a clay tile that has got the Emerson Creek and --

10  mark on it that we had made I think to photograph, to put in

11  that promotional printed piece that you're looking at.

12  Q    Okay.  And what is the box?

13       MR. WILLETT:  Ashley, I don't know, maybe if you

14  could go back up to the previous page and focus in on the --

15  yeah, right there.

16  BY MR. WILLETT:

17  Q    What is the box that we see there, sir?

18  A    Which box?

19  Q    You see the words "Emerson Creek."

20  A    Yeah.

21  Q    And then right next to it --

22  A    That's a logo symbol that we've used on and off ever

23  since we started the pottery.

24  Q    And it's sort of a wave?

25  A    It's kind of a wave.  It's like the mountains and the

1  stream.

2       MR. WILLETT:  We can pull that down.  Thank you.

3       Carmen, I'm going to ask you how to clear.  I made an

4  arrow on the screen.  If I could clear that.

5       THE CLERK:  Does that clear it?

6       MR. WILLETT:  Yes.  Thank you.

7       THE CLERK:  Okay.

8  BY MR. WILLETT:

9  Q    You obviously referenced a few of the customers: Mount

10 Vernon, Monticello, Smithsonian.  Generally speaking, who does

11 Emerson Creek Pottery sell its pottery to?

12 A    We have several hundred customers around the country, and

13 a few in Canada that we sell to.  We sell directly -- these

14 would be gift stores, some department stores or catalogs that

15 we sell our pottery to directly.

16      We used to run sales reps pretty much in the whole

17 country that would represent us and personally go to stores

18 and show the pottery and make sales.  These days it's done

19 more online with people finding us and calling us.

20 Q    And do you know approximately how many states you have

21 customers located in?

22 A    Customers in every state, through the Internet stores,

23 and the majority of the states.

24 Q    And when you said earlier that you had several hundred

25 customers, you're talking about shops?

1  A    I'm talking about retail stores that we sell wholesale

2  pottery to.

3  Q    With respect to those retail stores, walk us through the

4  pricing structure that you would use for those stores.

5  A    Yes.  So we have a published wholesale price list which

6  is what a retail store would purchase the pottery for.  They

7  generally mark the price up two times, or a little bit more,

8  plus they had the trade-in.  And that would be the standard

9  pricing structure.

10  Q    Next, if I could hand you -- it's been previously marked

11  as Exhibit 2 for identification purposes.

12        MR. WILLETT:  Your Honor, if I may approach?

13        THE COURT:  You may.

14     (Discussion off the record between counsel.)

15  BY MR. WILLETT:

16  Q    As Ashley scrolls through it on the screen, if you can

17  just identify what this is.

18  A    That would have been our wholesale catalog from 2018.

19  Q    And if you will turn to the back, and Ashley will scroll

20  to the end of that document, there's some printed pages.  I

21  just wonder if you could identify what those are?

22  A    Yeah.  These are the wholesale price lists that would

23  have been in effect in that year.

24  Q    Okay.

25        MR. WILLETT:  At this time, Your Honor, we would like

1  to move for the admittance of the document previously marked

2  for identification as Exhibit 2.

3         THE COURT:  All right, without objection?

4         MR. LAUBSCHER:  No objection.

5         THE COURT:  It will be admitted.

6      (Plaintiff's Exhibit Number 2 was received.)

7  BY MR. WILLETT:

8  Q    Mr. Leavitt -- while staying on this page, Ashley -- if

9  you could just describe -- we've got the wholesale price list.

10 And, again, that's a price list that you would provide to

11 whom?  Who would get that?

12 A    That -- a qualified retailer would get it.  We wouldn't

13 just give that out to anybody.  You have to prove that you're

14 a bona fide retailer that has a store of the quality that we

15 would want to sell to.  And then they would -- once we had

16 made that determination and they filled the paperwork out,

17 then they would get a catalog and a price list.

18 Q    When you say "the paperwork," what do you mean by that?

19 A    To establish an account with us.

20 Q    And then if we also look, there's a retail price list in

21 there.  Ashley can direct us to one of those.  If you could

22 identify what that is.

23 A    Right.  So this is a retail price list which is

24 essentially two times cost of the wholesale, which is what

25 would be our recommended retail price at that time.

1  Q     So you sell it to the gift shop for wholesale, and then

2  that gives them the ability to make a profit?

3  A     Right.  They would usually sell it at about this price

4  plus whatever the freight cost them.

5  Q     You mentioned a couple other types of customers that you

6  do business with.  Who, for example, is King Arthur?

7  A     Yeah.  So we do a lot of work with king Arthur Flour.

8  They have a big online business where they sell products

9  related to flour, bread baking products.  We sell two ceramic

10 bread pans to them that they sell online.

11 Q     Do they sell it as an Emerson Creek product?

12 A     They do.  It's co-branded with King Arthur and Emerson

13 Creek both.

14 Q     And do you have -- do you have an agreement with them?

15 Or how does that work?

16 A     We have a handshake agreement with them.  They came to us

17 and asked us to make certain pieces of pottery for their

18 company, and they said, "We want it exclusive.  We don't want

19 you to sell this to anybody else or sell it online."  We said,

20 "Fine."  And that's the way we've conducted business.  It's

21 been quite -- maybe ten years.  I'm not sure.

22 Q     Do you still do business with King Arthur?

23 A     Yeah.  We've done a huge business since COVID.

24 Q     Next, sir, I want to ask you about some of the

25 recognitions that Emerson Creek has received.  If I could

1    direct your attention to Exhibit 237.

2    A     Uh-huh.

3    Q     And that should appear on your screen.

4    A     Yeah.

5    Q     If you can identify what that is.  And Ashley will scroll

6    down.

7    A     Yeah.  This is a blog post by Martha Stewart, I think it

8    was last week, where her senior food editor was reviewing some

9    shortbread pans that we make and talking about how to make

10   shortbreads and this, that, and the next thing.  And then at

11   the bottom she rated us with -- well, we've got three as three

12   best, and gives our website on where to buy them.

13         MR. WILLETT:  At this time I would like to move for

14   the admittance of Exhibit 237.

15         MR. LAUBSCHER:  No objection.

16         THE COURT:  It will be admitted.

17      (Plaintiff's Exhibit Number 237 was received.)

18   BY MR. WILLETT:

19   Q     So tell us what we're seeing on the screen here under the

20   category -- what appears to be the category "Best Shortbread

21   Molds."

22   A     Yeah.  "Best Traditional design:  Emerson Creek Thistle

23   Shortbread Pan," and there's a photograph of it below.

24   Q     Ashley will scroll down just a little bit for that.  Now

25   go back up.

1    Can you tell us who these other brands are that have

2 received recognition here?

3 A    Nordic Ware is a company that makes metal shortbread

4 pans.  The next one is "Best Ceramic Mold: Rose Window

5 Shortbread Pan."  That's one of ours.

6    "Cutest Design" is Brown Bag Design, which is a

7 wholly-owned subsidiary of Emerson Creek that we make the

8 shortbreads.

9    And then the last one is another Nordic Ware metal pan.

10 Q    So let me take you a step back.  When you said the Rose

11 Window Design, what do you mean that's one of your designs?

12 A    That's one of our designs that we sell under the Brown

13 Bag Design's mark.

14 Q    And then where it says "Brown Bag Design Tea Time

15 Shortbread Pan," what is that?

16 A    That's another -- a different one, a different design and

17 shape.

18 Q    But you make these products?

19 A    Yes, absolutely.  We make all of them.

20 Q    Next I would like to refer you to Exhibit 53.  All right,

21 if you could just identify what this document shows.

22 A    That's the -- I believe it's the Facebook page from the

23 White House in the fall of '20.  They were going to do a made

24 in America exhibit to honor American-made manufacturers, and

25 one company was chosen from every state.  There are big

1  companies, little companies, and everything in between.  And

2  we got chosen to represent the state of Virginia at the White

3  House.

4      MR. WILLETT:  And at this time, Your Honor, I would

5  like to move for the admittance of Exhibit 53.

6      MR. LAUBSCHER:  No objection.

7      THE COURT:  It will be admitted.

8      (Plaintiff's Exhibit Number 53 was received.)

9  BY MR. WILLETT:

10  Q    What do we see depicted on the picture there?

11  A    That's one of our berry bowls, and it looks like

12  blueberry.

13  Q    Your understanding as to the qualifications of this, this

14  was all for products that were made in America?

15  A    That's correct.  The focus was to try to honor companies

16  that were still making products in this country.

17  Q    And this occurred in 2020?

18  A    It did.

19  Q    Next I would like to direct your attention back to

20  Exhibit 47, and specifically to page 14, which we're on there.

21  We talked about this a little bit, but that's an example early

22  on of the Emerson Creek mark.

23  A    That is correct.  And early on, we signed every single

24  pot with the Emerson Creek mark with a paintbrush.

25  Q    Okay.  And next I'd like to direct your attention to

1 Exhibit 1.  And these are some pictures depicting the actual

2 pottery pieces that we have here.  If I may, I'm going to grab

3 one more of these.  I'm just going to ask if you could confirm

4 what these pictures depict.

5 A    That's a vase in our Iris design.  That's a serving bowl

6 in the Irish design.  Toothbrush holder, square plate, frilly

7 flowerpot.  That's another shot of the same thing.  That's the

8 bottom of the flowerpot, another one.

9       MR. WILLETT:  Ashley, go down to page 14.

10 A    Okay.

11 BY MR. WILLETT:

12 Q    What do we see here?

13 A    These are the bottoms of flowerpots that we made back in

14 the '80s when we were still signing everything by hand.  We

15 used to make them all in the redware.  Flowerpots were very

16 popular then.  And you can see they're all signed as Emerson

17 Creek with the date.

18       MR. WILLETT:  Okay.  And at this time I would like to

19 move for the admittance of Exhibit 1 into evidence.

20       MR. LAUBSCHER:  No objection.

21       THE COURT:  It will be admitted.

22    (Plaintiff's Exhibit Number 1 was received.)

23 BY MR. WILLETT:

24 Q    Now, if we look at the picture on the page, this is one

25 of the examples that I used earlier in the opening.  If you

1  could tell us what you do there.  How do you put that mark on

2  there?

3  A    Excuse me.  That would be put on with a paintbrush, the

4  same brush that we used to do the decoration.  It would be

5  actually hand signed.

6  Q    And how do you choose which pieces of pottery of the

7  Emerson Creek Pottery get that mark?

8  A    Everything has always gotten the mark.  We always mark

9  every single piece that we've done, and almost all years we

10  put the date on it too.

11  Q    All right.  If I can next direct your attention to the

12  document that's previously been marked as Exhibit 222.  Start

13  at page 2.  These are some additional -- we looked at some

14  newspaper articles earlier.  These are some additional -- it's

15  a conglomeration of additional newspaper articles.

16      But I would ask, if Ashley could just flip through that

17  for you, if you could just identify what we're seeing here.

18  A    I think that's *The Roanoke Times* picture, a story about

19  our pottery.  That was a company that sold equipment that had

20  written an article about us.  That looks like a price list and

21  such.

22  Q    Okay.  And what is this, Exhibit 22 -- or page 22?

23  A    Yeah.  That's a display piece for display racks for our

24  outlet store in Bedford.

25  Q    What about the next page there?

1   A    Again, it's the same thing but would be a different year.

2   We would change that every year or two.

3   Q    And when you say it's a display, how would this be used?

4   A    We put those in display racks in tourist areas to let

5   people know that we -- where we are, here we are, and

6   hopefully they pick them up and come out and visit us.

7         MR. WILLETT:  At this time I would ask that

8   Exhibit 222 be admitted.

9         MR. LAUBSCHER:  No objection.

10        THE COURT:  It will be admitted.

11        (Plaintiff's Exhibit Number 222 was received.)

12  BY MR. WILLETT:

13  Q    And so if I'm looking at -- Ashley, I don't know if you

14  can make that bigger or not.  But if I'm looking at the

15  current exhibit there, can you tell us what's depicted?  Is it

16  the front and back?

17  A    Yeah, this is the front.  It's a picture inside the log

18  cabin outlet where we have our outlet retail establishment on

19  the grounds next to the production facility.  And then the

20  back would be the back of that same card.

21  Q    Okay.  Great.

22        MR. WILLETT:  And, Ashley, if you can just scroll up

23  one page to 22.

24  BY MR. WILLETT:

25  Q    Is that the same thing, sir?

1  A    Exactly.  It's just a different year.

2       MR. WILLETT:  And next, Ashley, if you could go to --

3  back up to page 2.

4  BY MR. WILLETT:

5  Q    This is another article, but if you could tell us what

6  this article is.

7  A    It looks like *The Roanoke Times* talking about Emerson

8  Creek.  They call it Huddleston, which is the area of Bedford

9  we're in.

10 Q    And that's your former spouse?

11 A    It is.  And the girl on the left, I think she was the

12 first decorator that we hired, actually, Michelle.

13 Q    And does Priscilla -- is she still affiliated with --

14 A    No, she's not.  No.

15 Q    Next, if we could go to page 38.  What is this, sir?

16 A    A little newsletter that we put out quarterly.  That

17 would be -- it says 1995.

18 Q    Great.  And next if we can go to page 47.

19      MR. WILLETT:  Ashley, if you can focus on that

20 picture there, the house.  Yeah.

21 BY MR. WILLETT:

22 Q    What is that?

23 A    That's our old website and it says, "Visit Emerson

24 Creek."  It's got a picture of the outside of the outlet store

25 and then a picture of somebody painting pottery, and then

1  below it is the Emerson Creek, the actual creek.

2  Q    Great.  Thank you.  Let me also show you -- going back to

3  Exhibit 1 real quick on page 20.  Let's see if Ashley can make

4  that a little bit bigger.

5       If you could tell us what that is.

6  A    That's the mark that we put on the pottery these days.

7  At some point we switched to using a rubber stamp instead of

8  actually hand signing each one, and that allowed us to put

9  more information on the pot.  So you see "Bedford, Virginia,"

10 and it also says "Emerson Creek Pottery" instead of just

11 "Emerson Creek," and it's got our iris logo additionally.

12 Q    And it also has the year the pottery is stamped?

13 A    Yeah, it has the year too.

14 Q    Do you still use that process today?

15 A    Yeah, that's what we do now.  Right.  It's a lot quicker.

16 We make so much stuff we don't have time to hand sign each

17 piece.

18 Q    Great.  Thank you.  Now, we just saw a picture of the

19 shop.  I'm next going to ask Ashley if she could show us

20 Exhibit 228.

21      All right.  The first page here looks like a picture of a

22 picture.  If you could tell us what that is.

23 A    That's an aerial view of the pottery.  You can see over

24 on the left that's the plant where we make all the pottery,

25 and then the original studio would have been right behind one

1  of those trees there.  And we've grown out the buildings

2  around it.  And then if you look over to the right, with the

3  green roof, that's the log cabin where we have our outlet

4  store.  And then further over to the right is where we do our

5  clay preparation and store pallets of clay in that shed back

6  there.

7  Q    Let me see if I can make this work.  The first thing you

8  pointed to, I think there's a green --

9  A    Yeah, this --

10 Q    -- area.  What is that right here?

11 A    These -- well, we started the building -- we had one

12 building, then we kind of built out in both directions.  But

13 it's all a production facility.

14 Q    And then what about right here?

15 A    That would be the log cabin outlets, an 1825 farmhouse,

16 log farmhouse.

17 Q    And that's what was depicted in the brochure?

18 A    That's correct, the interior of that is what's in those

19 brochures.

20 Q    And then the last picture or last building or structure,

21 what is that there?

22 A    Yeah, that's the clay preparation area.  Just below that

23 line is a shed that we keep pallets of raw materials in, and

24 then the building above it is where we prepare the clay.

25

1  Q    Okay.  Great.

2         MR. WILLETT:  Ashley, if you could scroll on down.

3         Carmen, how do I clear it?

4         THE CLERK:  I'll get it.

5         MR. WILLETT:  Thank you.

6  BY MR. WILLETT:

7  Q    I'm sorry for the side-angle view here, but if you could

8  just tell us what we see.

