Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.,
6:20cv54, 2/23/2022

1                    UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF VIRGINIA
2                         LYNCHBURG DIVISION

3    ****************************************************************

4    EMERSON CREEK POTTERY, INC. CIVIL CASE NO.:  6:20CV54
                                 FEBRUARY 23, 2022, 9:30 A.M.
5                                JURY TRIAL, DAY 2
          Plaintiff,
6    vs.

7    EMERSON CREEK EVENTS, INC., Before:
     ET AL.,                     HONORABLE NORMAN K. MOON
8                                UNITED STATES DISTRICT JUDGE
          Defendants.           WESTERN DISTRICT OF VIRGINIA
9
     ****************************************************************
10   APPEARANCES:

11   For the Plaintiff:         HENRY IRVING WILLETT, III, ESQUIRE
                                Christian and Barton, LLP
12                              909 East Main Street, Suite 1200
                                Richmond, VA  23219
13
                                GARFIELD BERNARD GOODRUM, ESQUIRE
14                              Garfield Goodrum, Design Law
                                90 Canal Street, 4th Floor
15                              Boston, MA  02114

16   For the Defendants:        KENNETH S. MCLAUGHLIN, JR., ESQUIRE
                                Law Offices of McLaughlin &
17                              Associates, P.C.
                                1 E. Benton Street, Suite 301
18                              Aurora, IL  60505

19                              LAWRENCE E. LAUBSCHER, JR., ESQUIRE
                                Laubscher & Laubscher, PC
20                              1160 Spa Road, Suite 2B
                                Annapolis, MD  21403
21

22   Court Reporter:  Lisa M. Blair, RPR, RMR, CRR, FOCR
                       255 West Main Street, Suite 304
23                     Charlottesville, Virginia  22902
                       434.296.9284
24

            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25   TRANSCRIPT PRODUCED BY COMPUTER.

Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.,
6:20cv54, 2/23/2022

1                          INDEX OF WITNESSES

2    WITNESSES ON BEHALF OF THE PLAINTIFF:                    PAGE

3    JAMES LEAVITT

4     Direct Examination by Mr. Willett                          5
      Cross-Examination by Mr. Laubscher                        75
5     Redirect Examination by Mr. Willett                      123

6    TRENDA LEAVITT

7     Direct Examination by Mr. Willett                        135
      Cross-Examination by Mr. Laubscher                       148
8
     ELLENA LEAVITT
9
      Direct Examination by Mr. Willett                        152
10
     LINDSAY WINKLER
11
      Direct Examination by Mr. Willett                        180
12    Cross-Examination by Mr. McLaughlin                      208
      Redirect Examination by Mr. Willett                      219
13
     DAVID DEMIDUK
14
      Direct Examination by Mr. Willett                        222
15

16

17

18

19

20

21

22

23

24

25

Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.,
6:20cv54, 2/23/2022

| | INDEX OF EXHIBITS | | |
|---|---|---|---|

1                                  INDEX OF EXHIBITS

2  EXHIBITS ON BEHALF OF THE PLAINTIFF:

| | EXHIBIT: | Marked | Received |
|---|---|---|---|
| 4 | 3 | 6 | 6 |
| 5 | 229 | 8 | 8 |
| 6 | 8 | 9 | 9 |
| 7 | 17 | 14 | 14 |
| 8 | 45 | 17 | 17 |
| 9 | 65 | 54 | 54 |
| 10 | 9 | 64 | 64 |
| 11 | 234 | 69 | 69 |
| 12 | 13 | 71 | 71 |
| 13 | 20 | 73 | 73 |
| 14 | 108 | 74 | 74 |
| 15 | 240 | 126 | 126 |
| 16 | 72 | 138 | 138 |
| 17 | 106 | 142 | 142 |
| 18 | 10 | 145 | 145 |
| 19 | 105 | 157 | 157 |
| 20 | 23 | 165 | 165 |
| 21 | 241 | 168 | 168 |
| 22 | 76 | 170 | 170 |
| 23 | 73 | 178 | 178 |
| 24 | 74 | 178 | 178 |
| 25 | 141 | 190 | 190 |

Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.,
6:20cv54, 2/23/2022

1                    INDEX OF EXHIBITS (Continued)

2    EXHIBITS ON BEHALF OF THE PLAINTIFF:

3            EXHIBIT:              Marked      Received

4            162                   192         192

5            41                    196         196

6            39                    203         203

7            21                    224         224

8            32                    227         227

9            34                    230         230

10           33                    232         232

11           30                    236         236

12   EXHIBITS ON BEHALF OF THE [DEFENDANT:

13           EXHIBIT:              Marked      Received

14           40                    115         115

15           43                    117         117

16           45                    119         119

17           66                    119         119

18           39                    120         120

19           1                     121         121

20           55                    212         212

21           62                    217         217

22           63                    218         218

23

24

25

J. Leavitt - Direct

1 (Proceedings commenced, 9:35 a.m.)

2          THE COURT:  Good morning.  Are we ready to call the

3 case?

4          MR. WILLETT:  Yes, Your Honor.

5          THE COURT:  Call the jury.

6          The witness may return to the witness stand.  He's

7 already sworn.

8 **(Jury in, 9:36 a.m.)**

9          THE COURT:  Good morning.  Good to see you back.  You

10 may have a seat and you may proceed.

11          MR. WILLETT:  Thank you, Your Honor.

12                    DIRECT EXAMINATION (CONTINUED)

13  BY MR. WILLETT:

14 Q    Mr. Leavitt, I would next like to direct your attention to

15 Plaintiff's Exhibit 3.  This should appear on your screen, sir.

16          MR. WILLETT:  May I approach, Your Honor?

17          THE COURT:  You may.

18  BY MR. WILLETT:

19 Q    Sir, can you tell me what that is?

20 A    This is a cookbook that she had produced and sold in her

21 store, and sent me -- she told me she was going to do it, sent

22 me a copy of it.  And I believe we sold it in our store for a

23 while too.

24 Q    Okay.  And when you say "she," you're referring to

25 Ms. Demiduk?

1  A    Chris, uh-huh.

2           MR. WILLETT:  Your Honor, at this time I'd like to

3  move for the admission of Exhibit 3.

4           MR. LAUBSCHER:  No objection.

5           THE COURT:  Be admitted.

6           (Plaintiff Exhibit 3 marked.)

7           (Plaintiff Exhibit 3 admitted.)

8           MR. WILLETT:  All right.  And if we can flip through

9  that exhibit to show some of the images there.

10   BY MR. WILLETT:

11  Q    And if you'd look at the "about" page there.

12       Do you see that?

13  A    Uh-huh.

14  Q    That's a picture of Ms. Demiduk and her family; is that

15  correct?

16  A    That's correct.

17  Q    And again, this was -- she had referenced the fact that

18  she was going to be putting this cookbook together with you

19  prior to actually doing it?

20  A    She did.

21           MR. WILLETT:  If we can flip through some more

22  images.

23   BY MR. WILLETT:

24  Q    And you were okay with her doing the cookbook?

25  A    I was.  Sure.  Uh-huh.

J. Leavitt - Direct

1  Q    And tell me about this.  Look at this page, page 8 of the
2  PDF, if you can see that on the screen.
3      For example, we have -- this is oven baked goat cheese.
4  What's depicted in the picture on the left?
5  A    It's displayed on our pottery.
6  Q    Okay.  And there are other images displayed on your
7  pottery as well?
8  A    Yes, there are.  Uh-huh.
9  Q    And it looks like some general scenes of the site as well,
10 meaning the location at Emerson Creek; is that correct?
11 A    Uh-huh.  That's correct.
12 Q    And do you understand -- the image of the bowl there, do
13 you recognize that?
14 A    Yeah, that's a brie baker that we make.
15 Q    A what?
16 A    A brie baker.
17 Q    And it looks like there it's got an image of the tearoom?
18 A    Yeah, images of the tearoom; and it's, again, got our
19 pottery displayed.  Uh-huh.
20 Q    So if I look at the right-hand side of this picture,
21 that's the pottery displayed?
22 A    That is.
23 Q    All right.  And then if I look, is that the same rock that
24 we saw?
25 A    That's correct.  It is, yes.

1    Q    Thank you.

2         No further questions on that exhibit.

3         And Ms. Demiduk also did some Internet marketing that

4    we've discussed.  Next I'd like to take a look at -- all right.

5    This is a -- a screenshot of the initial part of a YouTube

6    video produced by Ms. Demiduk, "Emerson Creek Pottery Product

7    of the Week, 7-13-2010."

8         Do you see that?

9    A    I do.

10   Q    Okay.  And you had been made aware of this, the fact that

11   this was on the Internet?

12   A    Yeah, I did.

13        MR. WILLETT:  At this time I'd like to move for the

14   admission of Exhibit 229.

15        MR. LAUBSCHER:  No objection.

16        THE COURT:  Be admitted.

17        (Plaintiff Exhibit 229 marked.)

18        (Plaintiff Exhibit 229 admitted.)

19        MR. WILLETT:  And Carmen, this is going to be played

20   as a video.

21        THE CLERK:  Okay.

22        (Video playing.)

23    BY MR. WILLETT:

24   Q    You were okay with Ms. Demiduk making videos like this?

25   A    Oh, absolutely.  Yeah.

J. Leavitt - Direct

1  Q    And those were Emerson Creek Pottery bowls?

2  A    They were.  Depicted our pottery in a very nice way.

3  Q    Next I would like to direct your attention to Exhibit 8.

4      And this is a newspaper article from the *Chicago Tribune*

5  from July 3rd, 2002, "Out-of-way Pottery Shop Finds a

6  Following."

7      Do you see that?

8  A    I do.

9  Q    Okay.  And have you seen this article before?

10  A    Yes, I have.  She sent it to me after it was published.

11  Q    Again, just to be clear for the record, "she"

12  being Ms. Demiduk?

13  A    I'm sorry, yes, Chris.  That's correct.

14      MR. WILLETT:  And I'd like to go ahead and move for

15  the admission of Exhibit 8.

16      MR. LAUBSCHER:  No objection.

17      THE COURT:  Be admitted.

18      (Plaintiff Exhibit 8 marked.)

19      (Plaintiff Exhibit 8 admitted.)

20  BY MR. WILLETT:

21  Q    And did you have an opportunity to read this article when

22  she provided it to you?

23  A    I did.

24  Q    Did you believe that this article was consistent with your

25  understanding of the story of how the two of you met?

J. Leavitt - Direct

1  A    Yeah, it's exactly.  It's talking about the farmhouse in

2  the country; you have to look for us; it's like a destination

3  place.

4  Q    In fact, do you mind reading that first sentence to us?

5  A    "Walk-in business plays no part in the marketing plan at

6  Emerson Creek Pottery, a dinnerware and decorative-item gift

7  shop in rural Oswego."

8  Q    Okay.  And if you go down to the third sentence there, the

9  third paragraph?

10  A    "'You definitely have to look for us,' said Emerson Creek

11  owner Chris Barickman, who relies largely on word of mouth to

12  promote the shop.  But once people come here, they usually come

13  back and bring a friend."

14  Q    Going down to the fifth paragraph.

15  A    "Produced by Emerson Creek Pottery in Bedford, Virginia,

16  some of the pieces are sold at other Chicago-area stores, but

17  Chris Barickman's is the only shop outside of Virginia to stock

18  the entire line."

19  Q    And did you -- when you read this article, did you have

20  any issues with it, or tell Chris that you had any problems

21  with this article?

22  A    No.  No.  It depicts the store she was running.  She was

23  doing a nice job of it.  It was fine with me.

24  Q    Read the next paragraph, if you would.

25  A    "'I bought a set of pine-cone pattern dishes from Emerson

J. Leavitt - Direct

1  Creek while I was visiting relatives in Bedford and fell in

2  love with the product,' said Barickman, who has 14 years of

3  experience in retail sales.  'I had been wanting to open some

4  kind of a store, so I asked the owners if they would be

5  interested in having an Emerson Creek shop in Illinois, and

6  they said yes.'"

7  Q    And you were comfortable with that statement?

8  A    Yes.  It comports with the conversation that we had when

9  they came to visit me.

10  Q    Next I want to direct your attention back to the

11  registration document that we looked at yesterday.  And that's

12  previously been marked and admitted as Exhibit 232.

13       So we just started looking at this document when we

14  concluded yesterday, and so I wanted to pick back up there.  We

15  had just had the discussion about the acquisition of the Brown

16  Bag Designs.

17  A    Uh-huh.

18  Q    Do you recall that testimony?

19  A    I do.

20  Q    Okay.  So tell me, why was it in 2015 that you registered

21  the Emerson Creek Pottery trademark?

22  A    When I started my business in 1977, I had a lawyer, a

23  family friend and business advisor who told me at the time I

24  really didn't need to register trademarks, because by not doing

25  that I would have a broader use of the mark, rather than making

1   it very specific.

2       And so I went with his advice, and that was fine for all

3   those years.  But in conversations with the lady that I bought

4   the Brown Bag Designs line from, she was -- she had registered

5   every design, every trademark.  She had multiple trademarks on

6   all her designs.  And in talking to her I started to think,

7   well, maybe I really need to reconsider and get a trademark for

8   my -- for the words we were using.

9   Q    And so when you -- the conversation that you had with

10  Mr. Bice, the attorney, that would have been about 38 years

11  before that?

12  A    Yeah.  At that time I didn't have a company lawyer.  He

13  has long since retired and moved on.

14  Q    And so, why register Emerson Creek Pottery?

15  A    I registered it because that's the words that we were

16  using on the bottom of our pottery, and so that was my go-to at

17  the time.

18      And I also understood by looking at the third line from

19  the bottom where it says, "no claim is made for the exclusive

20  right to use 'pottery,'" that "pottery" was kind of a generic

21  term, and "Emerson Creek" was the operating part of the

22  trademark.

23  Q    When you say the third line from the bottom of the

24  document --

25  A    Yes, right there.

J. Leavitt - Direct

1  Q     And I'll put the arrow there.

2        All right.  I want to take you back to 2017.  At that time

3  you were continuing to produce your pottery.  You had some

4  additional lines of business; is that correct?

5  A     Correct.

6  Q     Okay.  And what was the relationship with Ms. Barickman?

7  Were you all still doing business?  How were things going?

8  A     Yeah, we were.  We started to run into some issues of

9  confusion on the Internet, but we were still doing business.

10 That's correct.

11 Q     Let me first show you Exhibit 17.

12       I'll represent to you this is an image that was taken from

13 the Wayback Machine from March 1st of 2017, a picture of part

14 of the website ecreekpotteryandtearoom.com.

15       Do you see that?

16 A     Yes.

17 Q     Okay.  And would you continue to monitor and look at her

18 website?

19 A     Yeah.  You can see she had the pottery shop, the tearoom,

20 the barn, event space.  It's all right there on the website.

21          MR. WILLETT:  And at this time I'd like to move for

22 admission of Exhibit 17?

23          MR. LAUBSCHER:  No objection.

24          THE COURT:  Be admitted.

25             (Plaintiff Exhibit 17 marked.)

J. Leavitt - Direct

1        (Plaintiff Exhibit 17 admitted.)

2    BY MR. WILLETT:

3    Q    And when you say "it's all right there," you understood --

4    we heard some talk in the openings about events -- the barn,

5    that was the events business?

6    A    Yes.

7    Q    And the tearoom is obviously the tearoom that we've

8    discussed?

9    A    Right.

10   Q    And the pottery shop is what sold the Emerson Creek

11   pottery?

12   A    Right.

13   Q    If we look at that -- and maybe Ashley can make this a

14   little bit bigger on the pottery shop there.

15        Can you read that description for me, the first sentence?

16   A    "Located inside a renovated 100 year-old farmhouse,

17   Emerson Creek Pottery shop offers a wide array of handcrafted

18   gifts and accessories, as well as our namesake handcrafted --

19   or hand-painted pottery."

20   Q    And if you look at the description of tearoom, if we could

21   scroll down just a little bit there, towards the bottom where

22   it says, "Our weekly menu offers a variety of homemade dishes,

23   including our popular Emerson Creek" --

24   A    Flowerpot salad.

25   Q    And then it goes on to say, "all of which is served on

1  Emerson Creek pottery."

2  A     That was my understanding, uh-huh.

3  Q     And so as of March 1st of 2017, you were comfortable with

4  them having all of this --

5  A     Yes.

6  Q     -- on their website?

7  A     Yes.  Sure.  Absolutely.

8  Q     And identifying the shop as the "Emerson Creek Pottery

9  Shop?"

10 A     That's correct.

11 Q     And then also if we look on the right-hand side, again the

12 same web page, then we have the barn that you understood -- and

13 your understanding of the barn was that it was used for --

14 A     Yeah, that they had renovated and turned that into a

15 wedding and event space.

16 Q     Did you also understand in addition to weddings, you said

17 that they did other things in addition to that in the barn?

18 A     Yeah, I guess they could.  I know they had those fairs

19 where they bring vendors in and such.

20 Q     And do you recall the name of those -- well, I'll ask do

21 you recall if those were the Vintage Market fairs?

22 A     Yes.

23 Q     So you knew as of 2017 they were doing those as part of

24 the events business?

25 A     Sure.

1  Q    And it's your understanding that all of this is happening

2  on the Oswego property?

3  A    Yes, exactly.

4  Q    Mr. Leavitt, did you ever have an opportunity to go and

5  visit the Oswego property?

6  A    I didn't.  She invited me a number of times over the

7  years, but the truth is I really didn't have the time.  I ran a

8  small business where I had to wear multiple hats, everything

9  from production to design to maintenance to just whatever.  I

10 really couldn't -- it's very difficult to take time off, hard

11 enough to get any vacation time at all, let alone to take a

12 week or whatever to go up there.  I would have liked to, but it

13 was really hard.

14 Q    And did -- during that time -- after the first meeting,

15 did Ms. Demiduk ever come to you?  Did she ever come down to

16 Bedford after that?

17 A    She did on I think maybe one or two other occasions.

18 Q    But in between, you all had the communications continued

19 to be --

20 A    Right.  Yeah.  Email, telephone, uh-huh.

21 Q    And then also you had the ability to view things like the

22 website?

23 A    Of course, yeah.  Once the websites were going, sure, I

24 could see what she was doing there.

25 Q    Okay.  Let me next direct your attention to Exhibit 45,

1   and if Ashley will scroll through that for you.  There's some

2   forwarding emails at the top which make it a little bit

3   confusing.  Go back up real quick on that page.

4       It looks like these were forwarded at some point to

5   counsel as part of the discovery process.  So I'll just ask

6   you -- you don't need to focus on that.  But I will ask you --

7   Ashley, go back up a little bit.  On that -- well, keep on

8   going down.  I'm sorry, Ashley.

9       But if you look there, for example, Jim Leavitt, February

10  22nd, 2017 to Chris --

11  A    Yes.  Okay.

12  Q    Those would have been the emails that you sent in the

13  normal course of --

14  A    Right.  Correct.

15       MR. WILLETT:  At this time I'd move for the admission

16  of Exhibit 45.

17       MR. LAUBSCHER:  No objection.

18       THE COURT:  Be admitted.

19       (Plaintiff Exhibit 45 marked.)

20       (Plaintiff Exhibit 45 admitted.)

21   BY MR. WILLETT:

22  Q    Let's start -- well, actually, while we're on this page

23  right here, this is from Jim Leavitt.  It says

24  emersoncreekpottery.com, and then it has

25  emersoncreek@emersoncreekpottery.com.  You talked about some

J. Leavitt - Direct

1  various --

2  A     Yeah, that's one of my -- I've got basically two emails.

3  Emersoncreek@emersoncreekpottery.com and

4  emersoncreek@earthlink.com.

5  Q     And both of those start with "Emerson Creek"?

6  A     They do.

7          MR. WILLETT:  And so scroll up that page a little

8  bit, Ashley, on page 684, PDF 3.  Go to the top of that.

9   BY MR. WILLETT:

10  Q     Just ask you real quick there -- and again, this is the

11  forwarding email, but that's -- the email address there is Dave

12  Demiduk, dave@ecreekpotteryandtearoom.com.

13       Do you see that?

14  A     Yes.

15  Q     That's as of October 4th, 2021?

16  A     Yeah.

17          MR. WILLETT:  And Ashley, if we can go back to page

18  1.  Scroll on down a little bit more down the page.  There we

19  go.

20   BY MR. WILLETT:

21  Q     You said there starting on January 25, 2017 at 10:40 a.m.

22  you sent an email to Ms. Demiduk.

23       Do you see that?

24  A     Yeah; asking her if she's going to place a spring order.

25  Q     And so we looked at some more historical emails.  In

1  deference to time and everything else, I want to jump ahead a

2  little bit.

3      Were these emails -- did you continue to have these types

4  of communications with Ms. Demiduk?

5  A    Yeah, that would be typical.  It would have been towards

6  the end of January.  So I was wanting her to place a spring

7  order shortly so we'd have enough time to produce it.

8  Q    And then if you scroll up just a little bit, Ms. Demiduk

9  responds that day saying, "Thanks for the email.  I am coming

10  home from Las Vegas Gift Show.  I was in Atlanta last week for

11  a show.  I will call you maybe tomorrow.  Coming home tonight."

12  A    Right.

13  Q    "I have sales printed for 2015 and '16 for Emerson Creek

14  sales I want to email to you so maybe you can see it on paper."

15      Do you know what she was referring to there?

16  A    She was talking about the sales -- her sales numbers she

17  would have done in those years.

18  Q    Then she says, "Look up a company, Rae Dunn.  The mugs

19  with coffee, tea, words, etc. are just a huge trend.  I don't

20  buy them, but I would love to start something like this with

21  EC."

22  A    Right.

23  Q    Do you see that?

24  A    I do.  So I assume that she -- when she went to those two

25  gift shows that she referred there that she was -- she had seen

1  this lady, and she felt like it was a popular item at the time,

2  and she's asking me if maybe we would make some stuff similar.

3         MR. WILLETT:  Scroll up.

4   BY MR. WILLETT:

5  Q    And this is your response to her?

6  A    Yeah.

7  Q    And you say, "Did you see our showroom at Las Vegas?"

8         What are you referring to there?

9  A    We had a temporary showroom that year.  We had a sales rep

10 who represented Brown Bag Design and Emerson Creek Pottery for

11 us.  And she did what they call a temporary showroom where you

12 just open a showroom for the duration of the show, and display,

13 and take orders.

14 Q    What was the show?

15 A    Las Vegas.

16 Q    Okay.  I mean, is there any particular name for it?

17 A    The Las Vegas Gift Show, I think.

18 Q    And that's something that Emerson Creek had been a part of

19 before?

20 A    That may have been the first time that we showed there.

21 It probably was.

22 Q    All right.  You go on to say in the second paragraph,

23 "Also, we need to be sure to talk about nomenclature on the

24 Web.  Some of your references are not Emerson Creek

25 Pottery & Tearoom, but only Emerson Creek or Emerson Creek

1  Pottery, which is causing problems with our website."

2      What were you referring to there?

3  A    I'm referring to some confusion that's coming in because

4  of stuff they've got on their website which is not sticking to

5  the Emerson Creek Pottery & Tearoom.  They're starting to use

6  Emerson Creek, Emerson Creek Pottery.  And then Google is

7  getting confused by both companies having the same words.

8  Q    All right.  And how did you learn of this confusion?

9  A    From doing Internet searches.  Just if I went to Google my

10  company just out of curiosity and then the other results show

11  up, plus probably could have been looking at their website.  I

12  don't remember.

13  Q    All right.  And you say, "Give me a call when you get

14  back."

15      That have been still normal protocol for you all?

16  A    Sure.

17  Q    If we look down at 684.

18          MR. WILLETT:  So Ashley, this is PDF 3.

19   BY MR. WILLETT:

20  Q    You say in this one -- and actually, I may want to go to

21  one before that.  Bear with me here.  That's all right.  We can

22  go with this one.

23      You say in this one, "Get me those words so we can start

24  on your order."  This is still from February 2017?

25  A    Right.  She wanted me to make mugs with different sayings

1  on them where we would handwrite the sayings.  Instead of doing

2  a floral decoration, we were making them similar to that Rae

3  Dunn line that she's talking about.

4  Q    All right.  And do you believe you would have had some

5  communication with Ms. Demiduk about doing that?

6  A    Yeah.  In fact, we did -- we did make her those mugs for a

7  while.

8  Q    The mugs with the words on them?

9  A    Mugs with words basically for her, rather than our usual

10  decorations.

11  Q    Did Ms. Demiduk ask you to make any items other than mugs

12  with words on them?

13  A    No.

14  Q    You go on to say, "Also, your social media person has not

15  dealt with the Emerson Creek Events on Instagram yet."

16      What were you referring to there?

17  A    I believe that we -- that they had an Instagram page.  And

18  we went to start an Instagram page, and they had already taken

19  the Emerson Creek name on Instagram without our knowledge.  And

20  we had to use underscores and such to get it to set up our own

21  Instagram page.  So there was a lot of confusion on that.

22  Q    And next if we could go to PDF 4.

23      This is an email dated February 27 -- so shortly after

24  that -- Dave Demiduk sends to emersoncreekpottery@outlook.com.

25  Is that another email address that you had?

1  A    Yeah.  I had set that one up later on.

2  Q    And it says, "Jim, it's Dave, Chris' husband."

3       Did you know Mr. Demiduk at that point in time?

4  A    Yes.

5  Q    But did you regularly correspond with him about business?

6  A    No, we didn't.  Most of my interaction was with Chris.

7  Q    It goes on to say, "She had told me that you were having

8  an issue with us using the term 'Emerson Creek' in our social

9  media posts."

10      Do you see that?

11 A    I do.

12 Q    Okay.  And this would have -- did you understand this to

13 be addressing the conversations you had with Ms. Demiduk?

14 A    Yeah, right.  Right.  Exactly.

15 Q    He goes on to say, "I talked to our Web person and our

16 social media person, and they both thought it benefits both of

17 us.  They said the more things you can hashtag that have

18 anything to do with your business will increase traffic."

19      Do you see that?

20 A    I do.

21 Q    He goes on to say, "The more times we use Emerson Creek,

22 tearoom, pottery, wedding, salads, lunch, etc. in our posts or

23 website, the higher up on Google you appear if someone searches

24 those words."

25      Do you see that?

1  A    I do.

2  Q    And did you understand what he meant there?

3  A    Yeah.  I think what he's saying, the more times a word

4  comes up in Google, that it will rank higher because there's

5  more traffic to it.

6  Q    And did you have an understanding at that time that for

7  marketing purposes, the defendants were using terms like

8  "Emerson Creek" and "tearoom" and "pottery" and "weddings" and

9  "salads" and "lunch" together?

10 A    Yeah.  Uh-huh.

11 Q    It goes on to say, "The more traffic we get, the more we

12 sell, the more we buy from you."

13      Do you see that?

14 A    I do.

15 Q    And what did you understand him to mean by that?

16 A    Well, he's saying that the more Web traffic they get, the

17 more they're going to sell, so the more pottery they're going

18 to buy.  So it's going to benefit me, too, in that regard.

19 Q    And that part was consistent with the way you had always

20 viewed their marketing?

21 A    That is true, yes.

22 Q    He goes on to say, "It always has been and is still our

23 policy not to ship any merchandise, with the exception of our

24 cookbook."

25 A    Yes.

1  Q    And what did you understand him to mean there?

2  A    That they're not taking orders for pottery and shipping

3  it.  They're not selling it on the Internet or whatever.

4  Q    And he goes on to say, "Any time we get any type of

5  inquiry about shipping pottery, we always send them to your

6  website."

7  A    Yeah.

8  Q    Is that consistent with that?

9  A    Yeah.

10 Q    And you understood that their business as it was set

11 up was set up as a destination --

12 A    Right, a local destination, that's correct.

13 Q    It goes on to say, "None of us up here" -- I think he

14 means here, location -- "are sure what the problem is."

15      Do you see that?

16 A    I do.

17 Q    If you go to the next email up there, this is your

18 response to him?

19 A    Yeah.

20 Q    All right.  And tell me what you're communicating there.

21 A    So I had talked to the people doing my website at the time

22 and saying their feeling is there's some truth to that about

23 the traffic.  And they're saying, "After looking at your site

24 they suggested you should add a link to your website that says

25 'to buy online, click here,' which would go directly to my

J. Leavitt - Direct

1  website.  Also keep in mind that 'Emerson Creek Pottery' is our

2  trademarked name, and you should only use it appropriately and

3  with 'and tearoom' when referring to your store."

4  Q    Why did you include that second paragraph?

5  A    I'm trying to get them to use -- to stick as much as

6  possible with the Emerson Creek Pottery & Tearoom because of

7  the confusion we're getting on the Internet and with social

8  media.

9  Q    And at least at that time, your understanding of their

10  website URL that that was --

11  A    Ecreekpotteryandtearoom, that's right.

12  Q    Next I'd direct your attention to PDF page 6.

13       This one the subject question you say, "Hi, Dave.  I

14  hadn't heard back from you on the link idea.  What's your

15  thoughts on that."

16       Do you see that?

17  A    I do.

18  Q    What are you referring to there?

19  A    I think that would be the email that we just looked at

20  where I asked them to put a link on their website back to ours

21  to buy pottery online.

22  Q    And here you say, next sentence, "Also, over the weekend I

23  was looking at Instagram again, and I believe that the Emerson

24  Creek Events link there really needs to be changed to something

25  that includes tearoom."

1   A    Tearoom, yeah.

2   Q    What were you seeing on Instagram?

3   A    Yeah, I think what we're getting is too much confusion

4   there because it doesn't have "tearoom" on it.  And it's

5   starting to confuse people between them and us in the social

6   media realm.

7   Q    All right.  And then if you look at PDF 7.

8        And this is his response to you?

9   A    I believe it was.

10  Q    It says, "Sorry for the delay."  He goes on to say that he

11  can -- "we can put a link on our website to yours; but in

12  return, we would like a link from your website to ours maybe

13  under other places to purchase pottery."

14       Do you see that?

15  A    I do, yeah.

16  Q    Now, am I correct that the websites historically had had

17  links?

18  A    Yeah, I thought it did.  We looked at one the other day

19  from that time frame, and it did list them --

20  Q    And you --

21  A    -- on our website.

22  Q    You were comfortable linking to the website?

23  A    Right.  I felt they had a license with me.  We had a

24  long-standing relationship.  So it was perfectly appropriate.

25  Q    He then says, "As far as the Emerson Creek hashtags, we

1  were still not understanding how that would hurt your

2  business."

3      It goes on to say in the next paragraph they had been

4  working hard on getting our name out there for the shop,

5  tearoom and events, for many years.  "This is our life and this

6  is how we make a living, just like you."

7      Do you see that?

8  A    I do.

9  Q    The next paragraph it says, "When Chris started the shop,

10 I think this will be year 17, she incorporated in Illinois as

11 Countryview Pottery, Inc. and the d/b/a Emerson Creek Pottery."

12     Do you see that?

13 A    Yeah.  Uh-huh.

14 Q    Is that your understanding of what she did back then?

15 A    Right.  Yeah.  That's what we talked about, and that's

16 what we did.  Uh-huh.

17 Q    And again, you were fine with that?

18 A    Yes.

19 Q    It says, "Two or three years after the shop, she started

20 up the tearoom.  The tearoom was run under the same

21 corporation."

22     Do you see that?

23 A    I do.

24 Q    Okay.  And you were again fine --

25 A    Yes, I was.  I knew about that.  Uh-huh.

1  Q    And it says and eventually they adopted another d/b/a in

2  Illinois under Emerson Creek Tearoom.

3  A    Uh-huh.

4  Q    And you were okay with that?

5  A    Yes.

6  Q    It says, "As time went on and we started hosting wettings,

7  we started a totally different company in 2012 called Emerson

8  Creek Events, Inc.  All the names are our legal names in the

9  State of Illinois."

10      Do you see that?

11 A    I do.

12 Q    And did you understand that they had started another

13 company at some point in time, Emerson Creek Events?

14 A    Sure.  That would be when they expanded -- when they

15 renovated the barn and expanded into the event and wedding

16 services.

17 Q    But what was your understanding from a marketing

18 standpoint as far as how they held themselves out on the

19 Internet?  Was it still all --

20 A    It was all under the same umbrella of Emerson Creek and

21 Emerson Creek Pottery.  They had expanded that original idea

22 outwards into tearoom, into events.  It was all done under our

23 mark with our permission.

24 Q    And you didn't have any -- did it matter to you how they

25 set up things from a corporate standpoint?

1  A    No.  I didn't see how that was relevant to me.

2  Q    It goes on to say, "We feel it would be unfair to our

3  customers to stop using Emerson Creek.  Our customers know us

4  as Emerson Creek, Emerson Creek Pottery & Tearoom, Emerson

5  Creek Pottery, Emerson Creek Tearoom, and Emerson Creek

6  Events."

7       Do you see that?

8  A    I do.

9  Q    And you understood at different times they had held

10 themselves out --

11 A    As different variations of those words, yes.

12 Q    Of those words?

13 A    Yes.

14 Q    And I just want to be clear on this:  Up to a point, you

15 were okay with them doing that?

16 A    I was.  They had a license to use our name, and in that

17 process they had expanded that license in essence by doing

18 these other activities.

19 Q    In fact, in 2012 you had asked them specifically to

20 include -- do you recall what you had asked them to include on

21 their name to make sure there was less confusion?

22 A    Emerson Creek Pottery & Tearoom.

23 Q    And do you recall what communications, if any, you had

24 with Mr. Demiduk or Ms. Demiduk after that?

25 A    Not exactly, no.  I mean, we went back and forth with some

1  emails about it.  I don't have a specific recollection.

2  Q    All right.  Let me direct your attention to -- on that

3  same document to PDF page 10.

