Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.,
6:20cv54, 2/24/2022

1                    UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF VIRGINIA
2                        LYNCHBURG DIVISION

3    ****************************************************************

4    EMERSON CREEK POTTERY, INC. CIVIL CASE NO.:  6:20CV54
                                FEBRUARY 24, 2022, 9:37 A.M.
5                                JURY TRIAL, DAY 3
            Plaintiff,
6    vs.

7    EMERSON CREEK EVENTS, INC., Before:
     ET AL.,                     HONORABLE NORMAN K. MOON
8                                UNITED STATES DISTRICT JUDGE
            Defendants.          WESTERN DISTRICT OF VIRGINIA
9
     ****************************************************************
10   APPEARANCES:

11   For the Plaintiff:         HENRY IRVING WILLETT, III, ESQUIRE
                                Christian and Barton, LLP
12                              909 East Main Street, Suite 1200
                                Richmond, VA  23219
13
                                GARFIELD BERNARD GOODRUM, ESQUIRE
14                              Garfield Goodrum, Design Law
                                90 Canal Street, 4th Floor
15                              Boston, MA  02114

16   For the Defendants:        KENNETH S. MCLAUGHLIN, JR., ESQUIRE
                                Law Offices of McLaughlin &
17                              Associates, P.C.
                                1 E. Benton Street, Suite 301
18                              Aurora, IL  60505

19                              LAWRENCE E. LAUBSCHER, JR., ESQUIRE
                                Laubscher & Laubscher, PC
20                              1160 Spa Road, Suite 2B
                                Annapolis, MD  21403
21

22   Court Reporter:  Lisa M. Blair, RPR, RMR, CRR, FOCR
                       255 West Main Street, Suite 304
23                     Charlottesville, Virginia  22902
                       434.296.9284
24

            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25   TRANSCRIPT PRODUCED BY COMPUTER.

Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.,
6:20cv54, 2/24/2022

1        INDEX OF WITNESSES

2   WITNESSES ON BEHALF OF THE PLAINTIFF:                PAGE

3   DAVID DEMIDUK (Continued)

4    Direct Examination by Mr. Willett                     5
     Cross-Examination by Mr. McLaughlin                  61
5    Redirect Examination by Mr. Willett                  75

6   TOWNSEND BELISLE

7    Direct Examination by Mr. Willett                    84
     Cross-Examination by Mr. Laubscher                  118
8

9   WITNESSES ON BEHALF OF THE DEFENDANTS:               PAGE

10  CHRISTINA DEMIDUK

11   Direct Examination by Mr. McLaughlin                128
     Cross-Examination by Mr. Willett                    235
12

13

14

15

16

17

18

19

20

21

22

23

24

25

Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.,
6:20cv54, 2/24/2022

1                      INDEX OF EXHIBITS

2    EXHIBITS ON BEHALF OF THE PLAINTIFF:

3          EXHIBIT:                Marked      Received

4          84                      12          12

5          37                      23          23

6          38                      24          24

7          60                      25          25

8          61                      26          26

9          63                      28          28

10         70                      29          29

11         71                      30          30

12         78                      31          31

13         75                      33          33

14         55                      42          42

15         56                      51          51

16         223                     85          85

17         224                     89          89

18         236                     113         113

19         4                       128         128

20         5                       128         128

21         6                       128         128

22         7                       128         128

23         109                     128         128

24         133                     128         128

25         142                     128         128

1                    INDEX OF EXHIBITS (Continued)

2    EXHIBITS ON BEHALF OF THE DEFENDANTS:

3         EXHIBIT:                    Marked     Received

4         3                          159        159

5         5                          165        165

6         6                          167        167

7         23                         171        171

8         12                         173        173

9         13                         173        173

10        29                         181        181

11        65                         183        183

12        51                         185        185

13        44                         187        187

14        49                         193        193

15        53                         195        195

16        61                         195        195

17        54                         196        196

18        64                         199        199

19        38                         202        202

20

21

22

23

24

25

D. Demiduk - Direct

1  **(Jury in, 9:37 a.m.)**

2          THE COURT:  Good morning, ladies and gentlemen.

3  We'll proceed with this witness.

4          MR. WILLETT:  Thank you, Your Honor.

5                      DIRECT EXAMINATION

6   BY MR. WILLETT:

7  Q    Good morning, Mr. Demiduk.

8  A    Good morning.

9  Q    I don't remember exactly where we were, but I'm going to

10  bring us close to that.

11      When we were last speaking we had talked about the entity

12  Emerson Creek Events, Incorporated.  Are you familiar with that

13  entity?

14  A    Yes.

15  Q    I believe that you are an owner of that entity?

16  A    Correct.

17  Q    And you're also an officer of that entity; is that

18  correct?

19  A    Yes.

20  Q    So were you -- did you have a relationship with Emerson

21  Creek in Oswego at the time that Emerson Creek Events Inc. was

22  formed?

23  A    Yes.

24  Q    That was around 2011?

25  A    We incorporated in 2012.

1  Q    In 2012, okay.  At the time that you did that, am I

2  correct in stating that you had considered some other names

3  such as "The Barn" or "The Barn at Emerson" for the name of

4  Emerson Creek Events; is that correct?

5  A    Yeah, we sat down and just had -- you know, rattle off

6  names for people who worked for us at the time.

7  Q    Because the barn was a big emphasis of where the weddings

8  would be held, correct?

9  A    Correct.

10 Q    Because that was the barn that you and your wife,

11 Mrs. Demiduk, had renovated prior to your wedding in 2010?

12 A    Correct.

13 Q    And at the time that Emerson Creek Events was

14 incorporated, the signage on the property of Emerson Creek

15 still read, for example, "Emerson Creek Pottery & Tearoom."

16 That sign still existed at that time; is that correct?

17 A    Yes.

18 Q    In fact, if we -- we'll look at Exhibit 14 briefly.  I'm

19 just looking for the photo at the top there.  This is already

20 admitted.  If you look at the photo at the top, the red wagon

21 sign, that would have been the red wagon sign that existed at

22 the time Emerson Creek Events was created; is that correct?

23 A    I don't know if it was that exact sign.  We had changed

24 signs throughout the years.

25 Q    But at least for the time that you've been there, there's

D. Demiduk - Direct

1  been a sign -- until maybe recently -- there's been a sign on a

2  red wagon that read "Emerson Creek Pottery & Tearoom" in some

3  form or another?

4  A    Correct.

5  Q    And that's what directed people to the Emerson Creek

6  property in Oswego?

7  A    Correct.

8  Q    Okay.  I next want to go back to Exhibit 30 where we were

9  yesterday when we left off, and direct your attention to page 9

10 of that.  Actually, it's a little bit earlier.  Let's do --

11 yeah, page 7 of 19 in that document, and just get you to

12 identify what this is.

13 A    It looks like our tax return for Emerson Creek Events.

14 Q    That would have been for 2012, the first year that Emerson

15 Creek Events Inc. had been incorporated; is that correct?

16 A    Correct.

17 Q    And then if we go from there to page 9 of 19, that would

18 have been the tax return for Emerson Creek Events for 2014?

19 A    Yes.

20 Q    Am I reading this correct in that the gross receipts that

21 year in 2014 for the events business would have been $670,641?

22 A    Yes.

23 Q    And then the gross profit was $515,895?

24 A    Yes, that's what it says.

25 Q    At that time, when we're talking about Emerson Creek

1  Events, what -- and I know you set this up to sort of

2  distinguish between the events business on the business side of

3  things and the pottery and restaurant business; is that

4  correct?

5  A    Yes.

6  Q    And so the pottery and restaurant business was done under

7  Countryview; is that correct?

8  A    Yes.

9  Q    And then the events like weddings and vintage fairs and

10 things like that were under Events?

11 A    Yes.

12 Q    Was it -- you looked like you hesitated.  Was there any

13 change in that at any point in time?

14 A    No.  Just the vintage -- I mean, the vintage fairs took

15 place on the grounds.  So as people ate and -- but we -- I

16 guess when we rented spaces out, it went through Events.

17 Q    Okay.  If you rented space out, it went through Events.

18 But for the food that was served for the vintage fair, that

19 would have been done through the restaurant and Countryview,

20 correct?

21 A    Correct.

22 Q    So, yeah, when people came to the property for that, the

23 restaurant would be open, and would you have food served

24 outside of the restaurant for the vintage fair as well?

25 A    Yeah, we had to-go food in our barn.

D. Demiduk - Direct

1  Q    And that would have all been through Countryview?

2  A    Correct.

3  Q    Okay.  And again, during that time the pottery shop would

4  have been open as well for visitors to shop during that -- for

5  at least now we're talking about 2014, correct?

6  A    Yes.  And we did use paper products in our vintage fairs,

7  too, because we had so many -- we'd have such a large amount of

8  people.

9  Q    Let me ask you this:  At any point in time have you

10 applied the money that comes in to the restaurant, has that

11 been associated with Emerson Creek Events?

12 A    No.

13 Q    Let me ask you this:  If someone goes into the restaurant

14 to eat or to have a meal, does the receipt read "Emerson Creek

15 Events"?

16 A    If they go into the restaurant?

17 Q    Yeah, if they have a meal in the restaurant.

18 A    No.  It reads Emerson -- it reads "Tearoom" or

19 "restaurant" or "cafe," whatever it was.

20 Q    Let me direct your attention to a document that has not

21 been admitted yet.  This is going to be Plaintiff's 84.  This

22 is a revised version.  This is just photographs and nothing

23 else.  Again, this is 84, and particularly I want to direct

24 your attention to page 2 of that document.

25        MR. MCLAUGHLIN:  Henry, was it a previous marked one?

1      MR. WILLETT:  It was.  It was one of the

2  investigative reports.  This is just photographs.

3      MR. MCLAUGHLIN:  Okay.  Got it.

4   BY MR. WILLETT:

5  Q    And if you can identify what this document is?

6  A    It's a receipt for something.

7  Q    And it has an order number, 62.  Do you see that at the

8  top?

9  A    Yes.

10 Q    Okay.  It says "manual item, $7.58"; do you see that?

11 A    Yes.

12 Q    It's from July 22, 2021?

13 A    Yes.

14 Q    And so an order number, that would be -- you would order

15 in the restaurant, you would have an order number?

16 A    Yeah.  I'm looking, though.  That's not even our address

17 up in the top.

18 Q    5712 Stephens Road?

19 A    No.

20 Q    Let's look at some other documents on this one.  Look at

21 the document above that.

22      MR. WILLETT:  Carmen, I'm sorry, I had something that

23 made it clear easily yesterday when I was pointing.

24      THE CLERK:  If you click the top right, I think it

25 will come back.

1                MR. WILLETT:  Thank you.

2      BY MR. WILLETT:

3    Q    Can you identify what this document is, sir?

4    A    It looks like it would be a receipt from the shop.

5    Q    And this receipt is dated July 22nd, 2021?

6    A    Yes.

7    Q    And if you look down from that it says circa plate set,

8    quantity, 2, price $6.99, and then the price for both is

9    $13.98?

10   A    Yes.

11   Q    Emerson Creek, it says "5126 Stephens Road, Oswego,

12   Illinois."  That's your address?

13   A    Yes.

14   Q    All sales are final?

15   A    Yes.

16   Q    So you do recognize that that's a receipt from the shop?

17   A    It looks like it is.

18   Q    If we go down from there, we looked at the one on the

19   second page.  Take a look at the next document.  It looks like

20   a credit card receipt.  Can you see that?

21   A    Yes.

22   Q    All right.  And it says -- that one says "server, Haley

23   F."  Do you see that?

24   A    Yes.

25   Q    And then it has a date of 7-22-21?

1   A    Yes.

2   Q    And you would believe that that would be for restaurant?

3   A    Yes.

4   Q    And then if you go down to the next one, that one is a

5   little harder to read.  I'm not sure what that one is.

6        All right.  And then below that -- I'll just go ahead

7   while we're on this, if you look at the next page, it looks

8   like a menu.  It says Emerson Creek, has snacks and salads?

9   A    Yes.

10  Q    And then if we go on down from there, there are just some

11  photographs of -- it looks like of the pottery and some other

12  things from 2021.  Do you see that?  If you keep going down.

13  Go down to the ninth document.  Images like we looked at

14  yesterday.  It looks like products sold, the Mud Pie brand

15  products sold in the shop.

16  A    Yes.

17         MR. WILLETT:  At this time I'd move for admission of

18  Exhibit 84.

19         MR. LAUBSCHER:  No objection.

20         THE COURT:  Be admitted.

21         (Plaintiff Exhibit 84 marked.)

22         (Plaintiff Exhibit 84 admitted.)

23   BY MR. WILLETT:

24  Q    Go back up if you would to page 2.  Again, on that one,

25  would there be something associated with events that would

1  have -- and this is the one that has the order number 62.  And

2  it has the item count, one, manual item 7.58.  And it looks

3  like a Visa charge.  Would there be something associated with

4  the events that would have order numbers?

5  A    Well, in 20 -- this is --

6  Q    This is last summer.

7  A    Since we are only open limited days, we use the credit

8  card -- we have a mobile credit card machine, and it could have

9  been that, because we turned off one of our merchant ID numbers

10  so we don't get a monthly -- you know, a $45 monthly charge,

11  because we're only open 20 days or whatever.  I don't remember

12  exactly how many days, but a limited number of days in 2021.

13  And we didn't want to be charged merchant fees for every month

14  when we weren't doing anything.

15  Q    So you believe this would have been for the sale of some

16  sort of product on the Emerson Creek property in July of 2021?

17  A    Other than -- wrong address on it.

18         MR. MCLAUGHLIN:  I'm sorry, I just want to object to

19  the form of the question.  The purchase of a product.

20         MR. WILLETT:  I'm sorry, I couldn't hear.

21         THE COURT:  He objected to the form of the question.

22  Can you rephrase it?

23         MR. WILLETT:  What was the basis of the objection?

24         MR. MCLAUGHLIN:  The objection was you said it was

25  for the purchase of a product, which from this specific

1  document, it wasn't clear what it was.

2          MR. WILLETT:  That's what I am trying to get to.  So

3  I will rephrase that.

4  Q    As you sit here today, you don't know whether this is for

5  the purchase of a product, with the name Emerson Creek Events

6  at the top, or for services, with the name Emerson Creek Events

7  at the top?

8  A    Correct.

9  Q    And --

10  A    We stopped merchant services in 2021 so we didn't have to

11  pay merchant fees month after month when we weren't using them.

12  Q    What do you mean by that?

13  A    Well, with the credit cards they charge you to have a

14  merchant account.  You get a merchant ID number and every month

15  it's a $45 charge or something like that.  I don't remember

16  exactly what it is.  Since we're not using it every month, we

17  have a mobile one that we use when people put money down on a

18  wedding, that they can scan their credit cards.

19  Q    Okay.  So you could use that for the weddings and events

20  and you could also use it for things like the restaurant or if

21  you had sales --

22  A    We only did that in 2021 in the shop because we turned off

23  our merchant numbers.

24  Q    Okay.  So for purchases in the shop in 2021, they would

25  have been run through the credit card with the header at the

D. Demiduk - Direct

1    top "Emerson Creek Events"?

2    A     They could have been.

3    Q     Let me direct you --

4    A     Like I said, that's not our address on the top.  So I

5    don't know -- I can't say that's ours.  That's not our address.

6    Q     Let me ask you this question:  If you look at the top of

7    the document, Emerson Creek Events, Inc., that's your company's

8    name, correct?

9    A     Correct.

10   Q     You're saying the 5712 isn't correct.  But Stephens Road,

11   Oswego, Illinois is correct?

12   A     Correct.

13   Q     And the phone number there, 630-554-7100 --

14   A     Yes.

15   Q     That's correct as well?

16   A     Yes.

17   Q     It may be before your time.  We noticed in some invoices

18   earlier there have been some different addresses used for

19   Emerson Creek over the years.  You understand at some point in

20   time there was a change in the actual physical address.  Are

21   you familiar with that?

22   A     Yes.

23   Q     Thank you.

24   A     I was part of that.

25   Q     You were part of that.  And what was the purpose behind

D. Demiduk - Direct

1  that?

2  A    Because 911, a company by us was called Chemicon, and the

3  fire department couldn't find us because our address used to be

4  5000B Grove Road, which is a mile and a quarter from our actual

5  property.  So they changed our -- which we're not on Grove

6  Road.  We're a mile and a quarter, mile and a half from Grove

7  Road.  So they changed our address to Stephens Road where the

8  property is actually located.

9  Q    Okay.  Great.  Thank you.  And if we can go now to -- back

10 to Exhibit 30.

11        And we were looking at 2014.  Let's go forward to 2015,

12 which is the next page of that PDF, which I believe is page 10.

13 And if we look at this, sir, again another tax return for

14 Emerson Creek Events.  And again, to conform with your

15 testimony earlier, the date of incorporation is listed as

16 February 1st, 2012, and that's consistent with your

17 recollection?

18 A    Yes.

19 Q    Okay.  And what's that address, sir, 4914 Stephens Road?

20 A    That's our home address.

21 Q    So we've got the Grove address and then 4914 Stephens

22 Road, and then another address for Emerson Creek as well on

23 Stephens Road?

24 A    Correct.

25 Q    If we look down at this document, there is a -- it looks

D. Demiduk - Direct

1    like for the gross receipts $715,951?

2    A    Yes.

3    Q    And then the gross profit on that is $420,780; is that

4    correct?

5    A    Correct.

6    Q    If we go to the next page, this is for Emerson Creek

7    Events and this is for 2016.  And the gross profits for that

8    year were $878,248 -- I'm sorry, the gross receipts were

9    $878,248, and the gross profits were $482,567; is that correct?

10   A    Yes.

11   Q    And if we go to the next one, this is for 2017.  And this

12   has the gross receipts at $1,026,354, and the profit at

13   $490,000?

14   A    Yes.

15   Q    And if we look at the next document, this is for -- well,

16   let me ask that.  Let me go back to 2017 quickly.  Now, in 2017

17   do you know how many weddings you held?

18   A    Right around 50, I think.

19   Q    And then in 2018 do you recall how many you held?

20   A    Our normal was about 50 a year, right around 50.

21   Q    And one year at least you hit 70 or close to 70; is that

22   correct?  Would that have been 2019?

23   A    No.  In -- we did very little weddings due to COVID.  In

24   2021 we did 68 I think.

25   Q    2021 was 68 weddings.  2020 would have been a lower year?

D. Demiduk - Direct

1  A    Yes.

2  Q    And then what about 2019?  Would that have been the year

3  you hit 70?

4  A    No.  We never hit 70.  I think 68 is our largest after

5  COVID because I think 29 of them were a push-over from COVID.

6  Q    Okay.  29 of the weddings pushed over from 2020 into 2021?

7  A    Correct.

8  Q    So for 2018 you were around 50, and 2019 do you think you

9  met or --

10 A    Around 50.

11 Q    And in addition to the weddings during those years like

12 2017, '18, and '19, did you also hold vintage fairs?

13 A    We stopped doing it.  I'm not sure exactly what year we

14 stopped.

15 Q    And when you say you stopped, because the weddings -- by

16 that point you were hosting more weddings and so you needed

17 those weekends for weddings?

18 A    No.  We always held our vintage fair on a Wednesday, and

19 they just got too big and we didn't want to screw up the

20 grounds if it rained on a Wednesday and our grounds would get

21 destroyed and then we couldn't have a wedding -- it didn't give

22 us enough turnaround time.

23 Q    And so in addition to the weddings -- so for example, when

24 we're looking at 2017, which is on the screen, what other

25 events, if you know, would have been held in 2017 other than

1  weddings that comprised the gross receipts of a million

2  dollars?

3  A    Weddings was it.

4  Q    That was weddings.  What about for 2018, would that be the

5  same thing?

6  A    Yes.

7  Q    And then for 2019 it would be weddings as well?

8  A    Yes.

9  Q    And for -- did you have any weddings in 2020?

10  A    I think we did 20 of them.

11  Q    And then for 2021 you had 68 weddings?

12  A    68, I believe.

13  Q    And any other -- anything other than weddings that year?

14  A    Well, we --

15  Q    This past year.

16  A    This past year?

17  Q    Yeah, 2021.

18  A    No.

19  Q    But you did -- but you also had -- and then during all of

20  those years you had the restaurant in operation as well,

21  correct?

22  A    Yes.

23  Q    And during 2017, '18, and '19 you had the pottery shop

24  open, correct?

25  A    Yes.

1  Q    And then again in 2021 you opened the pottery shop on a

2  couple of weekends for sales, correct?

3  A    In '21?

4  Q    2021, this past summer?

5  A    Yeah, we just -- very limited times.

6  Q    Very limited times.  And that would be the -- if we can go

7  quickly to Exhibit 106.  If you scroll down on that a little

8  bit.  Keep going.

9      That would be the couple of long weekends that it was open

10 in July of 2021?

11 A    Yes.

12 Q    Go back to 30.

13     All right.  So we had 2017, and now we'll go to 2018.  The

14 gross receipts for that year were $1,421,770.  Do you see that?

15 A    Yes.

16 Q    And the profit for 2018 was $806,514; is that correct?

17 A    Yes.

18 Q    All right.  And so that's for 2018 where you had 50

19 weddings, and then again you said in 2019 you also had 50

20 weddings.  And in 2020 you had 20 of those weddings; is that

21 correct?

22 A    Yes.

23 Q    And then in 2021 you had 68 weddings, correct?

24 A    Yes.

25 Q    Now I want to direct your attention to -- bear with me

D. Demiduk - Direct

1  here.  Let's go to -- real quickly to page 14.

2      Now, these are the tax returns for Countryview Pottery,

3  correct?

4  A    Yes.

5  Q    And just to confirm, if we look at the address on

6  Countryview Pottery, it's 4914 Stephens Road as well; is that

7  correct?

8  A    Yes.

9  Q    And if we go back real quick to the last tax return for

10  Emerson Creek Events, that's also 4914 Stephens Road, correct?

11  A    Yes.

12  Q    And then, so looking at 2013, we've got gross receipts of

13  $450,466; do you see that?

14  A    Yes.

15  Q    And then profits of $95,006?

16  A    Yes.

17  Q    And then 2014 we had $511,397 in gross receipts, and

18  $168,623 in profits?

19  A    Yes.

20  Q    And then for 2018 [sic] we had $551,907 in gross receipts

21  and profits of $339,198, correct?

22  A    Yes.

23  Q    Moving forward to 2016, we had gross receipts of $554,013

24  and gross profits of 397,751, correct?

25  A    Yes.

1  Q    And in 2017, 597,616, and gross profits of $399,666; is

2  that correct?

3  A    Yes.

4  Q    And then 2018, $580,837 in gross receipts and $323,016 in

5  gross profits; is that correct?

6  A    Yes.

7  Q    And the -- I'm also correct in stating both the restaurant

8  and the pottery shop were open in 2019?

9  A    Yes.

10 Q    And those were the two entities that contribute to the

11 gross receipts of Countryview Pottery?

12 A    Yes.

13 Q    And then 2020 we had COVID.  Was there any point in that

14 time in 2020 where the restaurant or pottery shop were open?

15 A    The restaurant was not open at all, and I believe once we

16 stopped weddings in November we opened the shop for -- on

17 weekends --

18 Q    For Christmas?

19 A    Yeah, correct, to try to get rid of our stuff.

20 Q    And that would have been in 2020, November through

21 December of -- to the end of --

22 A    I don't know if it was open every -- I don't remember what

23 the hours were, but sometime after our last wedding in November

24 till Christmas.

25 Q    So through November of 2020 through Christmastime of 2020,

D. Demiduk - Direct

1  the pottery shop would have been open?

2  A    Correct.

3  Q    And then in 2021 the restaurant was open for normal

4  service?

5  A    Yes.

6  Q    And the pottery shop was open on the weekends that we've

7  discussed?

8  A    Yes.

9  Q    Bear with me one second.  Quickly if we can go to Exhibit

10  37.  And if you can verify for me what this document is?

11  A    It looks like a printout from our POS system in the

12  restaurant.

13  Q    Okay.  And if Ashley will scroll down for us.  This would

14  just reflect restaurant sales, as well as the number of guests

15  for the restaurant; is that correct?

16  A    Yes.

17  Q    It looks like that's for 2017.  And then if you -- oh, at

18  this time I'd move for the admission of Exhibit 37.

19         MR. LAUBSCHER:  No objection.

20         THE COURT:  Be admitted.

21         (Plaintiff Exhibit 37 marked.)

22         (Plaintiff Exhibit 37 admitted.)

23  BY MR. WILLETT:

24  Q    And then also want to look at Exhibit 38, which is for

25  2019, if you'd just confirm the same thing, that that would

D. Demiduk - Direct

1   reflect the restaurant sales for 2019.

2   A    Yes.

3   Q    And to confirm, you would have had the same printout for

4   2018 and you'd have the same printout for 2021 as well,

5   correct?

6   A    Yes.

7   Q    Let me next direct your attention to Exhibit 60.

8             THE CLERK:  Are you admitting 38?

9             MR. WILLETT:  I'm sorry, thank you.  Yes.  Move for

10  admission of 38.

11            MR. LAUBSCHER:  No objection.

12            THE COURT:  Be admitted.

13            (Plaintiff Exhibit 38 marked.)

14            (Plaintiff Exhibit 38 admitted.)

15            MR. WILLETT:  Thank you, Carmen.

16   BY MR. WILLETT:

17  Q    Next for Exhibit 60, you're aware that Emerson Creek

18  Events had an Instagram account?

19  A    Yes.

20  Q    There is one specific to Emerson Creek Events, correct?

21  A    I believe so.

22  Q    And just get you to take a look at the image that's on the

23  screen here, and just want you to authenticate that that would

24  have been the Emerson Creek Events Instagram account that

25  existed as of May of 2017.

D. Demiduk - Direct

1 A    I don't see a date on it.

2 Q    If you look -- here, I'll -- I think I covered it for you.

3 Hold on.  You'd think I'd have this better by now.  Hold on.

4 A    Yes.

5        MR. WILLETT:  At this time I'd move for the admission

6 of Exhibit 60.

7        MR. LAUBSCHER:  No objection.

8        THE COURT:  Be admitted.

9        (Plaintiff Exhibit 60 marked.)

10       (Plaintiff Exhibit 60 admitted.)

11  BY MR. WILLETT:

12 Q    If I can take you to -- well, before I do that.  Now,

13 during this time, roughly 2016 to 2017, the wedding business,

14 as we saw from the gross receipts, the wedding business was

15 continuing to grow?

16 A    Yes.

17 Q    And it was becoming a big focus of the time and attention

18 that you and your wife were spending on Emerson Creek; is that

19 correct?

20 A    It did what?

21 Q    It was becoming a focus of the time that you and your wife

22 were spending with respect to Emerson Creek?

23 A    Yeah, another -- we put another hat on.

24 Q    By this point in time you and your wife were full time

25 working for Emerson Creek.  You didn't have another job.

1   A    No.

2   Q    Let me direct your attention to Exhibit -- let me see

3   here -- 61.  And this is an article that was written by Hannah

4   Leone, the Aurora Beacon News; do you see that?

5   A    Yes.

6   Q    There were a couple of articles that were written about

7   the expansion of services and that sort of thing.  And just

8   confirm that this was one of those articles that you would have

9   seen?

10  A    Yeah, I guess so.

11         MR. WILLETT:  At this point in time I'd move for the

12  admission of Exhibit 61.

13         MR. LAUBSCHER:  No objection.

14         THE COURT:  Be admitted.

15         (Plaintiff Exhibit 61 marked.)

16         (Plaintiff Exhibit 61 admitted.)

17   BY MR. WILLETT:

18  Q    Again, while we have that on the screen, the picture there

19  would have been a picture of the actual shop itself and the

20  goods offered for sale in the shop?

21  A    Yes.

22  Q    That was for 2017, that article came out; is that correct?

23  A    Yeah.  I don't know when the picture was taken.

24  Q    But the article was 2017?

25  A    Yes.

1  Q    Did you ever talk to Hannah Leone or would that have been

2  something that your wife would have handled?

3  A    Not that I recall.

4  Q    You don't recall you talking to her?

5  A    No.

6  Q    Do you have any knowledge as to whether your wife would

7  have spoken to her?

8  A    I have no idea.

9  Q    Okay.  Let's go next to Exhibit 33.  I'm sorry, 63.

10      And this is another article from the -- a little bit

11  further back in time, July 17, 2015, from the Aurora Beacon

12  News; do you see that?

13  A    Yes.

14  Q    It says, "Don't be fooled by the name.  For more than a

15  decade, owners Chris and Dave Demiduk."  Do you see that?

16  A    Yes.

17  Q    And do you recall seeing an article like this at any point

18  in time referencing that Emerson Creek is about more than

19  pottery in the Aurora Beacon News?

20  A    I don't remember reading it, no.

21  Q    You don't doubt the authenticity of this document or that

22  there were articles printed from time to time related to the

23  expansion of services at Emerson Creek?

24  A    No.

25          MR. WILLETT:  I'd move for admission of Exhibit 63.

1        MR. LAUBSCHER:  No objection.

2        THE COURT:  Be admitted.

3        (Plaintiff Exhibit 63 marked.)

4        (Plaintiff Exhibit 63 admitted.)

5    BY MR. WILLETT:

6    Q    And if you go down to the second page of that document

7    where it says "About the owners."  It says, "Residents of

8    Oswego, Chris and Dave Demiduk have been cultivating the farm

9    and adjacent property in hopes of providing visitors with a

10   unique and memorable experience."  Do you see that?

11   A    Yes.

12   Q    By this point in time in 2015 you were an owner of

13   Countryview Pottery Co.; is that correct?

14   A    Yes.

15   Q    I just want to authenticate a couple of quick documents

16   quickly with you.  If you'll go to Exhibit 70.

17        Now, during this time -- we looked at an Instagram post

18   earlier, but during this time there also would have been

19   marketing on Facebook for Emerson Creek Pottery & Tearoom; is

20   that correct?

21   A    Yes.

22   Q    And do you believe this is a -- an image of the Facebook

23   account as of -- this was captured as of 2019.  Does that look

24   familiar to you?

25   A    That's our logo that we had.

D. Demiduk - Direct

1  Q    And when you say your logo, you're referring to the E and

2  the C --

3  A    Yes.

4  Q    In the upper left-hand corner?

5  A    Correct.

6  Q    It doesn't look like that today, right?  It's still an E

7  and a C, but is it something different?

8  A    I don't remember, to be honest.

9  Q    Whether it was this or some other E and C?

10  A    We've changed them through the years.

11  Q    Thank you.  One more here.

12        MR. WILLETT:  Oh, did I already move for admission of

13  that, Carmen?

14        THE CLERK:  No.

15        MR. WILLETT:  I'd move for the admission of 70.

16        MR. LAUBSCHER:  No objection.

17        THE COURT:  It will be admitted.

18        (Plaintiff Exhibit 70 marked.)

19        (Plaintiff Exhibit 70 admitted.)

20   BY MR. WILLETT:

21  Q    Similarly, I'll show you 71.  And the same thing, do you

22  believe this to be a Facebook post from the Emerson Creek

23  Pottery & Tearoom account as of 2016?  That's when the posting

24  was made?

25  A    Yes.

D. Demiduk - Direct

1  Q    Okay.  And this would have been available on Facebook as

2  of the date of this capture, May 2nd, 2019?

3  A    Yes.

4          MR. WILLETT:  Move for admission of Exhibit 71.

5          MR. LAUBSCHER:  No objection.

6          THE COURT:  Admitted.

7          (Plaintiff Exhibit 71 marked.)

8          (Plaintiff Exhibit 71 admitted.)

9          THE WITNESS:  The post was 2016.

10  BY MR. WILLETT:

11  Q    Yeah, the post is 2016.  If you look in the upper

12  left-hand corner, it says date accessed of 5-2-2019.  Do you

13  see that?

14  A    Yes.

15  Q    You don't have any reason to believe this post wouldn't

16  still be available on Facebook as of May of 2019?

17  A    No.

18  Q    Just a few more here.  Let's look at Exhibit 78.  There

19  also is an Emerson Creek Events Facebook page that's used for

20  marketing purposes; is that correct?

21  A    I think so.

22  Q    Let me show you this and see if it helps refresh your

23  recollection.  If you look at this picture, Exhibit 78, it's a

24  picture of, it looks like the tearoom and it's set up for some

25  sort of event, and the date of capture on that is 12-28-21.

1  And if you look at the HTTPS up there, the URL, it's

2  Facebook.com/emersoncreekevents; do you see that?

3  A    It's too small.  I can't see that.

4       Yes.

5  Q    I couldn't see it either.  I just knew what it said.

6           MR. WILLETT:  At this point in time I'd move for

7  admission of Exhibit 78.

8           MR. LAUBSCHER:  No objection.

9           THE COURT:  Be admitted.

10          (Plaintiff Exhibit 78 marked.)

11          (Plaintiff Exhibit 78 admitted.)

12   BY MR. WILLETT:

13  Q    Let me give you one more here.  Now, Emerson Creek Events

14  and Emerson Creek Pottery also are on things like Yelp and

15  TripAdvisor.  Do you have that understanding?

16  A    I've seen that today, or yesterday.

17  Q    Well, but -- I mean, you have an understanding that

18  TripAdvisor is out there and people will use TripAdvisor to

19  figure out where they're planning their trips or where they

20  might go and that sort of thing, right?

21  A    Yes.

22  Q    Let me just show you this image from -- it's Plaintiff's

23  Exhibit 75.  Right there.  And do you -- have you seen this

24  page before?

25       And Ashley, you can scroll down a little bit, let them

D. Demiduk - Direct

1    see.  Keep going down.

2        Have you seen the TripAdvisor website before?

3    A    No, I've never -- I don't think I've ever been on

4    TripAdvisor.

5    Q    You've never been on TripAdvisor?

6    A    No.

7    Q    Okay.  And do you have any reason to doubt this is the

8    TripAdvisor page for -- if you keep going down to the bottom --

9    stop right there -- for Emerson Creek Pottery & Tearoom?