9  A    Yeah.  It's a road sign leading off the main road onto

10 Pottery Lane, which is where we are.

11        MR. WILLETT:  Ashley, if you could go through this.

12 Keep on going, please.

13 BY MR. WILLETT:

14 Q    And what are these pictures, sir?

15 A    The picture of the outside of the store, and then this is

16 the inside.  You can see the logs and the pottery display.

17 Q    And is this what the store looks like present day?

18 A    Yes, uh-huh.

19        MR. WILLETT:  At this time I would like to move for

20 the admission of Exhibit 228.

21        MR. LAUBSCHER:  No objection.

22        THE COURT:  It will be admitted.

23     (Plaintiff's Exhibit Number 228 was received.)

24 BY MR. WILLETT:

25 Q    I want to go back here for a second.  If we could go back

1   to that first photograph.  And now I'm just forgetting that

2   that hadn't been published so I just want to do that real

3   quick.

4       Where I'm putting the mark right now, that's the

5   production facility?

6   A    Yeah, it is.  That whole area is the production facility.

7   Q    And then where I'm putting the green mark now, that's the

8   pottery shop?

9   A    Correct.

10  Q    And then where you make the clay is on the right?

11  A    Correct.

12       MR. WILLETT:  Now if we could go back to the pictures

13  of the structure, of the building, please.

14  BY MR. WILLETT:

15  Q    So there's the signage for Emerson Creek Pottery; is that

16  correct?

17  A    Uh-huh, correct.

18  Q    And then there is a -- what is that, sir?  Go back.

19  A    That's the outside of the store, the entrance to the

20  retail store.

21       MR. WILLETT:  If you could go down one from there.

22  A    And that's the -- that's one of the rooms in the store.

23  BY MR. WILLETT:

24  Q    Okay.

25       MR. WILLETT:  And keep going.

1  A    And, again, that's another room with the pottery.

2  BY MR. WILLETT:

3  Q    And what is sold in the store, sir?

4  A    Emerson Creek Pottery and accessories that might go with

5  it, such as place mats or hangers to hang it on the wall, that

6  sort of thing.

7          MR. WILLETT:  And, Ashley, if you could keep going

8  down.

9  BY MR. WILLETT:

10  Q    You see there --

11          MR. WILLETT:  Go back.  Yeah, there.

12  BY MR. WILLETT:

13  Q    It looks like there's things like holders for pottery?

14  A    Yes, display stuff.  It's also for sale, but especially

15  right there.  But it's Emerson Creek Pottery; that's all we

16  sell there.

17          MR. WILLETT:  And go on down just a little bit.

18  BY MR. WILLETT:

19  Q    And what is that, sir?

20  A    That's a gift bag that we use at the pottery -- well, in

21  the retail store.

22  Q    If you go down one more picture, what is that, sir?

23  A    That's the deck to the office production warehouse area,

24  the entrance to it.

25  Q    All right.  Great.  Thank you.

1    I want to -- I talked a little bit about this in my

2  opening, and then Mr. Laubscher talked about it as well.  I

3  want to take you to the point in time where you first met

4  Ms. Demiduk and her then former boyfriend, Ron Wehrli, and ask

5  you what you can recall about that meeting.

6  A    Yeah, they both had approached me in -- I think it was

7  2001, so that -- I believe that Ron had a sister that lived at

8  Smith Mountain Lake, and so they came down here from time to

9  time.  And they had either heard of or seen our pottery, and

10  they came out to visit the store.  And they really liked the

11  experience of coming out to the country and having the old

12  farmhouse and the pottery.

13    And so they met with me and they proposed -- well, they

14  told me that they had a piece of land up near Chicago with an

15  old farmhouse and that they wanted to fix it up.  And they

16  proposed that they would open an Emerson Creek outlet type

17  store up there, where it would kind of duplicate that same

18  experience of driving out to the country, to a destination

19  point where you would be buying Emerson Creek Pottery.

20  Q    And what was it that you -- well, let me take that back.

21  What did you know about Ms. Demiduk or Mr. Wehrli when you had

22  that meeting?

23  A    Well, as part of that conversation, he indicated that he

24  was a developer of high-end houses in that area and that she

25  had extensive retail and marketing experience, I believe, with

1  Nordstrom and some other places.  So she knew how to market

2  and display and sell goods.  And so it seemed like they would

3  have the financial ability to carry it out, and then she

4  certainly seemed to have the capability to do a good job in

5  opening a store like that.

6  Q    Okay.  And what was the -- what was the benefit to you of

7  doing that?

8  A    Well, by multiple things.  Number one, it was a chance to

9  sell a lot of pottery.  Number two, I had a presence in an

10 area of the country that we didn't have that many stores in,

11 plus it would be a large store, another destination spot, so

12 it would help build my brand as well as help me sell pottery.

13 Q    All right.  You referenced earlier, you said the "outlet

14 type store."  What does that mean?

15 A    The general term "outlet" is, and what we do with our

16 store, for the most part, it's filled with seconds, or good

17 quality seconds, but they're still seconds.  And they're sold

18 below regular retail, and so people get a chance to get a

19 bargain, like going to an outlet mall.  And so I was going to

20 do the same kind of a deal with them where I would sell the

21 pottery at a good discount and they would be able to retail it

22 at less than wholesale, and by doing that do more sales

23 volume.

24 Q    Okay.  And what was the outcome of that meeting, sir?

25 A    We sold them a large number of flowerpots; we had an

1  overstock at that point.  And then once they got their store

2  rolling, they started buying a lot of pottery from us on a

3  regular basis.

4  Q    How did the meeting conclude?

5  A    With a handshake agreement, we agreed that they were

6  going to proceed with remodeling the farmhouse, and when it

7  was ready, they would start ordering more pottery.

8  Q    And who was part of that handshake agreement, sir?

9  A    It would have been Ron Wehrli and Chris.

10  Q    And yourself?

11  A    Well, yeah, and myself.

12  Q    You heard Mr. Laubscher talk earlier about the sample

13  licensing agreement.  Why didn't you use a sample licensing

14  agreement or a form agreement with them?

15  A    Well, primarily, I'm kind of a self-taught businessman.

16  I got into it -- I didn't get an MBA and learn all the tricks,

17  so to speak, but I've learned it by doing it over the years.

18  And I have dealt with many businesses over the years with a

19  handshake agreement where we all agree to certain things and

20  everybody keeps their word.  And I just assumed that that

21  would be fine in this case, and that's what we proceeded with.

22  Q    All right.  Now let me direct your attention to a

23  document that's been marked for identification purposes as

24  Exhibit 57.

25          MR. WILLETT:  And I will ask you to put that on the

1  screen.

2  BY MR. WILLETT:

3  Q    And if you can just tell me what this document is, sir.

4  A    That's a document that I drew up which basically

5  memorializes the points that were discussed at that meeting.

6  Q    All right.  And when did you prepare this document, sir,

7  if you know?

8  A    Well, it says March 23 of '01.

9  Q    And do you --

10        MR. WILLETT:  Let me ask you, Ashley, if you can

11  scroll down just a little bit.  No, the other way.  I'm sorry.

12  BY MR. WILLETT:

13  Q    Do you have an understanding -- well, let me ask you

14  this:  What is this document?  Was this a paper document?  An

15  electronic document?

16  A    Well, this is a copy of a paper document that I prepared

17  as a Word document.  So it was saved as a Word document, but

18  it was printed as a paper document.

19  Q    And what did you do with this once you prepared it?

20  A    I sent it -- I sent it to Ron Wehrli.

21  Q    And do you know how you sent it?

22  A    I probably -- you know, I originally was -- when this

23  whole thing came out, I thought I had e-mailed it.  But most

24  likely I faxed it or mailed it because I don't think people

25  were doing much e-mailing back in those days.

1  Q     And that would have been around the time that you

2  prepared it?

3  A     Yeah.  I would have sent it right in that time, sure.

4         MR. WILLETT:  At this time, Your Honor, we would move

5  for the admission of the document previously marked for

6  identification purposes as Exhibit 57.

7         MR. LAUBSCHER:  No objection.

8         THE COURT:  It will be admitted.

9     (Plaintiff's Exhibit Number 57 was received.)

10 BY MR. WILLETT:

11 Q     Now, you said -- this is obviously a paper document.

12 Were you able to locate a Word version of this document as

13 well?

14 A     Yes.

15        MR. WILLETT:  Ashley, if you could go to Exhibit 87.

16 BY MR. WILLETT:

17 Q     Can you identify what we see on the screen here?

18 A     Yeah.  I think -- I think that's a term called metadata,

19 or such, that shows the actual -- when the document was

20 actually made.

21 Q     And do you have an understanding how you view this?  I

22 mean, this is something that you're able to view on the

23 document?

24 A     No.  I think you have to go into one of the screens up on

25 the left side of Word and click on it or something to actually

1  see that.

2  Q    But meaning this was something that you were able to

3  access from the document itself?

4  A    Oh, yeah, right.  It's in the -- I guess it's in the

5  computer file, if you want to use the correct term.

6        MR. WILLETT:  Your Honor, at this time we would like

7  to move for the admission of the document previously marked

8  for identification purposes as Exhibit 87.

9        THE COURT:  It will be admitted.

10       MR. LAUBSCHER:  No objection.

11     (Plaintiff's Exhibit Number 87 was received.)

12       MR. WILLETT:  Now we can get back to 57.

13  BY MR. WILLETT:

14  Q    I want to direct your attention, sir, to the first

15  paragraph there.  Well, before I do that, I do want to ask you

16  this:  If you went to the trouble of preparing this document,

17  why didn't you have a contract drawn up?

18  A    I don't have attorneys on staff.  I didn't even have a

19  relationship with an attorney at the time, and it didn't

20  really occur to me.  I thought that we had an agreement, and I

21  felt like this just kind of summarized that agreement and that

22  that would be adequate.

23  Q    After you believe you sent it to Mr. Wehrli, did you hear

24  anything further from him on this?

25  A    No.  Actually, once the project got going, I'm not sure

1  if I had much interaction with him at all.  It was all with --

2  all my interactions were with Chris.

3  Q     And by "Chris," you mean Ms. Demiduk?

4  A     Yes.

5  Q     The first paragraph there, if you could read that.

6  A     "The purpose of this agreement is to enable Ron Wehrli to

7  establish an outlet store in Naperville, Illinois, to sell

8  Emerson Creek Pottery products at a discount from regular

9  retail prices."

10 Q     All right.  And do you know where Naperville, Illinois,

11 is?

12 A     I understand that it's south of Chicago.

13 Q     Do you know why you used the name -- we heard about

14 Oswego.  Why were you using the name Naperville?

15 A     I think that they're next door.  I think that maybe his

16 business is in Naperville, but the actual store is in Oswego.

17 Q     You mentioned that you didn't have much interaction with

18 Mr. Wehrli directly.  Did you have any interaction with his

19 company or anyone else affiliated with him other than

20 Ms. Demiduk?

21 A     Yeah.  At the beginning we, would send the invoices to

22 his company in Naperville and they would pay them.  He did the

23 financial end of the business.

24 Q     And what was -- I'm sorry, I didn't mean to interrupt

25 you.  What was the name of his company, if you recall?

1  A    I think it was called RW Development.

2  Q    And if you look at -- read the second paragraph for us,

3  please.

4  A    "ECP agrees that RW, meaning RW Development, will set up

5  a corporation in Illinois for purposes of operating the store

6  with a dba as Emerson Creek Pottery Outlet Store."

7  Q    All right.  And do you understand what the dba means?

8  A    Doing business as.

9  Q    And do you have an understanding as to whether or not

10 that was done?

11 A    I believe it was, yes.

12 Q    Looking at Number 3 there, it says, "ECP will furnish its

13 pottery and accessories carried in its wholesale catalog" --

14 and it says "the."  Maybe it meant to say "to RW at a discount

15 specified in the appendix."  Do you know what that's referring

16 to?

17 A    Right.  I laid out, I think, further at the bottom the

18 discount that I gave them off of their published wholesale

19 pricing.

20 Q    When you refer to the published wholesale prices, is that

21 the catalog --

22 A    Yeah, I'm talking about that price list that we looked at

23 there.

24 Q    So, for example, when -- the price list that you looked

25 at earlier, the wholesale price was about half of the retail

1  price?

2  A    Uh-huh.

3  Q    That's correct?

4  A    Correct.

5  Q    And then so the discount that you were giving to the

6  defendants here was then 40 or 30 percent off of that price?

7  A    Off of the wholesale price, that's correct.

8  Q    If you look at the next item there, Number 4.  If you

9  could read that for us.

10 A    "RW agrees to keep the store stocked with a minimum of

11 75 percent ECP products in order to keep using the ECP name on

12 the store."

13 Q    Okay.  And so what does that mean, sir?

14 A    The idea that she would sell Emerson Creek Pottery but

15 that she would keep the greatest majority of the store full of

16 pottery and not accessories, like linens, place mats, or

17 whatever, other things that might be sold.

18 Q    Well, you tell me, so the idea of that was that if she

19 didn't do that, then what was your ability?

20 A    Well, then the -- I believe the agreement says she

21 wouldn't be able to use my name.

22 Q    Take a look at the next item, Number 5.

23 A    "RW will allow ECP a reasonable amount of time between

24 placing orders and shipment."

25 Q    Did you understand -- have an understanding as to what

1  that referred to?

2  A    Yeah.  Basically, it's kind of indicating that we're

3  expecting them to place large orders, but they have to

4  understand that we can't ship them in a week or two weeks,

5  that we need time to produce it if we didn't have it in stock.

6  Q    Okay.  Now, you mentioned earlier the idea of seconds and

7  overstocks.  Did you also contemplate selling anything else to

8  defendants?

9  A    No.  The idea was that I knew that we would sell them

10 high quality seconds at a really good discount.  But if we

11 didn't have enough seconds to fill a particular order, we

12 would ship them firsts at the same discounted rate.

13 Q    At the same rate as the seconds?

14 A    Yes, exactly.

15 Q    The next paragraph, Number 6, says, "Terms of placement

16 will be FOB Bedford, net 30 days."

17 A    Uh-huh.

18 Q    "Initial stocking order accepted to be one-half prepaid."

19 What is that referring to?

20 A    The normal terms of business is, after an order is

21 shipped they would have 30 days to pay the bill.  The initial

22 stocking order, I believe I wanted half down since it was, you

23 know, a new relationship.

24 Q    All right.  And then the "FOB Bedford," what is that

25 referring to?

1  A    That means freight on board Bedford.  It just means that

2  the freight -- that the customer will be paying for the

3  freight between, well, in this case, you know, Bedford and

4  Oswego.

5  Q    And the last paragraph there, Number 7, what does that

6  say?

7  A    "ECP will use the best available freight rates for

8  shipments."  Meaning that we would try to get them the best

9  trucking rates we could.  Most of what we sent was pallets, so

10 we could hopefully get them a discount.

11 Q    All right.  And then looking back at the appendix where

12 it says "discounted rate," there's -- it says, "Wisteria at

13 30 percent off."  What is that referring to?

14 A    That's one particular pattern that was very difficult to

15 make, so I didn't give her quite -- I couldn't afford to give

16 her quite the same discount on that one.

17 Q    Was that a pattern that you had already made at that

18 time?

19 A    Yeah.  Uh-huh.

20 Q    And then when it says, "License designs 30 percent off."

21 What does that refer to?

22 A    At that time we were licensing from certain artists, like

23 Thomas Kincaid and applying decals.  It was like another line

24 that we were doing.  So that indicates the discount that they

25 would have gotten on that type of merchandise.

1  Q    Okay.  And so after your interactions with the Demiduks

2  in person and then you prepare this document, if you could

3  walk us through, how did the relationship go from there with

4  respect to them ordering pottery from you?

5  A    It went fine.  We both -- she opened their store, we sold

6  her pottery, she bought more pottery, we shipped it to her.

7  She kept me informed on a regular basis of how things were

8  going, sent me pictures of her store, the inside, the outside.

9  She discussed her marketing plans with me and ideas that she

10 had with trying to get people like Oprah interested in the

11 store and such like that.  And, basically, it went along in

12 that same manner for quite a few years.

13 Q    When did she start placing orders with you?  How soon

14 after the agreement was reached?