4      And this is an email subject contract.  It looks like a

5  new email chain.  Do you see that?

6  A    Uh-huh.

7  Q    And this is from you, Jim Leavitt,

8  emersoncreek@emersoncreekpottery.com to

9  Chris@ecreekpotteryandtearoom.com.

10 A    Right.

11 Q    Do you see that?

12 A    Yeah.

13 Q    And you say, "Hi, Chris.  Have you had time to review and

14 sign the contract I sent yet?  Hoping to get this concluded

15 shortly."

16 A    Yes.

17 Q    And what were you referring to?

18 A    Okay.  So what I was referring to was a formal licensing

19 contract that I had sent them at that time.  And that came

20 about that in the course -- after I bought the Brown Bag line,

21 in the course of events some of the trademarks came up for

22 renewal.  And the lawyer, Garfield Goodrum, who was handling

23 that had approached me.  We discussed doing that.  And in the

24 process, we discussed my business operations and that the --

25 the fact that we had this outlet store and other stuff going on

1   up in Illinois, and we had been having more and more issues

2   with Internet confusion, social media confusion.

3        And so the idea was to send them a contract which would

4   formalize our agreement that we had been operating under, and

5   at no cost to them.  And the only thing we were really asking

6   for is that they put on their printed literature -- their

7   websites and their social media -- that Emerson Creek Pottery

8   is a registered trademark, and it's used with permission in

9   that place.

10        So we were just asking for acknowledgment, formal -- as if

11  you had a Disney license.  You would have a copyright, Disney

12  used with permission.

13  Q    And so why, after 17 years of operating under your

14  handshake agreement, was the -- you felt it was necessary to --

15  A    Well, we were getting into the time of social media and

16  kind of feeling our way through it and learning how this stuff

17  worked, and finding that we're getting all kinds of confusions.

18  Plus we have the issues with Google, getting into more and more

19  confusion.  I'm getting some pushback from them about names and

20  stuff.

21        So we decided that it would be appropriate at that time to

22  formalize it.  Continue the relationship, but just formalize it

23  and try to stop the confusion by having the use-by-permission

24  kind of thing on there.

25        I wasn't going to ask them for a royalty.  The cost of a

1  50-cent stamp would have been the only thing it would have

2  cost.

3  Q    When you say no royalty, why was that, sir?

4  A    Because I was -- I wanted to continue the relationship the

5  way it had been.  We didn't used to have a royalty.  They were

6  buying pottery, and that was sufficient.

7  Q    Heard reference to the word "royalty" yesterday in

8  opening.

9       Why didn't you have a royalty?

10 A    I felt the idea was to increase my brand and widen its

11 name.  I was going to be selling pottery to them and hopefully

12 making some money in the process.  So I didn't feel like I

13 needed to try to put a royalty on top of it.

14 Q    Also heard some talk yesterday about the idea of a term of

15 an agreement.

16      The handshake agreement, why didn't you put a specific

17 term on that?

18 A    We just assumed that it would renew or stay in effect

19 unless it was broken for some reason.

20 Q    And what do you mean by that, unless it was broken?

21 A    Well, if they had done something terrible that we didn't

22 like and didn't want them to use our name anymore.

23 Q    And if they -- and what would have happened if they had

24 just stopped selling Emerson Creek pottery?

25 A    I think we would have terminated the agreement because

1  that was part of the plan there.  They wouldn't be able to keep

2  all these other venues going without buying our pottery,

3  because they'd be using our name.  There would be confusion

4  with the public assuming that we're related and connected.

5  Q    Now, as of 2017, how were your sales to defendants?

6  A    At that point they were starting to drop off quite a lot.

7  It might have been in that time frame that she quit ordering.

8  I don't remember exactly when that happened.

9  Q    I next want to direct your attention to Exhibit 66.

10      This is a letter that was sent by counsel for defendants

11  to Mr. Goodrum back in September of 2017, September 19.

12      Do you see that?

13  A    Yeah, uh-huh.

14  Q    Why was it that at this point, September of 2017, you

15  understand when lawyers started communicating?

16  A    Well, yeah.  So --

17          MR. MCLAUGHLIN:  Judge, I just want to state an

18  objection at this point.  The exhibit he's showing is stylized.

19  These are in the form of settlement communications.  Part of

20  the issue in these communications is they have lawyers'

21  impressions of their case, which are issues that this jury has

22  to consider.  With respect to the timing of demands, that's

23  fine.  But with respect to the contents of them, they actually

24  take the form of settlement negotiations, and so therefore

25  would not be appropriate for the jury to consider in their

1    entirely.

2            MR. WILLETT:  It seems to me if that was the

3    objection, that would have been an appropriate objection to

4    make when this was included in our exhibit list.  This was

5    included.  It was not objected to.

6            THE COURT:  I'm not hearing you.

7            MR. WILLETT:  Oh, I was saying, Your Honor, that this

8    was included on our exhibit list.  It was not objected to.  And

9    I think the only basis for objection at this point would be

10   relevance.  And I really only want to use it for one point that

11   is not settlement communications, but a direct point about

12   whether or not third-party pottery is being sold in the last

13   paragraph of the letter.

14           THE COURT:  Well, for that purpose, then, get to

15   that.  And as far as the rest of the exhibit, the jury can

16   disregard it.

17           MR. WILLETT:  Disregard that, but I can show that

18   last paragraph?

19           THE COURT:  Yes.

20           MR. WILLETT:  Okay.  Thank you.  If we could go to

21   the second-to-last paragraph.

22    BY MR. WILLETT:

23   Q    How had the issue of whether or not defendants were

24   selling third party arisen again?

25   A    There had been an email where Chris had said she wasn't,

J. Leavitt - Direct

1  and I took her at her word.  And so I assumed that she was not

2  doing that.

3  Q    And that was back in 2014.  And my --

4  A    Yeah.

5  Q    -- question, sir, is in 2017, why was it that the issue

6  came up again as to whether or not they were selling

7  third-party pottery?

8  A    It was -- I don't remember the exact email chain that led

9  to that.  What happened was we decided to send her that

10  agreement.  I had called her on the phone and told her --

11  explained the whole situation why I was doing the agreement,

12  and she was fine with that.  She said send it.

13      And then her husband then emailed me and said, yeah, we

14  got it, and we're going to review it with our attorney and

15  we'll get back to you.

16      And then what happened after that was this letter arrives

17  through counsel.

18  Q    At some point in time did you raise, or someone on your

19  behalf, raise an issue with defendants as to whether or not

20  they were selling third-party pottery based on decline in

21  sales?

22  A    Yeah, we did.  We did.  I can't remember the exact details

23  of when that happened, but that had come up.

24  Q    And did you have an understanding from this second-to-last

25  paragraph here as to what the response of defendants was?

J. Leavitt - Direct

1  A    That they were not doing that.

2  Q    And read the last sentence there.

3  A    "My clients have not offered any pottery under the Emerson

4  Creek mark, other than that purchased from Emerson Creek

5  Pottery."

6  Q    And when the letter says offered under the Emerson Creek

7  mark, did you have an understanding as to what that meant,

8  offered under the Emerson Creek mark?

9          MR. LAUBSCHER:  Objection, foundation.

10          MR. WILLETT:  I'm just asking for your understanding,

11  if you have one.

12          THE COURT:  Sir?

13          MR. MCLAUGHLIN:  The objection is foundation.  It was

14  my statement.

15          THE COURT:  Well, he can state what he understood the

16  letter to say.  Now, you know, if that's not what was meant by

17  the writer of the letter, that's a different matter.  But

18  only -- you said you only were offering it for the one

19  sentence.

20          MR. WILLETT:  Yes, Your Honor, and just wanting his

21  understanding.

22          THE COURT:  All right.  He can testify as to what his

23  understanding was.  Someone else can say that's not right, but

24  we're talking about his state of mind at the time.

25          MR. WILLETT:  Yes.

1           THE COURT:  All right.

2    BY MR. WILLETT:

3    Q    Go ahead and answer.  What was your understanding?

4    A    Yeah, my understanding that he's saying that they're not

5    selling any other pottery other than Emerson Creek pottery in

6    their facilities.

7    Q    Because your understanding at that point is that the

8    facilities that is were selling your pottery were called --

9    A    Emerson Creek, Emerson Creek Pottery, Emerson Creek

10   Events, etc.

11   Q    All right.  Now, you received this letter.  Following

12   that, did that satisfy you that there was nothing going on that

13   shouldn't be?

14   A    I mean, he said that.  You know, they had said that, but

15   it was such an aggressive response to a license that really

16   didn't ask for anything more than what we had been doing, other

17   than for them to put on their literature that the name is used

18   with permission, that we really wondered what was going on.  It

19   kind of aroused our suspicions.

20   Q    And next I'm going to direct your attention to, well,

21   Exhibit 65.

22           MR. WILLETT:  And Ashley, if you can scroll down to

23   the photographs there.  And scroll through those for him,

24   please.

25    BY MR. WILLETT:

1  Q    And if you can tell us what those photographs are, sir.

2           MR. MCLAUGHLIN:  Object.  Foundation.

3           MR. WILLETT:  I'm trying to establish that at this

4  point, Your Honor.

5           THE COURT:  What did you say?

6           MR. MCLAUGHLIN:  My objection is foundation.

7           THE COURT:  I know.  I was asking --

8           MR. WILLETT:  I'm sorry, Judge.  Yeah, that's what

9  I'm establishing.  We haven't offered it yet.  I'm just

10  establishing the foundation.

11          THE COURT:  Okay.

12          MR. MCLAUGHLIN:  The problem with the way he's going

13  about doing it is he's introducing something in the middle of

14  the exhibit under the establishment of foundation.  But by the

15  time he gets it in, the jury would have heard it.  And I don't

16  believe that this witness has firsthand knowledge of what's in

17  this exhibit.

18          THE COURT:  All right.

19          MR. WILLETT:  And I can establish that he does have

20  firsthand knowledge of what's depicted in the photographs.

21          THE COURT:  Well, what is the exhibit?

22          MR. WILLETT:  These are photographs of what -- a

23  private investigator went to their facility and purchased items

24  that we have, and they're photographs of the items that were

25  purchased by the private investigator back in 2017.  It was

J. Leavitt - Direct

1   directed by Mr. Leavitt.  He paid for the items.  And we just

2   want to show the photographs of the items.

3           MR. MCLAUGHLIN:  The problem is he's trying to admit

4   in what he's claiming is an investigator's report.  We don't

5   have the investigator on the stand.  We haven't heard from the

6   investigator.  As far as I know, he's not being called as a

7   witness in this case.  And Mr. Leavitt would not have firsthand

8   knowledge with respect to what's contained in this report.

9           THE COURT:  I sustain the objection.  I suppose -- I

10  mean, I don't know what you're going to ask him about this

11  picture.

12          MR. WILLETT:  I just wanted to clarify that these

13  were the items -- he had directed the investigator to go to

14  Oswego and to purchase items to see if there was third-party

15  pottery.  And we don't need -- I don't need the report in.  I

16  just --

17          THE COURT:  Well, is the investigator going to

18  testify?

19          MR. WILLETT:  Say that again.

20          THE COURT:  Will the investigator be here?

21          MR. WILLETT:  The investigator will not be here, Your

22  Honor.  He purchased these items and we have the actual items

23  he purchased.  He purchased them for Mr. Leavitt.  And we don't

24  need his testimony.  I don't need him to establish that, other

25  than we have his receipts and we have the actual items

1  themselves.

2          MR. MCLAUGHLIN:  Your Honor, he's trying to get in

3  through this witness an exhibit that he has no foundation to

4  provide.

5          THE COURT:  The only thing I can say:  He can

6  describe what's in the picture, if it means something to him.

7  I mean, if he recognizes what's in the picture, he can describe

8  it.  He wasn't there when the picture was taken, I take it.

9          MR. WILLETT:  That's correct.

10          THE COURT:  But he can say what the picture

11  represents.

12          MR. WILLETT:  That's fine, Your Honor.

13          THE COURT:  I mean, normally --

14          MR. WILLETT:  And that's all we'll show.  That's what

15  we would admit it for, that limited purpose of showing the

16  photos, for him to identify what he can identify.

17          MR. GOODRUM:  And then, Your Honor, he subsequently

18  received the items from the investigator in person.

19          MR. MCLAUGHLIN:  Judge, they've already had the jury

20  hear enough about what's reported in the report, and it's gone

21  fair afield.  I think the --

22          THE COURT:  You know, we can have sidebars.  We don't

23  need to have you all speak out.

24          Did he physically have these plates in his

25  possession?

J. Leavitt - Direct

1          MR. WILLETT:  Yes, Your Honor.  For some of the

2     plates he made them and then -- he can identify them.  And then

3     we have them here, the actual items that he was provided.  So

4     he can identify them.

5          THE COURT:  Well, he can identify his items.  But to

6     introduce a photograph, you have to -- the person has to be

7     able to verify that it accurately portrays what it purports to

8     be.  How does he know that?

9          MR. WILLETT:  Understood, Your Honor.  I will tell

10    you that the reports -- I didn't want to get into the reports,

11    but I think we have to.  It's not really a report.  It's a

12    factual recitation of what was observed.  They are signed as

13    under penalty of perjury as declarations.

14         MR. MCLAUGHLIN:  Judge, sidebar, please.

15         THE COURT:  All right.

16         (Sidebar commenced.)

17         MR. WILLETT:  Yeah, Judge, so these -- what he did is

18    he did a factual report of what he observed.  He signed that as

19    a declaration.  By the way, this was on our exhibit list and

20    not objected to.

21         MR. MCLAUGHLIN:  The issue is not whether they can

22    bring an exhibit.  It's about foundation.  Identifying an

23    exhibit doesn't mean it gets admitted into evidence.  It's an

24    exhibit you're going to use.  We're aware of the exhibit, but

25    they have to lay the foundation.  They've never called the

1  witness.  You can't bring another lay witness.  You have to

2  bring in what would effectively be an expert report.

3  MR. WILLETT:  It's not an expert -- this is a private

4  investigator.  This is not an expert report.

5  THE COURT:  I've never heard of -- I mean, it's

6  hearsay just quadrupled.

7  MR. WILLETT:  Rule 807 has a residual exception for

8  things that can be verified.  This is done in the normal course

9  of his duties as an investigator.  He's simply reporting --

10  THE COURT:  Well, he's not here to say that, though.

11  MR. WILLETT:  He's not, but he has signed it as a

12  declaration.  And it was on our exhibit list, and they did not

13  object to it.  And under Rule 26(a), they can only object under

14  402 and 403.  They didn't object to it in a timely fashion.

15  MR. MCLAUGHLIN:  We can object at trial with respect

16  to foundation and with respect to admissibility.  There's a

17  difference between disclosing an exhibit before trial and then

18  actually laying the foundation.

19  THE COURT:  Right.

20  MR. MCLAUGHLIN:  Otherwise anybody can --

21  THE COURT:  Just because you put an exhibit on your

22  exhibit list doesn't make it admissible into evidence.

23  MR. WILLETT:  It doesn't, but it does waive

24  objections, other than 402 and 403 other than Rule 26(a).

25  MR. MCLAUGHLIN:  That means under he could bring any

1  exhibit without foundation.  That is not trial practice.

2           THE COURT:  Unless the rule allows it.

3           MR. WILLETT:  We should have been dealing with this a

4  week ago, and not today.

5           MR. MCLAUGHLIN:  Judge, they've been giving exhibits

6  the last minute.

7           MR. WILLETT:  This has been on our original exhibit

8  list.

9           MR. MCLAUGHLIN:  What I'm saying is to identify an

10  exhibit, they still have to bring the witness to testify if

11  there's a document that has a person who did it.  They have

12  every ability to call that person here, in which case there

13  would have been no excuse.  But they didn't.  And now they want

14  to use this lay witness to do that.

15          MR. WILLETT:  What I can -- go ahead, Your Honor.

16          THE COURT:  I'll sustain the objection -- I mean, you

17  know, for the time being.  I'll have to look.  Just go ahead

18  with something else.

19          MR. WILLETT:  Well, this is going to be a big part of

20  what I have to talk about, because his learning of the fact

21  that they were selling third-party pottery when this private

22  investigator went out a week after receiving Mr. McLaughlin's

23  letter saying they weren't doing it, the private investigator

24  goes out and purchases -- we have the receipts and we have the

25  items that were purchased by his agent for him.  I can just

J. Leavitt - Direct

1  show you the exhibits and I can show the actual items.

2          MR. GOODRUM:  The investigator also sent the items

3  directly to Mr. Leavitt, sir.

4          THE COURT:  I don't see that that's all -- I'm not --

5  I'm not up on the rule of evidence that you are.  We'll have to

6  look into that.

7          MR. WILLETT:  Well --

8          MR. MCLAUGHLIN:  I would just state one other item.

9  To take my statement to bootleg this is a problem because to

10  use someone's mark, it meant the third-party pottery actually

11  says Emerson Creek, which it did not.  There's no evidence that

12  Emerson Creek was put onto any other pottery.  His own pottery

13  was sold under his own mark.  The evidence will show they knew.

14  That's not what we're here about.  They're trying to bootstrap

15  an argument that this witness can't talk about.

16          MR. GOODRUM:  Your Honor, the signage on the store,

17  the signage on the street is "Emerson Creek Pottery."

18          MR. WILLETT:  The only point I need to make, Your

19  Honor, with this witness is at that point as of September of

20  2017 he learns, based on what was provided to him, that they're

21  selling third-party pottery.  And he then moves to terminate

22  the agreement.  This is a pretty critical point that he needs

23  to make because of what he learned because of what was sent to

24  him.

25          THE COURT:  Well, I know it's critical.  It's

1  critical. I don't know why on earth you wouldn't have the

2  principal witness here to testify.

3          MR. WILLETT: Well, I mean, it's like a lot of

4  things; he's out of state. We can work to get him. I do have

5  them acknowledging these photos in the depositions. So I can

6  obviously do it through them.

7          THE COURT: Call them out of turn to do it, if you've

8  got some other evidence.

9          MR. WILLETT: Well, then, I may need to call them out

10 of turn and then resume Mr. Leavitt.

11         THE COURT: We'll just have to do it. I mean, at

12 this point I'm not prepared to rule in your favor.

13         MR. WILLETT: Understood.

14         THE COURT: I would be doing it out of ignorance.

15         MR. WILLETT: If we could just take a very short

16 recess, and then I think I will call either Chris or Dave

17 Demiduk at this point, and then resume with Mr. Leavitt.

18         THE COURT: Yes.

19         MR. WILLETT: Just give me a couple of minutes.

20         MR. MCLAUGHLIN: The issue that we're still going to

21 have is if they try to get this report even through my clients.

22 Again, they wouldn't have foundation to testify about it at

23 all.

24         THE COURT: We've got whatever --

25         MR. WILLETT: We've got receipts.

1          THE COURT:  Can they identify the receipts?

2          MR. MCLAUGHLIN:  But then the next part they would

3     want to do is -- so the problem we have is photos are one

4     thing.  Having a report tied to it -- what they've done is they

5     have this long exhibit.

6          MR. WILLETT:  We can cut the report out.

7          THE COURT:  The report is not in evidence.

8          MR. WILLETT:  It's not even a report, but we can cut

9     that out.

10          MR. MCLAUGHLIN:  The other issue --

11          (Sidebar concluded.)

12          THE COURT:  Members of the jury, I'm going to let you

13     retire to the jury room for a break at this time, about 15

14     minutes.

15          MR. MCLAUGHLIN:  The other issue with respect to the

16     settlement letter that was sent, should we -- that said some

17     form of redacted letter would have to be submitted at that

18     point.

19          MR. WILLETT:  We can redact it and just put --

20          MR. MCLAUGHLIN:  With respect to both letters, his

21     own letter would have the same issues and it would just have,

22     you know --

23          THE COURT:  All right.  If you're going to get that

24     in, do whatever you've got to do.

25          MR. WILLETT:  Thank you, Your Honor.

J. Leavitt - Direct

1          THE COURT:  We'll take a break.

2     **(Jury out, 10:37 a.m.)**

3          (Recess.)

4          THE COURT:  Okay.  All right.  I understand somebody

5     wishes to take up an issue before the jury returns.

6          MR. MCLAUGHLIN:  It was us, Your Honor.

7          MR. WILLETT:  Yes, Your Honor.  We were just going to

8     -- given the issue that had arisen, we were just going to call

9     the investigator via Zoom.  He's available.  He's on standby on

10    Zoom.  We were just going to call him for five minutes, have

11    him identify the photos, and then move on, if that works.  They

12    were objecting because he wasn't on --

13         THE COURT:  What's the objection?

14         MR. MCLAUGHLIN:  The objection is he was never named

15    as a witness, and therefore to call him now after we've begun

16    trial --

17         THE COURT:  Well, I overrule that objection.  I mean,

18    it's not -- if all he's going to do is lay the foundation for a

19    photograph, which you had notice was going to seek to be

20    admitted, I don't see -- he can just lay the foundation.  I

21    don't see any problem with that.

22         MR. MCLAUGHLIN:  There's two issues.  I don't believe

23    he's going to bring him in just to lay the foundation for the

24    photograph, but rather for the report itself.

25         MR. WILLETT:  No.

1    MR. MCLAUGHLIN:  And the identification of various

2  exhibits in and of itself still doesn't change the burdens of

3  the rules of evidence.  We were aware this investigator had

4  gone, but the purpose is to avoid surprise.  So certainly they

5  can use whatever exhibits that they want, but they also had an

6  obligation to provide a witness list.  And on that witness list

7  should have been the investigator.  They chose not to name him,

8  and therefore that's the problem.

9    MR. WILLETT:  And Judge, briefly, if I may in

10  response to that, we're not -- we removed any of the writings

11  of the report.  We're just going to use him to authenticate the

12  photographs, which both of which were on our exhibit list

13  submitted 30 days before and were not objected to, well prior

14  to the deadline for defining witnesses.

15    THE COURT:  Well, is what you're trying to show that

16  these plates are not Emerson Creek plates --

17    MR. WILLETT:  And that they --

18    THE COURT:  -- they were made by the plaintiff?

19    MR. WILLETT:  Yeah, that they were purchased in

20  September of 2017, and that they were, you know, this

21  third-party pottery being sold in their facility.

22    MR. MCLAUGHLIN:  There is -- there is no dispute that

23  those were plates that were in the store.  We would dispute the

24  characterization of them being under the Emerson Creek Pottery

25  brand, but the actual fact that the plates were sitting in the

1   store and sold on that date is undisputed.

2           And so my concern was always that they were bringing

3   in photographs under a report.  So the way that we have it set

4   up with the jury, they're looking at the entirety of an

5   exhibit.  And they're not going to avert their eyes, whether

6   someone tells them to or not.  I told counsel before this, I

7   said:  If you just have the photographs, we'll stipulate that

8   those photographs were in the store on the 17th.  We just

9   didn't want the investigator's report.

10          So I'm even fine with a stipulation on that.  I want

11  to avoid evidence coming before the jury that shouldn't be

12  considered.

13          MR. WILLETT:  Well, I asked about the stipulation,

14  but I thought you said you weren't fine with the stipulation.

15          The stipulation would simply be that these

16  photographs depict pottery that was purchased from their store

17  in September of 2017.  And I would ask then Mr. Leavitt could

18  be able to tell us what is his pottery and what is someone's

19  else's pottery.  If we can stipulate to that, it's fine.

20          MR. MCLAUGHLIN:  We would stipulate to that.  That

21  would resolve the issue.  It was the rest we have the problem

22  with, Your Honor.

23          MR. WILLETT:  And we've removed -- there were pages

24  at the beginning and one other page in there that had words on

25  it.  We removed that from the exhibit.

1          MR. MCLAUGHLIN:  That's perfectly fine with us.

2          THE COURT:  You all can stipulate then?

3          MR. MCLAUGHLIN:  We can stipulate to that, sure.

4          THE COURT:  Okay.  If you all understand what you've

5   stipulated to --

6          MR. WILLETT:  Just to be really clear, I'm going to

7   ask him to identify these photographs.  And they were

8   photographs that were taken in the shop.

9          THE COURT:  You're going to ask Mr. Leavitt?

10         MR. WILLETT:  Mr. Leavitt.

11         Stipulate that they were photographs that were taken

12  in the shop in September of 2017 and that were ultimately

13  provided to him, and just go through each one and ask him to

14  identify whether that's his pottery or third-party pottery.

15         MR. MCLAUGHLIN:  That's not an issue.

16         We were saying if you want to just stipulate for the

17  jury that that's what we've agreed.  Either way, I don't care

18  if you want to get it through him or just have a stipulation.

19         MR. WILLETT:  Well, I do want to stipulate, but I do

20  want Mr. Leavitt to identify to tell them which is his and

21  which is not his.

22         MR. MCLAUGHLIN:  That's fine.  I don't have any

23  problem with that.

24         MR. WILLETT:  Then I think we're okay.

25         THE COURT:  All right.  Do you all need a break

J. Leavitt - Direct

1  before we go?

2         MR. WILLETT:  If we could just have like two minutes,

3  Judge.

4         We're just letting the investigator know --

5         THE COURT:  Well, the investigator we don't need now,

6  right?

7         MR. WILLETT:  Yes.  He was going to call him and let

8  him know.

9         THE COURT:  Okay.

10        MR. WILLETT:  It will be a revised 65.

11        MR. MCLAUGHLIN:  But we're still using the same

12 number.  Okay.

13        THE COURT:  Okay.  Can you go ahead without your

14 co-counsel.

15        MR. WILLETT:  Yes.  I just want to make sure I had

16 the image of the pottery.  I just want to make sure I had one

17 thing from Mr. Goodrum.

18        Thank you, Judge.  Appreciate your indulgence.

19        THE COURT:  Are you ready now?

20        MR. WILLETT:  Yes, sir.  Thank you.

21        THE COURT:  Call the jury back.

22 **(Jury in, 11:03 a.m.)**

23        THE COURT:  You may have a seat.  Ladies and

24 gentlemen of the jury, sorry for the delay, but I think we've

25 arrived at an agreement here that will shorten or save time in

J. Leavitt - Direct

1    another area.

2            So, go ahead.

3            MR. WILLETT:  Thank you, Your Honor.

4     BY MR. WILLETT:

5    Q    At this time we'd like to display the updated Exhibit 65.

6    I'm going to go ahead and move for the --

7            MR. MCLAUGHLIN:  These are 70 pages.  I think the

8    photographs were less than that.  Are there 70 photos?

9            MR. WILLETT:  They're all photographs.

10           MR. MCLAUGHLIN:  Okay.

11           MR. WILLETT:  I mean, if you see something, just --

12           MR. MCLAUGHLIN:  That's fine.  Go ahead.

13    BY MR. WILLETT:

14   Q    What's depicted on your screen, Mr. Leavitt?  I'm going to

15   lead a little bit on this just to get to the --

16   A    That's the wagon.  That's the entrance to the driveway to

17   their facility.

18   Q    And just to confirm, your understanding is that these

19   photographs were taken in September of 2017 at the Emerson

20   Creek facility in Oswego, Illinois?

21   A    Correct.

22           MR. WILLETT:  At this time I'd move for admission of

23   the photographs, subject to seeing something that -- I'd move

24   for admission of Exhibit 65 at this time.

25           MR. MCLAUGHLIN:  No objection.

1    THE COURT:  Be admitted.

2        (Plaintiff Exhibit 65 marked.)

3        (Plaintiff Exhibit 65 admitted.)

4  BY MR. WILLETT:

5  Q    And again, sir, your understanding of this first

6  photograph?

7  A    Right.  That's the wagon that they have the sign on at the

8  entrance to the gravel road.

9        MR. WILLETT:  If we could go to the next image.

10        What is that photograph, sir?

11  A    That is the store entrance.

12        MR. WILLETT:  Ashley, keep going to the next image.

13  A    So this is the porch.  We've seen that picture before.

14  Q    Okay.  Now, on the porch we see this picture.  If you

15  could identify for us, sir, there's sort of shelving on the top

16  of that platform.  Are those --

17  A    The flowerpots on the top are Emerson Creek pottery.

18  Q    And then there are some other items that are identified on

19  the sort of flat surface there, some jack-o'-lanterns?

20  A    The things with the faces.  Yeah, I see that.

21  Q    Are those Emerson Creek pottery?

22  A    No, they're not.

23  Q    And jut to be clear, I'm looking at where the arrows are

24  pointing --

25  A    Yeah, that's -- no, that's not Emerson Creek pottery, no.

1   Q    Now, there's some other jack-o'-lantern-type things on

2   there where the arrow now is.

3        Do you see that?

4   A    Yeah.

5   Q    Do you have an understanding of what material or

6   what those are?

7   A    I can't tell from this picture.

8             MR. WILLETT:  If we can go to the next exhibit.

9   Q    Again, this is something -- this is not Emerson Creek?

10  A    No, it is not.

11            MR. WILLETT:  And if we could go, Ashley, to page 9.

12  I'm sorry, my numbers are different than yours.  Go back.

13  Right there.  Thank you.

14  Q    And what is that, sir?

15  A    That's one of our flowerpots, yes.

16            MR. WILLETT:  And if you go to page 10 -- I'm sorry,

17  page 8.

18  Q    And what is that depicting?

19  A    That's the bottom of one of our pots with our mark on it,

20  the stamp that we put "Emerson Creek Pottery" with the date.

21  Q    And then that's obviously some sort of --

22  A    Well, it's got a price tag on it, sure.

23            MR. WILLETT:  Next page.

24  Q    And what is that, sir?

25  A    These are cups, latte mugs in the olive design that we

1    make.

2    Q    Page 13?

3    A    And again, that's our pottery on the shelf.

4    Q    And from what you can see from this photograph, those are

5    all Emerson Creek?

6    A    Yeah, it appears to be all our pottery, uh-huh.

7    Q    And if we look at 17?

8    A    Berry bowls.  Yes, that's our pottery.

9    Q    And this is the same berry bowls that were depicted in --

10   A    That was in the YouTube, that's correct.

11   Q    I do want to show this.  These --

12        MR. WILLETT:  The next exhibit?

13   A    Those are pitchers that we make.

14   Q    Okay.  And if you look in the lower right-hand corner of

15   that picture it says "Being happy."  Do you see that?

16   A    Uh-huh.

17   Q    "Never goes out of style"?

18   A    Yeah.

19   Q    Do you have any issue with Emerson Creek in Oswego selling

20   things like that?

21   A    No.  I consider that an accessory that would normally be

22   put in the store.

23   Q    Let's go to page 19.

24        What's depicted in this photograph?

25   A    That's not anything we ever made.

J. Leavitt - Direct

1  Q    It appears to be a pitcher of some sort?

2  A    Yeah, it's some sort of a pitcher.  That's exactly right.

3  It's not our pottery.

4  Q    Okay.  And did you ever obtain one of these pitchers?

5  A    The investigator had sent that to me, yes.

6  Q    Is this one of the pieces of pottery that you received?

7  A    It is.  That's the picture there, uh-huh.

8  Q    And again, this is not your pottery?

9  A    Absolutely not.

10  Q    All right.  And you see it has a saying on it, "You say

11  tomato, I say bloody mary"?

12  A    I do.

13  Q    And these were provided to you in September of 2017?

14  A    Correct.

15  Q    Now, you testified earlier that at some point in time you

16  had produced some products with words on them?

17  A    Coffee mugs, yes.

18  Q    Coffee mugs?

19  A    Uh-huh.

20  Q    And do you know approximately when you did that?

21  A    It might have been that year or the year before.  I can't

22  remember exactly.

23  Q    Can you read what that says there?

24  A    It says, "Mud Pie, made in China."

25  Q    And it has like a scan code on the bottom?

1  A    Oh, yeah, bar code, yeah.

2  Q    And again, this is -- the pitcher, this is the bowl for

3  the pitcher?

4  A    Yes, that's correct.

5  Q    Now if you'll go to page 28.

6       What's depicted in this photograph, sir?

7  A    It looks like some sort of a teapot and a cup.  It's not

8  anything that we make.  And in the background hanging on the

9  wall is some kind of pottery of some sort that's not anything

10 that we ever did.

11 Q    And if you go to page 30, what is that, sir?

12 A    It looks like a -- possibly a mug with a saying on it.

13 It's not our pottery.  We did not do that.

14 Q    Go to the next page, please.  And that's --

15 A    That says, "Mud Pie, made in China."

16 Q    And that appears to be the bottom of that mug?

17 A    Yes, it does.

18 Q    Go to the next page.  I'd ask you to take a look at this,

19 and if you could identify --

20 A    That's a whole shelf of stuff.  None of it is our pottery,

21 not a bit of it.

22           MR. WILLETT:  Scroll down a little bit on that.

23 Q    And again, there's some sort of bowl there?

24 A    Yeah.

25 Q    And who makes that bowl; do you know?

1   A    I don't know.  Not us.

2   Q    Is this the --

3   A    Yeah, that's what's in the picture.  That's correct.

4   Q    If you go to the next -- well, let's see here.

5        What's on the -- depicted on the bottom of that one, if

6   you can see, if you can read that?

7   A    It's got -- I have to get my glasses.  I think it says,

8   "Sorento utility bowl."

9   Q    I'll grab that back, please.

10       But that's not an Emerson Creek --

11  A    Absolutely, no.

12  Q    Just a few more I'm going to show you.

13       Take a look at the next, at 36.  What do you see there?

14  A    It looks like it's more pottery that we don't make.

15  Q    If you go to the next page, what about that picture, does

16  that have any Emerson Creek Pottery in it?

17  A    I don't believe so.  That's all -- well, maybe hanging on

18  the wall possibly on the left, those mugs.  I can't tell.  But

19  all the stuff in the front is not our pottery, no.