10   A    I don't know if we have an Emerson Creek TripAdvisor page.

11   I didn't know people can own pages.

12   Q    Well, I don't think it's owned, but if folks are looking

13   for a particular entity, that they would land on, for example,

14   a page for Emerson Creek Pottery & Tearoom.  And do you know

15   whether you had one or not?

16   A    Not that I know.

17   Q    Okay.  I'm going to move for admission of this but I can

18   use Karla for this, too.

19        MR. MCLAUGHLIN:  If I understand what his testimony

20   was, for the limited purpose of just showing him there's a

21   TripAdvisor page where people have posted, that's fine.

22        MR. WILLETT:  Yeah, exactly.  So I would move for

23   admission of Exhibit 75.

24        THE COURT:  Admitted.

25        MR. LAUBSCHER:  No objection.

1          (Plaintiff Exhibit 75 marked.)

2          (Plaintiff Exhibit 75 admitted.)

3   BY MR. WILLETT:

4   Q    At any point in time, Mr. Demiduk, did folks bring to your

5   attention, for example, if there had been negative reviews on

6   either TripAdvisor or Yelp of their wedding or events or

7   pottery or restaurant experiences?

8   A    Not -- I mean, if something on our Facebook page would

9   come up, but I don't -- not that I remember from other places.

10  Q    So what would -- what would an example of that be from

11  Facebook if someone had had a bad experience?  They would bring

12  it to your attention and ask how they should respond to that?

13  A    Yeah.  And usually we didn't even respond to negative

14  things, if we got anything.  It's not worth getting in an

15  argument with somebody.

16  Q    But for example, if -- and understanding your position on

17  this, but someone would still bring those issues to your

18  attention and say, hey, just letting you know we have this

19  issue and asking if you wanted to comment on it or respond to

20  that.  Is that fair?

21  A    Yes.

22  Q    But your recollection is that you did not respond to

23  those?

24  A    No.

25  Q    For example, if you turn to the top page there, just ask

1    if you remember anything about this.  It says "Vintage holiday

2    market."  And there's a writeup there.  Obviously it's a

3    customer that's upset about the experience they had.  It says

4    they reviewed this on October 29, 2018.  And my question is

5    whether or not anyone brought this posting -- I'm going to make

6    it a little bigger -- if anyone brought this post to your

7    attention?

8    A    I've never seen that before.

9    Q    But did anyone discuss a situation like this with you or

10   ask you how it should be addressed?

11   A    Yeah, I guess so.  I mean, nobody -- but -- I'm not saying

12   it's never happened where things have been brought to my

13   attention, but not on a regular basis.

14   Q    Take a look also at page 2 of 5 there.  Go down a little

15   bit.  Right there.  Give you an opportunity to read that

16   posting.

17           MR. MCLAUGHLIN:  So Judge, at this point I want to

18   raise an objection.  I'm not sure what the -- I understood

19   before the purpose was to show that they were on TripAdvisor,

20   but it seems to be that now that the focus is on I guess some

21   isolated negative reviews.  I don't believe that this would be

22   the entirety of a TripAdvisor page.  They've been in business

23   for a number of years.  So I think to take isolated posts out

24   of context potentially for the purpose of disparaging the

25   company I think would be inappropriate.  So at that point I

D. Demiduk - Direct

1  would ask this exhibit be stricken.

2          MR. WILLETT:  Judge, I'm just trying to get a feel

3  for whether or not Mr. Demiduk as an officer of Emerson Creek

4  Events, as well as Countryview Pottery, the owner of Emerson

5  Creek Pottery & Tearoom, whether he was informed when folks had

6  negative reviews that were out there on the Internet and took

7  any action to respond to those.  That's the limited purpose of

8  my question.

9          THE COURT:  Well, he can answer that question.

10   BY MR. WILLETT:

11 Q   Again, sir, I'm just asking if anyone ever brought this to

12 your attention that this review was out there, that someone was

13 upset about this, and if it was, if you responded?

14 A   I know -- this was me they were talking about, so I knew

15 about this one.  I've never read the post before.

16 Q   Did you provide any sort of response to this --

17 A   Not online we didn't.  I've never seen the post.  I didn't

18 know she posted something, but we spoke with the lady when it

19 happened.

20 Q   And had a different view of the world that day?

21 A   What's that?

22 Q   And had a different view of the situation, it sounds like.

23 A   No.  I mean, we spoke with her.  I had no idea that she

24 wrote something on TripAdvisor.

25 Q   All right.  Let me next -- let me take you to Exhibit 41.

D. Demiduk - Direct

1  And this is a previously admitted exhibit.  And if Ashley will

2  scroll down a little bit on this to page 8, this is the

3  exchange.  And we read through some of this.  Actually, it's on

4  page 7.  This is the exchange and you were here for the

5  testimony of Ms. Winkler yesterday, but an email exchange

6  between you and Ms. Winkler regarding domain names.

7  A    Okay.

8  Q    For the website.  And do you recall those discussions that

9  you had or emails with Ms. Winkler back in 2019?

10  A    Yes.

11  Q    And I'll direct your attention -- it looks like on

12  Tuesday, April 23rd she provided you with some recommended

13  names and also gave you some other domain names that were

14  available.  Do you see that?

15  A    Correct.

16  Q    And then in response to that you responded, "Let's use

17  Emerson Creek Events as our domain name, but also purchase and

18  keep the other ones," which included -- and that's the one that

19  says "keep" there, with the word "keep" next to it,

20  ecreekpotteryandtearoom.com.

21      My question is just confirming that as of April 23rd, 2019

22  ecreekpotteryandtearoom was still your website URL; is that

23  correct?

24  A    Yes.

25  Q    And so for Emerson Creek Pottery & Tearoom, as well as

D. Demiduk - Direct

1  Emerson Creek Events, you were -- at that point everything was

2  on the same website, right?  You had -- you go -- for the

3  pottery shop, restaurant and events, they're all advertised on

4  the same website; is that correct?

5  A    You had tabs.  Up at the top you could choose which one

6  to --

7  Q    But you'd choose that from the same website, correct?

8  A    Correct.

9  Q    And you say, "Will we be able to use all of these as

10 redirects?"  And I just want to make sure I understand, your

11 understanding of that is that if someone went to a particular

12 website and clicked on it or typed it in, that they would be

13 redirected to the new website, correct?

14 A    Yes.

15 Q    And then ultimately there was some more testimony from

16 Ms. Winkler about the fact that ultimately you got the website,

17 www.emersoncreek.com; is that correct?

18 A    Yes.

19 Q    And so everything for all of your operations on the Oswego

20 property, they are all on the www.emersoncreek.com website?

21 A    Yes.

22 Q    And do you know today, in 2020, if someone clicks on or

23 types in Emerson Creek or ecreekpotteryandtearoom.com, do you

24 know what happens?

25 A    You said in 2022?  Today?

1  Q    Today.

2  A    Yes.  I believe the redirect is still active.

3  Q    The redirect is active and they go directly to...

4  A    Right.  Correct.

5         MR. WILLETT:  Carmen, this is -- I'm going to show

6  them something that has not been admitted.  I want to show this

7  just for illustrative purposes.

8  Q    Ashley is typing in ecreekpotteryandtearoom.com and

9  hitting return, and this is your current website; is that

10 correct?

11 A    Yes.

12 Q    That was your intention in asking for that name to be

13 held, was that if someone did that, they would be directed to

14 the EmersonCreek.com website, correct?

15 A    Correct.

16 Q    Now, at some point in time related to website activities

17 an issue arose.  You had a company that you did business with

18 called Twisted Vendor [sic].  Who were they?

19 A    Twisted Vintage.

20        MR. MCLAUGHLIN:  Objection, Your Honor, relevance.

21        MR. WILLETT:  Can I establish a foundation?

22        THE COURT:  Yes.

23  BY MR. WILLETT:

24 Q    Who was Twisted Vendor?

25 A    It was two girls we worked with that kind of -- as the

1  markets got bigger, we teamed with them or partnered with them

2  and they would interview the vendors and go out and look for

3  vendors for us for our markets, and mark the spaces out.

4  Q    And then, so at some point in time you stopped doing

5  business with them?

6  A    Yes.

7  Q    Okay.  And why was that?

8         MR. MCLAUGHLIN:  I want to object, Your Honor, to

9  relevance.  I think he's getting into a business relationship

10  with a completely unrelated entity which isn't relevant to the

11  matter before us.

12         MR. WILLETT:  I'm actually going to show their use of

13  the Twisted Vendor information and their use of that

14  information on their website for the vintage market.

15         MR. MCLAUGHLIN:  And the use of Twisted Vintage or

16  anything related to Twisted Vintage has nothing to do with a

17  dispute between Emerson Creek Pottery in Bedford, Virginia and

18  Emerson Creek Pottery -- Emerson Creek Pottery & Tearoom and

19  Emerson Creek Pottery in Oswego, Illinois.

20         MR. WILLETT:  It actually does because they've raised

21  an issue about the relatedness of the activities, and our

22  position has been that the vintage market, as well as these

23  other items, were promoted by the pottery, and people who came

24  to buy pottery are people who go to vintage markets, and people

25  who go to vintage markets are people who buy pottery, and

1  therefore the marketing materials and information used for

2  vintage markets is as relevant as anything to relatedness.

3          MR. MCLAUGHLIN:  Judge, I think I'd ask for a

4  sidebar.  There's more to this, so if we could have a sidebar

5  for a moment.

6          (Sidebar commenced.)

7          MR. MCLAUGHLIN:  The issue, Your Honor, is the only

8  time that Twisted Vintage has ever been brought up in this case

9  is with respect to a dispute between our clients and Twisted

10 Vintage with respect to a form on a website.  So Twisted

11 Vintage used to be a vendor at the market and Twisted Vintage

12 decided to pull out of that market.  And there was an issue

13 with respect to a form that they were using.

14          And so there was allegations that they had copyright

15 ownership of a form.  And so there was a dispute between the

16 parties that they ultimately resolved and moved on.  But the

17 documents are going to show, are going to intimate that there

18 was some copyright dispute that would purport that our clients

19 violate other people's IP rights, which would then prejudice

20 the jury with respect to deliberations between the parties.

21          MR. WILLETT:  Judge, this is an email exchange.  It

22 relates to their vendor and their basic copying of that

23 vendor's information and placing it on their website.  And it

24 does relate to their disregard for copyright and other marks

25 that that vendor had.  And we do think this -- it's related

D. Demiduk - Direct

1  because it deals with the same subject matter we're dealing

2  with here.  We've got this issue of relatedness that they've

3  raised between pottery and tearoom and everything else and

4  marketing.

5       So it's for two purposes.  One, it shows what they've

6  done to continue to promote this vintage market business; and

7  two, it shows an utter disregard for copyrights, which we do

8  think is relevant.

9       MR. GOODRUM:  Intent.

10      MR. MCLAUGHLIN:  And there's the problem, Your Honor,

11 because we're talking about a vintage market where -- there's a

12 ton of vintage markets.

13      MR. WILLETT:  It's going to be limited testimony.

14      THE COURT:  I think the prejudice outweighs the

15 probative value of it so I'm going to sustain the objection.

16      MR. WILLETT:  We would just note our objection.

17      THE COURT:  Yes.

18      MR. WILLETT:  Thank you, Your Honor.

19      (Sidebar concluded.)

20  BY MR. WILLETT:

21 Q   Next, Ashley, if you could pull up Exhibit 55.  And

22 Mr. Demiduk -- and this is not admitted, sorry.

23      THE CLERK:  I show it was admitted.

24      MR. WILLETT:  No, it was admitted.  Sorry.  I

25 apologize, then.

D. Demiduk - Direct

1          THE CLERK:  Let me look.

2          MR. WILLETT:  So you can put it back up.  I

3   appreciate that.

4          THE CLERK:  Double-check.  No, you're right.  I had

5   it on the other list.  Thank you.

6    BY MR. WILLETT:

7   Q    At some point in time, Mr. Demiduk, on or around September

8   19, 2017, do you recall authorizing the filing of a trademark

9   application for the mark "Emerson Creek Pottery & Tearoom"?

10  A    Yes.

11  Q    And if you take a look at this document that's before you,

12  if you could just identify -- just confirm that that's indeed

13  the application that was submitted at your direction?

14  A    I've never seen the application personally, but it appears

15  to be.

16  Q    And you know that one was submitted at your direction?

17  A    Yes.

18         MR. WILLETT:  At this time I'd move for the admission

19  of Exhibit 55.

20         THE COURT:  Be admitted.

21         (Plaintiff Exhibit 55 marked.)

22         (Plaintiff Exhibit 55 admitted.)

23   BY MR. WILLETT:

24  Q    I just want to direct your attention to a couple of things

25  in here, if this is information you provided.  First of all, if

D. Demiduk - Direct

1  we scroll down the document -- and Ashley, kind of go down a

2  little bit -- this again was submitted in September 2017, and

3  if we go on down a little bit, to page 3, that just has general

4  information.

5          MR. WILLETT:  Keep on going down, please.  Can you

6  go -- keep the top, the mark.  Thank you.

7   BY MR. WILLETT:

8  Q    So that's the mark that you were applying for, "Emerson

9  Creek Pottery & Tearoom," correct?

10 A    Yes.

11 Q    And then if you go down a little bit, it just has some

12 basic information.  The owner of the mark is Countryview

13 Pottery Company, correct?

14 A    Yes.

15 Q    And then it just has basic demographic information and

16 it's got the website at the time, ecreekpotteryandtearoom and

17 that sort of thing.  That's all correct?

18 A    Yes.

19 Q    Next if I could direct your attention to page 7, and where

20 it says the applicants, Countryview Pottery d/b/a; do you see

21 that?

22 A    Yes.

23 Q    And so this was being applied for on behalf of Countryview

24 as well as Emerson Creek Events; is that correct?

25 A    It appears so.

D. Demiduk - Direct

1  Q    Okay.  And as an officer of both entities you had

2  authorized that, you were fine with them submitting this

3  application?

4  A    Yes.

5  Q    All right.  And next I want to go down to the description

6  of services there.  Garfield will direct -- actually, if we go

7  up to page 4 we'll see that.

8      If you look at identification there, it says "providing

9  banquet and social function facilities for special occasions."

10  Do you see that?

11  A    Yes.

12  Q    If we scroll down, there's another part that specifically

13  references the providing of banquet and social functions,

14  restaurant and cafe services.  Can you go to that part?

15      Okay.  Yeah, if you look right there, sorry, it's right in

16  front of my face, the international class 43, tearooms

17  providing banquet and social function facilities for special

18  occasions; restaurant and cafe services.

19      As you understood it, that was a description of the

20  services provided by the entity that was applying for the mark

21  at that point in time?

22  A    Yes.

23          MR. MCLAUGHLIN:  I just want to object to the form of

24  the question and the limiting aspect of it because it relates

25  to this application.

1  BY MR. WILLETT:

2  Q    Yeah, you were providing information so that your

3  attorney, Mr. McLaughlin, could submit an application on behalf

4  of you and your entities, correct?

5  A    Yes.

6  Q    And if you read -- let me clear that.  It says in the next

7  paragraph "the mark was first used by the applicant or

8  applicants related to company or licensed predecessor in

9  interest at least as early as 8-1-2000 and first used in

10  commerce at least as early as 6-1-2002.  It is now in such use

11  in commerce."  Do you see that?

12  A    Yes.

13  Q    And so what was the -- as you understood it -- the August

14  1st, 2000 date?  What was the significance of that date?

15  A    That's probably when Chris first incorporated Countryview

16  Pottery.  I don't know.

17  Q    Well, you may recall, and I can show it to you --

18  actually, I think it may be on this sheet -- that she

19  incorporated Countryview Pottery -- and actually on the tax

20  returns -- it was April the 2nd of 2001.  Do you recall that?

21  A    Yes.  Yeah, that sounds familiar.

22  Q    Yeah, and just pull up real quick, Ashley, Exhibit 21 just

23  to confirm.  I don't want to testify for you.

24      And if you look there you see the date of incorporation

25  right here as -- and I kind of covered it again -- but you see

1  that, April 2nd, 2001?

2  A    Yes.

3  Q    And so the August date would have been sometime --

4  A    Prior.

5  Q    -- the prior year.

6       Next if we can go back to Exhibit 55.  And then the other

7  date, 6-1-2002, do you understand that to be the day that the

8  tearoom opened?

9  A    Probably.

10  Q    But you don't recall as you sit here today?

11  A    No.

12  Q    But those would have been the two significant dates with

13  respect to this application, would be the opening of the

14  pottery and the opening of the tearoom?

15  A    Yes.

16  Q    Now, do you have an understanding of what the outcome of

17  this application was?

18  A    Of our trademark?

19  Q    Yeah, so this was submitted for Emerson Creek

20  Pottery & Tearoom in September of 2017.  And I'm just inquiring

21  if you know what the outcome of that submission was.

22  A    I think it would because they said "pottery and tearoom,"

23  because Jim had done "teapots," and "tearoom" and "teapots" was

24  too close.

25  Q    That's your recollection?

1  A    (No verbal response.)

2  Q    Let me show you this to see if this helps you.  Go to

3  Exhibit 56.  All right --

4           MR. MCLAUGHLIN:  Sidebar, Your Honor.

5           THE COURT:  Sure.

6           (Sidebar commenced.)

7           MR. MCLAUGHLIN:  So the issue with respect to Emerson

8  Creek Pottery & Tearoom, that application, there was a

9  determination by the examining -- or the examining attorney

10  that "teapots" and "tearoom" were too close, so they had

11  effectively rejected the application on that basis.  We

12  ultimately withdrew that application, and it's fine that he

13  talks about that limited purpose, but now what they want to

14  bring, this is the examining attorney's opinion as to -- to

15  bolster their argument of confusion.

16           And not only have they not brought an examining

17  attorney or anybody to testify with respect to that, he would

18  try to get through a lay witness effectively a legal opinion, I

19  think is inappropriate for a number of reasons.

20           The other aspect of it is it would be prejudicial in

21  this case because to allow the examining attorney's opinion

22  without anybody to -- the ability to cross-examine the actual

23  examining attorney will put in the minds of this jury that

24  there's absolute confusion any time anybody uses some aspect of

25  "Emerson Creek."  And so we're asking that that exhibit, which

1    is what he's about to introduce, be stricken from the record.

2            MR. WILLETT:  A couple things, Your Honor.  First of

3    all, he's just testified as to what his understanding of the

4    rejection was.  It's already in.  Secondly --

5            THE COURT:  Well, did he answer correctly?

6            MR. WILLETT:  Well, he's close, but I do want to get

7    a clarification on that.

8            The second thing is, Your Honor, the rules require

9    exhibits to be identified 30 days before trial, Rule 26(a).  It

10   required that objections be submitted 14 days later and that

11   motions in limine be timely filed seven days before trial.

12   None -- this is an exhibit on our witness list and none of that

13   has happened.  This is -- I mean, they didn't object to any,

14   but this is the second time we've been up here on this.  These

15   are the types of issues that should have been dealt with in

16   advance.  I think they've waived any objection to this.  That's

17   my first point.

18           My second point, Your Honor, is this is why it should

19   be dealt with in advance.  "Although a court need not decide

20   the question of hearsay, the court" -- and this is from the

21   Fourth Circuit -- "the court recognizes that documents created

22   in the course of the re-examination proceedings may well fall

23   within the exception of hearsay for public records."

24           So it's 803(a) is one of the exceptions in which this

25   would apply.  There are a number of courts that have found

1  that.  There is a court that looked at it as recently as 2006,

2  saying that the other side in that case didn't point to a

3  single case in support of its motion that it excluded PTO

4  documents as inadmissible hearsay.

5  　　　　With respect to relevance, it was relevant in those

6  matters, it's of relevance here.  Courts give due respect to

7  the determination of the PTO.  So this document just simply

8  reflects the rejection and the consideration of the PTO.

9  That's an issue that a lot of courts have addressed and we

10  think addressed in our favor.

11  　　　　But this is an issue, this is the type of issue that

12  we shouldn't be dealing with at trial, we should have been

13  dealing with well in advance of trial if they were going to

14  have this contention.

15  　　　　MR. GOODRUM:  These records regularly come in, Your

16  Honor, regularly.

17  　　　　MR. LAUBSCHER:  The case he has cited deals with a

18  patent re-examination, if I heard you correctly, you said

19  re-examination.  That's dealing with patent and patentability.

20  In this case we're talking about trademark registerability,

21  which is what the application is about.  And yet this case

22  deals with trademark use.

23  　　　　MR. GOODRUM:  It's the exact same thing.

24  　　　　MR. LAUBSCHER:  Excuse me.  There's a difference in

25  registration and use, and the evidence before this court is

D. Demiduk - Direct

1  totally different from the evidence that's before the trademark

2  examining attorney at the Patent and Trademark Office.

3          MR. GOODRUM:  The procedures are the exact same, Your

4  Honor.  These determinations regularly have come in.  The

5  standards of examination are exactly the same.  And as

6  Mr. Willett just said, we should have dealt with this much

7  earlier.

8          THE COURT:  Overrule the objection.

9          MR. WILLETT:  Thank you, Your Honor.

10         (Sidebar concluded.)

11  BY MR. WILLETT:

12  Q   Ashley, scroll down a little bit.

13      Just confirming you understand this to have been the

14  rejection that was --

15  A   Can you take your mask off.

16  Q   Oh, thank you.  I can't remember each way now.

17      That you recall this is -- it has a date up there, sent as

18  of January 2nd, 2008.  If Ashley will scroll down a little bit.

19  Just confirming you believe this was the response that you

20  received to the application for the Emerson Creek

21  Pottery & Tearoom mark; is that correct?

22  A   Yes.

23          MR. WILLETT:  At this time, subject to our

24  discussion, I'd move for admission of Exhibit 56.

25          MR. MCLAUGHLIN:  Pursuant to what we discussed at

D. Demiduk - Direct

1    sidebar, Your Honor.

2            THE COURT:  It will be admitted.

3            (Plaintiff Exhibit 56 marked.)

4            (Plaintiff Exhibit 56 admitted.)

5     BY MR. WILLETT:

6    Q    And specifically I want to direct your attention to just a

7    few things.  On page 2 of this document -- and I just want to

8    note -- get you to confirm one thing for me.  It says in here,

9    registration, if you look at that in section 2-D, "Refusal,

10   likelihood of confusion, registration of the applied for mark

11   is refused because of likelihood of confusion with the mark in

12   US registration" -- it says 4835568.  And my question is simply

13   do you know what that registration is?

14   A    Where is that?  She keeps moving and I can't --

15   Q    I'm sorry.  Bear with me here.  Right here.  And I put the

16   arrows on both sides.  Just confirm you know what that

17   registration is.

18   A    I don't know what the number is, no.

19           MR. WILLETT:  Can you hand me the registration

20   exhibit.  It's Exhibit 232.

21    BY MR. WILLETT:

22   Q    Have you seen this document before, sir?

23   A    Today I have, or yesterday.

24   Q    And if you look --

25   A    The numbers match.

D. Demiduk - Direct

1  Q    It's Mr. Leavitt's mark, the Emerson Creek Pottery mark?

2  A    Yes.

3  Q    And just want to confirm that if you look at the third

4  item down, talks -- and this is a point that I think was made

5  on cross-examination with Mr. Leavitt.  It says for ceramic

6  sculptures, vases, vessels, bowls, plates, and pots, household

7  containers for foods, mugs, serving platters, teapots, that

8  sort of thing?

9  A    Yes.

10  Q    And just to confirm, your application, the one that you

11  submitted didn't include any of those items, correct?

12  A    No.

13  Q    Okay.  It just talked about the services, the tearoom and

14  other services provided, correct?

15  A    Yes.

16  Q    Now, at the time that this was submitted in September

17  of -- the application was submitted in September of 2017.

18  Indeed, under Emerson Creek Pottery & Tearoom the pottery shop

19  had operated, correct?

20  A    Yes.

21  Q    And the pottery shop sold pottery, correct?

22  A    Yes.

23  Q    That wasn't listed as one of the businesses conducted by

24  Emerson Creek Pottery & Tearoom, correct?

25  A    Yes.

D. Demiduk - Direct

1  Q    And ultimately after that -- receipt of that, this

2  application was abandoned.  You didn't pursue this any further;

3  is that correct?

4  A    Correct.

5  Q    Bear with me.  I don't think I have much more here.

6       Just a few more documents I want to show you, sir.  I'm

7  trying to wrap this up here real quick.

8       Yeah, let me direct your attention to a document that was

9  used yesterday with Ms. Leavitt.  And that's the trade show.

10 You and your wife had both been to the Las Vegas gift show

11 before; is that correct?

12 A    Yes.

13 Q    And indeed, just confirming -- and I know I asked you

14 about this when we met before, but that you went to that gift

15 show in 2018, in January of 2018?

16 A    I believe so.

17 Q    Okay.  And this is -- in front of you is a document that's

18 previously been admitted.

19      What's the exhibit number on that?  I can't read it?

20          MR. GOODRUM:   10.

21  BY MR. WILLETT:

22 Q    That's Exhibit 10.  Do you see that?

23 A    Yes.

24 Q    As of -- if Ashley will scroll down a little bit for me.

25 No, the other way.  This was accessed as of December 27th,

D. Demiduk - Direct

1  2017.  As of December 27th, 2017, your email address or one of

2  the email addresses you used would have been

3  info@ecreekpotteryandtearoom.com?

4  A    Yes.

5  Q    And your wife's email address was

6  Chris@ecreekpotteryandtearoom.com?

7  A    Yes, sir.

8  Q    And you did attend the trade show that year in 2018?

9  A    I believe so.

10  Q    Next I want to direct your attention to Exhibit 76.  These

11  are some emails that had been produced by Emerson Creek in this

12  matter.  I'm going to direct your attention specifically to the

13  first four pages, ECP035000.  Do you see that?

14  A    Yes.

15  Q    And so if we scroll down a little bit to the -- to the

16  first one, page 1 of 4, but down to the bottom, there are a

17  couple things I want to note here.  At this point in time -- it

18  looks like from this was September 10, 2020, and it's from

19  ecreekpotteryandtearoom@gmail.com.  Do you see that?

20  A    Yes.

21  Q    That would have been an email address that you were using

22  as part of your business back in 2020, correct?

23  A    We used Gmail, but the whole email -- yes.

24  Q    Well, you were about to say the whole email thing.

25  A    It's -- because we used -- you can use your domain at the

D. Demiduk - Direct

1  end, but it's got to transfer to a Gmail account.  So you can

2  toggle, or we could toggle between the two.

3  Q    So sometimes -- so sometimes the email would show up

4  as@gmail and other times it would be -- read

5  as@ecreekpotteryandtearoom or Emerson Creek or something to

6  that effect?

7  A    Correct.

8  Q    And so you believe this would have been an email that was

9  sent from Emerson Creek --

10 A    Yes.

11 Q    -- Oswego.

12      Okay.  Now, if we go down a little bit, it looks like this

13 was something that -- a new contact form has been submitted on

14 the website.  Below are details of the form.  Do you see that?

15 A    Yes.

16 Q    And do you have an understanding that this was something

17 that, you know, if someone went to your website in 2020 and

18 they clicked on "Contact Us," that they would be able to email

19 you questions?  Is that what this is?

20 A    I would assume so.

21 Q    You knew you had that capability, or your website had that

22 capability?

23 A    Yes.

24 Q    Okay.  It looks like this lady had contacted you and

25 asked:  Are you still -- "Are you selling any of your pottery

1  online?  My husband broke my spoon rest and I would like to

2  replace it."  Do you see that?

3  A    Yes.

4  Q    And then the response, if we go up to the top of the

5  document, "Hi, Charlene.  Ecreekpottery in Bedford, Virginia

6  sells pottery online."  Do you see that?

7  A    Yes.

8  Q    And that was sent by Karla?

9  A    Yes.

10 Q    And Karla was your employee, correct?

11 A    Yes.

12 Q    And that's because this lady was obviously reaching out

13 about purchasing some pottery, and Karla knew that at that

14 point you all didn't sell pottery so she was directing her to

15 Emerson Creek Pottery in Bedford?

16 A    Yes.

17 Q    Let's go now to -- oh, look -- if you look down a little

18 bit on that.  So that's the email she sends back to her, but

19 scroll down just a little bit.  All right.  It has the "Follow

20 us on Facebook," and then it also has the name Emerson Creek

21 and info@emersoncreek on it.  Do you see that?

22 A    Yes.

23 Q    It also in this communication has the Emerson Creek

24 website on it, correct?

25 A    Yes.

D. Demiduk - Direct

1  Q    Let's go to page 2.  Now, this looks like an email that

2  was sent to -- scroll down just a little bit.  Well, it was

3  sent by Joni Blackman and it looks like it was sent to -- I'm

4  sorry.  You may have to go down just a little bit.

5       "Do you sell pots?"  Just get to the beginning of that

6  one.  Go back up.

7       "Do you still sell pots?"  And then there's a response

8  from info@emersoncreek.com:  "We may have a few, but everything

9  in the shop is 50 percent off right now, so I can't guarantee

10  what would still be available.  Thank you for your interest."

11  Do you see that?

12  A    Yes.

13  Q    The info@emersoncreek.com as of August 4th, 2021 was an

14  email address that your company utilized?

15  A    Yes.

16  Q    So this would have been an email sent by Lisa.  Who is

17  Lisa?

18  A    She's another employee.

19  Q    At this point in time, in 2021, she's responding to this

20  customer who has inquired whether you, Emerson Creek -- that's

21  who you were going by at that time?

22  A    Yes.

23  Q    Whether you, Emerson Creek, still sold pots, correct?

24  A    Yes.

25  Q    You understood that to be some sort of pottery pot,

1  correct?

2  A    Sure.

3  Q    And if you go up a little bit, she responds, "I'm actually

4  looking for the small oval dip tray.  Mine broke and I miss

5  it."  Do you see that?

6  A    Yes.

7  Q    If you keep going up a little bit from there, Karla sends

8  an email saying, "Hi Joni, you can order pottery pieces from

9  Emerson Creek Pottery in Bedford, Virginia.  They will ship

10 from their location."

11 A    Yes.

12 Q    All right.

13      Go back, real quick, Ashley, to the -- so this is August

14 the 4th.  And the response from Lisa about 50 percent off right

15 now, that's August the 4th of 2021.  Do you see that?

16 A    Yes.

17 Q    All right.  Now, we can go to page 3.  I'm sorry, page 4

18 of 4.

19      Here's another one.  This is back a little bit further,

20 but November of 2019.  And this is an email that says "The lid

21 to my sugar bowl got broken.  It's the lavender set."  And then

22 something -- there's like a little -- I think that's a C.  "Can

23 I buy just the lid?"  And then this is a response at that point

24 from Karla.  "Hi, Judith.  Unfortunately, we are no longer

25 carrying Emerson Creek Pottery.  Please contact Emerson Creek

1  Pottery in Bedford."  Do you see that?

2  A    Yes.

3  Q    And that was -- and again, at that point in time it looks

4  like her response would have gone to info@emersoncreek.com,

5  correct?

6  A    Yes.

7  Q    And I know we talked about this in your deposition, but at

8  some point in time there was a switch from -- with the email

9  account was switched so all of the addresses were

10 @emersoncreek.com?

11 A    Yes.

12 Q    And so November of 2019 would have been after that switch

13 was made to the @emersoncreek.com?

14 A    I don't know exactly what the date was.

15 Q    If you look at the from Emerson Creek email, it says

16 info@emersoncreek.com.  Does that help refresh your

17 recollection?

18 A    I don't know when the date was.  I don't know if we had

19 access to both of them.

20 Q    At that point in time?

21 A    (No verbal response.)

22 Q    Okay.  But at least the response came from

23 info@emersoncreek.com, correct?

24 A    Yes.

25 Q    If you go to page 5 -- this is the last one of these I'll

1  show you -- you've got an email here at the top from -- from

2  Emerson Creek, ecguests@ecreekpotteryandtearoom.com to Stacey

3  Rogers, rogersstacey211@gmail.  Do you see that?

4  A    Yes.

5  Q    This one is a little earlier.  This is March of 2019.  Do

6  you see that?

7  A    Yes.

8  Q    And so in this one, at least the email address for Emerson

9  Creek or ecguests is showing up as

10 @ecreekpotteryandtearoom.com, correct?

11 A    Yes.

12 Q    It looks like Stacey is some sort of food blogger and

13 she's looking to do an exchange, like a trade for services.

14 And Ashley can scroll down so you can read that.

15 A    Okay.

16 Q    Then if you look at -- as of this point in time in 2019,

17 if you look up above, she's looking for product samples.  She

18 says "You can ask Emerson Creek Pottery in Bedford, Virginia.

19 They're the ones that make pottery."  Correct?

20 A    Yes.

21 Q    So Stacey -- your understanding from reading that email is

22 that Stacey, the food blogger from Portugal, was reaching out

23 to basically trade her services in receipt of some pottery --

24 looking for pottery, correct?

25 A    Yes.

1        MR. WILLETT:  And I think at that point I do not have

2   any further questions for you, Mr. Demiduk.  Thank you very

3   much.

4        THE WITNESS:  Thank you.

5        THE COURT:  We'll take a 15-minute recess now.

6   Retire to the jury room.

7   **(Jury out, 10:57 a.m.)**

8        (Recess.)

9        THE COURT:  Call the jury back.

10  **(Jury in, 11:15 a.m.)**

11       THE COURT:  Be seated, please.  You may proceed.

12                      CROSS-EXAMINATION

13   BY MR. MCLAUGHLIN:

14  Q    Good morning, Dave.

15  A    Good morning.

16  Q    I'm just going to go through some of the exhibits you were

17  shown earlier by Mr. Willett and just ask you some questions

18  about them.  So we'll be bouncing around a little bit, but I'll

19  try to keep you focused on what we're getting back to, okay?

20  A    Okay.

21  Q    So the first thing I want to focus on are two exhibits.

22  One of them is Exhibit 39 and the other one is Exhibit 41.  And

23  these were exhibits that we've previously seen.  So if you'll

24  look at Exhibit 39, you understand that to be that text chain

25  with Lindsay Winkler that was talked about yesterday?