15 A    I can't -- I can't tell you an exact date.  It was right

16 after she got the store done, which is probably maybe a year

17 or less than a year.  I'm not sure.

18 Q    And then from there, was there a particular time of year

19 that she would typically order, or was it ongoing?

20 A    Yeah, she placed regular orders.  She was closed during

21 the winter, so she would place an order in the spring to get

22 her going in the spring.  And then they would get fill-in

23 orders during the year, and then they probably -- Christmas is

24 always a big, a big sales time, so we get another big order at

25 that time.

Leavitt - Direct

1  Q    And you mentioned the communication in those early years.

2  How did you communicate with Ms. Demiduk?

3  A    E-mail and telephone both, plus she would mail, like,

4  photographs of her store, so she would mail to me.

5  Q    Next if we could turn to Exhibit 11.

6        MR. WILLETT:  And I'll just ask, Ashley, if you can

7  kind of scroll through this.

8        All right.  If you could scroll in, Ashley, on the --

9  go back to that one.  I'm sorry, just make it larger on the

10 one before that, please.  Yeah, the back side.  Yeah.

11 BY MR. WILLETT:

12 Q    Sir, if you can read that for me.  Not all the technical,

13 but the date.

14 A    Yeah, it's -- it's 4/21/82, Walgreens photo.

15 Q    Ashley got it a little bigger now.  Do you think that

16 could be '02?

17 A    Yeah, '02.  4/21/02.

18        MR. WILLETT:  Ashley, you can go back to the top of

19 the document.

20 BY MR. WILLETT:

21 Q    These were actual photographs, actual film pictures

22 taken?

23 A    Right.  These were photographs -- right, exactly, prints

24 that she sent me in the mail depicting her store outside, the

25 inside.

1    MR. WILLETT:  At this time, Your Honor, we would like

2  to move for the admission of Exhibit 11.

3    MR. LAUBSCHER:  No objection.

4    THE COURT:  Thank you.  It will be admitted.

5    (Plaintiff's Exhibit Number 11 was received.)

6  BY MR. WILLETT:

7  Q    If you could walk us through -- now these are on the

8  screen, if you could just walk us through, for example, your

9  understanding of the picture in the upper left-hand corner.

10  What is that?

11  A    That would be a wagon that they had I think on the main

12  road down to their store that said "Emerson Creek Pottery" on

13  it.

14  Q    And do you have an understanding as to the purpose of

15  that wagon?

16  A    To direct people to the store.

17  Q    And do you know why they needed direction --

18  A    I think they were down a gravel road, so they needed

19  people to know where to turn.

20  Q    Okay.  Great.  Now, you obviously received a picture of

21  this.  Had Ms. Demiduk talked to you about the things that she

22  was doing to advertise and direct people?

23  A    I believe that she did mention that.  She told me they

24  had gotten that wagon and painted it, uh-huh.

25  Q    All right.  What about the next picture over?  The

1   picture on the right, what is that?

2   A     That's a walkway to her store.  And there's a rock that's

3   been painted with Emerson Creek Pottery and an image of their

4   farmhouse.

5   Q     Okay.  And so this would have been -- again, you

6   identified the date of the photo.  It looks like it was

7   printed on April 21st of 2002?

8   A     Right.

9   Q     And the farmhouse, is that -- what is that house?  Do you

10  know what that became?

11  A     That became the Emerson Creek outlet.

12          MR. WILLETT:  Okay.  And if you will scroll down just

13  a little bit, Ashley, to the next series.  Yeah, right there.

14  Perfect.

15  BY MR. WILLETT:

16  Q     What is that?  We see sort of a porch.  Do you have an

17  understanding what that is depicting?

18  A     Yeah.  That's a porch, the entrance to the farmhouse.

19  Q     And if you look at the back, the photo in the lower

20  right-hand corner, I think we'll have some more closeups of

21  that.  But if Ashley could blow that up for us a little bit.

22          What is that, if you can see it?  Give her a second

23  to move it over.

24  A     Yeah, that's a display, some sort of a display cabinet

25  that's got Emerson Creek Pottery in it.

1    MR. WILLETT: Okay. And, Ashley, if you could go

2  back out and then scroll down to some of the other photos for

3  us.

4  BY MR. WILLETT:

5  Q   And what do we see here? For example, on the upper

6  right-hand photo, what is that showing?

7  A   That's the image from inside the store, and it's --

8  everything in it is Emerson Creek Pottery, with a few

9  exceptions of a chair and some flowers and some display racks.

10 Q   But when you said "a few exceptions," do you see any

11 pottery other than Emerson Creek?

12 A   No. No. I see display, display racks, it looks like a

13 wreath, that sort of thing. All of the pottery is our

14 pottery.

15 Q   And then if you look to the right-hand side of that, it

16 looks like there's some lamps. What are those?

17 A   These are lamps that we make.

18 Q   Emerson Creek Pottery lamps?

19 A   Correct.

20 Q   And then on the left-hand side, on top of that shelf

21 there, what are those, if you can identify them?

22 A   Well, there's flowerpots in the middle and at the top,

23 and it looks like some candle accessories that we made at the

24 time, some vases.

25 Q   When you say "we made," that's made by Emerson Creek?

1  A    Absolutely, yes.

2      MR. WILLETT:  Ashley, if you would keep scrolling

3  down.  Keep on going to the next photo.  Sorry.

4  BY MR. WILLETT:

5  Q    I'm going to have Ashley freeze on that for a second.

6     If you could just tell us, like, in the upper right-hand

7  corner, what is that a picture of?

8  A    Again, another picture in the store with our pottery on

9  the table and up on the shelf.

10      MR. WILLETT:  All right.  Go down a little bit more,

11  Ashley.

12  BY MR. WILLETT:

13  Q    In the lower left-hand corner, what's being depicted

14  there?

15  A    That's more of our pottery hung on the wall and on

16  display.  There's some towels and things.  Accessories is what

17  I call them, to go with it.

18  Q    That would be the towels next to the pottery?

19  A    Yeah.  Looks like it's got a cherry on it.

20      MR. WILLETT:  Ashley, if you could finish scrolling

21  down.  Thank you.

22  BY MR. WILLETT:

23  Q    These are additional pictures?

24  A    Uh-huh.

25  Q    All right.  And then the last picture there in the

1  lower -- well, two of them, one in the upper left-hand corner.

2  Are those Emerson pieces?

3  A    Yeah.  Again, that's all Emerson Creek Pottery, every

4  piece of pottery in there is Emerson Creek.

5  Q    And then if you look at the picture on the right, it

6  looks like there's sort of a view outside of the property?

7  A    Uh-huh.

8  Q    Can you tell me what that is, if you know?

9  A    It looks like it's on the porch looking out to some other

10  outbuildings.

11       MR. WILLETT:  And, Ashley, if you will continue

12  scrolling down.  You can go all the way down.  Keep going.

13  BY MR. WILLETT:

14  Q    Same with the one, for example, right there, are those

15  Emerson Creek Pottery pieces?

16  A    Again, yes, everything I'm seeing there is Emerson Creek.

17  Q    All right.  If we scroll to that bottom right-hand

18  corner, the ones on the outside there, what are those?

19  A    Yeah, it's flowerpots and such that we made, all of it.

20  Q    Let's go ahead and go to the next exhibit.

21       Now, you talked about correspondence with Ms. Demiduk.

22  I'm next going to refer you to Exhibit 22.

23  A    Uh-huh.

24  Q    My apologies.  This is a longer document.  I'm just going

25  to have Ashley flip through a few of the first few pages and

 1  then down a little bit just to show you what this is.  It's a

 2  series of documents that have been produced in this case.

 3       MR. WILLETT:  Ashley, if you'll kind of scroll down

 4  for Mr. Leavitt so he can identify what he's looking at here.

 5  A    These are e-mails back and forth.

 6  BY MR. WILLETT:

 7  Q    For example --

 8       MR. WILLETT:  Freeze right there.

 9  BY THE COURT:

10  Q    We see at the top of this one -- we'll come back to it.

11  But "Chris Barickman, ecreekpottery@hotmail.com," do you see

12  that?

13  A    Uh-huh.

14  Q    And who is that?

15  A    That would be Chris.

16  Q    Who we refer to here by her married name, Ms. Demiduk?

17  A    Correct.

18  Q    And then EmersonCreek@earthlink.net, who is that?

19  A    That's one of my e-mail addresses.

20  Q    Is that a business e-mail address?

21  A    It is.  Yeah.

22       MR. WILLETT:  And then, Ashley, if you'll keep

23  flipping through.

24  BY MR. WILLETT:

25  Q    Just tell me if these appear to be just a continuation of

1  e-mail correspondence between the two of you.

2        MR. WILLETT:  And, Ashley, if you flip to, like, 30

3  or 31.  Advance a little bit.  There are a lot of them.

4  BY MR. WILLETT:

5  Q    So we went from 2005 -- do you see this one?

6  A    Uh-huh.

7  Q    -- to September 2006.

8  A    I do.

9        MR. WILLETT:  And then, Ashley, if you would go down

10  to, like, 98.  Keep going just a little bit further.

11  BY MR. WILLETT:

12  Q    It looks like this is -- this still identifies you, Jim

13  Leavitt, EmersonCreek@earthlink.net.  It says, "To Chris," and

14  it's 2008.  Do you see that?

15  A    Uh-huh.

16  Q    And you believe that would have still been Ms. Demiduk?

17  A    Yes.

18  Q    So at this point we've gone from 2005 to 2008.

19        MR. WILLETT:  And, Ashley, if you would go to 106.

20  BY MR. WILLETT:

21  Q    More -- it looks like more e-mails.

22  A    Yeah.  I must have sent her some samples.  Uh-huh.

23  Q    That one has the ecreekpottery@hotmail.com?

24  A    Uh-huh.

25  Q    If you could go to the very end, the last one.  Same

1 thing there. This is May of 2008?

2 A    Uh-huh. It's more back and forth that we had in the

3 course of business.

4        MR. WILLETT: Your Honor, at this time we would like

5 to move for the admission of Exhibit 22.

6        MR. LAUBSCHER: No objection.

7        THE COURT: It will be admitted.

8      (Plaintiff's Exhibit Number 22 was received.)

9 BY MR. WILLETT:

10 Q    We'll just stay on this one for a second. This is from

11 2008. It says, "Jim, just want to say thanks for the work on

12 the shipping. The price was great. We really appreciate it."

13      Do you know what she was referring to there?

14 A    That we must have been able to get her a good discount on

15 freight for a shipment that we sent her.

16 Q    All right. We'll go back to the first one. I'm not

17 going to make you go through all of these, trust me. Go back

18 to Number 1.

19      This looks like it's an e-mail from Ms. Barickman,

20 Ms. Demiduk now, July 23rd, 2005.

21 A    Uh-huh.

22 Q    "Subject matter: Payment sent to your

23 EmersonCreek@earthlink.net account"?

24 A    Uh-huh.

25 Q    And that is an account, a business account that you had

1   been using back in 2005?

2   A    Yeah, I still do.

3   Q    You still use that e-mail?

4   A    Yes.

5   Q    And her e-mail address was ecreekpottery@hotmail.com?

6   A    Uh-huh.

7   Q    Is that correct?

8   A    Yes.

9   Q    And if you look at this one, she's referencing, "Hi, Jim,

10  I put a check in the mail."  Do you know what that's referring

11  to?

12  A    That means she must have sent me a payment on an invoice.

13  Q    She then goes on to say, "We are really busy.  The

14  tearoom is now reservations only.  We are serving about 60 to

15  70 people between 11:00 to 2:00."  Do you know what she's

16  referring to there?

17  A    Yeah.  She had opened her tearoom and it was doing very

18  well at that time.

19  Q    She then goes on to talk about, "You see that we made a

20  video for Oprah the other day."

21  A    Uh-huh.

22  Q    Do you see that?

23  A    Yeah.

24  Q    Do you recall some discussions with her about some

25  marketing attempts to get on Oprah?

1  A    Yeah.  She had put a lot of effort into trying to get

2  Oprah interested and coming out there, that would have been

3  terrific publicity for both of us.

4  Q    Were you okay with that?

5  A    Oh, absolutely.  How could I object to getting Oprah

6  interested in us?

7  Q    And when you say "us," what do you mean by that?

8  A    I mean Emerson Creek, Emerson Creek Pottery.  If they

9  came out there, they would see her store, they would see our

10  pottery.  And they're linked together, so it would have been

11  publicity for us too.

12  Q    Go to Number 2.  All right.  Here's another one.  This is

13  from August of 2005.

14        MR. WILLETT:  And, Ashley, if you would scroll down a

15  little bit on that e-mail, Ashley.

16  BY MR. WILLETT:

17  Q    And it looks like there's an e-mail that Ms. Barickman

18  sent to you.  And if you look there towards the bottom, it

19  says, "On the days the tearoom is open, we usually do 600 to

20  1,000."  Do you see that?

21  A    Uh-huh.

22  Q    Do you know what she was referring to there?

23  A    I think she was indicating the retail sales in her store

24  the days the tearoom was open.

25        MR. WILLETT:  And, Ashley, now if you would go back

1  towards the top of that document.  Stop right there.

2  BY MR. WILLETT:

3  Q    This is your response dated August 10th, 2005.  Do you

4  see that?

5  A    Yeah.

6  Q    Can you just read what you're saying to her there?

7  A    "It sounds like you're doing a great lunch business if

8  you're doing $1,000 a day.  That sounds great.  I was just

9  wondering about your sales.  When I looked at what you've been

10 buying compared to previous years, it sounds like you must

11 have overbought in the past and now need to catch up."

12 Q    I'm going to break that down.  When you refer to, "If

13 you're doing $1,000 days, that sounds great" --

14 A    I'm thinking she's -- that's referring to her retail

15 store business.

16 Q    Meaning the selling of the Emerson Creek Pottery?

17 A    Correct.

18 Q    And then when you say, "I was just wondering about your

19 sales."  What are you referring to there, comparing it to

20 previous years?

21 A    Well, I was constantly on a regular basis looking to see

22 how much she was buying from me, so I was referring to a time

23 frame when her sales had been going up and up and maybe they

24 were starting to move down some.  I'm wondering, inquiring to

25 her about what was going on.

1  Q    And so back in 2005, what's the purpose of monitoring her

2  sales?  Why do you want to know that?

3  A    Well, because I want to see how her business is doing,

4  and -- because that affects me.  And also because, you know,

5  she's got a store with my name on it, I want to make sure

6  everything is going well there.

7        MR. WILLETT:  Next if we can go to page 3.  And,

8  Ashley, we can go on down to -- let's go on down to 6.

9  BY MR. WILLETT:

10  Q    Again, this is an e-mail from Ms. Barickman to you dated

11  September 26, 2005.  Can you tell me what you believe she's

12  referring to in this e-mail, the first two paragraphs?

13  A    Yeah.  She said she had a couple of bad weeks.  I think

14  back to school for moms.  I believe she's referring to when

15  people go back to school in the fall, there's less retail

16  sales because moms are generally the people that buy pottery,

17  so they're doing other things at that time.

18       I asked Lucy to send me a backorder list.  That would

19  have been to let her know which pieces -- when she had placed

20  an order, if we didn't fill the whole thing at one time, we

21  would send her a backorder so she would know when we were

22  going to complete the rest of it.

23  Q    Going down to the second paragraph, the last sentence

24  there, "I am up 3,000 from last year, and so far this is my

25  best year, so I think we are doing good."  Do you know what

1  she's referring to there?

2  A    Well, she's talking about her sales, what she's bought

3  from me during the year.

4  Q    The next paragraph, paragraph 3, the first sentence

5  reads, "I had mentioned before that I think our orders were so

6  big because I was new at ordering.  And we used to order 60 or

7  so dinner plates, salad plates, salad bowls, and I find out

8  that I sell more of the individual pieces rather than the

9  dinner pieces."  Do you see that?  Do you know what she's

10 referring to there?

11 A    Yeah.  I think what she's saying was that as she was

12 starting out in the business, she maybe overbought a bit and

13 also had to learn what was selling at retail in her store so

14 she could adjust her buying in the best way so she didn't have

15 too much excess inventory.