20            MR. WILLETT:  Ashley, can you zoom in real quick on

21  that.

22  A    Well, actually the square plate that we made for her is up

23  there on the right with a creamer or a small pitcher.

24  Q    So this is page 37 of Exhibit 65.  Just to be clear, where

25  I'm putting the arrow right there and the arrow right there,

1    those are Emerson Creek pottery?

2    A    That's correct, yes.

3    Q    But on the one that says sponge?

4    A    All the rest of it, no, not a bit of it.

5    Q    All right.  What about in the background there on the

6    right-hand side of that photograph?

7    A    Yeah, in the other room that looks like more of those

8    square plates and maybe some -- it's hard to tell.  That looks

9    like our pottery back in that other room, or most of it.

10   Q    All right.  And just a few more here.

11        MR. WILLETT:  Can we go to 48.

12   Q    I'll hand you this and ask you if this is one of those --

13   A    Yeah, this looks like what's in the picture.

14   Q    Is that Emerson Creek?

15   A    No, it is not, no.

16   Q    Do you see who makes that?

17   A    It doesn't have a mark on it.

18   Q    It has a price tag, but it does not appear to have a mark?

19   A    Yeah, correct.

20   Q    And again, that's not Emerson Creek pottery?

21   A    Not a bit.

22   Q    Do you know what material this is, or what this is made

23   of?

24   A    It's some type of ceramic, probably red clay.

25   Q    What is the -- what's the foundation for the Emerson Creek

1  pottery?  What's it made from?

2  A    I'm sorry?

3  Q    The foundation for Emerson Creek pottery, the pottery

4  pieces we've seen, what is that made of?

5  A    Oh, it's a high-fired ceramic.  It's essentially

6  vitrified.  It's almost like a porcelain.  It's a tough

7  material.

8  Q    Do you consider that a clay?

9  A    Well, sure.  All pottery is made of clay.

10 Q    All right.  Then if you go to Exhibit 53 -- I'm sorry,

11 page 53.

12      And these are the receipts that you were provided for the

13 purchase?

14 A    Correct; for the purchase of these different items.

15 Q    And if you zoom in at the top there, it identifies Emerson

16 Creek Pottery & Tearoom?

17 A    Correct.  That's Emerson Creek Pottery & Tearoom.

18 Q    And then you were actually provided with copies of those

19 receipts?

20 A    I was, yeah, with the pottery.  Uh-huh.

21 Q    And then if I can direct your attention to 61.

22         MR. WILLETT:  We must have removed -- maybe it's --

23 yeah, right there.  Go up a little bit on 60.

24 Q    What's your understanding of what that picture is?

25 A    It's the bottom of one of our plates.

J. Leavitt - Direct

1  Q    And do you understand -- you can see in the background

2  there, if Ashley will scroll down a little bit -- the other

3  way.  Over to the left there, do you recognize those items?

4  A    It's kind of hard to tell.  No, I don't think I do.

5  Q    Now, do you have an understanding from this photograph,

6  are you able to tell -- and I'm not sure how clear it is for

7  you; I can make it bigger, but I don't want to make it fuzzy --

8  where this picture was taken?

9  A    It kind of looks like it might have been in the

10 restaurant.  That looks like a napkin.  There's a menu.  That

11 would be my assumption.

12 Q    Thank you.  I don't need that exhibit up any further.

13          MR. WILLETT:  I would like to have these available,

14 Your Honor, if it's all right, for the jury to see.  These are

15 in the photographs.  These are all in the photographs.  I'd

16 like to have this and the other pottery we've shown available

17 for them, if that's okay?

18          THE COURT:  Well --

19          MR. LAUBSCHER:  No objection.

20          THE COURT:  Okay.  You may use them as demonstrative

21 evidence.

22  BY MR. WILLETT:

23 Q    After you received this pottery in the photographs, what

24 was your reaction, sir?

25 A    I was shocked and outraged, completely surprised.

J. Leavitt - Direct

1   Q    And to be clear, prior to that time, had you ever known

2   that there was, indeed, third-party pottery?

3   A    No, I did not.  Absolutely not.

4   Q    And what action did you take when?

5   A    We sent them a cease and desist letter.  We said that they

6   had violated the license and didn't have a right to use our

7   name anymore.

8   Q    Now, prior to sending the cease and desist letter, did you

9   learn of any other actions that had been taken by defendants

10  with respect to the use of your name?

11  A    I believe I became aware that right in that time frame

12  they were starting to try to register iterations of Emerson

13  Creek with the PTO.

14  Q    And when you say right in that time frame, what's that

15  time frame?

16  A    Right after -- or right before or right after the

17  investigator had gone up there.

18  Q    And so what was your understanding of the effect of the

19  cease and desist letter that was sent to them?

20          MR. MCLAUGHLIN:  Object to the form of the question.

21  Calls for a legal conclusion.

22          THE COURT:  Sustained.  Doesn't the letter speak for

23  itself?

24          MR. WILLETT:  The letter does, but we've had an

25  objection to those communications.  So I have not admitted the

1  cease and desist letter because it does discuss the back and

2  forth between the parties.  So I was just going to have him

3  testify to his understanding of the effect of sending a cease

4  and desist letter.  And that's all I want is his understanding

5  after that letter was sent.

6          THE COURT:  All right.  Any objection to that?

7          MR. MCLAUGHLIN:  No.

8          THE COURT:  Okay.

9   BY MR. WILLETT:

10 Q    So, sir, if you could just testify:  After the letter was

11 sent, which was January 5, 2018, what was your understanding of

12 the -- what was your intent in sending that letter?

13 A    To let them know that they had breached the license.  They

14 didn't have a right to use our name anymore to sell Emerson

15 Creek pottery or to use the name "Emerson Creek" or "Emerson

16 Creek Pottery" or any of the variations of it.

17 Q    And since sending that letter, have you learned that they

18 have been using the Emerson Creek marks?

19 A    They have.

20 Q    And how so?

21 A    By Internet searches, looking at their website, social

22 media and such.

23 Q    Next we can go to Exhibit 9.

24      And ask if you can identify what's depicted on --

25 A    Yeah, that's a web -- a screenshot of their website.

1  Q    And it has a date accessed of February 5th, 2018.  Did you

2  direct someone to look at that, and to confirm that they were

3  still using that name as of February 2018?

4  A    Yes.  Either I did or somebody else did.

5          MR. WILLETT:  At this time I would move for admission

6  of Exhibit 9.

7          MR. MCLAUGHLIN:  No objection.

8          THE COURT:  Be admitted.

9          (Plaintiff Exhibit 9 marked.)

10          (Plaintiff Exhibit 9 admitted.)

11          MR. WILLETT:  If we can scroll down.  Keep going.  Go

12  a little further.

13   BY MR. WILLETT:

14  Q    And so on that website at that time, these are some

15  pictures of the shop.

16      Do you see this?

17  A    Yes.

18  Q    And you understood that those were still on the website as

19  of February of 2018?

20  A    Yeah, sure.  There it is.

21  Q    And tell us what's depicted in this picture here.

22  A    It's got pictures.  It looks like oval platters, a lamp,

23  that sort of thing.

24  Q    All right.  And this is the shop in Oswego?

25  A    Yes.

1  Q    And do you see -- in this picture, for example, do you see

2  third-party pottery displayed?

3  A    No, I do not.

4  Q    Okay.  Go down.  What about there on those pictures?

5  A    Again, that's our pottery that's being depicted.

6  Q    And under pottery lines, if you can read the first

7  paragraph there, the first sentence of that first paragraph?

8  A    "All of our beautiful pottery is created and painted in

9  Bedford, Virginia, and is the original source and inspiration

10  for the pottery shop and tearoom that you enjoy today."

11  Q    And then it goes on to say more about the family-owned --

12  A    Right.  Since '77, yeah.

13  Q    And those are -- the square plates, those are the plates

14  that --

15  A    Correct.  Flowerpots, square plates, uh-huh.

16        MR. WILLETT:  Okay.  Scroll down.

17  Q    What about on these pages, is this Emerson Creek pottery?

18  A    Yes, it is.

19  Q    Including what's labeled "American Blue" or the "Copper

20  Clay"?

21  A    Right.  Those are two glaze covers that we produce.

22        MR. WILLETT:  Keep going down.

23  Q    We see a picture; it looks like it's outdoors there.  Do

24  you see that?

25  A    Uh-huh.

1  Q    And what's depicted in that picture?

2  A    That's some pitchers and vases in a cherry pattern that we

3  made for her.

4  Q    Okay.  And then right above that, what's depicted in that?

5  A    It's the olive pattern.

6  Q    And are those Emerson Creek pottery pieces?

7  A    They are.

8  Q    What about in the -- and so there's some plants there it

9  looks like above that.

10       Can you tell what those are?

11 A    It looks like it might be some kind of flowerpots made by

12 somebody else or something like that.  It looks like it.

13 Q    Can you tell -- it looks like they're wrapped.  Can you

14 tell?

15 A    Yeah, it's hard to tell, honestly.

16 Q    And whether those are pots or whether those are like

17 just --

18 A    I can't tell.  The picture on the right has got our

19 pottery with some -- it looks like butter dishes that we did

20 not make.

21 Q    But on the left, the pictures of the plants, can you tell

22 whether those were anything that are pottery or the material --

23 A    It's really hard to tell, honestly.  It's got paper or

24 foil on it.

25 Q    Going down, the American flag, is that something that you

1  all made?

2  A    We made that, yes, uh-huh.

3  Q    And what about the -- you go on down to the shamrock

4  there?

5  A    Yeah, that was one of our patterns.

6         MR. WILLETT:  Keep going down.

7  Q    And then there's the -- some of the rest of the website?

8  A    The cookbook, yes.

9  Q    Let's look at Exhibit 234, if you can see that?

10 A    That was on their website.  They had a 360 tour where you

11 could use your mouse and go through the store and view the

12 different rooms and what was in them.

13 Q    And if you scroll down a little bit -- Ashley, can you go

14 to the right to get the capture.

15      It looks like this is a screenshot.  Do you see that at

16 the bottom, the date there?  Can you read that?

17 A    Yeah, that's -- it looks like 10-1-2019.

18 Q    10-1-2019?

19 A    Yeah.

20        MR. WILLETT:  At this time I'd like to move for the

21 admission of Exhibit 34.

22        MR. MCLAUGHLIN:  No objection.

23        THE COURT:  Admitted.

24        MR. GOODRUM:  Plaintiff's 234.

25        MR. WILLETT:  Yes.  Thank you.  Sorry.

1          (Plaintiff Exhibit 234 marked.)

2          (Plaintiff Exhibit 234 admitted.)

3   BY MR. WILLETT:

4   Q    If you look on the shelves, do you see that?

5   A    Uh-huh.

6   Q    What's depicted there?

7   A    It looks like Emerson Creek pottery.

8          MR. WILLETT:  Go down a little bit.

9   Q    And this is -- you understand this to be the tearoom?

10  A    Yeah.

11  Q    And what was -- did you -- do you know what -- the 360

12  tour, what does that refer to?

13  A    It was -- like I said, it was on their website where you

14  could use a mouse and kind of scroll through the rooms and see

15  what was in each room.

16         MR. WILLETT:  Okay.  Go down from there.

17  Q    And what is that on the walls there?

18  A    Again, it's our pottery.  It looks like the tearoom.

19  Q    And what about on the table?

20  A    Yes, that's our pottery.

21  Q    And do you see -- it looks like a pitcher there, but do

22  you see any pottery manufactured by someone else depicted in

23  this?

24  A    I do not, no.

25         MR. WILLETT:  Okay.  Keep going.

J. Leavitt - Direct

1  Q    These are just more pitchers?

2  A    It's the same.  It's our pottery.  I don't see anything

3  that's not Emerson Creek there.

4  Q    And this is in October of 2019 as you understand it,

5  correct?

6  A    Yeah.

7  Q    And the cease and desist letter was sent in January of

8  2018?

9  A    Correct.

10          MR. WILLETT:  You can just keep scrolling through,

11  Ashley.

12  Q    What about there up on the wall there, those pieces?

13  A    Yeah, that's more of our pottery.  There's a lamp up

14  there.  It looks like a tray, a teapot and such.  Yeah, that's

15  our stuff.

16  Q    If we can now go to Exhibit 13.  If I could have the

17  Court's indulgence for just 30 seconds here.

18      All right.  If you could identify this for us?

19  A    Yeah, that's -- depicts a wedding at their -- it looks

20  like it's in their -- it says "spring wedding gown."  It was on

21  their website.

22  Q    If you look at the top there, it's got the capture

23  information, if you can read that.

24      Do you see that?

25  A    Yeah.  It's emersoncreek.com/barnweddings, spring,

1  8-5-2021.

2          MR. WILLETT:  And at this time I'd like to move for

3  the admission of Exhibit 13.

4          MR. LAUBSCHER:  No objection.

5          THE COURT:  It will be admitted.

6          (Plaintiff Exhibit 13 marked.)

7          (Plaintiff Exhibit 13 admitted.)

8   BY MR. WILLETT:

9  Q    All right.  And so this picture that was captured in

10 August of 2021, what's the pots that we see there?  Do you know

11 who manufactured those?

12 A    Yeah, those are earthenware pots that we had made a long

13 time ago and discontinued, and probably were part of the

14 original set of pottery that they bought when they bought a ton

15 of flowerpots at that initial meeting back in 2001 or whatever.

16 Q    And those are Emerson Creek pottery?

17 A    Oh, absolutely.  That's the rooster pattern and pinecone,

18 whatever, sure.  That's all our stuff.

19 Q    All right.  Mr. Leavitt, why does it matter to you if the

20 defendants are still using the Emerson Creek mark?

21 A    We had told them not to.  They didn't have a right to do

22 it.  People see that and they assume that they're associated

23 with us; that we're sponsoring them, so to speak, that they're

24 associate with us.

25 Q    Why does it matter if they use Emerson Creek Events?  Why

1  does that matter to you?

2  A    Because it's used under the Emerson Creek mark, and they

3  don't have the right to use that at this point.

4  Q    And your understanding is that Emerson Creek Events,

5  that's the weddings and things?

6  A    Right.

7  Q    Like what's depicted on this page?

8  A    Right.  It's all part of the same enterprise, on the same

9  property, the same location.

10          MR. WILLETT:  Can we go to Exhibit 20.  Scroll down a

11  little bit.  I'm sorry, Ashley.

12  Q    What is this, sir?

13  A    This is a LinkedIn profile for Christina Demiduk.

14  Q    And how did you -- how do you know that that's what this

15  is?

16  A    I'm sorry?

17  Q    How do you know that this is the LinkedIn profile for her?

18  A    Oh, because that's what it says.

19  Q    And have you or anyone at your direction looked for and

20  monitored things like social media and LinkedIn?

21  A    Yes.  And that's how we found this.  Uh-huh.

22  Q    If you look at the date accessed, can you read that?

23  A    Yeah, it's 5-2 of 2019.

24          MR. WILLETT:  I'd move for admission of Exhibit 20.

25          MR. LAUBSCHER:  No objection.

1          THE COURT:  Be admitted.

2              (Plaintiff Exhibit 20 marked.)

3              (Plaintiff Exhibit 20 admitted.)

4   BY MR. WILLETT:

5   Q    Now, as of 5-2-2019, was Chris Demiduk a president at

6   Emerson Creek Pottery?

7   A    No.  I thought I was.

8   Q    If we can go back real quick here to Exhibit 13.

9        We talked specifically about the marks.  What's your

10  concern, Mr. Leavitt, with folks in Oswego using pictures like

11  this with your pottery?  What's your concern there?

12  A    My concern is that people will think we're associated with

13  them.  There was a time when we were, and it was fine.  And

14  then when they were told -- given the cease and desist, it was

15  my understanding that they didn't have a right to use our mark

16  or our pottery.  And here we have it on their website.  So

17  we're being associated.

18          MR. WILLETT:  Can we go to Exhibit 108.

19  Q    Can you identify what this is, sir?

20  A    That's an email from November 4th of 2021.

21  Q    And it says emersonform@emersoncreekpottery.com.

22       Do you know what that is?

23  A    Yeah, it's come to our website.  It would have come to the

24  office website -- well, office email, I mean.  Sorry.

25  Q    And is this the kind of thing, meaning if you clicked to

1  email "contact us," or something like that?

2  A    Right.  We have a retail and a wholesale contact us.  So

3  this would have come to I think the wholesale one.

4  Q    And what's your understanding, what is this person trying

5  to do here.

6           MR. WILLETT:  Well, actually, before I do that, I'll

7  go ahead and move to admit Plaintiff's 108?

8           MR. LAUBSCHER:  No objection.

9           THE COURT:  Be admitted.

10           (Plaintiff Exhibit 108 marked.)

11           (Plaintiff Exhibit 108 admitted.)

12   BY MR. WILLETT:

13  Q    Again, this is November 4, 2021, and this is something

14  that was presented to you by email?

15  A    Yes.  This is junk mail we get.  It's not the first time

16  it happens when they think that we are located in Oswego.

17  They're trying to sell us one thing or another, or advertising,

18  or whatever.  This looks likes some kind of funding something,

19  whatever.  But yeah, we get those things fairly frequently.

20  It's just junk -- to me it's junk email.  I delete most of it

21  when I see it.

22  Q    Sir, are you the sole shareholder of Emerson Creek

23  Pottery?

24  A    I am.

25  Q    And what's your plan with Emerson Creek Pottery?

J. Leavitt - Cross

1  A    I'm in the process of investing shares of the company to

2  my children.  They're both going to work equally and take over

3  the company as I move out of it.

4  Q    And when do you think that's going to happen?

5  A    Oh, it's happening now.

6  Q    And the children work for the company now?

7  A    Yes, they do.

8  Q    And I know we'll hear from Ellena in a little bit.

9  What's -- what are the types of things that you have her doing

10  right now?

11  A    She does a bunch of stuff.  She's actually doing all the

12  decorating right now; she does a lot of the design; she's doing

13  marketing, working with special clients to develop new lines of

14  pottery or decorations that we work with them; she actually

15  works in production; she is learning how to take over the

16  office -- running of the office so she can then hire and train

17  somebody at some point when she does haven't time to do it;

18  financial stuff; a little bit of everything.

19          MR. WILLETT:  I don't have any further questions at

20  this time, Your Honor.

21          THE COURT:  All right.

22                     CROSS-EXAMINATION

23   BY MR. LAUBSCHER:

24  Q   Mr. Leavitt, I'd like to refer back to this agreement of

25  March 21, 2001.

1      MR. LAUBSCHER:  Mike, can you pull that up?

2      MR. FRETWELL:  Do you have the number, by any chance?

3  Do you happen to have the defense or plaintiff's number?

4      MR. LAUBSCHER:  Here's the exhibit list from

5  yesterday.

6      MR. FRETWELL:  Plaintiff's 57.

7   BY MR. LAUBSCHER:

8  Q    Mr. Leavitt, would you explain again your purpose for

9  creating this agreement?

10 A    Yeah.  Like I said, this is basically to memorialize the

11 agreement and conversations that we had when they came down and

12 met with me.

13 Q    And why did you make the agreement between Emerson Creek

14 Pottery and Ron Wehrli?

15 A    Because he was -- it was my understanding that he was the

16 financial backer of the enterprise.

17 Q    And I believe you testified yesterday that you either

18 faxed or emailed this agreement to Mr. Wehrli?

19 A    Yes, that's my recollection.

20 Q    Now, do you have any evidence that you faxed or emailed

21 it?

22 A    No.

23 Q    Do you know whether you sent it return receipt requested?

24 A    I did not.

25 Q    Do you know whether you sent it by certified mail?

1  A    No.

2  Q    But you're certain that you sent it?

3  A    That's my recollection, yes.

4  Q    Did Mr. Wehrli ever acknowledge that he received it?

5  A    No.

6  Q    Did you ever follow up with Mr. Wehrli about whether he

7  received it?

8  A    No.

9  Q    Did you ever have any -- you had subsequent conversations

10 with Mr. Wehrli about pottery purchases, correct?

11 A    I don't believe I did.  I believe that my conversations

12 were with Chris.

13 Q    So you never had any conversations with Mr. Wehrli

14 after your initial meeting --

15 A    I may have occasionally.  I really don't remember.

16 Q    Just -- if you would, just let me finish asking the

17 question before you answer.

18 A    Sorry.

19 Q    When did you learn that Mr. Wehrli was not in charge of

20 the defendant's company?

21 A    I'm assuming that you're referring to when she got married

22 to Dave Demiduk, but I'm not --

23 Q    Well, let me ask you this:  What was your understanding of

24 Mr. Wehrli's involvement with Countryview Pottery?

25 A    It's my understanding that it was his land, that he was

1  the financial backer of the company, and that he paid the bills

2  and such, or his company did.

3  Q    Did you believe that he was an owner of this business that

4  Chris was starting in the gift shop business?

5  A    That was my understanding.

6  Q    Is that your understanding today?

7  A    Well, he's not associated with them any longer, but at the

8  time --

9  Q    So when did you come to understand that he was no longer

10 affiliated with any of the defendants?

11 A    At some point when she informed me that she was going to

12 be married to Dave Demiduk.

13 Q    And that would have been around 2008 or 2010?

14 A    I thought it was 2010.  Whatever, yeah.

15 Q    And up until that point, it was Mr. Wehrli's company that

16 paid for all the pottery that Ms. Demiduk ordered from you?

17 A    Yeah.  I don't remember the details.  At some point she

18 may have been paying directly from her store.  I don't know.  I

19 didn't know what was going on with her personal life.

20 Q    So in 2010 when you learned that Mr. Wehrli was no longer

21 in the picture, did you send this agreement to Ms. Demiduk?

22 A    No.

23 Q    Did you send it to Mr. Demiduk?

24 A    No.

25 Q    Did you send it to any of the defendants?

1  A    No.

2  Q    Did you send it to anyone?

3  A    No.

4  Q    Did Ms. Demiduk ever agree to the terms of this agreement?

5  A    Not directly, but it represented the conversation that we

6  all had and agreed to, and what we operated under all those

7  years.

8  Q    But I'm asking you if she ever acknowledged, either orally

9  or in writing, an agreement --

10 A    No.

11 Q    -- with those terms?

12 A    No.

13 Q    Did she ever tell you that she had even seen this

14 agreement?

15 A    No.

16 Q    Did Mr. Demiduk ever tell you that he had seen this

17 agreement?

18 A    No.

19 Q    So none of the defendants, to your knowledge -- to your

20 testimony have ever acknowledged either receipt of this

21 agreement or agreement to the terms of the agreement?

22 A    Not directly, no.

23 Q    It says in the first paragraph -- or item 1, I should say,

24 "products at a discount from regular retail prices."

25       Do you see that?

J. Leavitt - Cross

1    A    I do.

2         MR. LAUBSCHER:  And then could we scroll down, Mike,

3    so we can see the bottom.

4    Q    And then we have a discussion of the discount rate.  Do

5    you see that?

6    A    I do.

7    Q    I believe you testified yesterday that this was a discount

8    off of the wholesale price?

9    A    That's correct.

10   Q    But doesn't this agreement -- scroll back up, please --

11   say that it was a discount off of the regular retail prices?

12   A    Well, yeah, it does say that.  But, you know, it's

13   basically the same thing.

14   Q    Well, wait a minute.  Your regular retail prices and your

15   wholesale prices are the same thing?

16   A    No.  It's my understanding the regular retail price would

17   be twice wholesale.  So I didn't say it exactly right, but the

18   intention was discount off of the wholesale.

19   Q    But how would the defendants know what your intention was?

20   A    Because we discussed it when they had met with me.

21   Q    Item 2 says, "ECP agrees that RW will set up a corporation

22   in Illinois."

23        Do you know if RW actually set up a corporation in

24   Illinois?

25   A    Well, I don't know who physically did it, but they did do

1  that.

2  Q     Did RW set up a corporation in Illinois?

3  A     I can't answer that.

4  Q     You don't know?

5  A     I don't know who did it.  Yeah, somebody did.

6  Q     Right.  But my question is --

7  A     Was it Ron Wehrli or somebody -- one of his agents, or was

8  it Chris?  I don't know which party did it, no.

9  Q     But my point, Mr. Leavitt, is that you say that this

10 document memorializes the agreement that you reached with Ron

11 and Chris during your meeting?

12 A     That's correct.

13 Q     And I'm asking you if Mr. Wehrli did, in fact, set up a

14 corporation in Illinois?

15 A     It's like I said:  A corporation was set up, but I'm not

16 sure if it was Ron Wehrli or his -- I don't know who did it.

17 Q     But was it one of your conditions under this alleged

18 license that you've been talking about for the last day that

19 Mr. Wehrli was going to set up this corporation in Illinois

20 that you were going to be doing business with?

21 A     But that's what happened.  Exactly who signed the

22 paperwork, I don't know.

23 Q     So it's your understanding, then -- or do you understand

24 whether Mr. Wehrli was in violation of the terms of your

25 agreement if he did not set up the corporation in Illinois?

1  A     No, because it happened, and we did business.

2  Q     Okay.  Section 2 further says that the store was going to

3  operate with a d/b/a as Emerson Creek Pottery Outlet Store?

4  A     Yes.

5  Q     Do you see that?

6  A     I do.

7  Q     What -- do you know whether the defendants ever used the

8  d/b/a Emerson Creek Pottery Outlet Store?

9  A     I believe they call it Emerson Creek Pottery.  I'm not

10 sure if they had that word "outlet store" on there or not.

11 Q     Right.  But your -- the agreement was they were going to

12 call it an outlet store, correct?

13 A     Right.  My intention there was -- and it's reflected by

14 the discount that they were getting -- that they were going to

15 get a discount off of wholesale.  They were going to get

16 seconds, or whatever, and it was going to be an outlet store in

17 the sense that people would get a discount.

18 Q     But it wasn't an outlet store, was it?

19 A     Well, sure it was in the sense that people were getting

20 the pottery below retail.  I sold her the pottery for less than

21 wholesale.  So when she marked it up, it would be sold at less

22 than normal retail, which to me makes it an outlet store.

23 Q     But how would a customer know that they were getting --

24 that they were purchasing pottery that had been prepurchased

25 from you at a discount when the store wasn't even labeled as an

1  outlet store?

2  A    I can't -- yeah, I can't answer to that.

3  Q    Once you learned that they adopted the name Emerson Creek

4  Pottery for the shop, did you contact them and say:  No, you

5  must use Emerson Creek Pottery Outlet Store, as we agreed back

6  when we met?

7  A    No.  No, I didn't.

8  Q    Why not?

9  A    It didn't occur to me.

10 Q    It seems -- so the next sentence, section 3 says, "ECP

11 will furnish its pottery and accessories carried in its

12 wholesale catalog."

13     Were there different products in a wholesale catalog from

14 a retail catalog?

15 A    No.

16 Q    So did Emerson Creek Pottery at the time have a retail

17 catalog and a wholesale catalog?

18 A    No.  We had a catalog and we have a printed price sheet

19 for either wholesale or retail.  So we only had one catalog.

20 Q    One catalog with two prices, a retail price and a

21 wholesale price?

22 A    Correct.

23 Q    You testified yesterday that you have around 200 stores

24 around the country that sell your product; is that correct?

25 A    Yes.  Correct.

J. Leavitt - Cross

1  Q    Do they sell product -- do they purchase product at the

2  retail price or at the wholesale price?

3  A    No.  At the wholesale price.

4  Q    Do they purchase product that is of first quality or of

5  second quality?

6  A    First quality.

7  Q    Do any of those retail outlets provide outlet stores?

8  A    No.

9  Q    So other than your store in Bedford, Virginia, the only

10 other retail store under Emerson Creek Pottery that was selling

11 seconds was the store in Oswego, correct?

12 A    Correct.

13 Q    And yet you didn't require them to use the term "outlet

14 store."  And so, therefore, wouldn't a customer of Emerson

15 Creek Pottery in Oswego, Illinois, when they see your pottery

16 and purchase it, wouldn't they assume that they're purchasing

17 the first-rate, high-quality pottery?

18 A    Well, they might.  But the truth is, the difference

19 between our first and seconds is very minimal.  We grade

20 everything very highly.  So the seconds are not cracked or

21 warped or anything like that.  They might have a little ink

22 mark on them, or such, or a teeny little glaze flaw.  There's

23 very little difference.

24 Q    Who makes the determination as to whether a piece of

25 pottery, after it's finished manufacturing, goes into the

1  first-quality, high-quality bin or the second-quality wholesale

2  bin?

3  A    The person who is grading the pottery when it comes out of

4  the kiln.

5  Q    What percentage of your pottery coming out of the kiln is

6  first quality versus second quality?

7  A    Probably less than 10 percent at second quality.

8  Q    When you met with Mr. Wehrli and Ms. Demiduk back in 2000

9  and that initial purchase was made by Mr. Wehrli of pottery, I

10  believe it was a truckload full.  It was a big purchase.

11  A    Well, I don't know if it was a truckload.  It was probably

12  several pallets, yes.

13  Q    Was that all of your secondhand-quality pottery?

14  A    No.  It was all -- it was all first-quality pottery that

15  we had -- where we had quit making that line.  We had a lot of

16  excess stock of it.

17  Q    So it's like -- excuse me.  I didn't mean to cut you off.

18  A    Like a closeout.

19  Q    Like it's like last year's pottery.  It wasn't the current

20  stuff?

21  A    Yes.

22  Q    And all of the pottery that was purchased by Emerson Creek

23  Pottery in Oswego, was it always closeout, secondhand stuff?

24  A    No.

25  Q    Sometimes when they placed -- let me start over.

1    When the defendants placed an order for pottery, did they
2  specify whether they wanted first-class pottery or high-end
3  pottery versus wholesale?
4  A    No.  They would place an order for what they wanted, and
5  we would bill it.  If we had some seconds, we might mix them
6  in.  But most of it was actually first quality because the
7  orders that they were placing were pretty large, and we didn't
8  have that many seconds.
9  Q    During the 17 years that they purchased pottery from you,
10 where would you say that the defendants ranked in the volume of
11 pottery purchased from you on an annual basis in relation to
12 your other accounts that purchased pottery from you for resale
13 to the public?
14 A    They would have been pretty high up for a great deal of
15 that time.
16 Q    Did you allow any of your other accounts to use Emerson
17 Creek Pottery as part of their store name?
18 A    No.
19 Q    How about any Emerson Creek marks?
20 A    No.
21 Q    Section 4 says that, "RW agrees to keep the store stocked
22 with a minimum of 75 percent ECP products in order to keep
23 using ECP name on the store."
24 A    Uh-huh.
25 Q    What does that mean?

1  A    My intention there was that they would keep the store

2  stocked with most of our pottery, and the rest of it would be

3  accessories that would go with the pottery.

4  Q    Does this section 4 state that they can't sell any pottery

5  under any other trademarks?

6  A    No, it doesn't say that specifically, but I thought that

7  was pretty obvious.

8  Q    Did you ever make it clear to the defendants that they

9  could only sell pottery from Emerson Creek Pottery in their

10  store?

11  A    Like I said, I thought it was obvious.  And during the

12  conversation when they were there, they were going to buy

13  Emerson Creek Pottery, and that's all they were going to sell.

14  So that was my understanding.

15  Q    It may have been obvious to you, but did you ever get any

16  positive statements from the defendants that they would only

17  stock the store with Emerson Creek Pottery purchased from you?

18  A    No.  Well -- no.

19  Q    Thank you.

20      Down in the appendix there is a reference to "licensed

21  designs."

22  A    Uh-huh.

23  Q    I know you went over this a little bit yesterday, but

24  could you just explain for me again what a licensed design was?

25  A    At that time we were licensing a few designs from what we

J. Leavitt - Cross

1  did from Thomas Kincaid, for example, and made a decal -- a

2  decal whenever we did artwork on it.

3  Q    And were these trademark licenses?

4  A    Yes.

5  Q    And were they in writing?

6  A    Yes.

7  Q    How many trademark licenses did you enter into prior to

8  creating this agreement?

9  A    It might have been several.

10  Q    So you were familiar with trademark licenses, then?

11  A    Well, in a sense.  These were great big companies.

12  Q    So why didn't you formulate a trademark license along the

13  lines that you had done for the designs, if you had seen such a

14  license when you did this agreement with --

15  A    Well, I assumed that we were operating with a certain

16  agreement here.  And it's like I said:  I didn't have an

17  attorney on staff, and we're a small business, and I thought we

18  had reached an agreement that this would be adequate.

19  Q    Well, why didn't you call it a license agreement?

20  A    I didn't -- I just didn't put those words in there.

21  Q    So in fact, over the course of this 17-year period that

22  you sold products to the defendants, you learned that they

23  changed their name from first they adopted Emerson Creek

24  Pottery, and then they changed their name to Emerson Creek

25  Tearoom, and then they started using Emerson Creek

J. Leavitt - Cross

1   Pottery & Tearoom, and Emerson Creek Events, and Emerson Creek.

2   Did you ever consider sending them a revised agreement

3   that would identify those specific marks that they could or

4   could not use?

5   A   No, I didn't consider it, no.  I felt like they were using

6   those terms with my permission under the agreement that we had

7   and the terms of business that we were doing.

8   Q   And before any of these changes in names were adopted by

9   the defendants, did they ask for your permission to do it, or

10  did they just do it and you were okay with it?

11  A   I believe there was -- I'm not sure that they asked

12  specifically, but I was aware of it in the emails or phone

13  calls.

14  Q   Right.  So after the fact you were aware of it, and you

15  were fine with it?

16  A   Or they may have discussed that they were going to do it

17  beforehand.  I don't remember the details of every conversation

18  I had.

19  Q   What was your understanding -- I think you testified about

20  this under questioning from Mr. Willett, but how long was this

21  agreement to be in effect?