D. Demiduk - Cross

1  A    I can't hear you very good.

2  Q    Okay.  So do you see -- if you look at Plaintiff's Exhibit

3  Number 39, do you see that that's the text chain that you had

4  with Lindsay Winkler, from yesterday?

5  A    Yes.

6  Q    Okay.  And then I want to show you Exhibit Number 41.  And

7  these are the series of emails that were shown to you a little

8  bit earlier.  And they relate to the domain names and the

9  acquisition of emersoncreek.com, etc.  Do you recognize that?

10  A    Yes.

11  Q    So I want to focus on that for a little bit.  I want to

12  put in context what happened when you had to acquire

13  emersoncreek.com.

14       When did you start looking into changing over the domain

15  names?

16  A    It was probably early 2019.

17  Q    And did you do that yourself or did you do that through

18  someone else?

19  A    We talked about it amongst ourselves, and then we reached

20  out to Jonathan and Lindsay about purchasing them.

21  Q    And what was your intent originally to use as the domain

22  name?

23  A    Emerson Creek Events.

24  Q    And were you also exploring other possibilities?

25  A    Originally we were, yes.

D. Demiduk - Cross

1  Q    Did any of them have to do with pottery?

2  A    No.

3  Q    What did they have to do with?

4  A    Emerson Creek weddings, Emerson Creek cafe, Emerson Creek

5  confectionary.

6  Q    And on Wix was a search done for Emerson Creek Events?

7  A    Yes.

8  Q    And was that name available?

9  A    It was originally available.

10 Q    When you went to apply for it, was it available?

11 A    No.

12 Q    Okay.  And did you then inquire as to why it was no longer

13 available?

14 A    Yes, I asked Jonathan.  He said it was no longer

15 available.

16 Q    Do you recall having a conversation with Jim Leavitt with

17 respect to that, to the domain name emersoncreekevents.com?

18 A    Yes.

19 Q    And approximately when did that conversation take place?

20 A    It was -- we were down in Texas for a -- Round Top.  It

21 was when we came back from that.  So it was sometime in April.

22 Q    Would it have been before or after you got

23 emersoncreek.com?

24 A    I believe it was after we got emersoncreek.com.

25 Q    Was it before or after?

1  A    I think it was after because we had tried to get Emerson

2  Creek Events and it was gone.  I don't remember the exact time,

3  if we got emersoncreek.com before or after my conversation with

4  Jim.

5  Q    Was the search for emersoncreek.com after Emerson Creek

6  Events was not available?

7  A    Yes.

8  Q    And in the conversation that you had with Jim, were you on

9  a telephone, in person?

10 A    On the telephone.

11 Q    Was anybody else with you?

12 A    Chris was.

13 Q    And can you tell us in your own words what took place

14 during that conversation?

15 A    I just asked Jim because we had -- it was available and

16 then the next -- literally a day or two later it wasn't

17 available.  And I had asked Jim, because I wasn't sure, you

18 know, where it went.  I said, did you take Emerson Creek

19 Events?  And excuse my language.  What he said, "You're goddamn

20 right I did.  I'm pissed at you guys."

21 Q    Did he offer to give you back emersoncreekevents.com?

22 A    No.

23 Q    So at that point then you had to look for alternatives?

24 A    Correct.

25 Q    One of those alternatives was emersoncreek.com?

D. Demiduk - Cross

1   A    Correct.

2   Q    Had Jim had that domain name when you applied for it?

3   A    No.

4   Q    So he hadn't taken any efforts to get it on his own

5   behalf?

6   A    No.

7   Q    So it's not like you stole it from him, so to speak?

8   A    No.

9   Q    And then -- and so there's been a series of questions

10  about the redirects.  Can you tell me what was the purpose of

11  getting redirects on the emails?

12  A    The emails?

13  Q    Or on the domains?

14  A    Just because we had been known for so long under a certain

15  name, our customers, so if they go look for you, type in that

16  name, you're no longer there.

17  Q    Were some of the domains ones that you had been using

18  historically for years?

19  A    The ones here in the email?

20  Q    Yes.

21  A    No.  People make cakes for weddings and do other things.

22  So we -- and do rental stuff and styling.  So people will write

23  checks or do whatever to certain, you know, different names.

24  Chris always wanted to open up a bakery, you know, so that's

25  why we did confectionary.

1  Q    If you take a look at Plaintiff's Exhibit number 41, page

2  1, you see there's a reference there and it says "keep

3  ecreekpotteryandtearoom.com"?

4  A    Yes.

5  Q    Was that a domain that you had been using before that

6  date?

7  A    Yes.

8  Q    And I think we've heard quite a bit -- well, let me ask it

9  this way:  How long had you been using

10 ecreekpotteryandtearoom.com?

11 A    I think since 2009 maybe.

12 Q    And had Jim ever indicated in any way that he opposed your

13 use of ecreekpotteryandtearoom.com?

14 A    No.

15 Q    I think we had heard earlier from Lindsay about the amount

16 of marketing that she had done for you and the website design,

17 right?

18 A    Yes.

19 Q    And part of what you were paying her services for related

20 to these domains because they were necessary for the website?

21 A    Correct.

22 Q    Do you have an idea how much money you had spent with

23 Lindsay since 2015 to this date to develop the domains for that

24 website?

25 A    I don't know offhand, but quite a bit.

D. Demiduk - Cross

1  Q    Can you guesstimate?  Is it in the thousands or tens of

2  thousands?

3  A    It's in the tens of thousands.

4  Q    And of the money you spent to develop the domain names,

5  had Jim ever contributed any money towards that?

6  A    No.

7  Q    Did he have any involvement whatsoever in the choice of

8  domains or how you set those up or how you did your website

9  design?

10  A    No.

11  Q    You were asked a series of questions about when someone

12  would inquire about pottery from the outside -- so if someone

13  would say I had a broken spoon or I want to buy a bowl or

14  anything like that, you recall those questions, right?

15  A    Yes.

16  Q    Has there ever been a time when someone inquired about

17  pottery that you did not redirect it back to Jim Leavitt --

18  A    No.

19  Q    -- and Emerson Creek Pottery in Bedford?

20  A    No.

21  Q    And it was, in fact, true that prior to January 5th, 2018

22  you were selling Emerson Creek pottery without any type of

23  limitations, right?

24  A    Correct.

25  Q    And those various individuals who you were shown --

D. Demiduk - Cross

1  whether they be Instagram or Facebook or wherever they came

2  through, you don't know when or if they had ever purchased

3  pottery from you or from Bedford, Virginia?

4  A    No.

5  Q    And would it be unusual for someone who had purchased

6  pottery from Emerson Creek Pottery in Oswego, Illinois or from

7  Emerson Creek Pottery in Bedford, Virginia, to inquire of one

8  or the other of you to purchase pottery?

9  A    No.

10 Q    I want to now direct your attention to Exhibit 184,

11 Plaintiff's Exhibit 184.  It's 84, I'm sorry.  My circle looked

12 like a 1.  Sorry about that.

13     Get rid of that, I'm sorry.  I don't know what I'm doing

14 here.

15          MR. FRETWELL:  I know we have it under defendants',

16 if you want it.

17          MR. MCLAUGHLIN:  I'm looking for the financials.  I'm

18 sorry.

19          MR. FRETWELL:  We have it in defendants' exhibits.

20 Here you go.

21          MR. MCLAUGHLIN:  It's not that one.  I'm sorry.  I'm

22 looking for the tax returns we had up a moment ago.

23          MR. WILLETT:  The tax returns are Exhibit 30.

24          MR. MCLAUGHLIN:  Thank you.  There we go.

25  BY MR. MCLAUGHLIN:

1  Q    So if we take a look at Exhibit 30, these were the tax

2  returns and financial reports that you were shown before,

3  correct?

4  A    That's not a tax return.

5  Q    These are the various financials you were shown before?

6  A    Yes.

7  Q    So I just want to scroll down.  And Mike, if you could go

8  to the first page of the tax returns.  There you go.

9       So I'm looking at number 7 or page 7 of the PDF.  And do

10 you see at the top that's the 2012 Emerson Creek Events, Inc.

11 tax returns?

12 A    Yes.

13 Q    So one item I just want to kind of get out of the way is

14 why use 4914 Stephens Road as opposed to 5126 Stephens Road?

15 A    It's our home address and the accountants use it as --

16 being a house now and we can get a deduction, I guess, for a

17 home office.

18 Q    But from your perspective, it didn't have any

19 significance.  The accountant makes the decisions about what

20 addresses are used?

21 A    Correct.

22 Q    For our purposes, everything took place at 5126 Stephens

23 Road on the grounds?

24 A    Correct.

25 Q    So I want you to -- I want to scroll down just a little

1  bit to that blackened area.  Do you see it starts 7 through 21

2  and it says "deductions"?

3  A    Yes.

4  Q    And you'll see that that's blacked out?

5  A    Yes.

6  Q    That was redacted for -- because it's proprietary and

7  confidential information of your financials?

8  A    Yes.

9  Q    Do you know what the labor costs were each year for

10  Emerson Creek Events?

11  A    Yes.

12  Q    And do your labor costs fluctuate from year to year or are

13  they pretty constant?

14  A    They've been going up, but they're pretty constant.

15  Q    What is your average cost of labor?

16  A    Nowadays in events?

17  Q    Yeah.

18  A    It's between 250 and $300,000.

19  Q    And in 2012 what would it have been?

20  A    That's when we first started.  It was low then, probably.

21  You know, 50,000, 60,000, maybe.

22  Q    So if we go to 2012, your labor costs would have been

23  about 50,000?

24  A    Yes.

25  Q    And if we go to 2013, do you know what they would have

D. Demiduk - Cross

1  been?

2  A    I mean, it slowly went up.  In the last probably five

3  years, it's been between 250 and 300,000.

4  Q    So going back to, what, about 2013 or 2015?

5  A    Probably 2015 they really started shooting up.

6  Q    Between the 200 and $250,000 range?

7  A    Yes.

8         MR. WILLETT:  Can I interrupt and ask for a quick

9  sidebar?

10         MR. MCLAUGHLIN:  Oh, yeah.

11         (Sidebar commenced.)

12         MR. WILLETT:  Judge, my problem with this is this is

13  the only thing that has ever been produced in this manner, just

14  by repeated requests, with the information blacked out.  They

15  are now testifying as to information that is -- that has been

16  excluded from us, not provided to us.  And so they're

17  testifying specifically to that information, what's behind the

18  blacked-out information.  So if he has a recollection of

19  something, that's one thing, but it's another thing to do it

20  insinuating that he's testifying as to what has been withheld

21  from us on this document.

22         MR. GOODRUM:  And we tried for years to get it in the

23  TTAB action, Your Honor, and I told Judge --

24         MR. WILLETT:  But that's my point, Judge.  This is

25  the way the document has been produced.  This is the exhibit

1  that's before the Court with it removed.  And we don't have it

2  and it's being presented as if that's what's behind this

3  blackened information.

4         MR. MCLAUGHLIN:  So Your Honor, it was redacted as

5  part of the litigation.  There were a variety of objections

6  for -- it was confidential information.  But the witness has

7  actually firsthand knowledge of the labor cost.  He can testify

8  that our labor costs were X.  He doesn't even have to rely on a

9  document.  He has firsthand knowledge of what his labor costs

10  are.  He's actually seen them.  He's involved with them.

11         THE COURT:  Okay.  But to put it up like that, it

12  does insinuate that it's on there.

13         MR. MCLAUGHLIN:  I can simply ask -- I won't tie this

14  in.  I'll simply say do you know your average labor cost.  As

15  he's said, it's between -- I can do it that way. I have no

16  problem with that.

17         THE COURT:  Okay.  Then you can cross-examine.

18         MR. WILLETT:  Yeah, absolutely.

19         (Sidebar concluded.)

20  BY MR. MCLAUGHLIN:

21  Q   I want to ask the question again.  With respect to the

22  average labor cost for the Emerson Creek Events business, what

23  was it again?

24  A    Between 250 and 300,000.

25         MR. WILLETT:  Ken, I'm sorry, I understood --

1          (Off the record.)

2          MR. MCLAUGHLIN:  You can just take that down.

3   BY MR. MCLAUGHLIN:

4   Q    And then with respect to Countryview Pottery Company,

5   there are separate labor costs for that?

6   A    Correct.

7   Q    What are your average labor costs in, say, the last seven

8   years for Countryview Pottery Co.?

9   A    Between 200 and 250,000, probably.

10  Q    Thank you.  Can you pull up Exhibit 10?

11         So showing you what's been previously marked as

12  Plaintiff's Exhibit 10, do you see that in front of you?

13  A    Yes.

14  Q    And this is what was the registration for the Las Vegas

15  Market Winter Show in 2018?

16  A    Yes.

17  Q    And if I look at the access date, it's December 27, 2017?

18  A    The access date?

19  Q    See on the top right?

20  A    Oh, yes.

21  Q    And as of that date, had Jim Leavitt or anyone at Emerson

22  Creek Pottery in Bedford, Virginia, indicated that you could

23  not use the name "Emerson Creek Pottery & Tearoom" or "Emerson

24  Creek Pottery" with respect to your name?

25  A    No.

1  Q    When we look at this registration, can you tell me how you

2  go about registering for the Las Vegas show?

3  A    It's an online application.

4  Q    And when you fill in the company name, do you have an

5  unlimited number of characters to type in?

6  A    Yeah, you're limited on the number.  We've been to

7  restaurant shows before and it cut -- the middle of a word, it

8  will just stop it.

9  Q    And so Emerson Creek Pottery on this list is just the way

10 they had to input it because of the character limitations?

11 A    Yes.

12 Q    And do you see on the right-hand side it says the words

13 "buyer"?

14 A    Yes.

15 Q    And then above that it says you're registered as a

16 non-exhibiting manufacturer.

17 A    Yes.

18 Q    Can you tell me what those mean?

19 A    We just went there to buy products, to look at products.

20 And non-exhibiting because we weren't selling anything.

21 Q    Did you have a table there?

22 A    No.

23 Q    Were you in any kind of competition with Jim Leavitt

24 there?

25 A    No.

1  Q    Was it any secret -- well, strike that.

2       Was Jim aware that you were going to be at the Las Vegas

3  show that year?

4  A    I believe so.  I believe Chris had told them.

5  Q    You had been there years in the past?

6  A    Yes.

7  Q    And in fact, you've discussed openly the fact that you go

8  to a variety of shows, one of which being the Las Vegas show?

9  A    Yes.

10 Q    And while you were at the Las Vegas show, did anybody ever

11 come up to you and ask to buy pottery?

12 A    No.

13 Q    That's all I have, thank you, on that.

14          MR. MCLAUGHLIN:  I have no other questions.  Thank

15 you.

16          THE COURT:  Redirect.

17          MR. WILLETT:  Yes, thank you, Your Honor.

18                      REDIRECT EXAMINATION

19  BY MR. WILLETT:

20 Q    If we could briefly go back to Exhibit 41, which was just

21 shown, Mr. Demiduk.  Ashley will put that on the screen for us.

22      Scroll up a little bit, please.

23      Mr. Demiduk, I believe you testified a few minutes ago

24 that at some point in time you tried to get the

25 emersoncreek.com URL and you couldn't and then you contacted

1  Mr. Leavitt and he told you that he had done it because he was

2  mad at you?

3  A    No.   We tried to get emersoncreekevents.com.

4  Q    I'm sorry if I misspoke.   Yeah, you tried to get

5  emersoncreekevents.com and you couldn't?

6  A    Correct.

7  Q    And when you couldn't get it, you spoke to Mr. Leavitt and

8  at that time you learned from Mr. Leavitt that he had already

9  reserved that URL or purchased it or something like that?

10 A    Correct.

11 Q    Let me direct your attention to the page that's on the

12 screen now.   This is Exhibit 41 that's already been admitted.

13 And you've got the exchange between you and Ms. Winkler.   And

14 she says to you, "Yes, we can use redirects to do whatever we

15 need between sites' pages, but we also don't want to confuse

16 people too much."   Do you see that?

17 A    Yes.

18 Q    And then you respond on April 23rd, 2019 about if you did

19 the five years, one less thing to worry about.   Do you see

20 that?

21 A    Yes.

22 Q    And then you go on down.   You said, "I don't think we

23 would advertise the other names.   It would just be if someone

24 types in something else.   My thought in the print is just put

25 Emerson Creek Events, shop, cafe.   All of that."   You see all

1  of that, correct?

2  A    Yes.

3  Q    You then say that 75 percent of your revenue comes from

4  events, so you thought as of April 23rd, 2019 that you should

5  use emersoncreekevents.com, correct?

6  A    Correct.

7  Q    Okay.  And at that point you didn't know whether -- that

8  anyone had taken that name or that it was no longer available,

9  correct?

10  A    Correct.

11  Q    And your next sentence says, "I also thought if we bought

12  the other names, Jim in Virginia couldn't."  Did I read that

13  correctly, sir?

14  A    Yes.

15  Q    You made that statement before you had any inkling that

16  Mr. Leavitt had procured emersoncreekevents.com, correct?

17  A    Correct.

18  Q    There were some questions asked to you about labor costs.

19  I want to make sure I have this correct.  Is it your testimony,

20  sir, that the labor cost for Countryview Developers averaged

21  250 to $300,000?

22  A    For Countryview Pottery?

23  Q    Yeah, for Countryview Pottery?

24  A    Yes.

25  Q    Okay.  And how long did they average 250 to $300,000, sir?

D. Demiduk - Redirect

1  A    Between the restaurant and the shop, I would say it's been

2  that for years and years.

3  Q    Well, was it -- did it average between 250 and $300,000,

4  sir, back in -- bear with me -- 2012?

5           MR. MCLAUGHLIN:  Objection, relevance, Your Honor.

6           MR. WILLETT:  You just asked him about his labor

7  costs, and I'm asking him if it was that in 2012.

8           THE WITNESS:  I haven't gone that far back in our

9  stuff.  I would have to look at the sales.

10  BY MR. WILLETT:

11  Q    What about 2013, were your labor costs 250 to $300,000

12  back in 2013?

13  A    I would have to look at the tax returns, because we kept

14  getting busier and busier.  And more people -- we added more

15  tables in the restaurant, which is more staff.

16  Q    What was your labor cost, sir, in 2018 for Countryview

17  Pottery?

18  A    Probably 250,000.

19  Q    You say probably.  Do you know what your labor cost was

20  that year?

21  A    I don't know the exact number, but I could --

22  Q    What was your labor cost in 2013 for Countryview?

23  A    I don't -- that's so far back, I don't remember.

24  Q    You don't know, do you?

25  A    That's --

1          MR. MCLAUGHLIN:  Objection, asked and answered.

2          THE WITNESS:  That's so far back.  I have no idea.

3          MR. MCLAUGHLIN:  Your Honor, he's already answered

4    this question, so I'm objecting.  It's asked and answered.

5          MR. WILLETT:  I'm done with this.

6     BY MR. WILLETT:

7    Q    Let me ask you this:  For weddings that occurred in let's

8    say 2015, what was your -- what was the average cost or the

9    amount paid by a patron for a wedding in 2015?

10   A    2015?

11   Q    Yeah.

12   A    Just for the wedding?

13   Q    Yeah, just for weddings and the things that go with

14   weddings.

15   A    I don't know.  Anywhere from -- I think we've had a

16   minimum of 14,000 for a number of years and people spend up to

17   $30,000.

18   Q    What's the most someone has spent for a wedding?

19   A    Probably 30-ish thousand.

20   Q    30-ish thousand?

21   A    Yeah.

22   Q    Bear with me here.  And as you sit here today, you don't

23   have information that could tell me the exact price of each

24   wedding that occurred; is that correct?

25   A    Correct.  I don't have that with me.

D. Demiduk - Redirect

1    Q    Let's go real quickly to Exhibit 10.  This is the document

2    you were just shown.  As of December of 2017 -- if Ashley will

3    scroll up -- yeah, you can see it there, the date accessed,

4    December 27, 2017.  At that point in time there had been a bit

5    of a falling-out with Mr. Leavitt, correct?

6    A    There was talks.

7    Q    Well, you had attorneys writing letters for you?

8    A    Okay.

9    Q    Is that correct?

10   A    There had been talks.

11   Q    And indeed, nine days later -- yeah, January 5th, 2018 you

12   received the cease and desist letter from Mr. Leavitt, correct?

13   A    Correct.

14   Q    And prior to this time you had seen emails that you saw

15   where -- in Exhibit 45 -- where there's communications that he

16   was concerned that you were using "Emerson Creek Pottery"

17   without the "and Tearoom" and other versions of Emerson Creek

18   without the "and Tearoom."  Do you recall that?

19        MR. MCLAUGHLIN:  Objection to the form of the

20   question.  He's talking generally about a number of

21   communications with us.

22        MR. WILLETT:  I can show him in the documents, if

23   that would help.  Yeah, let's go to Exhibit 45.  Give us a

24   second.  Ashley will scroll to that.

25    BY MR. WILLETT:

D. Demiduk - Redirect

1    Q    For example -- and appreciate Mr. McLaughlin mentioning

2    this -- Plaintiff's Exhibit 45, this is a document that's

3    already been admitted.  This is an email from Mr. Leavitt to

4    you back in March of 2017.  Do you see that?

5    A    Yes.

6    Q    He says, "Also, keep in mind that 'Emerson Creek Pottery'

7    is our trademark name and you should only use it appropriately

8    and with 'and Tearoom' when referring to your store."  Do you

9    see that?

10   A    Yes.

11   Q    And so as of March 1st, 2017 you understood that

12   Mr. Leavitt had concerns about the way in which you were using

13   "Emerson Creek Pottery"?

14   A    Yes.

15   Q    If we can go back to Exhibit 10.  Actually, before we do

16   that, let's go to Exhibit -- and you've seen this document a

17   number of times, Exhibit 232.  You recognize this, the

18   trademark for Emerson Creek Pottery?

19   A    Yes.

20   Q    And you understood that this trademark was owned by

21   Emerson Creek Pottery Inc., a Virginia corporation?

22   A    Yes.

23   Q    1068 Pottery Lane, Bedford, Virginia.  That's

24   Mr. Leavitt's company?

25   A    Yes.

1  Q    Now go back to Exhibit 10.  And you indicated that you

2  actually -- you typed in "Emerson Creek Pottery" because you

3  had limited space in the company line; is that correct?

4  A    And it's also like when you go to -- if you go to Jiffy

5  Lube, once you've been to Jiffy Lube once, they have your name

6  in there.  So if you start typing something, a lot of times

7  it's pre-done.

8  Q    But I want to make sure I understand your testimony, sir.

9  Is it your testimony that it was pre-done or you had a limited

10 amount of space and you typed in "Emerson Creek Pottery"?

11 A    You do have limited space and it is also pre-done.

12 Q    You have limited space and it's pre-done.  So is it now

13 your testimony you didn't type this in, it was just already

14 there?

15 A    As soon as you start typing it in, your information comes

16 up.  So we had been to the gift show numerous times, and if we

17 went to the gift show in 2014, our information was in there.

18 Q    Well, let me ask you this.  And is it your testimony, sir,

19 that it wouldn't let you edit that information?

20 A    I don't remember.

21 Q    You don't know?

22 A    I don't know if I'm the one that did this.  I don't know.

23 Q    Let me ask you this:  You don't know whether you're the

24 one that did this, but you know it auto populates and you know

25 that it has a limited amount of space.

1    A    Because I have registered for shows.

2    Q    Let me ask you this, sir:  Do you always register as a

3    manufacturer for the Vegas gift show?

4    A    I don't -- not that I remember.

5    Q    Do you manufacture anything?

6    A    No.

7    Q    Did you manufacture anything in December of 2017?

8    A    No.

9              MR. WILLETT:  No further questions.  Thank you.

10             THE COURT:  Okay.

11             MR. MCLAUGHLIN:  So we would just reserve to call

12   Mr. Demiduk in our case in chief.

13             THE COURT:  Thank you.  Step down.

14             Call the next witness.

15             MR. WILLETT:  So Your Honor, very briefly, I just

16   need to consult with counsel.  We had -- there was a witness

17   who had been waiting, Karla, who was employed.  And we had

18   proposed some exhibits to stipulate to their admission.  I just

19   want to see if we're all set on that.

20             MR. LAUBSCHER:  We're fine.

21             MR. WILLETT:  So we're good on that.  And so our next

22   witness is Townsend Belisle.

23             MR. MCLAUGHLIN:  Henry, should we call her and tell

24   her we won't need her now?

25             MR. WILLETT:  Yeah.

1    MR. MCLAUGHLIN:  Can we take just a two-minute

2 recess, Your Honor, just so I can call her so she knows.

3    THE COURT:  All right.  Is this a Zoom witness?

4    MR. WILLETT:  The witness who is actually going to

5 testify is a live witness, Your Honor.

6    THE COURT:  Okay.

7    MR. WILLETT:  The Zoom witness is the one that we are

8 stipulating to the evidence on.

9    THE COURT:  Where is the witness?

10    MR. WILLETT:  He's going to come up.  Do you want him

11 to come on up?

12    TOWNSEND BELISLE, CALLED BY THE PLAINTIFF, SWORN

13    THE COURT:  You may have a seat, and we'll wait until

14 he's ready.

15    You may proceed, I believe.

16    MR. WILLETT:  Oh, I didn't know we were ready.

17                    DIRECT EXAMINATION

18  BY MR. WILLETT:

19 Q    Mr. Belisle, could you please state your full name for the

20 record?

21 A    Townsend Belisle.

22 Q    Who is your current employer?

23 A    I am the founder and CEO of an agency called Haystack

24 Needle.

25 Q    What is Haystack Needle?

1  A    Haystack Needle is an agency, a rather large one, that has

2  many services with regards to digital marketing.  And one of

3  the key practices of that agency is something called a digital

4  reputation management practice.

5  Q    At this time I'd like to show the witness Exhibit 223.  If

6  you could just identify what this is, sir?

7  A    This is my CV.

8  Q    If we can go back up just so it shows -- yeah.

9        MR. WILLETT:  I'd move for the admission of the CV.

10        MR. LAUBSCHER:  No objection.

11        THE COURT:  Be admitted.

12        (Plaintiff Exhibit 223 marked.)

13        (Plaintiff Exhibit 223 admitted.)

14  BY MR. WILLETT:

15  Q    If you scroll down a little bit, Ashley.  That's the --

16  the first part there, that's the summary of what your company

17  just above that.  Sorry.  That's just a summary of what you do;

18  is that correct?

19  A    Correct.

20  Q    And then go down a little bit, Ashley and leave -- yeah,

21  go down a tiny bit more.

22        And so how long have you been with Haystack Needle?

23  A    2008.

24  Q    And you've given a sort of brief description of this, but

25  if you could tell us what does that mean when you refer to

1  digital reputation management?  What is that?

2  A    One of our practices, which is a significant part of our

3  business, involves understanding the digital landscape for

4  brands, including search engines, social media, etc.  And in

5  understanding those, understanding how one can influence those

6  whereby it's more favorable to brands.  Hence, it's called

7  digital reputation management, because brands are ultimately

8  looking to protect their reputations, and in doing so take up

9  as much real estate and the proper real estate that is

10 favorable to them in social media and search engines.

11 Q    And when you -- you're talking about -- I take it you're

12 using this in an analogous way.  When you're talking about real

13 estate, what does that mean in your world?

14 A    Good point.  In search engines specifically, when one

15 types in something into Google, Google's job is to present what

16 is most relevant to that user.  And we're looking to do what we

17 can in terms of promoting all the right things in that -- those

18 search engine results -- forgive me, the industry term is real

19 estate.  We're looking to take up as much space as possible in

20 search engines that are available to the brand who has hired

21 us.

22 Q    By taking up that real estate, what's the result of that?

23 What happens?

24 A    The result is you're putting forward a favorable

25 reputation to anyone searching for those terms, and in the

1  nature of business, that is something that would actually

2  promote your business or protect your business and its

3  reputation.

4  Q    And you mentioned in addition to this social media.  What

5  are examples of that, of social media that would be impacted by

6  this?

7  A    Sure.  The top social media platforms out there include

8  Facebook, Instagram, Twitter, YouTube, Pinterest, TikTok and

9  Snapchat for those of us who are under a certain age.  And in

10  those realms those are all platforms that also exist on the

11  Internet that, like Google, are platforms by which users can go

12  on and search for different functions and understand them

13  better, perhaps even transact.

14  Q    You talked about influencing search engine results.  What

15  is it that you do with respect to -- we've heard this term

16  search engine optimization.  What if anything do you do related

17  to that for your clients?

18  A    Search engine optimization, or SEO as it's often spoken

19  of, is the industry term for promoting one asset, one website

20  or one profile to the top of search engine results.  In doing

21  so you're looking to oftentimes get that one particular

22  presence, let's call it that, to the top of those search

23  results.  Digital reputation management is an exponential

24  version of SEO where you're actually not just looking to

25  promote one thing to the top of the search engine results, but

1   many things to the top of search engine results.  And as such,

2   take up that much more real estate, as we've said, in those

3   results.

4   Q    Well, we see lots of -- if you look on the Internet you

5   see lots of things related to, you know, improving your Google

6   rank.  What distinguishes what you do and the types of analysis

7   you perform for Haystack Needle from someone who would just go

8   out and hire someone to increase their visibility on Google?

9   A    Two examples.  My firm works with everything from small

10  town America to Fortune 50 clients, and in that nature,

11  whenever there's a merger or acquisition taking place, there's

12  name changes that take place in those mergers or acquisitions,

13  we're put in place to make sure that in the reset of that

14  reputation of those brands, that that comes into play.  So

15  we're a key firm in those transitions as some companies go

16  through.  But we're also hired by brands and high-powered

17  executives and even celebrities to clean up their search

18  results to put forward what is most favorable to those proper

19  nouns.

20          MR. WILLETT:  Just to cut to the chase here, at this

21  time, Your Honor, I'd move that Townsend Belisle be qualified

22  as an expert in the fields of digital reputation management and

23  search engine optimization.

24          MR. LAUBSCHER:  No objection.

25          THE COURT:  All right.  He may so testify.

1  BY MR. WILLETT:

2  Q    Mr. Belisle, what were you asked to do in this matter?

3  A    I was asked to assess the nature of -- the key words

4  "Emerson Creek," "Emerson Creek Pottery," and specifically how

5  those key words were relevant to the defendant.

6  Q    And so, at this time I will ask that Ashley bring up a

7  document that's previously been marked as Exhibit 224 for --

8  she can bring that up.  These are just exhibits or documents

9  that you prepared as part of your process; is that correct?

10 A    Right.

11       MR. WILLETT:  I'd move for the admission of these

12 documents, Exhibit 224, which is just the exhibits.

13       MR. LAUBSCHER:  No objection.

14       THE COURT:  Be admitted.

15       (Plaintiff Exhibit 224 marked.)

16       (Plaintiff Exhibit 224 admitted.)

17  BY MR. WILLETT:

18 Q    And if you can just sort of walk us through.  So we

19 have -- you talked a little bit about Facebook and that sort of

20 thing.  But before we do it and before we get into the meat of

21 that, if you could just sort of summarize what it was you were

22 looking for and what you found.

23 A    Each of these platforms, be they Google, Facebook or other

24 platforms, have an algorithm.  In essence what we're doing is

25 quantifying content, quantifying text that's out there and

1  understanding where that text is placed, and therefore

2  understanding its relevancy and how that relevancy increases

3  the visibility within the digital landscape.

4  Q    And so we have before us what looks like an excerpt from

5  Facebook.  What is this document?

6  A    This is the defendant's Facebook profile, and specifically

7  the page transparency of that profile.  We, the public, can

8  actually click on any profile within Facebook to understand

9  this.  And here is the profile for the defendant calling

10 themselves Emerson Creek as a wedding venue.  You can also see

11 the page history there as to how the name was changed over time

12 from Emerson Creek Pottery & Tea Room, two words, having

13 previously been a single word, and then in May of 2021 they

14 changed their name to Emerson Creek.

15 Q    When you say in May of '21 -- May of 2021 they changed the

16 name to Emerson Creek, meaning that's when their Facebook page

17 displayed "Emerson Creek" instead of "Emerson Creek

18 Pottery & Tearoom"?

19 A    Correct.  Which is then reflected in the account name that

20 you see far above.

21 Q    Okay.  And what else does this exhibit show us, sir?

22 A    It shows that this is a change of an existing account.

23 It's not a new account.  And it changes obviously the longer

24 tail term, right?  When one refers to this brand name as

25 "Emerson Creek Pottery & Tearoom," that's what we call a long

1  tail term, and they've shortened that term to just "Emerson

2  Creek" in that time.  And this is what we call an owned

3  profile.  They went on to a platform -- they don't own the

4  platform, but they created their account to exhibit their own

5  business on that platform, but they actually haven't run any

6  ads or anything to that effect.  This is just their presence on

7  that platform.

8  Q    I'm going to get back real quick to something you said.

9  Talked about short tail and long tail.  If you could explain

10 what that means?

11 A    Sure.  All of these platforms typically follow the US

12 copyright and trademark sentiment of assessing keywords in a

13 hierarchical order according to the linear function that they

14 follow.  Right?  So Emerson is one word.  Creek, we call that

15 two words.  In our language we call that a short tail keyword

16 term.  When you add additional terms to that, it makes a longer

17 tail to it.  So "Emerson Creek Pottery & Tearoom" is a longer

18 tail term versus "Emerson Creek" is a shorter tail term.

19      The hierarchy exists whereby more value is given to each

20 word at the top of the list.  So a primary keyword, "Emerson

21 Creek," has an authority over "Emerson Creek Pottery" or

22 "Emerson Creek Events" or any other function in that regard.

23 Q    And that applies to -- does this apply beyond Facebook?

24 A    It applies universally.  It is not -- it is not the only

25 factor in each of these platforms, but it is a factor in all of

1  the platforms.

2  Q    If we could next go to the next exhibit there.  And this

3  is native search results for "Emerson Creek" on Twitter.  What

4  does this show, sir?