16 Q    And were you okay with that?

17 A    Sure.

18 Q    The next sentence starts, "I'm having a 40 off" -- yeah,

19 "having a 40 off sale on the summer, spring, icey bluets,

20 green leaf pattern," some other patterns she references.  Do

21 you know what she's referring to there?

22 A    Yeah.  She's putting patterns or pieces that didn't sell

23 on sale at a bigger discount so she can move them out and

24 generate cash to buy more.

25 Q    Were you okay with that?

1  A    Yeah, absolutely.  That would be a typical, proper thing

2  to do.  And I believe I may have even discussed that with her

3  one time or another and advised her if it's not selling, you

4  really should just cut the price and get rid of it.

5  Q    And why is that?

6  A    Because then you'll have the cash as well as the space to

7  buy more.

8  Q    Let's next go to Exhibit 30.

9        THE COURT:  Why don't we stop here for a break.

10  We'll take about a 15-minute recess.

11        MR. WILLETT:  Thank you, Your Honor.

12      (Recess taken from 3:02 p.m. until 3:19 p.m.)

13        THE COURT:  Call the jury back.  The witness may

14  return.  Thank you.

15      (Jury in at 3:20 p.m.)

16        THE COURT:  You may resume.

17        MR. WILLETT:  Thank you, Your Honor.

18  BY MR. WILLETT:

19  Q    Mr. Leavitt, I'm going to next direct your attention to

20  page 30 of Exhibit 22.  You should have that.

21        THE CLERK:  I'm sorry, when we left off we were on

22  Exhibit 30 coming in.

23        MR. GOODRUM:  Page 30 of 22.

24        THE CLERK:  Got it.

25        MR. WILLETT:  Thank you.

1  BY MR. WILLETT:

2  Q    Mr. Leavitt, this appears to be an e-mail from Chris

3  Barickman to yourself, September 7th, 2006.  And, again, I'm

4  going to direct your attention to this one, the second

5  paragraph.  "We did 15,000 in the shop for August, and 14,450

6  in the tearoom.  Do you think that is good for the shop for

7  August?"  Do you see that?

8  A    Uh-huh.

9  Q    Is that a "yes"?

10 A    Yes.

11 Q    Do you know what she's referring to there?

12 A    She would be talking about her gross sales in the store

13 for that month.

14 Q    And then she references that she would have to look at

15 last year's figures.  Do you think that meets the gross sales

16 for last year?

17 A    Yeah.

18 Q    That was sort of a benchmark that was used.

19 A    Right.  Exactly.

20      MR. WILLETT:  Go to 31, please.  I'm sorry, staying

21 on the same exhibit, page 31.

22      MS. SCHMITZ:  I'm sorry.

23 BY MR. WILLETT:

24 Q    This one, September 27th, 2006, she says in the first

25 paragraph, "Jim, I sent a check on Monday for 2,500, not sure

1  where I am."  I assume that's for payments for pottery?

2  A    Yeah, I think she's talking about -- well, for sure she's

3  talking about sending me a check.  But I think she's

4  indicating she wasn't sure how much more she owed at that

5  point.

6  Q    All right.  Now take a look at the next paragraph there.

7  And if you wouldn't mind looking at that, particularly the

8  first sentence.  It says, "Also, I met with the lady, Cathy,

9  who is moving to Atlanta and interested in Emerson Creek."

10  A    Uh-huh.

11  Q    Do you know what she's referring to there?

12  A    Yeah.  She had met a lady that, like she says, moving to

13  Atlanta, who is -- she was promoting the idea with her of

14  opening an Emerson Creek outlet store in Atlanta.  So she was

15  promoting our brand to help us try to secure stores in other

16  areas.

17  Q    Okay.  And when you say "she," you're referring to the

18  defendant, Ms. Demiduk?

19  A    Correct.  Correct.

20  Q    Now, if you look at that sentence that starts, "Very nice

21  lady, also artist and paints lots of pictures," when she says

22  "also an artist," what do you think she's referring to there?

23  Do you know?

24  A    I'm assuming that she was an artist as well as somebody

25  who wanted to start a business.

1  Q    But when she says "also artist," is she referring to

2  herself or to you, or do you have an idea there?

3       MR. LAUBSCHER:  Your Honor, I'm going to object.

4  This calls for speculation.

5       MR. WILLETT:  I can withdraw, Your Honor.  I was just

6  asking his understanding.

7       THE COURT:  I sustain.

8  BY MR. WILLETT:

9  Q    I was just asking if you had an understanding.

10 A    Honestly, I'm not sure.

11 Q    If you go down to the next sentence, it says, "She is

12 moving October 18th and they are going to see about buying a

13 house or property.  Would also like to do a tearoom."

14 A    Uh-huh.

15 Q    Do you know what she -- what did you understand her to be

16 referring to there?

17 A    I understood that she was trying to encourage this lady

18 to set up an Emerson Creek outlet in Atlanta and possibly also

19 do a tearoom on the same location.

20 Q    Did you have any other discussions other than this e-mail

21 with Ms. Barickman about --

22 A    I believe there was some e-mails back and forth, but it

23 never amounted to anything, and the lady didn't get in touch

24 with me.  It was an idea, good idea that she was working on,

25 but it just didn't happen.

1  Q    And were you okay with Ms. Barickman, Ms. Demiduk, trying

2  to find other franchisees for Emerson Creek?

3  A    Oh, certainly.

4       MR. McLAUGHLIN:  I'm going to object to the form of

5  the question.  It assumes that it was a franchise, or that

6  they were franchisees.

7       MR. WILLETT:  I can rephrase, Your Honor, to make

8  that easier.

9       THE COURT:  Excuse me, when you object, remove your

10 mask so I can --

11      MR. McLAUGHLIN:  Sorry, Your Honor.

12      THE COURT:  Sometimes it's hard for me to pick up.

13 BY MR. WILLETT:

14 Q    Did you have any problems with Ms. Barickman,

15 Ms. Demiduk, going out and seeking other folks to open Emerson

16 Creek outlets?

17 A    No, I had no problem with that at all.  It was to my

18 benefit.

19 Q    What about the idea of talking to someone about also

20 opening a tearoom?  Did you have a problem with that?

21 A    No.  No.  Again, it was to my benefit.  It expands my

22 brand and puts me in other locations that I wouldn't

23 necessarily be in.

24 Q    Next if we can go to Exhibit 89.

25      MR. WILLETT:  And if you will -- Ashley will scroll

1  through this.  That's the one we just saw, but if you'll go

2  through the next few pages so we can identify this.  Slow down

3  there.  Go back up a little bit.

4  BY MR. WILLETT:

5  Q    This appears to be a November 2nd, 2006, e-mail from

6  Ms. Demiduk to yourself regarding Peoria.  Do you see that?

7  A    I do.

8        MR. WILLETT:  And, Ashley, if you will scroll on down

9  a little bit further.

10 BY MR. WILLETT:

11 Q    And the next one is November the 5th, and subject matter

12 there is, "A few things."  Do you see that?

13 A    Uh-huh.

14 Q    And I would represent to you this is another sort of

15 string of a couple of e-mails here.  Actually, if you will

16 just go down and confirm that these are all e-mails between

17 yourself, Mr. Leavitt, and Ms. Barickman, Ms. Demiduk.

18        MR. WILLETT:  At this time, Your Honor, I would like

19 to move for the admission of Exhibit 89.

20        MR. LAUBSCHER:  No objection.

21        THE COURT:  It will be admitted.

22    (Plaintiff's Exhibit Number 89 was received.)

23        MR. WILLETT:  Ashley, if you could go up to page 2 of

24 6.

25 BY MR. WILLETT:

1  Q    And in this document, or this e-mail, November 6th, 2006,

2  Ms. Barickman is referring to "Nancy," she says, "'for' Peoria

3  came up today."  Do you know who Nancy from Peoria is?

4  A    Yeah, I do.  I think she means from.  It was a similar

5  situation to the other one with Atlanta where a lady had --

6  I'm not sure exactly how she got in touch with her, but she

7  liked the idea of doing an outlet, and Chris had talked to her

8  and given her advice.  And in this particular case, it did

9  work out.  She did get in touch with me, and she set up a

10  small store in Peoria, Illinois, that lasted a couple of

11  years.

12  Q    And was it the same idea as what you set up with the

13  defendants?

14  A    It was.  It was an Emerson Creek outlet store.

15  Q    If you would look at the third paragraph when she says,

16  "She is nice and really checking out everything.  She asked me

17  about other products and I told her she really needs to carry

18  mostly Emerson Creek, 80 percent of the store."  Did you have

19  an understanding of what Ms. Barickman was communicating to

20  you there?

21  A    She was communicating to her that she needs to run it

22  along the same lines as the way she's running her store, where

23  it's mostly Emerson Creek Pottery.

24  Q    The next sentence says, "You have to make it look full of

25  Emerson Creek, so ask about carrying some line of crystal or

1  something."

2  A   She's talking about accessories that would go with the

3  pottery.

4  Q   Did you have a problem with her carrying accessories?

5  A   No, I didn't.  That would be standard practice.

6  Q   The next paragraph reads, "I think she is a good source.

7  I tried not to get too excited."  Do you know what she's

8  referring to there?

9  A   I think she's -- she's saying that she thinks this is

10  going to work out, but maybe it won't, so she's trying not to

11  get her hopes up.  But I think the rest of that sentence, she

12  talks about how with the lady in Atlanta, it didn't work out

13  for whatever reasons, and she spent a lot of time, her own

14  time, working with her and it didn't work out.  It didn't help

15  her.  It didn't help me.

16      MR. WILLETT:  Next, Ashley, if you could scroll down

17  to the -- I think it's the top of the last page of this

18  exhibit.  Yeah, and then go up just a little bit.  Yep, right

19  there.  Perfect.

20  BY MR. WILLETT:

21  Q   So, Mr. Leavitt, you see that e-mail address up there,

22  the one in the from is Jim Leavitt,

23  EmersonCreek@earthlink.net.  And that's you, correct?

24  A   Yes.

25  Q   What is the EmersonCreekPottery@outlook.com e-mail

1    address?  Do you know?

2    A    That's another e-mail address.  I've got three of them.

3    I've got EmersonCreek@EmersonCreekPottery.com,

4    EmersonCreek@earthlink.net, and then

5    EmersonCreekPottery@outlook.com.

6    Q    Great.  Thank you.

7         MR. WILLETT:  Actually, let me go back up one real

8    quick.  Right there.  On that page it says -- go down.  I'm

9    sorry, to Ms. Barickman's e-mail before that.

10   BY MR. WILLETT:

11   Q    She says, "Hi, Jim.  Just wanted to ask, Nancy from

12   Peoria called, just wondering if I had an extra Halloween, the

13   old one with the black cat and pumpkin face on it, I would be

14   interested in selling to her."  Do you know what she's

15   referring to there?

16   A    She's talking about one of the patterns that we made that

17   was discontinued at that point, that she probably had extra

18   stock on.

19   Q    Because she goes on the next paragraph, she says, "I have

20   about 200 large candle shades, 150 chip and dip, oval bakers

21   70, so she's just checking with you first.  It is okay if you

22   are not okay with it."  Do you know what she's referring to?

23   A    Well, she's asking me if it was okay for her to actually

24   sell that overstock to the lady in Peoria because she really

25   wanted that pattern.  We didn't have it at that time, so she's

1 asking my permission.

2          MR. WILLETT:  Ashley, if you will scroll up to the

3 response e-mail.

4 BY MR. WILLETT:

5 Q    And what's your response here, sir?

6 A    I said I don't mind, basically.

7 Q    That that was okay for her to sell to Nancy?

8 A    Yeah.  And I also suggested maybe she should put it on

9 sale to help move her inventory down.

10          MR. WILLETT:  Next, if we can go to -- yeah, Ashley,

11 go back down one little bit there.

12 BY MR. WILLETT:

13 Q    This is still in 2007.

14          MR. WILLETT:  Keep going down.

15 BY MR. WILLETT:

16 Q    The bottom paragraph there, last sentence, "Pretty busy

17 four days a week when tearoom is open, around 500 to $900 --

18 or 500 to 900 a day."  I think this may have been one you saw

19 earlier.  What's your understanding of what she's referring to

20 there?

21 A    I think she's talking about the retail sales in her

22 store.  When the tearoom was open, it was improving her sales,

23 which was one of the reasons that she wanted to open the

24 tearoom to start with.

25 Q    And, again, you were okay with that?

1   A      I was, yeah.

2   Q      Next, if we can go to Exhibit 196.  This is an e-mail

3   from Ms. Barickman to Jim Emerson, Emerson Creek Pottery --

4   sorry.  Jim, Emerson Creek Pottery.  Do you see that?

5   A      Uh-huh.

6   Q      And do you know what she's communicating to you here?

7   A      They had a fall festival.  It looked like they had about

8   a 1,000 people and did $8,000, plus the tearoom 5,000.  She

9   was going to send me pictures.  Sounds like she was real proud

10  of it.  Sounds like they had a good turnout, plus they had

11  antique vendors that were involved too.

12  Q      Let me ask you about that.  It says, "It was so great.

13  You would of loved it.  I had 27 antique vendors."  And it

14  says "the."  I think it means, "They paid me $2,000 to rent

15  the space."  Do you know what she's referring to there?

16  A      Sure.  The vendors that took part in that festival

17  actually paid for the privilege of being there.

18  Q      Did you have an understanding of where that festival took

19  place?

20  A      It was on her grounds, right by the store.

21         MR. WILLETT:  Next, if we could go to exhibit --

22  first of all, let me go back on that.  I apologize.

23         If I could move to admit Exhibit 196, Your Honor.

24         MR. LAUBSCHER:  No objection.

25         THE COURT:  It will be admitted.

1    (Plaintiff's Exhibit Number 196 was received.)

2         MR. WILLETT:  Display it.

3   BY MR. WILLETT:

4   Q    Again, this is the e-mail that you were just referring

5   to.

6         MR. WILLETT:  And, Ashley, if you want to make it a

7   little bigger.

8   BY MR. WILLETT:

9   Q    But this is the e-mail that you were just reading from;

10  is that correct, sir?

11  A    Uh-huh.

12  Q    That's a "yes"?

13  A    Yes.  Yes.

14  Q    And then if you look about three lines down, the sentence

15  that starts, "I had 27 antique vendors."  That was the

16  sentence I asked you about, or one of the sentences I asked

17  you about; is that correct?

18  A    Yeah.  Right, we just talked about that.

19  Q    Okay.  Great.

20       Next, if we can go to Exhibit 195.  Can you identify what

21  this is?  This appears to be a September 4, 2008, e-mail that

22  posted jpeg images?

23  A    Yeah.  It looked like I had a bunch of pictures of the

24  tearoom must have been attached.  You can't see them here, you

25  know.

1           MR. WILLETT:  Ashley, if you will scroll down to show

2    some of the images.  Let's stop on that one.

3    BY MR. WILLETT:

4    Q    What do you understand that to be, sir?

5    A    That's our flowerpot that's on an oval tray, and she

6    served her salads in the flowerpot.  It was kind of like a

7    signature dish, I believe.

8           MR. WILLETT:  At this time I would like to move for

9    the admission of Exhibit 195.

10          MR. LAUBSCHER:  No objection.

11          THE COURT:  Admitted.

12       (Plaintiff's Exhibit Number 195 was received.)

13          MR. WILLETT:  And, Ashley, if you could keep

14   scrolling down.

15   BY MR. WILLETT:

16   Q    What is that a picture of, sir, if you know?

17   A    So that's her tearoom.

18   Q    At the Emerson Creek Pottery --

19   A    Yeah, at the outlet.  Uh-huh.

20   Q    If you look on the wall, you see some decorations hanging

21   there?

22   A    Sure.  That's pottery, cups and plates hanging on the

23   wall, utensil holder on the counter.

24   Q    Yeah.  Focus in on that utensil counter, or utensil

25   holder.

1 A    Yeah, it's an iris pattern.  Yeah.

2 Q    And that's something that was made by Emerson Creek

3 Pottery?

4 A    It is.

5 Q    Great.  All right.

6        MR. WILLETT:  If you can go back to the e-mail,

7 Ashley.  Scroll down to the next.  More.  Thank you.

8        Again, this was -- scroll down a little bit more.  I

9 just want to see the date.