22  A   Perpetually, unless the terms were violated.

23  Q   And where -- and what would happen if a term was violated?

24  A   We would tell them, like I did, that they had to stop

25  using my name.

J. Leavitt - Cross

1    Q    Well, it seems like we've already identified a number of

2    issues where the terms were violated with regard to Mr. Wehrli

3    setting up a corporation in Illinois, with regard to the name

4    that they were supposed to use.  And yet you never terminated

5    the agreement?

6    A    I think the fact that they didn't put the word "outlet

7    store" on it seems like a very minor issue to me.

8    Q    Were there any termination provisions on behalf of the

9    defendants that if they didn't like the way things were going

10   they could terminate the agreement?

11   A    Nothing was specifically said, but I suppose if they

12   decided they didn't want to buy my pottery, we would have

13   terminated the agreement.

14   Q    When you learned that the defendants were expanding their

15   services beyond the gift shop selling your pottery and

16   accessories -- for example, when they opened the tearoom -- did

17   you ever consider requesting some sort of compensation for that

18   as like a royalty or some other compensation?

19   A    No.  I felt like they were expanding their license by

20   doing it, that that was going to accrue to my benefit because

21   of both the publicity and the fact that they would sell more

22   pottery.

23   Q    And how about for the events business?

24   A    The same thing.  Well, not sell more pottery, but it's

25   expanding the use of my mark and the goodwill of my name that

1 would be associated with it.

2 Q    Did you put any parameters as to how the quality of the

3 services that were provided either through the tearoom or the

4 restaurant or the events business were being set?

5 A    I didn't put it in writing, but by my observation of what

6 they did with the photographs or the website that I could see,

7 I could see it was all very high quality.

8 Q    Well, it sounds like you were reacting to what they were

9 doing and approving it, rather than dictating to them what they

10 must do to use your mark?

11 A    Well, I wouldn't put it quite that way.

12 Q    Well, how would you put it?

13 A    I was -- I was allowing them to do that, and it was fine

14 with me at that point.

15 Q    Who are some of your competitors, your largest

16 competitors?

17 A    My largest competitors, East Fork Pottery, Bennington,

18 people like that.

19 Q    And these are all pottery manufacturers?

20 A    Correct.

21 Q    So are you aware of any restaurants or tearooms that are

22 competitors to yours -- of yours?

23 A    I'm not following you.

24 Q    Do you know of any restaurants or tearooms that are

25 competitors to you --

J. Leavitt - Cross

1  A    No.

2  Q    -- of your company?

3  A    No.  No.

4  Q    Do you know of any events businesses that are competitors

5  to you?

6  A    No.  No.

7  Q    So you would say that your competitors are pretty much in

8  the pottery field?

9  A    Correct.

10 Q    Pottery manufacturers?

11 A    Yes.

12 Q    Do you provide any other services beyond manufacturing and

13 selling pottery?

14 A    We have -- at our outlet store, we have offered snacks and

15 that sort of thing.

16 Q    I'm sorry, I didn't --

17 A    I said at our outlet store at the pottery we have offered

18 snacks and that sort of thing, but we don't actually have a

19 restaurant.

20 Q    Do you have like a vending machine or something?

21 A    Well, we did.  We used to keep stuff in the icebox that

22 people could buy and eat on the grounds.

23 Q    But as far as operating other businesses or selling other

24 products, right now -- and really since 1977 -- you've been a

25 pottery business?

1  A     Correct.

2          MR. LAUBSCHER:  Pull up the exhibit that shows the

3  earlier version of the mark -- the Emerson Creek Pottery mark

4  that Mr. -- the stylized version that Mr. Leavitt used.

5  Q     While they look for that, I believe you testified that you

6  revised your stylized mark?

7  A     Yeah, we've changed it from time to time, yes.

8  Q     And with regard to your trademark registrations, it's my

9  understanding you have one that we've seen on the word mark,

10 and then you have a second registration on the stylized mark

11 with the logo mark?

12 A     That's correct.

13 Q     And both of those registrations include the word

14 "pottery," correct?

15 A     I believe that's so.

16 Q     And I believe you testified that you were advised -- well,

17 let me strike that.

18       With regard to filing your Emerson Creek Pottery word

19 mark, why did you include the word "pottery"?

20 A     That's what we were putting on the bottom of our pots at

21 that time.

22 Q     How often have you used -- well, strike that.

23       There was an exhibit shown earlier where you had a display

24 piece with the words "Emerson Creek" on it?

25 A     Uh-huh.

J. Leavitt - Cross

1  Q    And I think that was back from the early 1980s?

2  A    Correct.

3  Q    And I think there was also evidence showing the bottom of

4  pots that were marked with Emerson Creek and the year?

5  A    Yes, that's correct.

6  Q    And most of those, I believe, were 1983?

7  A    Well, I think during that whole time frame.  But yeah,

8  uh-huh.

9  Q    So are you using Emerson Creek without the word "pottery"

10  as a trademark today?

11  A    We've referred to ourselves both as "Emerson Creek" and

12  "Emerson Creek Pottery" I think in our literature, and our

13  general reference to ourselves is both.

14  Q    So let me be a little bit more specific.  When I say a

15  trademark, I'm talking about using Emerson Creek in connection

16  with actual pottery products.

17       Do you do that?

18  A    Well, the stamp that we're using now says "Emerson Creek

19  Pottery."  It doesn't say "Emerson Creek," if that's what

20  you're --

21  Q    Right.  So you don't have any pottery that you sell that

22  just bears the words "Emerson Creek" without pottery?

23  A    Not at this time.

24  Q    And how long -- when was the last time that you marked

25  your products with "Emerson Creek" without "pottery"?

1  A     Probably sometime in the late '80s, possibly.  I'm not

2  sure.

3  Q     So it's been more than 20 years?

4  A     Yeah.

5  Q     And with regard to your store and your website -- in other

6  words, the retail outlets that you use to sell your pottery --

7  well, let me start -- rephrase this.

8        Are your retail store and the -- your website the only

9  ways that you as Emerson Creek Pottery sell your pottery

10 products?

11 A     Well, we sell them online.  We sell them wholesale.  We

12 sell them in the store.

13 Q     Right.  So you sell them through your store.  You sell

14 them online through your website, and then you sell them

15 through these accounts you have around the country that resell

16 them?

17 A     That's correct.

18 Q     And none of those accounts use Emerson Creek as a name for

19 a business that sells product?

20 A     Yes, that's correct.

21 Q     So the only ways that you -- where you sell product is

22 through your website and through your store.  And both of those

23 have Emerson Creek Pottery on them, correct?

24 A     Yeah, but I think in some of our literature and

25 advertisements and such, we refer to ourselves as Emerson

1  Creek.

2  Q    Okay.  Could you, like, be specific as to what

3  literature -- recent literature you have that wasn't in any of

4  the --

5  A    Yeah, I couldn't tell you off the top of my head.  I can't

6  remember at all.

7  Q    I didn't see it in any of the exhibits that were

8  presented.  I was just asking you if you knew of what --

9  A    Yeah, I don't.

10 Q    Did you happen to see it in any of the exhibits that

11 Mr. Willett took you through yesterday and today?

12 A    I don't think so.

13        MR. WILLETT:  Objection, Your Honor.  There's been a

14 lot of exhibits that have been shown.  If he has documents he

15 wants to show, he can show him the documents.  I think it's

16 argumentative.

17        THE COURT:  Well, if he can answer the question.

18        THE WITNESS:  I'm sorry?

19        MR. LAUBSCHER:  That's okay.  We'll strike it.

20        MR. FRETWELL:  It's not coming up just yet.

21        MR. LAUBSCHER:  Bear with us.  We're trying to call

22 it up.

23        MR. FRETWELL:  My computer is frozen.

24        You said 11, Larry?

25        MR. LAUBSCHER:  Yeah, plaintiff's exhibit.  Switching

J. Leavitt - Cross

1  computers here.  We've got a technical snafu.

2            THE CLERK:  Is it still VGA hookup?

3            MR. FRETWELL:  No.  It's HDMI now.

4   BY MR. LAUBSCHER:

5  Q    Okay.  I believe you testified that you recognize these

6  photographs as representing defendants' facility in Oswego,

7  correct?

8  A    That's correct.

9  Q    And I believe you also testified that you've never visited

10 the facility?

11 A    That's correct.

12 Q    So -- and I believe you further testified that your

13 knowledge of what the defendants were doing was basically

14 gleaned through the communications that you had with

15 Ms. Demiduk and the photographs that she had sent you?

16 A    That's correct.

17           MR. LAUBSCHER:  Can you scroll down through this

18 exhibit?

19 Q    And I believe you testified that these are photographs

20 that show the interior of the store with your pottery on

21 display?

22 A    That's correct, yes.

23 Q    Now, how do we know that that's your pottery?  Let me

24 strike that.

25      Obviously, you can recognize your pottery.  But how would

1  somebody -- you know, a general member of the purchasing

2  public, how would they know that that was your pottery?

3  A    Well, they could look on the back of it.  They could look

4  on the sign to the entrance to the store.

5  Q    Okay.  And if you never visited the store, how would you

6  know whether the defendants were only selling your pottery?

7  A    Well, because she sent me pictures of what appears to be

8  everything in her store.  And I don't see anything but my

9  pottery.

10 Q    Well, was she required to send you photographs of what was

11 in the store?

12 A    She wasn't required, but that was just part of our normal

13 course of events that she informed me of what she was doing.

14 Q    Did you permit the defendants to sell their pottery

15 through the Internet?

16 A    No.

17 Q    Did you tell them they couldn't sell pottery through the

18 Internet?

19 A    Probably at some point.  The Internet really didn't exist

20 as a sales venue at the time we started our relationship.

21 Q    Okay.  So when the Internet sales became popular and you

22 started selling your pottery through the Internet, did you ever

23 tell them that they weren't allowed to sell theirs through the

24 Internet?

25 A    I don't recall specifically, no.

1  Q    Did you put any restrictions on what they did with your

2  pottery once they purchased it from you?

3  A    No.

4  Q    So for example, if they were doing a video trying to

5  promote their wedding business -- and I think you identified --

6  you saw pictures in a video with your pottery in it that I

7  think you said was from the very first purchase that --

8  A    That's correct.

9  Q    Let me just finish.

10      I believe you testified that there was photographs of a

11  wedding couple with your pottery in the background.  And some

12  of it was pottery that came from that very first purchase from

13  back in 2001?

14  A    That's what it looked like.

15  Q    Were they prohibited from using that pottery, you know, as

16  part of a scene in a wedding video?

17  A    Until they breached the license, they were perfectly

18  welcome to.

19  Q    But even afterwards, if they bought your pottery from you

20  and paid you for it, what control did you have over how they

21  could use it?

22  A    Well, once -- before they breached the license, the

23  control was that they were going to sell it.  Once they

24  breached the license, they didn't have a right to sell it or

25  associate themselves with me.

J. Leavitt - Cross

1  Q    Well, suppose I bought a piece of pottery from you.  We

2  don't have a license.  Can you control what I do with that

3  piece of pottery?  If I have a yard sale --

4  A    No.

5  Q    If I have a yard sale, am I allowed to sell that piece of

6  pottery?

7  A    Sure.

8  Q    So why can't they dispose of the pottery?  What difference

9  does it make that --

10  A    We had a long-standing business relationship with an

11  understanding.  It's a little bit different.

12  Q    But if they had excess inventory of thousands of pieces of

13  pottery, and you arbitrarily terminate a license, they're stuck

14  with all this pottery.

15       They're not allowed to get rid of it?

16  A    They could sell it in a different venue where my name

17  wasn't associated with it.

18  Q    So your concern was that they were selling it in a retail

19  outlet or some other outlet that still bore your name?

20  A    After they didn't have the right to use it, yeah, that was

21  my concern.

22  Q    But your name was Emerson Creek Pottery, and they weren't

23  using Emerson Creek Pottery anymore, were they?

24  A    I think they were.

25  Q    As late as earlier this year in the wedding video?

J. Leavitt - Cross

1  A    I believe so.

2  Q    What name are they using today?

3  A    I haven't looked at their website this week, but it has

4  kept that Emerson Creek name, as far as I know, up until the

5  last time I looked at it.

6  Q    Do you monitor the sales of the other 200-and-some vendors

7  that -- or outlets -- I shouldn't say outlets -- retail stores

8  that sell your pottery?

9  A    Well, I look at their sales on a yearly or a quarterly

10  basis, probably, just to see what's going on.

11  Q    And if you notice that, say, a store in -- hypothetically

12  I'll use an example in Denver, Colorado is selling your

13  pottery, and if their sales went down, would you contact them

14  and just find out --

15  A    Yeah, most likely, yes.

16  Q    I'm sorry?

17  A    Yes, most likely.

18  Q    So that was just a matter of your normal course of

19  business, then, was to monitor the sales of your pottery

20  through the various customers that you had?

21  A    Yes.

22  Q    The wholesale customers?

23  A    Correct.

24  Q    And if there was a question about the sales volume, you

25  would contact them?

J. Leavitt - Cross

1    A    Probably in most cases, yes.

2    Q    So all this back-and-forth correspondence you had with

3    Ms. Demiduk about her sales were no different than you would

4    have with any other of your customers?

5    A    Far more extensive.

6    Q    I'm sorry?

7    A    Far more extensive.  I mean, it's not like one possible

8    call or an email once a year.  We had conversations on a

9    regular basis, either phone or email.

10   Q    Or both?

11   A    Or both.

12   Q    And a lot of those conversations were initiated by

13   Ms. Demiduk, weren't they?

14   A    Yes.

15   Q    She sent you photographs and videos and cookbooks of all

16   the things that she was doing, correct?

17   A    That's correct.

18   Q    And she was proud of what she was doing, wasn't she?

19   A    And rightly so.

20   Q    And I believe you said she was one of the best marketing

21   people that you had ever worked with?

22   A    She was excellent, yes.

23           MR. MCLAUGHLIN:  Excuse me, can we switch it over to

24   VGA?

25           MR. FRETWELL:  I think I'm working again.

J. Leavitt - Cross

1     MR. LAUBSCHER:  Call up Plaintiff's Exhibit 128 --

2  no, I'm sorry, 178.  Can you scroll down through that.

3   BY MR. LAUBSCHER:

4  Q    So this is an exhibit, Mr. Leavitt, that you testified to

5  earlier.

6     MR. LAUBSCHER:  And if we could go back to the top.

7  Q    You sent Chris photos of your cabin redo.  This was in

8  March of 2008?

9  A    Yes.

10 Q    Why did you redo your cabin?

11 A    Why did we redo it?  Just to give it a new look, probably.

12 I can't remember exactly.

13 Q    And if we scroll down through these photographs, it looks

14 as if you're kind of merchandising your pottery in the same

15 manner that Chris was.  Did she give you suggestions on how you

16 might display your pottery to increase your sales?

17 A    No, I wouldn't say that, no.  And I didn't -- I generally

18 did not have much to do with the setup of the display in the

19 outlet.

20 Q    Did you control how Chris set up the displays in her

21 store?

22 A    Not directly, no.

23 Q    Did you do it indirectly?

24 A    No.  I just expected her to do it in a high-quality

25 manner, which she did.

1  Q    I believe you testified yesterday with regard to that

2  video, that you didn't object to it because you felt that it

3  increased your brand awareness?

4  A    Which video?

5  Q    The wedding video.

6  A    Yeah.

7  Q    How did the wedding -- this is the video that we just had

8  still screenshots from?

9  A    Right.

10 Q    I believe it's Exhibit 235.

11        MR. LAUBSCHER:  Call that up, Plaintiff's Exhibit

12 235.  You may need to scroll down.  Okay.  Just go to the last

13 page.

14 Q    So here it's identified as ecreekpotteryandtearoom.com

15 from the video?

16 A    Yes.

17 Q    That wasn't your brand, was it?

18 A    Well, yes, it was.  I mean, the pictures were of my

19 pottery in their shop, which was called Emerson Creek Pottery.

20 Q    But the video was titled, as shown on the bottom there,

21 "Day in the Country."  It was to promote the shop as a wedding

22 venue.

23 A    It says, "Emerson Creek, Day in the Country."

24 Q    Right.

25 A    I understood that to be one of their websites.

J. Leavitt - Cross

1  Q    How about the use of "ecreek;" that's not Emerson Creek?

2  A    No.

3  Q    Was the use of "ecreek" acceptable to you?

4  A    Sure.

5  Q    How about after you terminated your alleged license, would

6  that be acceptable to you today, "ecreek?"

7  A    I don't believe -- they quit using that one a long time

8  ago.

9  Q    But if they were to use it today, would you find that to

10 be one of your marks or would it be one of their marks?

11 A    I'm not sure what the answer to that would be.  That's

12 probably getting into legal matters that I'm not versed with.

13         MR. LAUBSCHER:  Pull up Plaintiff's Exhibit 198.

14 Q    There was some discussion yesterday about confusion with

15 regard to Google Maps.

16 A    Correct.

17 Q    Do you recall that?

18 A    I do.

19 Q    And my question to you is:  What type of confusion was

20 there?

21 A    As I recall, they were confusing two locations where they

22 were.

23 Q    Who was confused?

24 A    Google.

25 Q    Are you aware of any customers being confused between the

1  two locations?

2  A    Sure.

3  Q    And do you have evidence of that?

4  A    I have verbal evidence from my store manager telling me

5  that at least on one occasion she had a person come to our

6  store that had reservations at the tearoom, and they were

7  pretty annoyed when it turned out that they were 700 miles away

8  from where they were meant to be.

9  Q    Do you have any documents that would verify this evidence

10 of consumer confusion?

11 A    I believe there is social media -- well, images on social

12 media that would confirm it, yes.

13 Q    But I'm interested in customers being confused between the

14 two businesses; not Internet confusion, but just customers.

15 A    Well, I just gave you one example where somebody had come

16 to my store thinking they were at the other one.

17 Q    And how many times has this occurred over the last five

18 years?

19 A    With a reservation I think that was the only occasion, but

20 there are a number of other occasions that my store manager had

21 mentioned that people had come in there and they were confused.

22 Q    And did you document these instances?

23 A    No.  It never occurred to me.

24 Q    So collectively over five years you've identified one.

25 How many do you think there were?

1  A    Well, the last time I talked to her, she said maybe ten a

2  year, but this was just her recollection.

3  Q    Okay.  Thank you.

4      You mentioned Brown Bag pottery, I believe, and you

5  purchased Brown Bag?

6  A    Brown Bag Designs.

7  Q    Design.

8      Was that a pottery company?

9  A    Yeah.

10  Q    And when did you purchase that?

11  A    That would have been in '16, I believe, early in '16

12  maybe.

13  Q    And did you execute a purchase agreement?

14  A    I did.

15  Q    And was there also -- I believe you said Brown Bag had a

16  number of trademarks?

17  A    Correct.

18  Q    Did Brown Bag execute an assignment of those trademarks to

19  your company?

20  A    Yeah, that was -- well, part of the purchase agreement was

21  once I had paid off the loan, that those trademarks would

22  transfer.

23  Q    And I believe you then testified that having gone through

24  all that trademark work that you acquired from Brown Bag, it

25  kind of made you realize that you needed to be better about

1  protecting your mark; is that correct?

2  A    That's correct.

3  Q    And then did you think -- did you think in terms of --

4  strike that.

5       Was it following the Brown Bag purchase that you sent a

6  more formal agreement to Ms. Demiduk to put in more detail from

7  the earlier agreement from 2001?

8  A    Time-wise it was, yes.

9  Q    And what was in that agreement, the one that you sent her

10 in 2017?

11 A    We simply wanted to formalize the agreement that we

12 already had, and would allow them to keep using the Emerson

13 Creek name.  And all we really wanted was that they would put

14 on their literature and website, social media, etc. an

15 acknowledgment that Emerson Creek Pottery is our registered

16 name and they were using it with permission.

17 Q    So there were more details in this other agreement, this

18 2017 agreement, than were in your draft agreement back from --

19 A    Yes.

20 Q    And did the Demiduks agree to the terms of your new

21 agreement?

22 A    No, they did not.

23 Q    And I believe you testified earlier you don't have any

24 evidence that they agreed to the terms of your first agreement?

25 A    Well, they didn't specifically, but we conducted business

1  basically exactly along those terms for many years.

2  Q    Well, they purchased pottery from you at a discount, and

3  they paid you for it, and they paid the freight?

4  A    True.

5  Q    But some of the other terms of that agreement we went

6  through you had identified where they didn't.

7  A    Well, I don't believe they used the word "outlet" on it,

8  no.

9  Q    You testified yesterday about a square plate.

10       Do you recall that?

11  A    Yes.

12  Q    And this was something that I believe Chris presented to

13  you and asked if you could manufacture?

14  A    That is correct.

15  Q    Do you know how she acquired that square plate?

16  A    She probably bought it at an example at a show -- saw it

17  at a show, a trade show.

18  Q    Do you know whether she was selling a square plate that

19  wasn't an Emerson Creek Pottery square plate?

20  A    I do not believe she was, no.

21  Q    And this time period that you think she purchased it at a

22  show was back in 2008?

23  A    Whenever those emails were.  I don't remember.  Yeah.

24  Q    But it was quite awhile ago?

25  A    Yeah, it was.

1      MR. LAUBSCHER:  Can you pull up Plaintiff's Exhibit

2   45.

3   Q    Okay.  This is a document you went over this morning with

4   Mr. Willett with regard to issues with problems with your

5   website?

6   A    Yes.

7      THE COURT:  Before we get into this, I think it's

8   time for a lunch recess.

9      Members of the jury, you may retire now to the jury

10  room, and then we'll have our -- and leave for lunch.  And I'll

11  ask you to come back by 1:30.

12     Of course, during the recess, do not discuss the case

13  with anyone or allow anyone to discuss it with you, or remain

14  within the hearing of anyone discussing it.

15     And again, Carmen, is it best if they return

16  downstairs?

17     THE CLERK:  Yes.

18     THE COURT:  Return to the downstairs assembly room

19  when you come back.  You may be excused.

20  **(Jury out, 12:30 p.m.)**

21     (Recess.)

22     THE COURT:  No motions before the jury?

23     MR. WILLETT:  Not from the plaintiffs, Your Honor.

24     THE COURT:  Call the jury.  The witness may return.

25  **(Jury in, 1:34 p.m.)**

1          THE COURT:  Thank you.  You may be seated and resume,

2   please.

3    BY MR. LAUBSCHER:

4   Q    Mr. Leavitt, I want to call up -- have Mike call up

5   Plaintiff's Exhibit 45.

6          You testified with regard to this exhibit this morning.

7   This is the one with regard to the confusion that you were

8   concerned about in connection with from Google -- Google Maps.

9          Do you recall that testimony?

10  A    Yes.

11  Q    I believe you testified that --

12          MR. LAUBSCHER:  Let's see.  Scroll down a little bit.

13  Oh, wait, excuse me.  I'm sorry.  In this email -- scroll down

14  so we can see the whole thing, Mike -- I mean, up.  Sorry.

15  Q    So this is the email on March 1st, 2017.

16          MR. MCLAUGHLIN:  Excuse me.  We're just having

17  trouble hearing.  I just want to make sure the speaker is

18  working.

19          MR. LAUBSCHER:  You can't hear?

20          MR. MCLAUGHLIN:  Not very well.

21          (Off the record discussion).

22   BY MR. LAUBSCHER:

23  Q    So in any event, we're back on Exhibit 45, the email from

24  you to Dave, March 1st, 2017.

25          Second paragraph of that email, "Keep in mind that Emerson

1  Creek Pottery is our trademark name, and you should only use it

2  appropriately and with 'and tearoom' when referring to your

3  store."

4       Do you see that?

5  A    I do.

6  Q    Defendants did emphasize their use of tearoom.  And as far

7  as you're concerned, that resolved the issue that you had with

8  Google?

9  A    I think it resolved that particular issue at that time.

10 Q    And so from your -- why did it resolve that issue?

11 A    I believe it helped with the confusion.

12 Q    I'm sorry?

13 A    I think it helped with the confusion.

14 Q    It helped eliminate confusion?

15 A    I think it helped, yes.

16 Q    You testified earlier that you were monitoring the

17 purchases of pottery by the defendants from Emerson Creek

18 Pottery, and you would monitor when they go up and down and

19 whatnot.

20      Did you also monitor the sales of the tearoom?

21 A    No.

22 Q    Why not?

23 A    Because I wasn't selling her food for the tearoom.  It

24 didn't -- I didn't feel a need to.

25 Q    Well, I think you said that you approved of them using

1  "and tearoom" because it was enhancing your brand.  And I was

2  just wondering if there was any way that you were able to kind

3  of monetize or determine the value of how that was being

4  enhanced?

5  A    I did not.  I just wanted to make sure they were doing a

6  nice job with it.

7  Q    Okay.  And how about with regard to the events business?

8  A    It would be the same.

9  Q    So you didn't monitor the sales or --

10 A    No.

11 Q    -- revenues from events?  Numbers of events being held or

12 anything like that?

13 A    No.

14 Q    Okay.  And I believe you testified also that during the 17

15 years that you all had a relationship, Chris invited you to

16 come up and visit her facility on a number of occasions, but

17 you were basically too busy to do that?

18 A    That's correct.

19 Q    And yet you also testified that from the pottery end of

20 the business, they were one of your top customers that you sold

21 to for resale of pottery, correct?

22 A    For part of that period, yes.

23 Q    And then also they expanded into businesses that you

24 weren't familiar with or you hadn't offered before, mainly the

25 tearoom/restaurant business and the events business.  And so

1 they were using your mark in connection with services that

2 previously had never been offered under your mark; is that

3 correct?

4 A    That's true.

5 Q    So don't you think it would have been worthwhile, if you

6 were going to control the nature and quality of those services,

7 that you go visit and see exactly what was being done?

8 A    Well, perhaps.  But I could tell from the images that I

9 was seeing that they were doing a good job.

10 Q    You could tell from how?

11 A    From looking at website images, images that she sent me,

12 that sort of thing.  I felt like they were doing a good job.

13 Q    So you basically approved of these services and what they

14 were doing?

15 A    I did.

16 Q    So speaking of monitoring the websites, I'm now going to

17 ask Mike to call up different exhibits showing defendants'

18 websites over various periods of time.

19       The first one I think we have is from 2002.  And we showed

20 you this exhibit before, or this -- and do you see on this

21 wagon --

22            MR. LAUBSCHER:  Can you blow it up a little, Mike?

23            THE CLERK:  Is this a previously admitted exhibit?

24            MR. LAUBSCHER:  I'm sorry?

25            THE CLERK:  Is this previously admitted?  I just want

J. Leavitt - Cross

1    to be sure I can show it to the jury.

2              MR. LAUBSCHER:  Yes.

3              THE CLERK:  What's the number?

4              MR. MCLAUGHLIN:  We're going to admit it as

5    Defendants' Exhibit Number 40.  It is a previously admitted

6    exhibit, but for our purposes we'll call it Defendants' 40.

7              MR. LAUBSCHER:  I'd ask that it be admitted as Number

8    40.

9              THE COURT:  It will be admitted.

10             (Defense Exhibit 40 marked.)

11             (Defense Exhibit 40 admitted.)

12    BY MR. LAUBSCHER:

13   Q    So on the wagon there and also on the rock to the right,

14   do you see the Emerson Creek Pottery mark?

15        Do you have it on your screen?

16   A    I do now.

17             MR. LAUBSCHER:  Mike, move it over so we can see the

18   rock, too.

19   Q    Did you approve the use of those logo marks?

20   A    Yes.

21   Q    Do you understand when I use the term "logo mark," that

22   it's more than just the words, but it's the words and the

23   design?

24   A    Yeah.

25   Q    But you approved those?

1  A    Yes.

2          MR. LAUBSCHER:  Okay.  Next we'll call up a web

3  page -- defendants' web page from 2004.

4          And for identification -- I don't think this has been

5  entered before, but even if it has, we'll ask that this be

6  entered as Defendants' Exhibit 41.

7          MR. WILLETT:  I'm just going to object to the

8  description of this as a website.  It's not a website.

9          MR. LAUBSCHER:  Good.  Thank you for straightening me

10 out.

11         MR. WILLETT:  I wanted to just tell you that, but I

12 figured --

13         MR. LAUBSCHER:  Just kick me under the table.  That's

14 fine.  No problem.  Thank you.

15  BY MR. LAUBSCHER:

16 Q    So this again shows a logo mark of Emerson Creek Pottery

17 with the house on it.  Did you approve that?

18 A    Yes.  That looks like a postcard.

19 Q    Okay.  Next we have something from 2009.  I'll wait to

20 until I see it to figure out if it's a web page.

21         Okay.  This appears to be a web page, Defendants' Exhibit

22 43.  And I'll ask that it be entered as Defendants' Exhibit 43.

23             THE COURT:  Be admitted.

24         (Defense Exhibit 43 marked.)

25         (Defense Exhibit 43 admitted.)

1        MR. LAUBSCHER:  Thank you.

2    BY MR. LAUBSCHER:

3    Q    Again we see the wagon with the Emerson Creek Pottery mark

4    on it.  But on the left you see EC, Emerson Creek

5    Pottery & Tearoom in a circle?

6    A    I do.

7    Q    Did you ever use any marks with the letters EC?

8    A    No.

9    Q    Did you approve of use of this mark?

10   A    Well, I didn't look at that as a mark.  It just looks like

11   part of a graphic.

12   Q    Part of what?

13   A    Part of a graphic that's on a website.  It doesn't look

14   like -- I wouldn't have called that a mark.

15   Q    Well, it's used to identify the defendants' business,

16   isn't it?

17   A    Pardon?

18   Q    I say this design, this graphic, is used to identify the

19   defendants' business; is it not?

20   A    Well, that's part of it, yeah.

21   Q    So that -- in your opinion, is that a trademark or a

22   service mark?

23   A    I don't think I could testify to that.  I don't have the

24   expertise whether it's a trademark or a service mark or not.

25   Q    How about your understanding?

J. Leavitt - Cross

1    A    I wouldn't have thought that.  No, I would have thought

2    that was just a graphic.  That was part of their website.

3    Q    Okay.  Did you have any objections to that graphic?

4    A    No.

5    Q    Okay.  Next we have one from 2012.  And again, here we

6    see --

7              MR. LAUBSCHER:  You can blow up just the logo portion

8    up there.

9    Q    You see the letters EC again, a little bit different.  Now

10   they're in a square, and we see the words "Emerson Creek

11   Pottery & Tearoom" to the right of the square.

12             Do you see that?

13   A    I do.

14   Q    Did you approve of that?

15   A    Yes.

16   Q    No objections?

17   A    No.

18             MR. MCLAUGHLIN:  For the record, if we could note

19   this is Defendants' Exhibit 45 for identification, please.

20             MR. LAUBSCHER:  Oh, thank you.

21             We ask that this be admitted as Defendants' Exhibit

22   45.

23             THE COURT:  Be admitted.

24             (Defense Exhibit 45 marked.)

25             (Defense Exhibit 45 admitted.)

1    BY MR. LAUBSCHER:

2   Q    Next we have a web page from 2016.

3        Okay.  And do you see the EC to the left there in a

4   circle?

5   A    I do.

6   Q    And then do you see Emerson Creek Pottery -- Emerson Creek

7   Pottery & Tearoom just to the right of that circle in the

8   center portion of the page?

9   A    Uh-huh.  Yes.

10  Q    Was that acceptable to you?

11  A    Yes.

12  Q    This was Exhibit --

13            MR. FRETWELL:  This is not in the exhibit list.

14            MR. LAUBSCHER:  Oh, okay.  So we'll assign it an

15  exhibit number.

16            MR. FRETWELL:  66 is what it's going to have to be.

17            MR. LAUBSCHER:  We'll ask that this be entered as

18  Defendants' Exhibit 66.

19            THE COURT:  Be admitted.

20            (Defense Exhibit 66 marked.)

21            (Defense Exhibit 66 admitted.)

22   BY MR. LAUBSCHER:

23  Q    Next we have a web page from 2018.

24            MR. GOODRUM:  What were the Bates numbers for

25  Defendants' 66, please?

1    MR. FRETWELL:  Sure.  It might take me a minute.  It

2 looks like ECP00657.

3    MR. GOODRUM:  Thank you.

4    MR. LAUBSCHER:  Okay.  Can you blow it up, Mike, so

5 that the logo in the middle there appears.

6  BY MR. LAUBSCHER:

7 Q    Okay.  Have you seen this logo before, Mr. Leavitt?

8 A    I've seen that website.

9 Q    And specifically, have you seen the logo shown on the

10 website?

11 A    Yes.

12 Q    Did you ever have any objections to it?

13 A    I did not.

14    MR. FRETWELL:  This is 39.

15    MR. LAUBSCHER:  Okay.  We ask that this be entered as

16 Defendants' Exhibit 39.

17    THE COURT:  Be admitted.

18    (Defense Exhibit 39 marked.)

19    (Defense Exhibit 39 admitted.)

20  BY MR. LAUBSCHER:

21 Q    And then we have a website from 2019.

22    And again, do you see that logo on there, Emerson Creek

23 Events?

24 A    Uh-huh.

25 Q    Have you seen that before?

1  A    Yeah.

2  Q    And did you have any objection to it?

3  A    Well, I think that this dates from after we sent them a

4  cease and desist.  So yeah, I would.

5  Q    Because it was after the cease and desist letter; that's

6  why you would object to it?

7  A    I believe that's correct.

8           MR. LAUBSCHER:  Okay.  And this is Defendants'

9  Exhibit?

10          MR. FRETWELL:  1.

11          MR. LAUBSCHER:  1.  Ask that it be entered.

12          THE COURT:  Be admitted.

13          MR. LAUBSCHER:  Thank you.

14          (Defense Exhibit 1 marked.)