5  A    This is when any user goes onto Twitter and types in

6  "Emerson Creek."  This isn't about being one company or the

7  other going on there.  This is just a user going on and typing

8  "Emerson Creek," and these are the results that are found when

9  you click on the people function within Emerson Creek to

10 understand whoever has -- the type of presence that exists on

11 Twitter for the search term "Emerson Creek."

12 Q    And so if we look at -- are these -- so we see at the top,

13 we see Emerson Creek.  Then it has, it looks like barn

14 weddings, homemade, simplicity.  There's the little EC mark on

15 the side.  Do you have an understanding of who that belongs to?

16 A    It's our understanding the first result there where the

17 handle is ECreekEvents but titled Emerson Creek, that's the

18 defendant.  And then there's some other people in there who

19 have the last name Emerson, but then the plaintiff is number

20 three.  And then we have some other individuals.

21 Q    Just so I understand correctly, these are -- just like we

22 see on Google or something, because I don't use Twitter -- I

23 think that means I'm above a certain age, maybe -- does that

24 mean that these are ranked?  These are ranked in the order of

25 the search product?

1  A    They are and that ranking is very much dependent on the

2  algorithm of any individual platform.  And Twitter's algorithm

3  is one where they reward not just the setup as it's proper --

4  the establishment of the account, but actually the kinds of

5  activity that takes place on the account.  And I would quickly

6  summarize to say that the defendant's profile on Twitter has a

7  lot more activity on it or had activity on it in a more recent

8  date, whereby it's appearing higher.

9  Q    If we look at the next exhibit, is this their profile?

10  What is this?

11  A    That is the defendant's Twitter profile.

12  Q    What is this showing us?

13  A    It's showing that the handle is ECreekPottery, that the

14  title is also E Creek Pottery.  They then use the words

15  "Emerson Creek Pottery Shop" in the actual description of where

16  that is.  It also shows its location.  It also shows the URL,

17  Ecreekpotteryandtearoom.com, as the website associated with

18  this handle.

19  Q    When was this taken?  When was this image?

20  A    November.

21  Q    In November of last year?

22  A    Right.

23  Q    Do you know whether this still exists?

24  A    Yes, it does still exist.

25  Q    Meaning it is still on Twitter?

1  A    It is still on Twitter.

2  Q    They joined in June of 2010?

3  A    Correct.

4  Q    Let's go to the next one, Exhibit E.  If we can enlarge

5  that a little bit.  There we go.  Maybe just one more so we can

6  see the top and through the exhibit.  Go down a little bit.

7  There we go.

8      "Native search recommendations for 'Emerson Creek' on

9  Instagram," I think that's somewhat self-explanatory.  You've

10  gone to Instagram, typed in "Emerson Creek" and this is what it

11  shows?

12  A    Correct.

13  Q    A who are these entities as you understand it?

14  A    It took a while to figure these out, but we're quite sure

15  that the first entry is the defendant, the second entry is also

16  the defendant, the third entry is the plaintiff.  There is then

17  a hashtag, which is not an account, it's just something that

18  users create.  And then there's a location tag, that's the

19  defendants as well.  Then there is a resort.  And then there is

20  still another unrelated account.

21  Q    Real quick on the location tag where I put that arrow,

22  Emerson Creek, it's the 5126 Stephens Road, Oswego, Illinois,

23  who puts that information in there?

24  A    That is something that a user creates based on one of

25  these profiles that was up there.  It's identifying it as such.

Belisle - Direct

1  Q    And similarly, like when we see the first one, Emerson

2  Creek Weddings, that's something that a user creates?

3  A    Correct.

4  Q    Distinguish that from the hashtag just so we're all clear

5  on that.

6  A    Sure.  There's a difference between an account versus a

7  hashtag.  If one goes on as a business and creates an account,

8  you can speak from your own voice and participate in social

9  media using that account.  Contrary to that, hashtags are just

10  tags.  They're just identifiers.  They're a way to classify

11  content that's out there so that others can go and follow it or

12  you can track it from there.  So the hashtag "EmersonCreek" is

13  something that may have been created by a business, but it

14  could also have just been created by users who want to actually

15  identify that specific keyword and have others be able to

16  identify with it later.

17  Q    So when we see hashtags that are out there, hashtags, I

18  mean, they could have been -- something could be hashtagged by

19  the owner of the account, correct?

20  A    Correct.

21  Q    It could be hashtagged by another business or a

22  complementary business of the account?

23  A    Correct.

24  Q    And it could also be something that a consumer or

25  potential patron hashtagged?

1   A    Correct.  It's something called earned media whereby a

2   third party is typically participating in it.

3   Q    Let's go to the next exhibit.  You'll have to scroll up

4   for a second so we can see all this.  And what's depicted here,

5   sir?

6   A    This is a post on Instagram from a third party.  We've

7   surmised that this is from a wedding photographer who has

8   posted something that took place at the defendants' --

9   understanding, right?  We're look at something wedding related.

10  And as such, that wedding photographer has followed what would

11  be best practices in terms of promoting her business and her

12  content on Instagram.  And as such, she's actually put a

13  charming story that engages users to some extent, but then

14  immediately following her posting that information, she

15  comments on her own post by adding a lot of hashtags.

16  Q    All right.  So Ashley, if you can move this a little to

17  the right and I'm going to ask you to blow it up.

18       And so where I put the arrow there, what does that

19  represent?  Is that the post, the initial posting?

20  A    It is the initial posting.  All that text that follows

21  that in gray up until the tenure date down there is all part of

22  that original post.  So "chelseyjoyphoto" is the handle of the

23  photographer.  She then posts a charming story and there's a

24  time frame cue underneath that to show how long ago this was

25  posted.  But then following that she then immediately commented

1    on her own post with a lot of hashtags in order to try to

2    gather the attention of anyone interested in any of those

3    subjects using those hashtags.

4    Q    And the hashtags are where I've got the arrow directed at

5    this point?

6    A    Yeah.

7    Q    Very quickly on the hashtags, we've got some,

8    #marriedlife, #weddinganniversary.  Then we have

9    #emersoncreekweddings.  That's a hashtag.  That's not

10   necessarily defendants' Instagram account.  That's just a

11   hashtag for Emerson Creek weddings.  So if we were to search,

12   we would see like hashtags.  Things that people have

13   hashtagged, you'd come up and see a bunch of images that are a

14   thing someone liked?

15   A    Right.

16   Q    Again, it could be the owner doing it, it could be a

17   supporting business, or it could be a consumer doing that,

18   correct?

19   A    Correct.

20   Q    If we look from there we see the hashtag #emersoncreek,

21   same thing would apply there?

22   A    Correct.

23   Q    We also have here #emersoncreekpottery.  Again, that's a

24   hashtag that's been created.  That's not necessarily the

25   plaintiff's Instagram account.  That's just a hashtag that has

1  their name in it?

2  A    Correct.

3  Q    And then we go on to a bunch of other things that relate

4  to weddings that are in that description.  So in your job and

5  what you do for companies, what do you see here when you're

6  representing a company and they're part of a hashtag like this,

7  what's the implication of that?

8  A    The use of social media involves looking to gain

9  attention, and in gaining attention, gain engagement.  So

10 there's a visibility understanding and then there's an

11 engagement understanding.  Visibility is about promoting it,

12 trying to make it seen out there.  Versus engagement is

13 something where you want people to click, to like, to share,

14 etc.

15     This is a best practice.  It's actually a little bit over

16 best practice.  When using Instagram you don't want to

17 necessarily use this many hashtags, but there is a sweet number

18 as we quantify all this content out there.  Most users will

19 want to cast a wide net and use a ton of hashtags in order to

20 capture the attention of other users, right?

21     And so this photographer, for whatever their subjective

22 experience was in producing this particular content, they want

23 to see that this post is seen for Emerson Creek, Emerson Creek

24 wedding, Emerson Creek weddings, Emerson Creek Pottery, etc.

25 Q    Right.  So with that wide net -- the casting of the wide

1  net -- and Ashley, if you can scroll down a little bit to show

2  the posting date.  Am I correct this was originally posted in

3  July of 2020?

4  A    Correct.

5  Q    With that wide net, what are the implications of that for

6  businesses?  Because obviously we have here, as you've heard

7  from sitting here, you've got the Emerson Creek weddings, but

8  you also have the specific Emerson Creek Pottery, which is

9  the -- happens to be the name and the trademark of the

10  plaintiff.  So what's the implication of the intermingling of

11  those hashtags?

12  A    The implication is that there is going to be some

13  increased visibility around that.  And the implication is also

14  that there is a relationship to that particular entity, which

15  could then play into that entity's reputation.

16  Q    You mean relationship between the entities that are

17  hashtagged?

18  A    Right.

19  Q    Next if we can go to the next exhibit, G.  And if you

20  could just tell us what this is.  You're using the same search

21  term, Emerson Creek?

22  A    Yep.  This is a YouTube.

23  Q    I cheated.  I looked.  I saw it said YouTube below that.

24  What are we seeing here?  This is typing in "Emerson Creek" in

25  YouTube?

1  A    Correct.  And you're looking to see what kinds of accounts

2  there might exist as such, right?  There are numerous Emerson

3  Creek accounts here.  And what we determined -- this was

4  confusing at first.  Having dug into it, we understand the

5  first posting there is the defendant.  The second is also the

6  defendant.  The third is still questionable.  The fourth is the

7  defendant and the fifth is the defendant.

8  Q    I'm sorry, the fourth one is the --

9  A    The fourth is plaintiff.

10  Q    The fourth is the plaintiff?

11  A    Sorry if I misspoke.

12  Q    But the first one, the second one, and the last one you

13  confirmed were the defendant's postings?

14  A    Correct.

15  Q    Related to their company?

16  A    Correct.

17  Q    And then the one I'm putting on the left side, that's

18  plaintiff's company, is that correct?

19  A    Correct.

20  Q    That's just simply doing on YouTube the search, "Emerson

21  Creek"?

22  A    Correct.

23  Q    If we can go to the next.  Before we do, let me ask you

24  something real quick about YouTube.  With the customers that

25  you advise, we see this here, someone searching.  I remember

1  the days where someone would -- you'd go and look at a YouTube

2  video because something funny had happened or something like

3  that, and obviously today we see that sports are out there.

4  How are consumers using YouTube today?

5  A    It's significant.  It's absolutely significant.  The use

6  of YouTube is continuing to grow, particularly because younger

7  and younger generations live on YouTube.  I shouldn't say live

8  on YouTube.  They spend exceptional amounts of time on YouTube,

9  especially during pandemics.  As such, there's also a relevancy

10 that comes into play for any presence on YouTube, so it's wise

11 for any brand to create their own presence on YouTube.  And as

12 such, in creating that presence and putting some content up

13 there and sharing that content with their user base or with the

14 public, they gain some visibility, and hopefully if people then

15 watch the videos, that's called engagement.  If they like it or

16 share it, that's deeper engagement.  That creates more and more

17 relevancy.

18     And Google owns YouTube.  So if you actually create a

19 presence on YouTube and you have enough activity on YouTube

20 with videos and engagement, that YouTube channel can then

21 appear in search results for the given search terms.

22 Q    Meaning when you do a Google search?

23 A    Correct.

24 Q    Is there any interaction -- does YouTube influence Google?

25 Is that one of the factors for Google?

1  A    Well, given the fact that they're owned by Google, Google

2  wants to promote YouTube, frankly.  And the Internet is going

3  to be all video in ten years.  So the nature of how YouTube

4  works is one that Google wants to promote.

5  Q    I'm going to quickly go through the last two here.  The

6  next one is Pinterest.  Myself, I know what Pinterest is

7  because I do some home projects.  But what is Pinterest?

8  A    Pinterest is a mechanism by which you're bookmarking or

9  saving all sorts of visual information for future use.  It's

10 heavily used by the artistic community, the wedding community,

11 and by artists of various nature.  I think it would be natural

12 to understand that both the defendants and the plaintiffs would

13 be using Pinterest for that reason if they're promoting their

14 brands.

15     And as such, when one goes into Pinterest and types in

16 "Emerson Creek," there is a suggested search function just like

17 there is in all of the platforms that kind of gives you an auto

18 population as to what you might see when you're searching for

19 those functions.  And this suggested search that we did in

20 November revealed, again, short term and long term search

21 terms.

22     So "Emerson Creek" is the short term -- tail term.  It's

23 also what was -- it's grayed out because that's what the user

24 typed in.  But then the first term that comes up is "wedding,"

25 and the third term that populates is "pottery," followed by

1  "pottery and tearoom," followed by "pottery and tearoom wedding

2  venues."

3  Q    To be really clear about this, these aren't the results.

4  This is what what's auto filling at this point.  This is what

5  you're seeing as you type it in in real time, "wedding" is the

6  first thing that comes up, then nothing, then "pottery," then

7  "pottery and tearoom," then "pottery and tearoom wedding

8  venues"?

9  A    Just like all algorithmic understandings for search,

10  Pinterest's algorithm is determining based on the keyword terms

11  this user typed in, that this is the content that's going to be

12  most relevant to them on the platform before they even click

13  return.

14  Q    I'm going to switch gears a little bit and talk for a

15  second about -- well, let me ask you this.  We don't have a

16  slide of this.  We've seen something presented on Ms. Demiduk

17  on LinkedIn.  Does LinkedIn factor into searching or consumers

18  looking at LinkedIn, or is that just a business thing?

19  A    No, it's 100 percent -- it plays into reputation because

20  it also can populate on Google.

21  Q    And consumers use LinkedIn as well as businesses?

22  A    Correct.

23  Q    Now, let's talk for a second about, you talked about

24  Google.  So we've sort of done what I call the social media

25  side of this.  Let's talk about the search side of this.  What

1  did you determine from your analysis on the search side?

2  A    We determined that there has been so much activity on the

3  part of -- there's been so much activity relative to the search

4  term "Emerson Creek" that there is significant -- there's been

5  a significant presence in search engine results that have

6  resulted in muddying the waters.  There's significant

7  confusion, just by the algorithms, if not then translates to

8  users, for the fact that there is not one entity that shows up

9  for the short tail search term, right?  So here's -- we're

10  pulling up the results now.  This is just on the next page.

11  Q    The search is the same search, "Emerson Creek"?

12  A    Yep, you search "Emerson Creek" in Google, you get these

13  results.  If you search a little further -- this was done on a

14  mobile phone so it's a little crunched.

15  Q    Let me ask you this:  As you're performing this search on

16  Google, does it matter where you are?

17  A    Yes, it does.  There are over 200 factors in Google's

18  algorithm.  So just by solving for one particular factor

19  doesn't necessarily heavily influence the results.  There's a

20  definite hierarchy to all those factors.  But there's over 200

21  factors.  One of those factors is your geography.  Hence,

22  anyone hops on their phone or computer, wherever they're based,

23  Google recognizes that as an IP address and recognizes your

24  location and might serve you local results based on what you're

25  searching for.

1    So if I'm searching for iced tea or I'm searching for gas

2  station, those results will give you that geographic

3  understanding.  Similarly for businesses that might be located

4  close by, there can be a geographic factor in Google's

5  algorithm that then comes into play in your search results.

6  Q    When you did your analysis, did you test that?

7  A    We did.

8  Q    What did you determine?

9  A    We determined that there's so much relevancy for the

10  defendant now that they actually will show up first even if

11  we're in Virginia.

12  Q    Even in Virginia?

13  A    Correct.

14  Q    Now, the search you've done here, what was the location

15  for this?

16  A    We just -- we used a general masked IP address for the

17  East Coast.  Essentially, it could come up as New York.  But in

18  the search results as we're seeing here, when typing in

19  "Emerson Creek," the defendant's website comes up first.  It

20  also has what's called an indented set of links that are there

21  that show interior pages on their website.  And hence this is

22  taking up four real estate spots on search engine results as we

23  noted there.

24    And then the next result, which is arguably the fifth

25  result, is for the defendant's website.

1  Q    I'm sorry, so the -- we've got the defendant's website,

2  emersoncreek.com, and then the next one we see is the

3  plaintiff's, emersoncreekpottery.com?

4  A    It's the next non-indented function, yes.

5  Q    And so the indented function, is that something -- does

6  Google auto populate that?  How is that created?

7  A    That's a function of coding on the website and what's

8  called information architecture within the website, where the

9  plaintiffs likely tied into a Google product, either Google

10 Analytics or Google Webmaster Tools, and doing so allows Google

11 to understand the traffic and the search that takes place on

12 their website.  And as such, Google actually will promote the

13 most popular pages of that website, the interior pages of that

14 website, assuming that that is what is most relevant to what

15 the user is searching for.

16 Q    When were these searches performed?

17 A    November of '21.

18 Q    And if we look there, there's some words below the search.

19 It says Emerson Creek/Home/Emerson Creek Pottery & Tearoom.  Do

20 you see that?  What is that?

21 A    Say more specifically again.

22 Q    Oh, yeah, I'm sorry.  What it's showing right here, who is

23 populating that?  Is that coming from the website?  Is it

24 coming from Google?  How does that information show up?

25 A    So the URL shows up itself.  Then underneath that is

1  what's called a page title.  That's actually a piece of code

2  that's put on the website itself, and then this title code for

3  the defendant's website, the title code reads, Emerson

4  Creek/Home/Emerson Creek Pottery & Tearoom.

5  Q    And to be clear, that's -- so even though the website is

6  www.emersoncreek.com, that's what's in the coding on that

7  website?

8  A    That's correct.

9  Q    And if we look below that, there's some writing there:

10  "It happens the moment you turn onto the long gravel road.  It

11  might be the charm of the century-old farmhouse filled with

12  hand-painted pottery."  How does that get populated?

13  A    That is also code.  There's two pieces of code that follow

14  that underneath it called meta description and meta keywords as

15  such.  That is the meta description for this page.  It is --

16  has to be entered by someone who has created that website

17  itself.  Hence there's a meta title, meta description.  And

18  those are code -- if you then go to the website, unless they've

19  actually used that same text on the website, you might not see

20  this text on the website as a user, but it's still embedded in

21  the code.

22  Q    All right.  You just explained something to me because

23  I've often searched and then tried to find a sentence and it's

24  not been there and it's baffled me.  So you've explained that.

25        But this is something that's done in the coding.  This is

1  intentional that someone puts this information in there?

2  A    Correct.

3  Q    Then if we look below, we've got obviously the plaintiff's

4  website, the Emerson Creek Pottery, and there's handmade

5  stoneware pottery.

6        And then let's scroll down from there.  So these are other

7  search results that come up after that.

8  A    Correct.

9  Q    We've got --

10  A    You have the plaintiff's site.  You have an indent for the

11  plaintiff's site for what is their shop and how their site has

12  been coded, and then you have numerous profiles, owned media

13  presence for the defendant across other --

14  Q    The partyslate, the eventective, enjoy Illinois, that sort

15  of thing.  Keep going down.  Disc jockey.

16        You also have -- bear with me real quick.  The enjoy

17  Illinois, that's the holiday vintage market.  That's just again

18  on another website.

19  A    That's actually an earned media play.  That's a publisher.

20  Q    You're talking about coding.  Go to the next exhibit, if

21  you could explain what you mean by that.

22  A    There are website designers who are graphic artists who

23  create websites as an interface that one can click through.

24  But then there is website developers who actually create the

25  code for the back end of the website.  And the nature of that

1   code, how it's structured, how clean it is, how short it is,

2   and what words are used within that code comes into play with

3   how that website is then displayed, in search engines, on

4   various browsers, on various screens.  So there's a lot of

5   information to create this working interface that users can go

6   through.  And as such the code is very, very critical as to how

7   that plays out.  Part of that code is search engine

8   optimization code.

9       As we've noted, meta descriptions, meta titles, meta

10  titles, meta keywords, etc.  And they act like signposts,

11  right, whereby you -- again, these are part of Google's

12  algorithms, these are part of all these other platforms'

13  algorithms for whatever handles the presence one would have on

14  those platforms.  The more you find keywords in those places,

15  the more relevant that's going to be, right?

16      So if we then dig into the code of the defendant's

17  website, this was first -- the snapshot you're looking at is

18  from November of '21 but we actually checked it just this week.

19  It's still the same.  You're seeing the page source of

20  emersoncreek.com, the meta keywords, including the word

21  "pottery," "tearoom," "barn," "wedding," etc. and the meta

22  title further down is highlighted in purple.  Their title is

23  exactly as you just saw on the search engine because this is

24  where the search engine gets that information in the code of

25  the website includes Emerson Creek, Home, Emerson Creek

Belisle - Direct

1  Pottery.

2  Q    And so did you determine from looking at the defendant's

3  coding, we see an example here of Emerson Creek Pottery, did

4  you determine whether they had used that other times as well?

5  A    Yeah, there's numerous occasions of this word "pottery."

6  The defendant previously had a lot of uses of the word

7  "pottery" across their website.  They have since cleaned their

8  website of all the on-page text of "pottery."  But all of the

9  code still uses the word "pottery."  It still exists, I want to

10 say five or six times at least, still today.

11 Q    Okay.  And so let's look real quick at the next few

12 exhibits here, wrap this up.  If you could just tell us what's

13 on this screen, sir?

14 A    This is the portfolio page for the defendant's website.

15 So you can see that in the URL below that says

16 emersoncreek.com/portfolio_page.  If you dig into the code for

17 that particular page -- forgive us, it's not highlighted -- but

18 if you go into the meta names, the fifth name down, it says

19 meta name description.  And the content then reads "Emerson

20 Creek Pottery & Tearoom is located in Oswego, Illinois," etc.

21 If you then go into the meta names and the keywords, it says

22 "Emerson Creek," "Emerson Creek Pottery," "pottery in Oswego,

23 Illinois," etc.

24 Q    What is the -- help me out on that.  What's the portfolio

25 page?

1 A    Where the defendant is showcasing their portfolio,

2 whatever content that they feel is relative in that sense.

3 Q    Oh, okay.  And then what's the next image that we see

4 there, next exhibit down?

5 A    Again, another internal page on the defendant's website,

6 emersoncreek.com/the-first-day-of-fall, clearly promoting

7 either an event or the seasonality of that function.  When

8 going into the code of that particular website, similar to the

9 previous pages as we noted, the meta name description, content

10 says "Emerson Creek Pottery & Tearoom is located in Oswego,

11 Illinois."  Then you go into the keywords, the same.  The

12 keywords start "Emerson Creek," "Emerson Creek Pottery,"

13 "pottery in Oswego, Illinois."

14 Q    And just to say what I think you've made really clear, the

15 coding is what the search engines are looking at?

16 A    Correct.

17 Q    And then there --

18 A    They're also accessible by users, by the way.  Anyone can

19 go look at the page source and look at the code.

20 Q    How would one do that?

21 A    You go into your browser, Chrome, Firefox, Safari, etc,

22 and it's different by each browser.  In essence you go into

23 developer tools or into just the format kind of function and

24 say view source or view page source, and you can look at the

25 code.

1  Q    And that information is available.

2       Now, let me ask you:  Did you do any of this for the

3  plaintiff's website?  Did you look at their website?

4  A    We did.  Just to remain impartial and to understand how

5  things play out, we also looked at the plaintiff's site to

6  understand their use of the keywords "Emerson Creek" and

7  "Emerson Creek Pottery."

8  Q    And in looking at plaintiff's use of the keywords, does

9  plaintiff's web page, do they use the keywords "Emerson Creek"?

10 A    They do.

11 Q    And to be really clear, did plaintiffs use the keywords

12 "Emerson Creek" separate from "Emerson Creek Pottery"?

13 A    They did.

14 Q    Or just "Emerson Creek"?

15 A    Many times.

16 Q    Thank you.  And then if we can quickly go to 236, these

17 were just supplemental documents.  I just want to make sure we

18 get these in front of you real quick.  Tell me what we're

19 looking at at 236?

20 A    More evidence of the use of "pottery" on the defendant's

21 website for their internal pages that are still cached on

22 Google.

23 Q    If Ashley will scroll down.  When were these images

24 captured?

25 A    November of '21.

1          MR. WILLETT:  At this time I'd move for admission of

2  Exhibit 236.

3          MR. LAUBSCHER:  No objection.

4  BY MR. WILLETT:

5  Q    And again, this is just --

6          THE CLERK:  One moment.  I want to make sure it was

7  admitted.

8          MR. WILLETT:  I'm sorry.

9          THE CLERK:  I didn't hear from the Judge.  Exhibit

10  236, are you admitting that?  I didn't hear if it was admitted

11  or not.

12          THE COURT:  Okay.  Yes.

13          THE CLERK:  Thank you.

14          (Plaintiff Exhibit 236 marked.)

15          (Plaintiff Exhibit 236 admitted.)

16   BY MR. WILLETT:

17  Q    And then if you look at this page, we've got a couple

18  things that are circled, and that's just different pages of the

19  websites.  We're not seeing duplication of what you've already

20  shown us?

21  A    Correct.  The URL as seen just above those coded pages

22  depicts the interior pages that that code is coming from.

23  Q    So if we look at that, at the top, the URL where I put my

24  arrow right there is www.emersoncreek.com\barn-weddings\spring.

25  Is that correct?

1  A    It's close.  They're forward slashes.

2  Q    Never mind.  I tried.  Forward slashes.  No wonder people

3  get confused when I say those things.  Thank you for that.

4       That's for if you went to the website and then they would

5  have a page presumably for barn weddings in spring?

6  A    Correct.

7  Q    That's what's below that page, in the data below the page?

8  A    I wouldn't use the term "below."  I would say the code of

9  that page.

10  Q    Code.  All right.  And then if you scroll down, we've got

11  the same idea, barn weddings, summer.  It looks like -- yeah,

12  barn weddings summer.  Go up just a tad.  Right there.  The

13  same idea there, different page?

14  A    More evidence of use of the word "Emerson Creek Pottery."

15  Q    Scroll down, please.  And then if we go to -- the next one

16  is barn weddings and then rentals, same idea?

17  A    Yep.

18  Q    And then Ashley, if you would go down.  Keep going there.

19  That's the "about us" page, also has it on there?

20  A    It does.  There is different places where you can put that

21  code.  This one in particular was in the original title, which

22  was "Emerson Creek Pottery."  It's not in the description.

23  Q    And then if we go down from there.  What is this?

24  A    This is a study of inbound links to the website.  It lists

25  various places where those -- where those links are coming

1  from.  One way to -- one of the factors -- one of the top three

2  factors in Google's algorithm is links, and links kind of act

3  like votes.  Like hey, we're a website and we get lots of

4  traffic.  And you just see what's happening, thank you for

5  coming to our website, we think this is really relevant.  It's

6  like a vote from one website to another one.  And it adds

7  equity, if you will, kind of link equity to an end website's

8  results.

9      This is -- these are lots of evidence of links that are

10 inbound to the defendant's website.  There is quite a few.

11 This was actually just done for one page to understand that.

12 And as such, there's a ton of inbound links, which is good for

13 business in the fact that they have increased their relevancy.

14 This will play into how well their website is found in Google.

15 But as such, there are actually three links here that actually

16 are still using the word "pottery" in those links, and hence

17 the relevancy to pottery from all these other places still

18 inbound to this particular website.

19 Q    All right.  One of those is it looks like theknot.com.

20 One of those is wgntv.com.  And then the other one is --

21 A    Madwedding.

22 Q    Madwedding.

23 A    Not one I want to go to.

24 Q    And I think those were the end of your exhibits on that.

25      Let me ask you this:  Obviously you do this for a lot of

1 different companies and advise them on that. How difficult is

2 it to remove this code? I mean, is that something that someone

3 needs to call a sophisticated firm to do, or how difficult is

4 that?

5 A    My opinion is it's not that difficult. You can easily do

6 a quick scan. You could even go into Google and type in a

7 particular site search for in Google, searching for keywords on

8 a particular site, and Google will show you all the pages where

9 that is. You can immediately then detect where those are and

10 then you quite simply need to go into the code to do that.

11       You also don't necessarily need to be a coder to be able

12 to understand and take that code away, let alone any keywords.

13 If you operate on a common CMS -- if you operate on a common

14 content management system, which is the back end of how to

15 control the content and code on the website, a more popular

16 version of CMS is called WordPress. The nature of the

17 defendant's site was built in WordPress. There are fields

18 within WordPress that allow you to quickly go and change the

19 code, edit the code, delete certain keywords if you wish. For

20 what is the amount of content on this site, my firm could do it

21 in minutes.

22 Q    And let's say that happens. Let's say you go in tomorrow

23 and you say, all right, I'm going to delete this code? What's

24 the impact of that on searches? I then go and search on Monday

25 or Tuesday or whatever it is and search "Emerson Creek," is it

1  going to have an impact on this?

2  A    No.

3  Q    Why is that?

4  A    Because there's been a really, really tenured relevancy

5  for this website.  There's a long tenure that's been created

6  here, whereby a riverbed has been created where anybody who

7  types in "Emerson Creek" will get these results.  And "Emerson

8  Creek" itself only has so much search volume behind it.  The

9  popularity of "Emerson Creek," with no disrespect to anybody

10 who runs a business called "Emerson Creek" in the room, you're

11 getting 1,600 to 1,800 searches a month globally for that term.

12 That is actually not much compared to celebrities, compared to

13 other things people search for out there.  It's obviously good

14 for business where you want to be found for those particular

15 search terms.  But because of that search volume, you're lower

16 on the list for Google to come and check you out.

17      So it could take weeks, if not maybe some months, before

18 Google comes in and reunderstands that you took that code away

19 and therefore you don't want to be found as relevant to that

20 code anymore, and it could take some time for them to kind of

21 reset that unless you take proactive approaches using a firm

22 like ours.

23 Q    Even months out, when someone types in a search for

24 "Emerson Creek," is it still going to have -- so is it going

25 to -- in months, is the river dried up?  Is it done?  Or will

1  that continue to have influence on them even months down the

2  road?

3  A    It could have influence months down the road, unless you

4  don't take further action.  There's so many factors in the

5  algorithm, it's something where relevancy has been established.

6  There's a precedent that's been set that you have to really

7  work hard to counter.

8  Q    When you say you have to work hard to counter, you have to

9  work hard to counter if people are looking for you under, in

10 this case, the name "Emerson Creek"?

11 A    Correct.

12         MR. WILLETT:  No further questions.

13         THE COURT:  All right.

14                    CROSS-EXAMINATION

15  BY MR. LAUBSCHER:

16 Q    Mr. Belisle, my name is Larry Laubscher.  I'm the attorney

17 for the defendants.  I want to thank you for educating me

18 today.  I learned a lot.

19 A    I'm a party favor for a lot of people.

20 Q    Who hired you to do your analysis that you've discussed

21 today?

22 A    The defendants' lawyers.

23 Q    Which one?

24 A    I'm sorry, the plaintiff's lawyers.

25 Q    Which one?  Which lawyer?

1    A    Mr. Goodrum.

2    Q    And how much did it cost for you to do your analysis that

3    you did?

4    A    A little over $10,000.

5    Q    And are you being paid for your appearance here today?

6    A    Yeah.

7    Q    What's your hourly rate?

8    A    $250.

9    Q    Do you testify at many -- in connection with many trials?

10   A    No.

11   Q    How many on an annual basis?

12   A    On an annual basis, less than one.

13   Q    So your business started in 2008.  Since 2008 to the

14   present, how many times have you testified in a trial?

15   A    Four.

16   Q    Can you tell me what your analysis has to do with

17   trademark infringement?

18   A    None.

19   Q    Can you tell me what your analysis has to do with

20   trademark licensing?

21   A    None, but we are used oftentimes as evidence to understand

22   the nature of trademark violations.

23   Q    Understand the nature of what?

24   A    Trademark violations.

25   Q    And can you tell me how your evidence is used in

1  connection with trademark violations?

2  A    We are able to gather evidence that is quantifiable and

3  time stamped and dated, and as such can be that much more valid

4  proof of such challenges.

5  Q    I noticed that it looks like all of your analysis was

6  conducted in November of 2021, correct?

7  A    Correct.

8  Q    And when you did your analysis, was it related to any

9  particular time period?

10 A    In a sense, yes.  You take a snapshot in time.  But in

11 order to understand the relevancy of that snapshot in time you

12 do have to take into sense some historical precedence.  Hence

13 we actually did go back further in time.  So the screenshots

14 you saw today of code were those snapshots in time, but our

15 actual full analysis went back almost to the life span of the

16 brand.

17 Q    Did you do any breakdown in your time frame from when you

18 first started -- the beginning of time that you started your

19 analysis, the time period that you were analyzing, I should

20 say, and up to 2018 when a demand letter was sent in this case

21 about breach of a license, and then from 2018 to the present?

22 Did you break that down?  Were you asked to break that down?

23 A    We did an understanding as to what activities took place

24 and what time, whereby there were date stamps. I was not privy

25 to any letter sent out, as you noted in 2018, if that's when

1  you're saying it was.  We were unaware of that date.  We were

2  just asked to perform our analysis according to what data we

3  were finding on the Internet.

4  Q    So you weren't asked to do data analysis up to -- for

5  anything prior to 2018 and then a separate analysis from 2018

6  to the present?

7  A    Incorrect.  We were hired in November to perform our

8  analysis.  Our analysis only took us a week or so, maybe a week

9  and a half.  But in that analysis we went back to the full life

10 span of the brand whereby we actually have time and date

11 stamped understandings of what changed on the Internet for each

12 of the plaintiff and the defendant through that time.

13 Q    But in all these exhibits that you have there, it's -- the

14 exhibit themselves represent the analysis from beginning to

15 end, correct?

16 A    No.  The exhibits that we were just looking at, those

17 pictures that I was just shown on my screen were actually just

18 snapshots that we were asked to present of what we took in

19 November itself.

20 Q    Okay.  I believe you testified that -- with regard to

21 confusion that you determined from your analysis.  Could you

22 expound upon that a little bit?  I think you were referring --

23 relating it to algorithms and algorithm confusion or something

24 of that nature.  If I'm wrong, please correct me.

25 A    You're not wrong.  The nature of search engines in all

1  these platforms is to present what's most relevant, what they

2  think the user is looking for.  And as such, they're using all

3  these factors in their algorithm to determine what that

4  relevancy is, right?  And for what has been determined for the

5  search term "Emerson Creek," the algorithm is presenting mixed

6  results, very, very mixed results of both the plaintiff and the

7  defendant -- defense in a way that actually overlaps them to a

8  point that users -- well, frankly, the algorithm is confused

9  enough to say I don't know, did you want this or did you want

10  this?  Users then get further confused by the fact that both

11  parties were still using each of "Emerson Creek" and "Emerson

12  Creek Pottery" in the presentation of themselves across all

13  platforms.