10 BY MR. WILLETT:

11 Q    This is September of 2008.  And, obviously, from what you

12 said earlier it looks like she is -- has sent you some

13 pictures of the tearoom; is that correct?

14 A    Uh-huh, yes.

15 Q    And had you seen the tearoom before receiving these

16 pictures in 2008, pictures of it?

17 A    I think I did, but I can't remember exactly when she

18 would have sent me pictures.

19 Q    Next, if we could -- actually, it looks like she also

20 sent you some of her house that are not attached here.  She's

21 referring to that fall festival or that antique fall fest.  Do

22 you see that in the first two lines?

23 A    Right.  Uh-huh.

24 Q    And she also refers in the first line, "We had a slow

25 August, only 1,000."  Do you think that's referring to sales?

1    A    It says, "Only 1,000 increase from last year."

2    Q    Thank you.  I appreciate that.  "1,000 increase from last

3    year, but in these times I think that is still okay."  Do you

4    know what she's referring to there?

5    A    I think it was when with the economy was not doing too

6    good, so having an increase was -- any increase would have

7    been good.

8    Q    Going down to the middle there, there's a sentence that

9    reads, "Doing a lot of advertising.  They're helping to pay

10   for it."  Do you know what she was referring to there?

11   A    I think she was talking about getting her fall festival

12   ready, and since she's got the antique dealers, they were

13   probably chipping in to help her pay for advertising.

14   Q    She says, "We have 4,100 names.  They have 2,000, so

15   doing a nice list, and also many e-mails.  Should be good."

16   Do you know what she's referring to there?

17   A    Yeah.  She's talking about expanding her mailing list by

18   combining it with antique dealers, trying to get new customers

19   into the shop.

20   Q    Next, if we can go to Exhibit 194.  Okay.  It looks like

21   more of the same.  This is from 2009, the following year.

22   A    Uh-huh.

23         MR. WILLETT:  If you go down just a little bit,

24   Ashley.

25   BY MR. WILLETT:

1  Q    It looks like, again, an e-mail exchange --

2         MR. WILLETT:  Go down a little further.

3  BY MR. WILLETT:

4  Q    -- an e-mail exchange between you and Ms. Demiduk from

5  June of 2009?

6  A    Uh-huh.

7  Q    Is that yes?  Just so the court reporter can get that.

8  A    Yes, that's correct.

9  Q    And this would have been an e-mail you sent in the normal

10 course of business?

11 A    Yes.

12        MR. WILLETT:  At this time I would like to go ahead

13 and move for the admittance of Exhibit 194, Your Honor.

14        MR. LAUBSCHER:  No objection.

15        THE COURT:  It will be admitted.

16     (Plaintiff's Exhibit Number 194 was received.)

17        MR. WILLETT:  So if you go down, Ashley, to the

18 middle e-mail.

19 BY MR. WILLETT:

20 Q    It's an e-mail from Chris.  "Hope all is well.  We have

21 been really busy, about 60, 70 to 80 people for lunch a day.

22 The shop around 700 to 1,000 one day.  We had 1,800 last week

23 for shop."  Do you know what she's referring to there?

24 A    She's referring to the number of people coming to her

25 tearoom for lunch, and talking about the -- her sales in the

1  outlet store.

2  Q    The next sentence she says, "I have someone working on my

3  website, so I was wondering if he could just download some

4  pictures for the patterns and styles."  Do you see that?

5  A    Uh-huh, I do.

6  Q    Were you okay with that?

7  A    Yes.

8  Q    Look at the first sentence of the next paragraph.  "I

9  always tell customers they have to order online with your

10 website.  I do not ship or mail things.  Just want you to know

11 that."  Do you see that?

12 A    I do.

13 Q    And do you know what she's referring to there?

14 A    She's referring to the fact that we have an ecommerce

15 website at this time and that she's just reaffirming that

16 she's not shipping things, pottery that people buy away from

17 her store, so it wouldn't be competing with my website.

18 Q    Okay.  And you say "reaffirming."  Had you had

19 discussions with her along those lines previously?

20 A    We might have.  I don't remember exactly.

21 Q    And did you understand that for the entirety of your

22 business relationship with the defendants, are you aware of

23 them ever shipping or doing online sales?

24 A    No.  To my knowledge, they've never done that.

25 Q    Say that again.

1    A    To my knowledge, they have not, no.

2         MR. WILLETT:  If we can go up to the top e-mail.

3    BY MR. WILLETT:

4    Q    And then this is your response e-mail.  And you tell her

5    in the second paragraph that, "You can download pictures from

6    the website, not a problem."  Do you see that?

7    A    I do.

8    Q    You go on to say, "But do not copy word for word any

9    written materials.  This is bad for search engine

10   optimization."  What are you referring to there?

11   A    I was informed by people that ran my website that copying

12   sentences or descriptions verbatim from one website to another

13   is considered a no-no by Google and you should never do that.

14   You should always alter it a bit.  Copying the picture is fine

15   but not the words that go with it.  So I was just telling her

16   that.

17   Q    Relaying what you had been told?

18   A    Correct.

19   Q    And then you say in the -- you go on to say, "I can also

20   send you any photos you need if you can't find them on-site."

21   What were you referring to there?

22   A    Basically what it says, if she needed any pictures of the

23   pottery for any reason, we would be glad to send it to her.

24   Q    And you were fine with her using pottery pictures from

25   the website?

1  A    Yes.

2  Q    And why was that?

3  A    It was my pottery; they were selling it under my name.  I

4  wouldn't have any reason to have a problem with it.

5        MR. WILLETT:  Next, if we can go to Exhibit 174.  Go

6  down just a little bit on this one.  Go back up.

7  BY MR. WILLETT:

8  Q    All right.  And this, again, appears to be an e-mail

9  exchange between you and Ms. Barickman in the normal course of

10 business?

11 A    Yes.

12       MR. WILLETT:  At this time I would ask that

13 Exhibit 174 be admitted.

14       MR. LAUBSCHER:  No objection.

15       THE COURT:  It will be admitted.

16    (Plaintiff's Exhibit Number 174 was received.)

17       MR. WILLETT:  Scroll on down a little bit to the

18 beginning of -- you refer to, if you look at the middle, it

19 said e-mail from Ms. Demiduk.  "Thanks for checking.  Hi, Jim,

20 thanks for checking on that.  I will show Ron and make sure we

21 can still sell the lamps.  He was wondering if you could give

22 us a price on the shipment.  Not sure how you do that."  Do

23 you see that?

24 A    Yes.

25 Q    Do you know what she was referring to?

1  A    I'm a little confused.  I'm not sure why she would have

2  asked about selling the lamps because she did sell them.  "He

3  was wondering if you could give us a price on the shipment."

4  I think she's asking if maybe we could get her a better price

5  on the freight for some particular shipment.

6  Q    Do you know when she says "Ron," who did you understand

7  her to be referring to?

8  A    Ron Wehrli.

9  Q    So as of at least August the 9th of 2008, you understood

10 that Mr. Wehrli still had some affiliation with Ms. Demiduk

11 and the business?

12 A    Correct.

13 Q    And with the payments, were those still coming from RW

14 Development?

15 A    I believe so.  I believe so.

16 Q    And then if you look up on the -- or the last sentence

17 there, "Do the square plate turn out?"  Do you see that?

18 A    Uh-huh.

19 Q    Do you know what she's referring to there?

20 A    She's referring to a square plate that she had seen I

21 think at a gift show and was interested in.  She showed it to

22 her customers and felt like they liked it, wanted me to make a

23 square plate ourselves, and so she's referring to, you know,

24 how did it turn out, because I had to make it from scratch.

25 It was a process.

1  Q   Okay.  And if you look at that, your response e-mail

2  which is dated --

3        MR. WILLETT:  Ashley, if you can just go down a tad

4  there.

5  BY MR. WILLETT:

6  Q   The second paragraph, "Still working on the plate.  I get

7  pulled in so many directions, it's hard to spend as much time

8  as I would like," what are you referring to there?

9  A   I hadn't finished the work to get it ready to produce.  I

10 was working on it, just basically saying that I've got to wear

11 all kinds of hats at work, and I do everything from A to Z,

12 and it's hard sometimes to concentrate on one particular task

13 and get it done as quick as you like.

14 Q   Understood.  If you look at the first paragraph there,

15 you say, "For the freight, when we have finish packing, I will

16 call around to get the best price I can for you."  Do you know

17 what you're referring to there?

18 A   Sure.  It probably would have been enough to be several

19 pallets or more, so we would call different freight brokers or

20 whatever and see who gave us the best shipping to get it to

21 them.

22 Q   And was that consistent?  Do you always make the direct

23 relationship with defendants?  Do you always make the shipping

24 arrangements?

25 A   Right, we always arrange that.  We always tried to get

1  them the best price we could.

2  Q    If you look next at Exhibit 12.

3        MR. WILLETT:  And, Ashley, I'll get you just to flip

4  through these couple of pages so that Mr. Leavitt can identify

5  these for us.  Go slow on that first one.

6  BY MR. WILLETT:

7  Q    And we'll come back to these.  I just want to make sure

8  you understand what these are.

9  A    These are photographs of her store, advertising materials

10  related to her Emerson Creek store.

11  Q    Okay.  And when you say "her," you're referring --

12  A    To Chris, yes.

13  Q    And now if you'll go to the next page.  What is that?  Do

14  you understand what that is?

15  A    It looks like a gift certificate for her Emerson Creek

16  Pottery outlet.

17  Q    Okay.  And how did you know that was for her outlet?

18  A    Well, she would have sent me a picture of it, or maybe

19  it's the actual physical one she sent me as an example, and it

20  says, "Emerson Creek Pottery."  It's got the picture of her

21  old farmhouse on it.

22  Q    Go down to the next page.  If you can identify what this

23  is.

24  A    It's a -- it looks like some sort of advertising

25  promotional piece for her outlet store and pictures of our

1  pottery on it.

2        MR. WILLETT:  And, Ashley, if you will go to page 4.

3  BY MR. WILLETT:

4  Q    And --

5  A    That appears to be a postcard that she was -- or mailer

6  that she sent out.

7        MR. WILLETT:  And if you go back up one, Ashley, to

8  4.

9  BY MR. WILLETT:

10  Q    The envelope there, that's -- was that your address?

11  A    Yeah, that would have been -- she sent stuff to me all

12  the time, and that would have been probably in that envelope.

13  Q    Okay.

14        MR. WILLETT:  And if you scroll down under the

15  postage.  Scroll down a little bit more under the postage

16  mark.

17  BY MR. WILLETT:

18  Q    Do you know when that would have been?  I don't know if

19  you can read that.

20  A    Well, it's May -- it's 2000 something.  I can't --

21  Q    It looks like early 2000.  But, again, it looks like it's

22  cut off.

23  A    It's cut off.  May 28, 2002, possibly.

24  Q    But this is an envelope that you would have received?

25  A    Yes, probably with photographs or whatever.

1        MR. WILLETT:  At this time I would like to move for

2   the admission of Exhibit 12.

3        MR. LAUBSCHER:  No objection.

4        THE COURT:  It will be admitted.

5      (Plaintiff's Exhibit Number 12 was received.)

6        MR. WILLETT:  All right.  And so let's go back up

7   from page 4.

8   BY MR. WILLETT:

9   Q    That looks like that was sometime -- again, it's hard to

10  read the address there.

11       MR. WILLETT:  And then go backwards from there up to

12  the top.

13  BY MR. WILLETT:

14  Q    And these would have been different fliers or advertisers

15  that you received from Ms. Demiduk?

16  A    Yes, that's correct.

17  Q    Okay.  And it was her normal practice at the time to mail

18  these to you?

19  A    Yes.

20  Q    And, again, there we've got picture -- the picture on the

21  right-hand side --

22  A    That's her store and that's our pottery inside the store,

23  yes.

24       MR. WILLETT:  Go to the next one, please.

25  BY MR. WILLETT:

1  Q     Now, on this one --

2         MR. WILLETT:  Yeah.  Sorry.  That's fine.

3  BY MR. WILLETT:

4  Q     -- this one has some writing on it.

5  A     Uh-huh.

6  Q     And, again, is that your address?

7  A     It is.  And it looks like a postcard sent to us and she

8  had written, "Hi, Lucy, talk to you soon."  And Lucy was the

9  lady that ran my office at that time.

10 Q     And if you look on the left-hand side, it said,

11 "Reopening Saturday, May 1st, 2004."  Do you see that?

12 A     I do.

13 Q     And what's your understanding of what she was referring

14 to there, or this was referring to?

15 A     Well, they would close for the winter season and then

16 reopen in May when the weather got good again.  So this would

17 be a postcard announcing the reopening.

18        MR. WILLETT:  And if we scroll down from that a

19 little bit.  First of all, stop right there, Ashley.  Sorry.

20 BY MR. WILLETT:

21 Q     If you look at the box in the upper left-hand corner, you

22 see the address 5000-B Grove Road.  Did you understand that to

23 be defendants' address at that time?

24 A     Correct.

25 Q     And then the website address there, did you understand

1   that to be their website?

2   A    I did, yes.

3   Q    And that's the www.ecreekpottery.com?

4   A    Correct.

5   Q    And now if you scroll down a little bit further.  Again,

6   these are some pictures on that pamphlet.

7   A    Yes.  Again, this is the farmhouse and our pottery and

8   some flowers, a picture of her dog.  I guess it's their dog in

9   front of that rock with Emerson Creek Pottery on it.

10  Q    And the pottery that we see depicted here, that's all

11  Emerson Creek Pottery?

12  A    Again, yeah.  Every bit of it, uh-huh.

13           MR. WILLETT:  Ashley, go down a bit further.  Keep

14  going to the next page.  Oh, that's it.  Go back up just a tad

15  to the page before this.  Keep going.  A little bit more.

16  Sorry.

17  BY MR. WILLETT:

18  Q    So at the top of this, we see some pictures in the upper

19  left-hand, middle, and right-hand side there.

20  A    Uh-huh.

21  Q    Do you know what those are pictures of?

22  A    Yeah.  It says, "Come see our new addition.  Good for

23  showers, parties and meetings."  So she was expanding her

24  business to include events and, in essence, that was where she

25  started doing that.

1  Q    Okay.  If you look at that center paragraph, do you

2  understand -- do you know what that's a picture of?  Center

3  picture, rather.

4  A    Oh, I'm sorry.  Yeah, that looks like a set space, or

5  maybe it's the interior.  It's hard to tell.

6  Q    Can you identify whether that's Emerson Creek Pottery on

7  the walls?

8  A    Oh, yeah.  Absolutely, yes.

9  Q    What about outside, on the picture on the right?  Can you

10 identify --

11 A    On the porch, yes, again.

12        MR. WILLETT:  Ashley, now go back up to the first

13 two.

14 BY MR. WILLETT:

15 Q    All right.  And in these, this one which starts on page 1

16 of Exhibit 12, do you see in there any reference to the

17 tearoom?

18        MR. WILLETT:  Scroll on down, Ashley.

19 A    Not in that particular one.

20        MR. WILLETT:  Okay.  And then, Ashley, go to the next

21 one, past the gift certificate.

22 BY MR. WILLETT:

23 Q    What about in this one, "Has the hours Tuesday to

24 Saturday 10:00 to 5:00"?

25 A    It looks like it's just the store and not the tearoom.

1  Q    Thank you.  Now, at some point in time you understood

2  that Ms. Demiduk --

3        MR. WILLETT:  If you can get that last one where we

4  see the pictures of the tearoom, the top ones.  Yeah.

5        Yeah, just up a little bit further from that.

6  BY MR. WILLETT:

7  Q    Now, at some point in time, obviously, you've learned

8  that Ms. Demiduk had opened the tearoom; is that correct?

9  A    Correct.

10 Q    Did you have an understanding as to whether or not your

11 pottery was being used in that tearoom?

12 A    Yes.  Yes, she was planning to use -- serve on our

13 pottery and use it.  Well, she would decorate the walls with

14 it, but primarily be serving on the pottery.

15       MR. WILLETT:  Ashley, if you can go to Exhibit 182.

16 BY MR. WILLETT:

17 Q    All right.  This appears to be an e-mail between Chris

18 Barickman and yourself back in 2008.  Do you see that?

19 A    Yeah.

20 Q    And this would have been in the normal course of your

21 business?