15          (Defense Exhibit 1 admitted.)

16   BY MR. LAUBSCHER:

17  Q    So you mentioned the cease and desist letter.  And that

18  was in 2018, correct?

19  A    Yes.

20  Q    January of 2018.

21        And this lawsuit that we're here today was filed in August

22  of 2020; is that correct?

23  A    I believe.

24  Q    Can you explain why there was a delay in bringing this

25  lawsuit almost I guess two and a half years?

J. Leavitt - Cross

1  A    I believe there was a back and forth between my attorney

2  and their attorney to try to resolve the matter.  And we were

3  unable to get anywhere.  And finally felt in order to keep them

4  from continuing to use our name and attempt to register our

5  trademarks, that we would have to take them to court.

6  Q    Okay.  And as we sit here today now in 2022, what impact

7  is the defendants' business having on your business?

8  A    The fact that they're using their name is causing harm to

9  me because it associates them with us where we no longer have

10 an association.

11 Q    And how are they associated with you?

12 A    Through using the Emerson Creek name.

13 Q    But does the public -- I mean, are you aware of any

14 association in the minds of general consumers that there is an

15 association between the defendants and you?

16 A    I think that that comes about from confusing Google

17 searches, social media, Instagram, that kind of thing.

18 Q    And how are you being damaged by that association?

19 A    Because they're assuming my name when they don't have a

20 right to.

21 Q    Are they -- are you losing any business because of this

22 alleged association?

23 A    I can't testify to that because I don't know what people's

24 behavior is on the website.  When they go do a Google search

25 for "Emerson Creek," for example, and they come up before me, I

J. Leavitt - Redirect

1  don't know if they're going to scroll down and find us, or if

2  they're just going to click away and I just lost a sale.  It's

3  hard -- I can't quantify that.

4  Q    But you can't lose a sale to the defendants because they

5  don't sell pottery?

6  A    No, but I could have lost a sale because somebody thought:

7  Oh, that's an event space; they don't sell pottery.

8  Q    And is there any other type of damage that's being

9  incurred by Emerson Creek Pottery by the actions -- current

10  activities of the defendants today?

11  A    I think the primary damage is the fact that there is this

12  false association that's implied by them using my marks.

13  Q    But you're not aware of any financial damages that you've

14  incurred?

15  A    I can't quantify that.

16         MR. LAUBSCHER:  No further questions, Your Honor.

17         THE COURT:  Any redirect?

18         MR. WILLETT:  Yes, Your Honor.  Just a few questions.

19                    REDIRECT EXAMINATION

20   BY MR. WILLETT:

21  Q    Mr. Leavitt, a few follow-up questions from the questions

22  that you just answered.

23         There were some questions about the use of Emerson Creek,

24  just Emerson Creek.

25         Do you recall those questions?

1    A      I do.

2    Q      I'd like to direct your attention to a previously admitted

3    exhibit, Exhibit 22 -- I'm sorry, 222 -- and specifically

4    page -- go to pages 22 -- or page 22 of that document.

5           You testified a little bit earlier about this, what this

6    was.  But if you could remind the Court, what is this document?

7    A      It's a point-of-sale rack card for our store in Bedford.

8    Q      Okay.  And when you say a point-of-sale rack card, what

9    does that mean?

10   A      It would be displayed in places that -- like visitor

11   centers or stores that have racks where you put your cards for

12   tourists.

13   Q      And is it also utilized when actually selling the pottery?

14   A      Yeah, it's in the store too.  Uh-huh.

15   Q      And are both sides of this depicted?

16   A      Yes, that's correct.

17          MR. WILLETT:  If you can go to the next document or

18   the next page.

19   Q      The same, this is another version of that?

20   A      Yeah, it's a different year of the same -- exact same

21   thing.

22   Q      And do you still use point-of-sale cards?

23   A      We do, yes.

24   Q      Okay.  And do you know if these are the ones you still

25   use?

1   A   I think that's the one we're using.  We don't change it

2   that often.

3           MR. WILLETT:  Next if we could go to pages 42 to 44.

4   Q   And I think you identified this as well.  What do we have

5   depicted here?

6   A   You're going to have to scroll down.

7           MR. WILLETT:  Yeah, scroll down, Ashley.

8           THE WITNESS:  Yeah, that's -- it's a --

9           MR. WILLETT:  Go back up.

10          THE WITNESS:  I think it might have been from our

11  catalog.

12  Q   And the catalog was something that you did on --

13  A   We had a catalog, yeah.

14  Q   I didn't mean to interrupt you.

15  A   Oh, I say we used to do a printed catalog every year or

16  every couple of years.

17  Q   And I know we looked at a version yesterday.  I had handed

18  you the 2018 catalog.

19  A   Yes.  Correct.

20          MR. WILLETT:  What exhibit was that, Ashley?  Exhibit

21  2.

22  Q   But this was the same type of catalog?

23  A   Yes.

24  Q   You did that at least through 2018?

25  A   Yeah.

J. Leavitt - Redirect

1   Q    Let me also ask you this -- well, I'll come back to that

2   in a second.

3        Let me also direct you to -- if you'll display the next

4   document.  Now, this has not been marked yet as an exhibit, but

5   I'm going to ask the witness what it is.

6        If you could identify this, sir?

7   A    That's from our "about us" page or history page on our

8   website.

9   Q    And do you understand this is the current website?

10  A    Yes.

11          MR. WILLETT:  And I'd move that this be admitted as

12  our next exhibit, which would be 240.

13          MR. LAUBSCHER:  No objection.

14          THE COURT:  Be admitted.

15          (Plaintiff Exhibit 240 marked.)

16          (Plaintiff Exhibit 240 admitted.)

17   BY MR. WILLETT:

18  Q    It looks like another page we saw earlier, but if you flip

19  down it says, "A look-back history of Emerson Creek Pottery and

20  then the name Emerson Creek."

21       Do you see that?

22  A    Yes.

23  Q    Mr. Laubscher just asked you some questions about the

24  filing of the lawsuit, the fact that it was filed in 2020.

25       Do you recall those just a few minutes ago?

1  A    Yes.  Yes.

2  Q    And you mentioned discussions between the parties?

3  A    I did.

4  Q    Do you know, were there any other types of actions that

5  you're aware of between the parties between the date of your

6  cease and desist letter and the filing of this lawsuit?

7  A    I believe that they were trying to register a number of

8  marks with the word "Emerson Creek" in them at the PTO, and

9  they were also -- I think they were trying to oppose us

10 registering some marks too.

11 Q    And are you aware there was something called a TTAB

12 action?

13 A    Something like that, yeah.

14 Q    And you understood that had been filed prior to the filing

15 of this lawsuit?

16 A    Yes.

17 Q    And that related to the use of the mark?

18 A    It did, yes.

19         MR. LAUBSCHER:  Objection, Your Honor.  Actions at

20 the Patent and Trademark Office deal with registration, the

21 ability of a mark to be registered.  They have nothing to do

22 with use.

23         THE COURT:  Well --

24         MR. WILLETT:  Can I just ask him what his

25 understanding of the action was?

J. Leavitt - Redirect

1   BY MR. WILLETT:

2  Q     What is your understanding of the TTAB action?

3  A     That they were trying to register marks that were using

4  our name.  We objected to them, and that at a certain point

5  they were denied --

6              MR. MCLAUGHLIN:  Object.  Can we have a sidebar for a

7  moment?

8              THE COURT:  What is --

9              MR. MCLAUGHLIN:  Can we have a sidebar for a minute,

10 Your Honor?

11             THE COURT:  Maybe we can avoid it.

12             What are you trying to prove -- explain relative to

13 his understanding?

14             MR. WILLETT:  I'm just trying to show -- they had

15 made the point that there was some delay in the filing of the

16 lawsuit.  And I'm trying to get his understanding of the action

17 that preceded the filing of the lawsuit.

18             THE COURT:  Well, you can ask him -- just ask him

19 that, rather than his understanding of the law, something

20 like --

21             MR. WILLETT:  Oh, yeah.  I don't want his

22 understanding of the law.

23             THE COURT:  -- what was going on and why he

24 delayed -- his explanation for why the lawsuit was filed in

25 2020.

1          MR. WILLETT:  A much better question than the one I

2    posed.

3     BY MR. WILLETT:

4    Q    What was your understanding of what was happening prior to

5    the filing of the lawsuit?

6    A    That we had been trying to resolve this issue of the

7    trademark, and we weren't getting anywhere, that they had

8    continued to use our mark on their website, and there's an

9    association implied between them and us.  And at a certain

10   point when nothing had happened, despite attempts by our

11   attorney to work with theirs, we felt like we had no choice but

12   to bring this to court.

13   Q    Next if we could go to Exhibit 57.

14        This was a document that I had shown you yesterday, I

15   believe, and Mr. Laubscher had shown you today.

16        Do you see that?

17   A    I do.

18   Q    Just because I want to make sure that the jury understands

19   what this document was, I would like you to tell them what this

20   document represented.

21   A    This document basically was to memorialize the agreement,

22   the handshake agreement that Chris, Ron, and myself had made

23   when they came to Emerson Creek Pottery and we discussed the

24   setting up of an outlet store that would be run by them up in

25   Illinois.

1   Q    And to be clear, your testimony was that this was

2   something you prepared after that meeting?

3   A    After that agreement, yes.

4   Q    Who was at that meeting?

5   A    The three of us.

6   Q    And that was --

7   A    That would be Ron Wehrli, Chris Demiduk -- well, Demiduk

8   now -- and myself.

9   Q    And then after that meeting you prepared this document for

10  what purpose?

11  A    Just to make sure that everybody was basically on the same

12  page of the larger points that we were talking about.

13  Q    And you testified earlier you believe you may have sent

14  that to Mr. Wehrli?

15  A    I do.

16  Q    But you never received confirmation from him or

17  Ms. Demiduk saying --

18  A    No.

19  Q    -- they had received it?

20  A    I did not, no.

21  Q    With respect to the actual terms of the agreement, there

22  are a few that were referenced to you earlier.  First I'll look

23  at number 2.  It says, "ECP agrees that RW will set up a

24  corporation in Illinois for the purpose of operating a store

25  with a d/b/a as Emerson Creek Pottery Outlet Store."

1    Do you see that?

2  A    I do.

3  Q    Was it of consequence to you whether or not they called it

4  an outlet store?

5  A    No.  The main thing it was Emerson Creek Pottery, my own

6  store.  I don't say outlet store, I don't think, on the front

7  of it.  It's Emerson Creek Pottery.

8         MR. WILLETT:  Ashley, can you pull up the picture of

9  the pottery shop.

10 Q    This is your pottery shop, right?

11 A    Yeah, that's the front entrance to our store, uh-huh.

12 Q    And when you testified earlier, this was the shop that --

13 this was the shop that Ms. Demiduk and Mr. Wehrli first

14 visited?

15 A    Yeah, that's where they would have gone to purchase our

16 pottery.

17 Q    Now, of course, this is a more recent picture?

18 A    Yeah, this looks -- probably last year, maybe.  It's hard

19 to tell.  Maybe the year before.

20 Q    And I'm not sure because of the glare if you can see it,

21 but what does the sign say outside of your pottery shop?

22 A    Yeah, it says "Emerson Creek Pottery."

23 Q    What does it say below that?

24 A    "Proudly making functional art in the USA since 1977."

25 Q    And does this shop still sell seconds and overstocks and

1    that sort of thing?

2    A     Yes, and sometimes firsts.

3    Q     And sometimes firsts.

4          Okay.  Was that similar to what was sold at the store in

5    Oswego?

6    A     Yes, that's correct.

7              MR. WILLETT:  And Ashley, if you would go to the

8    other picture of the sign.

9    Q     And that's the sign that first greets you as you arrive on

10   the property?

11   A     Yeah, that's the sign off the main road.

12             MR. WILLETT:  Ashley, if we can go back to 57.

13   Q     You mention in paragraph 3, Will furnish pottery and

14   accessories carried in its wholesale catalog to -- it says to

15   RW at a discount specified in the appendix.

16         Do you see that?

17   A     I do.

18   Q     We showed you earlier the document that was your 2018

19   catalog.

20         Do you recall that?

21   A     Uh-huh.

22   Q     Is this your wholesale catalog or is this a retail

23   catalog?  What is this?

24   A     Well, it kind of functions as both, because the price list

25   is -- the wholesale and retail price lists are separate.

J. Leavitt - Redirect

1  Depending on what we were doing with it, we would put a

2  wholesale or retail price list in with it.

3  Q    All right.  And so -- and that's -- I directed your

4  attention to some pages that were loose in what you had, but

5  you would --

6  A    That's correct.

7  Q    -- to gift shops or someone like that that you were

8  selling to, you would provide this?

9  A    The wholesale price list.

10 Q    The wholesale price list, was this the price list for

11 Ms. Demiduk?

12 A    No.  She had a special price list that reflected her

13 discount, which we would prepare in a Word document in order

14 to -- well, actually, I think it's Excel -- to make it easier

15 for her to order so she would know what her actual prices were

16 going to be for each item.

17       MR. WILLETT:  Go back to 57, please.

18 Q    Mr. Laubscher also asked you if you ever got the

19 specific agreement -- I don't know if he used the word

20 "specific," but words to that effect -- of Ms. Demiduk that she

21 would only purchase pottery from you.

22       Do you recall that?

23 A    I do.

24 Q    Okay.  And did you ever get her specific agreement to

25 that?  Do you have a recollection of that?

J. Leavitt - Redirect

1  A    No.  But the whole idea was it was going to be Emerson

2  Creek Pottery.  It seemed way too obvious to state something

3  like that.

4  Q    And what was your understanding?  She was going to open a

5  pottery shop that was going to --

6  A    Sell Emerson Creek pottery with some accessories to help

7  the sales.

8  Q    And that's what you were attempting to reflect in

9  paragraph 4?

10 A    That's correct.

11        MR. WILLETT:  Bear with me.  One last thing.

12        If we could go to Exhibit 92.  Got my numbers mixed

13 up.  I think it's 192.

14 Q    There were some questions earlier about the use of various

15 iterations of Emerson Creek Pottery and your approval of those.

16 This is the email I showed you earlier that's been marked as

17 Plaintiff's Exhibit 192.  Do you recall this discussion with

18 Ms. then Barickman -- Ms. Demiduk -- about her request to use

19 ecreekpotteryandtearoom.com?

20 A    Yeah.

21 Q    And your testimony is that -- what did you do in response

22 to her question?

23 A    Right.  I told her that was fine to change it.

24        MR. WILLETT:  I don't have any further questions at

25 this time, Your Honor.  Thank you.

1    THE COURT:  Who's your next witness?

2        MR. WILLETT:  The plaintiff called Trenda Leavitt.

3      TRENDA LEAVITT, CALLED BY THE PLAINTIFF, SWORN

4                   DIRECT EXAMINATION

5  BY MR. WILLETT:

6  Q    Good afternoon, Ms. Leavitt; if you could please introduce

7  yourself?

8  A    Trenda Carter Leavitt, wife of Jim Leavitt.

9  Q    How long have you and Mr. Leavitt been married?

10 A    30 years this year.

11 Q    How long have you all been together?

12 A    Since 1988.

13 Q    And I know there are some children in the courtroom.  Are

14 they your children?

15 A    They are our children.

16 Q    And I want to cut to the chase and get to Emerson Creek

17 specifically.

18     Obviously, you're married to Mr. Leavitt.  Have you worked

19 for or had a business relationship with Emerson Creek as well?

20 A    Yes.  So I've helped with numerous aspects of the pottery

21 from printing catalogs to postcards to the brochure designs

22 that you were just looking at as exhibits here in the

23 courtroom.  I've helped in a collaborative fashion.  We work in

24 a team fashion at the pottery on developing designs such as

25 apple tree, the red poppy.  We recently did a shortbread

1   design.  I worked collaboratively with Jim on that.  Planting

2   gardens, weeding, other things.  I mean, it's a long list of

3   items.

4   Q    Understood.

5        And what background or training do you have with respect

6   to the services that you've provided to Emerson Creek?

7   A    I have an undergraduate in fine art and I have a master's

8   degree in architecture.

9   Q    Now, with respect to your design work, do you do any of

10  the design work that appears either in the -- on the Internet

11  or social media?

12  A    For several years I did do the Facebook postings and

13  developing the graphics for those postings, as well as the text

14  for those postings, and just kind of general monitoring.  As

15  the wife and the mom I'm very interested -- have a pretty

16  vested interest in this business.  I've been involved with it

17  for most of my life.  And so as a designer, the online

18  presence, catalogs, print material, the visuals of that

19  information is quite important to me.  And so I have -- I've

20  taken an active interest in monitoring and developing those

21  pieces of marketing.

22  Q    And when you say "monitoring," do you look at social media

23  sites other than your own?

24  A    Yes.  I look at a lot of social media sites.

25  Q    What about those for the defendants?

1  A    Yes.

2  Q    And specifically, have you monitored their Facebook

3  account, for example?

4  A    More actively in the years between 2013 and 2017.  There

5  have been several people who have kind of been in and out of

6  actively posting for the pottery.  There's no full-time

7  marketing position at Emerson Creek.  So, you know, sort of on

8  call as Jim would need print or sales advertisements developed

9  for him, help with Facebook postings, I would help him with

10 that.

11 Q    So after that roughly 2013 to 2017 period, did Ellena

12 assume any of those responsibilities?

13 A    In 2017, yes, she started.  Well, we had an external

14 marketing website developer, 434 Marketing, which is here in

15 Lynchburg.  And they were on board for about a year from 2016,

16 2017, 2018 until she took over most of the duties for Facebook

17 in 2018.  And now we have another outside consultant, Emma

18 Babbitt, who has been doing the postings for the past two years

19 and actively monitoring, responding to comments.

20 Q    Next can I direct your attention to Exhibit 72 and ask if

21 you can identify this email and the documents that follow it?

22      And Ashley will flip through it for you.

23 A    So the email was coming from myself to Jim just expressing

24 more confusion with people using the Internet and having

25 confusion with whom is whom online.  It's obviously their

1  customers are coming to our site for our products.  Our

2  customers are going to their site, assuming that they're the

3  same entities.  So I wanted to bring that to Jim's attention so

4  that he could share it with our attorney.

5  Q    And if you look, it looks like there's some attachments to

6  that email.  Before I ask about that, I'm going to just get you

7  to confirm that those are attachments, things you were

8  forwarding?

9  A    Yes, that's correct.

10          MR. WILLETT:  If you'll scroll down.  Yeah, perfect.

11          At this time I'd like to move for the admission of

12  Plaintiff's 72.

13          MR. LAUBSCHER:  No objection.

14          THE COURT:  Be admitted.

15          (Plaintiff Exhibit 72 marked.)

16          (Plaintiff Exhibit 72 admitted.)

17   BY MR. WILLETT:

18  Q    What was it you had identified on this particular Facebook

19  posting?

20  A    This was a Facebook post with someone asking, "Do you have

21  table linens at your Oswego location"?

22  Q    And do you know -- Ashley can scroll up for you so you can

23  see -- do you know when this would have been identified?

24  A    It would have been whenever -- I'm actually not sure when

25  that specific post was, but the email was sent March 5th, 2018.

T. Leavitt - Direct

1  Q    Now, at some point you indicated or stated that your

2  responsibilities had transitioned to Ellena.  Were you still

3  monitoring at this point?

4  A    No, I was not.

5  Q    But how did this get to your attention, then, this

6  Facebook post?

7  A    I just saw it.  I mean, again, actively kind of looking at

8  Emerson Creek's presence online.  I'm always making comments or

9  critiques to my family of things that I see that maybe they

10 want to change, or bringing things to their attention that may

11 be of concern.

12 Q    And that's why you brought that to Mr. Leavitt's

13 attention?

14 A    Yes.

15 Q    And if we go down to the next page, this looks like it has

16 a posting date of 2013.

17      Do you see that?

18 A    Yes.

19 Q    What did you understand was being communicated here?

20 A    It's a very nice comment about the Oswego outlet store.

21 "Your store in Oswego, Illinois is warm and inviting.  The

22 minute I arrived, I texted my sister and told her I was

23 bringing her here when she next visited, and I'm also taking

24 her to the on-site tearoom for her birthday."

25      Very positive comment.  There's a very positive response

T. Leavitt - Direct

1  on our end to that message redirecting her to the Oswego

2  Facebook site, because they had their own Facebook site.

3  Q    And if you look below that it says, "Thank you for

4  visiting the Chicago store."

5       Is that something that either you or one of your staff

6  would have put on there?

7  A    Yes, that's correct.

8  Q    And Chicago store, what did that refer to?

9  A    The Emerson Creek Pottery store in Oswego.

10  Q    Run by the defendants?

11  A    Yes.

12  Q    Next I will -- any other forms of monitoring that you've

13  done since -- we had heard testimony earlier about the cease

14  and desist going out in January of 2018.  Since that time, any

15  other forms of monitoring that you performed?

16  A    I signed up for their email blast newsletter.  So I've

17  been on that subscriber list since October the 31st, 2020.

18  Q    Next we can go to Exhibit 106.

19       It looks like there is an email at the top from you

20  forwarding that to -- or, yeah, from Ellena Leavitt to you.

21       Do you see that?

22  A    Yes.

23  Q    And then if you go down a little bit from there, do you

24  see that?  "Thought you might want to see this."

25       Do you see that?

1  A    Yes.

2  Q    If Ashley can keep on scrolling, I'll ask you to identify

3  what this is.

4        Well, the pages she's on now, those are an attachment to

5  the email that you received?

6  A    Yes.

7        MR. WILLETT:  Go back up to the email she received.

8  Thank you.

9  Q    And this is -- and just tell me, this

10 info@emersoncreek.com to, and then there's an email address

11 @gmail.  Whose email is that?

12 A    So a bit of embarrassment on my part.  The attachment is

13 from the email newsletter that they sent to me.  Because I'm

14 subscribed to their email newsletter, when I saw this

15 information where they were still using the name Emerson Creek

16 in their publication materials, I thought I was forwarding that

17 to my husband.  Unfortunately, the email address in this

18 particular email -- this is a personal email, not my business

19 email -- automatically included the email.  So this message I

20 believe went to the Demiduks in Chicago.  So, my error.  Honest

21 error.  The email addresses are very, very similar.

22 Q    Understood.  But the email at the bottom there from

23 Emerson Creek, that's something that you received on your

24 personal email?

25 A    That's correct.

1        MR. WILLETT:  At this time I'd like to move for the

2  admission of Plaintiff's 106?

3            THE COURT:  Be admitted.

4            MR. LAUBSCHER:  No objection.

5            (Plaintiff Exhibit 106 marked.)

6            (Plaintiff Exhibit 106 admitted.)

7            MR. WILLETT:  And now, Ashley, if you will scroll

8  down from there.

9   BY MR. WILLETT:

10  Q    And this was the attachment from that email you received?

11  A    That's correct.

12  Q    The first page there says Emerson Creek shop.  Do you know

13  what that building is?

14  A    I believe it is where the pottery used to be sold.

15  Q    And just real quick so we have this frame of reference,

16  Ashley, I'm going to ask you to go back to the email again to

17  confirm the date, which was July 14th of 2021, last summer,

18  correct?

19  A    Yes.  Also, the subject line caught my attention when the

20  email came into my email box, because it says, "Shop is opening

21  for a limited time at Emerson Creek."

22        When you're looking at things online you're looking very

23  rapidly.  So I thought, that's kind of an unusual subject line

24  because our store was already open at that point.  So this is

25  an example of customer -- potential customer confusion.  If I

T. Leavitt - Direct

1   am this intimately involved with my family's business and I'm

2   aware of the Oswego location's emails and newsletters, that I

3   would confuse these two, I'm sure that's happening frequently.

4              MR. WILLETT:  Ashley, if you'll just scroll down.

5   Keep going.  It says, "shop open."  That's directly about the

6   picture above.  Keep going slowly.

7   Q    "Shop is open for a limited time only."  This was all

8   information that was conveyed in the attachment, correct?

9   A    Yes.

10             MR. WILLETT:  Keep going down.  And then stop on that

11  page real quick.

12  Q    The shop was opening then, this was still part of that

13  same attachment, to stay for lunch at the restaurant?

14  A    Yes.

15             MR. WILLETT:  Keep going down.  And then it's

16  relatively lengthy because it goes into the menus.  I think

17  we've got it there.  Thank you.

18  Q    Are there other specific instances of confusion that you

19  have observed?

20  A    I accidentally discovered sort of interesting -- not

21  interesting, but rather surprising.  I was considering going to

22  the Las Vegas giftware show.  This was in 2019, I believe,

23  December 2019 when the registrations were coming out.  And so I

24  thought it would be a great trip to go to.  I like to stay

25  involved with -- no matter what your age, you should stay

1    involved with contemporary styles.  I thought it would be a

2    good trip to take.  Jim had a sales rep there, Ceil Wansink,

3    who had his pottery displayed, as well as Brown Bag pottery

4    displayed.

5        So I considered going.  I went to register.

6    Q    I'll hold you real quick there.  Sorry.  The Las Vegas

7    show, this is 2018?

8    A    Okay.

9    Q    I'm asking.

10   A    I think it was 2019.

11   Q    This is at some point after the cease and desist letter

12   had been sent?

13   A    Yes.

14   Q    And you heard testimony earlier from your husband about a

15   Las Vegas show.  I'm not saying the same year, but was this the

16   same gift show?

17   A    It's the same gift show.  It's annually.  And so the

18   giftware show he was referring to is the year prior to the one

19   that I was considering going to.

20   Q    And for -- if we can put up Exhibit 10.  Just before you

21   continue, I want to make sure you know.  Can you identify what

22   this document is?

23   A    This is a screenshot where I went to register for the --

24   to put your information in to check on fees, etc.  And I

25   started typing in "Emerson Creek Pottery," and I discovered

1  that Emerson Creek Pottery was already attending this giftware

2  show under the names of Chris and Dave Demiduk, and that they

3  were actually registered as a manufacturer under the

4  manufacturing category.

5      So this is a red flag, which I immediately sent to Jim.

6  Q    Okay.  If you look up there under -- well, first of all,

7  so this was an image that you took, a screenshot?

8  A    Yes.

9      MR. WILLETT:  I'd like to move for the admission of

10  Plaintiff's Exhibit 10.

11      MR. LAUBSCHER:  No objection.

12      THE COURT:  Be admitted.

13      (Plaintiff Exhibit 10 marked.)

14      (Plaintiff Exhibit 10 admitted.)

15      MR. WILLETT:  Ashley, scroll to the top of the

16  document real quick.  Scroll down a little bit to the pavilion.

17  There.

18  Q    The date of the show was what, if you can read that?

19  A    January 28th to the 31st, 2018.  So this was -- okay.  So

20  this would have been -- December 27th I believe is the email

21  date I sent to Jim of 2017, alerting him to their registration.

22  Q    And let me ask you this:  Did you indeed have a

23  representative who had a booth, or manning a booth at this

24  show?

25  A    Ceil Wansink.

T. Leavitt - Direct

1  Q    In 2018?

2  A    Yes.

3  Q    And were they -- that person, were they exhibiting Emerson

4  Creek Pottery?

5  A    I believe she did have Emerson Creek Pottery alongside

6  Brown Bag Design.

7  Q    All right.  And did you go to this show?

8  A    I ended up not going to the show, no.

9  Q    Let me go briefly back to the -- to Exhibit 72.

10        MR. WILLETT:  Go down to the third page of that

11  document.

12  Q    This is another Facebook post I just wanted to ask you

13  about because it was attached.

14        Do you recognize this Facebook posting?

15  A    I do.  This was made March the 11th, 2017.  It's a comment

16  from I think a deejay, actually, Sounds Abound Entertainment.

17  So this appears to be actually a deejay who helped with the

18  wedding reception at Emerson Creek Pottery at Emerson Creek

19  Events in Oswego on October 28th, 2016, who was confused

20  enough, even though they were physically present on the Oswego

21  site, were confused enough that when they went to post about

22  being on that site, that they posted it on our Facebook site.

23  Q    And I want to note the date of posting there, if you could

24  read what that date was?

25  A    March the 11th, 2017.

1  Q     And --

2  A     For a wedding that was held on October 28th, 2016.

3  Q     Ms. Leavitt, why -- I heard some discussion earlier about

4  the filing of this lawsuit -- why go through all this?

5  A     Well, it's certainly not anything we would have chosen to

6  have done.  It's very unpleasant.  But -- excuse me -- I think

7  45 years of building -- excuse me.

8       I think 45 years of building a business and a brand should

9  entitle someone to use their name.  Emerson Creek Pottery was

10 not built by one person.  You've heard a lot of information

11 from Jim.  Hundreds, if not thousands, of people have helped

12 build that company into what it is today.  It's something to be

13 very proud of.  It's going to be a legacy business.

14      Our children grew up playing in the pottery causing

15 trouble in the beginning.  Now they're working very, very

16 diligently every single day.  They're going to step into the

17 shoes of Jim, and they're going to assume this business.  And

18 to deny them the ability to use -- excuse me -- a name that

19 their father developed in 1977, I think personally as a mom and

20 a wife is a tragedy.  And so it is worth pursuing having our

21 name back.

22          MR. WILLETT:  No further questions.

23          THE COURT:  Wait just a minute.

24          MR. WILLETT:  I'm sorry.  Mr. Laubscher may have some

25 questions for you.

1    CROSS-EXAMINATION

2        MR. LAUBSCHER:  Could you call up Plaintiff's Exhibit

3  106.

4   BY MR. LAUBSCHER:

5  Q    I believe you testified in connection with this email,

6  Ms. Leavitt, that you subscribed to email blasts from the

7  defendants?

8  A    That's correct.

9  Q    And then by mistake you forwarded this email to Jim?

10 A    No, I did not mistakenly forward the email to Jim.  I

11 mistakenly -- well, I think he did eventually get the email,

12 but I accidentally forwarded it to --

13 Q    Oh, to Chris?

14 A    That's correct.

15 Q    Sorry.  But -- and then you said something to the effect

16 that if you were confused by this email, you think that there

17 must have been -- you said you were sure that other people were

18 confused because of the similarities of the email addresses?

19 A    Certainly an assumption, but it could be happening.

20 Q    It could be happening?

21 A    It could be happening.

22 Q    But you weren't actually confused.  You did it by mistake?

23 A    I did it by mistake.

24 Q    Plaintiff's Exhibit 10.

25      And this was the -- I guess attendee list for the show in

1  Las Vegas that you just testified about.  And do you see the

2  dates of the show is January 28th to 31, 2018?

3  A    Yes.

4  Q    And do you recall you said in earlier testimony you're

5  aware of the cease and desist letter, the demand letter that

6  was sent in January of 2018 from your attorney to the

7  defendant's attorney, correct?

8  A    So it looks as if I had my dates somewhat wrong on that.

9  I don't think the letter had been sent at that point; however,

10 this is registering at a giftware show under the name of

11 Emerson Creek Pottery.

12 Q    Right.  In other words --

13 A    And they're not representatives of Emerson Creek Pottery.

14 Q    My point is it's just a couple of weeks after the demand

15 letter.

16        MR. FRETWELL:  The date above it, the date accessed.

17        MR. LAUBSCHER:  Yeah.  Thank you.

18 Q    You see above there, the date accessed, 12-27-17.

19      Do you see that?  It's in the heading.

20 A    Yes.

21 Q    Up in the upper right-hand corner.

22 A    Right.  Exactly.  So registration is several weeks ahead

23 of the show.

24 Q    Right.  So this actual screenshot was created 12-27-17?

25 A    That's correct.

T. Leavitt - Cross

1  Q    It's in advance of the demand letter, which was in January

2  of 2018?

3  A    That is correct.  And I do apologize for that mistake.

4  Q    Apology accepted.

5       And now Mr. Willett asked you about the lawsuit, and you

6  said that it was unpleasant.  And I believe you said -- and

7  correct me if I'm wrong -- but that you think it's a shame for

8  somebody to use a name for 45 years, and they should be allowed

9  to use that name.  And it's a shame -- to deny somebody the

10 ability to use that name is a tragedy, I think were your terms.

11      But this lawsuit, nobody is denying the plaintiff, Emerson

12 Creek Pottery, from using that name, or anybody in your family

13 from using that name as it goes forward; isn't that correct?

14 A    The name of the business, as has been documented by

15 evidence, began as Emerson Creek in 1977.  And so having Chris

16 and Dave Demiduk in Oswego labeling their website Emerson Creek

17 is incorrect.

18      So today they have an Emerson Creek shop.  They're no

19 longer selling pottery.  I think the shop has closed.  Emerson

20 Creek weddings -- Emerson Creek Events, Emerson Creek cafe or

21 restaurant, whatever it's called.  If they continue with this,

22 who's to stop how many iterations of this name continues to be

23 developed?

24 Q    But I don't see how that denies you or your family from

25 continuing to use Emerson Creek Pottery.

1  A    Oh, it definitely will not, no.

2  Q    Okay.  Well, when you said you think it's a tragedy to

3  deny somebody from being able to use their name --

4  A    The Emerson Creek name independent of the word "pottery."

5  Q    But how are you being denied, or your family being denied

6  from continuing to use that name?  If you win in this lawsuit,

7  you'll still be able to use the name.  If you lose in the

8  lawsuit, you'll still be able to use the name; is that correct?