14  Q    When you did your analysis of the plaintiff's website and

15  the coding and the words that they used -- and I think you said

16  they used "pottery," for example, in their coding, did you

17  search to see if they used the word "events"?

18  A    We did not.

19  Q    Did you search to see if they used the words "tea room"?

20  A    We did not.

21          MR. LAUBSCHER:  I have no further questions.

22          THE COURT:  All right.  Thank you.

23          MR. WILLETT:  I don't have any further questions,

24  Your Honor.

25          THE COURT:  Fine.  Thank you.  All right.  Ladies and

1  gentlemen of the jury, we'll take a lunch recess now and I'll

2  ask you to come back at 1:45.

3  **(Jury out, 12:40 p.m.)**

4          (Recess.)

5          THE COURT:  Before the jury comes back, have you

6  finished with your witnesses?

7          MR. WILLETT:  Yes, Your Honor.  We've finished our

8  witnesses.  We have a couple things we were going to stipulate

9  to for the record and then there's one other issue.  There's a

10 witness, Mr. Wehrli, who we are not going to call in our case

11 in chief.  He may be called by the defendants, but we may end

12 up having to take him out of order at some point.  We'll work

13 around that just so he can be on Zoom and we don't slow down

14 the process.  But we are done with our witness presentation.

15         THE COURT:  Okay.

16         MR. WILLETT:  Do you want us to take that up -- there

17 are a few exhibits I need to run through with Carmen, that

18 those have been stipulated to that those can be admitted.  The

19 other thing we would ask about, there are some discovery

20 designations, things we had designated 30 days out that we

21 wanted to have part of the record.

22         THE COURT:  Anything else -- you want to show it to

23 the jury, right?

24         MR. WILLETT:  Yes.  Yes.

25         MR. LAUBSCHER:  Your Honor, since the plaintiffs have

1  now rested their case, we would like to file a motion for a

2  directed verdict.

3          THE COURT:  All right.

4          MR. LAUBSCHER:  So it would be on the issues of

5  breach of contract, we don't think they've met their burden of

6  proof with regard to the existence of a contract.  We certainly

7  don't think they've met their burden of proof that there was a

8  license agreement that was agreed to by the parties.  So on

9  these breach of contract and the licensing claims, we think

10  that judgment should be in our favor.

11          Moreover, as a result of Mr. Leavitt's testimony, we

12  think that the acquiescence that we have asserted as a defense

13  has been established.  And as you know, that's an equity relief

14  which you can grant without regard to the jury.

15          So again, we don't think there's been proof of breach

16  of contract.  We don't think that there has been -- we think

17  there's acquiescence.  And quite honestly, on the trademark

18  infringement claim, we don't think they've met their burden on

19  that as well.

20          THE COURT:  All right.  If you'll respond.

21          MR. WILLETT:  In response, Judge, we have met our

22  burden on all of those issues.  With respect to breach of

23  contract, we've got the testimony of Mr. Leavitt as to the

24  handshake agreement that was reached between the parties.  As

25  the Court knows, that would qualify both for the contract as

Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.,
6:20cv54, 2/24/2022

1  well as for the license.

2          We've also argued that in the event it was determined

3  that there was not a contract, that there is an implied license

4  as well.  So we have met our brief on that.  We've also met --

5  well, we've established that there was a license.  They were

6  holdover licensees.  It would be their burden to show

7  acquiescence.  But we've shown there was the necessary control

8  exerted, and we believe we've met all elements of our

9  affirmative case, Your Honor.  And happy to address any

10 specific questions the Court may have.

11         THE COURT:  I'm going to let the case go forward and

12 deny the motion at this time.  These are close issues, but I'm

13 going to let it go forward and we'll revisit it after the

14 verdict.

15 **(Jury in, 1:51 p.m.)**

16         THE COURT:  Have a seat.  We'll proceed.

17         MR. WILLETT:  And may it please the Court, Henry

18 Willett again on behalf of the plaintiff.  Prior to concluding

19 plaintiff's presentation of evidence, I'd just like to pull up

20 a few exhibits so that they can be admitted.  They have been

21 stipulated to by defendants.  Those are going to be --

22 actually, we'll start with the exhibits, 4, 5, 6, and 7.  Do

23 them one at a time.

24         The first one, Carmen, is going to be Exhibit 4 that

25 we move to be admitted.  Again, I'm not going to go through all

1  of these in detail right now, but these are things I may

2  obviously refer to in closing arguments, so you have them

3  before you.  This is the full video.  There have been some

4  stills that have been shown of this video previously.

5            Exhibit Number 5, another website image pulled from

6  2019 of Emerson's vintage market.  Again, that would be moved

7  for entry along with 4.  That would be Number 5.

8            Next would be Number 6.  This is a vendor form for

9  Emerson's vintage market.  This will be one of the documents

10 that will be available to the jury afterwards.

11           Exhibit 7 is another promotional material, Emerson

12 Look Book, actually if we can flip through that.  This is

13 another document that will be made available for the jury.

14 That's Exhibit 7, we'd move for admission.

15           Next would be Exhibit 109, just a text string between

16 Karla and Ms. Winkler related to website activities.

17           Then Exhibit 133, some additional email

18 correspondence with Ms. Winkler and Karla.

19           And Exhibit 142.  And I'm sorry to go through these

20 so quickly, but we will have these available for you.

21 Additionally some email correspondence from back in 2021 with

22 Karla and others related to the website.

23           And then that's it for the exhibits.  And then the

24 other items are the discovery responses.  There's some that

25 have been designated.  These are responses that have been

1   provided by the defendants in the course of discovery process

2   at trial.  The first one, number 1, would be the responses to

3   requests for admissions.  And Ashley, if you would pull number

4   1 up.  And I'll -- so it would be -- for each of these, because

5   of the four defendants, there will be questions that are asked

6   and some are objected to and some are answered.  For each of

7   those defendants, Ashley, if you would then go -- so we'll do

8   these -- there's 1 through 12.  If you could, go to number 5,

9   document 5.  It's Defendant Emerson Creek Events' responses to

10  plaintiff's second set of requests admissions.  And this gives

11  you an example of the types of questions that had been asked.

12  This is part, again, of the discovery process.  You'll be

13  presented with these.  There are questions.  There are

14  documents that are sometimes attached to them asking that they

15  be admitted too.  And there are their answers to those

16  questions if they admitted them or if they denied them.

17          So you'll have access to that for all of the

18  defendants.  And then the last thing, there are some

19  interrogatories, if we go to tab 9, which are the defendants'

20  answers to supplemental interrogatories.  These are some --

21  will be some written questions that have been asked of the

22  parties during the discovery process prior to trial.  And if

23  Ashley will scroll down, we can see there, there will be

24  various answers that are provided by them.  And these will also

25  be available to you in the jury room for afterwards and you'll

C. Demiduk - Direct

1  get to see each of these.  And these will be labeled as tabs 1

2  through 12 of the discovery designations of the plaintiff.

3          And with that, Your Honor, the plaintiff rests and

4  we'll turn the case over to defense.  Thank you.

5          THE COURT:  So they are all in evidence, then.

6          MR. WILLETT:  They are all in evidence.

7          THE COURT:  Is that right?

8          MR. WILLETT:  That's correct, Your Honor.

9          (Plaintiff Exhibits 4, 5, 6, 7, 109, 133 and 142

10  marked.)

11          (Plaintiff Exhibits 4, 5, 6, 7, 109, 133 and 142

12  admitted.)

13          THE COURT:  All right.  Defendant may call its first

14  witness.

15          MR. MCLAUGHLIN:  Call Christina Demiduk.

16      CHRISTINA DEMIDUK, CALLED BY THE DEFENDANTS, SWORN

17                      DIRECT EXAMINATION

18   BY MR. MCLAUGHLIN:

19  Q    Good afternoon.

20  A    Hi.

21  Q    So Ms. Demiduk, you go by Chris; is that correct?

22  A    Yes.

23  Q    Is it okay if I call you Chris?

24  A    Yes.

25  Q    All right.  So we've seen and we've heard a lot of

1    exhibits, and I want to kind of back us up a little bit first.

2    Let's just talk -- go back in time and let's talk about when

3    the shop was opened up, okay?

4    A    Yes.

5    Q    So before -- before you ever considered opening up a shop,

6    what did you do for a living?

7    A    I went to school to a trade school for hotel management.

8    It was a three-month program and it had a 99 percent placement.

9    So I grew up in a small town.  I started the school about three

10   days after high school in the summer.  I wanted to travel.  I

11   wanted to work in pretty places.  I was good with customers.

12   So I chose a trade school where I could start in the work field

13   right away.

14   Q    And did you at some point get involved in selling at

15   retail and gift shops, those types of things?

16   A    Yep.

17   Q    Tell us a little bit about that experience.

18   A    So after I graduated from trade school, I started working

19   for Hyatt Hotels.  I was a front desk clerk.  I worked for

20   Hyatt Hotels in Chicago on Michigan Avenue for a year.  Then

21   Fairmont Hotel opened up.  I applied to be a front desk

22   supervisor.  So I went and did that for a year.

23        And then I was interested in traveling.  So I was thinking

24   about cruise ships and people said it's very hard to get on

25   cruise ships.  They don't hire a lot of Americans at that time.

C. Demiduk - Direct

1  So I researched where cruise ships were based out of.  I had
2  never been on an airplane at 19 years old.  I booked a round
3  trip ticket to Miami.  That's where a lot of the cruise ships
4  were based out of.  So I booked the earliest flight and then I
5  booked the latest flight.

6      So I went to Norwegian Cruise Line to their office.  And
7  back then you could walk into a place and talk to the person,
8  front desk person.  And I said, I'm here for the day.  I flew
9  here.  I think I would be great working for your company, and I
10 would like to see if I could have an interview today.  So I had
11 an interview.  I flew back.  It went great.  I felt great about
12 it.  I flew back home.

13     Three days later they called me and said, could you --
14 would you take a job to work on a ship that's going out in two
15 weeks?  Packed up my stuff, dropped it off at my parents', and
16 I started working on cruise ships.  I worked in the gift shop.
17 So when we were in port, the shops were closed.  When we were
18 at sea, we would work eight, ten, 12 hours a day.  We would
19 work nine months on the cruise ships.  Some of us had
20 contracts.  I worked in the busiest shop.  There was about ten
21 shops on the SS Norway.  So I helped merchandise.  I would
22 every week when we arrived into port -- back then there was no
23 cell phones.  There was no POS systems.  So as a team we would
24 all have to meet with the buyers for the first hour that we
25 arrived in port for the day.

C. Demiduk - Direct

1    THE COURT:  Can we shorten it and get closer to
2  the --
3    MR. MCLAUGHLIN:  I will, Your Honor.  Her experience
4  in retail, at least this part of it, is relevant to some of the
5  issues in the case.  I'm not going to give her entire history
6  of work, but specifically the cruise ships and some others have
7  been raised and they are relevant.
8    THE COURT:  She can describe the job she had.
9   BY MR. MCLAUGHLIN:
10 Q    So let's just focus on what you were doing.  I want to
11 focus on two jobs specifically, one, just kind of what you did
12 in the gift shops with respect to the cruise ships, and then
13 after we're done with that I want to focus on some Nordstrom
14 experience, okay?  Those are the two I want to focus on.
15    Let's talk just about the cruise ships.  What types of
16 gifts hops were you working for?
17 A    It was from jewelry to T-shirts to liquor to clothing.
18 Q    And were you involved in the displays --
19 A    Yes.
20 Q    -- of those items?  Tell us about the experience you had
21 with displays.
22 A    I would help display merchandise.  I also would take ships
23 to dry dock and they would redo the shop, so I would help put
24 them all back together.
25 Q    And were you involved with customers?

C. Demiduk - Direct

1  A    Yes.

2  Q    And what was your involvement with customers?

3  A    Just meeting them, talking to them, making sure that I'm

4  providing good customer service.

5  Q    And when there were sort of items that would sell a lot,

6  some not as much, were you involved in that process?

7  A    I would just tell the buyers what sold good, talk to them

8  back and forth, what we were running low of, what we needed.

9  So I would communicate with them.

10 Q    And then later on you worked for Nordstrom?

11 A    Yep.

12 Q    What did you do at Nordstrom?

13 A    I worked at Nordstrom's as sales.  I helped merchandise.

14 Worked with the buyers.  Pretty much the buyer's office was

15 behind our department.  I would communicate with them on giving

16 them feedback, what was selling.

17 Q    And why was it important to kind of communicate what was

18 selling and what was not selling?

19 A    Because I worked on commission in both jobs.  And if I

20 didn't have product, I didn't make as much money.

21 Q    Did you have a process that you kind of developed over

22 time to kind of keep up on ordering so that you made sure you

23 always had enough product on hand?

24 A    Yep.

25 Q    What was that?

C. Demiduk - Direct

1  A    Just communicating with the buyers, the managers what I

2  needed, what we were running low on, and what customers wanted

3  to see.

4  Q    And how long did you work collectively between the cruise

5  ships and Nordstrom in that capacity?

6  A    Cruise ships was eight years.  Nordstrom was eight years.

7  Q    And so collectively 16 years you would think that you

8  would have made a career of it.  But here we are, obviously, in

9  a completely different business.  So what changed?

10  A    In 2000 I had a family tragedy.  My brother had passed

11  away, and I went back to Nordstrom's two weeks after.  And I

12  made it to lunchtime and I said, unfortunately, I have to

13  leave.  This is not what is good for me right now.  And so I

14  left the corporate world then.

15  Q    And did you have an idea what you were going to do when

16  you left the corporate world?

17  A    I -- we owned a little farm, my ex-boyfriend and I, since

18  he owned it probably since the maybe '90s.  We had people

19  living in the house.  And we started fixing it up.  After my

20  brother passed away, we started fixing up the house, my dad and

21  I.  We knew we wanted to open some kind of shop.  We had

22  checked into buying a franchise, Krispy Kreme Donuts, but we

23  learned that you have to open and close.  And we also had a

24  place in Florida, so we wanted to spend the winters there.

25          So I wanted to have my own thing.  We would close every

C. Demiduk - Direct

1  year in May and reopen in January.  So we had no -- I did not

2  want to have any restrictions at all for people saying what I

3  can do and what I can't do.

4  Q    And so when you mentioned your boyfriend, you're talking

5  about Ron Wehrli?

6  A    Yes.

7  Q    And so the property itself, where is it relative to your

8  home today?

9  A    It is a mile away from where we live.

10 Q    And the property that you had -- you were fixing up with

11 your dad is the same property as we're talking about today?

12 A    Yes.

13 Q    And we know we've heard about some different address

14 changes, but nonetheless --

15 A    Same place.

16 Q    So when you said that you were interested in opening up a

17 gift shop, I mean, did you have an idea of what you wanted to

18 open up?

19 A    I knew I liked clothing, jewelry.  I have been in retail a

20 long time.  So I wanted to carry things that I liked and I

21 needed to find products to fill my store.

22 Q    So obviously we're here about Emerson Creek Pottery

23 pottery.

24 A    Yes.

25 Q    So why don't we talk about how it was that Emerson Creek

1  pottery became the product that was being sold in that new gift

2  shop?

3  A    So Ron Wehrli had a sister that lived in Smith Mountain

4  Lake.  We had visited there probably for ten years.  His sister

5  was there.  So we had visited Emerson Creek in that ten years

6  probably twice.  His sister had pottery from Emerson Creek.  We

7  were driving by going somewhere and she said, hey, there's the

8  pottery shop.  So we stopped in, kind of looked around.  My

9  boyfriend at the time had bought some pottery, a line of the

10 pine cone pattern.  And that was pretty much it back then.

11 Q    You said you visited it twice over a ten-year period?

12 A    Yes.

13 Q    So in the two times, had the shop changed at all in the

14 two times you had visited it?

15 A    No.

16 Q    And this would have been right around maybe 2000?

17 A    Yes.

18 Q    Can you describe what the store looked like at the time?

19 A    It was a log cabin.  It was dark.  It had a lot of items

20 just lined up.  It was an outlet store.  It had just plates.

21 It wasn't merchandised the way I would merchandise a shop.

22 Q    And so when you were -- when you went to Emerson Creek

23 Pottery in Bedford, what was your thought at that point with

24 respect to selling it?

25 A    I mean, the item, I liked the item.  When I started

C. Demiduk - Direct

1   thinking of what -- I needed a supplier.  I needed vendors to

2   fill in our shop.  We had thought about -- my ex had said, hey,

3   what about getting the product of Emerson Creek Pottery?

4       So we made an appointment with Jim back in March of 2001.

5   In between that, I already had a partner that we brought into

6   the business.  Ron was the financial person.  Julie Browman was

7   the legal person in our team, and then I was the merchandiser,

8   buyer.  I had the vision.

9   Q    And when you had the meeting -- sort of just tell us what

10  happened in that meeting?

11  A    So we met with Jim, and we asked if we could buy

12  wholesale.  And he offered to us -- first of all, I saw a

13  product that we could make money on, that Jim said that he

14  could usually get it to us within two to three weeks.  So if

15  you have a product and you sell it, you have to be able to

16  restock it.  So he said that he could meet those needs.  And I

17  knew I could probably -- then he offered 40 percent off of

18  wholesale, which I was like, wow, I never asked for that deep

19  discount.  He had offered that, but also he told us that he had

20  a lot of discontinued items and a lot of flowerpots, all that.

21      And we saw -- we went in his warehouse.  We saw outside in

22  the yard.  And he said a lot of this is discounted --

23  discontinued.  And my boyfriend at the time, Ron Wehrli, said,

24  we'll buy it all.  So I'm like, oh, my gosh, what have we done?

25  So we bought -- I don't know if it was 60,000, 100,000 of

C. Demiduk - Direct

1  pottery that pretty much in June, I believe, a semi came and it
2  was full of pallets and pallets of pottery. And Jim had said
3  to me, he doesn't care what I do there. Just buy the pottery.
4  He would make money. I would make money. And that's how it
5  went.
6  Q    And then so you got -- the reason you got the discount is
7  because you bought so much of it?
8  A    Yes. I believe so.
9  Q    So at that point there was no discussion about minimum
10 orders or maximum orders?
11 A    No.
12 Q    Or anything like that?
13 A    No.
14 Q    And was there any discussion about how it would be
15 merchandised?
16 A    No.
17 Q    Was there any discussion about what you would display to
18 customers or not display to customers?
19 A    No.
20 Q    Was there even any discussion about what the design of the
21 shop would look like?
22 A    No.
23 Q    Ultimately you did open up the gift shop?
24 A    Yes.
25 Q    And who was involved in opening up that shop?

C. Demiduk - Direct

1  A    Ron Wehrli was the financial part, Julie Browman was the

2  legal, and myself.

3  Q    Has Ron ever been a part of the business?

4  A    No.

5  Q    Why was Ron providing finances if he wasn't part of the

6  business?

7  A    Well, we were together like I think at that time eight

8  years.  He wanted me to do something on my own.  We wanted to

9  travel.  I pretty much was pretty devastated, and I think he

10  was trying to help me and my family and him about our loss.

11  And I knew working with people.

12     Also, the farm had a lot of peace in it.  I worked on it

13  the last year.  It had a beautiful sunset.  It backed up to 500

14  acres.  It had a huge front porch.  And I found a lot of peace

15  there.  And I wanted to offer that to people, because whether

16  they were happy or sad, I wanted them to come there and I

17  wanted to make them feel better than when they came to when

18  they left.

19  Q    So there has been some discussion about sort of the land

20  where Emerson Creek Pottery in Bedford, Virginia is and Oswego,

21  Illinois.

22  A    Yeah.

23  Q    People here are probably familiar with Bedford, but they

24  wouldn't be so familiar with Oswego.

25  A    No.

C. Demiduk - Direct

1  Q    So I want to kind of help paint a picture for them.  So
2  describe for me in your words.  What does the farm in Bedford,
3  Virginia look like?
4  A    It had a house and it had a factory.  So most of the time
5  when we were there we spent a lot of time in the factory where
6  Jim was making pottery.
7  Q    So Oswego -- you still live in Oswego today?
8  A    Yes.
9  Q    Is Oswego in 2022 the same as it was in 2000?
10 A    No.  So we had --
11 Q    Let's go back on the Wayback machine and talk about Oswego
12 in 2000.  How many people were in Oswego in 2000?
13 A    I want to say maybe 5,000 people.
14 Q    And were there any, like, large department stores in that
15 area?
16 A    No.
17 Q    So where your property was situated, what was it?
18 A    It was down a mile and a half gravel road.  We -- it
19 pretty much was nothing around it.  Now there's subdivisions.
20 There's homes.  I think we're at maybe 110 000 people that live
21 in Oswego now.
22 Q    How many?
23 A    110,000 maybe?  No?  I don't know.
24 Q    Well, I can't testify.  So Oswego is not a major city even
25 today, is it?

C. Demiduk - Direct

1   A     No.

2   Q     Would it be closer to maybe around 20,000 people?

3   A     Maybe.

4   Q     Okay.  There are a hundred thousand -- there are towns

5   with 110,000, correct?

6   A     Yes.

7   Q     But Oswego is not one of them.

8         But back at that time, it would have been a couple

9   thousand people, relatively rural community, right?

10  A     Yes.

11  Q     Were there any major event venues in the area?

12  A     No.

13  Q     Were there a lot of retail gift shops in the area?

14  A     No.

15  Q     So what was your idea for the gift shop at that time to

16  look like?

17  A     I wanted to have a place where I could buy what I want,

18  put in there.  I wanted to mostly have great displays.  I

19  started going to the gift shows in 2001, started buying what I

20  would like.

21  Q     I'm just saying let's talk about setting up the gift shop

22  itself, what was it going to look like?

23  A     It was going to be merchandise pretty.  It was light,

24  bright.

25  Q     Were you going to have it on lines of plates like that?

C. Demiduk - Direct

1   A    No.

2   Q    So the design itself, who designed that?

3   A    I did.

4   Q    Did Jim Leavitt have any involvement in that?

5   A    No.  He's never been there.

6   Q    Anyone in the Leavitt family was involved in that design?

7   A    No.

8   Q    Did he ask to have any involvement?

9   A    No.

10  Q    So I want to direct your attention to Exhibit 46, Defense

11  Exhibit 46.  And can you see this?  Maybe if Mike could blow

12  this up just a little bit.  This will help kind of keep us on

13  track with respect to sort of how this developed.  You see this

14  is a website from March 1st, 2017, correct?

15  A    Yes.

16  Q    This was a snapshot taken from the Wayback Machine, which

17  is how you can look up websites, right?

18  A    Yes.

19  Q    You see we have the pottery shop established in 2000.  We

20  have the tearoom established 2002.  Then we have the barn

21  established in 2010.

22  A    Yes.

23  Q    So right now we only want to focus on the pottery shop

24  established in 2000.

25  A    Yes.

C. Demiduk - Direct

1  Q    And so we've seen this wording that's underneath this for

2  a while.  And it talks about the handcrafted pottery of Emerson

3  Creek Pottery.

4  A    Yes.

5  Q    We've heard about that.

6       So at the time that the pottery shop was set up, when you

7  opened up, was it exclusively Emerson Creek pottery?

8  A    No.

9  Q    Okay.  So how much of it was Emerson Creek pottery and how

10 much of it was other?

11 A    I would say probably, because I bought so much and I did

12 not start going to gift shows then, so -- and I had, I don't

13 know, 60 to $100,000 worth of pottery, it was probably 80

14 percent pottery at that time.

15 Q    And then the rest would have been what?

16 A    I would -- candles, dish towels, plate racks.  I had

17 jewelry, clothing, other -- yes.

18 Q    And was there any minimum amount of Emerson Creek pottery

19 that you had to have in there?

20 A    No.

21 Q    So I want to show you what's been previously marked as

22 Plaintiff's Exhibit Number 57.  This is the document we heard

23 about some time ago about an alleged agreement between Ron

24 Wehrli and Emerson Creek Pottery.

25 A    Yes.

C. Demiduk - Direct

1  Q    Have you ever seen that document?

2  A    No.  I did see it when you I believe brought it to

3  attention.

4  Q    As part of the litigation?

5  A    Yes.

6  Q    But otherwise, you had never independently seen this

7  document?

8  A    No.

9  Q    Is this anything that had ever been presented to you?

10 A    No.

11 Q    None of the terms in this you've ever seen?

12 A    No.

13 Q    And had you ever negotiated any of the alleged terms in

14 what purports to be an agreement?

15       MR. WILLETT:  Your Honor, I'm just going to object.

16 I was fine with the leading for a while to establish some

17 background, but we've crossed that line.

18       THE COURT:  Just to leading?

19       MR. WILLETT:  Just to leading.

20       THE COURT:  Sustain as to leading.

21       MR. MCLAUGHLIN:  Your Honor, there are certain

22 questions that warrant a yes or no, for example, did she agree

23 to this.  If you would just give me a little bit of leeway just

24 for purposes of moving along.

25  BY MR. MCLAUGHLIN:

C. Demiduk - Direct

1  Q    Did you reach any type of written agreement with Jim

2  Leavitt at any time?

3  A    No.

4  Q    Have you ever reached any type of an agreement with

5  respect to licensing the name "Emerson Creek Pottery" from Jim

6  Leavitt?

7  A    No.

8  Q    Have you ever reached any type of a license agreement

9  with --

10         MR. WILLETT:  Your Honor --

11         THE COURT:  I sustained the objection.  They're

12  leading and they're asking for legal conclusions.  I mean, she

13  can testify as to what her understanding was, what was said

14  between two of the group, but she can -- when she says --

15  that's the ultimate issue in the case.

16         MR. MCLAUGHLIN:  That's true, Your Honor.  One of the

17  allegations has been that there was an agreement.  So I think

18  my client needs to say there wasn't an agreement.

19         THE COURT:  That's a legal conclusion.  It's not her

20  opinion.  She can testify as to what was said.  The jury will

21  determine whether there was an agreement or not, but she can

22  testify as to what was said between the parties or what was

23  written between the parties.

24         MR. MCLAUGHLIN:  That's fine, Your Honor.

25   BY MR. MCLAUGHLIN:

C. Demiduk - Direct

1  Q   What limitations if any were placed on the use of "Emerson

2  Creek Pottery" with respect to the gift shop in 2000?

3  A    None.

4  Q    And what obligations were asked of you, if any, with

5  respect to setting up a business corporation or other entity in

6  order to operate the gift shop in 2000?

7  A    None.

8  Q    And what obligations, if any, were placed upon you with

9  respect to the percentage of pottery that had to be Emerson

10 Creek pottery versus anything else?

11 A    None.

12 Q    And what limitations, if any, were placed upon you with

13 respect to whether or not you could sell third-party pottery in

14 the gift shop?

15 A    None.

16 Q    And what limitations, if any, were placed upon you as to

17 the origin of -- the country origin of pottery with respect to

18 pottery sold in the gift shop?

19 A    None.

20 Q   I want to direct your attention now to what's been marked

21 as Exhibit D40.  And it may actually have a plaintiff's

22 exhibit.  And if it does, I'm going to go ahead and call that

23 one up.

24          THE CLERK:  Did you intend to admit Defense 46 as

25 well?

C. Demiduk - Direct

1    MR. MCLAUGHLIN:  Yes.  At this point I'd ask that

2  Defense Exhibit Number 46 be admitted into evidence.  Thank

3  you.

4    MR. WILLETT:  Yeah, I think it's already in.  No

5  objection.

6   BY MR. MCLAUGHLIN:

7  Q    So showing you what's been marked as Defendants' Exhibit

8  Number 40 for identification.  And I believe this might be a

9  duplicate of another set of documents you've seen before, but

10 in the interest of time I'm going to show it this way.  And

11 you've seen this before?

12 A    Yes.

13 Q    And if you could just scroll through, could you just

14 identify what we're looking at?

15 A    Oh, me?  Yes.

16      To the left it is --

17 Q    Just generally what is the grouping?

18 A    The shop.

19 Q    And if you scroll down, you'll see that on the back there

20 are some indications of dates of photographs.

21 A    Yes.

22 Q    For example, on page 4?

23 A    Yes.

24 Q    And so can you tell me generally what is this grouping of

25 items that we've seen as --

C. Demiduk - Direct

1  A    It's displays of the shop.

2  Q    And who took those pictures?

3  A    I did.

4  Q    At this point I'd ask that Exhibit Number 40 be admitted

5  into evidence.

6         MR. WILLETT:  No objection to that.  That is

7  Plaintiff's Exhibit 11.

8         MR. MCLAUGHLIN:  Thank you.

9   BY MR. MCLAUGHLIN:

10 Q    So I think what we'll do is go ahead and pull up

11 Plaintiff's Exhibit 11.  And we will -- I will withdraw

12 Defendants' 40 and use Plaintiff's Exhibit 11 just so we don't

13 have duplicate exhibits.

14      So if you take a look at these photographs -- and you've

15 heard before that these were -- a number of photographs were

16 taken in 2002?

17 A    Yes.

18 Q    And if you look on page 1, those depict the shop at that

19 time, correct?

20 A    Yes.

21 Q    Now, if you look at the top on the first page and you see

22 that photograph of the wagon where it says "Emerson Creek

23 Pottery" and an arrow?

24 A    Yes.

25 Q    How did it come that the Emerson Creek Pottery wagon

C. Demiduk - Direct

1  showed up on the property?

2  A    We -- the -- we have a main road, and literally we,

3  probably a week before we decided to open, we realized that we

4  didn't even have a sign out there.  And there's no way people

5  would find us.  So we called our lawyer and he said as long as

6  we had a farming implement, we could put a sign on.  So that's

7  how the wagon became the wagon.

8  Q    Now, you'll notice on that wagon it says "Emerson Creek

9  Pottery."

10  A    Yes.

11  Q    And that's the name you were using for the gift shop?

12  A    Yes.

13  Q    Did Jim Leavitt know that you were using that name or not?

14  A    Yes.

15  Q    Did Jim Leavitt put any limitations on the use of "Emerson

16  Creek Pottery" with respect to the gift shop?

17  A    No.

18  Q    And did he put any limitations on the amount of sales that

19  had to be done in the gift shop --

20  A    No.

21  Q    -- using that name?

22         MR. WILLETT:  Objection to leading, Your Honor.

23         THE COURT:  Sustained.

24         MR. MCLAUGHLIN:  Your Honor, I asked if there were

25  any limitations that had been placed on her.  I asked if any

C. Demiduk - Direct

1  limitations had been placed.

2           MR. WILLETT:  I thought he said did.

3           MR. MCLAUGHLIN:  I said had.

4           THE COURT:  Go ahead.  She can answer.

5   BY MR. WILLETT:

6  Q    Had any limitations been placed on the use of "Emerson

7  Creek Pottery" at that time in order to use it on the wagon?

8  A    No.

9  Q    And had any limitations been placed on the use of "Emerson

10 Creek Pottery" -- strike that.

11      Had any limitations been placed on the volume of sales in

12 order to continue using the name "Emerson Creek Pottery"?

13 A    No.

14 Q    If you go to the right, if you can scroll, do you see the

15 rock?

16 A    Yes.

17 Q    And how was the rock created?

18 A    One of my family members owns a quarry, and he pretty

19 much, for a gift, he pretty much dropped it and put it there --

20 for a gift.

21 Q    The picture, if you see the image where it says "Emerson

22 Creek Pottery," who created that?

23 A    I believe maybe a graphic person, Mary Blanchflower helped

24 us, or -- I can't remember who created it.  But I picked it

25 out.

C. Demiduk - Direct

1  Q    Had anyone from -- had anyone from the Leavitt family or

2  from Emerson Creek Pottery in Bedford, Virginia, been involved

3  at all in the creation of that image?

4  A    No.

5  Q    Have you used that "Emerson Creek Pottery" with the image

6  in different ways with --

7  A    Yes.

8  Q    -- your business?

9       In what ways?

10 A    On postcards, on maybe our website, our mailers.

11 Q    And at any time that you used "Emerson Creek Pottery" with

12 this image, had Jim Leavitt placed any limitations on your use

13 of it?

14 A    No.

15 Q    I want to go back to Defendants' 46.  I now want to

16 fast-forward to the time of the opening of the tearoom.  Can

17 you tell me how it is that you came about to open up the

18 tearoom?

19 A    People would come and sit in the yard.  It was seven acres

20 with a great view.  They would come and sit in the yard.

21 Sometimes they wouldn't even come in the shop.  It was just

22 very relaxing.  Sometimes people would have a picnic out there,

23 bring their lunch.  I started making cookies and lemonade for

24 them.  I feel like I'm a really good host.  I always welcome

25 people, greet them.  You can have the best product, but people

C. Demiduk - Direct

1  will always remember how you made them feel, not what they

2  bought.  And that is how people started coming to Emerson

3  Creek.  And they would have lemonade and cookies.

4      And then the public health came, said that we needed to

5  have a commercial kitchen.

6  Q    And if we go back to P-11 for a moment, do you see the

7  image on the right, the porch?

8  A    Yes.

9  Q    Okay.  And when you said people would get lemonade, would

10 they go and sit on the porch?

11 A    They would sit on the porch, in the yard.  That was our

12 porch.  Sometimes they would sit in the yard.

13 Q    If you go down, if you scroll below the photo -- go back

14 up one.  There you go.

15     If you see the porch there, the bicycle and it has what

16 appears to be some other chairs, do you see that?

17 A    Yes.

18 Q    Whose idea was it to put rockers out on the porch?

19 A    That was me because people would sit for a long time.

20 Just to sit there and talk and hang out.

21 Q    Did anyone from the Leavitt family or Emerson Creek

22 Pottery, were they involved in any way in the design of that

23 porch?