22 A    Correct.

23       MR. WILLETT:  At this time we would like to move for

24 the admission of Exhibit 182.

25       MR. LAUBSCHER:  No objection.

1    THE COURT:  It will be admitted.

2    (Plaintiff's Exhibit Number 182 was received.)

3 BY MR. WILLETT:

4 Q    All right.  So on the e-mail there in the center of the

5 page Ms. Barickman sends to you March 28th of 2008, it's

6 referring to something I think you sent her.

7    MR. WILLETT:  Ashley, if you would scroll down just a

8 little bit.

9 BY MR. WILLETT:

10 Q    The first e-mail is subject line, "Call."  Do you see

11 that?

12 A    Yeah.

13 Q    It says, "Hi, Jim, I'm around if you want to call any

14 time."

15 A    Yeah, uh-huh.

16 Q    And, again, at this point in 2008 would you still have

17 been having telephone calls and talking to Ms. Barickman?

18 A    We talked on the phone a fair amount, as well as e-mail,

19 uh-huh.

20 Q    If you look above that, it references an e-mail that you

21 sent back to her.  Do you know what you were communicating to

22 her there?

23 A    Yeah.  We had remodeled or redecorated the displays in

24 our log cabin outlet and I sent her pictures of what we had

25 done so she could see them, and also a picture of a new

1    product that we were making.

2    Q    Great.  And if you go on up to the top there, she says in

3    her e-mail, "Looks great.  So pretty on the cabin."  Do you

4    see that?

5    A    Yeah.  Uh-huh.

6    Q    If you look at the last sentence there, it says, "Also

7    just a reminder if we could put what boxes or pallets go for

8    tearoom."

9    A    Right.

10   Q    Do you know what she's referring to?

11   A    Yeah.  I think she wanted the pottery that she was going

12   to be using for the tearoom to be separated out so it would go

13   to that particular location, I guess for their convenience, so

14   they wouldn't have to move stuff around once it got there.

15   Q    It looks like that same day you responded to her.  What

16   did you tell her?

17   A    I said, "Yeah, we can make it as a separate purchase

18   order so it will be marked for the tearoom, just to eliminate

19   confusion."

20         MR. WILLETT:  Ashley, if you would go to Exhibit 178.

21   BY MR. WILLETT:

22   Q    Looks like this was from that last e-mail chain, but I

23   just wanted to introduce this separately because it has the

24   attachments.

25         MR. WILLETT:  Ashley, if you will scroll down from

1 that.

2 BY MR. WILLETT

3 Q    Are those pictures of the cabin?

4 A    Yes.  These would have been pictures that I would have

5 sent her of the inside of our log cabin outlet, and those were

6 the candleholders I was referring to.

7         MR. WILLETT:  At this time we would like to move for

8 the entry of Exhibit 178.

9         MR. LAUBSCHER:  No objection.

10         THE COURT:  It will be admitted.

11     (Plaintiff's Exhibit Number 178 was received.)

12         MR. WILLETT:  If you could scroll up a little bit,

13 just to the ones that show the shop.

14 BY MR. WILLETT:

15 Q    Am I correct in saying that as of March of 2008 this is a

16 picture that depicts what it looked like inside of your outlet

17 store?

18 A    Yes, that's correct.  That's correct.

19 Q    And this was something that you sent to Ms. Demiduk?

20 A    That's correct.

21 Q    Why did you send that to her?

22 A    We had just redecorated and I wanted to show her what we

23 were doing, also give her some ideas, possibly, and guidance

24 on displaying the pottery.

25 Q    Real quick, if we can go to Exhibit 79.  And, first of

1    all, I just ask you if you can identify what the picture

2    depicts?

3    A    It's a picture of our flowerpot.  I think she called

4    it -- it was a signature dish that they sold in the tearoom.

5    They put a salad in the flowerpot, and it's served on one of

6    our oval platters.

7    Q    So you had an understanding that she was using your food

8    (sic) for serving?

9    A    Correct.  And here we see it.

10         MR. WILLETT:  At this time I would like to move for

11   the entry of Exhibit 79.

12         MR. LAUBSCHER:  No objection.

13         THE COURT:  It will be admitted.

14      (Plaintiff's Exhibit Number 79 was received.)

15   BY MR. WILLETT:

16   Q    Let me also refer you to Exhibit 179.  And if you look at

17   that document -- scroll down just a little bit -- regarding

18   flowerpots.

19   A    Uh-huh.

20         MR. WILLETT:  And, Ashley, if you can just kind of

21   scroll down a little bit on that.  Now, this is an e-mail from

22   2007, "flowerpots," Ms. Barickman to you.  Do you see that?

23   A    I do.

24         MR. WILLETT:  This is just a single string of

25   e-mails.  I move for admission of Exhibit 179.

1          MR. LAUBSCHER:  No objection.

2          THE COURT:  It will be admitted.

3      (Plaintiff's Exhibit Number 179 was received.)

4  BY MR. WILLETT:

5  Q    Now, she says, "Just wondering if you have any large,

6  frilly flowerpots."

7  A    Uh-huh.

8  Q    "We serve our flowerpot salad in them and would like to

9  see what you have available for sale."  Do you see that?

10 A    I do.

11 Q    Do you recall having discussions with her about that?

12 A    Yes.  She was probably wanting more at that time.  And I

13 think in another e-mail you'll see that at a certain point we

14 had actually discontinued that pot from our wholesale line,

15 and so I was talking to her that, you know, we would be glad

16 to make it for her, but there's going to be some extra cost

17 involved because we have to special make a run of them for

18 her.

19 Q    If we scroll up there, it looks like you respond to her

20 exactly with what you just said, that you had discontinued the

21 item.

22 A    Yeah, basically that's right.

23 Q    But you agreed that you would run some for her.

24 A    Yeah.  Yeah.

25 Q    Next if we could go to Exhibit 238.  And this looks like

1  a little bit later in time, in 2015.  Do you see this

2  exchange?

3  A    Uh-huh.

4  Q    We'll get to some of the change in the e-mail address in

5  a little bit, but is this an e-mail that you, under the name

6  Emerson Creek Pottery, would have had with Chris Demiduk?

7  A    Uh-huh.

8  Q    2015?

9  A    Uh-huh.

10  Q    Is that a "yes"?

11  A    Yes.

12  Q    Okay.

13      MR. WILLETT:  And at this time I would like to move

14  for admission of Exhibit 238.

15      MR. LAUBSCHER:  No objection.

16      THE COURT:  It will be admitted.

17    (Plaintiff's Exhibit Number 238 was received.)

18      MR. WILLETT:  All right.  So if you go down a little

19  bit to the beginning of this document.  There we go.

20  BY MR. WILLETT:

21  Q    Flowerpots without holes.  It looks like this is

22  actually -- this is Heather.  Who is Heather?

23  A    She would have been a lady that worked in the office at

24  that time.

25  Q    And you had access to her e-mail or this e-mail account?

1  A     That would have gone to a different e-mail, but yeah, I

2  would see it.

3  Q     Okay.  It says, "Chris, it's a good" -- the subject line,

4  "Flowerpots without holes," what's that referring to, if you

5  know?

6  A     Well, normally when we make a flowerpot we would put a

7  hole in the bottom of it for drainage, but we're talking about

8  making some flowerpots without holes for her salad serving

9  pieces.

10  Q     And it looks like she's communicating that to Chris, or

11  Ms. Demiduk, confirming which patterns.

12  A     Right.

13         MR. WILLETT:  If you would scroll up a little bit,

14  Ashley.  Next if you can go to Exhibit 199.  Scroll down a

15  little bit.

16  BY MR. WILLETT:

17  Q     And this one, if you look -- this appears to be an e-mail

18  exchange between Jim at Emerson Creek Pottery and Chris

19  Barickman in 2008.  Do you see that?

20  A     Yes.

21  Q     And this would have been an e-mail you received in the

22  normal course of business?

23  A     Correct.

24         MR. WILLETT:  At this time we move for the admission

25  of Exhibit 199.

1        MR. LAUBSCHER:  No objection.

2        THE COURT:  It will be admitted.

3    (Plaintiff's Exhibit Number 199 was received.)

4 BY MR. WILLETT:

5 Q    In this e-mail Ms. Barickman says in the last full

6 paragraph, "Also we're expanding the tearoom.  It is under

7 roof now and just going to need extra pottery to serve on

8 besides the order for the shop."  Do you see that?

9 A    Yes.

10 Q    And do you recall having conversations with her about

11 that?

12 A    Yeah, I do, and she's wanting to order extra pots for it.

13        MR. WILLETT:  Okay.  And if you scroll up a little

14 bit.

15 BY MR. WILLETT:

16 Q    And then if you go to where it says, "Hi, Chris, got your

17 order.  What's the best number to call you to discuss this and

18 your questions?"

19 A    Uh-huh, yes.

20 Q    Would that have been a normal practice for you?

21 A    Sure.  Yeah, back and forth e-mails, phone calls

22 sometimes, sure.

23 Q    Next I want to take a quick peak at Exhibit 225.  This is

24 another big one, but I just want you to look from the start

25 here.  These are labeled "Purchase Order."  And if Ashley

1  could scroll through some, and maybe we can jump down because

2  it's a multi-hundred page document.

3      If you can just identify when Ashley gets to the next one

4  if you have an understanding of what this is.

5          MR. WILLETT:  Stop there.

6  A    Yeah, these represent purchase orders when she would send

7  us orders for the pottery, and we would enter them into

8  QuickBooks or whatever we were using at the time as a purchase

9  order.  And that's what we're looking at here, different

10 purchase orders.

11 BY MR. WILLETT:

12 Q    So on the -- on the left, on this one it says,

13 "Name/Address: Emerson Creek Pottery and Tearoom, 5126

14 Stephens Road, Oswego, Illinois."  Do you see that?

15 A    Uh-huh.

16 Q    Who is that referring to?

17 A    That would be her actual farmhouse, Emerson Creek Pottery

18 outlet.

19 Q    And the "ship to," what is that referring to, if you

20 know?

21 A    That would have been the -- where the actual freight had

22 gone.

23 Q    And, again, you referenced this earlier, but what's your

24 understanding of what RW Development is?

25 A    That would have been the company that Ron ran and he

1  wrote the checks on at that time, or not him, but his company

2  wrote the checks to us at that time for invoices.

3  Q   All right.  And if we go down maybe about halfway just to

4  see the time frame.  You might just go to, like, 150.

5      All right.  And, again, this one is in -- can you tell

6  me, what's the date on this one?

7  A   It's 11/3/11.

8      MR. WILLETT:  And, Ashley, if you would go to one of

9  the last few here.

10 BY MR. WILLETT:

11 Q   What's the date on that one?

12 A   February of 2017.

13 Q   And I'll represent to you that these were -- this is a

14 conglomeration of purchase orders that were produced in this

15 matter for a period of time --

16 A   Correct.

17 Q   -- that we've looked at.

18     MR. WILLETT:  At this time I would move for

19 admission --

20 BY MR. WILLETT:

21 Q   Is that your understanding of what this is?

22 A   Yes.  Yes.

23     MR. WILLETT:  At this time I move for admission of

24 Exhibit 225.

25     MR. LAUBSCHER:  No objection.

1        THE COURT:  It will be admitted.

2        (Plaintiff's Exhibit Number 225 was received.)

3    BY MR. WILLETT:

4    Q    And, again, that 2017, on this one the -- we've got the

5    same address for the name and address as well as the ship to?

6    A    That's correct.

7    Q    And the entity that it's being shipped to at that point

8    in 2017 was?

9    A    Emerson Creek Pottery and Tearoom.

10        MR. WILLETT:  And if you go back, Ashley.  Like go to

11   Number 30.

12   BY MR. WILLETT:

13   Q    All right.  And at that point in time that's when they

14   were being shipped still under the name Emerson Creek Pottery

15   and Tearoom but to --

16   A    But it would have gone to RW Development, that's correct.

17   Q    Thank you.

18        Next I'd like to -- Exhibit 192.  And this is a one-page

19   document e-mail from Chris Barickman, dated April 22nd, 2009.

20   Do you see that?

21   A    Yes.

22   Q    And this would have been sent in the normal course of

23   business or received by you?

24   A    Yes.

25        MR. WILLETT:  At this time I would like to move for

1  the entry of Exhibit 192.

2          MR. LAUBSCHER:  No objection.

3          THE COURT:  It will be admitted.

4      (Plaintiff's Exhibit Number 192 was received.)

5  BY MR. WILLETT:

6  Q    And there's some discussion in here about "Rebecca called

7  yesterday."  What is that referring to?

8  A    That would have been the person that worked in the office

9  at that particular time.

10 Q    And it looks like they're trying to get some billing

11 issues straightened out.

12 A    Yeah, uh-huh.

13 Q    And if you look down a little bit further, it says, "The

14 lady called about the shortbread pans.  Our cook is working on

15 a shortbread cookie."  Do you see that?

16 A    I do.

17 Q    Do you know what she's referring to there?

18 A    Well, I'm not sure what lady.  She was talking about the

19 shortbread pans, but it looked like she was working on getting

20 a recipe for a shortbread cookie.  I'm not sure.

21 Q    And if you scroll on down a little further to that last

22 paragraph there, it starts with "Can't wait to see the square

23 plate."  Do you know what she's referring to there?

24 A    Yeah.  That's that plate that we referred to earlier that

25 I was making for her.  I guess at that point I was about ready

1    to send her some.

2    Q    She goes on to say after some ellipses, "We lost our

3    domain name of ecreekpottery.com.  The guy who set it up had a

4    falling out with Ron and he owned the domain name because he

5    did not website six years ago so we have to change it."  Do

6    you see that?

7    A    I do.

8    Q    She goes on to say, "We are working on a new website.  I

9    believe the name is going to be ecreekpotteryandtearoom.com,

10   if that is okay."  Did I read that correctly?

11   A    That's correct, yes.

12   Q    Was that okay with you?

13   A    Yes, it was.

14   Q    Do you know whether she indeed did switch to that URL?

15   A    Yes, I believe that's true.

16   Q    And we may have seen one iteration of this, but I'll go

17   quickly to 203.  And, again, this is another e-mail between

18   Ms. Barickman and yourself in June of 2009.  Do you see that?

19   A    Yes.

20   Q    And in this e-mail, if you look -- this may be the same

21   one, it may be different, so I'm not going to tell you one way

22   or another.  But it says, "I have someone working on my

23   website, so I was wondering if you could download some

24   pictures for the patterns and styles."  Do you see that?

25   A    Yes.

1  Q     And you recall having that conversation with her?

2  A     Yeah, I do.

3         MR. WILLETT:  At this time I would like to move for

4  entry of Exhibit 203.

5         MR. LAUBSCHER:  No objection.

6         THE COURT:  It will be admitted.

7     (Plaintiff's Exhibit Number 203 was received.)

8  BY MR. WILLETT:

9  Q     Again, here we've got the first paragraph where she's

10  reporting on some sales.  Do you see that?

11  A     I do.

12  Q     We'll make it a little larger.  And then she talks about

13  having someone working on the website.  Do you see that?

14  A     Yes.

15  Q     And you recall having those conversations?

16  A     Yes.

17  Q     Next if we can go to Exhibit 204.

18     All right.  And, again, this appears to be an e-mail

19  exchange between you and then Ms. Barickman in the normal

20  course of business; is that correct?

21  A     Uh-huh.

22         MR. WILLETT:  I move for admission of Exhibit 204.

23         MR. LAUBSCHER:  No objection.

24         THE COURT:  It will be admitted.

25     (Plaintiff's Exhibit Number 204 was received.)

1        MR. WILLETT:  If you scroll down just a little bit,

2   Ashley, to get that full e-mail in.

3   BY MR. WILLETT:

4   Q    The first one dated May 11, 2009, it says, "Hi, Jim, do

5   you think you can put my new website page address on your

6   website?  We are working on it now with new pictures, et

7   cetera.  Our new address is www.ecreekpotteryandtearoom.com."