9  A    We will still be able to use Emerson Creek Pottery;

10 however, there is still going to be the presence of Emerson

11 Creek Events and Emerson Creek.

12 Q    I understand.  But I don't understand why you think that

13 you wouldn't be allowed to use Emerson Creek or Emerson Creek

14 Pottery?

15 A    Well, would we?  If there is a business in Oswego that

16 has -- that's calling themselves Emerson Creek, isn't that

17 going to continue to cause confusion, if we're saying we're

18 Emerson Creek and they're saying they're Emerson Creek.

19 Q    Well, let me turn the tables on you a little bit.  How

20 about the Demiduks?  They spent -- your husband spent 45 years,

21 of which you contributed for 30 plus, or whatever, to build

22 that business.  Very successful, American-made pottery.

23     And the Demiduks, Chris and then later with Dave, spent 22

24 years building their business.  And your husband and your

25 company consented to the use of that name.  So to me, the

E. Leavitt - Direct

1  tragedy is after they've spent all that time building their

2  name for you to try to take it away from them.

3  A    They were using the name Emerson Creek for selling

4  pottery.  And now they have other events that are no longer

5  related to Emerson Creek, which is a manufacturer of pottery in

6  Bedford, Virginia.

7  Q    But they're not using Emerson Creek Pottery anymore.

8  They're not selling Emerson Creek pottery anymore.  They're not

9  purchasing pottery from you anymore.  Maybe you lost that sale,

10 but beyond that, I don't see -- maybe you can tell me -- where

11 the conflict is.

12 A    I think you're getting into legal issues that I cannot

13 answer.  I'm not an attorney.  I'm not a copyright attorney.

14 I'm not -- I'm not familiar with the legalities of this matter,

15 as Mr. Willett and Mr. Goodrum are.

16          MR. LAUBSCHER:  Thank you.

17          MR. WILLETT:  I have no further questions for the

18 witness.

19          THE COURT:  All right.  Thank you.

20          MR. WILLETT:  Thank you, Ms. Leavitt.

21          THE COURT:  Who's your next witness?

22          MR. WILLETT:  The plaintiff calls Ellena Leavitt.

23       ELLENA LEAVITT, CALLED BY THE PLAINTIFF, SWORN

24                    DIRECT EXAMINATION

25  BY MR. WILLETT:

E. Leavitt - Direct

1  Q    Ms. Leavitt, if you could please introduce yourself to the

2  Court?

3  A    My name is Ellena Leavitt.  And like my mom and my dad

4  have said, I grew up in and around pottery.  As I was younger,

5  less useful; and now as I'm getting older, hopefully more and

6  more useful and productive.

7  Q    You were raised in Bedford?

8  A    Yes.

9  Q    Tell me just briefly about your background and your

10  education.

11  A    Sure.  I have a business administration degree, and my

12  focus was in digital marketing and advertising.

13  Q    And what's your current job?

14  A    So it's kind of hard to narrow it down just to one

15  specific role.  Like it's been stated, you know, we're a small,

16  family-run business.  So I kind of help out where I'm needed.

17  I could be doing production, cleaning, running the press.  I

18  think my dad mentioned earlier I'm starting to learn the

19  bookkeeping and managing the office, that side of things.  I'm

20  heavily involved with the marketing, creating campaigns,

21  planning what we're going to be doing with our store and

22  online.

23      I work with a lot of our potential clients and existing

24  clients to come up with new designs for them, and just, you

25  know, sales-type things for them.

E. Leavitt - Direct

1    I'm also the sole decorator right now.  So all of our

2 designs are all done by hand with a sumi brush, which is a

3 Japanese type of brush.  And so I'm in charge of that.  So I

4 have that responsibility, as well as coming up with new

5 designs.

6 Q    And just to break that down a little bit, obviously, first

7 of all, this is all for Emerson Creek?

8 A    Yes.

9 Q    And one of the last things you mentioned, the sumi brush,

10 that's what you use to -- will you just describe that process?

11 A    Yeah, so the brush was originally used to do Japanese

12 calligraphy.  So what we use them for is doing all of our

13 hand-painted designs.  So we have 16 designs that we currently

14 have in house.  And then we have, you know, other designs that

15 we do custom for certain clients or special orders.  For

16 example, like Monticello, Mount Vernon, they have specific

17 designs that we do just for them, and those are also done with

18 the sumi brush.  Nothing is done with templates or anything.

19 It's all done by hand by memory.

20 Q    And we've already had these admitted, but I just want to

21 show you a couple of pieces of the pottery.

22    This one, what design is that?

23 A    So this is Field of Iris.  This is one of our oldest

24 designs.  It's pretty much been around since the 1970s.  It's

25 kind of changed over time, but you can see some kind of

1   iteration of this throughout the years.

2        So, you know, I do my flowers first, and then I do the

3   green leaves and -- yeah, so each piece is -- it's very

4   similar, but each piece is a little bit different just because

5   it is done by hand, not by, you know, templates or anything.

6   Q    And how long have you been painting?

7   A    About a year and a half.  I think like a year and a half

8   is when I started training.  Full time just like a year, I

9   think.

10  Q    And if you would look at the bottom of that piece of

11  pottery, what's the mark on that?

12  A    This is 2021, and it has my stamp.  So I did this one.

13  Q    And how do you know that?

14  A    Because it has my initials on it.

15  Q    So you literally hand painted that?

16  A    Yes, I did.

17  Q    Along with a lot of other ones?

18  A    Yes.

19  Q    Let's talk about the other roles that you described

20  specifically as it relates to some of the digital marketing.

21  A    Uh-huh.

22  Q    If you could just tell us what do you do with regard to

23  digital marketing.  You heard your mom.  So you don't need to

24  repeat everything, but I want you to just tell us what you do.

25  A    So kind of on and off I've done content creation and

E. Leavitt - Direct

1  posting for social media, either doing that whole, you know,

2  beginning to end, or just monitoring, approving posts that are

3  going to be done as other people are posting; and, you know,

4  creating email campaigns and other things like that.  But

5  monitoring social media, posting on social media.

6      I set up our Instagram account in 2016 and posted on that

7  for a while.  Then we had a marketing agency do posting for a

8  while, and then I took it back over and, now someone else is

9  doing it.

10     So kind of in and out of the social media content

11  creation.

12 Q   Going to your statement about the Instagram, you set up

13 the Instagram account?

14 A   Yes, I did.

15 Q   What's the handle for it?

16 A   So it's emerson_creek_pottery.

17 Q   Okay.  And why did you choose that name?

18 A   Because the name Emerson Creek Pottery with no underscores

19 was already taken.

20 Q   Do you know who had taken that name?

21 A   The defendants.

22         MR. WILLETT:  If we could put up Exhibit 105.  And if

23 you would scroll down a little bit, Ashley.

24 Q   These are different screenshots of Instagram; is that

25 correct?

E. Leavitt - Direct

1  A    Yes, that's correct.

2  Q    And are these the screenshots that you took?

3  A    Yes.

4        MR. WILLETT:  At this time I'd move for the admission

5  of Exhibit 105.

6        MR. LAUBSCHER:  No objection.

7        THE COURT:  Be admitted.

8        (Plaintiff Exhibit 105 marked.)

9        (Plaintiff Exhibit 105 admitted.)

10        MR. WILLETT:  If we could go to page 2., and if you

11  could scroll down and show the date, first of all, the date of

12  the capture.

13  Q    If you can read that?

14  A    Yeah, it's 10-16-2019.

15  Q    And so that's an actual picture you took on your

16  computer --

17  A    Yeah.

18  Q    -- on that day?

19  A    Yeah.

20  Q    And if you could tell us what we're seeing in this

21  photograph.

22  A    It looks like some kind of, like, ghost metal decal, and

23  then some kind of ceramic pumpkin with some cookies.

24  Q    And where did you find this?

25  A    It looks like under the hashtag #emersoncreekevents.

1  Q    And the pumpkin pottery, whatever that is in the middle,
2  do you know who made that?

3  A    No, I do not.

4  Q    And what is under the name on the right-hand side, if you
5  go to follow above Emerson Creek Pottery & Tearoom, what is
6  that?

7  A    That is the location that the poster placed the post at.

8  Q    So whoever took this picture posted it at Emerson Creek
9  Pottery & Tearoom?

10  A    Yeah.  They tagged it for that location.

11  Q    And it was up as of October of 2019?

12  A    Yes.

13        MR. WILLETT:  If you go to the next page.  And
14  what -- if you can scroll out for a second -- or back up a
15  little bit.

16  Q    Same with the date, just confirm the date on that.  Is
17  that the same date?

18  A    Yeah, 10-16-2019.

19  Q    Your eyes are better than mine.  If you can scroll up a
20  little bit, Ashley.  Thank you.

21        So you see obviously you've got the primary picture here,
22  but then you've got some images of weddings in the background.

23        What is this?

24  A    I believe it is another image from the Emerson Creek
25  Events hashtag.

1  Q    And then do you know what this is a picture of?

2  A    It looks like some -- maybe a setup at a craft fair.  It

3  looks like some ornaments or jewelry or something of that

4  nature.

5  Q    And if you look next to the name there, Memories by

6  Raniti.

7       Do you see that?

8  A    Yes.

9  Q    It says, "vintage fair at," and then it has

10 "@emersoncreekevents today."

11      Do you see that?

12 A    Yes.

13 Q    Do you know what that refers to?

14 A    I believe that is one of the defendants' Instagram

15 accounts.

16 Q    And if you look down there you've got another hashtag that

17 follows that, #emersoncreek.

18      Do you see that?

19 A    Yes.

20 Q    Do you know what that refers to?

21 A    It's a general hashtag Emerson Creek that people put at

22 the end of posts.  They can put different hashtags on their

23 posts to tag them into groups of pictures.

24 Q    So that isn't necessarily associated with defendants?

25 A    Correct.

1  Q    That's just something that people come up with at -- or

2  #emersoncreek?

3  A    Yes.

4  Q    And that's what this person attached here?

5  A    Yes.

6         MR. WILLETT:  Okay.  We can go on to page 4.  Still

7  October of 2019.  And if you scroll up a little bit there.

8  Q    What is this showing, if you know?

9  A    It looks like another event at the Oswego location.

10  Q    And then if we look to the -- well, you've got the Emerson

11  vintage market, as you said.  It says at Emerson Creek.

12      You understand that to be from the Oswego location?

13  A    Yes.  It's not something that we had at our location.

14  Q    Understood.

15      And you understood that prior to the cease and desist

16  letter, that there was a vintage market that was held --

17  A    Yeah.

18  Q    -- in Oswego?

19  A    I think maybe they had it annually or something like that.

20  Q    And if you look over to the right-hand side the last

21  hashtag there; do you see that?

22  A    The #dayinthecountry?

23  Q    Yes.

24  A    Yes.

25  Q    Do you know what that refers to?

E. Leavitt - Direct

1  A    I assume just maybe some kind of marketing that was used

2  with the event that the poster wanted to add into the post.  I

3  don't know specifically what it refers to.

4  Q    And what is below that where it says, "yay, we're so

5  excited?"  What is that?

6  A    It looks like a comment from Emerson Creek Events.  So

7  they commented on the post.

8  Q    How do you know that's Emerson Creek Events as opposed to

9  just -- how do you know that's from Emerson Creek Events?

10 A    Because of the handle that it's written from.  So the

11 little circle and then the Emerson Creek Events that says who

12 is actually posting the comment.

13      MR. WILLETT:  If you go to PDF 5, and if you -- same

14 date there, and scroll up on that a little bit.

15 Q    And then we have on the side there Joy Lyn Photo, follow.

16 It says Emerson Creek Pottery & Tearoom.  What does that refer

17 to?

18 A    It looks like it was the location that they tagged their

19 image to that location.

20 Q    So whoever took the picture tagged it to Emerson Creek?

21 A    When they posted the picture, yes.

22 Q    And this was done in -- or at least it still appeared as

23 of 2019?

24 A    Yes, when the capture was taken.

25 Q    Okay.  Next if you would look at PDF 13, that same date.

1  A    Yes.

2        MR. WILLETT:  Ashley, if you would go up from there.

3  Q    And that was again October of 2019.  And the picture, can

4  you identify what that is?

5  A    It looks like someone standing at I think the wagon that

6  they used at the -- their driveway to direct people to their

7  facility.

8  Q    And then there's a writeup from the young lady who posted

9  this:  "I enjoyed my Emerson Creek vacation.  Please tune in to

10 my new YouTube channel."

11       And she's promoting something of hers, correct?

12 A    Yes.

13 Q    And those are -- what appears next to that hashtag

14 #emersoncreek, #emersoncreekevents.  Those are all hashtags

15 that she would have included?

16 A    Yes.

17       MR. WILLETT:  Next if we can go to PDF 14.  So go to

18 the date real quick.

19 Q    Just confirm it's that same date, 2019?

20 A    Yes.

21       MR. WILLETT:  Okay.  And then if we scroll up a

22 little bit.  Keep going, please.

23 Q    So we can still see in the background there we've got the

24 Emerson Creek Pottery & Tearoom.

25       Do you see that?

E. Leavitt - Direct

1  A    Yeah, the wagon post, yeah.

2  Q    And then this is a picture that you pulled out of --

3  A    Yeah, that same grouping of hashtags.

4  Q    So with the same grouping of the hashtags for the red

5  wagon, we have this photograph?

6  A    Yes.

7        MR. WILLETT:  Next -- Ashley, I'm all good with that

8  one.  Thank you.  Next if you can pull up Exhibit 79.

9  Q    This is another Instagram post, although I don't believe

10 you actually captured this image; is that correct?

11 A    I don't remember capturing it.

12       MR. WILLETT:  Go up to the top there, Ashley.

13 Q    It looks like this was pulled July 22nd of 2021, last

14 summer.

15      Do you see that?

16 A    Yes.

17       MR. WILLETT:  Okay.  And is this just -- I believe

18 this is just this one page, correct?

19           At this time I'd move for admission of Exhibit 79.

20           THE COURT:  Be admitted.

21           MR. LAUBSCHER:  No objection.

22           THE CLERK:  I show that as admitted yesterday.

23           MR. WILLETT:  Yes, I'm sorry.  It was admitted.

24 Thank you.

25  BY MR. WILLETT:

1  Q     Tell me about this.  When was this posted, if you can

2  tell?

3  A     It looks like it was posted August 30th of 2019.

4  Q     So August 30th, 2019.  And then the -- at the top where it

5  says Beth_Moore4, what does it have below that?

6  A     Emerson Creek.

7  Q     And what does that reflect?

8  A     That's another location.  So sometimes on Instagram the

9  locations have -- the actual geographic location will have

10 different names.

11 Q     And that's one of those names?

12 A     Yes.

13 Q     And then if you look next to that under the hashtags, it

14 has #emersoncreekpotteryandtearoom?

15 A     Yes.

16 Q     And then some other, #fridayfunday and #flowerpotsalad?

17 A     Yes.

18       MR. WILLETT:  Next if you will go to Exhibit 23.

19 Q     This is a series of further screen captures from

20 Instagram.  It has the capture date of July 22nd, 2021.

21       Do you see that?

22 A     Yes, I do.

23       MR. WILLETT:  At this time I'd move for -- I don't

24 think this one was entered, entry of Exhibit 23.

25       MR. LAUBSCHER:  No objection.

E. Leavitt - Direct

1          THE COURT:  Be admitted.

2              (Plaintiff Exhibit 23 marked.)

3              (Plaintiff Exhibit 23 admitted.)

4   BY MR. WILLETT:

5   Q    If you could tell us what we're seeing on page 1 of 14

6   there.

7   A    It looks like a post that is pulled from the general

8   hashtag group of Emerson Creek Pottery.

9   Q    Of Emerson Creek Pottery?

10  A    The hashtag is Emerson Creek Pottery.

11  Q    Okay.  Because that's what we see in the -- above the

12  picture?

13  A    Yes.  Yes.

14  Q    And then if we look to the right-hand side there we see

15  all of the hashtags associated with this?

16  A    Yes, that's correct.

17  Q    Including #emersoncreek, and then next to that

18  #emersoncreekpottery.

19        Do you see that?

20  A    Yes, I do.

21  Q    And then the last one is #emersoncreekweddings?

22  A    Yes.

23  Q    And again, this would have been a user who posted this and

24  attached it to -- by a hashtag to Emerson Creek Pottery?

25  A    That's correct.

1    Q    So what you had pulled were all images for Emerson Creek

2    Pottery?

3    A    Yes.

4    Q    If you scroll up just a little bit, you see in the

5    background there those images that appear on this page that are

6    sort of shaded -- or not highlighted -- those would have also

7    been from that hashtag, #emersoncreekpottery, including the

8    wedding photo in the middle and then the pottery photo on the

9    right side?

10   A    That's correct.

11         MR. WILLETT:  Next if we can go to Exhibit 76 -- or

12   actually, before that -- hold off on that for a second.  You

13   can take this one off.

14   Q    Do you -- what other ways do you monitor the activities of

15   defendants and others on the Internet?

16   A    Just generally looking at social media websites just to

17   see what is going on.

18   Q    Okay.  And do you look at competitors?

19   A    Yeah, definitely.

20         MR. WILLETT:  Bear with me one second here.  I'm

21   going to show you this image.

22         This has not been previously marked, Carmen.

23   Q    This is a screenshot of Bennington Potters.

24         Do you see that?

25   A    Yes, I do.

1        MR. WILLETT:  Ashley, if you'll scroll down a little

2    bit.  Keep going, please.

3            Made in Vermont.

4            Then keep going.

5    Q    And do you know who this company is?

6    A    Yes, Bennington Potters.

7    Q    Who are they?

8    A    They're a small pottery in Vermont.

9    Q    And they're a competitor of yours?

10   A    Yeah.  They make similar products and they're of a similar

11   manufacturing size.

12           MR. WILLETT:  At this time I'd move for admission of

13   what would be 242.

14           MR. MCLAUGHLIN:  Judge, I think we would object to

15   this.  I don't think what relevance anything with Bennington

16   Potters has to do with this case.

17           MR. WILLETT:  Well, I'm just showing, Your Honor,

18   they've made a point about whether or not -- what competitors

19   are doing.  And I'll show with the next exhibit the specific

20   testimony of --

21           THE COURT:  Overruled.  Go ahead.

22           MR. WILLETT:  Thank you.

23           THE COURT:  Be admitted.

24           MR. LAUBSCHER:  What number was that?

25           MR. WILLETT:  This will be 241.

E. Leavitt - Direct

1          (Plaintiff Exhibit 241 marked.)

2          (Plaintiff Exhibit 241 admitted.)

3          MR. LAUBSCHER:  And then if you could go to the next

4   page here.

5    BY MR. WILLETT:

6   Q    This also is a screenshot for Bennington Potters; do you

7   see that?

8   A    Yes, I do.

9   Q    Okay.  And what is --

10         MR. WILLETT:  You can scroll down a little further.

11  Q    Is this the type of thing that you monitor for

12  competitors?

13  A    Yeah, just to see what they're doing, see if we can glean

14  any ideas.

15         MR. WILLETT:  And so at this time I'd like to move to

16  admit this document as Exhibit 242.

17         MR. MCLAUGHLIN:  I'd state again I don't know what

18  the relevance of anything involving Bennington Potters has to

19  do with this case.

20         THE COURT:  Well, just what she said.  She explained.

21  I'll admit it.

22   BY MR. WILLETT:

23  Q    If you look here at the details, it says, "Midnight

24  Madness, 2019" -- we need to go back up a little bit.

25         "July 18, Midnight Madness 2019."

E. Leavitt - Direct

1    MR. WILLETT:  And if we can show the picture.

2  Q    And then if you'll -- and it looks -- do you have an

3  understanding -- you've looked at their website -- is this

4  their facility?

5  A    Yes, I believe so.

6    MR. WILLETT:  And if you'll scroll down, Ashley.

7  Q    And this is details.  You can see that.  "Our only pottery

8  sale of the year."  And then it goes on to talk about food,

9  music, kids' amusement.

10    Do you see that?

11  A    Yes, I do.

12  Q    And that's the type of thing that you would see from

13  competitors like Bennington?

14  A    Yes.

15  Q    In doing your Internet research, do you use Google?  Do

16  you do Google searches?

17  A    Yes, very often.

18  Q    And what are you looking for there?

19  A    Just general trends in pottery, you know, design,

20  ceramics; also our competitors, to see what they're doing;

21  looking just up our general name, Emerson Creek, Emerson Creek

22  Pottery to see what's coming up, and, you know, looking at our

23  reviews and things like that.  It's just a fast way to do

24  searches.

25  Q    Okay.  Take a look next at Exhibit 76.

1     MR. WILLETT:  And if you would go -- now, this is a

2 larger exhibit that has some email correspondence on it as

3 well.  And Ashley, if you'd go down to PDF 19 of 44, and then

4 scroll down from there.

5 Q    And at least starting as of page 19 of 44, there are --

6 these appear to be Google search results?

7 A    Yes.

8     MR. WILLETT:  And go back up to page 19, Ashley.

9 Q    And it looks like this particular one, this was pulled on

10 October 18, 2019.

11     Do you see that?

12 A    Yes, I do.

13 Q    And is this the type of search that you regularly conduct?

14 A    Yes.

15 Q    Were you conducting these searches back in 2019?

16 A    Yes, I was.

17     MR. WILLETT:  At this time I'd move for the admission

18 of Exhibit 76.

19     THE COURT:  Be admitted.

20     (Plaintiff Exhibit 76 marked.)

21     (Plaintiff Exhibit 76 admitted.)

22  BY MR. WILLETT:

23 Q    So let's look here.  This has the words "Emerson Creek

24 Pottery" as the search term?

25 A    Yes, it does.

E. Leavitt - Direct

1  Q    And then if you look below that -- now, first there

2  appears some pictures of pottery there.

3       What are those, if you have an understanding?

4  A    It looks like sponsored ads from one of our wholesale

5  accounts.

6  Q    Okay.  And what does that mean?

7  A    So --

8  Q    When you say "wholesale," what --

9  A    What wholesale accounts mean?

10 Q    Yeah.

11 A    So we have -- you know, we sell online through our website

12 to individuals.  We call those retail customers.

13      And then we sell wholesale products, which is -- I think,

14 you know, my dad has explained that -- it's half off retail to

15 different stores who then resell them.  So this is one of those

16 stores.

17 Q    And so -- and what's the name of this store?

18 A    Houzz.

19 Q    Houzz.

20      So that's Houzz selling Emerson Creek Pottery?

21 A    Yes.

22 Q    But the name that appears there is what we see on the

23 picture, H-O-U-Z-Z?

24 A    Yes.

25 Q    And then what are -- if you scroll down from there, we've

1  got the images that appear.

2      And in the upper left-hand corner, can you identify what

3  that is?

4  A    Yes, that's the defendants' location.

5  Q    And it references a website.  Is that the website that

6  this search is pulling from?

7  A    These are the Google images that appear when you search

8  for Emerson Creek Pottery.  So it kind of just pulls from the

9  web any image that is tied to Emerson Creek Pottery is going to

10 show these images.

11 Q    And that one -- that first image has emersoncreek.com

12 below it; is that correct?

13 A    Yes, it does.

14 Q    Some of the other images have other things like Venue

15 Report and Tripadvisor and another Emerson Creek.

16     Do you see that?

17 A    Yes.

18 Q    And that's what you see when you do these searches?

19 A    Yes.

20 Q    And so what's the purpose of this?  Why are you doing

21 these Google searches?

22 A    Just to see what is on our Google images.  It's not

23 something that we have control over because it is Google just

24 pulling the images based on how the picture is named.  But it's

25 just something to look at to see, you know, kind of what's out

E. Leavitt - Direct

1  there under our name, our brand awareness.

2  Q    What comes up when you search?

3  A    Exactly.

4  Q    And again, remind us --

5          MR. WILLETT:  Ashley, if you would go up.

6  Q    -- that was a search for Emerson Creek Pottery, and this

7  was done in 2019?

8  A    Yes.

9          MR. WILLETT:  And then Ashley, if you'll scroll down,

10  just keep going slowly there.  Keep going.

11  Q    So we see -- so there we have in almost the center, we do

12  have some pottery.  It says, "Emerson Creek Pottery, Bedford,

13  Virginia."  But then a different website below that.

14      What is that, if you know?

15  A    I'm not sure what the website is, but that is images of

16  some of our historic pieces.

17  Q    And then if you keep scrolling down, and then we get to

18  some more pieces of pottery.

19      Do you know if those are Emerson Creek?

20  A    Yes, they are.  They're some of our, again, historic

21  pieces.

22          MR. WILLETT:  Keep scrolling down.

23  Q    And there on the left side we've got -- stop, please --

24  we've got Chris Demiduk of Emerson Creek Pottery.  Do you see

25  that?

E. Leavitt - Direct

1    A    Yes, I do.

2    Q    And then if we keep scrolling down we've got the image of

3    the wagon there.

4         MR. WILLETT:  Stop real quick.

5    Q    The image of the wagon, and it says "Emerson Creek Pottery

6    wedding slash -- and can you tell what that says?

7    A    Maybe Dana.

8    Q    But that's the wagon that we've seen?

9    A    Yes.  Yes.

10   Q    And then to the right and below that, are those pieces of

11   Emerson Creek pottery?

12   A    Yes.  The dark brown one is pieces that we currently have,

13   and the one directly below that is another one of our historic

14   pieces.

15   Q    Next if we can go to Exhibit 73.

16        Let me ask you this before we start there, how long have

17   you been doing the Google searches?

18   A    On and off for years, but probably it mostly started when

19   I started taking on more responsibility for the social media.

20   So maybe 2018, 2016, in that time frame.

21   Q    And then do you have an understanding of who was doing

22   that sort of thing before you?

23   A    Yes.  It was various people.  Directly before me it was

24   434 Marketing.  They, you know, handled our marketing, our

25   social media posting.  Before that was my mom, Trenda Leavitt.

1  And then before that has been various different people kind of

2  in and out.

3  Q    All right.  Now, Exhibit 73 -- and Ashley, if you'll --

4  we've got a title at the top "Photos for Emerson Creek Pottery

5  and Tearoom-Yelp."

6       Do you see that?

7  A    Yes, I do.

8  Q    And then it has the URL, and it's photos, and then slash

9  Emerson Creek Pottery & Tearoom, Oswego.

10      Do you see that?

11 A    Yes, I do.

12 Q    So tell me what this is?

13 A    So these are images that have either been posted by people

14 who are doing reviews on Yelp or they've been uploaded by the

15 business itself.

16 Q    Okay.  And this is -- in essence, is this a site for

17 Emerson Creek Pottery & Tearoom?

18 A    It's more like an account on Yelp.  It is -- yeah, I mean,

19 they can control -- whoever has the account -- so in this case,

20 Emerson Creek Pottery & Tearoom -- has somewhat control over

21 it, you know, their business, pictures that they upload

22 themselves, but then the reviews --

23           MR. MCLAUGHLIN:  I just want to state an objection at

24 this point, Your Honor.  If she's going to testify about a Yelp

25 site and how it's designed, I don't think she has foundation to

E. Leavitt - Direct

1  testify.

2        If she wants to testify that she had actually

3  downloaded these, that's a different question.  But it sounds

4  to me like she's going into the territory of how it's set up

5  and how it operates and those types of things, which I think is

6  beyond the foundation of this witness.

7        MR. WILLETT:  I'm just asking for her understanding

8  of what she's searching for when she does Yelp searches.

9        THE COURT:  What?

10        MR. WILLETT:  I'm just asking for her to explain her

11  understanding of how Yelp works.

12        THE COURT:  What is the point of this anyway?

13        MR. WILLETT:  This is -- these are the photos for

14  Emerson Creek Pottery & Tearoom.  And so for this one it's

15  going to show what comes up when someone goes to their page,

16  pictures that have been posted on a Yelp page for Emerson Creek

17  Pottery & Tearoom, which was their entity.

18        THE COURT:  And so --

19        MR. WILLETT:  And it goes to confusion, Your Honor.

20  It goes to the confusion that exists out there in the public.

21        THE COURT:  Okay.  Well, she can say what she found

22  when she searched, but --

23        MR. WILLETT:  Yeah, I was just going to ask her if

24  she searched Emerson Creek Pottery & Tearoom, and what she

25  sees, if this is replicated of what she sees.

E. Leavitt - Direct

1        THE COURT:  It looks like we've seen a lot of it

2   already.

3        MR. WILLETT:  This is Yelp, to be clear.  We've

4   looked at Google.  We've looked at Instagram and others.  This

5   is another search medium on the Internet.

6        THE COURT:  Let's move on.

7    BY MR. WILLETT:

8   Q    So if we scroll down there a little bit, these are the

9   pictures that would appear on the Emerson Creek

10  Pottery & Tearoom page --

11  A    Yes.

12  Q    -- is that correct?

13  A    Yes, that's correct.

14  Q    Let's go on to -- now, there are also reviews associated

15  with Yelp?

16  A    Yes, there are.

17       MR. WILLETT:  Let's go -- well, first of all, can I

18  publish this, Your Honor?  I'd like to admit Exhibit 73.

19       THE COURT:  Yes.

20       MR. MCLAUGHLIN:  So just for the limited purpose of

21  that she may have downloaded this page, we don't have an

22  objection.

23       THE COURT:  All right.

24       (Plaintiff Exhibit 73 marked.)

25       (Plaintiff Exhibit 73 admitted.)

E. Leavitt - Direct

1          MR. WILLETT:  Next let's go to Exhibit 74.  And

2    Ashley, if you would just scroll through this.  Keep going to

3    PDF 7.

4     BY MR. WILLETT:

5    Q    And this is another screenshot.  This is of actual reviews

6    from Yelp?

7    A    Yes.

8    Q    Okay.  And if you look at the top, do you know what these

9    Yelp reviews relate to?

10   A    The top of the PDF or the top of this page?

11   Q    Yeah, can you tell from this what these Yelp reviews

12   relate to?

13   A    Yeah, they're from Yelp and then Emerson Creek Oswego.

14   Q    Emerson Creek Oswego?

15   A    Yes.

16   Q    And this is the type of thing that you look at in the

17   course of your --

18   A    Yes.

19          MR. WILLETT:  I'd like to move at this time for

20   admission of Exhibit 74.

21          THE COURT:  Be admitted.

22          (Plaintiff Exhibit 74 marked.)

23          (Plaintiff Exhibit 74 admitted.)

24    BY MR. WILLETT:

25   Q    And why do you look at reviews?  Why do you care what

E. Leavitt - Direct

1    these reviews say if they're about Oswego?

2    A    Well, this specifically the name is just Emerson Creek.

3    So someone just, you know, searching quickly might not add

4    "pottery" to their search.  So, you know, it reflects on our

5    brand, the reviews, good or bad.

6    Q    And the next-to-last one, just to take you to Exhibit 9,

7    this is an exhibit that's already been admitted.

8        And is this something that you would have also reviewed?

9    And this is a picture of defendants' website from February of

10   2018?

11   A    Yes.

12   Q    And you continue to do that through today?

13   A    Yes.

14       MR. WILLETT:  No further questions of this witness at

15   this time.

16       THE COURT:  All right.  We'll take a break now, about

17   15 minutes.

18   **(Jury out, 3:05 p.m.)**

19       MR. WILLETT:  For scheduling purposes, after this

20   witness -- we have cross-examination next.  But after this

21   witness, we are going to have our first Zoom witness, Lindsay

22   Winkler.  And she's on standby.

23       THE COURT:  Okay.

24       (Recess.)

25   **(Jury in, 3:23 p.m.)**

1        THE COURT:  All right.  You may be seated and we'll

2   resume cross-examination.

3        MR. LAUBSCHER:  Your Honor, I do not have any

4   questions for this witness.

5        THE COURT:  Okay.  Thank you.

6        MR. WILLETT:  Yes, Your Honor.  I'm sorry, we didn't

7   know that before.  So our next witness is the Zoom witness.  It

8   would be Lindsay Winkler.

9        THE COURT:  Okay.

10        THE CLERK:  She's not in the waiting room.

11        THE COURT:  Do we have the witness?

12        MR. WILLETT:  She's in the Zoom waiting room.  She

13   should be on.  We thought they had some cross-examination.

14        THE COURT:  All right.

15        MR. WILLETT:  She's logging on right now.

16        THE CLERK:  Ms. Winkler, can you hear us?

17        THE WITNESS:  Yes.

18        THE COURT:  All right.  You may swear the witness.

19        LINDSAY WINKLER, CALLED BY THE PLAINTIFF, SWORN

20                    DIRECT EXAMINATION

21        THE CLERK:  And if you will please speak a little

22   louder for us.

23        THE WITNESS:  Yes.

24    BY MR. WILLETT:

25   Q    Ms. Winkler, thank you for joining us on such short

1  notice.  My name is Henry Willett, and we met a while back via

2  Zoom.

3       If you could please just introduce yourself?

4  A    Yeah.  I'm Lindsay Winkler.  I have a graphic website

5  company, and have done work for Emerson Creek in Oswego.

6  Q    Ms. Winkler, if I could get you to hold for just a second.

7  There we go.  Perfect.  Thank you.

8       And I interrupted you.  If you could continue, please.

9  You were saying you do graphic design for Emerson Creek in

10 Oswego?

11 A    Yes.

12 Q    And where are you physically located?

13 A    In Evanston, Illinois.

14 Q    Okay.  And that's close to Oswego?

15 A    Yeah, it's about an hour away.

16 Q    And what -- generally if you could just describe what it

17 is that you do for Emerson Creek in Oswego?

18 A    Well, we designed their website I believe in 2015, and

19 then also I do a lot of print design like fliers and postcards

20 and graphic design work.

21 Q    And do you -- even through today, do you still perform

22 those services for them?

23 A    Yes.

24 Q    Including the print advertising?

25 A    Yes.

1  Q    With respect to the print advertising, those are things

2  that would then be sent to like mailing lists for customers,

3  that sort of thing?