24 A    No.  They've never been there in 22 years.

25 Q    Do you recall if Emerson Creek Pottery in Bedford,

C. Demiduk - Direct

1  Virginia, used rockers at that time on their property?

2  A    Not that I remember.

3  Q    What kind of business did you do at the tearoom in 2022?

4  A    We had five tables, and maybe I would get maybe two

5  four-tops.  We started one day a week and then each year we

6  started to expand another year.

7  Q    And were you serving food in the tearoom?

8  A    Yes.

9  Q    And you've heard testimony that the food was served on

10 Emerson Creek Pottery pottery?

11 A    Yes, it was.

12 Q    The ordering -- the decision of the food that was served

13 in the restaurant, who made that?

14 A    I did, and then also our cooks.

15 Q    Did anyone from the Leavitt family or Emerson Creek

16 Pottery in Bedford, Virginia, were they involved in any way as

17 far as the dishes that were served?

18 A    No.

19 Q    Did they in any way purchase the foods that were used

20 there?

21 A    No.

22 Q    Involved in the suppliers of the ingredients?

23 A    No.

24 Q    If you go back to P-11.

25 A    This one is P-11.

C. Demiduk - Direct

1  Q    Oh, I'm sorry, if you can go back to D-46.  I'm sorry

2  about that.  So if you look at the bottom there.

3  A    Yes.

4  Q    Do you see that there's a reference to the popular Emerson

5  Creek flower pot salad?

6  A    Yes.

7  Q    What's the flower pot salad served on?

8  A    I had hundreds of flower pots.  And so when I started the

9  tearoom, I grew up where there was -- we had a flower pot salad

10 in our hometown.  It was served in a flower pot.  So that is

11 how I started serving flower pot salads in our flower pots.

12 Q    What's your hometown?

13 A    Steger, Illinois.

14 Q    To your knowledge, is there a flower pot salad in Bedford,

15 Virginia?

16 A    No.

17 Q    Did anyone from the Leavitt family or Emerson Creek

18 Pottery in Bedford, Virginia, offer any insight with respect to

19 the names or the types of items being used?

20 A    No.

21 Q    So you said that you were using the flower pots that were

22 being used.  Can you describe the flower pots that you got in

23 that original load?

24 A    Originally it was terra cotta inside and it had a hole in

25 it, and then the salad dressing would kind of mark the inside

C. Demiduk - Direct

1  of the terra cotta, kind of the -- the salad dressing, and then

2  also people would have salad dressing, it would run through the

3  flower pot, so I would stick a piece of cheese so that the

4  dressing wouldn't come out.  So with those two things, I asked

5  Jim if he could make a flower pot and glaze it and then not put

6  a hole in it so the salad dressing wouldn't come out.  Back

7  then we used a glazed flower pot instead of all the terra

8  cotta.

9  Q    When there were sales at the -- so when the tearoom was

10  opened up, did the pottery shop continue to operate?

11  A    Yes.

12  Q    Were they both in that same kind of farmhouse that we

13  looked at?

14  A    No.  So there was a separate building, it was a horse

15  barn, little garage.  We started with five tables.  It had an

16  awesome porch to it.  So --

17  Q    Let's do this.  If you could pull back up P-11.  I'm

18  wondering if you scroll down, see if you can tell us if it's

19  depicted in any of these photos.

20       You don't see it depicted there?

21  A    No.

22  Q    What we've seen depicted on that is basically the gift

23  shop?

24  A    Yes.

25  Q    So the tearoom was a separate location on the property?

C. Demiduk - Direct

1  A    Yes.

2  Q    Where was it relative to --

3  A    So if you look up at the top where the rockers are, it's

4  to the right.  It was just an old metal building and then it

5  had the little garage.  So that was a separate area.

6  Q    So on page 9 of this document where we see these two

7  chairs in the window, and you're saying it's in the back there?

8  A    Back to the right.  It was just an old shed, like.

9  Q    And who was involved in building that building?

10 A    Me and Ron Wehrli, my boyfriend at the time.

11 Q    And who was involved in the decoration of the tearoom?

12 A    I was.

13 Q    Was any pottery being sold in the tearoom?

14 A    No.

15 Q    So can we go back to D-46.  And if we go back to D-46, we

16 now see something called the barn?

17 A    Yes.

18 Q    That says established in 2010?

19 A    Yes.

20 Q    Did anything significant happen in your life in that time

21 period?

22 A    So I met Dave in 2000 maybe '8, and then we wanted to have

23 just a cheap wedding -- well, an inexpensive wedding.  So we

24 cleaned out this old barn.  It was a dirt floor.  We had our

25 wedding in there in October of 2000 after working on it for a

C. Demiduk - Direct

1    couple of years.

2    Q    You said 2000, or 2010?

3    A    2010.

4    Q    Was anyone from Emerson Creek Pottery in Bedford, Virginia

5    or the Leavitt family involved in the creation of the barn?

6    A    No.

7    Q    And have they -- did they provide any type of input with

8    respect to the layout, displays for the wedding venue?

9    A    No.

10    Q    And have -- had they ever -- let me just ask it very

11    easily:  Has the Leavitt family or Emerson Creek Pottery in

12    Bedford, Virginia ever paid anything to you or your companies

13    for the costs that are involved in either the pottery shop or

14    the tearoom or the barn?

15    A    No.

16    Q    Who paid all those costs?

17    A    We did.  Hundreds and hundreds of thousands of dollars

18    every year.

19    Q    Then what was the relationship -- so we've heard about all

20    these different businesses.  So explain to us what's the

21    relationship between your companies in Oswego, Illinois and

22    Emerson Creek Pottery in Bedford, Virginia?

23    A    Jim has a pottery business.  And in Oswego, Emerson Creek,

24    we had a shop.  It has now since closed.  We're turning it into

25    a bridal suite.  And we have a restaurant now.  And we have

1  weddings.

2  Q    We've heard about pottery being sold.

3  A    Yes.  Jim was --

4  Q    Was it done on consignment?

5  A    No.  Jim was a supplier.  So he had a great product,

6  something I could make money on, he could make money on.  For

7  17 years we had a great relationship.  We hardly ever, ever had

8  problems.  He would root me on.  I would root him on.  He would

9  say I don't care what you do there.  Just buy my pottery.

10 Q    When he would sell you the pottery, who would make

11 decisions as to what pottery needed -- how much you had to buy

12 and the types of pottery?

13 A    It would be me.

14 Q    And who would set the price for the pottery?

15 A    I would.

16 Q    No, who would set -- I mean who would set the price that

17 you paid for the pottery?

18 A    Jim.

19 Q    And who would set the retail price?

20 A    I would.

21 Q    And who would set the discounts that were paid?

22 A    Jim.

23 Q    Was that ever negotiated?

24 A    No.

25 Q    And were they always constant?

C. Demiduk - Direct

1  A     Yes, but it changed through the years.

2  Q     Did it change for the better for you or for the worse?

3  A     For the worse.

4  Q     And so just tell us what changed with the discount levels.

5  A     I was not --

6  Q     Just what were the discount levels?  What did they change

7  to?

8  A     40, 30, 20 maybe.  I'm not sure.

9  Q     In any of those ten years that we've seen here from the

10  time the pottery shop was opened up till the barn opened up in

11  2010, had Jim put any limitations on your ability to use the

12  name "Emerson Creek Pottery" in connection with your business?

13  A     No.

14  Q     Now, can you -- can we go to Exhibit D-3.  I believe that

15  this is one of about 100 emails that are part of Plaintiff's

16  Exhibit Number 22?

17  A     Yes.

18  Q     But to make it simple for the ladies and gentlemen of the

19  jury, I want to do these as separate emails.  So quite a few of

20  the defendant exhibits are going to be duplicates but I think

21  it will be easier for you to focus.

22  A     Okay.

23  Q     If you take a look at D-3, can you tell me what this is?

24  A     It's an email to Jim.

25  Q     And is that your email address, ecreekpottery@hotmail.com?

C. Demiduk - Direct

1   A    Yes.

2   Q    And the to, emersoncreek@earthlink.net, that's who?

3   A    Jim.

4        MR. MCLAUGHLIN:  I'd ask that Exhibit D-3 be admitted

5   into evidence.

6        MR. WILLETT:  No objection.

7        THE COURT:  Admitted.

8        (Defense Exhibit 3 marked.)

9        (Defense Exhibit 3 admitted.)

10  BY MR. MCLAUGHLIN:

11  Q    Can you tell me what's being discussed in this email?

12  A    Just letting -- just talking about how many people we had.

13  I was making a video for Oprah, to send to Oprah, and my

14  neighbor's brother worked with Oprah, and anything -- I wanted

15  to have Oprah come to my place to have lunch.  Anything Oprah

16  touched turned to gold.  So I was kind of shooting for the

17  stars.  So I made a video and I sent it to her.

18  Q    Did Oprah ever take your video?

19  A    No.

20  Q    Did you ever go on Oprah?

21  A    No, but we probably wouldn't be sitting here if we did.

22  Q    So in the second paragraph it talks about the various

23  ideas with respect to the video, right?

24  A    Yes.

25  Q    Was anybody in the Leavitt family or Emerson Creek Pottery

C. Demiduk - Direct

1  in Bedford, Virginia involved in any of the concept or design

2  of that video?

3  A    No.

4  Q    Did they get involved in any of the video shooting?

5  A    No.

6  Q    Did they have any input on it?

7  A    No.

8  Q    And then on the top part you mentioned -- it says, "We are

9  serving about 60 to 70 people between 11 to 2."  Where is that

10 service?  In what location is that?

11 A    That is in the restaurant.

12 Q    Was it a restaurant or tearoom?

13 A    It was a tearoom.

14 Q    And then you make reference to the flower pot salad we had

15 heard about before.

16 A    Yes.

17 Q    Now, you're informing Jim about various things in the

18 business.

19 A    Yes.

20 Q    Are you checking in with him?

21 A    No.

22 Q    Why are you communicating with Jim, then, on July 23rd,

23 2005 about the business?

24 A    Just to let him know that our business is expanding, that

25 I could need more product, and I was proud of what we were

C. Demiduk - Direct

1    doing, what I turned it into with several employees.  And that

2    was back in 2005 when we had a few customers a day.  I also

3    would be in touch with him, just as I was reordering, sometimes

4    I would give him a heads-up of some products that I would need.

5    Q    And if you see in the second full paragraph it says, "But

6    I think if she liked it, we could ask Jim in Emerson Creek

7    Pottery to make her a place setting."  Why did you make

8    reference to Jim with respect to the video if he didn't have

9    any involvement in it?

10   A    Because I would root Jim on as much as myself.  I was a

11   marketer.  Jim had a great product, still has a great product.

12   But he needed someone to promote it if he wanted kind of to --

13   I felt like he had a great product and I also thought he -- I

14   wanted him to do well.  And that's just how I worked with my

15   suppliers.  Things that I sold good, I would communicate with

16   them.  I've always done that through the years.  I've had

17   hundreds of different vendors.  So I was used to communicating

18   with the suppliers, the buyers just to let them know what's

19   going on.

20   Q    If you can take this down, Mike.  If you can pull up

21   Exhibits D-4 and D-5.  So I want to first show you what's been

22   marked as Defendants' Exhibit Number 4 for identification.  And

23   can you tell me generally what this document is?

24   A    About we received 14 boxes and that I had paid $5,000, I

25   think, on an order.

C. Demiduk - Direct

1  Q    It's basically an email between yourself and Jim dated

2  August 10, 2005?

3  A    Yes.

4          MR. MCLAUGHLIN:  And I'd ask that Exhibit D-4 be

5  admitted into evidence.

6          MR. WILLETT:  No objection.

7          THE CLERK:  That was already admitted yesterday too.

8          MR. MCLAUGHLIN:  I think some of these are actually

9  part of a larger group, but I think it will be easier just

10  to --

11          THE CLERK:  Right.  Your Defense Exhibit 4 was

12  admitted yesterday.

13          MR. MCLAUGHLIN:  All right.  Thanks.

14   BY MR. MCLAUGHLIN:

15  Q    So if you take a look, and if you just kind of go down to

16  where it says "Hi, Chris, sounds like you're doing a great

17  lunch business."

18  A    Yes.

19  Q    And then if you go down to below that, you'll see that

20  there is an earlier email and it says "Hi Jim.  Sorry it took

21  me so long to email back."  Do you see that?

22  A    Yes.

23  Q    And then if you go down, that's just basically the

24  beginning of a string, right?

25  A    Yes.

C. Demiduk - Direct

1  Q    And I just want to scroll up for a minute.  If you'll see

2  where it says "Hi, Chris, sounds like you're doing a great

3  lunch business.  If you're doing a thousand dollars a day, that

4  sounds great.  I was just wondering about your sales when I

5  looked at what you're been buying compared to previous years.

6  Sounds like you must have overbought in the past and now need

7  to catch up."

8       Can you tell me what was being discussed there?

9  A    Just my ordering had been less.  Was that 2005?  I was

10 really, really overbought.  Also, some things that were coming

11 in I was having problems with.  I had back orders.  So I

12 started having problems just a little bit with some of trying

13 to get the product through Emerson Creek.

14 Q    So it sounds to me, at least, that maybe there -- you

15 weren't buying as much as he would have expected?

16 A    I mean, I had --

17 Q    I didn't mean to cut you off.  How did issues like that

18 resolve themselves when there would be an issue of maybe a

19 drop-off in sales?

20 A    I don't know what you mean.

21 Q    Well, for example, in an email like this when Jim would

22 reach out and say hey, it looks like your sales are off.  In

23 this instance, for example, how did that resolve itself?

24 A    Well, I mean, I let him know that I'm not selling as much.

25 I'm completely overbought, which I had some stuff still since

C. Demiduk - Direct

1  probably from the time we opened till last year.  So I was

2  overbought.  And I -- a lot of things became also special

3  orders.  Some items were discontinued.  He started putting a

4  dye charge on certain items --

5  Q    I'm sorry.  I didn't mean to cut you off.  But for

6  purposes of this, with ordering itself, sometimes orders would

7  be up, sometimes they would be down?

8  A    Yes.

9  Q    When the orders would go down, would Jim from time to time

10 ask why the orders went down?

11 A    He never really -- this is the first time.

12 Q    But if he did, was it ever tied to the use of the name

13 "Emerson Creek Pottery" with respect to the business?

14 A    No.

15 Q    Then what was -- what would transpire between the two of

16 you when he was asking you about the size of the order?

17 A    I would -- I'm not sure where you're going.

18 Q    Other than, for example, telling him I need less of this

19 item or I need more of that item, did anything else -- did you

20 guys talk about anything else other than how much you need to

21 order in any given year because of what your needs are?

22 A    I would talk about what customers were asking for, trends

23 that I saw.  I would ask him for certain sizes of things, give

24 suggestions.  People were asking for a berry bowl.  I had asked

25 him about making a berry bowl.  About just certain items I

C. Demiduk - Direct

1  would give ideas to him.

2  Q    But no discussions with respect to using the word "Emerson

3  Creek Pottery" with respect to the size of those sales?

4  A    No.

5           MR. WILLETT:  Objection, leading, Your Honor.

6           THE COURT:  Sustained.

7  BY MR. MCLAUGHLIN:

8  Q    So there's a question there about thousand dollar days?

9  A    Yes.

10 Q    Can you tell me what that's referring to?

11 A    To the tearoom.

12 Q    Does that have to do with sales of pottery?

13 A    No.

14 Q    Can you go to D-5.  I want to show you what's been marked

15 as Defendants' Exhibit Number 5 for identification.  And can

16 you just tell us the date of the email?

17 A    It is August 10, 2005.

18 Q    And who is that between?

19 A    That is between Jim and I.

20           MR. MCLAUGHLIN:  I'd ask that Defendants' Exhibit

21 Number 5 be admitted into evidence.

22           MR. WILLETT:  No objection.

23           THE COURT:  Be admitted.

24           (Defense Exhibit 5 marked.)

25           (Defense Exhibit 5 admitted.)

C. Demiduk - Direct

1  BY MR. MCLAUGHLIN:

2  Q    So I just want to focus on one part of this email.  And it

3  deals with the paragraph that says, "I sent Lucy a check for

4  2,500 last week.  Just wondering if she received it.  I will

5  send one with Ron today to mail.  Sorry about being behind.

6  Have you heard from Laura?  I've called her a couple times and

7  never called back."  Do you see that?

8  A    Yes.

9  Q    So first I want to focus on sort of the way that you would

10  pay Jim with respect to the product you --

11  A    Yes.

12  Q    So what was the process?

13  A    We would get an invoice and we pretty much paid it pretty

14  much right away.  I don't even remember what our terms were

15  because we didn't talk about that.  But we pretty much paid

16  right away.

17  Q    And in this situation, if you were paying 2,500, that

18  would have been toward some order?

19  A    Yes.

20  Q    And am I correct that you paid -- have you paid for all of

21  the pottery that was sold to you?

22  A    Yes.

23  Q    That's all I have.

24      Can you pull up D-6, Defendants' 6.  So I'm showing you

25  what's been marked as Defendants' 6 for identification.

C. Demiduk - Direct

1   A    Yes.

2   Q    Can you identify what this is?  Just generally what are we

3   looking at?

4   A    That my sales were up compared to the year before.

5   Q    But this is an email between yourself and Jim?

6   A    Yes.

7   Q    And it's dated September 26, 2005?

8   A    Yes.

9        MR. MCLAUGHLIN:  I'd ask that Defendants' Exhibit

10  Number 6 be admitted into evidence.

11       MR. WILLETT:  No objection.

12           (Defense Exhibit 6 marked.)

13           (Defense Exhibit 6 admitted.)

14  Q    So if you go down, you're mentioning in that second

15  paragraph, which is what you were kind of intimating to, it

16  says "I'm up three $3,000 from last year.  And so far this is

17  my best year, so I think we're doing good."  Do you see that?

18  A    Yes.

19  Q    Would you from time to time inform Jim about how your

20  sales were doing?

21  A    Yes.

22  Q    Was that an obligation of any agreement you had with him?

23  A    No.

24           MR. WILLETT:  Objection, leading.

25           THE COURT:  Sustain as to leading.

C. Demiduk - Direct

1    MR. MCLAUGHLIN:  Your Honor, there are --

2    THE COURT:  Leading questions has been the rule

3  forever.  You can ask her why she did something, but you can't

4  suggest that she did it and just have her say yes.

5  Q    Do you see how the sales, it makes reference to $3,000?

6  A    Yes.

7  Q    Why did you mention the volume of sales in that email?

8  A    Because I could have needed to order more merchandise, and

9  I kind of communicated with all my vendors, just letting them

10  know how we were doing, if we needed to order more.

11  Q    Okay.  The volume of sales -- the use of the name "Emerson

12  Creek Pottery," was it tied to the volume of sales?

13  A    The volume of sales for the shop?

14  Q    Right.

15  A    Well, I sold other items.  So I had different items, the

16  pottery.  It was all sales of the pottery, at the shop.

17  Q    I'm saying were the two tied together?  The volume of

18  sales, whatever that volume was, was there ever any discussion

19  about your use of "Emerson Creek Pottery" depending on the

20  volume of your sales?

21  A    No.

22    MR. WILLETT:  Objection, leading, Your Honor.

23    THE COURT:  Well, you know, it would help -- she's

24  never said what the conversation was.

25    MR. MCLAUGHLIN:  Your Honor -- I'm not trying to

C. Demiduk - Direct

1  argue with Your Honor.  What I'm saying is there are certain

2  questions that require a yes or no answer because if they did

3  not occur, that she would have to answer yes or no.

4          THE COURT:  Okay.  But you have to formulate the

5  question so that you're not suggesting the answer.

6  BY MR. MCLAUGHLIN:

7  Q    What limitations, if any, were placed on the use of

8  "Emerson Creek Pottery"?

9  A    None.

10 Q    Ever?

11 A    None.

12 Q    Thanks.  When you would have -- do you see in this that

13 there was a discussion about various patterns being

14 discontinued?

15 A    Yes.

16 Q    And who made the decision as to whether those patterns

17 would be discontinued?

18 A    Me.

19 Q    I don't mean in your shop, but I'm saying if Emerson Creek

20 Pottery decided to discontinue an item --

21 A    That was up to Jim.

22 Q    If they were discontinued, how would that be handled?

23 A    I would try to order and he'd say no, it's discontinued.

24 Q    And if it got discontinued, what would then happen?

25 A    I would have to pay extra.  I would have to order a

C. Demiduk - Direct

1  hundred flower pots, so there was a large quantity that I would

2  have to order, and there was ten, 12, 19 different patterns,

3  so.

4  Q    And when an item would be discontinued -- well, strike

5  that.  Who made the decisions with respect to what was sold in

6  the shop?

7  A    Me.

8  Q    And who made decisions with respect to the number of items

9  of Emerson Creek that were sold in the shop?

10 A    Me.

11 Q    Who made decisions with respect to the number of

12 non-Emerson Creek Pottery items that were sold in the shop?

13 A    Me.

14 Q    What involvement, if any, did the Leavitt family or

15 Emerson Creek Pottery in Bedford, Virginia have with respect to

16 those volumes?

17 A    None.

18 Q    Can we go to Defendants' Exhibit 23.  I'm showing you

19 another email from Chris Barickman, which is yourself, correct?

20 A    Yes.

21 Q    To emersoncreek@earthlink.net, which is Jim Leavitt?

22 A    Yes.

23 Q    The date is May 22, 2007, correct?

24 A    Yes.

25 Q    Can you tell me what this email is about?

C. Demiduk - Direct

1  A    Oh, that I was trying to get solid red plates.  I had been

2  telling her for two years.  At that time Jim didn't do a solid

3  red plate.  So that's what that's about.

4  Q    Now, in --

5           MR. MCLAUGHLIN:  I would ask that Defendants' Exhibit

6  23 be admitted into evidence.

7           MR. WILLETT:  No objection.

8           (Defense Exhibit 23 marked.)

9           (Defense Exhibit 23 admitted.)

10   BY MR. MCLAUGHLIN:

11  Q    In May of 2007 did you sell pottery other than Emerson

12  Creek pottery?

13  A    Yes.

14  Q    And what brands do you recall you were selling in 2007?

15  A    I sold Mud Pie, Home Décor and Signature.

16  Q    And can you describe what kind of items Signature items

17  are?

18  A    Solid red plates, red -- all solids.

19  Q    And what about the Mud Pie, what are they?

20  A    They were mostly main pieces.

21  Q    And when -- with respect to your store, did you sell

22  online or did you sell in the store itself?

23  A    Just in the store.

24  Q    And if someone wanted to buy the Emerson Creek Pottery

25  pottery, where would they go?

C. Demiduk - Direct

1  A    If they wanted to buy Emerson Creek pottery, if they

2  wanted it shipped, I would direct them to Jim's website.

3  Q    And the Signature items, were they being sold in 2006?

4  A    Probably before that.

5  Q    And who would make the decision about how you displayed

6  things in the store?

7  A    I would.

8  Q    How many rooms did you have at that time for displays of

9  items?

10 A    Maybe five, six.

11 Q    Could the public just walk into your store?

12 A    Yes.

13 Q    Did you put any limitations on anyone?

14 A    No.

15 Q    I want to pull up, if we can, first for a moment Exhibit

16 Number D-12 and D-13.  Do you see that this is an email dated

17 January 5th, 2006 --

18 A    Yes.

19 Q    -- between yourself and Jim?

20 A    Yes.

21        MR. MCLAUGHLIN:  I'd ask that Defendants' Exhibit

22 Number 12 be admitted into evidence.

23        MR. WILLETT:  No objection.

24  BY MR. MCLAUGHLIN:

25 Q    Can you pull up D-13?  I'm showing you what's been marked

C. Demiduk - Direct

1  as Exhibit D-13, a January 5th, 2006 email between yourself and

2  Jim, correct?

3  A    Yes.

4         MR. MCLAUGHLIN:  I'd ask that Defendants' Exhibit 13

5  be admitted into evidence.

6         THE COURT:  It will be admitted, as will the one

7  previously.

8            (Defense Exhibits 12 and 13 marked.)

9            (Defense Exhibits 12 and 13 admitted.)

10 BY MR. MCLAUGHLIN:

11 Q    If you take a look at this -- there's a number of items on

12 here.  I want you to scroll down.  This is on -- keep going

13 down.  Can you go back to the previous one?  Go to 12.  Thank

14 you.

15     Defendants' Exhibit 13, if you can go back to that, you're

16 discussing a number of things that you're doing for

17 advertising, correct?

18 A    Yes.

19 Q    And who was involved with the advertising at that time?

20 A    I did.

21 Q    And was anybody at Emerson Creek Pottery in Virginia

22 involved in your advertising at all?

23 A    No.

24 Q    Why were you sharing with him what advertising you were

25 doing?

C. Demiduk - Direct

1   A     I just thought it was -- I was excited what I was doing.

2   We were getting articles in the newspaper.  So I was excited

3   about growing my business.

4   Q     And had you at that time invited Jim to come up and visit?

5   A     Yes.

6   Q     And did Jim ever come up?

7   A     No.

8   Q     Now, I want to direct your attention down to the bottom of

9   D-13.  And if you see that there is a discussion about:  I was

10  not sure if we could market it as being your own boss with

11  Emerson Creek.  Do you see that?

12  A     Yes.

13  Q     In the 2006 time period, did a couple of people approach

14  you about whether they could sell Emerson Creek Pottery?

15  A     Yes.

16  Q     Do you recall how many people?

17  A     Maybe one or two.

18  Q     And do you recall where they came from?

19  A     From around my area.  One from Peoria, Illinois and one

20  from Atlanta, Georgia.

21  Q     Okay.  Do you remember the discussion you had with the

22  person from Peoria?

23  A     Yeah.

24  Q     And the person from Peoria, how did that discussion go?

25  A     I just told her -- she asked me if she could contact the

C. Demiduk - Direct

1  person who made the pottery.  And I said you would have to call

2  Jim.

3  Q    And what was she looking to accomplish?

4  A    She wanted to open a store that carried Emerson Creek.

5  Q    And did you tell her you weren't in the position --

6  A    No.  I had my own store.

7  Q    Did you think of yourself at that time as an Emerson Creek

8  Pottery outlet store?

9  A    No.

10  Q    Did you represent that you were?

11  A    No.

12  Q    Why was she asking you about starting up an Emerson Creek

13  Pottery store in 2006?

14  A    She liked the product and she wanted to open a store.

15  Q    And how did you handle that inquiry?

16  A    I told her she would have to talk to Jim.

17  Q    Do you see at the bottom there it says, "I was not sure if

18  we could market as being your own boss with Emerson Creek and

19  that there is no franchise fee with a startup."  Do you see

20  that?

21  A    Yes.

22  Q    Did you ever say to -- did you ever discuss with her what

23  it would take to actually be able to sell any products?

24  A    I told her if she wanted to sell Emerson Creek pottery she

25  would have to make a statement.

C. Demiduk - Direct

1  Q    And were you involved in any kind of discussions between

2  herself and Jim?

3  A    No.

4  Q    Were you at any time a franchise of Emerson Creek?

5  A    No.

6  Q    Do you know if Emerson Creek Pottery has ever been a

7  franchise?

8  A    No.

9  Q    And just to be clear, why would you raise this issue in an

10  email with Jim?  What was the point of it?

11  A    Because I thought Jim had a great product, and I wanted

12  him to do well with his pottery.

13  Q    Do you know if this discussion went anywhere?

14  A    Yeah, she did open a little store.

15  Q    You weren't involved in any of --

16  A    No.

17  Q    -- those discussions, correct?

18  A    No.

19  Q    And then there was another one you said about someone from

20  Atlanta?

21  A    Yes.

22  Q    The discussion with the person in Atlanta, how did that

23  go?

24  A    She wanted to open a tearoom.

25  Q    How did she find out about a tearoom?

C. Demiduk - Direct

1  A    She went to our tearoom.

2  Q    And what discussions did you have with her about a

3  tearoom?

4  A    I mean, it's a lot of work.

5  Q    And whatever happened from those discussions?

6  A    The one in Peoria, she opened a little shop.  And then in

7  Atlanta, I don't know, Jim had talked to her, I believe.

8  Q    Do you know if that went anywhere?

9  A    No.

10  Q    So other than those two individuals, the one from Peoria

11  and the one from Atlanta, had anyone else after that time ever

12  contacted you with respect to any desire to sell Emerson Creek

13  pottery?

14  A    No.

15  Q    And if you go to Defendants' Exhibit Number 25, this is an

16  email dated November 25th, 2007 between yourself and Jim,

17  correct?

18  A    Yes.

19  Q    Okay.  And I'd ask that Defendants' 23 be admitted into

20  evidence -- excuse me, yes, Defendants' 25 into evidence.

21          MR. WILLETT:  This is -- it's already in.

22          MR. MCLAUGHLIN:  All right.  Thanks.  Appreciate it.

23   BY MR. MCLAUGHLIN:

24  Q   So if you see that in this email there is a discussion

25  taking place with respect to some billing.  Do you see that?

C. Demiduk - Direct

1   A    Yes.

2   Q    Okay.  And can you tell me what was going on with the

3   billing?

4   A    Just confusion on the billing.

5   Q    Between who and who?

6   A    Between Jim and I.

7   Q    And what had happened in this situation?

8   A    I feel that when he had a secretary, Lucy, things got

9   harder to work with at Emerson Creek.  The back orders, the

10  response back and forth got harder.

11  Q    And if you look at that, do you see the -- it would be

12  basically the second to last paragraph.  It says, "Also, we are

13  coming down to Virginia around January 6"?

14  A    Yeah, just wanted to meet.

15  Q    I just wanted to bring your attention to that.  It says,

16  "Also, we're coming down to Virginia around January 6.  Just

17  wondering if we could meet to see what is happening in the

18  future."

19       Do you see that?

20  A    Yes.

21  Q    What was the purpose of making that comment?

22  A    Just I was starting to have problems.  I was starting to

23  order less.  Just the communication.  Things weren't as good

24  quality.  So...

25  Q    And when you raised issues about the quality, how was it

C. Demiduk - Direct

1  handled by Jim, just from your recollection?

2  A    I don't remember.

3  Q    If the product you're receiving, if you weren't happy with

4  the quality of any of his products, were you required to

5  purchase it?

6  A    No.

7  Q    And did you actually meet with Jim in January of 2008?

8  A    I don't believe so.

9  Q    Did you have discussions with him with respect to the

10 future?

11 A    Just I -- I don't remember.

12 Q    And during those discussions with respect to the product,

13 did the use of "Emerson Creek Pottery" in connection with your

14 business come up?

15 A    He said we started in 2001.  2007, there started to be

16 with his SEO person or his web --

17 Q    No, I'm saying in 2007 -- we'll get to -- I'm saying in

18 2007 with respect to these discussions about product, was there

19 any issues brought up at that point with respect to the name?

20 A    No.

21 Q    Can you pull up D-26.  I'm showing you what's been marked

22 Defendants' Exhibit Number 26 for identification.  And is

23 this -- this is -- appears to be an email between yourself and

24 Jim dated January 21st, 2008.

25 A    Yes.

C. Demiduk - Direct

1  Q    Do you see that?

2  A    Yes.

3  Q    It talks -- I'd ask that Defendants' 26 be admitted into

4  evidence.

5         MR. WILLETT:  No objection.

6  Q    So in this email it references three days at Chicago gift

7  show; do you see that?

8  A    Yes.

9  Q    And can you -- do you recall the Chicago gift show in

10 2008?

11 A    Yes.

12 Q    What were you looking for at the Chicago gift show?

13 A    I looked for all different kinds of stuff.  I look for if

14 a customer is asking for things, I keep on getting the request,

15 that's what I look for.  That's what I shop for.

16 Q    And when you went to the Chicago gift show, were you

17 looking for Emerson Creek Pottery or other --

18 A    Other things that Emerson Creek Pottery did not do.

19 Q    And did Jim Leavitt put any limitations on you that when

20 you went to the Chicago gift show that you had to buy certain

21 items versus other items?

22 A    No.  I paid for my own trips.  I was going for my shop.

23 Q    Did you or did you not purchase third-party items for sale

24 in your shop?

25 A    Yes.

C. Demiduk - Direct

1  Q    And did you discuss with Jim that you were going for that

2  purpose?

3  A    Not for that purpose, but I would tell him things were

4  selling good.  I was selling certain items in pottery and then

5  I would send him something and then he would make it also.

6  Q    And I want to -- if you could pull up D-29.  Just direct

7  your attention to D-29.  For identification it's a February 18,

8  2008 email from Jim to you.  Do you see that?

9  A    Yes.

10  Q    And if you scroll down, and you see it's in response to a

11  February 18th, 2008 email from yourself?

12  A    Yes.

13  Q    So I want to go up to the top of that really quick.  I'd

14  ask that Defendants' 29 be admitted into evidence.

15          MR. WILLETT:  No objection.

16          THE COURT:  Be admitted.

17          (Defense Exhibit 29 marked.)

18          (Defense Exhibit 29 admitted.)

19  BY MR. MCLAUGHLIN:

20  Q    In Defendants' 29 it looks like you're having discussion

21  about a variety of different items, right?

22  A    Right.

23  Q    I want to focus your attention on one item.  Do you see

24  where it says:  "To answer your other questions, I do like

25  to" -- it says "to square plate," but it should say "the square

1  plate, and I'm going to start making one as soon as I get my

2  new office person going.  Would you want to go in together to

3  buy the holders so we can get a better price?"

4  A    Yes.

5  Q    Do you know what that's referring to?

6  A    That is the Signature square plate rack.

7  Q    And the Signature square plate, is that something that you

8  had sold?

9  A    Yes.

10  Q    And why were you asking him about a square plate?

11  A    Because I was selling it.  I was selling it good.  He knew

12  I was selling it.  And I told him it would be good in his

13  patterns, and to this day he still sells it.

14  Q    Did you actually send him a physical --

15  A    Yes.

16  Q    -- version of the -- the actual plate itself?

17  A    Yes.

18  Q    Can you go to D-65.  So I want to show you what's been

19  marked as D-65 for identification.  Can you tell me what this

20  is?

21  A    It's the Signature square plate.

22  Q    The plate that we just talked about?

23  A    Yes.

24        MR. MCLAUGHLIN:  Ask that Defendants' Exhibit 65 be

25  admitted into evidence.