8   Do you see that?

9   A    Yes, I do.

10  Q    Were you okay with that?

11  A    Yes, I was.

12  Q    What did you do in response to that?  If Ashley will

13  scroll up a little bit.

14  A    Yeah, I think you'll see I forwarded that to the people

15  that were running my website at the time and asked them to

16  change that, that we had an image on our website, and I

17  believe a link to their website on our website.  So I was

18  asking him to correct that web address.

19  Q    And what does the Chicago outlet store refer to?

20  A    Chris's Emerson Creek Pottery outlet store.

21  Q    And next if we can go to Exhibit 14.

22       And if you could scroll down a little bit.  I'm just

23  going to ask -- stop there.  Go back up a little bit.

24       Are you familiar with this image, sir?

25  A    Yeah.  Yeah.  Mm-hm.

1    Q    And what is this, sir?

2    A    It's an image from their website.

3    Q    Defendants' website?

4    A    Yes.

5         MR. WILLETT:  Now, at this time I would move for

6    admission of Exhibit 14.

7         MR. LAUBSCHER:  No objection.

8         THE COURT:  It will be admitted.

9         (Plaintiff's Exhibit Number 14 was received.)

10   BY MR. WILLETT:

11   Q    And if you scroll up a little bit on that you see a date

12   up there.

13        Maybe Ashley can zoom in on that a little bit.

14        Do you see that, October 17th, 2009?

15   A    Uh-huh.

16   Q    Is that a "yes"?

17   A    Yes, I do.

18   Q    Do you know what that refers to?

19   A    That I guess is the day that screenshot was taken.

20   Q    Now, we looked and we see a red wagon in the middle

21   there.

22        And if Ashley will zoom in on that a little bit.

23        And do you know what that image is?

24   A    Yeah.  That's that wagon that was depicted previously in

25   a photograph that's at the entrance to their -- the road that

1  goes to their store from the main road.

2  Q    And so can you read what it says on the white arrow?

3  A    It says "tearoom."

4        MR. WILLETT:  Now, Ashley, go down a little bit.

5  Yeah, if you go wide.

6  BY MR. WILLETT:

7  Q    And this where it says "pottery," do you know what that's

8  referring to?

9  A    That's referring to the pottery that she sells, our

10 pottery.

11 Q    The pictures on the right-hand side, are those all

12 pictures of your pottery?

13 A    They are indeed, yes.

14 Q    What's the first pattern that we see there?

15 A    The first one is a cranberry, and then a blueberry, and

16 then some cranberry.  And the next one, the pink one would

17 have been a pink dogwood, dragonfly, Go Green solid design.

18 We do iris and olive, pine cone, poppy.

19 Q    You've seen -- you've had an opportunity to look at this

20 website before?

21 A    Yes.

22        MR. WILLETT:  Ashley, if you go back up to where the

23 words are, "pottery."

24 A    Uh-huh.

25

1  BY MR. WILLETT:

2  Q    Do you see -- can you read that first sentence there?

3  A    "All the pottery is formed, fired, and painted in

4  Bedford, Virginia, the original source of the inspiration for

5  the shop and tearoom you see today.  The family-owned company

6  began in 1977 and has been crafting pottery ever since, using

7  Japanese-style Sumi painting techniques.  Each piece is hand

8  painted from memory by individual artists."

9  Q    I'll go ahead and interrupt you.  Am I correct in saying

10 that this language, this appeared on defendants' website in

11 October of 2009?

12 A    Yes.

13 Q    And when they say "all of the pottery," do you know what

14 pottery they're referring to?

15 A    They're referring to our pottery.

16 Q    Meaning Emerson Creek Pottery?

17 A    Emerson Creek Pottery, that's correct.

18 Q    And if you look at the -- it looks like the last full

19 sentence there, it says, "There is an Emerson Creek Pottery

20 piece . . ."  Can you read that?

21 A    Yes.  Yes.  ". . . for almost every use in the home:

22 dinnerware, coffee, tea mugs, bakeware, serving dishes,

23 bathroom accessories, and more."

24 Q    At the time, in 2009, did you make all those items?

25 A    Yes.

1  Q    If you go down to look at the next picture, what is that?

2  A    That's a brie baker, and she describes that as a brie

3  baker, small casserole.

4  Q    And if you could read that first sentence for us.

5  A    "Come on in and check out our full line of Brie bakers.

6  The ideal pottery bakeware for baking casseroles and

7  desserts."

8  Q    And what's your understanding when she says, "Our full

9  line of Brie bakers"?

10 A    She's referring to Emerson Creek, Emerson Creek Pottery.

11 Q    Go to Exhibit 15.  Sir, I will represent to you this is

12 another --

13        MR. WILLETT:  Ashley, scroll over.

14 BY MR. WILLETT:

15 Q    -- another image from that website.

16        MR. WILLETT:  Scroll down a little bit.  Keep going.

17 BY MR. WILLETT:

18 Q    And can you identify what this is?

19 A    Yeah.  That's from their website again.

20        MR. WILLETT:  Okay.  And, Ashley, if will you scroll

21 back up.

22        At this time we would like to move for admission of

23 Exhibit 15.

24        MR. LAUBSCHER:  No objection.

25        THE COURT:  It will be admitted.

1    (Plaintiff's Exhibit Number 15 was received.)

2        MR. WILLETT:  If you will scroll down a little bit,

3  Ashley.

4  BY MR. WILLETT:

5  Q    All right.  That description on the right-hand side, do

6  you see that?

7  A    I do.

8  Q    Okay.  Can you read that first paragraph for me?

9  A    Yeah.  It's "Our story.  We bought the farm with an idea

10  in mind that we got while visiting Virginia.  We ran across

11  Emerson Creek Pottery in Bedford, Virginia.  They make the

12  pottery there and each piece is hand painted to this day.  We

13  had to travel down a long country road to get there, which led

14  to an old country farmhouse where the pottery is sold.  It is

15  a destination in itself, like our shop and tearoom, and the

16  people loved going there."

17  Q    All right.  And then if you would read the first sentence

18  of the next paragraph.

19  A    We thought we could create the same effect here and share

20  the peace and quiet of the country with others.

21  Q    And is that consistent with your understanding of --

22  A    That's exactly what my understanding was when they came

23  to me and wanted to create this Emerson Creek outlet.

24  Q    All right.  And then if you scroll over to the -- on the

25  left-hand side there, you see the picture of the pottery shop.

1  That's --

2  A    That's their pottery shop, yeah.  Uh-huh.

3  Q    But the pottery in the picture is?

4  A    Yeah, that's all Emerson Creek Pottery.

5  Q    And what does it -- can you read the first sentence

6  there?

7  A    It says, "Located inside the renovated 100-year old

8  farmhouse, emerson Creek Pottery Shop offers a wide array of

9  handcrafted gifts and accessories as well as our namesake hand

10  painted pottery."

11  Q    All right.  When it reads "our namesake hand painted

12  pottery," did you have an understanding as to what they were

13  referring to?

14  A    They're referring to Emerson Creek Pottery.

15  Q    We talked a little bit earlier, Mr. Leavitt, about the

16  request for a square plate.  Do you remember that testimony?

17  A    I do.

18  Q    And did you ultimately make a square plate?

19  A    Yes, I did, and still do.

20  Q    And who recommended making a square plate to you?

21  A    That was Chris's idea.

22  Q    And you sold her those square plates; is that correct?

23  A    Yes, I did.

24  Q    Has Ms. Demiduk ever asked you for other sort of special

25  requests or asked you to make something?

1    A    Yeah, from time to time she would come up with ideas that

2    she wanted me to make.  There were occasions when I decided I

3    didn't like the idea or couldn't do it.  One was a cake, cake

4    stand with a platter on it and a holder.  We decided not to do

5    that.

6    Q    Decided not to do the cake stand?

7    A    No.  Yeah, we did not do it.

8    Q    Let me take you to Exhibit 193.  And, again, this looks

9    like an e-mail exchange between you and Ms. Barickman.

10         MR. WILLETT:  Ashley, if you could scroll down a

11   little bit.

12   BY MR. WILLETT:

13   Q    And it looks like the dates on this range -- it's roughly

14   February of 2008.  Do you see that?

15   A    Yeah.

16   Q    If you look at the names on the e-mail, I just want to

17   confirm that this would have been an e-mail exchange between

18   you and Ms. Barickman.

19   A    That's correct, yes.

20         MR. WILLETT:  At this time we move for admission of

21   Exhibit 193.

22         MR. LAUBSCHER:  No objection.

23         THE COURT:  It will be admitted.

24     (Plaintiff's Exhibit Number 193 was received.)

25   BY MR. WILLETT:

1  Q    And if you would look at the middle paragraph there to

2  answer your other questions.  If you could read that and tell

3  us what you're referring to there.

4  A    Yeah, talking about that square plate.

5  Q    The second paragraph says -- or sentence says, "Will you

6  want to go in together to buy the holders so we can get a

7  better price?"  Do you see that?

8  A    I do.

9  Q    What were you referring to there?

10  A    There's a wire holder that it fit, and we were both going

11  to go in together to buy so we could get a bigger order and

12  get a better price.

13  Q    And do you recall whether or not you did that?

14  A    We did do that, yes.

15  Q    Now, at some point in time did you learn that

16  Ms. Barickman and Mr. Wehrli were no longer together?

17  A    Yes.

18  Q    Okay.  And do you recall how you learned that?

19  A    She would have told me at some point.

20  Q    Okay.  And at some point in time you learned that she was

21  getting married to someone else?

22  A    Correct, yes.

23  Q    And how would you have learned that?

24  A    She would have informed me.

25  Q    She would have informed you?

1  A     Yeah.  Yeah, right, for sure.

2  Q     And do you know any of the details, like where they got

3  married?

4  A     Yeah, she told me that they were renovating a barn that

5  was on the property and they were going to expand their events

6  into doing -- kind of doing a wedding venue, and they planned

7  to get married there once they got the renovations done.

8  Q     And were you okay with that?

9  A     Yes, I was, because it expanded my mark from doing the

10 restaurant services into events and it benefited my trademark.

11 It would have sold me more pottery, so, yeah, I was fine with

12 it.

13 Q     And at any point in time did you get an opportunity to

14 see what it looked like, where they were doing the weddings?

15 A     They would have sent me photographs, either e-mail or in

16 the mail; I don't remember which.

17 Q     And did you have an understanding as to where the

18 weddings were taking place?

19 A     Well, it was all right on the grounds, right together by

20 the shop.

21 Q     Meaning the --

22 A     The same property, yeah.

23      MR. WILLETT:  Okay.  Next if we can go to

24 Exhibit 235.  And, Ashley, if you will scroll through this

25 document for us.

1  BY MR. WILLETT:

2  Q    These are still photos of a YouTube video.

3  A    Okay.

4       MR. WILLETT:  Ashley, if you will just keep scrolling

5  through that.

6  BY MR. WILLETT:

7  Q    And I'm just going to ask if you understand what video

8  this is.

9  A    Yeah.  That would have been a video that she had I guess

10 on her website, or maybe it's just a YouTube, and it's

11 depicting our pottery, the restaurant.  That's all, you know,

12 restaurant.  There's an outside cornfield, weddings.

13      MR. WILLETT:  And, Ashley, just stop right there.

14      At this point I move for the admission of

15 Exhibit 235.

16      MR. LAUBSCHER:  No objection.

17      THE COURT:  It will be admitted.

18   (Plaintiff's Exhibit Number 235 was received.)

19      MR. WILLETT:  Now, if you scroll in there or zoom in

20 a little bit, this is at the end -- go back to the beginning.

21 BY MR. WILLETT:

22 Q    The website that appears there, did you understand that

23 to be --

24 A    Their website, that's correct, yes.

25 Q    And then if you look at the title there, "Emerson Creek -

1  Day in The Country," do you see that?

2  A    Uh-huh.

3  Q    Is that a "yes"?

4  A    Oh, yeah, I'm sorry, uh-huh.

5  Q    And then do you understand what that reference is below

6  the views and the date, what those are?

7  A    That would have been the number of people that had viewed

8  it as of October 2013.

9  Q    Now, let's go back to the beginning of this, and I just

10  want to walk you through a few of these photos.  It looks like

11  this is sort of the intro here.  Again, can you identify what

12  that red wagon is?

13  A    That's that same wagon at the entrance, yes.

14  Q    Keep going.  What's depicted here, sir?

15  A    That appears to be inside her store.  That's our pottery

16  everywhere as far as I can see.

17  Q    And were you okay with Ms. Demiduk having a video on

18  YouTube back in 2013 that depicted the pottery that --

19  A    Sure.  Why would I object to it?

20  Q    Well, tell me that, why were you okay with it?

21  A    Because if it was on YouTube and it got a lot of views,

22  that would have increased my brand awareness under my Emerson

23  Creek mark.

24       MR. WILLETT:  All right.  Ashley, if you will keep

25  flipping through.

1  BY MR. WILLETT:

2  Q    All right.  There in the second photo there you've got

3  another picture of a lady holding something.  Do you know what

4  they're holding?

5  A    It looks like one of our pitchers, and there's some of

6  our lamps in the foreground.

7  Q    So the lamp with the light on, is that an Emerson Creek

8  product?

9  A    It is, yes.  Jug lamp.

10 Q    What is it called?

11 A    Called a jug lamp.

12        MR. WILLETT:  Ashley, if you'll go to the next.

13 BY MR. WILLETT:

14 Q    Again, more pictures of the pottery?

15 A    Correct.  That's dragonfly pottery.

16 Q    And if we look on that shelf, it looks like there's

17 something metallic.

18 A    Yes.  It's a holder, display piece, what I call an

19 accessory that would be normally sold with the pottery.

20 Q    And you were okay with her selling those?

21 A    Sure.

22 Q    Go on down to the next picture.  What is your

23 understanding of what this is depicting?

24 A    That would be the tearoom restaurant.

25 Q    If you zoom in on the table there.

1  A    Yeah, so that's a sugar creamer, our pottery sugar

2  creamer, salt -- looks like it might be salt and pepper too.

3  Q    And that's on the table in the restaurant?

4  A    Yeah, it's right there, that's correct.

5  Q    Go on to the next slide.  And this is -- what is this

6  depicting?

7  A    That's one of our handle plates like you had picked up

8  before.  That's -- it looks like an appetizer being served on

9  it.

10  Q    All right.  Keep going through.

11  A    Again, more of our pottery.  It looks like a handle plate

12  with some plates in her left hand and a small baker that

13  they've got a -- it's hard to tell, some sort of a condiment

14  in it.

15  Q    Okay.  Keep going down.

16  A    Again, that's the same thing.  And in the background you

17  can see the salt and pepper, and it looks like it might be a

18  vase in the back.

19  Q    Keep going.  Keep going.  This is all on the same video?

20  A    That's correct.  That's the outside.  I think there's a

21  cornfield that was up next to the property.

22  Q    Keep on going.  Keep on going.

23      And then what's your understanding of what this is --

24  A    That would be part of the wedding venue.  I guess that

25  would be a sign that was there.  Somebody is just getting

1 wedding -- getting married.  Sorry.

2 Q    This is all on the same video?

3 A    Uh-huh, yeah.

4 Q    And there's the final picture.

5 A    Right.

6 Q    Thank you.

7     Now, do you recall at some point in time -- at some point

8 in time that there was some confusion with Google Maps over

9 your location and the Oswego location?

10 A    Yeah, I do.

11 Q    And what was that?

12 A    That would have been when Google was starting to gain

13 some prominence, and they were starting to catch all of the

14 searches, and they were confusing our two locations.

15 Q    Okay.  And so what did you do in response to that?

16 A    I talked to her about trying to see what we could do

17 about making some changes.

18 Q    Okay.  Let's direct your attention to Exhibit 198.  Keep

19 going down a little bit.  And this is an e-mail exchange

20 between you --

21 A    Uh-huh.

22 Q    The top part is between you and Ms. Demiduk?

23 A    Yeah, that's right.  That's where I tell her we had a big

24 problem with Google places confusing us.  And I told her to,

25 "Follow the directions.  Call Miriam for help if you need it."

1    She would have been the lady that did our website at the time.

2    So we were trying to get the problem straightened out.

3    Q    All right.  Just go down a little bit more.  When we see

4    that e-mail address info at solaswebdesign.net, what is that

5    referring to?