4  A    Yes.

5  Q    Now, let me direct your attention to a -- we'll try this

6  and hope that this works right -- a document that's previously

7  been marked as Exhibit 17.

8       Can you see that document, Ms. Winkler?

9  A    Yeah, it's a little small, but I can sort of see it.

10 Q    And are you able to adjust the view on your screen?

11 A    It looks like I can't zoom in anymore, but I can see the

12 website there.

13 Q    Okay.  Can you tell us what that is?

14 A    It looks to be their about page perhaps on the website.

15 Q    And when you say "their," referring to Emerson Creek in

16 Oswego?

17 A    Correct.

18 Q    Okay.  And I don't know if you can see the capture date on

19 that document -- we'll put it back up in just a second here --

20 but if you can see the capture date on that document.  And if

21 you can't, I can read it for you.

22 A    Yeah, I can't see that.

23           THE CLERK:  Can you share your screen?

24           MR. WILLETT:  Can you share your screen, Ashley?

25           MR. GOODRUM:  Should we go on the Zoom, ma'am?

1            THE CLERK:  I don't know.

2     BY MR. WILLETT:

3    Q    I'll ask a question.  We can go back to your picture in a

4    second.  I will represent to you, Ms. Winkler, that this image

5    was taken on March 1st of 2017.

6         And my question -- Ashley is going to flip through this

7    real quick and go back to your image -- if this is your

8    understanding of what the website for Emerson Creek in Oswego

9    looked like in March of 2017?

10   A    Yes.

11   Q    And the website -- the URL back in March of 2017, that

12   would have been the ecreekpotteryandtearoom.com?

13   A    Yes.

14   Q    Okay.  Now, and we can go back to the witness view.

15        At some point in time you were asked to begin removing

16   some images from that website by defendants?

17   A    Yes.

18   Q    And if you can recall, what were you asked to do?

19   A    To remove all images of pottery and the word "pottery"

20   from the website.

21   Q    Do you know approximately when that occurred?

22   A    I don't remember exactly.  I think it was around 2018 or

23   '19.

24   Q    Next I'm going to ask Ashley if she can put Plaintiff's

25   Exhibit 132 on the screen for you.

1    And as she's doing that, I'll just simply ask you:  How

2  did you typically communicate with the defendants?

3  A    Mostly through email.

4  Q    And your email was the lindsaywinkler29@gmail?

5  A    Yes.

6  Q    And if Ashley can scroll through this document for you

7  briefly, it's something that's been produced in this matter

8  actually I think by you and your husband, Mr. Domanus.  And

9  it's an email exchange between Emerson Creek, and it says

10  ecguest@emersoncreekpottery -- or at

11  ecreekpotteryandtearoom.com, and then Lindsay Winkler from

12  August of 2019.

13    Can you see that okay?

14        MR. MCLAUGHLIN:  Can you tell me which exhibit number

15  that is?

16        MR. WILLETT:  It's 132.

17        MR. MCLAUGHLIN:  132.  Thank you.

18        THE WITNESS:  Yes, I can see that.

19   BY MR. WILLETT:

20  Q    And if you scroll down to the -- so this would have been

21  something you would have done within the normal course of your

22  business, correct?

23  A    Yes.

24        MR. WILLETT:  And I'd like to at this time move for

25  admission of Exhibit 132.

1         THE COURT:  Be admitted.

2         THE CLERK:  Did you also admit 17?  I don't recall.

3         MR. WILLETT:  17 was already admitted.

4         MR. GOODRUM:  Just a second, Mr. Willett.

5         Can we try to join the Zoom?  I think it might be

6  easier if you give me permission to join the screen.

7         THE CLERK:  That's fine.

8         MR. WILLETT:  Bear with us, Ms. Winkler.  I think

9  this is going to make the image bigger for you.

10         (Pause.)

11         MR. GOODRUM:  I think we're in and trying to share

12  the screen now.

13         MR. WILLETT:  We're back on Exhibit 132.  So what I'd

14  ask, Ashley, if you would scroll down to the email there that's

15  dated -- this one is dated February 14, 2019, and specifically

16  page 4 of the PDF where it starts with "questions."  Keep going

17  one more page.

18   BY MR. WILLETT:

19  Q    And what was being -- if you could take a minute to review

20  this, and Ashley can scroll up or down for you if you need her

21  to.  I'm going to ask you if you can identify what you're

22  discussing with Mr. Demiduk here.

23  A    So I'm confirming they want me to get rid of any mentions

24  of the word "pottery," and then they want me to change the

25  domain name, since it has "pottery" in the domain.  I can help

1  facilitate that.

2      And it looks like there were some questions about renaming

3  the shop to something else.  So I was asking them if they want

4  to rename the shop.  And then there was a question about the

5  main logo tag lines because they were switching wording a lot,

6  so clarifying.  And then just confirming if they want to get

7  rid of the illustrations of the pottery on the tearoom page.

8  Q    So let me ask you this:  When was the -- when did you

9  learn that you would need to take these actions to, indeed, get

10 the pictures of pottery and references to pottery off the

11 website?

12     Would it have been sometime around your sending this

13 email?

14 A    Yeah, I believe so, but I don't remember for sure.

15 Q    And am I correct in stating -- if Ashley will scroll up to

16 the date of this particular one, which I think was February of

17 2019, is it fair to say that as of February 14, 2019, the

18 website -- you had not made any modifications to the website to

19 remove pictures or images of pottery or references to pottery;

20 is that correct?

21 A    I'm not -- I don't remember if there was any times before

22 that.  I'd have to look through my email.

23 Q    But indeed -- and Ashley can scroll down to the next

24 page -- at this point one of the questions that had been asked,

25 or that you were rephrasing in the questions:  You want me to

1  get rid of any mentions of the word "pottery" itself, correct?

2  And that was one of the things that you had been directed to

3  do?

4  A    Yes.

5  Q    And is it also your understanding that you were supposed

6  to get rid of images and things like that of pottery that

7  appeared on the website?

8  A    Yes.

9  Q    And if we scroll up a little bit from there to the bottom

10 of page -- or let's go to page 2.

11      And indeed, that's what the -- those are images, for

12 example, of what had appeared for Emerson Creek shop?

13 A    You mean the screenshot there?

14 Q    Yeah, this is what had been on that website, or is this

15 what you changed it to?

16 A    I believe that's what was on the website, and she was

17 making notes for what she wanted changed.

18 Q    All right.  And if you look, for example, just above

19 that -- let's see here.  There is some reference.  I just saw

20 the flowerpot.  Maybe go down, Ashley.

21      Yeah, so there it says, "Tearoom page:  Please change all

22 to say 'tearoom/cafe.' We want customers to start recognizing

23 the" --

24          MR. WILLETT:  We can't read that, Ashley.  Can you

25 make it bigger?

1  Q    "Recognize the word 'cafe' so all places that say

2  'tearoom' change to 'tearoom/cafe' everywhere."

3       Do you see that?

4  A    Yes.

5  Q    Was that a change that you made?

6  A    Yes.

7  Q    And then it says, "For 'our classic flowerpot salad served

8  in an actual Emerson Creek flowerpot' change to 'served in an

9  actual flowerpot.'  Remove Emerson Creek."

10      Do you see that?

11 A    Yes.

12 Q    And then it goes on to say, "Hide or remove all of

13 Joanna's pottery images she drew on the menu."

14      Do you see that as well?

15 A    Yes.

16 Q    Okay.  So as of the time that this email was sent --

17          MR. WILLETT:  If you'll go up to when that email was

18 sent, Ashley.

19 Q    -- in August of 2019, it looked like these were still

20 things that needed to be done to the website; is that correct?

21 A    Yes.  Yes.

22          MR. MCLAUGHLIN:  I want to object to the reference to

23 the date.  I believe that's a European date system.

24  BY MR. WILLETT:

25 Q    Okay.  So do you have an appreciation one way or another;

1    is that March of 2019?

2        Did you hear my question, Ms. Winkler?  We're just

3    clarifying if you believe that was March of 2018 [sic]?

4    A    I don't know that date format.  So I'm not really sure,

5    the European date.

6    Q    And even though it doesn't appear anywhere else, I can

7    tell you that there is an email before that that's on

8    Wednesday, March 6, 2019.  And this appears to be somewhat

9    responsive to that email.

10           MR. WILLETT:  And Ashley, if you can scroll down to

11   that and help her out.  Thank you.  Keep going down, please.

12   Sorry.  I think it's on page 3 of 4 of the PDF.  There you go.

13   Q    It looks like that's part of the email string.  It looks

14   like you're having this discussion in March of 2019?

15   A    Yes.

16   Q    Okay.  So I'm not really sure one way or another whether

17   that's August or March, but at least at some point in 2019

18   you're still taking care of these action items that you've

19   listed here?

20   A    Yes.

21           MR. WILLETT:  Let's go to Exhibit 141.

22           THE CLERK:  I am taking that from the jury's screen

23   until it's admitted, to be clear.

24           MR. GOODRUM:  Can we do that, ma'am?

25           MR. WILLETT:  Oh, yeah, I think Ashley has to do

1    that.

2            THE CLERK:  No.  No.  You're sharing.  I just turned

3    their monitors off.

4            MR. WILLETT:  Okay.  Because that monitor is still

5    on.

6            THE CLERK:  Yes.

7            MR. WILLETT:  Ashley, if you'll just scroll this so

8    Ms. Winkler can identify that for us.

9     BY MR. WILLETT:

10   Q    And this would have been an email exchange that you had

11   with info@emersoncreek.com back in April of 2021?

12   A    Yes.

13   Q    And if we see the -- in the middle of that on the first

14   page --

15           MR. WILLETT:  Well, before I do that, at this time,

16   Judge, I'd like to move for admission of Plaintiff's 141.

17           THE COURT:  Be admitted.

18           MR. MCLAUGHLIN:  No objection.

19           (Plaintiff Exhibit 141 marked.)

20           (Plaintiff Exhibit 141 admitted.)

21           MR. WILLETT:  Ashley, if you'll scroll to the middle

22   of that page, it says, "remove photo of pottery from restaurant

23   page."

24    BY MR. WILLETT:

25   Q    Do you understand what you were being asked to do here?

1    A    Yes.

2    Q    And what was that?

3    A    Basically to remove this header photo.

4    Q    And when you said the header photo, that's the photo of

5    the tearoom, or what may have been called something different

6    at that point?

7    A    Yeah, remove the photo of the tearoom.

8    Q    Okay.  And what were you -- you were removing that photo.

9    That was still on the website at that point in time, and you

10   were removing the images of the pottery on the wall?

11   A    Correct.

12   Q    And so, how did you do that?  Did you have to get new

13   photographs or how did that happen?

14   A    No.  I just removed it altogether.

15   Q    Just got rid of it entirely?

16   A    Yeah.

17        MR. WILLETT:  Next let's go to Exhibit 162.  And

18   again, this won't be published yet.  And Ashley, if you'd just

19   scroll through that for us so she can see that.

20   Q    And this would have been an email exchange that you would

21   have had with -- this is for EC guest at Emerson Creek

22   Pottery & Tearoom as of April 24th, 2019?

23   A    Yes.

24        MR. WILLETT:  Okay.  At this time I would like to

25   move for the admission of Exhibit 162.

1     MR. MCLAUGHLIN:  No objection.

2     THE COURT:  It will be admitted.

3     (Plaintiff Exhibit 162 marked.)

4     (Plaintiff Exhibit 162 admitted.)

5     MR. WILLETT:  And if you scroll to the middle of that

6  first page there, there is an email that says -- it's got a

7  picture of yoga and wine.  And it looks like a picture of a

8  website.  Go down a little bit farther.  There you go.

9   BY MR. WILLETT:

10 Q    Is that a picture of defendants' website?

11 A    Yes.

12 Q    That would have been the way the website was depicted back

13 in 2019?

14 A    Yes.

15 Q    And if you look at that, it says above that, "Hi, Lindsay.

16 Can you change the yoga and wine to say 'small bites are

17 provided.' We need to remove the buffet style, etc."

18     Do you see that?

19 A    Yes.

20 Q    And then below that it says, "remove."  And that's the

21 language that you were supposed to remove?

22 A    Yes.

23 Q    And that's referring to -- if you can read that language,

24 what that says, "remove"?

25 A    "All food is fresh and homemade and served buffet style at

1  8:15 p.m."  And then remove, "the food selection changes each

2  night, but expect s'mores as well as appetizers, small entrees,

3  and desserts from our amazing chefs."

4  Q    Thank you.

5        If you go down to the second page there, there's an email

6  from yourself to Dave and Karla, April 24th at 8:50 a.m.

7        Do you see that?

8  A    Yes.

9  Q    That's just reflecting things you've done.  You've

10 taken -- or you've at that point changed "tearoom" to "cafe,"

11 correct?

12 A    Yes.  Yes.

13 Q    And is that all you did?  You literally just changed the

14 word "tearoom" on their existing website to "cafe"?

15 A    Yes.  Yeah.

16 Q    And it says you took off photos featuring pottery.  "There

17 are a few with pottery in the background, small, but wasn't

18 sure if those are okay."

19       Do you know if you ever got a response to that?

20 A    I don't remember.

21 Q    Then it says, "took out mentions of the word 'pottery.'"

22       And does that mean what it says, you just literally went

23 through the website and searched for the word "pottery" to take

24 it out?

25 A    Yes.

1  Q    Okay.  Waiting on text for the "about" page, "our story."

2  What's that referring to?

3  A    Yeah, on the "about" page they wrote up their story about

4  how Emerson Creek came to be.  And I think I was just waiting

5  for them to rewrite that to remove mentions of pottery.

6  Q    All right.  So at some point after April 24th, 2019, did

7  you indeed get some text to change the "our story"?

8  A    Yes.

9  Q    Who prepared the text for the "our story," the changes to

10 "our story."  Do you know?

11 A    I don't know who did it, but I believe Karla sent it to me

12 via email.

13 Q    So it was something that someone at Emerson Creek prepared

14 and then sent to you for publication?

15 A    Yes.

16 Q    And prior to that, the "our story" page had -- do you know

17 whether that had been changed since the 2017 version of the

18 website we looked at earlier?

19 A    I don't remember.  Possibly.

20 Q    But you don't have a recollection at this time?

21 A    No.  I don't remember.  I mean, we made so many edits and

22 changes to the website since we've been working with them.

23 Q    But this was a specific project, right?  This project was

24 you were supposed to remove references to things like "tearoom"

25 and remove "pottery" and references to Emerson Creek in

1  Bedford, Virginia, correct?

2  A    Yes.

3  Q    So that was different than just making normal revisions to

4  the website, correct?

5  A    Yes.

6  Q    Now, at some point in time -- you referenced this in one

7  of your earlier emails -- at some point in time you were asked

8  to get a new domain name for defendants, correct?

9  A    Yes.

10  Q    All right.  So as of April 24th of 2019, the website URL

11  was still www.ecreekpotteryandtearoom.com?

12  A    Yes.

13  Q    Then let me next direct your attention to Plaintiff's 41.

14  And Ashley will flip through this for you, and just get you to

15  identify this exchange.

16       I'll make it even easier.  This would have been an

17  exchange that happened in the normal course of the work that

18  you did for defendants?

19  A    Yes.

20  Q    And this is from April of 2019?

21  A    Yes.

22            MR. WILLETT:  At this time I'd move for admission of

23  Plaintiff's 41.

24            MR. MCLAUGHLIN:  No objection.

25            THE COURT:  Be admitted.

1          (Plaintiff Exhibit 41 marked.)

2          (Plaintiff Exhibit 41 admitted.)

3          MR. WILLETT:  All right.  If you scroll down, Ashley,

4    to the eighth page there.

5    Q    It says, "On Tuesday, April 23rd, 2019" -- this is from

6    Dave Demiduk -- "Lindsay, just wondering where we are in taking

7    out the pictures of the pottery on our website, and where are

8    we in changing 'tearoom' in our logo to 'cafe.'"

9          And that would be Dave Demiduk who is affiliated with

10   defendants?

11   A    Yes.

12   Q    And then the next item in that exchange is a response

13   email from yourself to Dave.  And you're also referencing

14   communications with Karla.

15         Do you see that?

16   A    Yes.

17   Q    Who is Karla?

18   A    I believe she was like an office manager at Emerson Creek.

19   Q    And then you also say in that email, "Also wanted to

20   double-check that you do not want to change the website domain

21   at this time, as it contains tearoom and pottery shop wording?"

22   A    Yes.

23   Q    And then if you look -- and if you look at -- the next

24   email in this chain is about five minutes later.

25         Do you see that?

Winkler - Direct

1   A    Yes.

2   Q    All right.  What are you communicating there?

3   A    I think it looks like Dave asked if we ever get any other

4   domains there.

5        Am I looking further up the list?

6   Q    Yeah, I'm sorry.  It's right above the list.  It looks

7   like -- yeah, I apologize, I missed that.  Dave said, "Did we

8   ever get any other domains?"

9        And then you respond almost immediately with, "We haven't

10  purchased any domains.  Waiting to hear which ones you guys

11  want to pick to buy for sure.  But below is what we had sent to

12  pick from."

13  A    Yeah.  So we sent them the list of available domains.

14  Q    And am I correct it's stating that you had already

15  provided this list to someone at Emerson Creek prior to this

16  time?

17  A    No.  I think this was the first time we sent them this

18  list.

19  Q    When you say, "waiting to hear which ones you guys wanted

20  to buy for sure," what were you referring to there?

21  A    I was just waiting on a decision if they wanted to buy any

22  of them and change the domain.

23  Q    And after that you have some recommended domains.  Do you

24  see that?

25  A    Yes.

1   Q    And did you come up with these?

2   A    Yes.

3   Q    And these were -- were these domains that were all

4   available at that time?

5   A    Yeah.

6   Q    And then you also mentioned some additional domains that

7   are available as well.

8        Do you see that?

9   A    Yes.

10  Q    Okay.  And so if I'm looking correctly, the five that you

11  recommend are emersoncreekshopandcafe.com, as well as

12  emersoncreekevents.com, emersoncreekcafe.com,

13  emersoncreekshop.com and emersoncreekconfectionary.com.

14       Do you see that?

15  A    Yes.

16  Q    And then below you have a reference to ecreek.com and

17  emerson-creek.com.

18       Those were also available?

19  A    Yes.

20  Q    Above that is a response from Mr. Demiduk it looks like

21  shortly thereafter at 11:18.  And he says, "Let's use

22  Emersoncreekevents.com as our new domain, but also purchase and

23  keep," and then he lists four names there.

24       Do you see that?

25  A    Yes.

1  Q    And on one of them he -- it looks like he changed the

2  spelling of "confectionary," or at least he says, "note the

3  spelling of confectionary"?

4  A    Yeah, it looks like it was an A in that one.

5  Q    Below that he says keep ecreekpotteryandtearoom.com.

6       Do you see that?

7  A    Yes.

8  Q    And that was the URL that appeared on the 2017 website

9  that we looked at a little bit earlier, correct?

10 A    Correct.

11 Q    And that's the URL that was presently, as of April of

12 2019, on the website, correct?

13 A    Correct.

14 Q    It says, "Will we be able to use these all as redirects?"

15 And then he also asks, "Can you only buy them for a max of two

16 years at a time?"

17      Do you see that?

18 A    Yes.

19 Q    All right.  If we'll scroll to the next email, this is

20 your response.

21      And you say, "Okay.  Yes, we can buy all these.  Yes, we

22 can use redirects to do whatever we need between sites/pages,

23 but we also don't want to confuse people too."

24      What did you mean by that?

25 A    When you're changing a URL name, it can confuse people,

1  the different names if you're changing it.  So I think in

2  buying all those different URLs, you know, we would recommend

3  as Web developers to try to keep only one URL for your website.

4  Q    And then Mr. Demiduk responds a little bit later at 12:57

5  p.m. and says, "I guess if you did the five years it's just one

6  less thing you have to worry about.  I don't think we would

7  advertise the other names.  It would be just if someone types

8  in something else.  My thought in the print is just put Emerson

9  Creek," and then he goes events, shop, cafe.

10       Do you see that?

11 A    Yes.

12 Q    Did you have an understanding of what Mr. Demiduk meant

13 by -- when he said, "I don't think we would advertise the other

14 names.  It would be just if someone types in something else,"

15 what he was referring to?

16 A    I mean, he might have meant to have those domains so they

17 could market some other aspects of their business better.

18 Q    And -- oh, I'm sorry.

19 A    If they own those, then they could direct people from

20 those URLs to their website.

21 Q    Explain what that means.  When you say "redirect," what

22 does that mean?

23 A    If you go to a URL, you are basically redirected to a

24 different URL.  So, for instance, like if they bought Emerson

25 Creek Events, they could push people to emersoncreek.com from

1  that URL.

2  Q    And similarly if they bought ecreekpotteryandtearoom.com

3  they could push people to whatever they changed their website

4  name to, correct?

5  A    Right.

6  Q    It goes on to say right before the signature there, "I

7  also thought if we bought the other names, Jim in Virginia

8  couldn't."

9       Do you know who Jim in Virginia refers to?

10 A    Yes.  It's the owner of the Emerson Creek Pottery.

11 Q    And when he says that if we buy them, Jim couldn't, what

12 does that mean?

13 A    Well, if we bought those domains, no one could actually

14 buy those until they expired.

15 Q    Which would be five years unless you renewed, correct?

16 A    Right, if that's what we did.  I don't know if we bought

17 those for five years.  I don't remember.

18 Q    But if you do buy a URL name for a certain period of time,

19 no one else can buy that URL during that time period, correct?

20 A    Correct.  Yes.

21 Q    Then the response to you is -- from you, "Okay, great.

22 Makes sense.  We'll go ahead and buy those domains and Jonathan

23 will work on getting it all switched over to

24 emersoncreekevents.com."

25      Do you see that?

1  A    Yes.  Oh, well, scrolling.

2          MR. WILLETT:  Sorry.  It's on PDF 6 of 9.

3  Q    And that was your response to him, correct?

4  A    Yes.

5  Q    And then there's also some discussion there about changing

6  the URLs for -- or the domain names for emails.

7          Do you see that?

8  A    Correct.  Yes.

9  Q    And that's something your husband did with them ultimately

10  was to change those emails?

11  A    Yes.

12          MR. WILLETT:  At this point I want to -- bear with me

13  here.  Next we'll go to Exhibit 109.

14          No, I'm sorry, that's not it.  Exhibit 39.

15  Q    I'm just going to ask if you can identify this.  It says,

16  "CD."  It says, "Chris."

17          If you can identify if this is a text string between you

18  and Ms. Demiduk?

19  A    Yes.

20  Q    All right.  Now, if we -- well, before that -- go ahead.

21          And that's Chris Demiduk, defendant.  And this would have

22  been texts it looks like that you were sending in the normal

23  course of your duties for them?

24  A    Right.

25          MR. WILLETT:  At this time we move for the admission

1  of Plaintiff's 39.

2            MR. MCLAUGHLIN:  No objection.

3            THE COURT:  Be admitted.

4            (Plaintiff Exhibit 39 marked.)

5            (Plaintiff Exhibit 39 admitted.)

6   BY MR. WILLETT:

7   Q    If you scroll down a little bit, we'll just get right to

8   it here -- it looks like in the middle of this -- bear with me.

9   If you go down to page 3 of 8, you have a message that looks

10  like it's inserted there, a picture or something.

11       Do you see that?

12            MR. WILLETT:  Keep going down, please.

13  Q    It looks like she took a screenshot from Dave Demiduk and

14  sent that to you; is that your understanding?

15  A    Yes.

16  Q    And the question was, "You guys are okay with going ahead

17  and changing the names at the same time, correct?  John will

18  start this weekend.  Hope to finish no later than next week."

19       Do you see that?

20  A    Yes.

21  Q    And it looks like Dave is asking a question related to

22  that.  He says, "Will dave@ecreekpotteryandtearoom.com just get

23  forwarded to dave@emersoncreek.com?"

24       Do you see that?

25  A    Yes.

1      MR. WILLETT:  And Ashley, can you scroll up from

2  there?

3  Q    Do you know if you responded to that?

4  A    Which?

5  Q    That indeed if someone sent an email to

6  @ecreekpotteryandtearoom.com, that they would get forwarded to

7  whatever the new email domain name was?

8  A    I'd have to see in that message.

9      MR. WILLETT:  Ashley, if you'll scroll up from there.

10      THE WITNESS:  I'm not sure if I replied to that.

11  Q    Let me ask you this:  Do you have that understanding?  Do

12  you know one way or another if emails -- the way that the

13  transition worked, if emails sent to

14  dave@ecreekpotteryandtearoom.com would have been transferred to

15  whatever the new email name was?

16  A    Yes, I believe we forwarded emails.

17  Q    So anyone who -- if someone emailed, for example,

18  into@ecreekpotteryandtearoom.com, they'd get directed to

19  whatever defendants' new email became?

20  A    Correct.

21  Q    All right.  Now, look up just a little bit above that.  It

22  says on PDF -- the first page, "You are officially the proud

23  owner of emersoncreek.com."

24      Do you see that?

25  A    Yes.

1  Q    And how did that come to be?  How did defendants get

2  emersoncreek.com?

3  A    I believe that it became available at some point, I don't

4  remember when, and we let them know and we bought it.

5  Q    And did they use it?

6  A    Yes.

7  Q    And so now the website is www.emersoncreek.com, correct?

8  A    Yes.

9  Q    All right.  And then with respect to the redirects, if

10 someone types in www.ecreekpotteryandtearoom.com, they would be

11 redirected to emersoncreek.com; is that correct?

12 A    I actually don't know that right now, if that's still a

13 redirect happening or not.

14 Q    And how would you find that out?  You would just type it

15 in and -- you would just literally type it in --

16 A    Right.

17 Q    -- and see if it redirected, correct?

18 A    Yes.  And Jonathan handled all that.  So I'm just not

19 sure.

20 Q    Yeah, but you can type in an email address and see if it

21 redirects you, correct?

22 A    Yes.

23        MR. WILLETT:  Bear with me just one minute, Your

24 Honor.  I may be done.

25        Ashley is going to share the screen again.  This is

1  just an image of the current Internet.  She's going to type it

2  in for you so you can see it on your screen, but we're not

3  publishing at this point.

4          THE CLERK:  You said we're not publishing?

5          MR. WILLETT:  We're not publishing at this point.

6          Did I admit the last one?

7          THE CLERK:  Yes.  39?

8          MR. WILLETT:  Yes, ma'am.

9          THE CLERK:  Yes.

10          MS. SCHMITZ:  Can you stop my current share?

11          THE CLERK:  One moment.  Oh, on Zoom?

12          MS. SCHMITZ:  Yeah.

13          THE CLERK:  Just a moment.

14          MR. GOODRUM:  And then can you re-share again?

15          THE CLERK:  You should be able to share.

16          MR. GOODRUM:  Okay.

17          MR. WILLETT:  If we can go back to Exhibit 39 real

18  quick.

19   BY MR. WILLETT:

20  Q    In response to your text --

21          MR. WILLETT:  And Ashley, can you put Exhibit 39 back

22  up.

23          MR. FRETWELL:  I don't have controls to do that.

24          MR. WILLETT:  Exhibit 39.  We've got it.

25   BY MR. WILLETT:

1  Q    So right there after "you are officially the proud owner

2  of emersoncreek.com," that was your words to them, correct?

3  A    Right.

4  Q    And they respond, "Great.  Thank you.  Everything happens

5  for a reason."

6       That's from Chris Demiduk?

7  A    Yes.

8  Q    And then you say, "I guess so."

9       And you also say, "I'm going to set up a notification to

10 receive when the events and wedding domains expire so we can

11 know when they may become available next time."

12      What is that referring to?

13 A    I believe in GoDaddy you can set up on a domain that

14 notifies you when it becomes available if you're interested in

15 it --

16      (Overlapping speakers.)

17 Q    I'm sorry, I thought you were done.  I spoke over you.

18 A    That would allow you to buy it if it expired and it was

19 available.

20 Q    Then you go on to say, "Let us know if you think of any

21 other wedding-related domains you might think of, and we can

22 check if they are available."

23      Do you see that?

24 A    Yes.

25 Q    Okay.  And what were you doing there, just offering to

1    keep checking on different iterations of URLs for websites?

2    A    Right.  Correct.

3         MR. WILLETT:  I don't have any further questions of

4    this witness.

5         THE COURT:  All right.  Cross?

6                    CROSS-EXAMINATION

7     BY MR. MCLAUGHLIN:

8    Q    Good afternoon, Ms. Winkler.  I believe the last time we

9    met was during your deposition?

10   A    Yes.

11   Q    And as you know, I represent the defendants in this

12   matter.

13        So I want to direct your attention to two exhibits you

14   already talked about, one being Plaintiff's Exhibit Number 41

15   and the other being the texts that are Plaintiff's Exhibit 39,

16   okay?

17   A    Okay.

18   Q    So I want to direct your attention back to the April 24th,

19   2019 time frame when you were looking at various domain names.

20   And specifically when it came to emersoncreekevents.com, do you

21   recall that the defendants in this case wanted to get

22   emersoncreekevents.com, right?

23        MR. WILLETT:  Objection, foundation.

24    BY MR. MCLAUGHLIN:

25   Q    You were involved with them getting the domains for the

1  business; am I correct?

2  A    Yes.

3  Q    And one of the domains that they wanted to obtain was

4  emersoncreekevents.com, correct?

5  A    Yes.

6  Q    And did you assist them in the search to see if Emerson

7  Creek Events was available?

8  A    Yes.

9  Q    Was it available?

10 A    I believe so.

11 Q    But you weren't able to get that name, if you recall,

12 right?

13 A    I don't remember, honestly.  This is more of Jonathan was

14 doing this.

15 Q    So I want to see if I can refresh your memory.  At the

16 time do you recall that, in fact, Jim Leavitt had actually

17 obtained the name emersoncreekevents.com?

18 A    Yeah, I wasn't -- I wasn't aware of that.

19 Q    That would be something Jonathan may or may not know?

20 A    Yes.

21 Q    And do you recall, then, when Emerson Creek Events was not

22 available that you were searching for other available names as

23 we've talked about, correct?

24 A    Yes.

25 Q    Okay.  And you found at that time that emersoncreek.com

1  was available?

2  A     Yes.

3  Q     And Emerson Creek Pottery in Bedford, Virginia had not

4  taken that name, had they?

5  A     Right.  It was available.  No one owned it.

6  Q     So apparently they weren't interested in taking it, right?

7  A     Right.

8  Q     And when you were looking at the other names, weren't they

9  all tied to the wedding and events business that defendants in

10 this case were already doing?

11 A     Yeah.  It was focused on the weddings part of the business

12 a lot more than the shop and tearoom.

13 Q     And the reason was is because they were trying to separate

14 it from pottery because of the litigation involved in this

15 case, correct?

16        MR. WILLETT:  I'm just going to object to the

17 continuing leading, Your Honor.

18        MR. MCLAUGHLIN:  Judge, I'm on cross-examination.

19 Leading is allowed.  It was his witness.  I'm on cross.

20        THE COURT:  Overruled.

21  BY MR. MCLAUGHLIN:

22 Q     You can go ahead and answer.

23        Is it correct that they were looking for alternatives to

24 pottery because they were focusing on domains for their website

25 business, correct -- or for their events and weddings business?

1  A    Correct.

2  Q    And they had engaged you in a substantial effort to remove

3  "pottery" and "tearoom," as we already talked about?

4  A    Yeah, there were several times that we were going through

5  and removing stuff.

6  Q    And in fact, you had testified that they had asked you in

7  February of 2019 to make those changes, correct?

8  A    Yes.

9  Q    So I want to show you what will be marked as Defendants'

10  Exhibit 55.

11         MR. MCLAUGHLIN:  So Mike, if you can pull that up.

12  What I want you to do is go to one that is dated January 30th.

13  I think it's the first one.

14         THE CLERK:  The Zoom witness can't see it.

15         MR. FRETWELL:  There's nothing I can do about that.

16         MR. MCLAUGHLIN:  Larry, why don't we do this:  Give

17  me my laptop.

18         We're working with technology, but we've got it.

19  Give me a second to pull it up on mine.  Then I can work with

20  you.

21   BY MR. MCLAUGHLIN:

22  Q    I want to direct your attention to what's been marked as

23  Defendants' Number 55 for identification.  And if you take a

24  look at that first page, can you see that, where it's a January

25  30th, 2018 email from Thomas Adams to yourself?

Winkler - Cross

1  A    Yes.

2  Q    That's an email you received in the ordinary course of

3  business?

4  A    Yes.

5  Q    And if you look down, those emails continue, and there are

6  actually a number of emails between yourself and Thomas; is

7  that correct?

8  A    Yes.

9        MR. MCLAUGHLIN:  I'd ask that Defense Exhibit Number

10 55 be admitted into evidence.

11       THE COURT:  Be admitted.

12       (Defense Exhibit 55 marked.)

13       (Defense Exhibit 55 admitted.)

14  BY MR. MCLAUGHLIN:

15 Q    So I want to focus on this first page on what's PDF

16 number -- or page 1.

17       And if you can take a look at that for a minute and read

18 that.  And hopefully you can read it, because --

19       THE CLERK:  The reason is they were connected to the

20 Zoom.  So that's why --

21       MR. MCLAUGHLIN:  It's not a problem.

22       THE CLERK:  Now the jury can only see the exhibit,

23 but not the witness testifying.  That's what's going to happen.

24 That's the only way around it.

25       MR. MCLAUGHLIN:  Well, Lindsay, hopefully you're

1   still there.

2           THE WITNESS:  Yeah, it's a little small, but I can

3   kind of read it.

4    BY MR. MCLAUGHLIN:

5   Q    I'm just going to read it just because of -- in the

6   interest of the technology issues we're having.