C. Demiduk - Direct

1      MR. WILLETT:  No objection.

2      THE COURT:  Be admitted.

3      (Defense Exhibit 65 marked.)

4      (Defense Exhibit 65 admitted.)

5      THE COURT:  Let's stop here for a recess for 15

6  minutes.  You may retire to the jury room.

7  **(Jury out, 3:16 p.m.)**

8      (Recess.)

9      THE COURT:  Call the jury back.

10  **(Jury in, 3:32 p.m.)**

11      THE COURT:  Be seated, please.  You may resume.

12      MR. MCLAUGHLIN:  So if you can pull back up D-65.

13   BY MR. MCLAUGHLIN:

14  Q    So when we left off, I was showing you what was marked as

15  D-65.  And I don't recall if this had been admitted into

16  evidence yet.

17      MR. WILLETT:  It has.

18      MR. MCLAUGHLIN:  It has.  Okay.

19   BY MR. MCLAUGHLIN:

20  Q    And this is a copy of the plate that was sent to Jim?

21  A    Yes.

22  Q    And can you tell me what it reads on the back side of that

23  plate?

24  A    "Signature Houseware Incorporated, microwave and

25  dishwasher safe.  Stoneware.  Made in China."

C. Demiduk - Direct

1  Q    Is that what it bore on it in 2008?

2  A    Yes.

3  Q    And that was provided to Jim?

4  A    Yes.

5  Q    And do you have that physical plate with you today?

6  A    Yes.

7         MR. MCLAUGHLIN:  May I approach the witness?

8         THE COURT:  You may.

9   BY MR. MCLAUGHLIN:

10 Q    Could you just hold up and verify that's in fact the plate

11 itself?

12 A    Yes.

13 Q    Or one of them?

14 A    Yes.

15 Q    Now, after you provided that plate to Mr. Leavitt, did he

16 indicate that there was a problem now with your selling Emerson

17 Creek Pottery pottery in the gift shop and non-Emerson Creek

18 Pottery items that originated in China or anywhere else?

19 A    No.

20 Q    And at that point were you told in any way that you could

21 no longer use the name Emerson Creek Pottery in connection with

22 your businesses?

23 A    No.

24        MR. WILLETT:  Objection, leading.

25        THE COURT:  Sustained.

C. Demiduk - Direct

1   BY MR. MCLAUGHLIN:

2   Q    What limitations were placed on the use of "Emerson Creek

3   Pottery" at that time by Mr. Leavitt?

4   A    None.

5   Q    So let's pull up Defendants' 51.  I want to show you

6   what's been marked as an exhibit, Defendants' 51 for

7   identification, a June 12th, 2009 email that appears to be

8   between yourself and Mr. Leavitt.  Do you see that?

9   A    Yes.

10              MR. MCLAUGHLIN:  I ask that Defendants' 51 be

11  admitted into evidence.

12              MR. WILLETT:  No objection.

13              THE COURT:  It's admitted.

14              (Defense Exhibit 51 marked.)

15              (Defense Exhibit 51 admitted.)

16  BY MR. MCLAUGHLIN:

17  Q    Have you had a chance to review that email before today?

18  A    Yes.

19  Q    So can you tell me what's being discussed in this email?

20  A    Jim is letting us know that we can download pictures from

21  his website, but do not put any print in the material.

22  Q    You've seen a number of photographs that were on the

23  website and on social media and the like, correct?

24  A    Yes.

25  Q    The photographs, where did they come from?

C. Demiduk - Direct

1    A    The photographs from us or from --

2    Q    Where did those photographs come from?

3    A    For just the pottery in general?

4    Q    Generally where I'm going is you've seen a number of

5    photographs that appeared on your website --

6    A    Yes.

7    Q    -- over the years and some on social media --

8    A    Yes.

9    Q    -- that have to do with Emerson Creek pottery.

10   A    Yes.

11   Q    Where did they come from?

12   A    They come from other people.  We put things on our

13   website, take pictures and put things on our website.  Some has

14   come from Jim, from his pictures.

15   Q    And would some of them come in connection with an email

16   like this where you were asking about use of photographs?

17   A    Yes.

18   Q    And have you ever done a copy word for word of any written

19   material of his?

20   A    No.

21   Q    And when you had this email with Mr. Leavitt about using

22   photographs, what limitations, if any, were placed by

23   Mr. Leavitt on the use of "Emerson Creek Pottery" in connection

24   with those photographs?

25   A    None.

C. Demiduk - Direct

1   Q    Go to D-43 to 46.  What do we have that's before you?  So

2   what I'd like to do is actually show you D-43, 44, 45 and 46 as

3   a collection of documents.

4          THE CLERK:  The only one not admitted is 44.

5          MR. MCLAUGHLIN:  Thank you very much.  Why don't we

6   just do D-44 and it will make it easy.

7   Q    So showing you what's been marked as Defendants' 44 for

8   identification; do you see that?

9   A    Yes.

10  Q    Can you tell me what that is?

11  A    That is our web page.

12  Q    And when would that web page have been in existence?

13  A    Maybe 2008.

14  Q    Ask for defendants' --

15  A    2009.

16         MR. MCLAUGHLIN:  I'd ask that Defendants' 44 be

17  admitted into evidence.

18         THE COURT:  Be admitted.

19         MR. WILLETT:  No objection.

20         (Defense Exhibit 44 marked.)

21         (Defense Exhibit 44 admitted.)

22  BY MR. MCLAUGHLIN:

23  Q    And that is as your website appeared on October 17th,

24  2009?

25  A    Yes.

1  Q    And who was involved in the creation of that website?

2  A    I believe Dave's brother.

3  Q    And did anyone from Emerson Creek -- well, other than

4  Dave's brother or yourself, was anybody else involved in that

5  website?

6  A    No.

7  Q    What involvement, if any, did Emerson Creek Pottery in

8  Bedford, Virginia or the Leavitt family have with respect to

9  the creation of this website?

10  A    Nothing.

11  Q    From time to time would you have included photographs of

12  Emerson Creek Pottery pottery on the website?

13  A    Yes.

14  Q    Why?

15  A    I was -- I took pictures of our displays.

16  Q    Now, we have just seen this plate from 2008.

17  A    Yes.

18  Q    And we have a website that's up in October of 2009.

19  A    Yes.

20  Q    Between the time that you had shown Mr. Leavitt that

21  plate --

22  A    Yes.

23  Q    -- in 2008 to the time of this website here in 2009, had

24  Mr. Leavitt ever told you that there were any limitations on

25  the use of "Emerson Creek Pottery"?

1  A    No.

2  Q    Had he told you in any way to take down any photographs?

3  A    No.

4         MR. WILLETT:  Object to the form.  Object to leading.

5         THE COURT:  Sustained as to leading.

6   BY MR. MCLAUGHLIN:

7  Q    What photographs were you asked to take down from the

8  website?

9  A    None.

10  Q    Can you pull up D-50 and D-52.  So I want to show you

11  first a document identified as Defendants' 50 for

12  identification.

13  A    Yes.

14  Q    And if you scroll down, you'll see that's a portion of an

15  email, the bottom of which is dated May 1, 2012 from

16  Mr. Leavitt to info@solaswebdesign.net.

17  A    Yes.

18  Q    And then can you pull up 52.

19      You'll see that -- if you scroll from the bottom all the

20  way up you'll notice this is a continuation of that same email

21  chain, and then it's from Mr. Leavitt to yourself dated May

22  1st, 2012.  Do you see that?

23  A    Yes.

24         MR. MCLAUGHLIN:  Ask that Defendants' 50 and 52 be

25  admitted into evidence.

C. Demiduk - Direct

1        MR. WILLETT:  No objection there.

2   Q    So if we scroll on down, just -- and I'm looking at 52

3   right now.  It says that this is -- you understand this to be

4   an email between Miriam and Liam Ellis and Mr. Leavitt,

5   correct?

6   A    Yes.

7   Q    Do you know who those people are?

8   A    They were his web people.

9   Q    And when you received this email, what did you understand

10  that Mr. Leavitt was asking?

11  A    He was asking us to add "and tearoom" to "Emerson Creek

12  Pottery."

13  Q    And prior to this email, what names were you using in

14  connection with your business?

15  A    "Emerson Creek Pottery," and we were also -- we called the

16  tearoom the Tearoom.

17  Q    Other than requesting you change your name from "Emerson

18  Creek Pottery" to "Emerson Creek Pottery & Tearoom," were any

19  other requests made of you?

20  A    No.

21  Q    And did you make these changes?

22  A    Yes.

23  Q    What did you understand the issue that Mr. Leavitt was

24  trying to raise in sending these emails?

25  A    He was saying -- let me read here.

1    He wanted me to add "tearoom" to "Emerson Creek Pottery."

2  Q   Why was he asking you to do that?

3  A   Because there was some confusion.

4  Q   And what confusion was he talking about?

5  A   Can I see --

6  Q   Do you need to see -- why don't you look at Exhibit 50 at

7  the same time.

8  A   Google maps.

9  Q   So are you looking at Exhibit Number 50?

10 A   Yes.

11 Q   And what are you looking at on Exhibit 50?

12 A   Emersoncreekpotteryandtearoom.com.

13 Q   Are you looking at -- I'm just asking which email are you

14 looking at?  Is it the one May 1st, 2012?

15 A   Yes.

16 Q   Info@solaswebdesign.net and Jim Leavitt?

17 A   Yes.

18 Q   And I'm just going to read some of this.  It says, "Hi

19 Miriam, the website is www.ecreekpotteryandtearoom.com.  She

20 calls herself Emerson Creek Pottery and Tearoom and has done so

21 for many years.  She sells our pottery at discount and other

22 accessories that go with it, but she is an independent

23 business.  I have allowed her to use our name, but never

24 considered the problems that have arisen with Google.  Actually

25 I don't know what to do as it would cause her hardship to force

C. Demiduk - Direct

1   her to change her name (and me sales), but on the other hand

2   Google has made a mess of this, they should fix it.  Maybe she

3   could modify her URL.  Do you have any ideas?  It seems to me

4   that since we both have different names, even though our name

5   is part of hers, that Google ought to be able to distinguish

6   between us."

7        Correct?

8   A    Yes.

9   Q    So what was -- so the ensuing discussions that took place

10  between yourself and Mr. Leavitt, what were you trying to

11  correct?

12  A    That we had -- he was trying to connect "Emerson Creek

13  Pottery" and "tearoom" together.

14  Q    Explain that.

15  A    That we had created Emerson Creek Pottery, Emerson Creek

16  Tearoom and Emerson Creek.

17  Q    When you said he was trying to connect the two, what did

18  you mean by that?

19  A    Just so they would be one.

20  Q    And was it your understanding -- I'm not trying to put

21  words in your mouth, but was it your understanding that he

22  wanted to distinguish between him being Emerson Creek Pottery

23  and you being Emerson Creek Pottery & Tearoom?

24  A    Yes.

25  Q    Were any other requests made of you other than the change

C. Demiduk - Direct

1  of adding "and Tearoom" to your name?

2  A     No.

3  Q     Did you make those changes?

4  A     Yes.

5  Q     And after that did Mr. Leavitt raise any other issues with

6  respect to what changes would be needed in order to avoid

7  confusion in Google?

8  A     No.

9  Q     If you go to D-49, and this is a May 17th, 2012 email

10  from -- strike that -- yeah, go down for a minute, Mike.  Go

11  up.

12        So if you take a look at this, this is a May 17th, 2012

13  email from yourself to emersoncreek@emersoncreekpottery.com?

14  A     Yes.

15  Q     And who is emersoncreek@emersoncreekpottery.com?

16  A     Yes.

17  Q     Who is that?

18  A     That is -- emersoncreekpottery.com was Jim.

19        MR. MCLAUGHLIN:  I'd ask that Defendants' 49 be

20  admitted into evidence.

21        THE COURT:  Be admitted.

22        (Defense Exhibit 49 marked.)

23        (Defense Exhibit 49 admitted.)

24   BY MR. MCLAUGHLIN:

25  Q     So if you look at this, this was -- was this a follow-up

C. Demiduk - Direct

1  to the emails we just looked at?

2  A    I believe so.

3  Q    And if you take a look at it, it says, "Hi Jim."  And it

4  mentions -- I'll just read it again for the benefit of the

5  jury.  It says, "We corrected our name so it correctly lists

6  Emerson Creek Pottery and Tearoom with our address.  When you

7  Google 'Emerson Creek Pottery' your website is listed first

8  with ours second.  Under places, though, we are listed first

9  and you are second.  This is something that is determined by

10  search popularity, as far as I know.  I do know there is a

11  picture of the cookie mold up still, and we are working to take

12  that off.  So I assume our end of the issue has been taken care

13  of since our business is correctly identified with the right

14  web address, business name, and address.  Let me know if there

15  is something on your end that does not seem correct."  Is

16  that --

17  A    Yes.

18  Q    And after this was sent, did Mr. Leavitt or anyone from

19  Emerson Creek Pottery in Bedford, Virginia, follow up with you

20  and tell you to do anything else?

21  A    No.

22  Q    Can you pull up D-61, Mike.  I want to show you what's

23  been marked Defendants' Exhibit Number 61 for identification.

24  It is a string of emails -- if you scroll to the top, Mike.  It

25  says from Jim Leavitt to Chris, May 25, 2012.  That's you?

C. Demiduk - Direct

1   A    Yes.

2          MR. MCLAUGHLIN:  Ask that Defendants' 61 be admitted

3   into evidence.

4          MR. WILLETT:  No objection.

5    BY MR. MCLAUGHLIN:

6   Q    And in follow-up, if you scroll down, it says, "Hi Jim,"

7   and it talks about Miriam -- you see that between Jim and

8   Miriam?

9   A    Yes.

10  Q    And do you understand her to be asking for anything other

11  than you adding "and tearoom" to your name?

12  A    No.

13  Q    If you can pull up D-53.  And this is an email dated May

14  30th, 2012 from yourself to -- excuse me, from Jim to yourself,

15  correct?

16  A    Yes.

17  Q    And it looks like he's cc-ing Miriam and Jon Liam

18  Ellis-Lorditch, same individuals, correct?

19  A    Yes.

20         MR. MCLAUGHLIN:  Ask that Defendants' Exhibit 53 be

21  admitted into evidence.

22         THE COURT:  Be admitted.  Also 61.

23         (Defense Exhibits 53 and 61 marked.)

24         (Defense Exhibits 53 and 61 admitted.)

25

C. Demiduk - Direct

1  BY MR. MCLAUGHLIN:

2  Q    What did you understand the purpose of this email being?

3  A    (Witness perusing document).

4       Again, his web person is saying to -- Jim is saying to add

5  "and tearoom" to everything.

6  Q    So in the span of May 1st, 2012 through May 30th, 2012,

7  what, other than adding "and Tearoom" to "Emerson Creek

8  Pottery" were you asked to do to end any confusion between your

9  two companies on Google?

10 A    Nothing.

11 Q    Can you pull up Defendants' Exhibit 54.  I'm showing you

12 what's been marked as Defendants' Exhibit 54 for

13 identification.  Appears to be an email from yourself to

14 Mr. Leavitt dated December 22, 2012.  Do you see that?

15 A    Yes.

16 Q    And have you seen this email before today?

17 A    Yes.

18       MR. MCLAUGHLIN:  Ask that Defendants' 54 be admitted

19 into evidence.

20       MR. WILLETT:  No objection.

21       THE COURT:  Be admitted.

22       (Defense Exhibit 54 marked.)

23       (Defense Exhibit 54 admitted.)

24 BY MR. MCLAUGHLIN:

25 Q    So I want you to go down to the third full paragraph.  It

1  says, "We have 40 weddings next year."  Do you see that?

2  A    Yes.

3  Q    Can you tell me about what the wedding business was like

4  for you guys in 2012?

5  A    We did -- we were just starting out and we did -- it

6  was -- we started with three weddings, and they were friends

7  and neighbors.

8  Q    But I'm saying in 2012, it sounds to me like the wedding

9  business has taken off at that point.

10 A    Yes.

11 Q    Do you know why you're discussing the wedding business

12 with Jim at the end of 2012?  What's the point of this

13 discussion?

14 A    We had developed the name "Emerson Creek Events," Emerson

15 Creek.

16 Q    Let me focus this a little bit better.  I'm not trying to

17 confuse you.  If you take a look at the -- that paragraph says

18 we have 40 weddings next year?

19 A    Yes.

20 Q    You go to the end, it says, "I really want to work with

21 you and I love the product, but feel like it has been a very

22 hard few years with Emerson Creek and us."

23      Do you see that?

24 A    Yes.

25 Q    Earlier in that same paragraph you're talking about having

C. Demiduk - Direct

1  40 weddings next year.

2  A    Yes.

3  Q    So what are you trying to convey to Jim in that paragraph?

4  A    That our wedding business is taking off and we're focusing

5  on weddings.

6  Q    Do you see where it says, "I know the website thing has

7  been a problem that we come up first.  That is only because

8  barn weddings are so popular"?

9  A    Yes.  So we have a lot of traffic, and people are going to

10  take pictures.  And we advertised a lot.  We went with The

11  Knot, which is a wedding --

12  Q    I just want to focus on this.  So in December 22nd, 2012

13  when you're talking about the weddings and you say to him, "I

14  love the product" -- "I really want to work with you and love

15  the product, but feel like it has been a very few hard years

16  with Emerson Creek and us," did you --

17  A    Our relationship was --

18  Q    Go ahead.

19  A    -- starting to not be as good.  It got more difficult to

20  order.

21  Q    And what limitations, if any, were placed on your

22  businesses in Oswego, Illinois to continue using "Emerson Creek

23  Pottery & Tearoom" in connection with your wedding business if

24  you ordered less product from him?

25  A    Nothing.

C. Demiduk - Direct

1  Q    Were any limitations placed?

2  A    No.

3  Q    Can you go to Exhibit D-64.  Showing you what's been

4  marked as Exhibit D-64 for identification.  This appears to be

5  an email from Jim to yourself dated January 16, 2014?

6  A    Yes.

7  Q    Have you had a chance to -- have you seen this before

8  today?

9  A    Yes.

10        MR. MCLAUGHLIN:  I'd ask that Defendants' 64 be

11  admitted into evidence.

12        MR. WILLETT:  No objection.

13        THE COURT:  Be admitted.

14        (Defense Exhibit 64 marked.)

15        (Defense Exhibit 64 admitted.)

16  BY MR. MCLAUGHLIN:

17  Q    Can you generally tell us what's going on in this email?

18  A    (Witness perusing document.)

19  Q    Let me withdraw the question and make it easier for you.

20  Let's focus on that first paragraph for a minute.  It says,

21  "I'm not sure why you're now having problems with your

22  commercial dishwasher.  Please understand that we do not make

23  restaurant vitrified China; but that being said, we have not

24  had any other complaints about short life and breaking from

25  other customers."  Do you see that part?

1   A    Yes.

2   Q    Focusing on that, what was going on at the time?

3   A    The pottery that we were using in the restaurant was not

4   holding up.

5   Q    And did you have discussions with him about what solutions

6   you would have to look into?

7   A    Other products.

8   Q    And those other products would be used where?

9   A    At the restaurant.

10  Q    And did Mr. Leavitt put any limitations at all -- well,

11  let me ask it this way:  What limitations, if any, did

12  Mr. Leavitt place on the use of "Emerson Creek

13  Pottery & Tearoom" in connection with your business if you did

14  not use his pottery in the restaurant?

15  A    Nothing.

16  Q    If you take a look at the second paragraph.  I'm just

17  going to focus on a small part.  It says, "We've always given

18  you a 30 percent discount off of wholesale and are continuing

19  to do so, however when we get small orders we lose too much

20  money processing them to justify such a large discount.  This

21  is why we set up a sliding scale for you this year.  I hope you

22  understand that this gives you the flexibility to get you" --

23  that should be "your large discount as well as place small fill

24  in orders for quick turnaround."  Do you see that?

25  A    Yes.

C. Demiduk - Direct

1  Q    Can you tell me what discussions took place with respect

2  to the change in the discount?

3  A    We're not ordering as big and our discount is getting

4  less.

5  Q    And in the course of this discussion what limitations, if

6  any, did Emerson Creek Pottery in Bedford, Virginia, Jim

7  Leavitt place upon you in using "Emerson Creek

8  Pottery & Tearoom" in connection with your businesses if the

9  volume went down?

10 A    Nothing.

11 Q    Can you pull up D-38.  I'm showing you what's been marked

12 Defendants' Exhibit Number 38 for identification.  Can you tell

13 me generally what we're looking at?

14          ATTORNEY1:  Do you want me to scroll through the

15 whole thing?

16          MR. MCLAUGHLIN:  Yeah, it's only four pages.  Scroll

17 really quick.

18 Q    Generally what are we looking at?

19 A    Our cookbook.

20 Q    You see there's some notations on the right?

21 A    Yes.

22 Q    What is all that?

23 A    That is stuff that we made changes to, to the cookbook.

24 Q    And when were those changes asked for?

25 A    I believe 2014.

C. Demiduk - Direct

1  Q    The cookbook, yes.  I'm saying the changes on the right,

2  do you know when those request for changes were being made?

3  A    Yes.

4  Q    About when?

5  A    Just some changes that we did in our wording.  We removed

6  "pottery shop," "Emerson Creek Pottery, which is in Bedford,

7  Virginia."

8  Q    Let me do this first.

9        MR. MCLAUGHLIN:  I'd ask that Defendants' Exhibit 38

10  be admitted into evidence.

11        MR. WILLETT:  No objection.

12        THE CLERK:  I'm sorry.  I don't believe 64 was

13  admitted either, unless I missed that.

14        MR. MCLAUGHLIN:  We'd ask that it be admitted into

15  evidence.

16        THE COURT:  Be admitted.

17        (Defense Exhibits 38 marked.)

18        (Defense Exhibits 38 admitted.)

19  BY MR. MCLAUGHLIN:

20  Q    So on this exhibit there's two things I want to focus on,

21  two different time periods.  So at the top it says "EC cookbook

22  9-26 2014 final.pdf."

23  A    Yes.

24  Q    And generally what is -- forget about all the requests for

25  changes, but generally what would that have been?

C. Demiduk - Direct

1  A    We are making changes to the cookbook.

2  Q    So could I assume that roughly September 26, 2014 is when

3  the cookbook was created?

4  A    Yes.

5  Q    Or maybe in its final form?

6  A    Yes.

7  Q    And then this additional writing on the right-hand side,

8  about when would that have been placed?

9  A    Maybe 2017, '16.

10 Q    Do you know?  Can you even tell from looking at this?

11 A    No.

12 Q    And if I represented it would have taken place maybe after

13 a demand letter was sent by Mr. Goodrum, would that -- do you

14 believe that's the date or not, or can you not even say that?

15 A    I can't even say that.

16 Q    That's fine.  So the first thing I want to focus on is the

17 language itself is how it existed in 2014?

18 A    Yes.

19 Q    Okay.  And you had provided a -- did you provide a copy of

20 that to Mr. Leavitt?

21 A    I sent him a copy, yes.

22 Q    I think he even said he might be selling it in his gift

23 shop?

24 A    Right.

25 Q    Did he have any input whatsoever in the creation of the

C. Demiduk - Direct

1  cookbook?

2  A    No.

3  Q    What about the photographs that were put in there?

4  A    No.

5  Q    What about the recipes?

6  A    No.

7  Q    Any involvement in the layout?

8  A    No.

9  Q    Did he ever get like a prior version of it or did you just

10 send him a final one?

11 A    No.

12 Q    No, I'm asking did he ever get a pre copy of it?

13 A    No.

14 Q    Or did he get a final copy of it?

15 A    No.

16 Q    Which was it?

17 A    I think I just sent him a copy.

18 Q    And when he got a copy of the cookbook, did he state any

19 objections to the content?

20 A    No.

21 Q    Did he make any limitations on the use of the cookbook?

22 A    No.

23 Q    Any limitation on --

24          MR. WILLETT:  Object to form.  We're leading again.

25          THE COURT:  All right.

C. Demiduk - Direct

1  BY MR. MCLAUGHLIN:

2  Q    What limitations, if any, did he place on you in the use

3  of your cookbook after you provided it to him?

4  A    None.

5  Q    So if you take a look at the changes, at some point you

6  were making changes?

7  A    Yes.

8  Q    And can you just generally tell us what changes you were

9  making?

10  A    We changed "Emerson Creek Pottery & Tearoom," "Emerson

11  Creek," remove all the sentences about our business for 14

12  years, the shop, Emerson Creek Pottery, Bedford, Virginia,

13  changed the "tearoom" to "cafe."  Changed "Emerson Creek

14  Pottery & Tearoom" to just say "Emerson Creek."

15  Q    Why were you making changes at that point?

16  A    Because they had requested that we make changes.

17  Q    You were trying to accommodate?

18  A    Yes.

19  Q    I know this has been previously admitted.  I want you to

20  pull up the October 20th, 2015 registration for "Emerson Creek

21  Pottery."  I have it as D-35.  Let me see if I can find the

22  plaintiff exhibit version of it.  Actually, I don't want to

23  pull that up.  I'll just move on.  It's not necessary.

24       No, actually, do -- do you know what number the

25  registration is?

C. Demiduk - Direct

1    ATTORNEY1:  Defendants'?

2    MR. MCLAUGHLIN:  Yeah.

3    ATTORNEY1:  I think you had just said, but it's

4  easier to move through defendants anyway.  Actually, no, we

5  don't have the registration from defendants.  We just have the

6  application.

7    MR. MCLAUGHLIN:  It's okay.  I'll ask it this way.

8  It's not necessary to pull it up.

9   BY MR. MCLAUGHLIN:

10 Q    You're aware that Emerson Creek Pottery in Bedford,

11 Virginia, had registered a trademark in 2015?

12 A    Yes.

13 Q    And it was for pottery and some other goods?

14 A    Right.

15 Q    And to your knowledge did they register that in connection

16 with any events or restaurant or wedding business?

17 A    I believe so.

18 Q    No, no, in 2015 when they got the original one?

19 A    No.

20 Q    Generally -- at some point in time are you aware that

21 Emerson Creek Pottery had attempted to register a second

22 trademark?

23 A    Yes.

24 Q    And do you recall what -- if there were any categories

25 that they were attempting to register that you had a problem

C. Demiduk - Direct

1  with?

2  A    Weddings.  Events.

3  Q    And why would you have had a problem with Emerson Creek

4  Pottery in Bedford, Virginia, registering a trademark with

5  weddings?

6  A    Because we had been doing weddings since 2012 and now

7  we're 2018.

8  Q    Do you believe that -- okay.  Can you pull up Defendants'

9  48.  I'm showing you what's been -- I think this is previously

10 marked as Plaintiff's 24.  If that's the case, if you could

11 pull up Plaintiff's 24.  I believe it's all the same.

12          THE CLERK:  And that's not admitted, by the way, I

13 don't believe.  Is it?  Plaintiff's 24, I'm not showing that as

14 admitted.

15          MR. MCLAUGHLIN:  Okay.  Then I will admit, then,

16 Defendants' 48.

17          MR. WILLETT:  I think it's part of 45.  I think it's

18 45.

19          MR. MCLAUGHLIN:  Let's do it this way:  Why don't we

20 admit it as Defendants' 48 just to keep it clean.

21 Q    So showing you an email dated March 1st, 2017 between --

22 the first one is between Mr. Leavitt and your husband, Dave,

23 correct?

24 A    Yes.

25 Q    And if you scroll down, you see another one from Dave to

1  Emerson Creek, which is Jim?

2  A    Yes.

3  Q    I understand that you're not on this email, but you had an

4  opportunity to see this email?

5  A    Yes.

6  Q    And you had an opportunity to discuss the contents of the

7  email?

8  A    Yes.

9        MR. MCLAUGHLIN:  I'd ask that Defendants' 48 be

10  admitted into evidence.

11        MR. WILLETT:  No objection.

12  Q    In February of 2017, these emails went back and forth, and

13  I'm just going to read this just so we can stay focused on the

14  language.  It says, "Jim, it's Dave, Chris's husband.  She had

15  told me you were having an issue with us using the term Emerson

16  Creek in our social media posts.  I talked to our web person

17  and our social media person, and they both thought it benefits

18  both of us.  They said the more things you can hashtag that

19  have anything to do with your business will increase traffic.

20  The more times we use Emerson Creek, tearoom, pottery,

21  weddings, salads, lunch, etc. in our posts or website, the

22  higher up on Google you appear if someone searches those

23  terms."

24        Do you see that?

25  A    Yes.

C. Demiduk - Direct

1  Q    And you recall the testimony that's been around this time

2  period about the use of "Emerson Creek Pottery," etc. in

3  hashtags and social media?

4  A    Yes.

5  Q    Before this email was sent from Mr. Leavitt, had you

6  received any communication from anyone at Emerson Creek Pottery

7  in Bedford, Virginia objecting to any use of "Emerson Creek

8  Pottery" in your name since that last bunch of communications

9  in May of 2012?

10         MR. WILLETT:   Object to form.

11         THE WITNESS:   No.

12  BY MR. MCLAUGHLIN:

13  Q    In -- do you have someone who helps you with web design?

14  A    Yes.

15  Q    And who is that person?

16  A    Lindsay.

17  Q    Is it Lindsay Winkler that we saw yesterday?

18  A    Yes.

19  Q    How long has Lindsay Winkler been your web designer?

20  A    She developed our website maybe in 2015, '14.

21  Q    When you engaged Lindsay Winkler to do your website, just

22  give us an idea of what you had asked her to do.

23  A    To do what she does to bring traffic, to put about

24  weddings, to do the back end where she could do keywords,

25  design.

C. Demiduk - Direct

1  Q    And were you using the words "Emerson Creek

2  Pottery & Tearoom" in your website?

3  A    Yes.

4  Q    And when you engaged her, was that part of her duties?

5  A    Yes.

6  Q    While you were in the development of that website in 2015,

7  did anyone -- was there any kind of communication or

8  involvement from anyone at Emerson Creek Pottery in Bedford,

9  Virginia, with respect to that process?

10 A    No.

11        MR. WILLETT:  Object to the form.  Continuing to

12 lead.

13        THE COURT:  Sustained as to leading.

14 Q    What involvement, if any, did Jim Leavitt or anyone from

15 Emerson Creek Pottery in Bedford, Virginia, have with respect

16 to your website?

17 A    Nothing.

18 Q    So do you know roughly when the 2015 website work -- when

19 it actually was completed and you went live?

20 A    I don't remember exactly.

21 Q    Would it have been before this time?

22 A    Yes.

23 Q    Do you know roughly how much money you spent on developing

24 that website?

25 A    I want to say maybe $10,000, $8,000.

C. Demiduk - Direct

1  Q    What contribution, if any, did anyone from Emerson Creek

2  Pottery in Bedford, Virginia have to that?

3  A    Nothing.

4  Q    And what involvement did they have?

5  A    Nothing.

6  Q    And what was the purpose of doing the website at that

7  time?

8  A    That was to help our brand, Emerson Creek, be who we are

9  today.

10 Q    Would that have included -- well, let me ask this:  From a

11 consumer standpoint, what were the different ways you were

12 trying to reach your audience?

13 A    Weddings, restaurant.  That's what we were doing.

14 Q    So can you scroll -- is the March 1st one -- scroll up for

15 a minute, if you could.  Keep going.  Keep going down.

16      What was your feeling with respect to the name being your

17 own at that point?

18 A    It was "Emerson Creek."

19 Q    And why do you believe that at that point your name was

20 "Emerson Creek"?

21 A    That's what our customers knew us.  That's what they

22 called us.  That's what we branded ourself for 22 years.

23 Q    Now, when you say Emerson Creek, are you saying people in

24 the area would call you Emerson Creek?

25 A    Yes.

1  Q    With respect to the website itself, though, how did you --
2  what words did you use?

3  A    We used "Emerson Creek Pottery & Tearoom."

4  Q    And did you attempt to use it consistently as it was
5  requested back in 2012?

6  A    Yes.

7  Q    You understand that you were provided a cease and desist
8  letter from Mr. Goodrum on January 5th, 2018?

9  A    Yes.

10 Q    And in -- was that the first demand that was made to stop
11 using the words altogether or was there an earlier
12 communication?

13 A    In 2017 we had -- Jim had talked about changing the name.
14 He said we had to stop using "Emerson Creek," which we
15 considered that our name.

16 Q    Was that part of the demand letter or some other
17 communication?

18 A    2017, it was another communication.

19 Q    Was that between the two of you?  Was that a nonlawyer
20 communication?

21 A    Yes.

22 Q    And how did -- how did those communications resolve
23 themselves?  Or did they ever resolve themselves?

24 A    Right away we started working on taking "pottery" out of
25 everything, changing everything.  We started just making all

C. Demiduk - Direct

1  the changes after we were Emerson Creek Pottery & Tearoom for

2  18 years.

3  Q   Can you pull up D-58, which it may actually be another

4  exhibit.  Don't pull that up, actually.  Don't pull up 58.

5  Pull up D-55.  Sorry.

6      I'm going to show you what's been marked as Defendants' 55

7  for identification.  Do you see that?

8  A    Yes.

9  Q    Have you seen that before today?

10 A    Yes.

11 Q    Do you see it's a series of emails between Tomas Adams and

12 Lindsay Winkler?

13 A    Yes.

14      MR. MCLAUGHLIN:  I don't know.  Henry, was this

15 admitted before?

16      THE CLERK:  Yes.  It was admitted yesterday.

17      MR. MCLAUGHLIN:  All right.  Thank you.

18  BY MR. MCLAUGHLIN:

19 Q   With respect to Defendants' 55, were these the kind of

20 communications you were talking about as it related to the

21 website?

22 A    Yes.

23 Q    And tell me generally what instructions you gave for

24 changes on January 30th, 2018?

25 A    We are starting to take off the "pottery."  We have a new

C. Demiduk - Direct

1   logo. And change to "events and tearoom."

2   Q    Why at that -- well, what were you trying to accomplish at

3   that point with these changes?

4   A    We were making the changes from when we received the

5   letter.

6   Q    Were you going to get rid of "Emerson Creek" with respect

7   to all uses?