6    A    And that would be -- her and her husband did our website.

7         MR. WILLETT:  At this time I would like to move for

8    entry of Plaintiff's Exhibit 198.

9         MR. LAUBSCHER:  No objection.

10        THE COURT:  It will be admitted.

11        (Plaintiff's Exhibit Number 198 was received.)

12   BY MR. WILLETT:

13   Q    And so your understanding is that -- what's being

14   communicated to you, as you understood it, by Solas Web

15   Design?

16   A    I'm sorry, what?

17   Q    What was your understanding at this time, back in 2012,

18   of what Solas was telling you was the problem?

19   A    They're telling her that she needs to change her name on

20   her place page, and she was telling her how to do it.

21   Q    What was your understanding of what they wanted her to

22   do?

23   A    They wanted it to be changed to Emerson Creek Pottery and

24   Tearoom.

25   Q    If you could go up to the next e-mail.  This is you

1  forwarding it on to Chris?

2  A    Yeah.  I said, "Hi, Chris.  Very important.  We have a

3  problem.  You need to follow the directions below.  Call

4  Miriam for help if you need it.  Please fix this right away."

5  Q    Go up to the next one.

6      Is this her response?

7  A    "Yeah, I really hate this web stuff.  I sent all your

8  e-mails to our website person.  Sorry about some cookie thing

9  on our website.  We will get it off.  We are getting a lot

10 more hits because of the wedding thing.  We will do whatever

11 we need to do."

12 Q    And do you have an understanding as to whether or not

13 Ms. Demiduk took any action after this?

14 A    I believe she did.  She indicates she would do whatever

15 she had to do to get it fixed.

16 Q    And next go to Exhibit 82.

17     All right.  And this is, again, an e-mail exchange

18 between you and --

19 A    Chris.

20 Q    -- Ms. Demiduk?

21 A    That's correct, yes.

22 Q    This would have been in the normal course of business?

23 A    Yes.  Yes.

24        MR. WILLETT:  At this time we move for admission of

25 Exhibit 82.

1          MR. LAUBSCHER:  No objection.

2          THE COURT:  It will be admitted.

3      (Plaintiff's Exhibit Number 82 was received.)

4   BY MR. WILLETT:

5   Q    And if you look there at that -- the beginning of that

6   e-mail on May the 17th, do you see that, "Hi, Jim"?

7   A    Uh-huh.

8   Q    If you could read that.

9   A    She says, "We corrected our name so it correctly lists

10  Emerson Creek Pottery and Tearoom with our address.  When you

11  Google Emerson Creek Pottery, your website is listed first

12  with ours second.  Under 'places,' though, we are listed first

13  and you are second.  This is something that is determined by

14  search popularity as far as I know.  I do know there is a

15  picture of the cookie mold still up.  We are working to take

16  that off.  So I assume our end of the issue has been taken

17  care of since our business is correctly identified with the

18  right web address, business name, and address.  Please let me

19  know if there is something on your end that does not seem

20  correct."

21  Q    And what was your understanding of what -- how their name

22  now read at that point?

23  A    Emerson Creek Pottery and Tearoom.

24  Q    Okay.  Scroll up a little bit from there.  Okay.  And

25  that would have been something that she sent to you and then

1    you forwarded it on to your folks?

2    A    Correct.  Yes.

3    Q    Go to Exhibit 202.  And if you could identify what this

4    is.

5    A    It's another e-mail from Chris.

6    Q    And this would have been exchanged in the normal course

7    of business?

8    A    It would, yes.

9    Q    Go back up a little bit.  This would have been, it looks

10   like, December.  And then the top one is --

11   A    January.

12   Q    -- January of 2013?

13   A    Uh-huh.

14   Q    And this would have been in the normal course of

15   business?

16   A    It would.

17        MR. WILLETT:  We move for admission of Exhibit 202.

18        MR. LAUBSCHER:  No objection.

19        MR. WILLETT:  All right.  Now, scroll down just a

20   little bit.

21        THE COURT:  That was admitted.

22        (Plaintiff's Exhibit Number 202 was received.)

23   BY MR. WILLETT:

24   Q    If you look after it says "500 acres."

25   A    Uh-huh.

1  Q    It says, "I know the website thing has been a problem

2  that we come up first, and that is only because barn weddings

3  are so popular.  If I could do something to change that I

4  would.  I'm just not a computer person.  I really want to work

5  with you, and I love the product."  Do you see that?

6  A    I do.

7  Q    Did you feel as of 2012 that Ms. Demiduk was working with

8  you to try and address this issue?

9  A    I did, yes.

10  Q    Next, let's go to Exhibit 16.

11       Going back to May of 2012, can you tell me what this was?

12  A    That's their website.

13  Q    Their website?

14  A    Yes.

15  Q    It's an image of that, correct?

16  A    That's right.

17       MR. WILLETT:  At this time move for admission of

18  Plaintiff's Exhibit 16.

19       MR. LAUBSCHER:  No objection.

20       THE COURT:  It will be admitted, and 202 is admitted

21  too.

22       MR. WILLETT:  Thank you, sir.

23       (Plaintiff's Exhibit Number 16 was received.)

24  BY MR. WILLETT:

25  Q    And if you scroll down a little bit there, the title

1  there, "Emerson Creek Pottery and Tearoom," do you see that?

2  A    Yes.

3  Q    Did you have an opportunity to look at the website back

4  at that point in time?

5  A    Yes, I'm sure I did.  Uh-huh.

6  Q    Is that how it was depicted back then?

7  A    Yes.

8  Q    And if you look at the pictures below there, what do we

9  see, starting with the left-hand side?

10  A    Yeah.  You see the store, the tearoom, the wedding venue.

11  Q    Okay.  And then if you scroll down a little bit more.

12  The history of Emerson Creek, that's on their website?

13  A    It is, yes.

14  Q    And that's that same -- does it appear to be a similar

15  history to what we read from 2009?

16  A    It's identical, basically, yes.

17  Q    And this is talking about the history of Emerson Creek.

18  It says there, "Located inside the renovated 100-year-old

19  farmhouse Emerson Creek Pottery Shop offers a wide array of

20  handcrafted gifts and accessories as well as our namesake hand

21  painted pottery."  Do you see that?

22  A    I do.

23  Q    And do you have an understanding as to what "our namesake

24  pottery" is?

25  A    Emerson Creek pottery.

1 Q    All right.  Now at some point in time -- we've seen a lot

2 of e-mails back and forth looking at sales figures.  At some

3 point in time did you notice any change in those figures?

4 A    I did.  I noticed that at a certain time her sales had

5 been growing every year and then they started to slide down a

6 bit, and maybe a little bit more after that.

7 Q    Okay.  And you -- how did you keep track of this?  I

8 mean, obviously, we've seen her e-mails, but how did you know

9 what your actual sales were?

10 A    Well, we use QuickBooks accounting software and we would

11 look and just keep track of sales on that.

12 Q    And sales to?

13 A    Sales to her, yes.

14 Q    Now, let me direct your attention to Exhibit 171.  If you

15 could identify what this is.

16 A    That's an e-mail from Chris to me in December of 2014.

17 Q    All right.  And if you scroll down a little bit.  Your

18 initial mail says, "Subject:  Let's talk"?

19 A    Uh-huh.

20 Q    Dated November 14, 2014.  Do you see that?

21 A    Yes, I do.

22 Q    A couple of things.  First of all, the e-mail address for

23 Ms. Demiduk in this says Chris@ecreekpotteryandtearoom.com.

24 Do you see that?

25 A    I do.

1  Q     You understood that to be an e-mail address that she has?

2  A     I did, yes.

3  Q     You go on to say, "Hi, Chris" -- well, strike that.

4       This would have been in the normal course of business?

5  A     It would.

6       MR. WILLETT:  Go ahead and move for the admission of

7  Exhibit 171.

8       MR. LAUBSCHER:  No objection.

9       THE COURT:  It will be admitted.

10      (Plaintiff's Exhibit Number 171 was received.)

11 BY MR. WILLETT:

12 Q     If we could blow up that e-mail a little bit.  It says,

13 "Friday, November 14th, 2014.  Hi, Chris, we haven't talked in

14 a while and I wanted to touch base.  I was running through

15 some sales numbers and noticed that you're off by 33 percent,

16 $10,000 this year."  And, again, how would you have arrived at

17 that figure?

18 A     By looking at the actual numbers from my accounting

19 software.

20 Q     You go on to say, "I'm wondering what's going on?  Are

21 you having sales problems, carrying other lines?  Anyway,

22 please give me a call."  Do you see that?

23 A     Yes, I do.

24 Q     What were you trying to communicate to Ms. Demiduk?

25 A     Well, I was wondering why her sales had had such a

1  dramatic drop in one year.  I was wondering if she was having

2  trouble with -- sales problems, basically people not coming

3  into her store or what.

4  Q    All right.  Now, when would she typically do her buying

5  for the year at this point in time, if you recall?

6  A    I think most of it would have been in the spring, and

7  then we would work through the year, and probably early fall I

8  would send her more for the Christmas season.

9  Q    And what caused you to ask that question "carrying other

10 lines"?

11 A    Well, it seemed like such a big dropoff that I was just

12 curious.

13 Q    Okay.  Now, let's scroll up a little bit.  So that was

14 November 14, 2014.

15 A    Uh-huh.

16 Q    And now --

17       MR. WILLETT:  Make that a little bigger.

18 BY MR. WILLETT:

19 Q    On Wednesday, December the 3rd, 2014, now --

20       MR. WILLETT:  Ashley, if you could go back down just

21 a hair on that.  Keep going down for the other.

22 BY MR. WILLETT:

23 Q    Now, you sent -- that was an e-mail you sent to

24 Chris@ecreekpotteryandtearoom.com.  Do you see that?

25 A    I do.

1  Q    If we go on up, we've got the Emerson Creek Pottery

2  Outlook.  Do you see that?

3  A    Yeah.

4  Q    And that's your e-mail address, correct?

5  A    Uh-huh.

6  Q    And then we've got for Chris Demiduk, it's

7  ChrisDemiduk@gmail.com.  Do you see that?

8  A    Yeah, I do.

9  Q    Was that an e-mail address you would receive e-mails from

10 sometimes?

11 A    Yeah.  Yeah, she had a gmail account additionally.  Lots

12 of people do.

13 Q    Now, she goes on to a somewhat lengthy response, says, "I

14 will give you a call later today and we can go over things."

15 Do you recall whether she called you that day or whether you

16 had any conversation on December 3rd?

17 A    I don't have a firm recollection of that, no.

18 Q    Now, from -- I'll give you a second to read this e-mail.

19 I won't make you read it out loud because it's a pretty

20 lengthy e-mail.  If you could go ahead and take that

21 opportunity and I'll ask you a quick follow-up question.

22 A    Okay.  Uh-huh.

23 Q    Okay.  So in your last e-mail, you had asked her a direct

24 question of whether she was selling other lines, and this

25 was -- your understanding is this is the response you got to

1   that e-mail, correct?

2   A     That's correct, yes.

3   Q     So that e-mail you sent was on November 14th.  She

4   responds on December the 3rd?

5   A     That's correct.

6   Q     And did you have an understanding from reading this

7   e-mail as to whether or not Chris had answered your question

8   whether or not she was selling other lines?

9   A     She didn't say she was selling other lines, so I didn't

10  assume she was.  I had no reason, really, to think it.  I

11  trusted her.  She had a lot of plausible reasons for her not

12  buying as much from me, you know, difficulties of running a

13  small business.  I guess they were doing, well, repairs,

14  probably renovations on buildings and this, that, and the next

15  thing, so it seemed logical.

16  Q     She also says, "Just a few things why I feel we're down

17  on ordering.  There's less patterns, first of all, a lot of

18  discontinued items that we used to sell."  What is she

19  referring to there?

20  A     Well, every year we -- most years we introduced new

21  patterns and we discontinued older ones that aren't selling as

22  well.  So I think she had a lot of patterns that she liked

23  that we discontinued over the years, so I think that's what

24  she's mentioning.  And then she's also talking about a die

25  charge that would be for a form that we may have discontinued,

1  which normally we would just make for her in the course of

2  business, but now we have to charge a little bit extra because

3  it's a lot of work to set up to make that piece for her.

4  Q    She goes on to say, "The most painful part is we do not

5  have a large cash flow at all."  Do you see that?

6  A    I do.

7  Q    Did you understand what she was referring to there?

8  A    My feeling is she's having some cash flow problems, and

9  she's giving reasons: health insurance, 7 acres of land,

10  repairs, maintenance, that kind of stuff.  It might have been

11  hard for her budget, you know, so it made sense to me.

12  Q    And it looks like she talks about the small business

13  operations, health insurance, running 7 acres of land.

14  A    Right.

15  Q    She says, "So that is off the top of my head why I feel

16  it has been a hard budget."

17  A    Yes.

18  Q    Did you understand that to be answering your question?

19  A    Yes, I did.  I mean, she's giving me reasonable -- a

20  reasonable explanation.  I had no reason to think she was

21  selling any other pottery.

22  Q    What if her answer had been yes that she was?

23  A    I would have jumped all over that.  That was not part of

24  our agreement.  She was using my Emerson Creek mark to sell

25  pottery, expand into the restaurant area and then into events,

1  so, yeah, that would not have been acceptable.

2  Q    All right.

3        MR. WILLETT:  We can go ahead and take that one off.

4  BY MR. WILLETT:

5  Q    We had referenced earlier with respect to the Martha

6  Stewart acknowledgment that you talked about the acquisition

7  of Brown Bag Designs.

8  A    Right.

9  Q    If you could just briefly tell us what that was.

10 A    Yeah.  Brown Bag Designs was a line of shortbread pans

11 and cookie molds that had been around for many years.  We

12 actually made all of our production under contract for them

13 for, I don't know, 10, 15 years.  And at a certain point in

14 time, the lady that ran that company decided she was looking

15 to sell it, and since we had been her prime contractor, so to

16 speak, she gave us first right to buy the business.  And so we

17 entered into negotiations with her and ultimately bought all

18 of her -- basically, her whole business, all of her

19 trademarks, all the tool and die work to make those products.

20 Q    All right.  Do you recall approximately when that

21 occurred?

22 A    That was -- probably happened sometime in '16, I think.

23 Q    Okay.  Now, at the beginning, when we were speaking -- or

24 I was doing my opening --

25        MR. WILLETT:  Your Honor, if I may grab something.

1  BY MR. WILLETT:

2  Q     You may recall that I showed this document, and it's --

3  in fact, we could pull it up on the screen for you.  It's

4  Exhibit 232.  I'll let Ashley do that.

5  A     Right.

6  Q     Can you see that on the screen, sir?

7  A     I do.

8  Q     And do you know --

9          MR. WILLETT:  And, Ashley, if you'll scroll on down

10  there.

11  BY MR. WILLETT:

12  Q     And do you know what this document is, sir?  Go back up.

13  A     Yeah, that's our trademark for Emerson Creek Pottery from

14  the PTO.

15  Q     All right.

16          MR. WILLETT:  At this time I would move for admission

17  of Exhibit 232.

18          MR. LAUBSCHER:  No objection.

19          THE COURT:  All right.  It will be admitted.

20      (Plaintiff's Exhibit Number 232 was received.)

21          THE COURT:  We've been going now about an hour and a

22  half, and if we take another break it will take us past 5:00

23  o'clock.  I think this is a good time to stop.  We will recess

24  now until tomorrow morning at 9:30.  And should they come to

25  the same place?

1          THE CLERK:  Yes.

2          THE COURT:  So tomorrow morning, before 9:30, report

3    in at the same location on floor A that you did today.

4          Now, overnight do not discuss the case with anyone or

5    allow anyone to discuss it with you, or remain within hearing

6    of anyone discussing it.  And thank you and we'll see you in

7    the morning.

8          (Court recessed at 4:51 p.m.)

9

10                          CERTIFICATE

11   I, Judy K. Webb, certify that the foregoing is a

12   correct transcript from the record of proceedings in

13   the above-entitled matter.

14

15   /s/  Judy K. Webb              Date: 3/5/2022

16

17

18

19

20

21

22

23

24

25