7        It says, "Lindsay, I work in the office at Emerson Creek,

8   and from time to time they ask me to make changes to the

9   website.  Dave is hoping to change the logo on the website.  I

10  attempted to do just that, but it looks to me like you're using

11  some plug-in that I'm not familiar with.  I have some

12  experience with WordPress, but I have always selected the logo

13  in the theme's appearance settings.  I attached the image for

14  the new logo.  He just wants to change it to events and

15  tearoom."  That's the first paragraph.

16       The second paragraph says, "I got the font pretty close to

17  yours.  It's Avenir font, but I still see some slight

18  differences.  It if it is easier for you to edit the original

19  or make a new one yourself, that's fine, whatever is easiest

20  for you.  Dave was hoping to have this done today or tomorrow

21  morning at the latest, but I had to let him know I couldn't

22  figure it out.  And I didn't want to go changing settings

23  without knowing what I was doing.  Sorry this is so last

24  minute.  I appreciate that."

25       Do you see that?

1  A    Yes.

2  Q    And so if we go down, we see a number of -- a string of

3  emails between you and Thomas in which certain changes are

4  being requested on the website, correct?

5  A    Yes.

6  Q    And your business practice with Emerson Creek and Oswego

7  was to get instructions from them, and then you would actually

8  handle all the website changes; isn't that correct?

9  A    Yes.

10  Q    Okay.  And you were initially engaged for this most recent

11  iteration of the website in 2015, right?

12  A    Yes.

13  Q    And not only were you handling website design, but you

14  were handling social media and all aspects of the marketing,

15  right?

16  A    Not social media, but yeah, everything else with print and

17  marketing.

18  Q    And is that the kind of thing that can be done overnight?

19  A    No.

20  Q    And so when you began working with them on the changes,

21  approximately how long did it take, start to finish, to make

22  all the changes that were necessary to remove items like

23  "pottery" and "tearoom," those types of things?

24  A    It would take at least like a month or so, since there was

25  some back and forth, and then our time frame to be able to get

1  stuff done.

2  Q    And in this case it was actually over a period of several

3  months, because from time to time you would see another change

4  that sort of was overseen, and you'd have to make that change

5  as well?

6  A    Yeah, there's different levels of changes.  But there was

7  like logos or text or images.

8  Q    Do you believe that Dave Demiduk and Chris Demiduk were

9  working diligently with you to make the changes that were

10  necessary to remove "pottery" and "tearoom" throughout this

11  entire process?

12  A    Yes, I do.

13  Q    Now, I want to show you again, if you can pull up -- let's

14  go to -- pull up 62 and 63.

15      I want to show you two documents that have been marked as

16  Defendants' 62 and Defendants' 63.  And first I'm going to have

17  us pull up 62.  I'm going to represent to you the first part

18  doesn't deal with you at all.  It's actually just a number of

19  marketing expenses.  But I want to scroll down or have Mike

20  scroll down until --

21          MR. WILLETT:  Which document are you on?

22          MR. MCLAUGHLIN:  Defendant's Number 62.

23          Just give me a second.  I'm going to get to the page

24  I want you to see.  All right.  I believe if you can take a

25  look, Mike, at Bates -- or excuse me, the PDF page 38 is the

1  first page I want to look at.

2  Q    Can you see that first page?

3  A    Yeah.  It's a little hard to read.

4  Q    So I'm just going to kind of have him scroll down a couple

5  of pages so you can kind of get the sense of what you're

6  looking at.

7       What I really just want you to answer is:  Does that

8  appear to be the statement of worksheet that you would provide

9  to Emerson Creek in Oswego in order to do the website and other

10  type of marketing work you were doing?

11  A    Yeah.

12          MR. MCLAUGHLIN:  And I want to admit Exhibit Number

13  62 into evidence at this point for Ms. Winkler to identify her

14  portion, but later on tomorrow we'll actually bring in the

15  remainder of it through Ms. Demiduk.  I believe it's something

16  even plaintiff is using in their exhibits.

17          MR. WILLETT:  I just missed the last part.  Tomorrow

18  you'll do what?

19          MR. MCLAUGHLIN:  We'll bring in the rest through

20  Ms. Demiduk.  But I believe it's your exhibit, so I'd ask it be

21  admitted into evidence now.

22          MR. WILLETT:  Yeah, that's fine.

23   BY MR. MCLAUGHLIN:

24  Q    So if you just kind of -- I'll have Mike scroll down, if

25  you can just take a look.

1    Can you confirm for us that this is the statement of work

2  that you would have provided for this work in 2015 and '16 and

3  '17?

4  A    Yes.

5  Q    Thank you.

6         MR. MCLAUGHLIN:  And then I want to have Mike pull up

7  what's been previously marked as Defendants' Exhibit Number 63.

8  And it's going to take a moment for it to come up on the

9  screen?

10         THE CLERK:  Judge, just for clarification on the

11  record, 62 is admitted, the last one?  I didn't hear if it was

12  admitted.

13         MR. MCLAUGHLIN:  Yeah, he had agreed to it.

14         (Defense Exhibit 62 marked.)

15         (Defense Exhibit 62 admitted.)

16   BY MR. MCLAUGHLIN:

17  Q    Do you have it in front of you?  Can you hear us still?

18  Did we lose her?

19  A    Oh, yes, I can hear you.

20  Q    Okay.  Great.  So in the same way here, this is a

21  continuation.  This is only 18 pages.  I'm going to have him

22  kind of scroll down.

23     Can you confirm that this is the work that you were doing

24  for Emerson Creek in Oswego in 2018 and '19?  It looks like it

25  may go down to around 2020 as well.

1  A    Yes.

2  Q    So I'm not going to go page by page.  But generally the

3  way you would work with them is whatever work you were doing at

4  the time, you would set forth the statement of work, and you

5  would have a price for that, and you would go about doing that,

6  correct?

7  A    Right.  It was hourly.  We did the initial website as a

8  lump sum, and then everything else after was hourly.

9  Q    So if we want to see what you did on any given day or for

10 a given week, we could just look on your statement of work, and

11 it would pretty much itemize what you had done?

12 A    Yes.

13        MR. MCLAUGHLIN:  I'd ask that Defense Exhibit 63 be

14 admitted into evidence.

15        MR. WILLETT:  No objection.

16        THE COURT:  Okay.  Be admitted.

17        (Defense Exhibit 63 marked.)

18        (Defense Exhibit 63 admitted.)

19  BY MR. MCLAUGHLIN:

20 Q    All of the work that you did on behalf of -- well, any of

21 the work that you did relative to Emerson Creek in Oswego, were

22 100 percent of those fees and expenses paid by the defense in

23 this case?

24 A    Yes.

25 Q    Did Mr. Leavitt or did Emerson Creek in Bedford, Virginia

1  pay anything towards any work that you did?

2  A    No.

3  Q    Okay.  And at any time that you did any work for Emerson

4  Creek in Oswego, did anyone from -- on behalf of Jim Leavitt or

5  from Emerson Creek in Bedford, Virginia ever give any kind of

6  input or have any kind of involvement as it related to

7  marketing designs and changes, website designs and changes,

8  those types of things?

9  A    No.

10          MR. MCLAUGHLIN:  That's all I have.  Thank you.

11          THE COURT:  All right.  Any redirect?

12          MR. WILLETT:  Just a few.

13                    REDIRECT EXAMINATION

14  BY MR. WILLETT:

15  Q    Just direct your attention back to Exhibit 55 briefly in

16  the exchange.

17      Okay.  And if Ashley will scroll down a little bit from

18  there to the email exchange with Tomas --

19          THE CLERK:  Are you going to share your screen again

20  in the Zoom?

21          MR. WILLETT:  Yeah, she can.  That's fine, because

22  she'll need to see that.

23  BY MR. WILLETT:

24  Q    If you look at the email that you referred to earlier, it

25  should appear on your screen right now.

1    A    Yes.

2    Q    Okay.  It says, "I attached the image for the new logo.

3    He just wants to change it to events and tearoom."

4         What logo was that referring to?

5    A    I believe it was the original log.

6    Q    The what now?

7    A    I believe it was their original logo that he wanted

8    changed.

9    Q    Okay.  And you believe that -- what is the image for the

10   new logo that's referenced here?

11   A    Let me read through this real quick.

12        (Witness perusing document.)

13        I believe it's the -- it's the logo Emerson Creek, but

14   then the tagline underneath it used to read "pottery and

15   tearoom."  He wants it to read "events and tearoom."

16   Q    So at this point in -- this looks like January 30th of

17   2018, he wants it changed to "events and tearoom," correct?

18   A    Yes.

19   Q    And what happened there?  What did you do?

20   A    I helped Tomas out, and I just redid the logo for him and

21   updated it that evening.

22   Q    Now, next I want to direct your attention back to -- bear

23   with me here.

24        I'd like to direct your attention back to Plaintiff's

25   Exhibit 132.  If you go down to the second PDF there, page 2 of

1   the PDF, and look at the image on the screen.  Again, this is

2   what you were -- and if you look below that it says, "tearoom

3   page, change all to say 'tearoom/cafe.'"

4        Do you see that?

5   A    Yes.

6   Q    And again, this was -- this page was what you were being

7   asked to modify as of it looks like March of 2019; is that

8   correct?

9        MR. WILLETT:  And Ashley, you can scroll so she can

10  see that from the email.

11  Q    This was the date that Mr. McLaughlin helped us with

12  earlier.  We think this was March 8th as opposed to August 8th

13  of 2019?

14  A    Yes.

15  Q    And at this point about -- well, more than 14 months

16  later, if we look at the top header --

17       MR. WILLETT:  Go down to the screenshot there,

18  Ashley.

19  Q    We've got -- it says, "shop tearoom."

20       Do you see that?

21       And then below that it has some text.  It says, "Emerson

22  Creek shop.  Shop local and handmade."

23       Do you see that?

24  A    Yes.

25  Q    And if you could read that first sentence for me.

1  A     Can you just -- "located inside the renovated 100 year-old

2  farmhouse, Emerson Creek Shop offers a wide array of

3  handcrafted gifts and accessories, as well as our namesake

4  hand-painted pottery."

5           MR. WILLETT:  No further questions.  Thank you, Your

6  Honor.

7           THE COURT:  Okay.  Is that all?

8           MR. WILLETT:  That's all for that witness.

9           THE COURT:  Thank you.

10          MR. WILLETT:  Your Honor, we -- plaintiffs call Dave

11 Demiduk.

12          THE COURT:  Is that witness on Zoom too?

13          MR. WILLETT:  No, he's going to be live.

14      DAVID DEMIDUK, CALLED BY THE PLAINTIFF, SWORN

15                  DIRECT EXAMINATION

16  BY MR. WILLETT:

17 Q     Good afternoon, Mr. Demiduk.  How are you doing?

18 A     Good.  How are you?

19 Q     And if you could please state your full name for the

20 record?

21 A     David Demiduk.

22 Q     And what's your current occupation, Mr. Demiduk?

23 A     I own our business with my wife in Oswego.

24 Q     And what is that business, sir?

25 A     It's the restaurant and wedding business.

1  Q    And how long have you been a part owner of that business?

2  A    Me and Chris got together in the 2008, 2009 time.

3  Q    And have you been an owner ever since that time?

4  A    We got married in 2010.  I don't know if we ever filled

5  out paperwork that I was an owner, but just...

6  Q    I couldn't hear.

7  A    Just we never filled out paperwork.  Stuff we filled out

8  with the state and stuff, we split it 50/50 with Events.

9  Q    Okay.  Prior to that, you owned a plumbing business?

10 A    Yes.  I did plumbing and remodeling.

11 Q    Are you familiar with an entity called Countryview

12 Pottery, Inc.?

13 A    Yes.

14 Q    And in fact, you're the registered agent for that entity?

15 A    Yes.

16       MR. WILLETT:  If we could go to Exhibit 21.

17 Q    I'll represent to you, if you look in the upper left-hand

18 corner, that's a screenshot from the Office of the Illinois

19 Secretary of State from May the 2nd, 2019.

20     Do you see that?

21 A    Yes.

22 Q    And if Ashley will scroll down, I'll just represent to you

23 this is the website with the corporation details for

24 Countryview Pottery Co.

25     Do you see that?

D. Demiduk - Direct

1  A    Yes, I do.

2           MR. WILLETT:  At this time I'd move for the admission

3  of Exhibit 21.

4           MR. MCLAUGHLIN:  No objection.

5           THE COURT:  Be admitted.

6           (Plaintiff Exhibit 21 marked.)

7           (Plaintiff Exhibit 21 admitted.)

8   BY MR. WILLETT:

9  Q    If we look at this page, Mr. Demiduk, it has -- it says

10 "agent," but the registered agent for Countryview Pottery Co.

11 at that time was yourself?

12 A    Yes.

13 Q    And it has an incorporation date of April the 2nd, 2001.

14      Do you see that?  It's right above your name.

15 A    Oh, yes, I see it.

16 Q    Do you agree that that's indeed the date that Countryview

17 Pottery Co. was incorporated?

18 A    Yes.

19 Q    And now if we look down from there it says the president

20 name and address, Christina Demiduk, that's your wife?

21 A    Correct.

22 Q    And secretary, and that's you?

23 A    Correct.

24 Q    And if you look down in the assumed name category there,

25 do you see that?

1    A    Yes, I do.

2    Q    All right.  And it lists as an active assume name as of

3    the date of this image capture in 2019, Emerson Creek Pottery.

4    Do.

5         You see that?

6    A    Yes, I do.

7    Q    And it also lists as an active doing business -- or assume

8    name, Emerson Creek Tearoom.

9         Do you see that?

10   A    Yes.

11   Q    Do you have an understanding of what an assumed name is?

12   A    Yes.

13   Q    That's like a doing business as, correct?

14   A    Correct.

15   Q    And go back up.

16        The incorporation date of April the 2nd, 2001, you weren't

17   affiliated with Countryview at that time, correct?

18   A    No, sir.

19   Q    And so, for example, we saw the Ron Wehrli document

20   earlier, Exhibit 57.

21        Now, since that time have you had an opportunity to see

22   this document, sir?

23   A    Just during this, my deposition.

24   Q    And so -- but you weren't affiliated with either of these

25   entities on March 23rd, 2001, the date of this document,

D. Demiduk - Direct

1  correct?

2  A    No, sir.

3  Q    And as of the time that you first met Ms. Demiduk,

4  Countryview Pottery Co. was operating as Emerson Creek Pottery,

5  correct?

6  A    Yes, sir.

7  Q    Now, let me ask you this:  Do you know what I mean when I

8  refer to Mud Pie ceramics?

9  A    Yes.

10 Q    Okay.  What is that?

11 A    It's a line of giftware, stuff that we sold in the shop.

12 Q    And so, for example -- if I may, Your Honor, if I can

13 approach, are these Mud Pie items?

14 A    Yes, they are.

15 Q    Let me ask you this, sir:  You handle some of the

16 financial aspects of Emerson Creek in Oswego?

17 A    Yes.

18 Q    Let me direct your attention to Exhibit 32.  I would ask

19 if Ashley could show you that and then scroll through that

20 document for you so you can see what that is.

21 A    Yes.  It's items that we sold for a particular vendor.

22 Q    And this is for -- the vendor in this particular case, if

23 you look under that column, is Mud Pie?

24 A    Correct.

25         MR. WILLETT:  And at this time I'd like to go ahead

1  and move for the admission of Plaintiff's 32.

2          MR. LAUBSCHER:  No objection.

3          THE COURT:  Be admitted.

4              (Plaintiff Exhibit 32 marked.)

5              (Plaintiff Exhibit 32 admitted.)

6   BY MR. WILLETT:

7  Q    And so I just want to make sure.  This is -- in what

8  format do you -- well, do you maintain spreadsheets like this?

9  A    I personally don't.

10 Q    And who does that for you?

11 A    We used to use QuickBooks in the shop and it -- everything

12 had -- the attribute -- you type in the attribute and it would

13 keep a tally of everything.

14 Q    But at some point in time you switched to something that

15 your son had helped you create using some spreadsheets; is that

16 correct?

17 A    Not for the shop.

18 Q    Not for the shop, just for the other aspects of the

19 business?

20 A    Correct.

21 Q    All right.  And so as of the time period for this, May 1

22 of 2017 through 12-31 of 2017, you would have had access to

23 spreadsheets like this related to sales in the shop?

24 A    For the most part, yes.

25 Q    And so just a couple of questions about this.  If we -- if

D. Demiduk - Direct

1  we look down a little bit -- oh, shoot.  Do you see my arrow?

2  I'm terrible at this, but where it says "pitcher"?

3  A    Yes.

4  Q    And maybe Ashley can make that a little bit bigger on the

5  screen.  And then it says -- I just want to highlight the word

6  "pitcher."  And then if I scroll over to the right.  So this

7  would establish this was a pitcher that was made by Mud Pie,

8  and it's quantity sold, four bloody mary pitcher sets.

9       And then what does EXT price refer to?

10 A    If you can scroll over more.

11 Q    And I'm going to clear that.

12 A    It's the extended price of what we charge the customer, I

13 believe.

14 Q    Okay.  And so the price charged to the customer for the

15 bloody mary pitcher would have been $177.06?

16 A    No, I think that was our -- we had four of them.  That was

17 probably the total of the four of them.  See it says quantity?

18 Quantity sold, we sold four of them.  So it was -- that was the

19 total for the four pitchers.

20 Q    The total for the four.

21      All right.  Then if Ashley can scroll a little bit over to

22 the right from there.  And then that gives you just some other

23 information.

24      Under size, do you know what that refers to?

25 A    No, I don't.

D. Demiduk - Direct

1  Q    Then it's got -- I think on that far right column it has

2  ceramic and then Xs in it.  What is that referring to?

3  A    You know, I'm not sure.  I didn't input things into --

4  into QuickBooks in the shop.

5  Q    For example, if someone was searching for ceramic items

6  under Mud Pie, they could list them based on all Mud Pie items

7  that are ceramic.  They could do that in your QuickBooks

8  software?

9  A    You know, I don't know.  I don't know if this was headers

10  we came up with.  I don't know if it's pre-done.

11  Q    But you know what the word "ceramic" means?

12  A    Correct.

13  Q    Is that pitcher, is that a ceramic pitcher?

14  A    I would think so.

15  Q    If we can go back over to the left again.  And then -- and

16  again, these would have been sales that occurred in May of 2017

17  between May 1, 2017 through December 31st, 2017; is that

18  correct?

19  A    Yes.

20  Q    Do you know what Signature Housewares refers to?

21  A    Yes.

22  Q    And what does that refer to?

23  A    It was a line of stuff that we sold.

24  Q    Okay.  And I would next ask Ashley if she could put up

25  Exhibit 34 for me.

D. Demiduk - Direct

1       And if you could identify this, is this the same type of

2  information for Signature?

3  A    Yes.

4  Q    And Signature, they make items -- like it says here oval

5  platters, dinner plates, that sort of thing?

6  A    Yes.

7  Q    They make it looks like Signature 7-inch berry baskets.

8       Do you know what that is?

9  A    No, I don't.

10 Q    And then that goes on over.  It has -- and this one has

11 estimated price and estimated cost.  Do you know why that has a

12 different column than the prior document?

13 A    I think it's not estimated.  It's extended.

14 Q    Extended.  I'm sorry.  Meaning what it was sold for?

15 A    I believe that's what it means.

16       MR. WILLETT:  At this time I'd move for admission of

17 Plaintiff's 34.

18       MR. LAUBSCHER:  No objection.

19       THE COURT:  Be admitted.

20       (Plaintiff Exhibit 34 marked.)

21       (Plaintiff Exhibit 34 admitted.)

22       MR. WILLETT:  And if you go back real quick, Ashley,

23 to Exhibit 32 -- sorry, scroll over just a little bit.  The

24 other way.  Thank you.  A little bit more to the right.  There

25 you go.  Great.

D. Demiduk - Direct

1  Q    So, for example, there if we look at the baking tray set,

2  the extended price there was 95.81.  It says the EXT cost was

3  $50 on that item?

4  A    On the first item?

5  Q    Yes, sir.

6  A    Yes.

7  Q    So that's what it cost you guys was the $50, and then the

8  $95.81 was the price of the item?

9  A    And I don't know if that's the price of all four of them.

10 I mean, we didn't -- that's probably the price for all four of

11 them.

12 Q    And that would be, then, the cost for all four as well,

13 correct?

14 A    I think so.

15 Q    Okay.  And if we scroll down to the bottom of this chart

16 here, and it looks like the total amount that those were sold

17 for, if your understanding is correct, was $7,266 during that

18 period of May to December 2017?

19 A    Correct.

20 Q    And then the cost for those was the $3,847?

21 A    Yes.

22 Q    And do you know if you maintained this information for Mud

23 Pie, for example, prior to May 1st of 2017?

24 A    I would assume so.

25 Q    But it's obviously not included in this sheet; is that

D. Demiduk - Direct

1  correct?

2  A    It's not in this sheet, no.

3  Q    And just for clarification, if we can also take a quick

4  look at Exhibit 33.  And this is the same type of sheet.  And

5  I'll tell you at least the header of this document is, "Mud Pie

6  no ceramic."

7       Do you see that?  It's actually up in the document name?

8  A    Non-ceramic, yes.

9  Q    Okay.  And then if you look at the column on the far right

10  where it has ceramic, nothing is checked or X'd over there?

11  A    Correct.

12  Q    So if we scroll down, am I correct in my understanding

13  that these would have been non-ceramic items that you would

14  have sold from this particular company, Mud Pie?

15  A    I would assume so.

16          MR. WILLETT:  At this time I would move for admission

17  of Plaintiff's 33.

18          MR. LAUBSCHER:  No objection.

19          THE COURT:  Be admitted.

20          (Plaintiff Exhibit 33 marked.)

21          (Plaintiff Exhibit 33 admitted.)

22   BY MR. WILLETT:

23  Q    So this was through December of 2017.  Did you continue to

24  sell Mud Pie, either ceramic or non-ceramic items, after that?

25  A    I think we stopped ordering from pretty much most vendors,

1  I think, because we were planning on closing the shop.  So we

2  just kind of sold off what we had.  So if we had items left, we

3  continued to sell them.

4  Q    But again, with respect to the ceramic items, you believe

5  that you indeed sold those prior to May 1st of 2017?

6  A    Prior to this?

7  Q    Yeah, prior to --

8  A    I'm not sure exactly when we started carrying Mud Pie.

9  Q    But do you know one way or another whether you carried it

10 prior to May 1st of 2017?

11 A    I just said I'm not sure when we started carrying Mud Pie.

12 Q    Yeah, and that's a little different than my question.  My

13 question is:  Do you know if you carried it at all prior to May

14 1st of 2017?

15 A    I guess --

16 Q    I know you don't know the start date.  I'm just asking

17 did --

18     (Overlapping speakers.)

19 A    I don't know.  I didn't work in the shop.  I didn't ring

20 people out.

21     MR. WILLETT:  And -- well, let's go -- next we'll go

22 to Exhibit 30.

23     Oh, I'm sorry.  I didn't admit Exhibit 33.  I'd move

24 for the admission of 33, which is the last document.

25     MR. MCLAUGHLIN:  You did already.

1       MR. WILLETT:  I did?  Okay.

2    BY MR. WILLETT:

3   Q    All right.  Again, these are some documents that have been

4   produced or provided to us in this litigation.  This one has

5   handwritten "2016 shop" at the top.

6        Do you see that?

7   A    Yes.

8   Q    And you recall that I took your deposition and you

9   testified regarding these documents.

10       Do you recall that?

11  A    Yes.

12  Q    And this is one of the documents I showed you.  And if

13  Ashley will scroll down, it will have some other items below

14  that.

15       It says, "2017 shop."  Now, these first two pages refer to

16  the sales for the shop; is that correct?

17  A    Yes.

18  Q    And this time period is May 1st of 2017 through

19  December 31st, 2017.

20       Do you see that?

21  A    Yes.

22  Q    If Ashley goes back to the first document -- the first

23  page of the document.  Sorry.  Thank you.

24       That was May 1st, 2016 to December 31st, 2016.

25       Do you see that?

D. Demiduk - Direct

1  A    Yes.

2  Q    Now, typically the shop would open in May?

3  A    Yes.

4  Q    And that's because it would close following Christmas for

5  the winter months?

6  A    Yes.

7  Q    And so this would represent the total sales for the shop

8  at Emerson Creek Pottery & Tearoom for 2016?

9  A    Yes.

10  Q    And then if we go to the next slide, this would represent

11  the total sales for the shop at Emerson Creek Pottery from May

12  1st, 2017 to December 31st, 2017?

13  A    Yes.

14  Q    Now, if we can scroll down a little bit from there.

15      All right.  And then if you can keep going, Ashley.  So we

16  went from the shop, and now we're going to have some financials

17  for the restaurant.  And then keep scrolling.  Okay.  Go back

18  up to the top of that.

19      We get a tax return for Emerson Creek Events.  And then,

20  Ashley, if you'd go to like the last few pages, we have tax

21  returns for Countryview Pottery.

22      Do you see that?

23  A    Yes.

24  Q    And you're familiar with these documents related to your

25  duties for Emerson Creek in Oswego?

1  A     Yes.

2           MR. WILLETT:  At this time I'd move for admission of

3  Plaintiff's 30.

4           MR. LAUBSCHER:  No objection.

5           THE COURT:  Be admitted.

6           (Plaintiff Exhibit 30 marked.)

7           (Plaintiff Exhibit 30 admitted.)

8   BY MR. WILLETT:

9  Q    So let me direct your attention here -- bear with me here.

10 So if we go back up, we've looked at the shop.  I want to go

11 back to those first.  We had 2016, 2017, and now 2018.

12        And again, the same with 2018, these would be the total

13 sales for the shop during that time period, correct?

14 A     Yes.

15 Q    And then the next page goes on to something else.

16        Was the shop open in 2019?

17 A     '19, yes.

18 Q    But obviously as part of this document we don't have the

19 sales for the shop in 2019, correct?

20 A     I don't see it here.

21 Q    And then you've been here for the testimony, and you saw

22 earlier that there was some reference to an email blast from

23 Emerson Creek in Oswego related to a sale that occurred last

24 summer in July of 2021.

25        Did you see that?

D. Demiduk - Direct

1  A    Yes.

2  Q    And do you have the financial numbers or how much pottery

3  was sold by the shop in 2021?

4  A    I don't have it with me.

5  Q    But that's something that exists?

6  A    Yes.

7  Q    And you did sell pottery in July of --

8  A    We tried to sell whatever we had left.

9  Q    And that included whatever Emerson Creek pottery you had,

10 as well as the Mud Pie and Signature products?

11 A    Correct.

12 Q    And that was --

13 A    If we had it left, we tried to sell it.

14 Q    And that was July of 2021?

15 A    Yes.

16 Q    All right.  Next if we can go to the next page there.

17 This says "restaurant."  And this says May 1 -- it's in the

18 upper left-hand corner -- May 1 through December 31st, 2016.

19      Do you see that?

20 A    Yes.

21 Q    Okay.  And then if Ashley can scroll for us a little bit,

22 this is going to show us for the restaurant what the sales

23 were; is that correct?

24 A    Yes.

25          MR. WILLETT:  All right.  And if you go back up a

D. Demiduk - Direct

1  little bit, Ashley.

2  Q    Am I correct in saying the net sales were the -- well, the

3  gross sales were $266,039.92?

4  A    Yes.

5  Q    And then you've got -- there's some discounts that are

6  applied there, and then you've got the net sales of 259?

7  A    Yes.

8  Q    So that's $259,000?

9  A    Yes.

10 Q    And that would have been from May 1st to December 31st,

11 2016?

12 A    Yes.

13 Q    And that would have been while you were serving food on

14 the Emerson Creek pottery in the restaurant, correct?

15       MR. MCLAUGHLIN:  Object to the form of the question.

16 BY MR. WILLETT:

17 Q    Well, let me ask this -- I'll just make it easy -- were

18 you aware of how food was being served in the restaurant at

19 Emerson Creek during that time period, May 1 through December

20 31st, 2016?

21 A    Yes.

22 Q    And it was being served on Emerson Creek pottery, correct?

23 A    Yes.

24 Q    Now, let's go to the next page.  This says "Restaurant,

25 May 1 through December 30th, 2017."

1    Do you see that?

2  A    Yes.

3  Q    And it looks -- up there we see select locations, Emerson

4  Creek Tearoom.  That's the tearoom on the property in Oswego,

5  correct?

6  A    Yes.

7  Q    If we scroll down a little bit, we see that the gross

8  sales were $298,000 and the net sales were $291,000?

9  A    Yes.

10        MR. WILLETT:  And go back up just a little bit,

11  Ashley.  Can you go just a little bit more to the date?  Sorry.

12  Q    Am I correct in stating that between May 1 and December

13  30th, 2017, the food served in the restaurant would have been

14  served on Emerson Creek pottery?

15  A    Yes.

16  Q    If we can go to the next page in the PDF.  This is April 1

17  to December 31, 2018.

18        Do you see that?

19  A    Yes.

20  Q    And if you look down at net sales, you have $287,105 and

21  then gross sales $290,272.

22        Do you see that?

23  A    Yes.

24  Q    And am I correct in stating between April 1 and December

25  31st, 2018, that food in the restaurant would have been served

D. Demiduk - Direct

1  on Emerson Creek pottery?

2  A    Not solely.

3  Q    Not solely, but some would have been?

4  A    Correct.  We used it as a transition.

5  Q    And there would have been pottery decorating the walls

6  during that time, Emerson Creek pottery?

7  A    Could have been.  I don't remember.

8  Q    Well, you saw the pictures that I showed Ms. Winkler

9  earlier where you were directing her to remove the images of

10  the pottery from the website, correct?

11  A    Correct.

12        MR. WILLETT:  You can scroll on down.

13  Q    Let me ask you this:  Do you have data that shows the

14  total number of sales of Emerson Creek pottery for the July

15  2021 sale, how much you sold?

16  A    Not with me, I don't.

17  Q    But that's something you would keep, right?

18  A    I would think so.

19  Q    And the same would apply to Mud Pie and Signature, that

20  sort of thing?

21  A    Yes.

22  Q    Now, we've talked a little bit about an entity called

23  Emerson Creek Events, or you've heard testimony to that effect.

24        Do you know what that entity is, sir?

25  A    It's a company we own.

1  Q    It's a what?

2  A    Company that we own.

3  Q    Okay.  Now, Emerson Creek Events, you're also the

4  registered agent for that entity?

5  A    I believe so.

6         THE COURT:  This seems to be a good time to stop

7  because you're going into another matter, and it's nearly 5:00.

8         MR. WILLETT:  Your Honor, if I could -- yeah, that's

9  fine.  We can stop here.

10         THE COURT:  I want to ask the lawyers something after

11  the jury leaves.

12         So members of the jury, you're excused now until 9:30

13  tomorrow morning; return to the assembly room.  Do not discuss

14  the case or allow anyone to discuss it with you.  Do not remain

15  within the hearing of anyone.

16         You may be excused.  Thank you.

17  **(Jury out, 4:57 p.m.)**

18         THE COURT:  All right.  I'm curious about how we're

19  on track to finish this case by Friday?

20         MR. WILLETT:  So Your Honor, we will have in the

21  morning to finish up Mr. Demiduk.  And then I need to confer

22  and make sure we haven't missed anything else, but I believe

23  that we can go ahead and conclude our presentation in chief

24  with the -- with our expert would be our last witness called

25  tomorrow morning.  So we'd finish Mr. Demiduk and then go into

1   our expert, and then the plaintiff would rest.

2           And I will say with the caveat I have asked counsel

3   for the defendants about one of their employees, Karla, who is

4   available in the morning.  And I may have just a very -- like

5   five minutes' worth of questions for her on just one point.

6   But other than that, we would just have --

7           THE COURT:  Is she by Zoom?

8           MR. WILLETT:  She would be by Zoom, and our expert

9   would be live.

10          MR. MCLAUGHLIN:  You're not calling Ron Wehrli?

11          MR. WILLETT:  I don't think I'm going to call him in

12  our case in chief, just cognizant of time and that sort of

13  thing.

14          THE COURT:  But, you know, sitting here hearing this

15  case, I've never been in a case in 49 years, I think, nearly,

16  if there ever was a case that should have been settled, and if

17  everybody was reasonable about it, it could have been settled,

18  I believe.  I would just urge you again, because somebody is

19  going to be very disappointed.  And even if anybody wins this

20  case, they're not going to come out any better than if they

21  probably settled it, because this -- the jury is not in a

22  position -- they don't do equity.  They have to follow the law.

23  And you may feel like you're entitled to something, or the

24  other side might feel like they're put upon.  But the jury is

25  going to have to follow instructions, and it's just very

Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc., et al., 6:20cv54, 2/23/2022

1  unlikely -- this is not a sure thing for anybody.  So I would

2  just encourage you to think about settling.  Like I say, I

3  just -- it's up to you, but I think you all could work it out

4  better than a jury can.

5          So anyway, we'll recess until 9:30 tomorrow morning.

6  (Proceedings adjourned, 5:00 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc., et al., 6:20cv54, 2/23/2022

1            C E R T I F I C A T E

2      I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3  the United States District Court for the Western District of

4  Virginia, appointed pursuant to the provisions of Title 28,

5  United States Code, Section 753, do hereby certify that the

6  foregoing is a correct transcript of the proceedings reported

7  by me using the stenotype reporting method in conjunction

8  with computer-aided transcription, and that same is a

9  true and correct transcript to the best of my ability and

10  understanding.

11      I further certify that the transcript fees and format

12  comply with those prescribed by the Court and the Judicial

13  Conference of the United States.

14      /s/ Lisa M. Blair            Date: March 8, 2022