8   A    No.

9   Q    So explain what uses you were continuing to use of

10   "Emerson Creek" as part of the name and which ones would have

11   been -- that you were basically changing and getting rid of?

12   A    We were using it for Emerson Creek Cafe, Emerson Creek

13   Events.

14   Q    What about "Emerson Creek Pottery"?

15   A    We were "Emerson Creek."

16   Q    No, I'm saying what were you -- were you intending to

17   continue the use of "Emerson Creek Pottery"?

18   A    No.

19   Q    What about "Emerson Creek Tearoom"?

20   A    No.

21   Q    Why get rid of those two parts since they were originally

22   part of the name?

23   A    Because we were going more into weddings and we were

24   changing our tearoom to a restaurant.

25   Q    Why did you believe you should have been able to continue

C. Demiduk - Direct

1  using "Emerson Creek" in connection with cafe or weddings or

2  events or anything like that?

3  A    Because we built a brand.

4  Q    And what makes you believe that you built a brand as

5  opposed to, as you've heard testimony, Emerson Creek Pottery in

6  Bedford built a brand?

7  A    Jim had no communication with us, or the Leavitt family

8  never put in any money, never told us what direction to go in,

9  what to do.  We pretty much were Emerson Creek.  We built a

10  brand, and that was our brand.

11  Q    Nonetheless, did you make some efforts to change over the

12  website to reflect the nonuse of "pottery" and "tearoom"?

13  A    Yes.

14  Q    And who paid for that?

15  A    I did.

16  Q    And do you know approximately how much was paid in order

17  to make those changes?

18  A    I mean, I don't know off the top of my head, but maybe 10,

19  $15,000.

20  Q    Were you personally involved in pulling things down or did

21  you have other people involved in it?

22  A    We had other people doing it.

23  Q    Generally what team did you have involved in trying to

24  get -- pulling things out of this?

25  A    Lindsay and Jonathan, our web people.

C. Demiduk - Direct

1  Q    Can you tell us what efforts were made generally to sort

2  of remove "pottery" and "tearoom" from --

3  A    I mean, everything we saw, we built this.  This is almost

4  18 years.  So we were working on it from 2018, and if there's

5  anything in there, for 18 years, we had so many -- so much

6  stuff that we built -- that we're constantly making the changes

7  and doing whatever we can do to take out "pottery."

8  Q    And that is happening to this day?

9  A    Yes.  I mean, if we see something.

10  Q    Is there a difference between, like, coding and pictures

11  and words on a website for you?

12        MR. WILLETT:  Objection, foundation.

13        MR. MCLAUGHLIN:  I'm asking if she knows.

14        THE COURT:  He asked as to her.

15        MR. MCLAUGHLIN:  I did.  I asked her if she knows

16  what it is.

17        THE COURT:  Overruled.

18        MR. WILLETT:  He asked her a question:  Is there a

19  difference between.

20        MR. MCLAUGHLIN:  I said does she know.

21        MR. WILLETT:  I didn't hear that.

22        THE COURT:  I thought he asked did it make any

23  difference to her.

24        MR. WILLETT:  I think he was asking -- inquiring as

25  to whether or not there is any difference between coding and

C. Demiduk - Direct

1    words on a website.  He's saying he's asking did she know if

2    there was any difference.  I'm fine with did she know if there

3    was any difference.

4              THE COURT:  Okay.

5              MR. MCLAUGHLIN:  I'm asking a different question.

6     BY MR. MCLAUGHLIN:

7    Q    Are you aware of any differences between coding and the

8    words and pictures on a website?

9    A    I don't know much about coding.  I don't do websites.

10   Q    Are you involved in that aspect of your website?

11   A    No.

12   Q    Who is?

13   A    Lindsay and Jonathan.

14   Q    And what instructions generally did you give to Lindsay

15   and Jonathan?

16   A    Just continue working on taking anything out that has to

17   do with pottery.

18   Q    Did you put any limitations on how they were to take it

19   out?

20   A    No.

21   Q    And if we take a look -- if you can pull up Defendants'

22   39.  And I believe that this has been marked but I want to mark

23   this as Defendants' Exhibit 39 for identification and ask that

24   it be admitted in evidence.

25              MR. WILLETT:  No objection.

C. Demiduk - Direct

1      THE CLERK:  It's admitted already.

2   BY MR. MCLAUGHLIN:

3   Q    So what I want to do is just show you this.  If you scroll

4   down to the top -- so I can see the top.  So you see it says

5   accessed February 5th, 2018?

6   A    Yes.

7   Q    That's about a month after Mr. Goodrum's January 5th, 2018

8   demand letter?

9   A    Yes.

10  Q    And had any opportunity -- were you able to make any

11  changes to the website as of that date?

12  A    We had been making changes.

13  Q    You'll notice that it still says "Emerson Creek

14  Pottery & Tearoom," etc.  Do you see that, kind of that face

15  page?

16  A    Yes.

17  Q    Is that how it looked around 2015, '16 when you completed

18  the website?

19  A    Yes.

20  Q    This was the way it existed at about the time of the

21  demand letter?

22  A    Yes.

23  Q    And if you go to Defendants' Exhibits 56 and 57.  So this

24  is a series of emails that are between yourself and Ms. Winkler

25  on February 9th, 2019.

C. Demiduk - Direct

1  A     Yes.

2         MR. MCLAUGHLIN:  I'd ask that -- is that 56, Mike?

3  Defendants' 56 be admitted into evidence.

4  Q     So just scrolling down to the bottom of that, you see that

5  it says, "Thank you so much.  We enjoyed working with Tina and

6  Colleen for five years.  They wanted more money.  It was just

7  not there."  You see all that?

8  A     Yes.

9  Q     And then you go a little bit further and you start talking

10 about changes made to the website.  Do you see that?

11 A     Yes.

12 Q     Can you tell us, based on the email, what changes you were

13 making to the website in February of 2019?

14 A     We are starting to make changes to take out the word

15 "pottery," anything in Bedford, Virginia, that Jim was very

16 upset that we came up on Google before him.  "When I started

17 Emerson 18 years ago he said to call it Emerson Creek Pottery,

18 but the Internet was not what it is -- what it was 18 years

19 ago."

20 Q     So were you making these changes or are you just informing

21 what changes someone else is making?

22 A     Lindsay is making them.

23 Q     And the purpose of the email is what, then?

24 A     To tell Lindsay that we needed to continue changing

25 everything.

C. Demiduk - Direct

1  Q    Can you go to D-57.  And again, we have a number of

2  emails.  Scroll down real quick.  I just want to make sure I

3  even need this one.  No, I don't need it.  Withdraw it.

4       Can you jump to Defendants' Exhibit 1.  I want to show you

5  what's been marked as Defendants' Exhibit Number 1 for

6  identification.  I'm certain this showed up in another exhibit,

7  but just to keep it clean, I'd ask that Defendants' Exhibit

8  Number 1 be admitted.

9            MR. WILLETT:  No objection.

10  Q    So can you tell me what Defendants' Exhibit Number 1 is?

11  A    That is our vintage market and our website.

12  Q    And if you see it says a date accessed of, it looks like

13  May 2nd, 2019 at the top left?

14  A    Yes.

15  Q    Okay.  And is this the way that your website would have

16  appeared on May 2nd, 2019?

17  A    Yes.

18  Q    Now, I want you to take a look at these three pages.  Can

19  you tell me if you see any references to "pottery" or

20  "tearoom"?

21  A    No.

22  Q    Have you had a chance to look at it all?  Scroll through

23  all three pages.  I want to make sure you have a chance.

24  A    Okay.  No.

25  Q    I know you're getting tired.  It's a long day.

221

C. Demiduk - Direct

1    Do you see any references there?

2  A    Yes.

3  Q    What did you see?

4  A    It is about our market.

5  Q    No, do you see any references to pottery?

6  A    No.

7  Q    And to the extent that there would be a residual find of

8  "pottery" or "tearoom" on a social media site or on a website

9  or something, how would you handle that?

10 A    I mean, I didn't look at a lot of the -- I mean, anything

11 that was on the website, I would let Lindsay know.

12 Q    Do you know much about how social media sites are set up?

13 A    No.

14 Q    Do you know if you even have the ability to take things

15 off social media?

16 A    No.

17 Q    And who is the person who would take care of that?

18 A    We've had different people in the years.

19 Q    And did you -- like I said, as you sit here, are you even

20 aware what can be done?

21 A    No.

22 Q    Showing you what's been marked as Defendants' 62.  This is

23 already admitted into evidence.  Can you tell me what

24 Defendants' 62 is?

25 A    That is our print, mailing and print that we did for

C. Demiduk - Direct

1  Emerson Creek.

2  Q    And can you tell me what the first date of this one is at

3  least?

4  A    This one is I believe May 20th of 2011.

5  Q    Can you scroll down until you get to the end of this

6  grouping of them.

7      Can you tell me what the last date there is?  It should be

8  page 18 of this PDF.

9  A    85,000 --

10 Q    No, no, no, the date.

11 A    4-19-2019.

12 Q    And can you tell me what this document represents?

13 A    What we had spent on print and mailers.

14 Q    Can you tell me how much you had spent on those items as

15 of April 19th, 2019?

16 A    $85,951.23.

17 Q    Was any amount of that paid by Emerson Creek Pottery in

18 Bedford, Virginia?

19 A    No.

20 Q    And then I want to scroll down a little bit further,

21 starting on, I believe it would be page 19 of the same

22 document.

23      And can you tell me what -- if you scroll down through

24 this, where it says Solstice.  So you see how it talks about

25 Solstice?

C. Demiduk - Direct

1  A    Yes.

2  Q    Keep scrolling, Mike.  So you see these documents for

3  Solstice?

4  A    Yes.

5  Q    Can you tell me what Solstice is?

6  A    It was someone we hired to promote Emerson Creek.

7  Q    And when did you hire them to promote Emerson Creek?

8  A    It looks like April 2015.

9  Q    And what kind of promotion efforts were they doing?

10  A    I'm sorry?

11  Q    What kind of promotion efforts were they doing?

12  A    They would contact TV stations, newspapers, that sort of

13  thing.

14  Q    And what involvement, if any, did Emerson Creek Pottery in

15  Bedford, Virginia, have in this marketing effort with Solstice?

16  A    Nothing.

17  Q    What input?

18  A    Nothing.

19  Q    And if you keep scrolling down -- keep going.  I'm going

20  to stop right there.  So if you look at about page 31, can you

21  tell me what that is?

22  A    That is advertising, our invoice for The Knot.

23  Q    What is The Knot?

24  A    It is something that if you own a wedding venue, if you're

25  involved in weddings at all, it is the number 1 thing to

C. Demiduk - Direct

1  advertise -- account to advertise with for weddings.

2  Q    Does The Knot advertise anything for sales of pottery?

3  A    No.

4  Q    Or goods?

5  A    No.

6  Q    What amount, if any -- what amount did Emerson Creek

7  Pottery in Bedford, Virginia, contribute to your advertising in

8  The Knot?

9  A    No.

10 Q    What's the purpose of advertising in The Knot, then?

11 A    To get weddings.

12 Q    And is it necessary to -- what other purpose would you

13 have to advertise in The Knot?

14 A    We did newspapers, social media, Facebook ads, print,

15 mailers.

16 Q    And any -- until this lawsuit occurred --

17 A    Yes.

18 Q    -- did Jim Leavitt or anyone from Emerson Creek Pottery in

19 Bedford, Virginia demand of you any of your profits in your

20 weddings and events and restaurant business?

21        MR. WILLETT:  Objection, leading.

22        MR. MCLAUGHLIN:  I'll ask it a different way.

23  BY MR. MCLAUGHLIN:

24 Q    How much, if any, of your profits did anyone from Emerson

25 Creek Pottery in Bedford, Virginia demand of you, ever, before

C. Demiduk - Direct

1  this lawsuit?

2  A    Nothing.

3  Q    And so what amounts did you pay to -- throughout the

4  entire history of your business relationship with Emerson Creek

5  Pottery in Bedford, Virginia, what amounts did you pay to them

6  generally -- not a dollar amount, but for what?

7  A    Just for pottery.

8  Q    Scroll on down.

9       So you see here starting on page 36, you see it says

10 Lindsay Winkler?

11 A    Yes.

12 Q    It says invoice, it says 101, April 30th, 2015?

13 A    Yes.

14 Q    And we know who Lindsay Winkler is, obviously.

15 A    Yes.

16 Q    We've already seen her.  What does the rest of this

17 document represent?

18 A    Working on our website.

19 Q    And I see that there are dates, then I'll see a

20 description, I'll see a total.  Can you tell me what those

21 three categories are?

22 A    She would work on things like for a month, two months.

23 She kept a description of what she did.  And then the amount

24 that she invoiced us for.

25 Q    And you paid all of that?

C. Demiduk - Direct

1  A    Yes.

2  Q    Did -- what amount, if any, did Emerson Creek Pottery in

3  Bedford, Virginia contribute towards Lindsay Winkler's efforts

4  towards your website, marketing, whatever was contained in this

5  document?

6  A    Nothing.

7  Q    So if we can go to D-63.  And D-63 is previously admitted

8  as well.  And it's an 18-page document.  Can you tell me what

9  this is?

10  A    This is work for Lindsay in 2018 where she started

11  taking -- working on continuing taking everything off that we

12  had asked her, anything that was with "pottery," anything that

13  Jim had requested us to work on.  We started working

14  immediately on stuff that we could take things off.

15  Q    So in the interest -- obviously, I'm not going to go

16  through every page, but in the same format as before, left

17  column is the dates of work, middle column is the description,

18  right is the amount paid?

19  A    Yes.

20  Q    And was all of this paid?

21  A    Yes.

22  Q    And what amount, if any, did Emerson Creek Pottery in

23  Bedford, Virginia, contribute towards Lindsay Winkler's work as

24  contained on Defendants' Exhibit Number 63?

25  A    Nothing.

C. Demiduk - Direct

1  Q    Can you pull up D-42.

2      I'm going to show you what's been marked as Defendants' 42

3  for identification.  I recognize this has shown up in some

4  other document, but I just want to focus on this.  So I'd ask

5  that Defendants' 42 be admitted into evidence.

6          MR. WILLETT:  No objection.

7   BY MR. MCLAUGHLIN:

8  Q    Do you see the flower pots there?

9  A    Yes.

10 Q    Whose flower pots are they?

11 A    They were our flower pots that we bought.

12 Q    I see there's a date accessed of August 5th, 2021.

13 A    Yes.

14 Q    Do you know when the wedding actually took place?

15 A    Years before.

16 Q    And at the time that this photograph was taken, were any

17 limitations placed by -- were there any limitations placed by

18 Emerson Creek Pottery in Bedford, Virginia to -- for the use of

19 this photograph?

20          MR. WILLETT:  Objection.  Leading.

21          THE COURT:  Well, the objection is it's leading.

22 BY MR. MCLAUGHLIN:

23 Q    What limitations if any were placed on the use of this

24 photograph by Emerson Creek Pottery in Bedford, Virginia?

25 A    Nothing.

C. Demiduk - Direct

1    THE COURT:  If it's a matter not in contest --

2    MR. MCLAUGHLIN:  Your Honor, I'm not trying to --

3    THE COURT:  No, I'm saying don't bother to -- if it's

4  not in contest, don't object.

5    MR. WILLETT:  I appreciate that, Your Honor.  I will

6  try not to do that.  I'm trying to be mindful of them.  I've

7  missed a few.  A few shots have gotten past the goalie, so I'm

8  trying to react quickly late in the afternoon.

9    MR. MCLAUGHLIN:  I'm also, in the interest of time,

10  trying to move it forward, too, Judge.

11   BY MR. MCLAUGHLIN:

12  Q    So with respect to this photograph, were there any

13  limitations placed upon the use of the pottery in the

14  photograph?

15  A    None.

16  Q    Do you know if this photograph has been used outside of

17  your website?

18  A    Yes.

19  Q    Just generally speaking, are there a number of photographs

20  over the years that you've been provided from Emerson Creek

21  Pottery in Bedford, Virginia that others have taken off your

22  website?

23  A    Not that I know of.

24  Q    Have you seen -- do you recall seeing the various

25  Instagrams?

C. Demiduk - Direct

1  A    Yes.

2  Q    So sometimes there might be photographs and hashtags and

3  all that?

4  A    Yes.

5  Q    What limitations if any were placed by Emerson Creek

6  Pottery in Bedford, Virginia when those photographs were

7  provided to you with respect to their ability to be used by

8  third parties, say, for weddings and the like?

9  A    None.

10 Q    The flower pots that are in this photograph, Defendants'

11 42, do you know when they were purchased by Emerson Creek

12 Pottery & Tearoom?

13 A    They were purchased in 2001.

14 Q    2001.

15     Can you pull up Plaintiff's Exhibit Number 10, please.

16        MR. FRETWELL:  I'm sorry, you said Plaintiff's 10?

17        MR. MCLAUGHLIN:  10.

18        MR. FRETWELL:  Plaintiff's?

19        MR. MCLAUGHLIN:  Plaintiff's, yes.

20        MR. FRETWELL:  That was my fault.  I have pulled up

21 defendants'.  10?

22        MR. MCLAUGHLIN:  Yeah.

23  BY MR. MCLAUGHLIN:

24 Q    So this is an exhibit we saw a little earlier today when

25 Dave was testifying.

C. Demiduk - Direct

1  A     Yes.

2  Q     You recognize this, right?

3  A     Yes.

4  Q     And tell us -- this is the -- your -- I guess your

5  registration for the 2018 winter show in Las Vegas?

6  A     Yes.

7  Q     What is the Las Vegas winter show?

8  A     It's a gift show.

9  Q     And just describe it for us.

10 A     It's just buildings of showrooms after showrooms after

11 showrooms where I've gone for years to buy.

12 Q     And how did the exhibitors display their goods?

13 A     They would have displays and they would set them up in

14 booths, rent a booth.

15 Q     Do you have to have a booth to display or can you just

16 kind of carry stuff around and sell it?

17 A     No, you have to have a booth.

18 Q     Did you have a booth at this event?

19 A     No.

20 Q     Now, I see that it says non-exhibiting manufacturer.  Why

21 are you called a non-exhibiting manufacturer?

22 A     Because we were not exhibiting there, and we are not a

23 manufacturer.

24 Q     But why would it call you non-exhibiting manufacturer?

25 A     Because I don't manufacture anything.

C. Demiduk - Direct

1  Q    I'm just saying, this says -- maybe this is my ignorance.

2  It just looks like it says "non-exhibiting" and then

3  "manufacturer."  So I'm saying what is the significance --

4  A    I was there to -- as a buyer.

5  Q    So, I mean, is everybody who goes to buy and not display

6  just called a non-exhibiting manufacturer?

7  A    No.  If you're distributing there, you enter as a

8  distributor, and if you enter as a buyer, you're a buyer.

9  Q    And what if an individual just showed up, what would they

10 be called?  Or can an individual even show up to the show?

11 A    They would have to have someone with them that had a sales

12 tax number or a business.

13 Q    I mean, who identifies you as a non-exhibiting

14 manufacturer?  Does the show itself or do you do that?

15 A    Anyone can sign up.  I mean, anyone can fill a form out.

16 So I'm not sure.

17 Q    Did you intend to suggest in any way that you were

18 manufacturing any goods at this?

19 A    No.

20 Q    So what goods did you sell at this Las Vegas show?

21 A    Nothing.

22 Q    When you went to buy -- well, let me ask this.  Was

23 Emerson Creek Pottery in Bedford, Virginia one of the

24 exhibitors at the show?

25 A    I didn't know.  But now I know they were.

C. Demiduk - Direct

1  Q    Were you going to buy Emerson Creek Pottery pottery at

2  this Las Vegas show?

3  A    No.

4  Q    What were you going to buy?

5  A    Other things that -- other lines, other things that I was

6  looking for.

7  Q    And is this the first time you had been to the show?

8  A    No.  I have been going since 2002.

9  Q    Is this something you had discussed with Jim before this?

10 A    No.

11 Q    You had never discussed the Las Vegas show with him before

12 this?

13 A    He knew I went to all the shows, Atlanta --

14 Q    That's what I'm getting at.  It's something that was

15 commonly understood, that you would both go to these shows?

16 A    He wouldn't go, not that I knew of.  I would go on my own.

17 Q    And had he put any limitation on you when you went to the

18 Las Vegas show that you couldn't purchase anything other than

19 his Emerson Creek Pottery pottery?

20 A    No.

21 Q    Were there any limitations placed on what third-party

22 pottery that you could purchase?

23 A    No.

24 Q    Can you pull up -- I'm going to pull up what was marked as

25 Plaintiff's 36.  And I'm not sure if it was actually admitted

C. Demiduk - Direct

1  in this way, but I'm going to do it this way anyway.

2      I want to show you what was marked -- what is marked as

3  Plaintiff's Exhibit Number 36 for identification, and ask you

4  if you know what this is?

5  A    This is the order that I would do to send to Jim.

6  Q    And can you scroll down for me, Mike.  Or scroll up,

7  excuse me.

8          ATTORNEY1:  Which page do you want?

9          MR. MCLAUGHLIN:  2.

10 Q    Can you tell from this when it was made?

11     It's okay.  I'll withdraw it because I can do this in a

12 much easier way.

13     When is the last time that you made an order with Jim?

14 A    2017.

15 Q    Do you know when?

16 A    I think we placed the order -- we got an order in July.

17 Q    And what was the purpose of the order?

18 A    It was for, I believe, the restaurant.

19 Q    And what were you specifically ordering for the

20 restaurant?

21 A    More flower pots, I believe.

22 Q    And did -- and at the time that you placed the order in

23 July of 2017, were there any discussions between yourself and

24 Jim Leavitt or anyone at Emerson Creek Pottery in Bedford,

25 Virginia, with respect to the continued use of "Emerson Creek

C. Demiduk - Direct

1  Pottery & Tearoom" with respect to your business?

2  A    No.

3  Q    And were you given any indication that any time between

4  July 17, 2017 and January 5th, 2018 when the demand letter

5  came, that you would be demanded not to continue using that

6  name?

7  A    No.

8  Q    And were there any discussions in which you were going to

9  be told -- were there any demands made upon your continued sale

10 of the pottery?

11 A    No.

12        MR. WILLETT:  Object to the form.  Leading.  I think

13 this is --

14        MR. MCLAUGHLIN:  "Were there any limitations placed

15 upon your."  That opens it up to her, Your Honor.

16 A    No.

17        THE COURT:  It's leading.  So.

18  BY MR. MCLAUGHLIN:

19 Q    Well, what limitations, if any, were placed upon you

20 between January 17th, 2017 and January 5th, 2018 with respect

21 to your ability to sell Emerson Creek Pottery pottery in your

22 shop?

23 A    None.

24 Q    And what limitations, if any, were placed upon you between

25 January 17th, 2017 and January 5th, 2018 with respect to your

C. Demiduk - Cross

1   ability to use Emerson Creek Pottery pottery in the tearoom?

2   A     None.

3   Q     And what limitations if any between January -- July 17th,

4   2017 and January 5th, 2018 in your ability to serve food on

5   Emerson Creek pottery in the tearoom?

6   A     None.

7           MR. MCLAUGHLIN:  Give me a moment, Your Honor.  I

8   just want to make sure.  I'm looking back at some other notes.

9           No other questions, Your Honor.

10          THE COURT:  Do you want to get started?  You've got

11  ten minutes.

12          MR. WILLETT:  I defer to you, Your Honor.  If you

13  want me to get started, I'm happy to.

14          THE COURT:  Let's get started because we don't have

15  much time tomorrow.

16                      CROSS-EXAMINATION

17   BY MR. WILLETT:

18  Q     Good afternoon, Ms. Demiduk.  I'll take you back to some

19  things you've discussed recently in response to

20  Mr. McLaughlin's questions.

21          For starters, can I direct your attention to -- well,

22  before I do that, you were referencing the Las Vegas show, the

23  one that occurred in 2018.  Do you recall that testimony just a

24  few minutes ago?

25  A     Yes.

1  Q    And you and Mr. Demiduk did go to that show, correct?

2  A    Yes.

3  Q    I believe, but tell me if I misheard, that you said you

4  were not aware that Emerson Creek had participated in that show

5  before; is that your testimony?

6  A    Right.

7  Q    Let me direct your attention to Exhibit 45.  This is a

8  previously admitted exhibit.  If Ashley will scroll down a

9  little bit, this is a -- go back up just a little bit -- this

10  is an email from Jim Leavitt to yourself dated January 27,

11  2017.  Do you see that?

12  A    Yes.

13  Q    And you received this email, ma'am?

14  A    I believe so.

15  Q    And the first question is:  "Did you see our showroom at

16  Las Vegas?"

17       Do you see that?

18  A    Yes.

19  Q    And then if you go down from there he says -- and just to

20  be clear, this was January 27 of 2017, and so about a year

21  before the 2018 show, correct?

22  A    Yes.

23  Q    And if we look at the next paragraph there, it says,

24  "Also, we need to be sure to talk about nomenclature on the

25  web.  Some of your references are not 'Emerson Creek

1   Pottery & Tearoom,' but only 'Emerson Creek' or 'Emerson Creek

2   Pottery,' which is causing problems with our website."  Do you

3   see that?

4   A    Yes.

5   Q    And so you knew that as of January 27th, 2017 Mr. Leavitt

6   had some concern with you holding yourself out as "Emerson

7   Creek Pottery" without the "and tearoom," correct?

8   A    Yes.

9   Q    Now, if we could go to Exhibit 10.  And this is the

10  document we've seen a couple times, the one that Mr. McLaughlin

11  just showed you.  This is the form that was submitted or the

12  application that was submitted for the 2018 show, correct?

13  A    Yes.

14  Q    Listing your company and David Demiduk's company as

15  "Emerson Creek Pottery," without the "and Tearoom," correct?

16  A    Yes.

17  Q    Next, I want to look at the -- let's go back to the

18  picture we just looked at.  I'm just going to try and go

19  backwards here, the wedding picture that we looked at.  It was

20  Defendants' 42 and it's one that we introduced as well.

21  Plaintiff's Exhibit 13.  Do you see that?

22  A    Yes.

23  Q    I just want to be clear.  This document you understand was

24  found on the www.emersoncreek.com and it says slash

25  barn-weddings/spring website for your company, correct?

1  A     Yes.

2  Q     And so you agree that this would have been on the website,

3  one of the gallery photos as of August 5th, 2021?

4  A     Yes.

5  Q     And when is it that you believe this photograph was taken?

6  A     Maybe ten years ago.

7  Q     Ten years ago?

8  A     Yeah.

9  Q     Now, do you know who took this photograph?  Ashley, if you

10 could scroll down a little bit?

11 A     Maybe Joy Lyn.

12 Q     Why is it you believe it was taken ten years ago?

13 A     I believe that's when the wedding was -- or that's -- I

14 don't know exactly, but we had that photo for a long time.

15 Q     You think it was a long time; is that your testimony?

16 A     Yes.

17 Q     Next I'm going to ask Ashley to pull up Joy Lyn's website

18 for us.

19       This is the photographer, Joy Lyn Photography?

20 A     Yes.

21 Q     And Ashley, if you can scroll down.  First of all, we have

22 at the top there from June 3, 2016, "posted in Joy Lin

23 Weddings," and above that do you see "River and Allison"?

24 A     Yes.

25 Q     "Emerson Creek Pottery and Tearoom Wedding," do you see

1  that?

2  A    Yes.

3  Q    And Ashley, if you'll scroll down a little bit.  Keep

4  going.  These are pictures from the wedding.  This is all

5  happening -- by the way, all of these pictures are -- slow down

6  real quick, Ashley.  This is at the property at Emerson Creek?

7  A    Yes.

8  Q    In Oswego?

9  A    Yes.

10 Q    And keep going, Ashley.  Go back up a little bit.  One

11 more.  And that's at the property as well?

12 A    Yes.

13 Q    That's outside the tearoom or the restaurant?

14 A    Yes.

15 Q    What was it called at that point?  In June of 2016 what

16 was it called?

17 A    Emerson Creek.  It was called the Tearoom.

18 Q    It was called the Tearoom at that time?

19 A    Yeah.

20 Q    Emerson Creek Pottery & Tearoom?

21 A    Yes.

22 Q    And keep going down, Ashley.  And then it looks like

23 that's not exactly the photo.  That looks like one -- I think

24 that might be it.  Do you think that's the photo we just saw?

25 A    Yes.

1  Q    Okay.  And so this would have been in June of 2016,

2  roughly about a little over a year and a half before the cease

3  and desist letter that we saw?

4  A    Yes.

5  Q    Thank you.  Next I want to talk about the -- go to

6  Defendants' Exhibit 56.  Ashley is going to kill me, but go

7  back to the wedding picture real quick.  Those are Emerson

8  Creek Pottery flower pots?

9  A    Yes.

10 Q    Now go back to Exhibit 56.  Looking at Exhibit -- I'm

11 sorry.  I may have written the wrong number.  Bear with me.

12      I'm sorry, Ashley.  If you'll go to -- oh, it's Exhibit 1,

13 I'm sorry, Defendants' Exhibit 1.

14      All right.  This was an image that had been shown to you,

15 and it's got the capture date of May the 2nd, 2019.  Do you see

16 that at the top?

17 A    Yes.

18 Q    All right.  And that's -- at the time it was the

19 ecreekpotteryandtearoom.com website?

20 A    Yes.

21 Q    This was vintage weddings.  And I believe Mr. McLaughlin

22 asked you to look at this and identify whether or not you saw

23 any pottery on this, correct?

24 A    No.  But it wasn't vintage -- we -- this is our page, but

25 right now it's not a vintage wedding going on.

C. Demiduk - Cross

1    Q    A vintage market?

2    A    Exactly.

3    Q    Okay.  If I said wedding, I apologize.

4         And if you'll scroll down, Ashley, this was the document

5    we just went through and Mr. McLaughlin asked you if you could

6    identify any pottery, correct?

7    A    Yes.

8    Q    And Ashley, if you would just scroll down to the bottom of

9    this.  You didn't see any pottery here?

10   A    No.

11   Q    Next -- go on to the bottom to make sure we hit

12   everything.  Next -- well, go back up real quick.  At the time

13   there you've got the hours.  This is for the shop.  At the time

14   that was what had been the Emerson Creek Pottery shop?

15   A    Yes.

16   Q    And next, Ashley, if you can pull up Exhibit 234.  This is

17   Plaintiff's Exhibit 234.

18             THE COURT:  I'll tell you what, we'll stop.

19             MR. WILLETT:  Can I show this one, Judge?  Actually,

20   never mind.  I'll be in the way of people leaving.  So I don't

21   want to do that.

22             THE COURT:  Members of the jury, you may retire and

23   are excused until tomorrow morning at 9:30.  Return to the same

24   place.  And of course I'll tell you not to discuss the case

25   with anyone or allow anyone to discuss it with you.  Or remain

1   within the hearing of anyone discussing it.

2           Hold just a minute.

3           You all go ahead, but just a minute.

4   **(Jury out, 4:58 p.m.)**

5           THE COURT:  All right.  We posted the proposed jury

6   instructions.  It's not the final.  I would like for you all to

7   look at them overnight and we meet at 9:15.  And if you have

8   any objections you wish to raise, I think we can get that.

9           Where do we stand on time now?  How many more

10  witnesses do you have?

11          MR. MCLAUGHLIN:  So we -- she was our primary

12  witness.  Since we've kind of covered a lot, if I call Dave

13  back for any reason, it would be very minimal.  I don't even

14  think I probably will.  We have Ron Wehrli, which is going to

15  be about five minutes just to establish the nonexistence really

16  of this agreement because we can't get a stipulation on it.  I

17  would think that's about it, right?

18          MR. WILLETT:  And we'll have -- you agreed that I

19  could go a little bit beyond cross with Mr. Wehrli.

20          MR. MCLAUGHLIN:  But it's going to be 15, 20 minutes.

21          MR. WILLETT:  Yeah, it's not going to be very long.

22          THE COURT:  The jury has to have some time to

23  deliberate if you're going to finish tomorrow.

24          MR. WILLETT:  Understood.

25          MR. MCLAUGHLIN:  Unless you would stipulate that he

1  would say he never received it.  I don't see you stipulating to

2  that, but that's the only reason we would call him is to say he

3  never received the agreement.

4       MR. WILLETT:  I would stipulate to what he -- I'm

5  still going to call him.  I would stipulate that he said what

6  he said in his deposition, which is he doesn't recall.

7       MR. MCLAUGHLIN:  That's the only reason that we would

8  call him is basically for him to affirmatively state that.

9  Beyond that, we don't have any purpose to call him.  I want to

10  be mindful of the Judge, but --

11       MR. WILLETT:  We're still probably talking about a

12  30-minute exchange.

13       MR. MCLAUGHLIN:  We'll get it done fast.  I would say

14  that at this point, what have we got, maybe cross and

15  everything, two hours?

16       MR. WILLETT:  Yeah, we may have a very brief rebuttal

17  on a couple of points.

18       THE COURT:  Okay.  I don't know what this jury -- we

19  told them they'll be through tomorrow.  I don't know where

20  they're -- some of them may have plans on Monday that we would

21  have to excuse.  We have two alternates.  Bear that in mind.

22       MR. MCLAUGHLIN:  Is there anything else we can do?

23       THE COURT:  We'll recess.

24       MR. MCLAUGHLIN:  We'll talk about it, Judge.

25  (Proceedings adjourned, 5:01 p.m.)

1            C E R T I F I C A T E

2        I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3    the United States District Court for the Western District of

4    Virginia, appointed pursuant to the provisions of Title 28,

5    United States Code, Section 753, do hereby certify that the

6    foregoing is a correct transcript of the proceedings reported

7    by me using the stenotype reporting method in conjunction

8    with computer-aided transcription, and that same is a

9    true and correct transcript to the best of my ability and

10   understanding.

11       I further certify that the transcript fees and format

12   comply with those prescribed by the Court and the Judicial

13   Conference of the United States.

14       /s/ Lisa M. Blair              Date: March 9, 2022

15

16

17

18

19

20

21

22

23

24

25