Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.,
6:20cv54, 2/25/2022

1          UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF VIRGINIA
2              LYNCHBURG DIVISION

3  ************************************************************

4  EMERSON CREEK POTTERY, INC. CIVIL CASE NO.: 6:20CV54
                           FEBRUARY 25, 2022, 9:14 A.M.
5                          JURY TRIAL, DAY 4
        Plaintiff,
6  vs.

7  EMERSON CREEK EVENTS, INC., Before:
   ET AL.,                   HONORABLE NORMAN K. MOON
8                            UNITED STATES DISTRICT JUDGE
        Defendants.          WESTERN DISTRICT OF VIRGINIA
9
   ************************************************************
10 APPEARANCES:

11 For the Plaintiff:        HENRY IRVING WILLETT, III, ESQUIRE
                           Christian and Barton, LLP
12                         909 East Main Street, Suite 1200
                           Richmond, VA  23219
13
                           GARFIELD BERNARD GOODRUM, ESQUIRE
14                         Garfield Goodrum, Design Law
                           90 Canal Street, 4th Floor
15                         Boston, MA  02114

16 For the Defendants:       KENNETH S. MCLAUGHLIN, JR., ESQUIRE
                           Law Offices of McLaughlin &
17                         Associates, P.C.
                           1 E. Benton Street, Suite 301
18                         Aurora, IL  60505

19                         LAWRENCE E. LAUBSCHER, JR., ESQUIRE
                           Laubscher & Laubscher, PC
20                         1160 Spa Road, Suite 2B
                           Annapolis, MD  21403
21

22 Court Reporter:  Lisa M. Blair, RPR, RMR, CRR, FOCR
                      255 West Main Street, Suite 304
23                    Charlottesville, Virginia  22902
                      434.296.9284
24

         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25 TRANSCRIPT PRODUCED BY COMPUTER.

INDEX OF WITNESSES

WITNESSES ON BEHALF OF THE DEFENDANTS:                     PAGE

CHRISTINA DEMIDUK

 Cross-Examination by Mr. Laubscher                         14
 Redirect Examination by Mr. Willett                       118

CLOSING ARGUMENTS:

 On behalf of the plaintiff by Mr. Willett                163

 On behalf of the defendant by Mr. Laubscher              186

INDEX OF EXHIBITS

EXHIBITS ON BEHALF OF THE PLAINTIFF:

| EXHIBIT: | Marked | Received |
|---|---|---|
| 255 | 35 | 35 |
| 67 | 44 | 44 |
| 168 | 98 | 98 |
| 210 | 107 | 107 |

1  (Proceedings commenced, 9:14 a.m.)

2        THE COURT:  I take it you all have had an opportunity

3 to look at the instructions and verdict form.  We received the

4 suggestions by the plaintiff.

5        Why don't we start with the defendant, if you all

6 have anything.

7        Did you send the defendant your changes?  Did you all

8 see them?

9        MR. GOODRUM:  Yes, Your Honor.  We copied them on the

10 email.

11        MR. MCLAUGHLIN:  I did not see the email.  I was

12 looking at emails.  If it was sent, it would have been sent

13 very recently.  We have changes as well which we can send to

14 Your Honor.  I think for the most part we're fine with what you

15 proposed.  We had some issues with maybe the language.

16        THE COURT:  Why don't we -- say what you --

17        MR. MCLAUGHLIN:  I was going to say most issues had

18 to do with language about what is a trademark and definitions;

19 but otherwise, we can send you our changes really quick, and

20 maybe we can go with that.

21        THE COURT:  Okay.  I just want to be sure we're all

22 on the same page.

23        MR. GOODRUM:  I don't think we are, Your Honor.

24        Mr. McLaughlin, are you saying that you made changes

25 to the revisions Mr. Duda sent around yesterday?

1          MR. MCLAUGHLIN:  I'm saying that we, last night when

2     we were looking at the proposed instructions provided, we've

3     made redline changes of what we would propose to those.  We

4     haven't submitted anything, but we've looked at that.

5          THE COURT:  Okay.  That's what I'd like for you --

6     we'd like for you to get that straightened out now.  I don't

7     want to keep the jury waiting while I'm talking about

8     instructions.

9          MR. MCLAUGHLIN:  We can email them to you in a few

10     seconds.

11          MR. GOODRUM:  I hit "reply all" to Mr. Duda's email,

12     I believe.

13          THE COURT:  You can take your mask off.  I can't

14     understand.

15          MR. GOODRUM:  Sorry, Your Honor.  I ran up that hill.

16     I can't believe I'm still standing.

17          I hit "reply all" to Mr. Duda's email this morning

18     with our changes that you all have now.

19          MR. MCLAUGHLIN:  I'll be back, Your Honor.

20          THE COURT:  I mean, if we have any disputes over the

21     law, I want to be sure we've got that straight.

22          MR. LAUBSCHER:  I could have Mr. Goodrum's email, but

23     we hadn't seen it until just now.

24          MR. MCLAUGHLIN:  Judge, I don't have Internet

25     connection.  I really did not see it.

1          MR. GOODRUM:  Your Honor, the bulk of our changes

2     were just adding back in several points -- not all the points,

3     but several points from what we proposed a week or two ago.  So

4     it was just adding, but not everything.

5          MR. MCLAUGHLIN:  I see it was sent about 8:45.  We

6     were already in the room reviewing our own changes.  So we can

7     send those to Your Honor.  Like I said, overall we were okay

8     with the instructions.

9          THE COURT:  Okay.  We'll do that, then.

10          All right.  Is there anything we can do to iron out

11     any major issues before the jury gets back?  I'd like to sort

12     of hit the ground running after, because we've got to give the

13     jury some time to deliberate.

14          MR. MCLAUGHLIN:  We're going to make your life easy,

15     Your Honor.  As soon as the cross is done with Ms. Demiduk,

16     we're going to rest.  We think we'll be ready to go to closing

17     arguments.  So we have time.

18          MR. WILLETT:  That sounds -- then we should be ready

19     for closings at that point in time, subject to the discussion

20     of -- we should be ready for closings at that time subject to

21     any motions and then the jury instructions.

22          MR. GOODRUM:  So will we do jury instructions now or

23     will we do them after?

24          THE COURT:  Well, I wanted to take up the jury

25     instructions now because -- so we wouldn't be -- that's why I

1  came early.

2          MR. GOODRUM:  Yes, Your Honor.  We're ready.

3          MR. MCLAUGHLIN:  It's being emailed right now.  Like

4  I said, we don't have substantial changes to what you proposed.

5  I don't know if they do.

6          THE COURT:  If the plaintiff then would just tell us

7  any changes.

8          MR. GOODRUM:  Yes, Your Honor.  Starting on page 3,

9  there's a change to -- I'm sorry, page 3 of the verdict form,

10  there is a change, just to clarify, that question 9 should be

11  asked, if there was sale of third-party pottery --

12          MR. MCLAUGHLIN:  I'm sorry, I didn't mean to cut you

13  off, Garfield.  Could we maybe pull it up on the screen,

14  because I can't see redline changes on the phone.  Because of

15  Internet issues, we cannot see them.

16          THE COURT:  I can't hear.

17          MR. GOODRUM:  I'm sorry, Your Honor.  I'm not hooked

18  into the system.

19          THE COURT:  What instruction are you on?

20          MR. GOODRUM:  I was on the verdict form.  We can go

21  to the instructions.  Let's go to the jury form.

22          MR. WILLETT:  She can put it on the screen.

23          MR. GOODRUM:  The first one, Your Honor, is -- it's

24  actually to question 1.  And it recognizes on the verdict form

25  it's an addition that says, "Given that parties do not contest

1   that plaintiff owns the trademark Emerson Creek Pottery,

2   comma," and this echoes what's in the instructions already and

3   what defendants have said.  And it just clarifies it a little.

4   I'm just emailing this again to get this up on the screen.

5           So again, it's question 1 on the form.  And it's --

6   the addition is, "Given that the parties do not contest that

7   plaintiff owns the trademark Emerson Creek Pottery, comma, does

8   plaintiff," etc.  And that just copies language from -- I

9   believe from Instruction 1 in the instruction form.  It just

10  clarifies it.

11          MR. LAUBSCHER:  The email that I have doesn't show

12  the changes.

13          MR. GOODRUM:  You have to hit "view" on your phone.

14          MR. LAUBSCHER:  I only have the final version.  I

15  don't have a redline version.

16          MR. GOODRUM:  You have to hit your view.

17          MR. MCLAUGHLIN:  We appreciate you sent it at 8:46.

18  We haven't had a chance to do it.  We understand what you're

19  saying.  If we could send this to you, would you be able to do

20  the same on our side?  If we were able to send it to you, would

21  you be able to do the same thing with our set?

22          MR. GOODRUM:  The ELMO.  We can use the ELMO.

23          THE CLERK:  There it is.

24          MR. GOODRUM:  There we go.  Sorry about that.  So

25  again, as Mr. Duda I believe acknowledged, this change on

1  question 1 in the verdict form merely carries over language

2  that's in the corresponding instruction number 11.  "Given that

3  the parties do not contest that plaintiff owns the trademark

4  Emerson Creek Pottery, comma, does," etc, etc.  And that's the

5  language in jury instruction 11.

6           THE COURT:  Any problem with that?

7           MR. MCLAUGHLIN:  We are going to have some problems,

8  Your Honor.  The way that the language was read with respect to

9  the trademark Emerson Creek Pottery, we don't disagree that

10  it's for pottery, but I think it's important for the jury to

11  understand that that is the limitation.  We don't concede in

12  any way that they have a registered trademark for Emerson Creek

13  Pottery for anything outside of pottery.  And then we've asked

14  for --

15           THE COURT:  Does that say -- isn't that what it says,

16  that they have the trademark for Emerson Creek Pottery?  Does

17  plaintiff have --

18           MR. MCLAUGHLIN:  Right.  So for this jury who is

19  hearing trademark law for the first time, we don't want them to

20  be confused to think that maybe a trademark for, quote, any

21  name in and of itself creates some superior rights to all other

22  subsequent users.  We want to clarify pottery.  And that way

23  when we say wedding services, that makes a distinction.

24           MR. GOODRUM:  It does say that.  This is the language

25  in the instruction.  It says pottery.

1    THE COURT:  Let me look at the suggestion and we'll

2 give it -- however I decide.  It does get a little

3 argumentative.  The questions I think ought to be pretty

4 straightforward and not suggest anything.

5    MR. GOODRUM:  Okay, Your Honor.

6    That might be -- let's see.  Then question 9 -- and

7 in the version I emailed this morning, there is punctuation

8 changes.  There is a colon and a semicolon in each clause.  But

9 it essentially recognized -- it says, "Only answer question 9

10 if you find that defendants did not have a license" -- "number

11 1, did not have a license to use plaintiff's trademark; number

12 2, violated the license if defendants sold third-party pottery;

13 or 3, that defendants continued to use plaintiff's mark after

14 revocation."

15    And there's another slight change.  It's "and/or"

16 right there.

17    And this recognizes that infringement can be found in

18 two separate areas:  Post-termination continued use, as well as

19 pretermination sale of third-party pottery.  We pled from

20 the -- you know, from the complaint that the sale of

21 third-party pottery pretermination of our alleged license is

22 infringement because it's beyond the scope of the license.  I

23 mean, it's forbidden in our view.

24    So this just clarifies that there are two real

25 instances where there could be infringement.  If you find that

defendants had a license, the first is defendants violated the

license for third-party pottery pre-revocation -- or

pretermination -- or that they, two, continued to use the mark

after termination of the license.

MR. MCLAUGHLIN: So the problem with this proposed

language, Your Honor, is you've already asked the jury to

consider if there was a license. So the jury would consider

the scope of the license. By adding this additional language,

it actually includes a term that the jury is already

considering. And what it does is it takes it out of the

consideration of the jury. Basically it says that if you found

that they were selling third-party pottery, that that was a

violation.

As you recall, our intention was that the sale of

third-party pottery was never an issue between these parties.

So if they're considering the license issue generally, they're

going to consider the scope, which would include third-party

pottery. By highlighting it, it makes the jury now have to

focus on an aspect of that license that may or may not exist.

THE COURT: You have no objection to it as stated?

MR. MCLAUGHLIN: On that one, I don't think we had

any objection.

MR. GOODRUM: We're contending the exact opposite, of

course. We pled and elicited evidence that sale prior to

termination is infringement. It's very clear. Beyond the

scope of the license.  We said that from day 1.  It's why we're
here.

MR. MCLAUGHLIN:  We can now pull up his own version
if you'd like to see our redline.  I don't know how we can do
this.  It's kind of a back-and-forth.  We'll work with Your
Honor.

As I've mentioned, our main issues have to do with
making sure the jury understands that they decide these issues
and that they understand the definitions.  We don't think that
any kind of hyper-focus on issues is going to be appropriate
for the jury.  It's already difficult enough for them to
consider trademark law.

MR. GOODRUM:  By that reasoning, we should take out
the remaining clause.  I mean, there are two species of
infringement here.  It's very clear:  Sale of third-party
pottery when the license was affected prior to termination; and
then the second submission is really all post-termination use.
I mean, they're separate and different, but fully equal
categories or species of infringement.  So by --

THE COURT:  Was it real clear that they had no right
to sell what they had purchased?

MR. GOODRUM:  That's right, Your Honor.  That's
absolutely right.  I mean, they would have a right, and we
wouldn't have a problem if they took that third-party pottery
off site to a bizarre or to a thrift store or something else.

1  The issue is they're selling it under our trademark.

2          MR. MCLAUGHLIN:  But that's the issue in this case

3  that the jury could decide, because we say that we're not.

4          MR. GOODRUM:  That's right.  Which they should award

5  damages upon.  It's one of our claims.

6          MR. MCLAUGHLIN:  But we don't sit on the jury.

7          MR. GOODRUM:  We ask the jury to decide the evidence

8  we put in front of them.  We've put evidence in front of them

9  that the pretermination sale of third-party pottery is

10  infringement.

11          I mean, if they had stopped using at termination

12  completely, they had stopped using, there would be no

13  infringement post termination.  But there certainly would

14  remain infringement pretermination by selling that third-party

15  pottery without us knowing.  They're two separate -- it's like

16  two apples hanging on the same tree.

17          THE COURT:  Well, do we know how much was sold?

18          MR. GOODRUM:  Yes, we do.  We don't know with

19  specificity, but we certainly have gross numbers we tried to

20  get with specificity but --

21          THE COURT:  Okay.  I've heard enough of this right

22  now.  We'll have to take it up later.

23          MR. GOODRUM:  Yes, Your Honor.

24          THE COURT:  Is the jury all ready?

25          COURT SECURITY OFFICER:  Yes, sir.

1        MR. GOODRUM:  And very quickly --

2        THE COURT:  Well, look, the jury is back.  They're

3   ready.  So we may as well let them come on in, and maybe we can

4   take this up at lunch.

5        MR. WILLETT:  Judge, can we have two minutes before

6   they come in?

7            (Off the record).

8        THE COURT:  Could you all docket your objections?

9        MR. MCLAUGHLIN:  Our assistant is trying to make sure

10  they get there.

11       THE COURT:  Let's have the witness return to the

12  witness stand.

13           (Off the record).

14       THE COURT:  Ready to call the jury back.

15  (Jury in, 9:45 a.m.)

16       THE COURT:  Members of the jury, we apologize for the

17  delay.  Overnight they came in to work on the heating and air

18  and unplugged the cables at the tables here, the electricity.

19  So it had to be restored.  Sorry about that.  Go ahead.

20                      CROSS-EXAMINATION

21   BY MR. WILLETT:

22  Q    Good morning, Ms. Demiduk.

23  A    Good morning.

24  Q    When we were speaking last night, we had just looked at

25  Defendants' Exhibit 1.

1    MR. WILLETT:  Ashley, can you pull that up for us.

2  Q    Just to refresh, this is a document Mr. McLaughlin had

3  shown you yesterday?

4  A    Yes.

5  Q    He had scrolled through the document, which Ashley will do

6  now, and you had not seen Emerson Creek pottery -- a picture of

7  pottery on this website, correct?

8  A    No.

9  Q    And when you say "no," you mean that you do not see any

10  pottery; is that correct?

11  A    Yes.

12  Q    And if you will --

13    MR. WILLETT:  Ashley, go to the top again to look at

14  the date of this.

15  Q    Do you see that date at the upper -- I'm going to put an

16  arrow right there, 5-2-2019, the date that this was accessed?

17  A    Yes.

18  Q    Again, this is for the ecreekpotteryandtearoom.com

19  website?

20  A    Yes.

21    MR. WILLETT:  If we can go -- next Ashley, if we

22  could go to Exhibit 234.  This has been previously admitted.

23  This is Plaintiff's 234.

24  A    I have a question.

25  Q    Yes.

1  A    I'm just not sure if we did events back then.  I would

2  have to -- I'm not sure if we did events in 2019.

3  Q    In 2019?

4  A    Yes.

5  Q    Meaning held events during that year?

6  A    Meaning vintage market.

7           MR. WILLETT:  Bear with me.

8           All right.  Ashley, if you could actually scroll down

9  a little bit on this page for Ms. Demiduk to 2019 market dates.

10  Q    Ms. Demiduk, do you see what's depicted on the screen in

11  front of you?

12  A    Yes.

13  Q    That says 2019 market dates, correct --

14  A    Correct.

15  Q    -- on select Wednesday.  And then it lists June 12th, July

16  10th, August 14th, September 11th, and October the 9th,

17  correct?

18  A    Yes.

19  Q    And it also says $5 admission per car; is that correct?

20  A    Yes.

21  Q    And you charged for parking?

22  A    Yes.

23  Q    Did the funds that were charged for parking, did those go

24  to the Events -- Emerson Creek Events or to Countryview

25  Pottery?

1  A    I'm not sure.

2            MR. WILLETT:  Next, Ashley, if you could go to --

3            (Overlapping speakers.)

4  A    Can I --

5  Q    I'm sorry?

6  A    I just didn't know where that -- I don't know if we did

7  events in 2019.  So I'm not sure about that.

8  Q    Do you think that --

9  A    It could be -- could we look where that came from or --

10           MR. WILLETT:  Ashley, can you go back to Exhibit 1,

11 please.

12           THE WITNESS:  Just wondering when that was -- I just

13 don't remember that on our website at all.  And in 2019 we did

14 not have any of that drapery up there, the lace drapery.  So

15 that was for Dave and I's wedding.  So I'm just making a point.

16  BY MR. WILLETT:

17 Q    That the photo may not have been from 2019, but clearly

18 you were marketing a vintage market to occur on the dates that

19 we just looked at, correct?

20 A    I'm not sure if it was in 2019.

21 Q    Okay.  And again, you see the website there,

22 www.ecreekpotteryandtearoom.com.  That website,

23 ecreekpotteryandtearoom.com, that was active in May of 2019,

24 correct?

25 A    I'm not sure what our website was back then.  So I'm not

1  sure if that is the correct website.

2  Q    You're not sure.

3       Well, you saw some email correspondence yesterday with

4  Lindsay Winkler where there is a discussion on April the 23rd

5  of 2019 about obtaining a new URL.

6       Do you recall that?

7  A    Yes.

8  Q    And ultimately you obtained www.emersoncreek.com, correct?

9  A    Yes.

10 Q    And that became your website?

11 A    Yes.

12 Q    Do you know if that became your website within nine

13 days of -- or within -- yeah, do you know if that became your

14 website, yeah, within nine days of April the 23rd, 2019?

15 A    I'm not sure.  I'm just -- just the whole thing doesn't

16 connect.

17 Q    Okay.  Including -- if Ashley will scroll back down

18 again -- the whole thing doesn't connect, including the dates

19 that appear there, the 2019 market dates, that doesn't connect

20 for you either, ma'am?

21 A    I'm not sure what year those dates were.

22 Q    You're not sure what date 2019 is?  I'm not sure I

23 understand.

24 A    I guess I don't remember all -- I know that photo is an

25 older photo.  I don't believe we had that on the website.

1  Q    Let's look at Plaintiff's Exhibit 234.

2       Now, if you look at this, ma'am, if Ashley will scroll

3  down a little bit and blow up the date on this document that's

4  already been admitted.

5       And do you see the date there, 10/1/2019?

6  A    Yes.

7  Q    So it's a little bit later that same year, correct --

8  about five months later, in fact?

9  A    Yes.

10  Q    And do you recognize what's depicted in this photo, ma'am?

11  A    What are you referring to, can I ask?

12  Q    What's -- this is part of the tearoom facility or

13  restaurant facility?

14  A    Yes, it is.

15  Q    And if Ashley will scroll down, and that's also something

16  that's depicted -- that's a picture of the restaurant?

17  A    Yes.

18  Q    Ashley, if you'll keep scrolling down.

19  A    And --

20  Q    Keep going there.

21  A    Can I ask a question?

22  Q    And that's -- well, unfortunately --

23  A    Okay.

24  Q    -- we're trying to get this done.  I think I need to keep

25  asking the questions.  But you can tell your lawyer something

C. Demiduk - Cross

1  and he can ask a question of you later maybe.

2  A    Okay.

3  Q    If you look at the table there, that's the restaurant,

4  correct?

5  A    In what year is that?  So I'm just wondering what --

6  Q    Yeah, so if Ashley will scroll down to the right-hand

7  corner of that image and show the image -- the year that was

8  captured, which is 10-1-2019.

9       Do you see that?

10 A    Okay.  So --

11 Q    So if Ashley will scroll back up.

12 A    Yes.

13          MR. WILLETT:  And then go down to the next photo,

14 Ashley.

15 Q    Same thing, 10-1-2019?

16      Do you see that?

17 A    Okay.

18 Q    And is that also the restaurant or cafe?

19 A    It is, but I don't believe that was from 2019.  I don't

20 know if that's the picture that goes with 2019.

21 Q    Okay.  So are you saying you don't believe that this image

22 was captured from your website in 2019?

23 A    I don't know, because I have no idea.  I don't remember on

24 our website having the wedding poster there.  So I don't know

25 where this image came from.

C. Demiduk - Cross

1    Q    Well, let me ask you this --

2         MR. WILLETT:  If you go into the -- on the right of

3    the fireplace there, Ashley, focus in on that.

4    Q    Look on the wall there.

5         Do you see that?

6    A    Yes.

7    Q    Okay.  And there's some sort of rack, and it's hanging

8    square plates.

9         Do you see that?

10   A    Yes.

11   Q    And those square plates, those were made by Emerson Creek?

12   A    Yes.

13   Q    And if you look up on the table there, there is some -- it

14   looks like maybe a sugar bowl and salt and pepper shaker with

15   the American flag on it.

16        Do you see that?

17   A    Yes.

18   Q    And that was made by Emerson Creek as well?

19   A    Yes.

20        MR. WILLETT:  Ashley, if you will just keep scrolling

21   down through this document.  Stop right there.

22   Q    And that also depicts a picture of the restaurant or cafe?

23   A    Yes.

24   Q    At Emerson Creek?

25   A    Yes.

1  Q    And if you'd look in the top of that --

2         MR. WILLETT:  Ashley, focus in on those sort of oval

3  plates there.

4  Q    There's a rack holding those.  And those are -- that's

5  Emerson Creek pottery?

6  A    Yes.

7         MR. WILLETT:  All right.  We're done with that,

8  Ashley.

9  Q    You testified yesterday that the last order you placed for

10 pottery was in July of 2017.  Do you recall that testimony?

11 A    Yes.

12 Q    Okay.  And that -- you testified something to the effect

13 that when you placed that order, you didn't have any

14 indications that you might not be able to use the name Emerson

15 Creek, something to that effect.  And I know I'm not getting it

16 exactly straight.

17 A    I'm not sure exactly when we placed -- what date.  I

18 believe when I placed the order, I would have never placed an

19 order if Jim or I had a dispute.  I mean, up until we received

20 a phone call -- I don't know what date that was -- this is four

21 years of working on this.  I don't remember exactly the date.

22 So if you -- I would have never placed an order if -- and I

23 don't think Jim would have made me an order if he was having

24 problems, or if he thought -- I mean, we got a letter saying:

25 You have to change your name.  I'm like, okay, that is our

1   name, Emerson Creek.

2       So if you just let me know when Jim made the phone call or

3   when he sent the email, that would be great.

4   Q    Well, let me ask this:  Did you -- last night did you look

5   at any documents or any information?

6   A    No.

7   Q    So you didn't try and check and see when dates were, or

8   when you might have said something?

9   A    No.  When I left here -- yeah.

10  Q    Understood.  Let me ask you this:  The order that you

11  placed in July of 2017, that was for pottery that would be used

12  in the restaurant, correct?

13  A    Correct.

14  Q    And you were pretty -- about that yesterday.  That was an

15  order for pottery?

16  A    I would like to see the order.  I'm not sure how many I

17  ordered, if it was for the shop, if it was for the restaurant.

18  I don't know how many flowerpots, and if they had holes or not

19  holes.  But there should be an invoice.

20  Q    This is Plaintiff's 36.  This is a document that you

21  looked at yesterday.  And this is the one you were looking at

22  when you testified, correct, that it was an order that you

23  placed for items to be used in the restaurant?

24  A    Okay.

25  Q    So just first question, ma'am:  Is this the document that

C. Demiduk - Cross

1   was shown to you yesterday by your counsel when you testified

2   that this was an order placed for use in the restaurant,

3   correct?

4   A    I testified it, but I --

5   Q    I'm asking you a yes-or-no question, ma'am.  This is the

6   document that the jury saw and that you looked at yesterday

7   when Mr. McLaughlin asked you the question, and you answered

8   that these were items ordered for the restaurant, correct?

9   A    I don't remember if this was exactly that order.  We

10  looked at a lot of things yesterday.  So I can't say that I

11  know this is the exact order that I placed -- that I saw

12  yesterday.

13       Can you go down more?

14  Q    Yes.  Absolutely.

15  A    I -- seriously, I just -- there's no date on here.  So I

16  don't know if this is the order.

17       So I'm questioning, too, where this order came from,

18  who -- I'm just wondering where this order came from.  I

19  thought I just ordered flowerpots, but if we -- there's no date

20  on here.

21  Q    All right.  But again, this is the same document you were

22  shown yesterday.  You agree with that?

23  A    I don't know if it's the same exact --

24            MR. MCLAUGHLIN:  Just to speed it along, we stipulate

25  that's the September -- that's the July 17, 2017 order.

1        MR. WILLETT:  Thank you.  I appreciate that.

2        MR. MCLAUGHLIN:  I didn't want to interrupt your

3   questioning.

4    BY MR. WILLETT:

5   Q    No.  No.  No.  I just wanted to make sure that I wasn't

6   missing something, that this is the document that when

7   Mr. McLaughlin asked you questions, it was the order placed by

8   the restaurant.  Let me ask you a couple of questions about

9   this, since you've made this an issue now.

10       Chili bowls, do you use chili bowls in the restaurant?

11  A    We do not use chili bowls.  I don't believe we use chili

12  bowls.

13  Q    Do you use -- now, let me ask you this:  It says,

14  "cereal."  It says, "dessert."  What does that mean, do you

15  know, when it says cereal bowl?

16  A    That's cereal.

17  Q    What's dessert?

18  A    A dessert bowl.

19  Q    Could "chili" be a design for a bowl?

20  A    No.

21  Q    Who places the orders for you, ma'am?

22  A    Karla helps me.

23  Q    Karla helps you and Karla places the orders --

24  A    Yeah.

25  Q    -- as of July of 2017?

1   A    Yeah.

2        I have one question.  The soap dish --

3   Q    Ma'am, we are trying to get this case through.  And it's

4   going to really help me if I can ask you the questions, and

5   your counsel will have an opportunity to ask you further

6   questions after I am done.

7   A    Right.

8   Q    If you look at -- under coffee and tea mugs, do you use

9   coffee and tea mugs in the tearoom?

10  A    We do.

11       MR. WILLETT:  Ashley, if you'll scroll up a little

12  bit.  Keep going.

13  Q    Salt and peppershaker sets, do you use those in the

14  Tearoom?

15  A    Salt and pepper, we do.

16       MR. WILLETT:  And Ashley, you can take that off.

17  Q    Now, this order was placed in July of 2017.  The --

18  A    I don't know if that order was placed.  I --

19  Q    Your counsel has just stipulated to that.  So --

20       MR. MCLAUGHLIN:  We stipulate that's the July 17th,

21  2017 order.

22  Q    Okay.  So the restaurant was open in July through the

23  season of 2017, correct?

24  A    Yes.

25  Q    The restaurant was open in 2018, correct?

1  A    Correct.

2  Q    The restaurant was open in 2019, correct?

3  A    Yes.

4  Q    And the restaurant has opened in 2021?

5  A    It opened in 2021, yes.

6  Q    Thank you.

7       Now, regarding the timing, you understood that -- and I'll

8  show you these documents if it will help refresh your

9  recollection -- that from Exhibit 45 there is a January 27th

10 email to you where Mr. Leavitt raised the issue of needing to

11 include "and tearoom" after "Emerson Creek Pottery."

12      That was in January of 2017.  Do you recall that?

13          MR. WILLETT:  Ashley will pull that up for us,

14 Exhibit 45, page 1.  Go down a little bit.

15 Q    You do recall this email, correct?

16 A    (Witness perusing document).

17      Yes.

18 Q    And then after this issue when it came to issues related

19 to naming, your husband, Dave, ultimately responded to

20 Mr. Leavitt on February the 27th.  It's here on PDF page 4.

21 This is page 4 of Exhibit 45.

22      And Dave Demiduk responded regarding the naming issue,

23 correct?

24 A    Yes.

25 Q    And so later that summer do you recall that Mr. Leavitt

1  provided you with something called a licensing agreement -- or

2  license agreement.

3      Do you recall that?

4  A   Can you show me the document?

5  Q   I can't.  I don't have that document.

6  A   What document?

7  Q   Well --

8  A   There was no agreement.

9  Q   This is something that he proposed to you based on some

10 discussions he had had with Mr. Demiduk.

11     And my question is:  Do you recall ever seeing a proposed

12 license agreement that Mr. Leavitt provided to Mr. Demiduk, and

13 that you and he discussed?

14 A   I -- if I could see the document, that would be great,

15 because I can't say -- without seeing it, I can't say I saw it.

16 Q   Understood.

17     So do you recall ever discussing a proposed license

18 agreement with Mr. Leavitt?

19 A   No.

20 Q   While he pulls that up, it's previously been admitted in

21 evidence.  If we can look at the document that's on the screen

22 there.

23     Do you see that?

24 A   Yes.

25 Q   Okay.  And there is an email from Mr. Leavitt to you dated

1  July 25, 2017.  And in it he says, "Hi, Chris, have you had

2  time to review and sign the contract I sent?  Hoping to get

3  this concluded shortly."

4      Do you see that?

5  A    Yes.  But I don't remember Jim's email.

6  Q    My question is:  Do you see that?  This is an email that

7  you would have received from Mr. Leavitt, correct?

8  A    I guess so.  Does it have -- I guess so.

9  Q    Well, this is a forward.  So the problem with forwards is

10  they don't always have -- so what I've got is this is a long

11  string of emails, right?  So when you have a long string of

12  emails, they don't always have the attachment.

13  A    It just looks weird because it's crooked on the page.

14  Q    Well, it does look weird, doesn't it?

15      MR. WILLETT:  Ashley, if you can scroll up a little

16  bit.

17  A    It looks weird that it was like --

18  Q    So it does look weird.  If you look at the top, it has

19  your lawyer's name, correct?

20  A    Yes.

21  Q    And then below that it has from Dave Demiduk to Ken

22  McLaughlin on October the 4th, 2021 copying Mr. Laubscher.

23      Do you see that?

24  A    There's a lot of attachments here.  So I'm not quite sure

25  how -- I mean, there's a lot of attachments.  So this seems

1  very odd to me.

2  Q    What I was going to explain to you, ma'am, is that this

3  is -- in the discovery process, there was a request for emails.

4       Do you recall that?

5  A    Yes.

6  Q    Okay.  And do you recall that for a while, no emails were

7  produced?

8            MR. MCLAUGHLIN:  Objection, Your Honor.  Can we do a

9  sidebar on this specific issue?

10           MR. WILLETT:  Please.

11           MR. MCLAUGHLIN:  Thank you.

12           (Sidebar commenced.)

13           MR. MCLAUGHLIN:  So the issue isn't -- so when we

14  produced these documents, they were a series of settlement

15  negotiations that everybody knew about.

16           MR. WILLETT:  This is not settlement.

17           MR. MCLAUGHLIN:  It was, because it was proposed.  I

18  don't have a problem if he asks if they had reached an

19  agreement or not, but I think if he's going to suggest --

20           THE COURT:  She's playing around with it.  She seems

21  to be --

22           MR. MCLAUGHLIN:  No, I understand.

23           THE COURT:  That's a problem.  She's not cooperating.

24           MR. MCLAUGHLIN:  I understand.  There's not going to

25  be an issue that that was forwarded or anything.  I think she's

C. Demiduk - Cross

1  just saying if I'm going to -- I want to see it.

2          MR. WILLETT:  And I'll provide a copy of the

3  agreement.  I want to get her to understand that's not --

4          (Overlapping speakers.)

5          (Reporter clarification.)

6          MR. MCLAUGHLIN:  She's very nervous, obviously.  I

7  think that she just doesn't want to be tricked into answering

8  something that she hasn't seen.  That's all.

9          THE COURT:  Well, what's the solution to it?

10         MR. MCLAUGHLIN:  If he can show it --

11         MR. WILLETT:  I will show her the agreement.  But I

12  want to finish my question on the fact that she understands

13  that there were emails that were produced in October, and that

14  that was something that was forwarded by counsel, that that's

15  not my fault that it appears like that.  I'm not going to ask

16  much on that.

17         MR. MCLAUGHLIN:  We're not raising that issue.

18         MR. WILLETT:  She has raised that issue and implied

19  that in front of the jury, and I think I should be able to

20  address that.

21         THE COURT:  Okay.  Do that.

22         (Sidebar concluded.)

23  BY MR. WILLETT:

24  Q    Ms. Demiduk, the point I was making is that you understand

25  that there were emails that were requested in discovery in this

1  matter, correct?

2  A    We turned over a lot of emails, yes.

3  Q    Well, you turned over a lot of emails in October of 2021,

4  correct?

5  A    I guess so.

6  Q    And I can take you back.  You recall that I deposed you,

7  for example, on September the 27th of 2021, correct?

8  A    What do you mean by that?

9  Q    I took your deposition.  You may recall that we sat in a

10  room in Mr. McLaughlin's office?

11  A    Of course.

12  Q    And I took your deposition for a long period of time?

13  A    Yes.

14  Q    And it was on video.

15       Do you recall that?

16  A    Yes.

17  Q    And during that deposition I asked you specifically if you

18  had any email correspondence.  And at that time you did not,

19  correct?

20  A    Correct.

21  Q    And so it wasn't until after your deposition that some

22  emails were forwarded by Dave Demiduk to counsel on October the

23  4th, 2021.  And the reason this has a lot of forwards is

24  because it's been produced or forwarded to your counsel,

25  correct?

1  A    I don't know.

2  Q    Well, you can see at the top that Dave Demiduk sent this

3  to Ken McLaughlin and Larry Laubscher on October the 4th, 2021?

4  A    Right.

5  Q    Do you see that?

6  A    I don't remember.  I can see it.

7        MR. MCLAUGHLIN:  Mr. Willett, we stipulate that the

8  emails were forwarded.  I don't think it's an issue.  She's

9  nervous, I understand, but we stipulate to that.

10  BY MR. WILLETT:

11  Q    I'm just trying to clarify.  Can you see that on your

12  screen?

13  A    I can see it, but it's different attachments, different --

14        THE COURT:  Well, the point is:  He didn't do that.

15  Did your side send him the emails the way they appear on the

16  screen?

17        THE WITNESS:  Okay.

18        THE COURT:  That's what I think you stipulated to.

19        MR. MCLAUGHLIN:  Right.  There is no dispute that

20  these were forwarded.

21        THE COURT:  Right.

22        MR. MCLAUGHLIN:  Your Honor, I apologize.  I just

23  think she's very nervous.  I apologize, Your Honor.  She's just

24  very nervous.

25  BY MR. WILLETT:

1    Q    To your other point --

2            MR. WILLETT:  Go back down a little bit, Ashley, on

3    that email.

4    Q    Do you agree that this was an email that Mr. Leavitt sent

5    to you that asked if you had time to review and sign the

6    contract yet.  You see that language, correct?

7    A    Yes.

8    Q    By the way, if you look at the next line down there, this

9    is July 25th, 2017.  Mr. Leavitt says, "Your order should be

10   ready to go out soon."

11           Do you see that?

12   A    Yes.

13   Q    Now, Ashley is going to put on the screen -- this is a

14   document that has not previously been admitted.  This is a

15   draft agreement.  And just ask you -- and she can scroll

16   through this agreement.

17           THE CLERK:  Was this previously admitted?

18           MR. WILLETT:  This is not previously admitted and

19   it's not numbered, so it would be a new number.

20    BY MR. WILLETT:

21   Q    Have you seen this document before?

22   A    First I'm going to read through it to make sure I've seen

23   it.

24   Q    Yes.  Absolutely.

25   A    (Witness perusing document).

C. Demiduk - Cross

1      Okay.  Can I make a comment on the first paragraph?

2           MR. MCLAUGHLIN:  Just answer his question.

3    BY MR. WILLETT:

4    Q    My question right now is just:  Is this the agreement that

5    you had seen?

6    A    I can't remember the exact -- if this is the exact

7    agreement.

8    Q    Do you recall seeing an agreement that looked like this,

9    some sort of draft agreement?

10          MR. WILLETT:  Ashley, go back up to the top.

11   Q    Do you recall seeing a draft agreement that was provided

12   to you?

13   A    I remember something like this, but I don't remember that

14   Jim had a trademark Emerson Creek.  And also I don't -- ECP had

15   given Ms. Demiduk permission to offer --

16          THE COURT:  Did you ever see anything that looked

17   similar to this?

18          THE WITNESS:  Yes.

19          THE COURT:  Okay.

20          MR. WILLETT:  I'd move for admission of this as

21   Plaintiff's 240 --

22          THE CLERK:  255.

23          MR. WILLETT:  255.  Thank you.

24          (Plaintiff Exhibit 255 marked.)

25          (Plaintiff Exhibit 255 admitted.)

1  BY MR. WILLETT:

2  Q    And do you recall ever -- you can go on to the next one.

3  I'm done with that.

4       Do you recall ever having a conversation with Mr. Leavitt

5  about a document that looked like that, a draft license

6  agreement, in the summer of 2017?

7  A    I don't remember having a conversation about that.  I know

8  when we received it -- I don't remember having a conversation.

9  Q    But you do -- you do recall receiving it.  You just don't

10  know whether you ever had a conversation with Mr. Leavitt about

11  it?

12  A    Yes.

13  Q    And you don't have a recollection of telling Mr. Leavitt

14  that you would sign some form of license agreement as of July

15  of 2017?

16  A    I never had signed anything and never -- no.

17  Q    I'm not saying -- to be clear, my question is not whether

18  you signed anything in 2017.

19       My question is whether you had a telephone conversation

20  with Mr. Leavitt where you said that you would sign or were

21  agreeable to signing an agreement if your husband and your

22  counsel agreed?

23  A    No.  I don't remember anything like that.

24  Q    And in fact, you don't remember having any conversation

25  with Mr. Leavitt is your testimony, correct, about the

C. Demiduk - Cross

1  agreement?

2  A    There was never an agreement.

3  Q    But you don't recall ever having a conversation with

4  Mr. Leavitt about a draft agreement about this document that we

5  just saw?

6  A    No.

7  Q    Do you recall at any point in time -- I'm not going to

8  show you the letter, but do you recall that your counsel

9  provided a written response to this agreement, sent a letter

10 to --

11         MR. MCLAUGHLIN:  Objection, Your Honor.  Sidebar,

12 please, on this particular issue.

13         (Sidebar commenced.)

14         MR. MCLAUGHLIN:  I didn't know he was going to go

15 here.  So what happened is they had filed an application in

16 April of 2017 in which they were trying to do an intent to use

17 on the same service we had.  The letter was to Mr. Goodrum

18 stating there's a problem with this.  We're going to file on

19 opposition.

20         So it gets into settlement negotiations.  I'm telling

21 you what the time period was going back and forth.  They are in

22 the form of settlement negotiations.  I didn't think he was

23 going to go there, but he is.  I think at this point we're

24 getting into dangerous territory.

25         MR. WILLETT:  All I want to establish is her

knowledge of the fact that she said as if it was out of the blue --

THE COURT: Said what?

MR. WILLETT: She testified yesterday that she placed the order in July and had no idea that she would ever have -- that anyone would ever tell her she couldn't use the name Emerson Creek. And my only point is she knew that there were ongoing discussions between the parties. And I just want to qualify the dates -- the fact that she knew those discussions. I'm not going to show her the document and I'm not going to get into the content. By the way, the response was to Mr. Leavitt.

MR. MCLAUGHLIN: Okay. But what I'm getting at is this: Is that the timing of things is you're going to have -- there was an April application, a 1B application for weddings. Then after -- there's things going on. Then through a response saying, you know, what's going on here? So a lot of those discussions in the second half were really settlement, trying to say, look, we're not trying to hurry each other. We're trying to get results. I just think we're going to go down that settlement territory where we're not going to be able to retract it.

THE COURT: He has a right to impeach her. She said she didn't know something else today, and he has evidence that she did.

MR. MCLAUGHLIN: We already have in January he had

1  raised this emersoncreekpottery.com and tearoom.  What she said

2  is I would have never ordered an order of pottery if he was

3  going to take everything away from us.

4          MR. WILLETT:  You asked one more question -- or maybe

5  she answered beyond it, because she said -- like it was out of

6  the blue that January the 5th, 2018 she got the cease and

7  desist letter.  She's already testified to that, and I have a

8  right to cross-examine her on that.

9          THE COURT:  Well, you can ask her that.

10          MR. MCLAUGHLIN:  I'm just saying we're going to get

11  into a point where we're going into settlement.

12          THE COURT:  Well, don't.

13          MR. WILLETT:  I'm not going to go too far.

14          (Sidebar concluded.)

15          MR. WILLETT:  Your Honor, can I ask Mr. McLaughlin

16  one question just to avoid more of this.

17          (Off the record).

18   BY MR. WILLETT:

19  Q    Ms. Demiduk, do you recall yesterday that you testified in

20  response to questions from counsel about the January 5, 2018

21  cease and desist letter.

22       Do you recall that?

23  A    I don't know exactly the date.  But I believe it was sent

24  to our lawyer, to Ken.

25  Q    And did you ever have -- I'm not asking about the content

1  at this point.

2      Did you ever have an opportunity to review a letter that

3  told you that you were no longer permitted to use the Emerson

4  Creek mark or the Emerson Creek Pottery marks?

5      Do you recall that?

6  A    I know we got a letter, my husband had said.  I don't know

7  if I read through it.  I can't remember what it said.  So...

8  Q    You can't remember what it said?

9  A    No.

10 Q    Do you recall ever seeing a letter that directed you that

11 you were to no longer use either the Emerson Creek Pottery mark

12 or the Emerson Creek mark?

13 A    I don't remember exactly what it said.  Dave was handling

14 most of that.

15 Q    When you say "Dave was handling most of that," understood.

16 I'm just asking whether you, as the president and CEO of

17 Countryview Pottery Co., ever received or saw a copy of that

18 letter?

19 A    I can't remember.

20          THE COURT:  Just a minute.  I mean, if you received

21 such a letter, would that be important to you?  I mean, that's

22 what this case is about, I think.

23          THE WITNESS:  I don't --

24          THE COURT:  It's about whether you can use these

25 trademark -- these marks or not.  That's what the case is

1    about.  I'm asking you was that -- would that be important to

2    you --

3                THE WITNESS:  Yes.

4                THE COURT:  -- if you got a letter saying you

5    couldn't use the names you were using in your business?

6                THE WITNESS:  But also --

7                THE COURT:  Well, can you answer my question:  Would

8    it have been important to you if someone told you that you

9    could no longer use Emerson Creek Pottery or Emerson Creek?

10               THE WITNESS:  That's what we -- we built a brand,

11   Emerson Creek.

12               THE COURT:  Well, would it have been important to you

13   if you could no longer use the marks?

14               THE WITNESS:  Yes.

15               THE COURT:  Okay.

16    BY MR. WILLETT:

17   Q    Would it also have been important to you, Ms. Demiduk, if

18   you had received instructions on specific items that needed to

19   be removed from your current website, types of things like

20   coding and other things that needed to be removed from your

21   website; would that have been important to you?

22   A    Yes.  We were doing that.

23   Q    And did you receive a letter that gave you those

24   instructions?

25   A    I don't remember those exact instructions.

C. Demiduk - Cross

1  Q    You don't remember those exact instructions, but you do

2  recall receiving a letter that had some instructions to that

3  effect?

4  A    I don't remember if it had about coding, about removing

5  from our website.

6            MR. WILLETT:  Well, then, at this time, Your Honor, I

7  would like to present the witness with a document.  It's a

8  redacted version of a letter that we discussed yesterday, and

9  it is redacted only to include those.

10           MR. MCLAUGHLIN:  Judge, can we have a sidebar.  It's

11  an issue that was supposed to be resolved yesterday.

12           (Sidebar commenced.)

13           MR. MCLAUGHLIN:  I don't want to belabor this.  The

14  issue -- it was sent to --

15           (Reporter clarification.)

16           MR. MCLAUGHLIN:  The document sent to Mr. Goodrum

17  literally is a 408 communication.  Again, it's a cease and

18  desist.  That part of it is fine.  The more we get into this

19  letter --

20           THE COURT:  Well, this witness, I mean, I don't want

21  to say somebody is not telling the truth --

22           MR. MCLAUGHLIN:  I understand.

23           THE COURT:  But my God, I mean, why is she --

24           MR. MCLAUGHLIN:  I don't understand.

25           THE COURT:  Why is she defending the case?  She can't

C. Demiduk - Cross

1  even remember that?

2         MR. MCLAUGHLIN:  I don't know what's going on.  I

3  think she's just -- she's so intimidated by what's going on, I

4  think she's shutting down.  If you want to take a two-minute

5  recess, I can kind of tell her, look, we've got to get through

6  this.  I don't know.  I think she's getting overwhelmed by the

7  process.  She's having almost like a panic attack.  I can't

8  tell the jury that, but I think that's what's going on.

9         THE COURT:  Just the sentence --

10        MR. WILLETT:  It's like one sentence just saying

11  that.

12        THE COURT:  Show her.

13        MR. MCLAUGHLIN:  She's -- I think she's just

14  getting -- I know it's not your fault, but I think that's --

15        MR. WILLETT:  I'm not objecting if you tell me -- if

16  they need to take a recess, I'm not objecting to taking

17  a recess.

18        MR. MCLAUGHLIN:  Let me just get her calmed down.

19        (Sidebar concluded.)

20   BY MR. WILLETT:

21  Q   Just so the jury can see, can you just go to the date of

22  the document?  This is the January 5, 2008 document.  It's been

23  redacted.

24        MR. WILLETT:  Then if you just go down, Ashley, a

25  little bit.

1  Q    Do you see that language on the screen, ma'am?

2  A    Yes.

3  Q    My question is:  If you take a look at that and the date

4  of the letter, do you recall whether or not you were provided

5  with a copy of this letter or saw a copy of this letter?

6  A    I honestly can't remember.  My husband might have shown

7  me.  And we started doing this right away in 2017.

8           MR. WILLETT:  I want to publish this to the jury, but

9  I want to redact one more thing, because I do -- to be

10 cognizant of what we represented, I want to redact that

11 sentence right there.

12          MR. MCLAUGHLIN:  I'm okay with what you're doing,

13 Henry.

14          MR. WILLETT:  At this point I'd move for admission of

15 this redacted version of Plaintiff's 67.

16          MR. MCLAUGHLIN:  No objection, Your Honor.

17          THE COURT:  Be admitted.

18          (Plaintiff Exhibit 67 marked.)

19          (Plaintiff Exhibit 67 admitted.)

20  BY MR. WILLETT:

21 Q    And if you could go to the top again, Ashley.

22      Do you see the date again on this letter, January 5, 2018,

23 and then the regard line, "Termination of trademark license

24 between Emerson Creek Pottery, Inc. and Chris Demiduk."

25      Do you see that, correct?

C. Demiduk - Cross

1  A    Yes.

2          MR. WILLETT:  And Ashley, if you'd go down to that

3  paragraph.

4  Q    And you can see that paragraph, correct?

5  A    Yes.

6  Q    It says, "Emerson Creek demands that your clients

7  immediately cease and desist from all use of Emerson Creek

8  trademark in all forms, including social media; e.g., Facebook,

9  etc., and immediately remove the Emerson Creek Pottery

10 trademark from their market trade show registration and email

11 address."

12         Do you see that?

13 A    Yes.

14 Q    And does this help refresh your recollection as to whether

15 or not you would have ever seen a copy of this letter?

16 A    I -- I can't remember, but --

17         MR. MCLAUGHLIN:  Stipulated, Your Honor.

18         MR. WILLETT:  Do you still want to take a recess?

19         MR. MCLAUGHLIN:  I think it would be --

20         MR. WILLETT:  I have no objection to their request,

21 Your Honor.  We can take a brief recess.

22         THE COURT:  Members of the jury, we'll take a short

23 recess now, 15 minutes.

24 **(Jury out, 10:30 a.m.)**

25         (Recess.)

C. Demiduk - Cross

1        THE COURT:  If all the jurors are ready, we can bring

2    them back.

3    **(Jury in, 10:44 a.m.)**

4        THE COURT:  All right.  You may be seated.  Thank

5    you.

6     BY MR. WILLETT:

7    Q    Ms. Demiduk, if I can next direct your attention to

8    Defendants' Exhibit 62.

9        Do you know what this document is?

10   A    Yes.

11   Q    It was a listing of expenses that had been incurred by

12   your company, correct?

13   A    Yes.

14   Q    And if you look at the upper left-hand corner there, it

15   says, "Emerson Creek Pottery & Tearoom" right above that arrow.

16       Do you see that?

17   A    Yes.

18   Q    And am I correct to say that these were expenses

19   associated with Emerson Creek Pottery & Tearoom?

20   A    Yes.

21   Q    And we'll scroll down a little bit.  Just to refresh

22   everyone, this was a document you were shown yesterday by

23   Mr. McLaughlin?

24   A    Yes.

25   Q    And in being shown this document, he went all the way down

1  I think and showed you the total amount, and asked you if

2  Mr. Leavitt or Emerson Creek had ever paid you for any of these

3  expenses that you had incurred.

4       Do you remember that?

5  A    Yes.

6  Q    And you testified that he had not paid you for any of

7  these, correct?

8  A    Yes.

9  Q    So let me direct your attention --

10       MR. WILLETT:  And Ashley, go all the way down to the

11  end of this one, 2018, 2019.  And stop right there.

12 Q    It was for $85,951.  Do you see that?

13 A    Yes.

14 Q    If you look by my arrow it says, "Total for Emerson Creek

15 Pottery & Tearoom"?

16 A    Yes.

17 Q    Great.  Now, if we go back to page 5 of the document, and

18 assuming that my notes are correct, I'm going to see if Ashley

19 can direct me to the -- maybe down a little bit.  Here we go.

20       Right here, do you see that?

21 A    Yes.

22 Q    Color copies, cookbooks, 76 pages plus covers -- and then

23 it has a price and some other information -- of $1,868.

24       Do you see that?

25 A    Yes.

1  Q    Do you know if the cookbook that it refers to there is

2  this cookbook which was previously marked as Exhibit -- I can't

3  remember -- 33.  Exhibit 3.  Sorry.  Exhibit 3.

4       This book, you're familiar with this?

5  A    Yes.

6  Q    We actually saw some excerpts of this, some revisions, but

7  this is the cookbook that -- and we can pull it up, Plaintiff's

8  33.

9       But this is the cookbook that you put together at some

10 point back around -- I think around 2014; is that your

11 recollection?

12 A    Yes.

13 Q    And if we look at the first page, flip that open.  And if

14 you look at "simple ways, simple days."

15      Do you see that?

16 A    Yes.

17 Q    "This has been our purpose from the moment we polished our

18 first plank in the century-old farmhouse to establishing our

19 Emerson Creek Pottery shop in 2000."

20      Do you see that?  I'll point it out right here.  I'm sorry

21 if I read it wrong.

22      "This has been our purpose from the moment we polished our

23 first plank in the century-old farmhouse to establishing our

24 Emerson Creek Pottery shop in 2000."

25      Do you see that?

1  A    Yes.   That's what it says.

2  Q    And then the next sentence, if you could read that for me.

3  A    Yes.   It says, "At the cornerstone of our business for 14

4  years, the pottery shop serves as our ambassador distributing

5  Emerson Creek Pottery, which is handcrafted in Bedford,

6  Virginia."

7  Q    And that's referring to the pottery made by Mr. Leavitt,

8  correct?

9  A    Yes.

10  Q    And then if you look below that it says, "Our expansion to

11  the tearoom, beautifully appointed bran, brick-paved patio and

12  reception pavilion further provides a place where customers

13  gather for a homemade meal, couples exchange vows, companies

14  unite to relax and unwind, and families and friends gather to

15  celebrate life."

16        Do you see that?

17  A    Yes.

18  Q    And that's text that you either wrote yourself or

19  authorized someone to write for you, correct?

20  A    Yes.

21        MR. WILLETT:  And if we flip to the next page.  Just

22  keep going through that, Ashley.  We have some recipes.  Go

23  back up there -- I'm sorry, to the picture of the bowl.  Down.

24  You would think we would get this straight by now.

25  Q    That is Emerson Creek Pottery?

C. Demiduk - Cross

1  A     Yes.

2  Q     Now, let me direct your attention back to Exhibit 62.

3  These are the expenses that you were noting had not been paid

4  by Mr. Leavitt.

5       Now, I'm going to clear that.  Go back to the cookbook.

6  If you look there, 10-1-2014, now, you recall providing a

7  sample of the cookbook to Mr. Leavitt, correct?

8  A     Yes.

9  Q     And you also recall, as I think you testified yesterday,

10 that you actually -- that Mr. Leavitt sold some of these in his

11 shop?

12 A     I can't remember.  I guess he did.

13 Q     I'm just asking do you have a recollection one way or

14 another of whether he sold some of these in his shop?

15 A     I don't remember if he sold them.

16 Q     Give me just a minute here.

17      Do you ever recall providing copies of this to Mr. Leavitt

18 that you sold to him at wholesale so he could sell in the shop?

19 A     I don't remember.

20 Q     What was the wholesale price of the cookbook?

21 A     It changed from $10 to $12, I believe.

22 Q     And do you ever recall -- you recall giving Mr. Leavitt a

23 sample.  Do you ever recall just giving him a bunch of

24 cookbooks that he could sell for himself in his shop in

25 Bedford?

1  A    I don't remember that.

2  Q    You don't remember one way or another?

3  A    No.

4  Q    All right.  So let me next direct your attention to page 6

5  of 35.

6       And specifically, I want to ask you about the -- so we've

7  got some references to the vintage market fliers, correct?

8       Do you see that?

9  A    Yes.

10  Q    And then we've got some place mats.  That would be for the

11  restaurant?

12  A    Yes.

13  Q    Reservation forms; would that be for the restaurant?

14  A    Yes.

15            MR. WILLETT:  And if we scroll down a little bit,

16  Ashley.

17  Q    Some more cookbooks there, correct?

18  A    Yes.

19  Q    And then if you look down just a little bit farther, we've

20  got wedding menus.

21       Do you see that?

22  A    Yes.

23  Q    Wedding menus printed 4/4 on 70 pound uncoated text with

24  corner staple, 100 plated, 100 buffet.

25       What is that referring to?

1 A     That is a price card, or that is menus that we printed.

2 We have a caterer that does all of our food.  So it looks

3 like -- so it was menus printed from our caterer to put in the

4 folders for a wedding.

5 Q     That would be food that the folks getting married could

6 then select that they were going to use for their wedding; is

7 that correct?

8 A     Yes.

9 Q     Let me next direct your attention to page 13 of 53, and

10 specifically the reference to "bride guides" here.

11 A     Yes.

12 Q     If you could tell me what a bride guide is?

13 A     It just gives a layout of our barn, just dimensions of our

14 tables, our rules if they're having a wedding at our place, the

15 timeline.

16 Q     When you host a wedding, how many people do you employ for

17 Emerson Creek Events that actually work when you have a

18 wedding?  How many people would that be?

19 A     It depends on the size of the wedding.

20 Q     So you have some that are employees and some that would be

21 independent contractors?

22 A     Yes.

23 Q     How many -- for example, in let's say 2019, how many

24 full-time employees would you have had that work for Emerson

25 Creek Events that would work with weddings?

1  A    Maybe ten.

2  Q    All right.  And in 2019 -- so when you say ten, what would

3  those -- the ten people, would they all -- when you had the

4  actual wedding event, were they all part of the wedding event

5  or were these people taking reservations and things like that?

6  A    They were pretty much on the event side.

7  Q    So you employed the ten people who would always work the

8  weddings and be on the event side; is that correct?

9  A    Yes.  And sometimes if we needed a bartender or something

10  like that, they would -- sometimes people would help us, if we

11  needed it, from the other department, from the restaurant.

12  Q    Okay.  Could come over and help out.

13       Did you sometimes use independent contractors for these

14  purposes?

15  A    We -- yes, for all of our food it was -- the wait staff,

16  all of that, is with the caterer.

17  Q    Now, did you employ the wait staff or did the caterer

18  employ the wait staff?

19  A    The caterer.

20  Q    The caterer did?

21  A    Yes.

22  Q    So the ten people that you employed that worked weddings,

23  what were their job functions?

24  A    From coordinator to stylist to bartenders to our marketing

25  person, our coordinator, our rental department person that

1   would help pull all the rentals, people that would help set up

2   for the wedding, Dave and I.

3   Q    Were you employees?

4   A    Yes.

5   Q    And so -- so did you and Mr. Demiduk, did you receive a

6   salary for this work?

7   A    Yes.

8   Q    In 2019, what was your salary?

9   A    Maybe around 60,000.

10  Q    And do you know what Mr. Demiduk's salary is?

11  A    About the same.

12  Q    Were any of the other employees salaried?

13  A    Yes.

14  Q    Who else would have been salaried?

15  A    We have our coordinator, our stylist, our two sales

16  people, marketing person.

17  Q    Would those folks -- they were salaried employees?

18  A    Yes.

19  Q    And any hourly employees there?

20  A    There would be some hourly employees, yes.

21  Q    So of the ten, some would be salaried and some would be

22  hourly, correct?

23  A    The ten full-time people would be approximately salary.

24  Q    Now, what about for the -- and I'm using 2019 as the

25  example -- for the restaurant, how many folks were employed in

1  the restaurant?

2  A    Maybe 30.

3  Q    30 people at the restaurant.

4       Okay.  And would those folks have been salaried or were

5  they employees -- I mean, were they salaried or hourly --

6  salaries or hourly?

7  A    Hourly.

8  Q    Okay.  They would have been hourly.

9       And then, for example, like wait staff and folks like

10 that, they would have been paid a wage that would accommodate

11 tips or the fact that they would be tipped by patrons, correct?

12 A    Right.

13 Q    Do you know what the hourly rate was for those 30

14 employees?

15 A    If it was 4.95 -- I'm not sure -- 4.85.

16 Q    Something in that range?

17 A    Yes.

18 Q    At that point in time how many folks were employed for the

19 gift shop?

20 A    Maybe three, four.

21 Q    Were those folks hourly or were they salaried?

22 A    Hourly.

23 Q    Now, the gift shop, for example, that was only open

24 typically from May through --

25 A    December.

1  Q    December.

2       But it wasn't open all those months, right?  There was a

3  period of time where, like, it would be closed for certain

4  periods once the weather got a little colder?

5  A    Yes.

6  Q    And do you know when that was typically, or how that

7  scheduled?

8  A    We would close kind of in January, around the beginning of

9  January.

10 Q    And when it was open, how many days a week was the gift

11 shop open?

12 A    It was open five days a week.

13 Q    Five days.

14      And what were the hours typically?

15 A    The hours, usually 10 to 4.

16 Q    And the restaurant would be the same.  It would have --

17 now, would the shift shop stay open completely through

18 December?  Were there any days -- I mean, I know obviously

19 holidays and weekends, but were there any weeks when it would

20 close for any period of time between May and December, other

21 than holidays and weekends?

22 A    No.

23 Q    And the same question for the restaurant:  That would open

24 again in May?

25 A    Usually, yes.

1  Q    Okay.  And what were the hours for the restaurant?

2  A    The restaurant was 11 to 2.

3  Q    11 to 2.  Okay.  So three hours.

4       And how many days a week was the restaurant open?

5  A    The restaurant was open five days.

6  Q    Five days and then the three hours.

7       So I want to direct your attention back briefly to the

8  sheet that we were looking at.  These were the expenses.  And

9  if you go on down, it also lists a look book.

10      What's a look book?

11 A    It is something that we would make to sell our rental

12 pieces.  So the brides could rent from us pieces for the

13 weddings.

14 Q    And then I've got the arrow there.  This one is listed for

15 April 21st, 2018.

16      Do you see that?

17 A    Yes.

18 Q    Now, the letter that we just looked at just a little bit

19 ago was dated -- do you remember the date?

20 A    January 5th, 2018.

21 Q    All right.  And so this -- the production of the look book

22 here, that would have been after that January 5, 2018 date,

23 correct?

24 A    Yes.

25 Q    And if we keep going down the list here -- I'll just let

C. Demiduk - Cross

1  Ashley scroll slowly here.

2          MR. WILLETT:  Keep going.

3  Q    What are the Antigua golf jackets?  What are those?

4  A    That is shirts that we ordered for our staff to wear.

5  Q    And then if we keep going down, again, we've got some more

6  vintage market stuff.

7          MR. WILLETT:  Keep going, Ashley, please.

8  Q    And so, again, we've got here at this point this is an

9  invoice, booklets, and it says "2014-2015 cookbooks."

10         Do you see that listed as of July the 8th, 2018?

11 A    Yes.

12 Q    And that would have been an order for these cookbooks?

13 A    Yes.

14         MR. WILLETT:  Okay.  And Ashley, if you could just go

15 to the bottom of this where this is summarized, the total we

16 looked at a little bit ago.  Right there.

17 Q    And this concludes on April 19th of 2019, correct?

18 A    Yes.

19 Q    And again, April 19th of 2019 is approximately 15 months

20 after you received the cease and desist letter, correct?

21 A    Yes.

22 Q    Okay.  Now, let's go on to Defendants' Exhibit 56.

23         This is an email that -- this is Defendants' Exhibit 56.

24 This was shown to you yesterday by Mr. McLaughlin.

25         Do you see that?

1  A    Yes.

2  Q    Now, this was part of a discussion about changes that were

3  being made to the website.

4      Do you remember that?

5  A    Yes.

6  Q    And the discussion was about changes that were made at the

7  direction of Emerson Creek in Bedford, correct?

8  A    Yes.

9  Q    Let me ask you about this.  If you look at the first

10  paragraph there it says, "We enjoyed working with Tina and

11  Colleen for five years.  They wanted more money, and it was

12  just not there.  And we were also not going to do the Christmas

13  show.  Thank you for working on the requests in the email

14  above.  They want everything with BackRoads off, and I know you

15  are working on it."

16      What is that referring to?

17  A    We were just taking BackRoads Vintage stuff off, I

18  believe, our website.

19  Q    What was BackRoads Vintage?

20  A    It was -- that was a show that we held at Emerson Creek

21  for vendors.

22  Q    Who were Tina and Colleen?

23  A    They were contracted -- they had their own business to run

24  it for us.

25  Q    What was the name of their business?

C. Demiduk - Cross

1    A    Twisted Vintage.

2    Q    And when -- this email reads from you, "They want

3    everything BackRoads off, and I know you are working on it."

4              MR. MCLAUGHLIN:  Your Honor, sidebar, please.

5              THE COURT:  Okay.

6              (Sidebar commenced.)

7              MR. MCLAUGHLIN:  So this appears to be an end run to

8    what we discussed yesterday about the Twisted Vintage copyright

9    issue, and here being brought up for the second time in front

10   of the jury after it's been decided on.

11             MR. WILLETT:  Your Honor, Mr. McLaughlin presented

12   her with this email yesterday.  And he asked her if this

13   related to her instructions about the removing Emerson Creek

14   information from the website where she went on to say --

15             MR. MCLAUGHLIN:  But it does.

16             MR. WILLETT:  Oh, it does.  But it also has in that

17   same email instructions about BackRoads.  And the implication

18   was that this was related to instructions about Emerson Creek

19   and removing that.  The only point I want to make is that has

20   nothing to do with Emerson Creek, and that's the last point

21   I'll make on that.

22             THE COURT:  Okay.

23             MR. MCLAUGHLIN:  Why would he want to bring up that

24   issue for any reason other than to make the implication -- the

25   problem is what they want to do is tie the two together.

1   There's no reason to ask that question.  It's a non-question.

2   The bulk of that obviously has to do with the removal of the

3   stuff with respect to their client.  So the highlight is

4   there's literally no purpose.  It's an end run to the issue I

5   raised yesterday.

6           MR. WILLETT:  You showed your client this document --

7           MR. MCLAUGHLIN:  There are a lot --

8           MR. WILLETT:  -- yesterday after this discussion.

9   And I just want to make that --

10          THE COURT:  All right.  You can make that point.

11          (Sidebar concluded.)

12   BY MR. WILLETT:

13  Q   Ms. Demiduk, I just want to confirm that the instructions

14  with respect to removing the BackRoads information, that had

15  nothing to do with the removal of any Emerson Creek or Emerson

16  Creek Pottery marks or information from your website, correct?

17  A   Yes.

18  Q   Okay.  Thank you.

19      Now, if we go on in that email, it says -- so this is

20  February 19th, 2009 [sic].  So at this point we are about 13

21  months after the cease and desist letter, correct?

22  A   Yes.

23  Q   And it says, "Dave and I are going through the website

24  page by page and making a list.  We have to take out the word

25  'pottery.'"

1    Then it says, "We have been a legal thing with Jim from

2  Emerson Creek in Bedford."

3    And when you say "we have been a legal thing," you mean in

4  a legal thing, is that correct?  You're referring to your

5  issues with Mr. Leavitt, correct?

6  A    Yes.

7  Q    And when you say Jim from Emerson Creek in Bedford,

8  Virginia, you're referring to Mr. Leavitt?

9  A    Yes.

10 Q    Okay.  And you go on to say, "He is very upset that we

11 come up on Google before him."

12    And your purpose in informing Ms. Winkler about the fact

13 that he was upset about the Google listings was to let her know

14 one of his specific issues, right, that he was concerned about

15 the way your website was being picked up on Google versus his

16 website, correct?

17 A    Yes.

18 Q    You communicated this to Ms. Winkler on February the 19th,

19 2009 about 13 months after receiving the cease and desist

20 letter, correct?

21 A    Yes.

22 Q    Now, it goes on to say, "When I started Emerson 18 years

23 ago, he said to call it Emerson Creek Pottery, but the Internet

24 was not what it was 18 years ago."

25    Did I read that correctly?

1  A    Yes.

2  Q    And that "he" is Mr. Leavitt, correct?

3  A    Yes.

4  Q    And when you say, "he said to call it Emerson Creek

5  Pottery," you're referring to your store in Oswego, Illinois,

6  correct?

7  A    Yes.

8  Q    Thank you.  Done with that document.

9        Now, when you testified yesterday you said that with

10  respect to yourself -- the relationship between yourself, Ron

11  Wehrli, and Julie Browman, that you were the merchandiser, that

12  Ron Wehrli was the money guy, and that Julie Browman was the

13  legal person, correct?

14  A    Yes.

15  Q    And I'm correct in stating that Julie Browman was the one

16  who told you that you couldn't call the shop Countryview.  You

17  needed to call it Emerson Creek Pottery; is that correct?

18  A    Yes.

19  Q    And indeed, back in 2001 right before you opened in June,

20  talking the April time frame, you would have preferred to have

21  called it Countryview Pottery, because it's a country view, and

22  that's what you came up with, correct?

23  A    Yes.

24  Q    But Ms. Browman told you -- the legal person, correct?

25  A    Yes.

C. Demiduk - Cross

1  Q    She told you that you had to call it Emerson Creek

2  Pottery, correct?

3  A    She suggested it, yes.

4  Q    Well, you remember that I took your -- well, are you

5  distinguishing between suggesting and telling?  Are you saying

6  that she didn't tell you you had to do that?

7  A    She -- I don't remember her telling me.

8  Q    Bear with me.

9       Just to confirm, I want to make sure I understand

10 correctly.  So are you saying that Ms. Browman never told you

11 at some point in time that you couldn't call it Countryview,

12 that you needed to call it Emerson Creek?  Are you saying she

13 did not say that?

14 A    She did say we need a d/b/a from -- we had Countryview

15 Pottery.

16 Q    I need you to answer my question, ma'am.

17      My question is:  Did Ms. Browman tell you at some point in

18 time that you couldn't call the shop Countryview Pottery, that

19 you needed to call it Emerson Creek Pottery?

20 A    I can't remember.  I -- she suggested, I believe, Emerson

21 Creek Pottery.

22 Q    Do you recall that -- we talked about it a little bit

23 earlier -- that back in September of last year -- back in

24 September of last year, I took your deposition --

25 A    Yes.

1  Q    -- in Aurora --

2  A    Yes.

3  Q    -- in Mr. McLaughlin's office?

4  A    Yes.

5  Q    And in that deposition you were -- we had a court reporter

6  just like Lisa here today, all that.  You were under oath.

7  A    Yes.

8  Q    Do you remember that?

9  A    Yes.

10 Q    Actually, it went over to the second day.  It went over to

11 September the 28th?

12 A    Yes.

13 Q    Now, what I'd ask you to do is Ashley is going to put this

14 on the screen for the lawyers and counsel, and just ask you to

15 confirm that this is what this is.

16         MR. WILLETT:  And Ashley, if you can go to page 346,

17 please.

18 Q    Now I'm not going to make you relive all the testimony,

19 but I do want you to read my question to you starting at 346,

20 line 7 through 346, line 12.

21 A    Okay.  It says, "You said yesterday that Ms. Browman told

22 you at some point that you couldn't call it Countryview

23 Pottery, that you needed to call it Emerson Creek Pottery.  Do

24 you remember this testimony?"

25     "Yes."

1    "Okay. Did Ms. Browman ever provide you an explanation as

2    to why she believed that to be the case?"

3    Q    And you said, "I can't remember," correct?

4    A    Correct.

5    Q    But with respect to my question about your testimony about

6    whether or not she told you that you needed to call it Emerson

7    Creek Pottery, you confirmed that, yes?

8    A    Yes.

9    Q    All right. Now, yesterday there was testimony --

10    actually, we'll just go on to the next thing.

11    Now, let's talk about the meeting that you had with

12    Mr. Leavitt and Mr. Wehrli back at some point in the early

13    2000s. Do you remember what date that meeting was?

14    A    Somewhere in March.

15    Q    Of what year?

16    A    2001.

17    Q    March of 2001.

18    And at that meeting at Emerson Creek it was you,

19    Mr. Wehrli, and Mr. Leavitt; is that correct?

20    A    Yes.

21    Q    And prior to that time you had had an opportunity to visit

22    the shop?

23    A    Yes.

24    Q    And at that meeting you actually got to see the shop, as

25    well as the warehouse facilities, correct?

1  A    Yes.

2  Q    And you talked to Mr. Leavitt about an idea that you had

3  for possibly opening a shop in Oswego, Illinois, correct?

4  A    Yes.

5  Q    And you specifically -- I think you testified to this

6  yesterday -- you told him that you wanted to close in January

7  and reopen in May, because you and your boyfriend, Mr. Wehrli,

8  liked to travel and go to Florida and do things like that,

9  correct?

10  A    Yes.

11  Q    And in fact at that point I asked -- you had visited twice

12  before that, and at least one of those times had been with his

13  sister?

14  A    Yes.

15  Q    And then -- now, let me ask you this:  Had you yourself

16  purchased any Emerson Creek pottery prior to that time?

17  A    Yes.

18  Q    And in fact, you had purchased the pinecone pattern of

19  something; is that correct?

20  A    Yes.

21       MR. WILLETT:  And if Ashley will pull up real quick

22  Exhibit 79.

23  Q    And I just want this for the limited purpose:  Is that the

24  pinecone pattern?

25  A    Yes.

1  Q    Okay.  Great.  Thank you.

2       Now, at the time that you talked about purchasing the

3  property in Oswego with Mr. Wehrli, when was that purchase

4  made?

5  A    I think in the '90s.

6  Q    You think the purchase was in the '90s, like maybe in the

7  late '90s or something?

8  A    Yes.

9  Q    And by that I think you had mentioned to Mr. McLaughlin

10 that you had been to the store maybe at least ten years prior

11 to that for your first visit; is that correct?

12 A    Yes.

13 Q    And I'm also correct to say that at the time you purchased

14 the pottery, that you had been wanting to open some kind of

15 store.  So that's why you went to -- you asked the owners if

16 they would be interested -- I'm sorry.  Strike that.

17      When you purchased the farm, meaning the farm in Oswego,

18 you bought it because you had the idea of recreating what you

19 had seen at Emerson Creek in Oswego.  You had that idea when

20 you actually purchased the property; is that correct?

21 A    No.

22 Q    Let me direct your attention to Exhibit 15.  And if Ashley

23 can -- you've seen this.

24      This is your website from 2009, correct?

25 A    Yes.

1  Q    And this was the ecreekpotteryandtearoom.com website,

2  correct?

3  A    Yes.

4  Q    And that's a new website in 2009, because before you had a

5  different URL, correct?

6  A    Yes.

7  Q    And if we blow up the "our story" tab there.

8       Do you see that?

9  A    Yes.

10 Q    It says, "our story."  And if you could read that for

11 me -- if you could actually read that first paragraph?

12 A    "We bought the farm with an idea in mind that we got while

13 we were visiting Virginia.  We ran across Emerson Creek Pottery

14 in Virginia.  They make the pottery there and each piece is

15 hand painted to this day.  We had to travel down a long gravel

16 road.  We got there, which led to an old country farmhouse

17 where the pottery is sold.  It is a destination in itself, like

18 our shop and tearoom, and people love going there."

19 Q    And so just to confirm, in that first sentence where I

20 have the arrows, "we bought the farm with an idea in mind that

21 we got while visiting Virginia."

22      Did I read that correctly?

23 A    Yes.

24 Q    So you believe that at the time -- at least what you're

25 communicating here, right?  This is on your website?

1  A    Yes.

2  Q    And this "our story" was on there long before 2009, right?

3  It was part of prior iterations of the website, correct?

4  A    Yes.

5  Q    And so when you redid the website in 2009, this was one of

6  the things that was included in that redo was the "our story"

7  description that you had previously used, correct?

8  A    Yes.  Someone wrote this, the content.

9  Q    Something else wrote the content?

10 A    Yeah.

11 Q    Who is the -- as of 2009, you're the president of

12 Countryview Pottery Co., correct?

13 A    Yes.

14 Q    And you approved the content of the website, correct?

15 A    Yes.

16 Q    You did, right?

17      All right.  And so -- and I'm correct in stating that

18 what's being communicated here is that the farm was bought with

19 the idea in mind that you had obtained while visiting Virginia

20 and running across Emerson Creek Pottery in Bedford, Virginia,

21 correct?

22 A    That's what it says.

23 Q    That's what it says.

24      I mean, are you saying that's incorrect?

25 A    We -- I -- no, I'm not saying it's incorrect.

1  Q    So that is a true statement.  You had the idea for opening

2  a shop; and you had visited Bedford, Virginia; and you wanted

3  to create that in Oswego, Illinois.  And you went and you found

4  some property with Mr. Wehrli with that idea in mind.  That's

5  correct?

6  A    We found the pottery and I wanted to open a shop, and we

7  had owned the farm.

8  Q    Well, but to be clear, are you saying -- I just want to

9  make sure I understand your testimony, ma'am.

10       You're saying, "we had owned the farm."  Are you saying

11  you owned the farm before you got the idea that's stated here

12  in our story?  Is that your testimony?

13  A    Yes.

14  Q    So -- okay.  Before we do that, if you go down to the

15  second paragraph here you say, "we thought we could create the

16  same effect here and share the peace and quiet of the country

17  with others."

18       Do you see that?

19  A    Yes.

20  Q    But again, it's your testimony that you had already

21  purchased the farm and then you visited Emerson Creek, correct?

22  A    Yes.

23  Q    Okay.  So this information contained in "our story" that's

24  on your website is incorrect?

25  A    No.

C. Demiduk - Cross

1  Q    Well, it says, "we bought the farm with an idea in mind

2  that we got while visiting Virginia."

3       And you're telling me that you bought the farm before you

4  visited Emerson Creek; isn't that your testimony?

5  A    Yes.

6  Q    Okay.  So that means that first sentence is incorrect?

7  A    We had owned the farm in -- yes.

8  Q    What is yes?  You're agreeing that the sentence is

9  incorrect?

10 A    No.

11 Q    So maybe that was my bad question.  When you say no, I had

12 asked you are you saying that the sentence is -- well, now I

13 can't remember what my question was, I apologize, because we've

14 gone in circles with this.  I want to make sure I understand.

15      Is that sentence correct, yes or no?

16 A    I did not write this sentence, but that's what it says.

17 Q    Is it factually accurate is my simple question?

18      MR. MCLAUGHLIN:  I appreciate Mr. Willett's wanting

19 to go through the "our story."  It's a matter of record that

20 it's on there.  The issues in this case don't -- aren't

21 involving 2000 --

22      THE COURT:  Well, he can ask the witness if it's true

23 or not.  I mean, she should know.

24      MR. MCLAUGHLIN:  But to hyper-analyze the website for

25 issues that are far later than this -- he can ask whatever he

1   wants, but I'm saying I don't know that what happened in 2000,

2   the story in and of itself, is relevant.  There's no question

3   that the --

4           THE COURT:  This is a simple question.  Answer the

5   question and move on.

6           MR. WILLETT:  The judge has instructed you to answer

7   the question, ma'am.

8           THE WITNESS:  Yes.

9           MR. WILLETT:  If you would go on down there a little

10  bit farther -- Ashley, if you could scroll down a little bit

11  for me.

12   BY MR. WILLETT:

13  Q    It says, "We turned the farmhouse into the shop in 2000

14  and.  Everybody liked it so much, they started to come and sit

15  on the porch to rest, and some even brought their lunches to

16  enjoy in a relaxing atmosphere."

17          Did I read that correctly?

18  A    Yes.

19  Q    Yesterday we saw some pictures that Mr. McLaughlin showed

20  you.  There was a picture of the house that housed the pottery

21  shop, and there was a porch on that house.

22          Do you remember that?

23  A    Yes.

24  Q    And so when you refer to folks started to come and sit on

25  the porch, that's the porch they would sit on; is that correct?

1  A    At the shop?

2  Q    Yes, ma'am.

3  A    Yes.

4  Q    Ashley will show that to you.

5       And so they were coming -- that's the photograph in the

6  lower right-hand corner.  They were coming to that porch.  And

7  that's where they would sit and enjoy because they were coming

8  to buy pottery at the shop, correct?

9  A    They were coming to shop at the shop, yes.

10 Q    They were coming to shop at the shop.

11      Were they coming to buy pottery at the shop?

12 A    I sold other things too.

13 Q    I mean, are you saying the people that ate on the porch,

14 that they weren't there to buy pottery?

15 A    They were there to shop, spend the day.

16 Q    And you don't think the fact that you sold Emerson Creek

17 pottery had anything to do with those folks coming to Oswego,

18 Illinois to your shop?

19 A    I'm not saying that, no.

20 Q    You do believe that it did.  That's why they came to the

21 shop is because you were selling Emerson Creek pottery,

22 correct?

23 A    I was selling other things too, pottery and other things.

24 Q    The reason they came to the shop is because you were

25 selling Emerson Creek pottery?

C. Demiduk - Cross

1  A    I don't know if that's their reason.

2  Q    Let's go back to the website, please.

3        And then it goes on to say after the sentence about

4  sitting on the porch and enjoying their lunch, "So we decided

5  to open a restaurant in a place to really relax on an even

6  bigger porch."

7        Do you see that?

8  A    Yes.

9  Q    So going back to the discussions that took place in 2001,

10  in that meeting with Mr. Leavitt you expressed --

11            MR. WILLETT:  You can take that off.  Sorry.

12  Q    In that meeting you expressed to him that you had been

13  wanting to open some kind of store.  So you asked the owners if

14  they would be interested in having an Emerson Creek shop in

15  Illinois, and they said yes.

16        Is that what happened?

17  A    Is it on the screen?  Can I see that?

18  Q    Oh, absolutely.  Do you want to see that?  Exhibit 8.

19  Yeah, so this is an article that's called, "Out-of-the-way

20  pottery shop finds a following."  And it's from the *Chicago*

21  *Tribune.*

22        That's a big newspaper in Chicago, correct?

23  A    Yes.

24  Q    And Lynn Van Matre, *Tribune* staff reporter, she wrote this

25  article back in July of 2002; is that correct?

1   A    Yes.

2   Q    And the shop opened in June of 2001?

3   A    Yes.

4   Q    So this was after the first year and a little bit into the

5   second season of opening the shop?

6   A    Yes.

7   Q    Okay.  And actually, she came out and saw the shop and met

8   with you and interviewed you for this --

9   A    Yes.

10  Q    -- article?

11       All right.  Great.  Now, in discussing the article with

12  her, if you look at the first paragraph there or the third

13  paragraph there it says,"'You definitely have to look for us,'

14  said Emerson Creek owner Chris Barickman."

15       That's you?

16  A    Yes.

17  Q    "Who relies largely on word of mouth to promote the shop.

18  But once people come here, they usually come back and bring a

19  friend."

20  A    Yes.

21  Q    That was a statement you made to her?

22  A    Yes.

23  Q    Now, if you look at the next paragraph it says, "'In

24  recent months, the store has drawn browsers and buyers from

25  DuPage, Kane, Kendall, and Will Counties,' Barickman said.

C. Demiduk - Cross

1   Most have made the trip in search of the hand-painted glazed

2   stoneware from the Blue Ridge Mountains that Barickman stocks

3   in abundance."

4       Do you what she's referring to there?

5   A   Yes; Emerson Creek pottery.

6   Q   Okay.  And that's something -- you told her that, right,

7   that that's why people came?

8   A   Yes.

9   Q   Is that a yes?

10  A   Yes.

11  Q   Okay.  Great.

12      And again, it goes on in the next paragraph.  It says,

13  "Produced by Emerson Creek Pottery in Bedford, Virginia, some

14  of the pieces are sold at other Chicago-area stores, but

15  Barickman is the only shop outside Virginia to stock the entire

16  line."

17      Did I read that correctly?

18  A   Yes.

19  Q   Now, if we go to the next paragraph, this is -- I'm

20  getting to the point here, because this is the quote you had

21  asked me about, the first one about the pinecone pattern where

22  you said, "'I bought a set of pinecone-pattern dishes from

23  Emerson Creek while I was visiting relatives in Bedford and

24  fell in love with the product,' said Barickman;" is that

25  correct?

1  A    Yes.

2  Q    It says, "who has 14 years of experience in retail sales."

3       And that's correct also?

4  A    Yes.

5  Q    That's the time on the cruise ship and the work at

6  Nordstrom?

7  A    Yes.

8  Q    And indeed, when you met with Mr. Leavitt at the meeting

9  that you all had in 2000, you told him about that experience,

10 sort of like you did to the jury yesterday about the experience

11 in the cruise ship, and how you were hired, and your experience

12 at Nordstrom, correct?

13 A    (No verbal response).

14 Q    Is that yes?

15 A    Yes.

16 Q    Now, the next quote is the:  "I had been wanting to open

17 some kind of store.  So I asked the owners if they would be

18 interested in having an Emerson Creek shop in Illinois, and

19 they said yes."

20      Did I read that correctly?

21 A    Yes.

22 Q    And that's a statement that you made to the reporter for

23 the *Chicago Tribune* prior to her publishing this article in

24 July of 2002, correct?

25 A    Yes.

1    Q    And when you say "having an Emerson Creek shop," you're

2    referring to a shop for Mr. Leavitt's pottery, correct?

3    A    I am referring to carrying his product at my shop.

4    Q    And when you say his product, you mean Emerson Creek's

5    product, correct?

6    A    Yes.

7    Q    All right.  Now, if we go on down a little bit, there's

8    some quotes and discussion about Priscilla Palmer.

9         Had you met Priscilla Palmer?

10   A    I believe I met her once.

11   Q    Go ahead and scroll on down, Ashley, please.

12        It says -- it talks about her companies, talking about

13   Emerson Creek, "'annual wholesale and retail sales in the

14   six-figure range,' she said.  'We're one of the few

15   manufacturers left in the U.S. that turns out hand-painted

16   pottery by trained artists.  Most of the handmade pottery sold

17   in this country is done in third-world countries where labor is

18   cheap.'"

19        Do you see that?

20   A    Yes.

21   Q    And did you understand that to be the case, that the

22   pottery at Emerson Creek was handmade American pottery?

23   A    Yes.

24   Q    Now, if you go on down a little bit to the bottom there it

25   says, "We're located on a dirt road, too, and we have become a

1    destination," she said.

2        Do you see that?

3    A    Yes.

4            MR. WILLETT:  Keep going down.

5    Q    It says, "Back in Oswego, Barickman and partner Ron

6    Wehrli" -- that's Mr. Wehrli, your boyfriend?

7    A    Yes.

8    Q    "A Naperville builder" -- and he was a builder at the

9    time, correct?

10   A    Yes.

11   Q    Naperville, how far is that from Oswego?

12   A    It's maybe 15 miles.

13   Q    That's where he made his mark was Naperville, correct?

14   A    That's where he was a builder.

15   Q    In fact, he wasn't just a builder; he was one of the top

16   builders in Naperville at that time, correct?

17   A    Yes.

18   Q    And Naperville was one of the fastest-growing areas in the

19   country at that time, the first or second fastest-growing,

20   correct?

21   A    Yes.

22   Q    It says, "Renovated a ramshackle farmhouse on property

23   they own on Grove Road, and Barickman filled six rooms with

24   displays of microwave-safe tableware and cookware, flowerpots,

25   and other pieces in 19 floral and folk-art patterns."

C. Demiduk - Cross

1      Do you see that?

2  A    Yes.

3  Q    And that's true.  You've done that, correct?

4  A    Yes.

5  Q    "The shop also carries Christmas, Halloween and other

6  seasonal lines from the Virginia pottery factor and handcrafted

7  soaps and candles."

8      Is that correct?

9  A    Yes.

10 Q    You talked about accessories earlier.  Those accessories

11 would be things like soaps and candles, things like that,

12 correct?

13 A    Yes.  And the other lines of pottery, yes.

14 Q    So it would be soaps and candles and other lines of

15 pottery; is that your testimony?

16 A    Yes.

17 Q    That's what an accessory is?

18 A    Accessory, home décor.

19 Q    My question is:  As of the time that this article was

20 published in July of 2002 when you were talking to the reporter

21 for the *Chicago Tribune* who came out to your shop, correct?

22 A    Yes.

23 Q    And you're telling her the types of things -- products

24 that you carry.  At that point in time did you carry other

25 lines of pottery?

C. Demiduk - Cross

1   A    I'm looking at the date 10-16-2019.  Sorry.

2   Q    That's the date that it was pulled.

3   A    Sorry.  In 2002, no, I don't believe so.

4   Q    You don't believe so.  Do you know one way or another,

5   Ms. Demiduk, whether in July of 2002 when this article that

6   appeared in the *Chicago Tribune* --

7   A    I was not carrying other lines yet, because I just started

8   going to gift shows.

9   Q    And so as of 2002, you were not carrying any other pottery

10  other than Emerson Creek pottery in the shop that bore the name

11  Emerson Creek Pottery; is that correct?

12  A    Yes.

13          MR. WILLETT:  Now, Ashley, go back and scroll down

14  again.

15  Q    Now, it goes on to talk about prices ranging from 5.95 for

16  a soap dish to 15.95 for a pie plate to 43.95 for a lamp.

17          Do you see that?

18  A    Yes.

19  Q    It goes on to say, "Because she buys in large quantities,

20  she receives a deep discount that allows her to sell Emerson

21  Creek stoneware at lower prices than the pieces would cost in

22  most other gift shops," Barickman said.

23          Do you see that?

24  A    Yes.

25  Q    And as of the time that you participated in this interview

1  in July of 2002, this was about -- I want to make sure I have

2  this correct -- this was a little more than a year after you

3  first met with Mr. Wehrli and Mr. Leavitt in Bedford, Virginia,

4  correct?

5  A    Yes.

6  Q    And you agree that because you were buying in large

7  quantities, you were receiving a deep discount that allowed you

8  to actually sell less than what other shops were selling retail

9  for, correct?

10 A    Yes.

11 Q    Okay.  Now, it goes on to say in the next paragraph, "I

12 called Virginia to order more items almost every week during

13 our first season."

14      So at that point that was the only season you had was the

15 first year?

16 A    Yes.

17 Q    And that's -- that's a true statement that you called

18 Virginia to order more items almost every week during that

19 first season, correct?

20 A    Yes.

21 Q    And the only company that you were buying pottery from in

22 Virginia at that time was Emerson Creek in Bedford?

23 A    Yes.

24 Q    Now -- and it goes on to say -- it said, "Barickman, who

25 opened the shop in June of 2001 and shut down for the winter on

1  December 31st."

2      Do you see that?

3  A    Yes.

4  Q    And that's because that was that sort of abbreviated first

5  season that you had.  You opened a little later than you

6  eventually started opening, correct?

7  A    Yes.

8  Q    You started opening after that in May for a while?

9  A    Yes.

10 Q    And then ultimately you opened sometimes a little bit

11 earlier in April?

12 A    No.

13 Q    Okay.  You don't recall ever opening April 1st?

14 A    Not that I remember, no.

15 Q    The bottom line is you were closing for the cold weather

16 months in Illinois, correct?

17 A    Yes.

18 Q    And at the time you and Mr. Wehrli would travel?

19 A    Yes.

20 Q    Now, it goes on to say, if you look at the next paragraph

21 there, "Over the seven months, the shop did about 125,000 in

22 business and signed up more than 1,200 customers for its

23 mailing list," Barickman said.

24      And that was true?

25 A    Yes.

1         MR. WILLETT:  And if you scroll on down a little bit.

2    Q    Oh, okay.  Yeah.  It says -- there is another quote --

3    "'We also put an old-fashioned farmer's wagon painted hunter

4    green on Grove Road by the path that leads to the shop,'

5    Barickman said.  If people are trying to find us, it's

6    something for them to look for."

7         Did I read that correctly?

8    A    Yes.

9    Q    And the green sign --

10        MR. WILLETT:  Go back to Exhibit 11.

11   Q    That's the wagon that you put off the side of the road,

12   correct?

13   A    Yes.

14   Q    I want to make sure I understand.  So the reason you were

15   able to put that wagon there is because it was -- instead of a

16   sign, because it was technically a piece of farm equipment or

17   something, and that allowed you to put the wagon?

18   A    Yes.

19   Q    So you couldn't have put like a post-in-the-ground sign.

20   There was some ordinance that required it to be a piece of farm

21   equipment?

22   A    Yes.

23   Q    Okay.  And that's what you did to make that --

24   A    Yes.

25   Q    -- happen?

1      All right.  If we could go back to the article real quick.

2  And then of course it gives the address of Emerson Creek

3  Pottery?

4  A    Yes.

5  Q    When it says Emerson Creek Pottery there at 5000 Grove

6  Road, that's referring to you, correct?

7  A    Yes.

8  Q    We had some discussion of this yesterday.  Just to

9  confirm, that was -- the original address was 5000 Grove Road,

10  but that didn't actually take people to your location, correct?

11  A    It took us -- took it -- that is the same area.  They just

12  changed our address to 5126 probably ten years later.

13  Q    5126 Stephens Road?

14  A    Our address was Emerson Creek, 5000-B Grove Road.  5126

15  Stephens Road is -- right now I can't even think of my

16  address -- 5000-B Grove Road I believe is our address.

17  Q    Well, we had this discussion yesterday.  What's the

18  Stephens Road address?

19  A    That is our home address, 4914 Stephens Road.

20  Q    No, the 51 number?

21  A    5126 is Stephens Road.

22  Q    Yeah, and that's what -- the facility became 5126 Stephens

23  Road?

24  A    Yes.

25  Q    So even though this says Grove Road, it's still talking

1   about the same place?

2   A    Yes.

3   Q    The article that refers to Emerson Creek Pottery is

4   referring to the shop that you opened, correct?

5   A    Yes.

6   Q    And the shop that you opened shortly after meeting with

7   Mr. Leavitt and Ron Wehrli in June of -- or in 2001, correct?

8   A    Yes.

9   Q    Now, if we could put up -- I just want to show you this

10  real quick.  This is a purchase order that would be

11  generated -- have you seen one of these before?

12  A    Yes.

13  Q    I've had 444 of them I think representing purchases

14  between 2007 and that date you're referring to in 2017.  The

15  ship-to is R.W. Development.

16       Who is that?

17  A    That was -- that was Ron's company.  R.W. Development,

18  that was his company.

19  Q    R.W. Development was his company.  And then below it it

20  says, "Emerson Creek Pottery."

21       That's referring to your operation in Oswego, Illinois,

22  correct?

23  A    Yes.

24  Q    Okay.  And then below it it has that 5000-B Grove Road.

25  That's not the pottery facility.  Is that your home address at

1  the time?

2  A    I can't remember if it was in '07 that I lived -- my home

3  was with Ron.  So I can't remember what that address was, but

4  5000-B Grove Road I -- I can't remember what...

5  Q    Well, you lived with Ron Wehrli in --

6  A    Yeah.

7  Q    -- in the property adjacent to the pottery property,

8  correct?

9  A    Yes.

10  Q    And you lived with Ron Wehrli in that property adjacent to

11  the pottery property from some point in time before the meeting

12  with Mr. Leavitt in 2001, correct?

13  A    Yes.

14  Q    Okay.  But as you sit here today, you just can't remember

15  what that address was?

16  A    I just remember my old address, 4900 Prairie Crossing was

17  our home address.

18  Q    4900 Prairie Crossing?

19  A    Was where I lived with Ron.

20  Q    All right.  And again, I think you just said this, R.W. is

21  Ron Wehrli, that's his development company, correct?

22       And that's -- and he's listed there because he's the one

23  who -- or at least his company -- was issuing the checks to pay

24  for the pottery orders, correct?

25  A    At that time we had developed a bank account that was

C. Demiduk - Cross

1  Countryview Pottery doing business as Emerson Creek Pottery.

2  Q    But for a period of time, Ron Wehrli's -- his company and

3  his assistant was the one who cut the actual checks that were

4  paid to Emerson Creek?

5  A    It was the first check.  I can't remember how the money

6  came out, which account.  He had several accounts.  So I don't

7  remember.

8  Q    Well, the invoices kept saying R.W. Development, correct?

9  A    Well, some -- that's what this one says.

10 Q    Well, in fact, when you testified yesterday you confirmed

11 that Ron Wehrli was the money guy, correct?

12 A    To start out, yes.

13 Q    Okay.  Well, when you say to start out, we just looked at

14 an article that said in the first year that you reordered

15 pottery on a weekly basis, correct?

16 A    Right.

17 Q    At that point in time Ron Wehrli was the guy -- or his

18 company -- that was writing the checks for that pottery,

19 correct?

20 A    He put money into it.  And then as we would sell things,

21 then we would write a check from our checking account.

22 Q    Okay.  But the money that was put into it came from Ron

23 Wehrli, correct?

24 A    From the first shipment, yes.

25 Q    And then after the first shipment as well, Ron Wehrli, who

C. Demiduk - Cross

1  you identified as the money guy, he was the one who was putting

2  the money into the business, correct?

3  A    And we were floating ourselves too.  As we sold, we would

4  reorder, and we had our own bank account for Emerson Creek

5  Countryview Pottery.

6  Q    It was called Emerson Creek Countryview Pottery?

7  A    I believe our checks were Countryview Pottery doing

8  business as Emerson Creek.

9  Q    Okay.  And when we look on the left-hand side here where

10  it says "Emerson Creek Pottery & Tearoom," that's as of 2007

11  referring to the business that operated in Oswego, right,

12  because by that point you had opened the tearoom?

13  A    Yes.

14  Q    Now, I'm next going to put up a document that you've seen

15  before, or at least I think it was shown to you briefly

16  yesterday, Exhibit 57.

17          THE COURT:  Members of the jury, we'll take about --

18  a break, and you can go back and try to be ready to come back

19  in about ten minutes, and we'll go a little further.

20  **(Jury out, 11:47 a.m.)**

21          (Recess.)

22          THE COURT:  How much longer is this going to take?

23          MR. WILLETT:  Judge, I don't have a ton longer, but I

24  think I have about 45 minutes.

25          THE COURT:  How much?

1    MR. WILLETT:  30 to 45.

2    THE COURT:  Who have we got after that?

3    MR. MCLAUGHLIN:  We have nothing else after that,

4 Your Honor.

5    THE COURT:  I can't hear you.

6    MR. MCLAUGHLIN:  Once her cross and any redirect,

7 which would be minimal, we're done.  So the quicker he's

8 finished, the quicker we're all done.

9    THE COURT:  Well, the witness has to be more

10 forthcoming and answer the questions.

11    MR. MCLAUGHLIN:  But I think she has now.

12    THE COURT:  We've gone 15 minutes with the top of a

13 purchase order.

14    MR. MCLAUGHLIN:  But I think she has been forthcoming

15 with respect to what's on the purchase order.  I don't know

16 that there's any relevance to the payments.  I leave it to

17 Mr. Willett to do his case.  After the break and she had a

18 chance to kind of calm down, I think she has been as

19 forthcoming as she can be.

20    THE COURT:  Yesterday we started out with

21 conversations that took place 20 or 30 years ago.  Today nobody

22 remembers anything.

23    So let's take a quick -- about a five-minute break

24 and we'll call the jury back.

25    (Recess.)

1    THE COURT:  All right.  Call the jury back.

2  **(Jury in, 11:58 a.m.)**

3    THE COURT:  All right.  You may proceed.

4   BY MR. WILLETT:

5  Q    Ms. Demiduk, I'm going to -- in deference to the jury and

6  everyone else, I'm going to try and move very swiftly here.

7    MR. WILLETT:  Ashley, I want to get a couple of

8  things knocked out.  If you can refer to document 168.  Don't

9  put it up yet.  I just want to ask a question.

10  Q    Ms. Barickman, yesterday -- or Ms. Demiduk, yesterday

11  there was a red plate that you had.  Do you still have that up

12  there?

13  A    No.

14  Q    Anyway, the red plate that you had, and it was your

15  testimony that that was made by Signature, and that that was

16  something that you sold in your shop as far back as 2007,

17  correct?

18  A    Yes.

19  Q    Okay.  And just to confirm, did you sell Signature pottery

20  in your shop between 2007 up until January 5th, 2018?

21  A    January 7th?

22  Q    January 5, 2018?

23  A    2018.

24  Q    Yes, did you sell Signature during that time period?

25  A    Yes.

1  Q    And specifically, Signature pottery?

2  A    Yes.

3  Q    And did you -- when did you start selling Mud Pie pottery?

4  A    Probably two thousand maybe '15, '14.

5  Q    2014 or '15; is that correct?

6  A    Yes.

7  Q    Now, do you know whether the Mud Pie pottery is lead-free?

8  A    I don't know.

9  Q    Okay.  And indeed it's not lead-free, correct?

10 A    I don't know.

11 Q    What about Signature pottery, do you know whether that's

12 lead-free?

13 A    I don't know.

14 Q    Okay.  And both lines are made in China?

15 A    Yes.

16 Q    Okay.  Now, it was your testimony that not only did you

17 sell this pottery starting in 2007, but that you -- that

18 Mr. Leavitt knew that you were selling this pottery back then;

19 is that correct?

20 A    Yes.

21 Q    And in fact, you testified that you sent him one of the --

22 sent him some of the square plates, or a square plate, correct?

23 A    Yes.

24 Q    Just like that red plate you had, correct?

25 A    Yes.

C. Demiduk - Cross

1  Q     Let me direct your attention to Exhibit 168.

2            MR. WILLETT:  Scroll down a little bit.

3  Q     That's an email from you to Emerson Creek.  And when you

4  sent an email to emersoncreek@earthlink.net, that was

5  Mr. Leavitt, correct?

6  A     Yes.

7  Q     And you say, "Hi, Jim, hope all is well.  Just wondering

8  if you got my little square plate that I sent you?  What do you

9  think of the little design on the edges?"

10           Is that correct?

11 A     Yes.

12 Q     "I see square plates a lot now.  Would you be interested

13 in trying one for a dinner plate?"

14           Did I read that correctly?

15 A     Yes.

16 Q     When you say would you be interested in trying one for a

17 dinner plate to Mr. Leavitt, you're asking him if he would be

18 willing to make one of those plates, correct?

19 A     Yes.

20 Q     Okay.  Now, let me direct your attention to Exhibit 193.

21           MR. WILLETT:  Oh, actually, before that, Ashley,

22 scroll up just a little bit.

23 Q     In fact, he responded to you.  He said, "Hi, Chris, thanks

24 for the plate.  It is interesting and I did some research for

25 what people are looking for on the Web, and a lot of searches

1  are for breakfast plates.  What about doing a square breakfast

2  plate?"

3       Do you see that?

4  A    Yes.

5  Q    Now, the plate you had yesterday, that's the size of --

6  what would that be, the size of a dinner plate or breakfast

7  plate?

8  A    That would be an appetizer plate.

9  Q    Okay.  Now, so he sent you this email back in March of

10  2007.  Now I want to take you to Exhibit 193.

11       And to be clear, the red plate you have, that's what you

12  were selling?  That was one of the things you were selling for

13  Signature, that red plate, correct?

14  A    Yes.

15  Q    Okay.  Now, if we scroll down a little bit here, and in

16  this email -- I'm just trying to skip to it -- you ask him

17  about, "I was wondering what you thought about the other items

18  I suggested."

19       And just to confirm, at this point in time you were -- and

20  throughout your relationship -- you would suggest items to

21  Mr. Leavitt to see if he was interested in making those items,

22  because you had seen that customers might want them, correct?

23  A    Yes.  First I would try the items out.  I would buy the

24  item.  And if it was working, then I would suggest it to Jim to

25  make.

C. Demiduk - Cross

1  Q    Now, when you say try the items out, what does that mean?

2  A    I would -- before I would suggest something, a lot of

3  times I would just see if it would sell, if it was a popular

4  piece or a popular item.

5  Q    Okay.  And -- all right.  Let me ask you this:  And so you

6  would sell the items in your shop.  And then if it was popular,

7  you would email Mr. Leavitt and see if he was interested in

8  making the item in Emerson Creek pottery; is that correct?

9  A    Right.

10 Q    You were just sampling the product just to see if people

11 might be interested?

12 A    Yes.

13 Q    Now, let me ask you this:  You say, "What do you think of

14 the dragonfly set?  It's a good seller.  Also sold solid

15 pieces.  Any samples of colors, that sort of thing.  Also if I

16 could have a list of what patterns are going to continue,

17 blueberry, not sure if we're going to keep."

18      Do you see that?

19 A    Yes.

20 Q    And then, "How about pieces I order for the tearoom."

21 Just asking about the order, status of the order, that sort of

22 thing?

23 A    Yes.

24 Q    And that was common.  You would check -- you would ask

25 him, you would send him emails.  You know, here's what I'm

1  thinking about; here's what I want to do.  You would send these

2  emails frequently to Mr. Leavitt.  And we've seen a lot of

3  those through the course of this trial, correct?

4  A    Yes.

5  Q    Now, if you go to the next sheet, he says, "Hi, Chris, I

6  tried to send you the price list today, but it would not go

7  through to your fax.  Will try again later.  To answer your

8  other questions:  I do like to square plate" -- I think it says

9  the square plate?

10  A    Yes.

11  Q    "And I am going to start making one as soon as I can get

12  my new office person going.  Would you want to go in together

13  to buy the holders so we can get a better price?"

14        Do you see that?

15  A    Yes.

16  Q    And you referred to the holders yesterday, the fact that

17  he had purchased holders?

18  A    Yes.

19  Q    In fact, you all went in on a large order to get a better

20  price on those holders, correct?

21  A    Yes.

22  Q    And in fact, we've seen some pictures of the holders on

23  the walls at the -- at the shop at Emerson Creek displaying the

24  square plates that Mr. Leavitt eventually made for you,

25  correct?

1  A     That's a different brand.  The ones on the wall were

2  different than --

3  Q     Different holders?

4  A     -- than the square plates that held other pieces of

5  pottery.

6  Q     Okay.  So the square plates that he said -- after he tells

7  you he's going to make a square plate, the square plate that he

8  goes in on with you, those -- that was something you would like

9  set on a shelf or something like that, correct?

10 A     Yes.

11        MR. WILLETT:  Okay.  And these are both -- 168 and

12 193 are admitted, correct?

13        THE CLERK:  193 is and 168 is not.

14        MR. WILLETT:  Oh, I'm sorry.  I would move for the

15 admission of 168.

16        MR. MCLAUGHLIN:  No objection.

17        MR. WILLETT:  That was the last email.

18        THE COURT:  Admitted.

19        (Plaintiff Exhibit 168 marked.)

20        (Plaintiff Exhibit 168 admitted.)

21  BY MR. WILLETT:

22 Q     And then he goes on to say, "Dragonfly has been a good

23 seller, especially in the spring."

24        Do you know what he's referring to there?

25 A     The dragonfly pattern he made.

C. Demiduk - Cross

1  Q   Okay.  And so when you said --

2      MR. WILLETT:  Scroll down a little bit, Ashley.

3  Q   "Wondering what you thought of the other items I

4 suggested," and you said, "also, what do you think of the

5 dragonfly?  It is a good seller."

6     You're talking about a good seller meaning a product of

7 Mr. Leavitt's that you were selling, a pattern that you were

8 selling?

9  A   Yes.

10  Q   Okay.  Great.

11     Then just to confirm, again, he makes the square plate; he

12 sells you the square plate; you sell the square plates to your

13 customers, correct?

14  A   Yes.  Along with the solid pieces of the other square

15 plates.

16  Q   Along with the other solid plates.  So your testimony is

17 you asked Mr. Leavitt if he could make the square plates.  He

18 makes the square plates with patterns and you sell those.  And

19 then your testimony is that you also sold other square plates

20 that were not Mr. Leavitt's; is that correct?

21  A   Yes.

22  Q   And you did this starting in 2007, correct?

23  A   I believe so.  I can't remember the exact date.

24  Q   You sold that other pottery from 2007 up until the time

25 that you received the cease and desist letter, correct?

C. Demiduk - Cross

1  A    Yes.

2  Q    Now, let's take a look, if we can, at Exhibit 171.  Do you

3  see that document?

4  A    Yes.

5  Q    It's already been admitted.

6  A    Yes.

7        MR. WILLETT:  Scroll down a little bit, Ashley.

8  Q    It says, "Hi, Chris, we haven't talked in a while and I

9  wanted to touch base.  I was running through some sales numbers

10 and noticed that you're off by 33 percent, $10,000 this year.

11 I'm wondering what's going on; are you having sales problems,

12 carrying other lines?  Anyway, please give me a call."

13       Do you see that?

14 A    Yes.

15       MR. WILLETT:  Ashley, if you could scroll up.

16 Q    And then you respond.  This is your email response to that

17 email, correct?

18 A    Right.

19 Q    Anywhere in this email do you tell Mr. Leavitt -- strike

20 that.

21       Nowhere in this email do you tell Mr. Leavitt that you

22 were selling third-party pottery, do you?

23 A    No.

24 Q    Let me next direct your attention to the conversation that

25 you had with Mr. McLaughlin yesterday.  And you were talking

C. Demiduk - Cross

1  about Nancy in Peoria, correct?

2  A    Yes.

3  Q    Do you remember that?

4  A    Yes.

5  Q    And she was someone that you said that you had some brief

6  interactions with, but you kind of referred her to Mr. Leavitt,

7  correct?

8  A    Yes.

9  Q    And the extent of your conversations with Nancy from

10  Peoria were that you were going to put her in touch with

11  Mr. Leavitt and see if they could work something out, correct?

12  A    Yes.

13  Q    Let me direct your attention, ma'am, to Exhibit 89.  Go to

14  the second page of that document.  "Hi, Jim."

15       Oh, first of all, do you recognize this email?

16  A    Yes.

17  Q    It says, "Hi, Jim, hope all is well.  Nancy" -- it says

18  "for."  I think that means "from?"

19  A    Peoria.

20  Q    Just to confirm, this is an email from Chris Barickman,

21  that's you, to emersoncreek@earthlink.com.

22       The Emerson Creek address is Mr. Leavitt, correct?

23  A    Yes.

24  Q    "Nancy from Peoria came up today.  I had another girl

25  working for part of the day, so I got to have one on one with

1  her and try and help her out.  She said her and her husband are

2  coming hopefully down sometime in December," and then question

3  marks.

4      Do you see that?

5  A    Yes.

6  Q    "I told her I would pass on any information I could to

7  help her out, like point-of-sale system, what works for me.  I

8  told her if she would like to work with me for a day or two at

9  the shop, no problem," etc.

10      Do you see that?

11 A    Yes.

12 Q    Next paragraph.  "She is nice and really checking out

13 everything.  She asked me about other products and I told her

14 she really needs to carry mostly Emerson Creek, 80 percent of

15 the store.  You have to make it look full of Emerson Creek.  So

16 asked about carrying some line of crystal or something.  I told

17 her to watch her price points."

18      Did I read that correctly?

19 A    Yes.

20 Q    And that's what -- you're communicating to Jim Leavitt

21 what you communicated to Nancy in Peoria, correct?

22 A    I --

23 Q    My question, ma'am, is:  You're communicating in this

24 email to Jim Leavitt what you communicated to Nancy from

25 Peoria, yes or no?

C. Demiduk - Cross

1  A    I can't remember.  But I told Jim that she was interested

2  in opening a shop and was interested in pottery, carrying the

3  pottery.

4  Q    And what you're communicating to him here is what you

5  communicated to her in your conversation, right?

6       She had come down and met with you for the day that day.

7  And you're communicating to Jim what you communicated to her,

8  correct?

9  A    I believe so in this email, yes.

10 Q    Okay.  And you go on to say, "I think she is a good

11 source.  I try not to get too excited."  I think you mean

12 T-O-O.  "That one lady I met with that just moved to Atlanta,

13 her husband works for Wendy's, she has some personal problems,

14 so was kind of let down because I spend" -- I think spent --

15 "three hours with her over coffee.  No big deal.  That's life."

16      Did I read that correctly?

17 A    Yes.

18 Q    And that was another person who was interested in opening

19 an Emerson Creek shop, correct, that you testified to

20 yesterday?

21 A    She was interested in opening a tearoom.

22 Q    And -- well, she was interested in opening a tearoom; is

23 that your testimony?

24 A    Yes.

25 Q    And was she also interested in opening an Emerson Creek

C. Demiduk - Cross

1  shop?

2  A    I can't remember.

3  Q    Oh, you don't remember?

4  A    I mean, right here it says she was interested in opening a

5  tearoom.

6  Q    And you didn't understand that to be a tearoom in addition

7  to a pottery shop?

8  A    No.  I mean, it's two separate businesses.

9  Q    So you thought that was totally unrelated to pottery, your

10 meeting with her?

11         MR. MCLAUGHLIN:  Objection.  Asked and answered.

12         THE WITNESS:  A restaurant is a restaurant.  And a

13 shop, that's what I thought, and that's what she meant.  She

14 wanted to open a tearoom.

15  BY MR. WILLETT:

16 Q    And yet you're communicating this to Mr. Leavitt, correct?

17 A    Yes.

18 Q    And you referred her to Mr. Leavitt, correct?

19 A    I believe so.

20 Q    Now, let me next direct -- bear with me one second here.

21      Let me go to page 3 of that document.  It says, "Hi Jim, I

22 hope your sale was good."

23      So at that point you knew he had had a sale as of November

24 5, 2006.  That's something he communicated to you?

25 A    I believe so.

C. Demiduk - Cross

1  Q    You go on to say, "We were really busy this weekend."

2       Do you see that?

3  A    Yes.

4  Q    Then you say, "Also met with some customers from Peoria,

5  Illinois that know Nancy and the location she is talking about.

6  And they said she is a really nice person and it would be a

7  great place for it."

8       Do you see that?

9  A    Yes.

10 Q    And then I want to direct your attention to the next page,

11 page 6.  So that was November of 2005.  And then we'll go to

12 page 6, a July 30th, 2007 email.

13 A    Yes.

14 Q    And you say here -- so this is fast forward a few months,

15 "Jim, just wanted to ask.  Nancy from Peoria called just

16 wondering if I had an extra Halloween, the old one with the

17 black cat and pumpkin face on it, I would be interested in

18 selling to her."  Then you go on to say, "I have about 200

19 large candle shades, 150 chip and dip, oval bakers 70.  So was

20 just checking with you first.  It is okay if you are not okay

21 with it."

22       Do you see that?

23 A    Yes.

24 Q    And then above that is a response from Mr. Leavitt to you.

25 He says, "Hi, Chris, I don't mind if you want to make a deal

C. Demiduk - Cross

1   with her on that stuff.  Sounds like you've got too much."

2       Did I read that correctly?

3   A   Yes.

4   Q   And and then he goes on to suggest that maybe you should

5   have a sale?

6   A   Yes.

7   Q   And he talks about the fall order, correct?

8   A   Yes.

9   Q   Great.  Thank you.

10      I also wanted to direct your attention to Exhibit 210.

11  This is another document that I believe Mr. McLaughlin showed

12  you yesterday, but maybe a different number.

13      Exhibit 210.  This is January 5, 2006.  Do you see that?

14  A   Yes.

15  Q   And you kind of start with a nice, you know, "Jim, I hope

16  you had a good year.  I'm just working on my books for the year

17  end.  I'm all closed up."

18      And you go on to talk about the inventory --

19  A   Right.

20  Q   -- information.

21      Do you see that?

22  A   Yes.

23  Q   And then a little further down, if Ashley can highlight,

24  you say, "I still" --

25          MR. WILLETT:  I'm sorry, has this one not been

C. Demiduk - Cross

1  admitted?

2          THE CLERK:  Not Plaintiff's 210.

3          MR. MCLAUGHLIN:  No objection.

4          THE COURT:  Be admitted.

5          (Plaintiff Exhibit 210 marked.)

6          (Plaintiff Exhibit 210 admitted.)

7          MR. WILLETT:  So now I'll ask if you can highlight

8  that.

9   BY MR. WILLETT:

10 Q   I just -- well, I'll read from right there, "I just want

11 to say we finished our five year and I still love my job so

12 much.  And I want you [sic] thank you for letting that happen

13 with all your hard work."

14      You say "you," but I think you meant "your."

15      "I'm so proud of Emerson Creek Pottery, and I just wanted

16 to let you know.  I hope I can order tons and make things good

17 for you."

18      Is that what you communicated to Mr. Leavitt?

19 A   Yes.

20 Q   You go on and you talk about that you hope he can make it

21 out that year.  You say -- further down you say, "For

22 Christmas" -- and Ashley, if you'll highlight that -- "for

23 Christmas, Ron got me sometime [sic]" -- I think "some time --

24 "paid with a professional couple that does media work and

25 networking to help new ideas with your business."

1    This was an email you sent to Mr. Leavitt, correct?

2  A    Yes.

3  Q    Now, you go on to say, "What do you think -- I was

4  thinking, you know" -- and I'll start right here.

5    "I was thinking, you know that magazine country business,

6  that is the one you sometimes advertise," referring again to

7  Emerson Creek, that's something they advertise in?

8  A    Yes.

9  Q    "It is out of St. Charles, Illinois.  They also do a

10  country sampler magazine.  When I opened the tearoom they came

11  out to check it out, but nothing happened.  What do you think

12  if we try and write the editor about doing a store" -- I think

13  you mean story -- "about opening more Emerson Creek Pottery?"

14    Did I read that correctly?

15  A    Yes.

16  Q    "I just know there's so many ladies that want gift shops,

17  but not regular gift shops."

18    Did I read that correctly?

19  A    Yes.

20  Q    "And we are so different with our products, and I was not

21  sure if we could market" -- you say "is," I think you mean "it

22  -- "as being your own boss with Emerson Creek" -- with Emerson

23  Creek referring to Mr. Leavitt's company, correct, in a

24  business that someone would open; is that correct?

25  A    Emerson Creek Pottery was his business, yes.

C. Demiduk - Cross

1  Q    And here you're saying, "I was not sure if we could market

2  it as being your own boss with Emerson Creek," meaning someone

3  would be opening an Emerson Creek shop, correct?

4  A    Yes.

5  Q    "And there is no franchise fee with the startup.  What do

6  you think?  Just an idea."

7       This is something you communicated to Mr. Leavitt,

8  correct?

9  A    Yes.  Because I -- yes.

10 Q    Now, let's go on to January 5 and Mr. Leavitt's response.

11 Oh, I'm sorry, we've got to go to defendant's -- it's a

12 different document.  Defendant's Exhibit 12.  I apologize.

13          MR. MCLAUGHLIN:  You're on a different one now.

14          MR. WILLETT:  It's the same email chain, but a

15 different document.  So Exhibit 12 has already been admitted.

16          Now, Ashley, if you could go to show the prior email.

17  BY MR. WILLETT:

18 Q    So you see at the bottom we've got the prior email.  And

19 then you get a response from Mr. Leavitt it looks like a little

20 bit later that day.  Do you see that?

21 A    Yes.

22 Q    And he says, "Good to hear from you.  Sounds like you had

23 a good year.  I sent you a sample of the rooster and moose

24 yesterday."

25       Those are some sort of patterns?

1   A    Yes.

2   Q    "Will have the new price list done soon and the catalog

3   pretty soon."

4        You understood what he was talking about there, correct?

5   A    Yes.

6   Q    That was each year he sent you a price list for you, as

7   well as a catalog, correct?

8   A    Yes.

9   Q    "I'd like to come out there next year.  Just a matter of

10  getting the time.  You know how it is."

11       And you did, because you were super busy then, right?

12  A    Yes.

13  Q    And still are?

14  A    Yes.

15  Q    "I'll be real interested to see what ideas those folks

16  have for you.  Keep me informed.  I think your idea of

17  contacting that magazine is an excellent one.  Are you going to

18  do it or do you want me to?  Stay in touch, Jim."

19       Did I read that correctly?

20  A    Yes.

21           MR. WILLETT:  And then if you look at -- if Ashley

22  will take us to your response where it says, "I could email

23  her."  Do you see that, Ashley?

24  Q    "Yeah, thanks for the email.  I've talked to the editor

25  before when I nominated Emerson Creek for vendor of the year

1  award two years ago.  So I could email her my opinion on owner"

2  -- I think you mean ownee, correct?

3     Is that what you mean there?

4  A    Yes.

5  Q    "An Emerson Creek product store, and if she wanted

6  additional information on it or emails me back, I would ask her

7  to contact you.  I will give no facts, just what a great line.

8  Is that okay?"

9     That's what you communicated to Mr. Leavitt, correct?

10 A    Yes.

11 Q    Just a couple more things.  We talked earlier --

12        MR. WILLETT:  We can take that one off, Ashley.

13 Q    We talked earlier about -- I showed you an image from the

14 website ecreekpotteryandtearoom.com.  You actually had some

15 questions about the authenticity of that website, whether that

16 was real.

17    Do you recall that testimony?

18 A    If I could look at it.

19 Q    It was -- I can pull that one up in a second.  It was the

20 vintage markets one.

21 A    Yes.

22 Q    I'm going to take you back to an earlier version of that

23 just to confirm this is your website, 192.

24    Now, Exhibit 192, this is an email from April 22nd, 2009?

25 A    Yes.

1  Q    And in this one you say at the beginning of this

2  paragraph, "Can't wait to see the square plate."

3       That's talking about he's making you the square plate you

4  asked for, correct?

5  A    Yes.

6  Q    "Think I'm okay with the holders.  I have enough to last a

7  while, but the rep for the company is great.  You can email her

8  and she is great.  I will forward her email."

9       You go on to say, "We lost our domain name

10 ecreekpottery.com."

11      Do you see that?

12 A    Yes.

13 Q    "The guy who set it up had a falling out with Ron, and he

14 owned the domain name because he did not -- website six years

15 ago so we have to change it.  We are working on a new website.

16 I believe the name is going to be ecreekpotteryandtearoom, if

17 that is okay."

18      Did I read that correctly?

19 A    Yes.

20 Q    That's the email you sent to Jim Leavitt at Emerson Creek

21 Pottery, correct?

22 A    Yes.

23 Q    Now, in your testimony yesterday, after the meeting that

24 occurred with Mr. Leavitt and Mr. Wehrli in Bedford, Virginia,

25 you recall that, correct?

1  A    Yes.

2  Q    You testified that you usually got your product -- you can

3  pull that down -- you usually got your product in two to three

4  weeks; is that correct?

5  A    Yes.

6  Q    You testified that you went in to ask for wholesale, but

7  he actually offered you 40 percent off wholesale, correct?

8  A    At that time, yes.

9  Q    And there were some adjustments to pricing over the course

10  of the contract -- or over the course of your relationship with

11  Mr. Leavitt, correct?

12  A    Yes.

13  Q    Okay.  And as you just testified a second ago, each year

14  he'd give you a price list and a catalog.  And that's the price

15  list that was special just for you, correct?

16  A    I guess so, yes.

17  Q    And so you had that price list.  So when you went to order

18  pottery each year, you could see that price list and you knew

19  the price you were ordering for, correct?

20  A    If I had special orders or something like that, that would

21  change.

22  Q    And you would email Mr. Leavitt and you'd talk about that,

23  right?  If you wanted something he wasn't normally making, like

24  he was going to make something special for you, you talked

25  about flowerpots yesterday?

1  A    Yes.

2  Q    Because, indeed, at some point in time we saw -- if I may

3  grab this -- at some point in time this was -- this one right

4  here, this was kind of the first flowerpot that you purchased

5  back with Mr. Wehrli at that meeting, correct?

6  A    Yes.

7  Q    That day when Mr. Wehrli I think you said cut a check or

8  stroked the check; is that correct?

9  A    Yes.

10 Q    And then ultimately you started purchasing flowerpots that

11 looked a little more like this, but not exactly?

12 A    Correct.  That's exactly the flowerpot we started

13 purchasing, yes.

14 Q    Well, except for one big difference, right?

15 A    Well, he had many without a hole -- I mean, with a hole

16 also.  And that's when I used to put the piece of cheese in it.

17 Q    Just like this one had the hole, right?

18 A    Yeah.

19 Q    But then ultimately Mr. Leavitt made at your request, to

20 avoid having to use the cheese, made it without the hole,

21 correct?

22 A    Yes.

23 Q    These were the flowerpots that were used in the restaurant

24 for the flowerpot salad?

25 A    Yes.

1   Q    Mr. Leavitt, he arranged for the shipping for any orders

2   you made, correct?

3   A    Yes.

4   Q    FOB Bedford?

5   A    Yes.

6   Q    And sometimes you didn't like the price or you thought it

7   was a little too much, and just as we saw on these emails you

8   would point that out and ask if he could get a better price on

9   the shipping?

10  A    Yes.

11  Q    Now, as far as the payments -- well -- yeah, as far as the

12  payments went, you testified yesterday that you don't really

13  remember what your terms were, but that you paid the invoices

14  right away.  Typically that was your practice?

15  A    Yes.

16  Q    Okay.  You also testified that you agreed, as you gauged,

17  you stocked the stock 80 percent pottery and the rest were

18  accessories, correct?

19  A    80 percent of the pottery for the --

20  Q    I'll try and find it for you here.  Bear with me.

21       Mr. McLaughlin had asked you -- let's see what time he's

22  talking about here.

23       Yeah, early on, how much of it was Emerson Creek Pottery

24  and how much of it was other?

25       And you testified that it was probably because you bought

1  so much early, but you said that 80 percent pottery at that

2  time.

3      And then he said, The rest would have been what?

4      You said, Candles, dish towels, place mats.

5      You remember that testimony, correct?

6  A    Yes.

7  Q    And that was accurate testimony, correct?

8  A    Yes.

9  Q    You also testified that the invoices indeed were sent to

10  R.W. Development?

11          MR. MCLAUGHLIN:  Object to the form.  What period of

12  time?  It varied over time.

13   BY MR. WILLETT:

14  Q    Yeah.  While Mr. Wehrli was still involved?

15  A    I guess so.  I mean, I can't remember every invoice.  I

16  don't know.

17  Q    Now, let me next direct your attention to Exhibit 57.  You

18  see this document on your screen, correct?

19  A    Yes.

20  Q    And am I correct that it's your testimony that you don't

21  believe you've ever seen this document, correct?

22  A    I've seen it when it went to Ken.

23  Q    But you don't believe you ever saw it when and if it went

24  to Ron Wehrli, correct?

25  A    Yes.

1  Q    Now, the date on that document is 3-23-01.  Do you see

2  that?

3  A    Yes.

4  Q    And next if Ashley would take us to Exhibit 81.

5       And you hadn't seen this before.  This is the metadata for

6  the actual Word version of that document.  You hadn't seen this

7  before, correct, because this would have been on Mr. Leavitt's

8  computer, right?

9  A    I've never seen it.

10  Q    Okay.  And that date has a last-modified date of

11  3-25-2001.

12       Do you see that?

13  A    Yes.

14  Q    Now, just to confirm, you testified earlier the shop

15  opened in June of 2001, correct?

16  A    Yes.

17  Q    And when the shop opened, it was called Emerson Creek

18  Pottery, correct?

19  A    Yes.

20  Q    And the entity that owned Emerson Creek Pottery,

21  Countryview Pottery Co., was incorporated as an Illinois

22  corporation on April the 2nd of 2001, correct?

23  A    Yes.

24  Q    And that was approximately -- from the date on the

25  agreement, that was approximately nine days after the date on

1  that agreement I just showed you, correct?

2  A    Yes.

3         MR. WILLETT:  No further questions.  Thank you.

4                    REDIRECT EXAMINATION

5   BY MR. MCLAUGHLIN:

6  Q    Afternoon again.  I'll try to make this fast.

7       Has Ron Wehrli ever been an owner of any of your

8  companies?

9  A    Yes.  He has a couple of them.

10  Q    No; of your companies?

11  A    I can't remember if he -- I believe so.

12  Q    No.  I know you're tired.

13       Has he ever been a member of -- strike that.

14       Has he ever been an owner of Countryview Pottery Co.?

15  A    I don't believe so.

16  Q    Has he ever been an owner of Emerson Creek Events?

17  A    No.

18  Q    Thanks.

19       You were asked -- you were asked some questions --

20         MR. MCLAUGHLIN:  If you'll pull up D-12.

21  Q    And I'm just referring you back to Exhibit Defendants' 12,

22  the January 5th, 2006 emails you were talking about maybe about

23  15 minutes ago.

24       Do you see that?

25  A    Yes.

1  Q    Do you recall the discussions about Nancy in Peoria and

2  the lady in Atlanta?

3  A    Yes.

4  Q    Did those ever go anywhere?

5  A    Nancy did open a gift store, yes.

6  Q    Were you involved in that in any way?

7  A    I was helping -- I sent her to Jim to get information

8  about product.

9  Q    And after she went, were you involved in any way?

10 A    She had come by a couple of times, and then she wanted

11 some pottery.  And Jim referred her -- I believe he said I

12 could sell her some of my Halloween pattern that she wanted.

13 Q    So what you just talked about?

14 A    Yes.

15 Q    But beyond that, did you have any other involvement with

16 her?

17 A    No.

18 Q    And so since 2006, have you had involvement with anyone

19 who has inquired in any way about selling Emerson Creek

20 pottery?

21 A    No.

22 Q    And when was your wedding business started?

23 A    The wedding business started in 2012.

24 Q    And this would have taken place before this time?

25 A    This?

1  Q    This, I'm sorry, the discussions with Nancy and --

2  A    Yes.

3  Q    -- the Atlanta woman would have taken place sometime well

4  before your opening up of a wedding business?

5  A    Yes.

6  Q    The pottery that you sold under the Signature brands and

7  the Mud Pie brands --

8  A    Yes.

9  Q    -- were they ever rebranded as Emerson Creek pottery?

10 A    No.

11 Q    So when you sold pottery in your store, how -- I just want

12 to cut to the chase:  Was it branded under the name of the

13 original manufacturer, or did you rebrand it under a different

14 name?

15 A    No.

16 Q    How was it done?

17 A    It had their name underneath.

18 Q    And that's how you sold it?

19 A    Yes.

20 Q    And you were asked a question about people coming to sit

21 on the porch.

22 A    Yes.

23 Q    Do you remember that?

24 A    Uh-huh.

25 Q    Can you tell us why people came to sit on the porch?

1      And tell me the kind of people who came to sit on the

2  porch.

3  A    It would be people would come and just hang out.

4  Sometimes they didn't even come in the store.  Teachers.  Kids

5  would come over and swing.  So it would be all kinds of people.

6  Q    Was it required for someone to purchase in the store to

7  come and sit on the porch?

8  A    No.

9  Q    And we've heard just a little bit about Julie Browman.

10 A    Yes.

11 Q    Can you tell us who Julie Browman is?

12 A    She was a friend and she was a legal secretary.

13 Q    And --

14 A    Partner.

15 Q    And was that -- for how long was she involved?

16 A    She was involved for two years.

17 Q    At the time you were opening up the wedding business, was

18 she involved at all?

19 A    No.

20 Q    And she was called a, quote unquote, legal person.  When

21 you say that, what do you mean by that term?

22 A    She would handle any of the documents that we -- just the

23 main stuff with the business.

24 Q    And so is that what you mean by legal person?

25 A    Yes.

C. Demiduk - Redirect

1   Q    She wasn't an attorney or --

2   A    No.

3   Q    -- someone giving legal advice, was she?

4   A    No.

5   Q    You were specifically asked about Countryview Pottery Co.

6   using the d/b/a?

7   A    Yes.

8   Q    And do you know what the specific issue, as it related to

9   Illinois corporations, why you had to have a d/b/a?

10  A    You had to have another -- I believe it's for bank

11  accounts or Countryview Pottery doing business -- like the

12  legal aspect of it, I believe.

13  Q    So it was so that you could use Emerson Creek Pottery with

14  respect to whether it would be on a checking account, or

15  whether it actually would just be maybe even on the name?

16  A    Yes.

17          MR. MCLAUGHLIN:  Those are all the questions I have.

18  Thanks.

19          THE COURT:  Is that all, then?  You may step down.

20  Who's your next witness?

21          MR. LAUBSCHER:  We have no further witnesses, Your

22  Honor.

23          MR. MCLAUGHLIN:  The defendants rest.

24          THE COURT:  All right.  Any rebuttal?

25          MR. WILLETT:  Judge, I'm just conferring real quick.

1          (Pause.)

2          MR. WILLETT:  No, nothing further, Your Honor.  No

3   further evidence.

4          THE COURT:  Members of the jury, it's 20 of 1, I

5   think, now.  I'm going to allow you to go to lunch at this time

6   and have you come back at 1:00.  There are some instructions

7   and things we have to consider before we can resume.  But

8   hopefully we'll be able to -- when you get back, I'll give you

9   the final instructions and you'll hear the final argument in

10  the case.  And then hopefully we'll be able to have some time

11  to deliberate.

12         THE CLERK:  Judge, did you mean 2:00?  You said 1:00

13  to return.

14         THE COURT:  I mean 2:00.

15         THE CLERK:  Thank you.

16         THE COURT:  Thank you.  So anyway, you're excused

17  until 2:00.

18  **(Jury out, 12:39 p.m.)**

19         THE COURT:  Can you all be back -- I mean the

20  lawyers -- at 1:30 --

21         MR. LAUBSCHER:  We can be back whenever you need.

22         THE COURT:  -- to finalize any objections?

23         MR. LAUBSCHER:  Yes, sir.

24         THE COURT:  All right.  Unless you've got a better

25  idea, I'm open.

1    MR. MCLAUGHLIN:  That sounds good, Your Honor.

2    THE COURT:  Okay.  We'll do that.  We'll recess in

3  here until 1:30.

4    (Recess.)

5    THE COURT:  Let's look at the injury instructions.

6  What's the first number the plaintiff objects to?

7    MR. GOODRUM:  In the instructions, Your Honor?

8    THE COURT:  Yes.

9    MR. GOODRUM:  Instruction 10 on page 10:  The

10  plaintiffs claim that defendants breached an express or implied

11  trademark license.

12    THE COURT:  What's the objection?

13    MR. GOODRUM:  Just a slight change, Your Honor, to

14  specify that it could either be an express or an implied

15  license.

16    THE COURT:  It says express or implied, right?

17    MR. GOODRUM:  In the revision, we've added it.  Is

18  that acceptable?

19    MR. MCLAUGHLIN:  It's in there.

20    MR. GOODRUM:  Well, Your Honor, in the original set

21  we got yesterday I don't think it was in there, and I think I

22  put it in there last night.  I put express and implied.

23    THE COURT:  I've given you the instructions I intend

24  to read.  I want to know what you object to in these

25  instructions.

1    MR. GOODRUM:  Why is this not adequate?  Well, it's

2  not adequate, Your Honor, because there were two types of

3  licenses.

4    MR. MCLAUGHLIN:  Your Honor, I think he's confused.

5  I don't think he has the most recent version.  I think that's

6  why he's confused.  He's just confused.  I think once he sees

7  the revised, he'll be fine.

8    MR. GOODRUM:  I'm looking for it now.  Sorry about

9  this.

10    THE CLERK:  I've got a copy right here.

11    MR. GOODRUM:  I'm getting it right now, Your Honor.

12  I'm sorry.  So I'm going down the instructions.

13    THE CLERK:  Here's a printout.

14    MR. GOODRUM:  Okay.  We're fine on 10.

15    THE COURT:  Okay.

16    MR. GOODRUM:  I believe we're fine on 11.  Yes.  Fine

17  on 12.  Fine on 13.  Fine on 14.  We're fine on 15.

18    MR. MCLAUGHLIN:  Your Honor, this is the first that

19  we would object to.

20    THE COURT:  Excuse me?

21    MR. MCLAUGHLIN:  We would object to 15.  That's our

22  first.

23    THE COURT:  Okay.  What is your objection to 15?

24    MR. MCLAUGHLIN:  So the comment there, the naked

25  licensing doctrine, does not apply even if a trademark owner

1 fails to adequately exercise adequate control where the

2 likelihood of confusion is apparent is not proper for the naked

3 licensing doctrine. It only deals with infringement -- or

4 excuse me, with acquiescence.

5 　　　　MR. GOODRUM: Your Honor, the citations I've got

6 there, *Pinehurst* and *Sara Lee,* they're both Fourth Circuit

7 cases. One applies to the doctrine in acquiescence. The other

8 applies it in naked licensing.

9 　　　　MR. MCLAUGHLIN: Yeah, with the acquiescence, there's

10 no issue. It's just the naked licensing that we have an issue.

11 　　　　MR. GOODRUM: I believe that *Resorts* case, 1998

12 Fourth Circuit case, applied it in naked licensing.

13 　　　　MR. MCLAUGHLIN: The problem is, Your Honor, that

14 with naked licensing, that if they've -- the problem is with

15 the naked license doctrine, if there's a naked license, then

16 it's been abandoned. They could not enforce it. This would

17 give an inconsistent instruction to the jury on that issue.

18 　　　　MR. GOODRUM: Well, there are no instructions on

19 abandonment at all, let alone any proof or on the standard of

20 proof which is strict.

21 　　　　MR. MCLAUGHLIN: But there is on naked licensing.

22 They have an instruction on naked licensing. Therefore, they

23 can reach that conclusion. And so we have naked licensing on

24 the license issue. With respect to acquiescence, what's stated

25 there is correct. It's just there's a distinction between the

1  two doctrines.

2         MR. GOODRUM:  Yes, but where there is inevitable

3  confusion in the Fourth Circuit called apparent confusion, the

4  doctrine does not apply.  And that is because the overriding

5  concern with trademarks in this country is consumer protection.

6  It is -- you know, the paramount importance is to protect

7  consumers from confusion.  So to apply this technicality when

8  confusion is apparent would work against the principal purpose

9  of trademarks.

10         MR. MCLAUGHLIN:  The whole purpose of the affirmative

11  defense, Your Honor, would be that if there is a naked license,

12  there is no trademark to enforce.  It's been abandoned.  And so

13  if they find naked licensing, then the remaining issues are no

14  longer on the table.  It's only if they find that there is a

15  valid trademark and then there's been acquiescence, then those

16  issues come back in with respect to the likelihood of

17  confusion.

18         MR. GOODRUM:  Your Honor, abandonment is not

19  established upon a showing of naked licensing.  Abandonment

20  requires significantly more proof.  The standard is much

21  higher.  It's strict.

22         MR. MCLAUGHLIN:  Judge, I mean, we just -- like I

23  said, we don't have extensive cases, obviously, in the last few

24  minutes here.

25         I'll just read something here.  It says, Uncontrolled

1  or naked licensing may result in the trademark ceasing to

2  function as a symbol of quality and control.  Source:  This

3  effect has often been characterized as the abandonment of the

4  trademark.  This may argue in favor of that.  Of all the

5  courts, the Ninth Circuit has stated this the most forcefully.

6  We have previously declared that naked licensing is inherently

7  deceptive and constitutes abandonment of any rights to the

8  trademark by the licensor.  So to have an issue about confusion

9  doesn't make sense where you no longer have a trademark.

10          MR. GOODRUM:  Your Honor, I'll read from *Pinehurst*,

11  Fourth Circuit 1998 at 148 F.3d 417 at 423, quote, "The public

12  interest in avoiding confusion and mistake requires that the

13  doctrines laches and acquiescence not be rigidly applied when a

14  strong showing of a likelihood of confusion is made."

15          And that cites to -- I omitted the internal citation.

16          MR. MCLAUGHLIN:  What he's doing is confusing the

17  equitable doctrine of laches and acquiescence with this naked

18  licensing doctrine.

19          So like I said, with respect to naked licensing, what

20  he's saying isn't correct.  With respect to acquiescence, it

21  would be.  That's already dealt with in another instruction on

22  the acquiescence issue.

23          MR. GOODRUM:  It is on acquiescence in the other

24  instruction, and that instruction is acceptable to us.

25          But the problem is, naked licensing is not equivalent

1  to abandonment.  The case law is clear that abandonment

2  requires a significantly higher showing, and the standard is

3  higher.  It's strict.

4          MR. MCLAUGHLIN:  The issue is not about the higher

5  standard.  The issue is to whether they can consider naked

6  licensing, which they are.  Once they've decided that there's

7  naked licensing, that's it.  I mean --

8          (Overlapping speakers.)

9          MR. GOODRUM:  That's incorrect, because that would

10 affect abandonment.  And for abandonment the level of proof

11 must be higher.

12         MR. LAUBSCHER:  No.  For abandonment under the

13 trademark statute, three years of nonuse, there is a

14 presumption of abandonment.  And then the burden shifts to the

15 trademark owner to show there was no abandonment.

16         MR. MCLAUGHLIN:  If you recall our original --

17         MR. LAUBSCHER:  That's in the statute.

18         MR. MCLAUGHLIN:  If you recall our original change it

19 had an abandonment statement in there.  It seems to me that

20 would inure to the benefit of the plaintiff.  At this point,

21 it's almost presumed --

22         MR. GOODRUM:  I haven't received your revisions.

23         THE COURT:  Okay.  Look, are laches and naked

24 licensing functionally equivalent?

25         MR. GOODRUM:  I beg your pardon, Your Honor?

Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.,
6:20cv54, 2/25/2022

1        THE COURT:  Are laches and naked licensing

2  functionally equivalent?

3        MR. GOODRUM:  Functionally, they are equivalent.

4  They're equitable defenses.

5        MR. MCLAUGHLIN:  No, they're not.  They're different

6  doctrines.

7        MR. LAUBSCHER:  They're not equivalent at all.

8  Laches is basically a delay in bringing an action; whereas

9  naked licensing is the whole control issue where the trademark

10  owner, the licensor, failed to control the activities of the

11  licensee.

12        MR. GOODRUM:  That's true --

13        MR. LAUBSCHER:  Two separate doctrines.

14        MR. GOODRUM:  Functionally, it's the same.

15        MR. LAUBSCHER:  They're two separate doctrines.

16        MR. GOODRUM:  Functionally equivalent.

17        MR. LAUBSCHER:  Under the laches doctrine, you don't

18  lose your trademark rights.  You might lose your rights to

19  enforce them in that one particular instance.

20        Under the naked licensing doctrine, you lose your

21  trademark rights, as against anybody.

22        THE COURT:  Okay.  I'm going to strike that entire

23  paragraph, second paragraph.  The naked license doctrine does

24  not apply, even if the trademark fails to exercise adequate --

25  fails to exercise control.  I'm taking that sentence out.

1        MR. GOODRUM:  Thank you, Your Honor.  We'll just note

2    our exception.

3        THE COURT:  Okay.

4        MR. GOODRUM:  Also, Your Honor, in that instruction

5    15 we had an addition that's not there.  We'd like to note our

6    exception to that.  Adequate quality control can be informal.

7    It does not require written reports, and can match the

8    circumstances of the parties' sizes and circumstances as small

9    businesses.  We cited the *Beachmark* case and *Vineyard House*

10   case.

11       MR. MCLAUGHLIN:  Your Honor, the only issue is that

12   we've left to the jury the determination of adequate control.

13   We've heard a variety of different testimony on that issue.

14       THE COURT:  All right.

15       MR. MCLAUGHLIN:  So I think they have facts they can

16   determine that from.

17       THE COURT:  Do you object to his addition?

18       MR. MCLAUGHLIN:  It's not necessary.  They have the

19   additional language.  We've already told the jury they're

20   determining adequate controls.  They've heard from a variety of

21   sources that they can consider in totality.

22       THE COURT:  I'll leave the instruction as is and note

23   your objection.

24       MR. GOODRUM:  Thank you, Your Honor.

25       THE COURT:  Go past 15.

1        MR. GOODRUM:  18, Your Honor, I think 18 is

2   acceptable.

3        MR. MCLAUGHLIN:  Are you okay with 18?  Because we

4   would have an objection to 18.

5        MR. GOODRUM:  I'm sorry, 19.

6        MR. MCLAUGHLIN:  Can we stop at 18 just for one

7   moment.

8        THE COURT:  18?  There was an instruction that said

9   something about in this circuit.  I don't think you can tell

10  the jury -- give them citations or anything.

11       MR. MCLAUGHLIN:  Right.

12       THE COURT:  Just instruct them on the law.

13       MR. MCLAUGHLIN:  Right.

14       MR. GOODRUM:  As it stands now, Your Honor, I think

15  it's fine.

16       MR. MCLAUGHLIN:  There's just one addition we want to

17  have to number 18 just for clarification.  The statement --

18  okay.  So if you go to the paragraph that says, "You need not

19  find acquiescence when the likelihood of confusion is apparent,

20  even where the plaintiff may have assured the defendants that

21  the plaintiff would not assert its trademark rights," that

22  should come out.

23       Instead it should read as follows, "If you find

24  acquiescence, you must then determine whether, despite that

25  acquiescence, likelihood of confusion is apparent."

1        It's a two-step process.  There has to be

2  acquiescence and then a determination of likelihood of

3  confusion.  It's a more accurate statement of what the law is.

4        MR. GOODRUM:  Could you read it again?

5        MR. MCLAUGHLIN:  So we're striking the paragraph that

6  says, "you need not find acquiescence when the likelihood of

7  confusion is apparent, even where the plaintiff may have

8  assured the defendants that the plaintiff would not assert its

9  trademark rights."

10        And that would be substituted with, "if you find

11  acquiescence, you must then determine whether, despite that

12  acquiescence, likelihood of confusion is apparent."

13        It just more accurately tracks the language.

14        MR. GOODRUM:  What were the final words?

15        MR. MCLAUGHLIN:  "If you find acquiescence, you must

16  then determine whether, despite that acquiescence, likelihood

17  of confusion is apparent."

18        MR. GOODRUM:  That's acceptable, Your Honor.

19        THE COURT:  Okay.

20        MR. MCLAUGHLIN:  Thank you, Judge.

21        THE COURT:  Okay.  19?

22        MR. GOODRUM:  19 is fine, Your Honor.  And then we

23  have no further objections.

24        MR. MCLAUGHLIN:  Nor do we.

25        THE COURT:  All right.  Looking at the verdict form.

1      MR. GOODRUM:  Your Honor, just cutting to it, the

2   only objection we have is to question 1.  And on question 1 the

3   addition I made, which is not in there, just added language

4   from the corresponding jury instruction.  And it simply says

5   from the jury instruction, "Given that the parties do not

6   contest that plaintiff owns the trademark Emerson Creek

7   Pottery, does plaintiff have a valid trademark in the mark

8   Emerson Creek?"

9      And again just copying the language over from

10  instruction 11.

11     MR. MCLAUGHLIN:  We don't think that that's

12  necessary.  This is already handled, and it's very specific

13  with respect to Emerson Creek.

14     THE COURT:  I'll note your objection to that, but I'm

15  going to leave it as it is.

16     MR. GOODRUM:  It's staying as is?

17     THE COURT:  As is.

18     MR. GOODRUM:  Exception, please.  Thank you, Your

19  Honor.

20     THE COURT:  Do you have any objections?

21     MR. MCLAUGHLIN:  Just to kind of clean up a couple of

22  things.

23     So the first thing that we were going to suggest is

24  that same question 1 should -- okay.  So let's go down.

25     If we go down to 6 and 7, which is on page -- I'm not

1  sure which page that's on.

2         MR. GOODRUM:  Page 2.

3         MR. MCLAUGHLIN:  Page 2.  Thanks.  What we were going

4  to do, we think that they should be flipped just because of the

5  way that the determinations are being made.

6         So the question about did plaintiff exercise adequate

7  control over the nature and quality of the services, question

8  7, that should come first.  And then there should be an

9  addition that instructs the jury to end their deliberations,

10  because that would actually be a finding in favor of the

11  defendants.

12         And then the next statement would be -- question 6

13  would become question 7, which would say:  Did defendants

14  breach the licensing agreement?

15         MR. GOODRUM:  Well, Your Honor, we have no problem

16  flipping the order of 7 and 6, but not with the addition,

17  because adequate control -- I mean, we just talked about these

18  equitable -- you know, these doctrines:  Laches, acquiescence,

19  and naked licensing.  That's really inevitable confusion.  So

20  where confusion is apparent, you know, you continue.  You don't

21  stop.

22         MR. MCLAUGHLIN:  This is a question that dealt with

23  the licensing issue.  There's a later question with respect to

24  the acquiescence issue.  So since this is only dealing with the

25  licensing at that point, it has to say on that issue it has to

Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.,
6:20cv54, 2/25/2022

1  be a finding for the defendants, because that means they would

2  have found naked licensing at that point.

3          MR. GOODRUM:  But they should still continue.

4          MR. MCLAUGHLIN:  And it does continue.  With respect

5  to that mark, it would actually be over, because that would

6  mean they would no longer have rights to the mark.

7          MR. GOODRUM:  But the mark would be enforced if it

8  were apparent confusion.

9          MR. MCLAUGHLIN:  That's what we just discussed.  It

10 would be naked licensing, in which case there would be no mark.

11         MR. GOODRUM:  Well, we're fine with flipping the

12 order, but not with the addition.

13         THE COURT:  Okay.  You agree that if the jury answers

14 question 7 no, there would not be damages, right?  They

15 wouldn't go to 8.  Is that your position?

16         MR. MCLAUGHLIN:  That's correct.

17         MR. GOODRUM:  I agree that there wouldn't be damages

18 on Count Four, the breach claim, the contract claim.  I do

19 agree.  But not on the infringement claims.

20         MR. MCLAUGHLIN:  And what we're saying is if there

21 was naked licensing with respect to the trademark, that would

22 be the end of the inquiry.

23         MR. GOODRUM:  Well, these instructions deal with the

24 contract claim.

25         MR. MCLAUGHLIN:  That's why I'm saying the issue of

1  acquiescence and trademark infringement is later on.  This is

2  the naked licensing issue.  Where this is right here, that

3  would be an appropriate instruction.

4         THE COURT:  We're going to tell them if they answer

5  question 7 no, then they don't answer 8.  But then they go and

6  take up damages.

7         MR. MCLAUGHLIN:  Right.  And then it would mean

8  that -- so question 7 would become number 6, and then question

9  6 would then become question 7, because that would -- there

10  would have been a determination earlier that there was a

11  breach.

12         THE COURT:  All right.

13         MR. GOODRUM:  Then with new question 7, if they

14  answer no, then they go to question 9?

15         MR. MCLAUGHLIN:  I would agree with -- that is

16  correct.  He's saying if they find a breach, yeah, then they

17  would -- yeah, we're fine with that.

18         MR. GOODRUM:  Really it's in either case they go to

19  question 9, isn't it, either yes or no?

20         MR. MCLAUGHLIN:  No.  If it's a no, you can't go to

21  infringement because it's over.  It has to be a yes answer to

22  go on.

23         MR. GOODRUM:  No.  No, because this is a separate

24  claim.

25         MR. MCLAUGHLIN:  We're still going around on the

1   naked licensing.  If there's naked licensing, there can be no

2   infringement because there is no trademark to infringe.  So

3   that's what we're saying; if there's a no, that ends the

4   inquiry.  If there's a yes, they would go on to make a

5   determination.

6           MR. GOODRUM:  There can be naked licensing under

7   inevitable confusion.

8           MR. MCLAUGHLIN:  That's the discussion we had before.

9           MR. GOODRUM:  It does not -- the inquiry does not end

10  at 8 -- rather, at 7, the new 7.  This is the contract claim.

11  We go on to the infringement claim.

12          THE COURT:  I think the plaintiff is right on that.

13  I'm going to rule the plaintiff is right on that.

14          MR. MCLAUGHLIN:  On which one, to go on?  To go on

15  with respect to that issue?

16          THE COURT:  The infringement.

17          MR. MCLAUGHLIN:  Just note our objection.

18          MR. GOODRUM:  Thank you, Your Honor.

19          THE COURT:  He's going to make the changes.

20          We'll try to start -- anything else?  Oh, how long do

21  you propose to argue?

22          MR. WILLETT:  Your Honor, some of that is going to --

23  I need to confer with Mr. Goodrum based on what we've got in

24  the instructions. I would try to say 40 minutes.

25          THE COURT:  Forty minutes is fine, but I think you

1  need to stick to it so the jury gets the case in time to go

2  back and start deliberating. And I'm going to tell them they

3  can finish tonight, if they want to, or come back Monday.

4  That's all I can do.

5          MR. LAUBSCHER: I'm only anticipating about 15

6  minutes, Your Honor, for myself.

7          MR. WILLETT: I will try and be as brief as possible,

8  but just to make sure I don't --

9          THE COURT: I hope they'll try to finish.

10          MR. MCLAUGHLIN: Two more housekeeping matters. With

11  respect to the instructions on question 9, it says, if the

12  defendants infringe plaintiff's trademark, but there are

13  actually a couple of marks involved. So what we're going to

14  ask is to have additions for -- we were going to repeat

15  question number 1 that says, "Does plaintiff own Emerson

16  Creek?"

17          THE COURT: There's static there.

18          THE CLERK: Maybe come away from the mic a little.

19          MR. MCLAUGHLIN: Question 1 says does the plaintiff

20  have the trademark Emerson Creek? We just think it needs to be

21  repeated here and a determination made, because then the next

22  question would be question 9 is fine as written, but it should

23  actually only have one would refer to plaintiffs Emerson Creek

24  Pottery trademark. And then another question would be: Did

25  defendants infringe plaintiff's Emerson Creek trademark? It's

1  because there's the two, we thought it would make sense to have

2  a question about whether there's an Emerson Creek trademark

3  like question number 1.  And then 9 would be, you know, a 9A

4  and a 9B, one determining for Emerson Creek alone, and then the

5  second for Emerson Creek Pottery.

6           THE COURT:  Okay.

7           MR. MCLAUGHLIN:  Just to clarify it.

8           MR. GOODRUM:  That's fine, Your Honor.  We'd note an

9  exception, but that's fine.

10          MR. MCLAUGHLIN:  And I believe those are all the

11  issues.

12          THE COURT:  All right.  Anything else then?

13          THE CLERK:  I just wanted to clarify something for

14  the record for exhibits yesterday.  The parties stipulated to

15  the discovery designations.  And so after we realized they each

16  needed an exhibit number.  So just for clarity of the record,

17  the stipulated discovery designations have been admitted as

18  Exhibit numbers -- Plaintiff's Exhibit 243 through 254, just

19  for the record.  Thank you.

20          MR. WILLETT:  Your Honor, now that the evidence is

21  in, the plaintiff would again request that judgment be entered

22  as a matter of law, appreciating the directive from the Court

23  yesterday that this matter is going to the jury.  We would

24  reiterate the points that were made in support of our motion

25  for summary judgment; namely that we have satisfied our burden

1  with respect to the trademark infringement claim, the 43(a)

2  violation for false sponsorship, as well as breach of contract.

3        The facts that have come in are essentially the facts

4  that were pled in our agreement.  They've never -- you know,

5  they've always contested the written agreement.  No one has

6  contested that -- no one is stating that it was a written

7  agreement.  It was an oral agreement.  We think the facts

8  support that.  The admissions that were pulled in through the

9  emails and other things, the direct correspondence that

10  Ms. Demiduk affirmed, that all established that there was,

11  indeed, an oral agreement.  And there can be no doubt that that

12  agreement was breached.

13        Similarly with respect to the marks, UIC got the

14  Emerson Creek Pottery mark, got the registration.  No dispute

15  there as to the validity of that mark.  I know they contest the

16  Emerson Creek mark, but we've seen ample evidence that that was

17  the mark and continued to be in use by Mr. Leavitt's company.

18  We believe that there was infringement of both of those marks.

19  That evidence is very clear.

20        And again, as well as false sponsorship.

21        So for all the reasons that we stated in support of

22  our motion for summary judgment, we would renew that as a Rule

23  50 motion at this time.

24        THE COURT:  The motion is denied.  There's sufficient

25  conflict in the evidence that I don't think judgment as a

1  matter of law is appropriate.

2          MR. LAUBSCHER:  Thank you, Your Honor.

3          THE COURT:  We'll take a couple of minutes while he's

4  making these changes.  Then at the end after I read all the

5  instructions, I'm going to allow -- if I read something wrong,

6  bring it up, or if some obvious error of law occurs that hasn't

7  been objected to, bring it up after I finish the instructions.

8          (Recess.)

9          THE COURT:  I was suggesting it might be helpful to

10 the jury for each juror to have their own copy of the

11 questionnaire.

12         MR. WILLETT:  Oh, that's a great point, Your Honor.

13         MR. LAUBSCHER:  So that they have it during closing

14 argument?

15         MR. WILLETT:  Yeah, I think that's a great idea.

16         THE COURT:  You can bring it up on the ELMO, too.  If

17 they have it, you could have them refer to it.

18         (Recess.)

19         THE COURT:  Could you reread instruction 18?

20         MR. MCLAUGHLIN:  If you find acquiescence, you must

21 then determine whether, despite that acquiescence, likelihood

22 of confusion is apparent.

23         I can read that again if you like.

24         THE COURT:  I'm reading it back to you:  If you find

25 acquiescence, you must then determine whether, despite that

1  acquiescence, likelihood of confusion is apparent.

2         MR. MCLAUGHLIN:  That's correct, Your Honor.  Thank

3  you.

4         MR. GOODRUM:  Your Honor, I beg your pardon, I've

5  just noticed something on question 13 on the revision.  We did

6  submit something on this.  It's very simple.  It's just adding

7  another amount space on the verdict form, question 13.  And

8  just saying the amount of defendants' profits in one space, one

9  dollar space, and the amount of plaintiff's damages in the

10  other dollar space.

11         And that's because the act at 1117(a) states that the

12  types of money damages or money remedy you can get, one being

13  damages and the other being profits.  So the way it's drafted

14  now it just says damages.  And that doesn't follow the act, and

15  it restricts from the type of money remedy.

16         MR. MCLAUGHLIN:  No, Your Honor.  There is a measure

17  of damages which includes several elements.  The instructions

18  are very clear about what they're entitled to.  They have two

19  lines which suggest that there were additional damages they're

20  entitled to.  I think one line the jury can determine the

21  damages.  They can do their own addition.

22         MR. GOODRUM:  Your Honor, I have the code section

23  here, 15 U.S.C. 1117(a):  Profits; damages and cost; attorneys'

24  fees.  And reading down in that section, I'll just read it,

25  "When a violation of any right of the registrant of a mark

1   registered in the Patent and Trademark Office, a violation

2   under section 1125(a) or (d) of this title, or a willful

3   violation under section 1125(c) of this title, shall have been

4   established in any civil action arising under this chapter, the

5   plaintiff shall be entitled, subject to the provisions of

6   sections 1111 and 1114 of this title, and subject to the

7   principles of equity, to recover (1) defendant's profits, (2)

8   any damages sustained by the plaintiff, and (3) the costs of

9   the action."

10          Now, of course, the Court determines costs with the

11  filing.  So there wouldn't be a space for that.  But there are

12  two separate types of monetary remedy under the act:  Profits,

13  as well as damages.  And the way it's stated now it just says

14  damages.

15          MR. MCLAUGHLIN:  There is an instruction that's very

16  explicit about what damages are allowable.  So it's already

17  spelled out much in the way he stated it.  So it just provides

18  a line.  Like I said, they can do their own math.  If they

19  think there's multiple elements --

20          THE COURT:  I think the jury instruction takes care

21  of it.

22          MR. GOODRUM:  Well, then, Your Honor -- thank you,

23  Your Honor.  Just exception, then.  I think actually we could

24  just strike the words "of damages" and just leave the question,

25  "what is the amount defendants should pay?"  That way it would

1  eliminate any discrepancy between the -- we leave one blank and

2  just say:  What is the amount defendants should pay?  So it

3  wouldn't suggest that they should just pay damages and not

4  profits.

5          MR. MCLAUGHLIN:  I don't know that the jury is

6  necessarily confused by damages.  I think already they're

7  reading enough language that they don't understand.  And it

8  does refer to both jury instructions with respect to the

9  measure of damages.  So it's not like they haven't looked at

10  what Mr. Goodrum has suggested.  They're already going to

11  know --

12          THE COURT:  Well, it wouldn't be an improper

13  statement of the law to say:  What is the amount the defendant

14  should pay for --

15          MR. MCLAUGHLIN:  That's fine.  If you want to massage

16  that a little bit, that's fine.

17          There's one other thing.  There's one line before the

18  9A and B.  There's the question:  Did plaintiff own the mark,

19  Emerson Creek?  It was whatever your question number 1 was, it

20  should have been brought down right before question 9A.  So

21  it's just basically a copy and paste of that.

22          That should be it.

23          MR. GOODRUM:  I'm not following.

24          MR. MCLAUGHLIN:  If you recall, we had originally --

25  because there were two potential marks.  And in order for 9A

1  and 9B to make sense, there has to be -- they have to make a

2  determination of -- make a determination of there being an

3  Emerson Creek mark.  It was just for consistency.  So question

4  1 had it.  And it was just going to drop down to have it again

5  so that it makes it clear to the jury that they were

6  considering it on two different potential marks.

7          MR. GOODRUM:  I'm still not following.  What do you

8  mean -- what's the form going to look like?

9          MR. MCLAUGHLIN:  What I'm saying is that the question

10 of whether plaintiff owns the Emerson Creek mark was a question

11 at 1, and there is a drop down under the infringement section

12 where it asks the question about:  Did defendants infringe

13 plaintiff's Emerson Creek trademark, and did they infringe

14 plaintiff's Emerson Creek Pottery mark?

15         So with respect to Emerson Creek Pottery, obviously

16 there's no issue on that, but there was an issue on Emerson

17 Creek.  So you're basically bringing down the question and

18 saying you're determining whether there's an Emerson Creek

19 mark, but you're not giving them the determination about

20 Emerson Creek Pottery.  It's just for consistency purposes.

21 That's all.

22         THE COURT:  Can we do all of this in question 1?

23         MR. MCLAUGHLIN:  No, because when you get down to --

24 either that or you can bring them down to refer to 9A/B.  So if

25 it's -- you'd have to refer them back down to 9.  There just

Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.,
6:20cv54, 2/25/2022

1  has to be a connection so that they understand the connection

2  between the two; otherwise, when they see it, it doesn't make

3  sense.

4        MR. GOODRUM:  I'd have to see the proposal in print.

5  I hear what he's saying, but I don't follow it.

6        MR. MCLAUGHLIN:  I think just to simplify it, would

7  you allow Mike Fretwell to speak?

8        MR. FRETWELL:  We don't agree that they own Emerson

9  Creek, the trademark.  So to determine that there is an

10  infringement, they first have to -- the jury first has to find

11  that they own Emerson Creek; then determine that there is

12  likelihood of confusion.

13        So in the infringement section of these instructions

14  the question should be for Emerson Creek first, do they own

15  Emerson Creek.  Then, second, if you said yes to ownership of

16  Emerson Creek, is there -- did they infringe on that mark, or

17  is there a likelihood of confusion?

18        Now, Emerson Creek Pottery we're not contesting.  So

19  there would be no need to determine if they own that first.

20        MR. MCLAUGHLIN:  It's just for consistency.

21        MR. GOODRUM:  So what is the proposed amendment?

22        MR. MCLAUGHLIN:  So there's two sections that are

23  being determined.  There's one dealing with licensing and one

24  dealing with trademark infringement.  And so the question about

25  whether they own the Emerson Creek mark has to be the first

1 question of inquiry before they can talk about infringement.

2 They have to say yes, they have an Emerson Creek trademark, and

3 then they would go to the next question of:  Did they actually

4 infringe on that mark?

5         MR. GOODRUM:  Isn't that what it says in question 1?

6         MR. MCLAUGHLIN:  Question 1 is under the licensing

7 part.  So it's just to keep it consistent so that when they're

8 considering the issue on the theory of infringement -- it

9 should be the same answer, obviously, but it's just for

10 consistency purposes.

11         MR. GOODRUM:  So then I ask again:  What exactly is

12 the amendment?  How do you propose to change this form?

13         MR. MCLAUGHLIN:  Before 9A, you just repeat question

14 1.

15         THE COURT:  Question 9A:  Only answer this question

16 if you found that plaintiff owns the trademark Emerson Creek

17 above in question 1?

18         MR. MCLAUGHLIN:  We're not trying to belabor the

19 issue.  It's not really a legal issue as much as just we're

20 considering that the jury is considering a lot.  It might be a

21 little easier for them if they see that question so it all

22 makes sense for them.  It's not -- it's not, quote unquote,

23 legal because they're going to decide it once.  It should be

24 the same answer twice.

25         THE COURT:  Okay.  We've got to move on.

1            MR. FRETWELL:  If they say no to one, they can't say

2    yes to 9A.

3            THE COURT:  All right.  We're going to email it to

4    you and check it out.

5            The only thing that changed was the parenthetical in

6    9A.

7            MR. MCLAUGHLIN:  That's fine.

8            MR. WILLETT:  Judge, I thought you made a comment.

9            MR. FRETWELL:  There's a parenthetical in 9A now.

10           MR. WILLETT:  Okay.  Gotcha.

11           THE COURT:  Can you all hear me okay?

12           MR. MCLAUGHLIN:  We did, yes, Your Honor.  I think

13   Mr. Willett was just in the middle of something.

14           MR. GOODRUM:  I think that change to 9A is

15   acceptable, Your Honor.

16           (Pause.)

17           THE COURT:  You will be referring to the verdict form

18   during closing, I take it?

19           MR. WILLETT:  Yes, Your Honor.

20           THE COURT:  I'm not going to read it to the jury.

21   We'll give them copies of it.

22   **(Jury in, 2:32 p.m.)**

23           THE COURT:  You may have a seat.

24           Members of the jury, I'm about to give you the final

25   instructions.  I'm going to read the instructions to you and

1  they're going to appear on the screen in front of you.  That's

2  the verdict form that you have, which we'll get to later.  Now

3  I'll ask you to direct your attention to the screen while I

4  read the instructions.  If I misspeak, it's the written words

5  that counts if I misspeak.  So anyone can correct me, too.

6          These are your final instructions:  Now that you have

7  heard all the evidence in the case, it becomes my duty to

8  instruct you on the rules of law that you must follow and apply

9  in arriving at your decision.  You will follow and apply these

10  rules of law after you have heard the final arguments of the

11  lawyers for the parties.  It is your duty as jurors to follow

12  the law as stated in my instructions and to apply the rules of

13  law, so given, to the facts as you find them from the evidence

14  in this case, and solely the evidence presented to you.

15          Counsel may quite properly refer to some of the

16  governing rules of law in their arguments.  If, however, any

17  difference appears to you between the law as stated by me in

18  these instructions, you are governed by the instructions I am

19  about to give you.  You must follow all the rules as I explain

20  them to you.  You may not follow some and ignore others.  You

21  are not to single out one instruction alone as stating the law,

22  but must consider the instructions as a whole.

23          Neither are you to be concerned with the wisdom of

24  any rule of law stated by the Court.  Regardless of any opinion

25  you may have as to what the law ought to be, it would be a

Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.,
6:20cv54, 2/25/2022

1 violation of your sworn duty to base a verdict upon some other

2 view of the law than that given in the instructions, just as it

3 would be a violation of your sworn duty, as judges of the

4 facts, to base a verdict upon anything but the evidence in the

5 case. You must not base your verdict on prejudice, sympathy,

6 guesswork, or speculation, but on the evidence and on the rules

7 of law I have given you.

8 Justice through trial by jury must always depend on

9 the willingness of each individual juror to seek the truth as

10 to the facts from the same evidence presented to all the jurors

11 and to arrive at a verdict by applying the same rules of law as

12 given in the instructions of the Court.

13 As stated earlier, it is your duty to determine the

14 facts, and in so doing you must consider only the evidence I

15 have admitted in the case. The evidence in the case includes

16 the sworn testimony of the witnesses, regardless of who may

17 have called them; all exhibits received in evidence, regardless

18 of who may have produced them; and all facts which have been

19 admitted or stipulated. Remember that statements, objections,

20 or arguments made by the lawyers are not evidence in the case,

21 and you may not consider any question which contained any

22 statement of facts as evidence of that fact, unless it was

23 agreed to by the witness. The function of the lawyers is to

24 point out those things that are most significant or most

25 helpful to their side of the case, and in so doing to call your

1  attention to certain facts or inferences that might otherwise

2  escape your notice.  In the final analysis, however, it is your

3  own recollection and interpretation of the evidence that

4  controls in the case.  What the lawyers say is not binding upon

5  you.

6  Also, during the course of the trial, I occasionally

7  made comments to the lawyers, or asked questions of a witness,

8  or admonished a witness concerning the manner in which he or

9  she should have responded to the questions of counsel.  Do not

10 assume from anything I may have done or said during the trial

11 that I have any opinion concerning any of the issues in this

12 case.  Except for my instructions on the law, you should

13 disregard anything I may have said during the trial in arriving

14 at your own findings as to the facts.

15 You are the judges of the facts and the credibility

16 of the witnesses and the weight of the evidence.  You may

17 consider the appearance and manner of the witnesses on the

18 stand, their intelligence, their opportunity for knowing the

19 truth and for having observed the things about which they

20 testified, their interest in the outcome of the case, their

21 bias, and, if any have been shown, their prior inconsistent

22 statements, or whether they have knowingly and voluntarily

23 testified untruthfully as to any material fact in the case.

24 You may not arbitrarily disregard believable

25 testimony of a witness.  However, after you have considered all

1  the evidence in the case, then you may accept or discard all or

2  part of the testimony of a witness as you think proper.

3        You are entitled to use your common sense in judging

4  any testimony.  From these things and all the other

5  circumstances of the case, you may determine which witnesses

6  are more believable and weigh their testimony accordingly.

7        In considering the weight to be given to the

8  testimony of an expert witness, you should consider the basis

9  for their opinion and the manner by which the witness arrived

10  at it and the underlying facts and data upon which the witness

11  relied.

12        Any fact that may be proven by direct evidence may be

13  proved by circumstantial evidence; that is, you may draw all

14  reasonable and legitimate inferences and deductions from the

15  evidence.

16        If you believe from the evidence that a witness other

17  than a party previously made a statement inconsistent with his

18  or her testimony at this trial, the only purpose for which the

19  statement may be considered by you is it's bearing on the

20  witness's credibility.  It is not evidence that what the

21  witness previously said was true.

22        You may not consider any matter that was rejected or

23  stricken by the Court.  It is not evidence and should be

24  disregarded.

25        In a civil case, the plaintiff has the burden of

1  proving its case by what is called the preponderance of the

2  evidence.  That means the plaintiff has to produce evidence

3  which, considered in the light of all the facts, leads you to

4  believe that what the plaintiff claims is more likely true than

5  not.  To put it differently, if you were to put plaintiff's and

6  defendants' evidence on opposite sides of the scales, the

7  plaintiff would have to make the scales tip somewhat on its

8  side.  If the plaintiff fails to meet this burden, the verdict

9  must be on the defendants.

10  Defendants have raised several affirmative defenses.

11  The burden of proof on the affirmative defenses is on the

12  defendants.  The burden of proof for an affirmative defense is

13  the same as the one for the plaintiff's claims:  A

14  preponderance of the evidence.

15  The basic position of the parties can be summarized

16  as follows:  Plaintiff claims that defendants breached an

17  express or an implied trademark licensing agreement between

18  plaintiff and defendants.  Plaintiff also claims that

19  defendants infringed plaintiff's trademark.  Finally, plaintiff

20  claims that defendants falsely suggested affiliation or

21  sponsorship between defendants and plaintiff.

22  Defendants deny these claims.  Defendants deny that

23  plaintiff and defendants ever entered into a trademark

24  licensing agreement.  In the alternative, defendants contend

25  that even if the parties entered into a trademark licensing

Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.,
6:20cv54, 2/25/2022

1  agreement, that plaintiff did not exercise adequate control

2  over plaintiff's trademark.  With respect to plaintiff's

3  infringement claim, defendants contend that plaintiff

4  acquiesced to defendants' use of the trademarks.

5         I will explain what each party is required to show

6  for each of those claims and defenses.

7         The parties do not contest that plaintiff owns the

8  trademark "Emerson Creek Pottery" with respect to pottery.  The

9  parties do contest whether plaintiff owns the trademark

10  "Emerson Creek."

11         Plaintiff owns the trademark "Emerson Creek" if

12  plaintiff used the term in a manner that allows consumers to

13  identify the term with plaintiff or its products and services

14  before defendants began to use "Emerson Creek Pottery,"

15  "Emerson Creek Pottery & Tearoom," "Emerson Creek," and

16  "Emerson Creek Events" with its products and services.  If

17  plaintiff has proven this, then it has ownership of the

18  "Emerson Creek" mark with respect to those products and

19  services.

20         Plaintiff's first claim is for breach of a licensing

21  agreement.  In order to prove its claim, plaintiff must prove

22  by a preponderance of the evidence:  One, that there was a

23  licensing agreement between the parties; and two, that

24  defendants breached the licensing agreement.

25         A breach of a licensing agreement occurs if a party

1  fails to do something which they are bound to do according to

2  the license agreement; and two, does something they are

3  forbidden from doing according to the licensing agreement, and

4  where the failure or forbidden action is so important and

5  central to the licensing agreement that the failure defeats the

6  purpose of the contract.

7          A trademark licensing agreement is an agreement

8  between two or more parties.  A trademark licensing agreement

9  can be express or implied.

10         An express agreement is an agreement, either written

11 oral, in which terms are stated by the parties.  An express

12 licensing agreement arises when an offer is accepted.  An offer

13 is a proposal to the terms on which a person will enter into an

14 agreement if that proposal is accepted by the person to whom it

15 is made.  Acceptance of an offer is a voluntary expression of

16 assent to be bound by the terms of the offer.

17         Even if plaintiff and defendants did not form an

18 express license agreement, they may still have formed an

19 implied agreement.  An implied licensing agreement arises out

20 of the objective conduct of the parties, which is a

21 reasonable -- which a reasonable person would regard as

22 indicating that an agreement has been reached.  The parties to

23 a licensing agreement do not need to have considered or known

24 that they were entering into a licensing agreement.  In order

25 to establish an implied license, plaintiff must prove:  One,

1  that plaintiff granted defendants permission to use the mark,

2  and two, that plaintiff exercised a reasonable degree of

3  control over the nature and quality of services offered by

4  defendants under the mark.

5        If you find, one, that the parties entered into

6  either an express or implied license; and two, that plaintiff

7  later revoked or terminated the license, then you must then

8  decide whether defendants continued to use the Emerson Creek

9  Pottery or Emerson Creek marks after the license was terminated

10 or revoked.

11       The owner of a trademark in a trademark licensing

12 agreement is required to exercise adequate control over the

13 nature and quality of the goods or services of a license, and

14 exercise adequate control over the licensee's use of the

15 trademark owner's mark.  If a trademark owner fails to exercise

16 adequate control, the trademark owner may not enforce its

17 rights in the mark against the licensee.  A failure to exercise

18 adequate control is sometimes called naked licensing.

19       Because it is an affirmative defense, defendants have

20 the burden to prove naked licensing by a preponderance of the

21 evidence.

22       Plaintiff claims that defendants infringed

23 plaintiff's registered trademark "Emerson Creek Pottery" and

24 unregistered trademark "Emerson Creek."

25       To succeed on this claim, plaintiff must prove the

1  following things by a preponderance of the evidence:  One, that

2  it owns a valid and protectable mark; and that two, defendants'

3  use of the mark creates a likelihood of consumer confusion.

4          As I mentioned earlier, defendants do not contest

5  that plaintiff owns the trademark "Emerson Creek Pottery" with

6  respect to pottery.  However, defendants do contest whether

7  plaintiff owns the trademarks "Emerson Creek" or "Emerson Creek

8  Pottery" with respect to the services being provided by the

9  defendants.

10          As I have told you, plaintiff must prove that

11 defendants used "Emerson Creek Pottery" or "Emerson Creek" in a

12 manner that is likely to cause confusion as to the source of

13 sponsorship of goods or services.  In determining whether there

14 is or will be a likelihood of confusion caused by the use of

15 "Emerson Creek Pottery" or "Emerson Creek" by defendants, you

16 may draw on your common experience as citizens of the

17 community.  The nine factors to be considered are:  One, the

18 strength or distinctiveness of the plaintiff's mark as actually

19 used in the marketplace; two, the similarity of the two marks

20 to consumers; three, the similarity of the goods or services

21 that the marks identify; four, the similarity of the facilities

22 used by the mark holders; five, the similarity of advertising

23 used by the mark holders; six, the defendant's intent; seven,

24 the actual confusion; eight, the quality of the defendants'

25 product; and nine, the sophistication of the consuming public.

Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.,
6:20cv54, 2/25/2022

1          Consideration of all the factors is not mandatory and
2   you need not weigh each of them equally.

3          The owner of a trademark cannot exclude others from
4   using the trademark if the owner has acquiesced to such use.

5          Defendants contend that plaintiff has acquiesced to
6   the use of "Emerson Creek Pottery," "Emerson Creek
7   Pottery & Tearoom," "Emerson Creek," and "Emerson Creek
8   Events."

9          Acquiescence in trademark law occurs when the owner
10  of a trademark expressly or impliedly consents to the
11  infringement.  It arises through the affirmative actions of the
12  trademark owner, resulting in an implied consent to use the
13  mark.  The owner of a trademark acquiesces to use of its
14  trademark when:  One, the owner actively represented that it
15  would not assert a right or claim; two, the delay between the
16  representation and the assertion of the right or claim was not
17  excusable; and three, the delay caused defendants undue
18  prejudice.

19         If you find that there is no express or implied
20  licensing agreement, the first two elements can be implied in a
21  business relationship in which the owner of the trademark works
22  directly with the defendant for an extended period of time
23  without asserting rights over the trademark.

24         Undue prejudice can be found when a defendant
25  reasonably relies on the owner of the mark's actions.

1        If you find acquiescence, you must then determine

2   whether, despite that acquiescence, likelihood of confusion is

3   apparent.

4        Because it is an affirmative defense, defendants have

5   the burden to prove acquiescence by a preponderance of the

6   evidence.

7        Plaintiff also brings a claim for unfair competition

8   and false designation of origin.

9        To prove false suggestion of affiliation or

10  sponsorship, plaintiff must prove that defendants used "Emerson

11  Creek Pottery" or "Emerson Creek" commercially in a manner that

12  is likely to cause confusion, or to cause mistake, or to

13  deceive as to the affiliation, connection, or association of

14  defendants with plaintiff, or as to the origin, sponsorship, or

15  approval of defendants' goods, services, or commercial

16  activities by plaintiff.

17       If you find that plaintiff has proved each trademark

18  infringement by a preponderance of the evidence, then you

19  should find for plaintiff on unfair competition and false

20  designation of origin.  However, if plaintiff did not prove

21  each element of trademark infringement by a preponderance of

22  the evidence, then you should find for defendants on unfair

23  competition and false designation of origin.

24       If you find for plaintiff on plaintiff's infringement

25  claim, you must determine plaintiff's damages.  Plaintiff has

Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.,
6:20cv54, 2/25/2022

1  the burden of proving damages by a preponderance of the

2  evidence.  Damages means the amount of money that will

3  reasonably and fairly compensate plaintiff for any injury

4  caused by the infringement of plaintiff's registered trademark.

5  You should consider whether any of the following exists and, if

6  so to what extent, in determining plaintiff's damages:  One,

7  any injury or loss of plaintiff's reputation; two, any injury

8  or loss of plaintiff's goodwill, including any injury to the

9  plaintiff's general business reputation; three, any loss of

10  plaintiff's sales as a result of defendants' infringement;

11  four, any loss of plaintiff's profits; five, any expense of

12  preventing customers from being deceived; six, any cost of

13  future corrective advertising reasonably required to correct

14  any public confusion caused by the infringement; and seven, any

15  other factors that bear on plaintiff's actual damages.

16          In addition to plaintiff's damages, plaintiff may

17  recover the profits defendants gained from a trademark

18  infringement.  You may not, however, include in any award of

19  profits any amount that you took into account in determining

20  actual damages.

21          Profit is determined by deducting expenses from gross

22  revenue.  Gross revenue is all the money defendants received

23  due to its use of the trademark.

24          Plaintiff is required only to prove defendants' gross

25  revenue.  Defendants are required to prove any expenses they

Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.,
6:20cv54, 2/25/2022

1   may argue should be deducted in determining their profits.

2   Plaintiff is entitled to recover defendants' total profits from

3   their use of the trademark, unless defendants prove that a

4   portion of the profit is due to factors other than use of the

5   trademark.

6           If you find that the defendants infringed the

7   plaintiff's trademark, you must also determine whether the

8   defendant used the trademark intentionally, knowing it was an

9   infringement or with reckless disregard for whether it was an

10  infringement.  Defendants acted willfully if they knew they

11  were infringing plaintiff's trademark or if they acted with

12  indifference to plaintiff's trademark rights.

13          If you find your verdict for plaintiff in its breach

14  of trademark licensing agreement claim, then it is entitled to

15  recover as damages all of the losses it sustained, that are

16  natural and ordinary result -- are a natural and ordinary

17  result of the breach of the license agreement, and that is

18  proved by a preponderance of the evidence allowable under the

19  contract.

20          Now, the last instruction -- two instructions I will

21  read to you just before you go to the jury room.

22          All right.  Counsel for the plaintiff.

23          MR. WILLETT:  Your Honor, if we may quickly approach

24  just on one point.

25          (Sidebar commenced.)

Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.,
6:20cv54, 2/25/2022

1          MR. WILLETT:  We agree it's defendants on that.

2          (Sidebar conclusion.)

3          THE COURT:  Members of the jury, we're going to show

4   you -- he will show you instruction 11.  The first paragraph of

5   the instruction read, The parties do not contest that plaintiff

6   owns the trademark, "Emerson Creek Pottery," with respect to

7   pottery.  Defendants do contest whether plaintiff owns the

8   trademark "Emerson Creek."

9          And we had in the instruction the parties do contest,

10  but it's the defendant who contests whether the plaintiff owns

11  the trademark "Emerson Creek."

12         You can put that up to show where the change was.

13  It's instruction 11.  And you'll have copies of these

14  instructions in the jury room.

15         All right.  Counsel, thank you.

16         MR. WILLETT:  Judge, I'd like to reserve eight

17  minutes of my time for rebuttal.

18         THE COURT:  Excuse me?

19         MR. WILLETT:  I'd like to reserve some of my time for

20  rebuttal.

21         THE COURT:  40 minutes.

22         MR. WILLETT:  I'll reserve eight minutes for whenever

23  I end.

24         CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

25         MR. WILLETT:  Good afternoon.  I'm not sure I thought

1  we'd ever get to this point, but I appreciate, and I want to

2  say thank you for your patience and your thoughtfulness and

3  attention to this matter over the last couple of days.

4        It's a lot of information.  I hope that at times we

5  didn't try and get some of it in too quickly just trying to

6  make sure we covered everything, a lot of landscape, because

7  that's something that makes this case really interesting,

8  right, because we're talking about things that happened back in

9  the year 2001 through the present, essentially.  And that's a

10 long time.  Sometimes I wonder what I ate for lunch last week

11 or had for dinner last week.  And to think back that long ago

12 is hard.

13       So one of the things that I tried to do here is to

14 give you something that we could look back to, right, at

15 different points in time along the way, things that don't

16 change, things like written documents and the pictures that

17 we've seen.  I wanted to give you an opportunity to look at

18 those things so you could see them and say, okay, this is what

19 this looked like back in 2001 when the parties first met in

20 Bedford, Virginia down the road, just as I said in my opening,

21 a destination on a gravel road.  You got to see that.  You got

22 to see the pictures of what it looks like out at Emerson Creek.

23 And you also got to see what the Demiduks and Mr. Wehrli

24 originally, and then ultimately Dave Demiduk, built and

25 developed in Oswego.  You got to see it all.

1    And I will get to this verdict form, which I think

2  you all each have a copy of.  I'll get to that in a minute.

3  And I hope that -- the parties have worked really hard, the

4  lawyers have, to try and make this part of the process as easy

5  as possible because it's a lot of information.  There are a lot

6  of instructions.  And I would encourage you to be thoughtful

7  about that, as I know you will be, and to read those

8  instructions and to make sure obviously that you understand

9  them.  And again, I'll walk through the verdict form.  I'm sure

10  Mr. Laubscher will also walk through it with you just to see if

11  we can give you some guidance and to refer you back to things

12  that hopefully you've seen over the course of the last few

13  days, and will resonate with you as you think about these

14  issues.

15    I also thought at the beginning here -- I'm going to

16  look at my watch a couple of times, because I am trying to be

17  mindful of your time.

18    I thought at the beginning that I would try and

19  address a few issues that, you know, might come up when

20  listening to information like this.  And it's so much

21  information.

22    One of the things I thought about is this idea -- I

23  go back to the opening.  There was -- actually from the

24  defendants' opening they had a map, right?  They had a map, and

25  had a star here and a star here, 700 miles.  What does it

1   matter to a party here versus the party that's here?  I thought

2   about that a little bit and thought that seems pretty

3   compelling.  Well, it's compelling if you take a random person

4   in Bedford, Virginia who has never met someone in Oswego,

5   Illinois, and the person in Bedford has a legacy of naming

6   their product Emerson Creek and goes back to Massachusetts and

7   talks about the actual Emerson Creek, which really was a brook,

8   right?  And so, the whole developing pottery and all of that.

9   You know, what if you had someone in Oswego who had a brand at

10  that time and it just happened -- let's say there was a little

11  creek in Oswego -- which there's not -- but let's say there

12  was, and that's what they called their brand back in time, and

13  you put those parties together and you would say, gosh, it

14  would be really unfair for one of those not to be able to

15  continue to do business.  Does it really matter?

16          But I want to be very clear about something.  That's

17  not what we had here.  What we had here is in Bedford, Virginia

18  a brand.

19          And Ashley, we can put those on the screen.

20          We had a brand, a mark that Jim Leavitt and his

21  former wife, Priscilla, and then ultimately his current wife,

22  Trenda, and Ellena and William, a brand that had been built for

23  25 years.  When these parties met, he had a brand that had been

24  around for 25 years.  You saw the recognitions that he had:

25  The Smithsonian, Mount Vernon, Monticello, all of these things,

1  right?  This is what he brought to the table were these

2  recognitions.  He brought a brand.

3         You heard the testimony about Oswego back then,

4  right, the vision?  And we saw today -- we saw today when we

5  looked at the newspaper article from 2002, we saw today

6  Ms. Demiduk's actual statements from back in time.  And we saw

7  her story, right, on her website of what happened; and that she

8  was inspired by what she saw in Bedford, Virginia, so much so

9  that she went back and she and Ron Wehrli -- or Ron Wehrli

10 bought the property.  But they went back and purchased a farm

11 because they were so inspired by what they saw.  You can look

12 at that document, Exhibits 14 and 15.  You can look at those

13 and you'll see what their story -- what the story was on the

14 website.  These are the words that have been memorialized for a

15 long time on that website.  And you've seen various iterations

16 of this.  And that's what inspired them to do this, to actually

17 buy the farm and then ultimately -- go to that 2002 article --

18 and then ultimately to ask the question, right?  She said she

19 had been there a while back, ten years before, bought the

20 pinecone pattern.  And then the question, right?  So this is --

21 we've got two -- this is the actual print copy of that article

22 and then we had also shown you the actual, like the one that

23 gives you the text, probably the online version.  And you can

24 read her words, her quotations.  I read them to you today.  She

25 read some to you.  But you guys can read each of those of what

1  she was getting, what was happening at that time.  I'll do it

2  so I can look at it, too.  You can look at what she said

3  happened back at that time.

4          And Ashley, if you can make that a little bit bigger.

5  And Ashley I probably need to thank most of all for putting up

6  with me.

7          You can see what she said, right?  "I had been

8  wanting to open some kind of store.  So I asked the owners if

9  they would be interested in having an Emerson Creek shop in

10  Illinois, and they said yes."

11          They said yes, right?  So we're going to talk a

12  little bit about the idea of what makes a contract, and offer

13  and then acceptance and consideration.  These are all things

14  you're going to be asked to consider when you sit back there.

15          But I do want you to think about that.  This is not

16  the scenario of two random folks coming together and just

17  happened to have the same name.  This is someone who had a

18  brand that he built over 25 years with his family:  His former

19  wife, his current wife, and his family, he built for 25 years

20  when he came into this equation.  This was not equal footing.

21          This was, to go back to my analogy, this was Nike.

22  This was Nike with the shoe store.  They had a shoe store.

23  They licensed their name to allow someone to make a Nike drink,

24  and then all of a sudden that license ends.  That guy who makes

25  the drink or gal who makes the drink, they don't get to keep

1 it. They don't get to sell Nike. No, we own this now, because

2 you didn't make the drink before. That's how a license worked.

3　　　　That's what this license allowed. It allowed her to

4 do these things. We'll show you that and we'll walk through

5 that. But this isn't about an even playing field. There was a

6 very lopsided playing field when they started.

7　　　　And so, why? Why do the deal? Why would he do the

8 deal? Well, he did the deal because he wanted -- he told you

9 this -- he wanted someone to market. And you heard from her

10 own testimony, Ms. Demiduk, you heard about her experience for

11 a while on the cruise line, and you heard about her sales with

12 Nordstrom and all these things. And so he wanted to take

13 advantage of that, right? I mean, this is the deal, right? So

14 she wants to open a pottery shop. Great. She wants to be an

15 active marketer. Even better.

16　　　　So she came to him, and you heard the testimony. She

17 said, I wanted it wholesale, right? That was her term. She

18 wanted it wholesale. But the deal she got was even better than

19 that, 40 percent off. And why? Because he wanted her to be

20 active. He wanted her to promote the business. He wanted to

21 entice her, right? That's called consideration. Sometimes

22 consideration can be in the form of dollars or cents that I

23 directly hand someone, and sometimes it can be in the form of

24 giving someone an opportunity to do something and giving them a

25 discount. So in this case he gives her the discount. He gives

1　her the opportunity to buy the plates.  So she's buying plates

2　from him at 40 percent below wholesale.  You can guess how much

3　money you make on that, right?  So not making a lot of money

4　off of her necessarily, but he gives her that opportunity.

5　Why?  Because she's going to do marketing for him in that area

6　of Oswego.

7　　　　　Why does that matter?  Because you saw the map and

8　you heard the testimony about Oprah and the proximity to

9　Chicago.  That's a prime area, right?  And that's the other

10　thing.  Talk about, you know, the location is 700 miles.

11　Oswego was a destination.  It says so right here in the

12　article.  You heard Ms. Demiduk's testimony.  Oswego back in

13　2001, that wasn't anyplace that people were going.  They had to

14　have a reason to go there.  And why did they go there?  She

15　agreed with me ultimately today:  They went there because of

16　Emerson Creek Pottery.  They went there because this gentleman

17　and his family had built a brand for 25 years, a brand based on

18　quality.

19　　　　　And you'll have these with you.  And I ask you to

20　feel them.  They're solid.  I mean, this thing is solid.  You

21　look at it and it's got his brand.  This is what they had done

22　for 25 years.  But they hadn't done it in isolation in Bedford,

23　Virginia, remote from the world.  They hadn't done it removed

24　from society.  They had received recognition.  They were known.

25　They were a known entity, right?  You've got the marks, the

Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.,
6:20cv54, 2/25/2022

1  Emerson Creek, right?  They put the mark on it.  They started

2  out writing "Emerson Creek."  He eventually finds if I do a

3  stamp, I can get a little more information on there.  They were

4  a known entity.

5          How do we know they were a known entity?  Look at the

6  articles that we saw, the recognition that they received,

7  right?  They were a known entity.  We looked at the pictures,

8  the brand, what they started out as.  And you'll see this.

9          So why show me older stuff?  Why show me pottery from

10  1983 and all these other things?  Well, we'll talk about it in

11  a minute when we go through this questionnaire, because it's

12  not just what their brand is today.  It's not just that he uses

13  emersoncreek@emersoncreekpottery.com or

14  emersoncreek@earthlink.net.  It's not just today.  It's not

15  just that -- what does Martha call him?  What does Martha say?

16  It's not just that Martha Stewart refers to him as "Emerson

17  Creek" as recently as February 18th of 2022, not "Emerson Creek

18  Pottery."  She just refers to them as "Emerson Creek."  That's

19  what he's known as.  That's what his brand is.  Two things,

20  right?  Sometimes it's Emerson Creek and sometimes it's Emerson

21  Creek Pottery.

22          But if you go back -- take us back a little bit,

23  Ashley.

24          We look back.  That's what it was known historically.

25  We know in 1983 that it was Emerson Creek.  And let's go

1  back -- she's going to get really mad at me now.

2         Go back to the 2002 article for a second.  Look at

3  that article.  Blow that up a little bit, Ashley.

4         What do we see?  What does the reporter call his

5  brand at that time, right?  We have various iterations:

6  Emerson Creek, Emerson Creek, and then at the end Emerson Creek

7  Pottery.  That's what it was back then.  That's what it was.

8  That's what it was known as.  Those were the brands and those

9  were his marks.  Those were the marks of Emerson Creek Pottery

10 in Bedford, Virginia.

11        So let's -- with that background, with that

12 information, let's take a look at the questionnaire.  So you

13 have to -- the first question here:  Does the plaintiff have a

14 valid trademark?  And then it refers you, if you have questions

15 about that, to jury instruction number 11, right?  So that's

16 the first one you've got there:  Does it have a valid

17 trademark?  And I think the affirmative answer here is yes.

18        We look at what those marks were.  We've got both

19 Emerson Creek and Emerson Creek Pottery.  So the one that's

20 easier that's not contested, we've got Emerson Creek Pottery.

21 We've got the trademark registration for 2015.  That's the easy

22 one, right?

23        What about Emerson Creek?  What about this Emerson

24 Creek mark?  We've just walked through and we've just shown you

25 that these things were used interchangeably.  You've seen it

1  throughout this case.  You've seen it in the email

2  correspondence.  You've seen it in the way Ms. Demiduk referred

3  to Mr. Leavitt's business.  You've seen it in the way that he

4  referred to his business.  You've seen those examples of the

5  Emerson Creek mark.  He had both marks, and he had those marks

6  as of the time that the parties first met in 2001.  We've

7  looked at the historical as well.

8         So if, indeed, he had that mark or the company had

9  that mark, did plaintiff and defendants enter into an express

10 licensing agreement?  All right.  What does this mean?  We

11 talked about the different forms of licensing agreement

12 earlier.  And, you know, Mr. Laubscher showed you -- although I

13 don't think it ended up in evidence -- but he showed you what

14 he said was some sort of standard licensing agreement.  Why

15 didn't they use the standard licensing agreement?  But in any

16 event -- and then we saw the draft one that ultimately in 2017

17 when things kind of blew up, that was presented to Ms. Demiduk.

18         But let's talk about what happened back in 2001,

19 right?  So before we do, you look at the instructions for this.

20 And these are 13.  This is the important part here, and I

21 really want to be very clear on this.  This type of agreement,

22 a license agreement, can be an oral agreement, all right?  You

23 may have heard other things about other types of agreements.

24 We're talking about a license agreement.  No disagreement on

25 this.  You look at the instructions.  It can be an oral

1  agreement.  You have to have an offer; you have to have

2  acceptance; and you have to have consideration.

3      Consider the things that I just spoke of.  Consider

4  the 2002 article, right?  We've got the offer by Ms. Demiduk.

5  Can I replicate this in Oswego?  We have the acceptance by

6  Mr. Leavitt.  And then we have the consideration, which is the

7  deal, which flows both ways.  He allows her to do this.  He

8  sells her the pottery at a discount.  And in exchange, she

9  sells that pottery.  So she's buying pottery from him and --

10  and she markets his product.  We have where the meeting took

11  place.  We have the article we just referred to.  And then

12  we've got this document, right?

13      And so this document, we've got this document that we

14  see from 3-23-2001.  And you have Mr. Leavitt who says, I

15  prepared the document.  We've got the metadata that shows that

16  the document is from a Word document.  That's a copy of an

17  actual document, and then we've got the metadata from the Word

18  document that shows it was created -- last modified two days

19  after that.  And we have Mr. Leavitt's testimony as to what he

20  put together.  This was not a contract.  This was not

21  Mr. Leavitt's attempt at a license agreement.  He was not

22  trying to take, you know, long documents and put it into this

23  paragraph.  He was memorializing what had been agreed to by the

24  parties in Bedford, Virginia.  What did he refer to it as?

25  Handshake agreement, right?  His oral agreement with them, his

 1  word.  Now, he may have had to enter into agreements from time

 2  to time with big companies and artists like Thomas Kincaid and

 3  folks like that.  But he told you how he does business:  The

 4  King Arthur way, right?  His handshake.  His word is his bond.

 5          Go to the next slide.  That's the metadata.  Keep

 6  going.

 7          And so there's all this question about what did the

 8  agreement say?  You'll have that document back there.  Again,

 9  we need to look no further than Ms. Demiduk's own words; in

10  this case, not that long ago.  "He said to call it 'Emerson

11  Creek Pottery.'"  That was the deal.  It was going to be a

12  replication -- just like the 2002 article said -- it was going

13  to be a replication of what he had in Bedford in Oswego,

14  Illinois.  And that is critical.  Why?  Because it was.  He

15  says it's in the document.  You'll see it, Exhibit 57.  He says

16  outlet store.  She says, Well, I didn't want to call it an

17  outlet store, what have you.  Look at their testimony.  You

18  heard their testimony.  The bottom line is you've got his shop,

19  right?  He calls it an outlet store.  He didn't put outlet

20  store all over it.  That's just how he describes it.  She went

21  back.  She was opening an Emerson Creek Pottery shop.  That's

22  what the deal was.  She was going to call it an Emerson Creek

23  Pottery shop.  And lo and behold -- lo and behold, what does

24  she do when she gets back, or what happens when she gets back

25  to Illinois?  We saw it on the registration document.  It was

1   registered with the State of Illinois as of April the 2nd,

2   2012, nine days later.  I've got 31 days in March, assuming my

3   math is correct, nine days later they register it.  She likes

4   Countryview Pottery Co. and doing business as Emerson Creek

5   Pottery.  That's what the deal was.

6           So then there's all this talk about:  Well, you know,

7   the written document didn't say you can only sell Emerson Creek

8   pottery.  It was a Nike outlet.  It was Emerson Creek Pottery

9   outlet.  You don't sell Reeboks at the Nike outlet.  You don't

10  sell cheap imitation pottery at Emerson Creek Pottery.  She

11  knew that.  And in fact, she went to great lengths to grow

12  that.  We heard her testimony today about growing it.  We heard

13  her testimony about promoting it, about talking about how you

14  didn't have to pay a franchise fee up front.  You saw that.

15  And you'll have those documents with you back in the room,

16  Exhibit 210.

17          All right.  Now, here's the other good thing about

18  licensing agreements, right?

19          Ashley, go to slide 24.

20          Even if you found there's no express agreement, you

21  can also have an implied license, right?  So now we're looking

22  at 3.  So the way this works:  Did they have a valid trademark

23  for 1?  If you mark yes, then you go to number 2.  Did they

24  enter an express agreement?  Yes.  If they do that, then you're

25  going to go to 4, right?  And if you mark no, then you go to 3

1   and you look at whether they had an implied license agreement.

2   And you're going to look at the following factors:  Again, no

3   written agreement required.  You look at permission.  She said

4   yes.  And you're going to look at control.  Let's just go

5   through control, because this is an important factor.  And I

6   know I promised I'd be brief to the judge, and I want to be

7   brief for you all.

8           Look at control.  July through May -- I'm sorry to

9   give you big documents.  Some of them have been broken down.

10  Those documents express the relationship.  These folks were in

11  constant contact.  I started thinking about it this morning.  I

12  was like, How do I explain that?  Because they're trying to

13  say, Jim didn't care.  Jim didn't care.  Jim didn't care?

14  There are constant emails back and forth.  Okay.  Maybe Chris

15  writes more emails than Jim maybe.  I don't know.

16          I was thinking about it in terms of my son and

17  school, right?  I mean, I send him to school.  He goes to

18  kindergarten.  And, you know, gosh, there's all sorts of

19  contact, right?  I'm checking on him and they're checking in,

20  and they're giving me reports, and I'm talking to the teacher

21  when I pick him up and all these things.  Gradually, you know,

22  I trust the school.  My son, he's a junior now.  He'll be a

23  senior next year.  I trust the school.  And gradually over

24  time, yeah, I'm probably not in as frequent contact, but I'm

25  keeping up with what's going on.  I'm watching him.  He's my

1  mark, right?  I'm watching.  I'm making sure they're doing

2  their job.

3          That's exactly what the evidence shows Mr. Leavitt

4  did over time.

5          Go to the next slide, please.

6          Look at this.  Yeah, look at this.  Keep going.

7  Opening Emerson Creek.  Keep going.  All of this.  She's

8  sending these things.  How does he know what's happening?

9  She's sending him these things constantly along the way.  Can

10  be no doubt about the control that was being exhibited by

11  Mr. Leavitt.  Look, for example, right before these in 2009,

12  right, she wants to open -- or start a website.  She had a

13  problem with the vendor.  They were "ecreek" before then.  She

14  wants to be ecreek -- "ecreekpotteryandtearoom.com, if that's

15  okay," plaintiff's 192.  That's control.  She's asking him the

16  question.  He says yes.  He allows her to do it.

17          We saw it again -- and I'm going to just kind of go

18  through this, guys, because there's a lot of documents and I'm

19  trying to give you specific numbers when I can.  We saw it

20  again in 2012 when the whole Google Maps thing came up, right?

21  First instance of confusion.  This is before he knows of any

22  breach of the license agreement.  What's his control?  Hey, add

23  "and tearoom."  Add "and tearoom."  He's exhibiting control all

24  along the way.  2014:  Hey, what's going on with your sales?

25  Tell me.  Give me an answer.  Give me an explanation, right?

1   The same idea.  Hey school:  I don't like something that's

2   happening.  I don't like that my son's grades are low, or

3   whatever the situation is.  I'm exhibiting control.  That's

4   what he's doing here.

5          Now, again, I don't think there can be any question

6   about control, but that's your determination to make.  And if

7   you determine that, right, if you determine that, okay, maybe

8   there wasn't an express license, but there was an implied

9   license, then you're going to go to questions 4 to 8.

10         So let's look at 4.  I'm trying to hurry this up.

11  What names were covered by the parties' licensing agreement?

12  You guys have seen this.  You know the evidence exists.

13  Emerson Creek, we have seen that time and time again.  I've

14  just shown you multiple examples of that.  The defendants have

15  used that mark since the beginning.  Emerson Creek Pottery,

16  they have used that mark since the beginning.  This 2002

17  article is great because it really has so many of these uses.

18  And then look at their websites.  Look at the way they did it

19  there.  Just like what the mother ship was doing in Bedford,

20  Virginia.

21         Emerson Creek Pottery & Tearoom, you heard the story,

22  the expansion.  On the porch of the pottery shop when people

23  come to the pottery shop, they expand.  They go.  And all of a

24  sudden they start using Emerson Creek Pottery & Tearoom.  And

25  we just saw -- at Exhibit 192 we just saw allowing them to

1  change that website to incorporate and use that name.

2          Emerson Creek Events, we've heard the discussions of

3  it.  You've seen the emails.  Constant discussions about the

4  wedding business, right?  Oh, I'm sorry about this because of

5  the wedding business.  The wedding business is why the Google

6  results are showing up the way that they did.  Full knowledge

7  of this.  And to Mr. Leavitt's benefit, as he said, right?  You

8  heard me ask:  Were you okay with her using this picture with

9  the wedding, right?  You saw the picture yesterday.  She

10 thought it might have been a little further back.  We found the

11 website, 2016.  So not too far before the end of the agreement.

12 We saw that picture.  Was he fine with that?  Heck, yeah, he

13 was fine with that.  It's his pottery.  It's getting exposure.

14 He was absolutely fine with her expanding to the Events

15 business.  That promoted his brand.

16          We saw the cookbook, right?  We saw the cookbook.

17 Absolutely fine with that.  Expanded his brand.  Hey, sure,

18 I'll sell that.  Sell it to me at wholesale.  I'll sell that

19 cookbook for you.

20          So what names were covered by the parties' license

21 agreement?  Check, check, check, check.  Emerson Creek, Emerson

22 Creek Pottery, Emerson Creek Pottery & Tearoom and Emerson

23 Creek Events, all of those were covered.

24          What services were covered?  Well, let's go to

25 Exhibit 17.  Just go to the exhibit.  Exhibit 17, what services

1   were covered?  Well, we know the gift shop services were

2   covered, right?  That's the words used here, gift shop, to

3   describe the Emerson Creek Pottery shop.  We know the

4   restaurant services were covered.  That was the tearoom.  I

5   will tell you obviously it's been tearoom, restaurant, cafe, a

6   bunch of different things.  This is what it was as of 2017,

7   license still in effect.  We've got the tearoom -- questionable

8   on the date, but we've got the tearoom.  It says "established

9   2002" here.  And we've got the barn established in 2010, the

10  Events.  All of those things covered.  And by the way, all of

11  those things right here under the Emerson Creek -- the website

12  ecreekpotteryandtearoom.com.  You can look at this, the name,

13  Emerson Creek Pottery, Emerson Creek throughout this website.

14  All of those services covered.

15          We just talked about control.

16          Ashley, go to 24.

17          We talked about control.  This is the next one.  Did

18  plaintiff -- so at this point we've gone through 5.  We've

19  checked those.  Did plaintiff exercise adequate control over

20  the nature and quality of the services under the mark, right?

21  We just looked at this, the elements that were required in

22  order to establish adequate control.  Did he exercise control?

23          It's my son.  It's the contact with the school.  It's

24  the constancy of it.

25          Listen, we don't have every single email between the

1  parties, right?  We start the email chain because, I mean, it's

2  a long time ago.  2005 they started these emails.  They start

3  coming.  That's four years into this relationship, right?  We

4  see the emails that were produced today in October of 2021, not

5  that long ago, by the other side -- or by defendants, right?

6  So we don't have all of the emails that exist in the world that

7  were over the course of 20 years, but what we have paints a

8  pretty comprehensive picture of incredible contact between

9  these folks:  The phone calls, the emails.  Mr. Leavitt

10  testified to it.  Ms. Demiduk testified to it.  Next if we look

11  at -- so we think there was adequate control.

12          Did they breach the licensing agreement, right?

13  What's required there?  Look at slide 42.

14          This was the question yesterday:  Did you or did you

15  not purchase third-party pottery items in your shop?  Yes.

16  Yes, she admitted to that.  Now, she says she did it in 2007,

17  right?  Well, you saw in 2014 Mr. Leavitt is asking her,

18  because the sales dipped:  Are you selling pottery?  And you

19  saw her response to that, right?

20          What exhibit is that?  Yeah, 171.  You saw her

21  response.  You look at his question.  Hey, sales dropped

22  significantly, $10,000, 33 percent.  Were you selling other

23  pottery?  Her response?  Not a word about selling third-party

24  pottery.

25          What was she saying about third-party pottery?  You

1  noticed that.  They brought out a plate.  It was a new exhibit

2  that they produced.  I'll ask you:  Go through and look

3  through -- you may find one -- but look through those pictures,

4  all the pictures that are out there of that pottery.

5  Everything she put on the website, all the news stories -- we

6  had a lot of it identified -- that's Emerson Creek pottery.

7         You saw this.  You saw quality.  Until when?  Until

8  September of 2017.  And in September of 2017, this became this.

9  You saw Exhibit 66.  I ask you to look at that document.

10  Exhibit 66 -- and we've got one paragraph that's in there, and

11  I want you to look at that document.  And then after that, we

12  go out, there are pictures taken, and then we see this.  This

13  is what we saw for all of those years before that time.

14         And that was September, a dialogue.  We don't go

15  through all the correspondence, but ultimately we end up with

16  the cease and desist letter in January of 2018.  I briefly want

17  to touch on a couple other things.  That was the breach of the

18  licensing agreement.  Those actions were the breach of the

19  licensing agreement.

20         With respect to the damages, I would ask you to

21  look -- now, we only have it for a short period of time.  It's

22  when you believe she first started -- it's your decision as to

23  when she first started breaching.  If you believe she started

24  it way back then, or if you believe she started it when the

25  pictures were taken in 2017.  But look at that.

1       Ashley, if you can walk through those exhibit numbers

2  we're talking about, 79 -- Exhibit 32 and 34, Exhibits 32 and

3  34, they're the sales of the Signature housewares and sales of

4  Mud Pie.  Those are the damages.

5       Now --

6       THE COURT:  You have about ten minutes left.

7       MR. WILLETT:  About ten minutes total?  Yes, Your

8  Honor.

9       I'm going to do this very quickly.  Then we go to

10 infringement, right?  Same question for number 9 that we just

11 asked:  Did they infringe?  If you said "yes" above that there

12 was a mark, did they infringe the mark?  What does that mean?

13 That's slides 49 through 63.

14       Ashley, keep going.

15       You'll see if you go back up, they're factors, right?

16 We're going to look at the strength of the mark, we've talked

17 about that.  We're going to look at the confusion.  We're going

18 to look at intent.  We're going to look at these other factors.

19 And I would ask you to look at a few things when you look at

20 this.  Did they infringe?

21       Keep going, please.

22       Indicators of confusion, look at that.  Plaintiff's

23 76, there are documents in there that show actual confusion

24 after the January 5th, 2018 cease and desist.  Look at the

25 Facebook pages.  Look at what the expert showed.  Look at all

1 of that confusion on Google, on Yelp, on TripAdvisor, Facebook,

2 every form of social media. All of those examples of

3 infringement, all of those examples of actual confusion.

4 Look at Exhibit 41 for intent. Look at the idea.

5 Look at what was directed by Mr. Demiduk: Hey, let's keep that

6 ecreekpotteryandtearoom alive so that we can get all the

7 redirects from that. You saw what was behind the scenes from

8 the expert, right, who said it would take him five minutes to

9 remove that information. You saw the coding that had the word

10 "pottery" in there, right? That is infringement, and then

11 ultimately that is intentional. The action of saying: Let's

12 do something that's going to redirect traffic, cause confusion

13 to consumers. We saw those emails, those actual emails.

14 What exhibits were those, Ashley, the 35001 to --

15 Exhibit 76. Look at those, actual consumers. We saw Facebook,

16 actual consumers who were confused and with whom infringement

17 had occurred.

18 Did infringement -- did defendants infringe the

19 "ecreekpottery" trademark? You see that from the expert and

20 all the other stuff. Did they act willfully? That's the

21 intent I just discussed.

22 Did plaintiff acquiesce? Did plaintiff acquiesce? I

23 would ask you -- I'm going to save my time to address that

24 later. Did we acquiesce? No. There was control exhibited.

25 No one let anything go by for free. There was a constant deal.

1  How did we know it?  Because until -- you know, through the

2  end, through July of 2017, there was constancy in the ordering.

3  He never let the mark go.  He constantly monitored that mark.

4          The last thing I would tell you on the damages, I

5  would ask you to look at the PowerPoint.  It's Exhibit 30.  And

6  that sets forth the damages.  And that's the profits, right?

7  That's the profits that the defendants earned during the time

8  of their -- during the time of their breach.  It's the tax

9  returns for Countryview and it's the tax returns for Emerson

10  Creek Events.

11          Hopefully I have a few minutes left, Your Honor.

12  Thank you.

13          THE COURT:  All right.

14          CLOSING ARGUMENT ON BEHALF OF THE DEFENDANTS

15          MR. LAUBSCHER:  I bet you all have learned a lot more

16  about trademarks than you were expecting before we started here

17  on Tuesday morning.  I've even learned a lot during the last

18  four days.  When Mr. Willett thanks you for your patience and

19  your consideration, I certainly echo that.  This case has

20  required patience not just on your part, but on our part, the

21  judge's part, everybody's part as well.  So we do thank you for

22  that.

23          It's interesting how the judge instructed you to

24  listen to the attorneys' arguments, but remember that they're

25  just arguments.  And now Mr. Willett has spent most of his time

1  telling you how to fill out this jury form, the questionnaire.

2  I'm not going to do that. I trust you that you have the

3  wherewithal -- you've listened to the evidence. You've

4  listened to the arguments. I trust you that you'll know as you

5  go question by question, and you'll look at each one

6  individually and know how to answer based upon what you've

7  heard and what you've seen over these last four days.

8       So you remember back when I was standing here -- I

9  hope you remember, it's a while ago now, seems like forever --

10  but last Tuesday afternoon I presented my opening argument, and

11  I asked you to look specifically for some certain features with

12  regard to a license agreement. And I've been paying attention

13  to the testimony as well, and the documents that have been

14  presented. And I haven't seen a physical license agreement.

15  And I think the plaintiffs will agree there is no physical

16  license agreement. They say there was an oral agreement or an

17  implied license. And you can tell by the conduct of the

18  parties -- is their position, not mine -- you can tell by the

19  parties there was a license agreement. I disagree.

20       We went through the factors of what makes a valid

21  license agreement. And the first thing was identification of

22  the parties. The original proposal, that memorandum, that

23  agreement that Mr. Leavitt drafted didn't have the parties

24  right. I told you that a license agreement has to identify

25  what the mark is, what the licensed trademark or service mark

1   is.  And you can look at the jury form.  They have three or

2   four different -- I'm looking at number 4.  You've got four

3   different options here.  What was the licensed mark?  It wasn't

4   identified.  And so this has become very amorphous over the

5   time period that we're talking about from 2001 to 2018.

6          What were the licensed products or the services?

7   There is no mention.  We do know that the plaintiff sells

8   pottery, and that he sold pottery to the defendants, that the

9   defendants resold.  But Ms. Demiduk told you about all the

10  other goods that were sold through her store.  There were

11  candles, dish towels, various accessories.  Were these licensed

12  goods?  We don't know.  It's not apparent certainly from an

13  agreement, nor is it apparent from the conduct of the parties.

14         Mr. Leavitt and the plaintiff never received a

15  royalty from the sales of these products.  Remember I talked

16  about royalties?  Simply be what you pay -- you pay a

17  percentage of a return on a sale of a product or officering of

18  a service?  Were they licensed products?  No.

19         And then the services, as we know, we've heard

20  testimony from 2001 to the present, the defendants certainly

21  expanded their services.  They've gone from being a gift shop

22  to now they're a restaurant and events business.  So if you

23  look from the start to the end, there's quite an evolution

24  here.

25         Were services part of the license agreement?  Don't

1  know.  It doesn't look like it, because Mr. Leavitt and the

2  plaintiff always allowed Ms. Demiduk and the defendants to

3  expand their services to go into the restaurant business, to

4  open up the tearoom.  And that started actually, if you recall

5  from the testimony and the evidence, back in 2002.  Just a year

6  or two after she opens the shop, she's already expanding her

7  services into the tearoom services.  And they were very

8  successful.  And so she changed her name to Emerson Creek

9  Pottery & Tearoom.  No objection.  No request to Mr. Leavitt

10 for permission to do so.  She just did it, and he said he was

11 fine with it.

12         2010 she expands the business again.  Opens the barn.

13 Now we have the Events business.  Changes the name.  It goes

14 from Emerson Creek Pottery to Emerson Creek Pottery & Tearoom

15 and then we have Emerson Creek Events.

16         And so all during this time period from 2001 to the

17 present we've had changes in this relationship between the

18 parties, if we can call it a relationship.  But it wasn't a

19 license agreement, because there is no definition of what the

20 licensed marks were.  There's no definition of what the

21 licensed products were.  And there's no definition of what the

22 licensed services were.

23         And now we get into that -- in my view, the most

24 important element of a valid license agreement is control.

25 Now, Mr. Willett has argued that the communications back and

Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.,
6:20cv54, 2/25/2022

1  forth between the parties demonstrate control.  He even

2  admitted that maybe Ms. Demiduk sent more communications than

3  did Mr. Leavitt.  That's probably true.

4        Ms. Demiduk is a very enthusiastic person who started

5  with nothing and grew her business.  We heard how the plaintiff

6  started a business and worked for 25 years to grow to it the

7  point that at the time that he first met Ms. Demiduk, he had 25

8  years into growing the business.  You know what?  Ms. Demiduk

9  and her now-husband Dave -- Dave maybe not quite as much -- but

10 Ms. Demiduk has 22 years into growing her business.  So she's

11 developed all this time, and it would be unfair to take that

12 away from her at this stage.  Mr. Leavitt allowed her to grow

13 her business, and she did it with full knowledge and full

14 consent from him.  No objection.  And so it just -- it's almost

15 illogical to think that today we could take that away from her,

16 take her name, take her brand away from her.

17        And it's interesting when we talk about the Google

18 situation in 2012, and Mr. Leavitt was complaining about now

19 the Internet access and Google is confused, Google Maps is

20 confused about our locations.  But if you add "and tearoom,"

21 then that will distinguish your business from mine.  Emerson

22 Creek Pottery & Tearoom, make sure to add "and tearoom."

23 Remember that?  Add "and tearoom."  So they did.  And that

24 resolved it.

25        So now we have the plaintiff actually helping the

1   defendant distinguish herself from his business.  And that's

2   very important, because as we look today, the defendants are

3   using Emerson Creek Events.  The plaintiff is Emerson Creek

4   Pottery.  And while "events" is descriptive of what services

5   are provided, just like restaurant is descriptive of restaurant

6   services, so "pottery" is descriptive of what the plaintiff

7   provides.  Pottery on here; events and restaurant services over

8   here.  These two are not related.

9           Mr. Leavitt testified they're not competitors.  And I

10  asked him:  How are you being damaged?  And he never gave me an

11  answer.  There is no damage here.  The parties actually have

12  coexisted.  So there are coexistence agreements as well.  And

13  maybe that's what should be done in this case.  Those are

14  agreements where people operate under names that have similar

15  terms -- certainly we agree Emerson Creek -- both parties use

16  "Emerson Creek."  But our client uses "Emerson Creek Events."

17  The plaintiff uses "Emerson Creek Pottery."  And if they

18  continue to do that, as they have over these last five years

19  since the breach -- the breach demand letter, they can coexist

20  without conflict.  As I say, there is no evidence -- and

21  Mr. Leavitt specifically testified to this -- there is no

22  damage, and they are not a competitor of his.

23          So today everything is okay and, yet now they want to

24  be compensated or rewarded, or they somehow want to punish

25  Ms. Demiduk for all her hard work in developing her business.

1    I don't get it.  And so you say:  Why wasn't this case settled?

2    We can't reach an agreement.  So we need your help.  We need

3    you to look at the facts here and say what's right in this

4    case.  Was there a license agreement?  I don't think so.  Was

5    there trademark infringement?  I don't think so.

6            And so, was there acquiescence?  Yes, I do.  And so

7    when you're going through your form, you can answer, go through

8    that form and consider each one, each question, and think long

9    and hard about it.

10           I also want to mention this concept that the sale of

11   the Signature and Mud Pie products was not right, that

12   Ms. Demiduk wasn't allowed to do this under this agreement,

13   whatever the agreement was.  And I showed you, and I walked

14   Mr. Leavitt through it.  I said, where in your proposal is

15   there any requirement that they exclusively sell Emerson Creek

16   pottery as opposed to any additional pottery?  It's not in

17   there.  So if it's not in there, how are we supposed to find

18   out that it was implied somewhere?  Do you know what his

19   answer?  Some do you remember?  He said, Well, it's obvious.

20   Well, it's obvious to him, but it's not obvious to me, and it

21   certainly wasn't obvious to the defendants.  If there was a

22   prohibition against doing something, they would have done it --

23   they wouldn't have done it.

24           And so this whole concept of some bad intent on the

25   defendants' part with their actions is hard to -- it's hard to

1  fathom.  The parties worked so well together for so long.  They

2  communicated back and forth.  They shared ideas.  And yet now

3  it's just like punishment.  It's not right.

4         This -- in order -- trademark infringement does not

5  require a finding of confusion.  It's just -- the test of

6  trademark infringement is the likelihood of confusion.  And

7  you'll see this when you go through the jury questions and

8  whatnot, which we've kind of gone through.  But as you study

9  this and apply the facts of the case to the law, the only

10 confusion that was really identified in this case, the only

11 instance of consumer confusion, Mr. Leavitt testified he was

12 aware of one instance, which he didn't have many details about,

13 but he said there was one instance.  Mrs. Leavitt testified as

14 to one, maybe a handful of instances, I think she said up to

15 six, over the last five years.

16        And yet we have this expert come in, Mr. Belisle, who

17 was paid $10,000 to do this study between the two names.

18 Remember what I asked him?  How does this apply to licensing

19 and trademarks?  Well, it doesn't really apply.  He didn't

20 know.

21        And it's true; it doesn't.  When you're doing an

22 infringement analysis, you can't take a name in a vacuum.  The

23 similarities in the names or the words is one of the nine

24 factors that's listed in those instructions, all the factors

25 you're supposed to study for infringement.  And the similarity

1  to the marks clearly is one.  But when you look down, there are

2  other factors, and so you should consider all that are

3  relevant.  Not every factor is relevant in every case.

4         But in this case, one factor that's particularly

5  relevant -- which is why there is no confusion today, and why

6  the instances of actual confusion are so de minimus -- one of

7  the factors is how similar or related are the goods or

8  services?  So again, they do pottery.  That's a product.  Our

9  client doesn't make products.  It doesn't brand products.  It

10 did have the Emerson Creek cookbook which they sent to the

11 plaintiff and showed them what they were doing.  He had no

12 problem with it.  May have even sold a few in his store.

13 Rather, the defendants provide services, restaurant services

14 and event services.  And they're good at it.

15         Remember what I told you when we started this case?

16 I said this case involves two American success stories.  The

17 plaintiff has a very successful pottery business, and we

18 congratulate him for that.  And Mr. Leavitt is looking forward

19 to his retirement.  He's spent his entire life building a

20 wonderful business.  And Ms. Demiduk has said how great the

21 product is.  That's not an issue.

22         But by the same token, the Demiduks have worked hard

23 over the last 20 years -- Dave a little bit less -- but they

24 worked together and they've built something.  They've built

25 their brand.  They're successful.  They should be applauded for

1  their success.

2          We talked about control, and I say communication is

3  not control.  Control is:  Send me your product so I can look

4  at it every year and make sure that what you're doing meets my

5  standards; or if you're providing services, I need the right to

6  come to your facility and make sure that you're doing a good

7  enough job with your services that meets my standards.

8          Mr. Leavitt was invited innumerable times to go and

9  visit the defendants' facility.  Ms. Demiduk was so proud of it

10  she kept inviting him and inviting him and inviting him.  And

11  he said, no, I'm too busy.  Too busy.  I can't take the time.

12  Over 17 years, not one visit.  Not one.

13          And yet you recall when I asked him about when she

14  was buying all this pottery from him -- which she paid for,

15  remember -- I said, Mr. Leavitt, you have over 200 accounts

16  that you sell to.  I said, where does she rank?  Well, she's at

17  the top.  She buys a lot of pottery.

18          He didn't monitor anything of what she did, other

19  than the numbers.  He was good at following the numbers.  Your

20  orders are down.  We've got to get you back up to speed, get

21  those orders up, because that's how he got paid.  That's the

22  only way he got paid.  You know why?  Because the only

23  agreement they had was a vendor/purchaser agreement.  They were

24  customers.  They weren't licensees.  They were customers.  He

25  even referred to them as customers, just like these other

1  200-plus accounts that he has around the country that he sells

2  wholesale to the companies and then they can resell his pottery

3  in their stores.

4           Don't punish her now.  Don't punish her now for what

5  has evolved when they were coexisting.  They're more than 700

6  miles apart, Mr. Willett.  They're 740 miles apart.  Let them

7  do their thing in Virginia.  Let them do their thing in

8  Illinois.  Let them coexist as they have been since 2018.

9  Thank you.

10          MR. WILLETT:  How much time do you think I have, Your

11 Honor?

12          THE COURT:  About seven minutes.

13          MR. WILLETT:  Thank you.  I want to be true to my

14 word here that I said I would come back and talk to you briefly

15 about acquiescence.  It's one of the things that's an

16 affirmative defense that they have the burden on that they

17 included here.

18          This is instruction 18.  So I thought you'd hear more

19 about it, but you didn't hear much about it.  I do want to tell

20 you it's instruction 18.  And it's -- trademark law occurs when

21 the owner of a trademark expressly or impliedly consents to

22 infringement.  And I think you saw the evidence, and I think

23 you can make that determination for yourself.

24          I will say I certainly didn't mean to imply that I

25 didn't trust that you could fill out the verdict form.  And I

1  hope it's as straightforward as possible, but I will tell you

2  that I have to sit down and read these things carefully and

3  look at them time and again, because it is one of these

4  if-yes-and-if-no documents.  So I hope that what I've provided

5  to you is helpful information as you go through this, and

6  triggers some thoughts for you as you look at it.

7       One I think I want to address right out of the gate

8  is no one is here to try and shut down the wedding business of

9  defendants.  No one is asking that that business be shut down.

10 What Mr. Leavitt is doing here is what he is in essence

11 required to by the law.  He is required to protect his

12 trademark, right?  You've heard all this stuff.  You have to

13 protect your trademark.  You cannot let someone go out there

14 and do whatever they want with your trademark.  It's their

15 defenses here.  It's the same arguments they make.  That's what

16 he is doing.  He is protecting his mark, and that's why we're

17 here today.

18      Now, if they want to go out and have a wedding

19 business and do it under another mark, under Countryview or

20 some other name that they come up with, absolutely.  Will they

21 have benefited from the relationship with Mr. Leavitt?

22 Absolutely.  But he can't control that.  He doesn't want to

23 control that.  If they have want to do that and operate, they

24 can.  If they want to sell -- if they have some remaining

25 pottery of his, can they sell that pottery?  Absolutely they

1  can sell that pottery.  They just can't sell it under one of

2  the names that he let them use Emerson Creek, right?  They

3  can't sell it under that.  Why?  Because you saw the pictures,

4  right?  Look at it.  Look at the report, the last exhibit with

5  all the pictures where it's intermingled, right, intermingling

6  this.  You can't sell this in a shop called "Emerson Creek,"

7  this next to this.  He can't allow that.  But if you want to

8  sell it at a flea market or under the name "Countryview" or

9  some other name, then by all means.  So I want to make sure

10  that point is very clear.

11        A lot of talk in the beginning and the end about the

12  features of a license agreement.  Who are the parties?  I don't

13  think there's any question about who the parties were.  Was Ron

14  Wehrli involved in this?  Did all the invoices go to Ron

15  Wehrli?  Did he pay for things early on?  Yes.  But there is no

16  question and no dispute about the fact that Ron Wehrli

17  eventually gave that business -- gave whatever interest he may

18  have had, if he had any, he gave it to Ms. Demiduk.  She had

19  the interest, and now she and her husband.  There is no

20  question about who the parties are.  You have the parties here

21  before you today.

22        I want to give two more numbers to you.  Ask you to

23  read 66.  I hope you will.  I hope you also read Exhibits 55

24  and 56.  Guys, we've gone through a lot of material, and I'm

25  trying to give you a crash course and get you back through

1  these documents as quickly as I can to help you as much as I

2  can.  And yes, that helps me.  But it helps you, and it helps

3  the parties that have invested a lot in the last four days of

4  this litigation.  Please look at exhibits 55 and 56.  I think

5  they will be informative to you.

6          Royalty.  Oh, there's no royalty.  The sales of the

7  pottery were the royalty.  The more she promoted, the more

8  sales there were.  That was the royalty.  That's how it worked.

9  And when did it end?  It ended when she started selling the

10  other pottery when he found out about that.  So at that point,

11  the sales end.  At that point -- because he can't allow that to

12  happen -- the royalty ends.  The payments end, and the contract

13  has to be terminated.  He does haven't a choice at that point.

14          He said that that was always allowed.  She was always

15  allowed to do that.  No, she wasn't.  Look at the 2014 email,

16  the 2014 email where he calls her out on it and she gives an

17  answer.  You heard her answers today.  She gives an answer just

18  like that.  Just like that.

19          Not asking that they shut down.  We talked about

20  that.  Chris has been at it for 22 years.  Agreed.  He's been

21  at it for 47.  I'm not sure if my math is perfect, but at least

22  25 years more than she has, right?  For 47 years.  That means

23  something.  He's built a legacy for his family.  He's not

24  giving that away, nor should he have to.  And he wouldn't have

25  had to if she had complied with the license agreement.  We

1  wouldn't be here if she had complied with the license

2  agreement.  Talk about fairness.  Fairness?  Fairness is

3  complying with the agreement and adhering to the agreement the

4  parties entered into, and frankly lived by it for a long time.

5       Listen to what the expert said.  Yeah, he costs a lot

6  of money.  All of these guys cost a lot of money.  This one

7  just happens to be really good.  And you heard him.  He -- I

8  mean, I focused on every word he said.  It was one of the most

9  informative things that I've heard someone like that -- a lot

10  of times you get double talk and talking around these issues.

11  This guy knows what he's talking about.  He does this for the

12  biggest companies in the world.  Look at his resumé:

13  Continental.  Truist.  Who has heard of Truist?  SunTrust and

14  BB&T.  They know that.  So who do they hire?  They hire him.

15  He's the guy they hire.  Why?  Because there's going to be

16  confusion.

17       Yeah, Mr. Laubscher asked a question about what is --

18  you know, what did that have to do with trademarks?  It doesn't

19  have anything to do with trademarks.  But what does it have to

20  do with trademark cases?  You heard his answer.  You didn't

21  hear that part today.  You heard his answer.  That's the kind

22  of thing he does; he looks at these issues when there is

23  confusion on the Internet.  That's his job is to put companies

24  ahead of other companies on the Internet.  He looks at the

25  factors where people confuse them.  Mr. Laubscher said there

1  are no examples of confusion or limited examples of confusion.

2  Look at the evidence that Mr. Belisle showed you.  Those are

3  evidence of confusion.  Look at the actual emails, the customer

4  reaching out to the other parties trying to figure out who's

5  doing what.  Those are the ones we know about.  Those are the

6  ones we know about.

7           With that, I will conclude and thank you again for

8  your time and for your patience.  I hope that I didn't move too

9  quickly.  Appreciate it.

10           THE COURT:  All right.  Members of the jury, I'm

11  going to give you the final instruction.

12           When you go to the jury room, you should first select

13  one of your members to act as your foreperson.  The foreperson

14  will preside over your discussions and speak for you here in

15  court.  It is your duty as jurors to discuss this case with one

16  another in the jury and try to reach an agreement.  Each of you

17  must make your own conscientious decision, but only after you

18  have considered all the evidence, discussed it fully with the

19  other jurors, and listen to the views of the other jurors.

20  Don't be afraid to change your opinions if the discussion

21  persuades you that you should, but do not make a decision

22  simply because other jurors think it is right or simply to

23  reach a verdict.  Remember at all times you are judges of the

24  facts.  Your sole interest is to seek the truth from the

25  evidence in the case.

Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.,
6:20cv54, 2/25/2022

1      If you need to communicate with me during your

2   deliberations, you may send me a note through the marshal,

3   signed by one or more jurors.  I will respond as soon as

4   possible in writing or orally in open court.  Remember that you

5   should not tell anyone -- including me -- how your votes stand

6   numerically.

7      Your verdict must be based solely on the evidence and

8   on the law that I have given to you in my instructions.  The

9   verdict must be unanimous.

10      Nothing I have said or done is intended to suggest

11   what your verdict should be.  That is entirely for you to

12   decide.

13      Finally, a verdict form has been prepared for your

14   convenience.  The verdict form is simply the written notice of

15   the decision that you reach in this case.  The form reads --

16   and I'm not going to read it to you.  Each of you have a copy

17   of it, and it's been referred to in closing arguments.  You

18   will take the form to the jury room.  And when each of you has

19   agreed on your verdict, your foreperson will fill in the form,

20   sign and date it, and advise the marshal that you are ready to

21   return to the courtroom.

22      Any verdict must represent the considered judgment of

23   each juror.  In order to return a verdict, it is necessary that

24   each juror agree thereto; in other words, your verdict must be

25   unanimous.

1    And the rest of that instruction I think is

2  repetitious of what was in instruction 24, and I won't read it

3  to you again.  But you will have the instructions in the jury

4  room.

5    It's 4:00.  There's not much time.  I will ask you to

6  devote as much time to the case as you need to reach a verdict

7  under the instructions.  You may stay after 5:00, if you wish,

8  or you may come back on Monday if you have not reached a

9  verdict by 5 -- and I don't suggest that you should by 5.  But

10  you have the option of either staying and finishing this

11  evening or coming back on Monday.  But at 5, I would like for

12  you to let us know what you decide to do.

13    You may retire now to the jury room, and you will

14  have with you the instructions.  As I say, you will have access

15  to the exhibits.

16  **(Jury out, 4:01 p.m.)**

17    THE COURT:  Court will be in recess until the jury

18  returns.

19    (Recess.)

20    (Whereupon, the Court and parties returned to the

21  courtroom for the following, 5:04 p.m.)

22    THE COURT:  "For question 8:  Are the damages based

23  off the profited amount (Exhibit 32 and 34) from sales of the

24  Signature or Mud Pie pottery, or loss of revenue by sales from

25  the plaintiff during that time?  How do we determine the amount

1   of damages?"

2          I'll read that again.  "Question 8:  Are the damages

3   based off the profited amount (Exhibit 32, 34) from sales of

4   Signature and Mud Pie pottery or loss of revenue by sales from

5   the plaintiff during that time?  How do we determine the amount

6   of damages?"

7          Any suggestions on the answer?  They were referred to

8   Instruction 23.

9              (Pause.)

10             THE COURT:  Do you have a suggestion as to the

11  answer?

12             MR. WILLETT:  Yes, Your Honor.  Just one second.

13             (Pause.)

14             MR. LAUBSCHER:  Your Honor, it seems to us that it's

15  up to the jury to decide whether there are any lost sales.

16             MR. WILLETT:  It would be up to the jury to decide

17  that.  And we believe that they can refer to Exhibits 32 and 34

18  in making that determination, because those are sales that --

19  because they shouldn't have been selling that pottery.  Those

20  are sales that otherwise would have been to Emerson Creek.

21             MR. MCLAUGHLIN:  I think that, yeah, they could look

22  at those two documents.  I think if they're looking at

23  Signature and Mud Pie, those are the documents.

24             THE COURT:  "How do we determine the amount of

25  damages?"

Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.,
6:20cv54, 2/25/2022

1          MR. MCLAUGHLIN:  I think the answer would have to be

2   they have to determine if they had any lost sales.  And if they

3   want to determine what those values are -- if they're

4   determining that Signature and Mud Pie would be infringing,

5   they would have to look at those documents to decide what that

6   number looks like.  And it would be the net sales.  That's the

7   legal answer, what you would sell it for minus its cost.  That

8   would be your profit on those sales.  I don't know if we can

9   instruct them specifically that way, but that's how it would be

10  calculated.

11         MR. WILLETT:  Yeah, I think the instruction would be

12  that they can look at Exhibits 32 and 34 in determining the

13  amount of lost sales that the plaintiff suffered, their lost

14  profits.

15         MR. MCLAUGHLIN:  And again, they were told to

16  consider profits.  So obviously it's not gross sales.  They

17  have to look at the math and figure out the profits of the loss

18  of those sales, but I think that those documents do spell it

19  out because it shows the retail price minus its cost.  By

20  looking at those documents they can do the math and determine

21  whatever they think is appropriate.  So we would tell them --

22  is that what they're trying to ask, revenue minus --

23         THE COURT:  They know about 32 and 34, it seems.  Are

24  the damages based off the profited amount, 32 and 34, from

25  sales of Signature or Mud Pie pottery or loss of revenue by

Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.,
6:20cv54, 2/25/2022

1    sales from the plaintiff during that time?

2           MR. MCLAUGHLIN:  But the plaintiff's pottery was

3    being sold at the time.  So those sales were already occurring.

4    They were already paid for.  So there couldn't be a loss of

5    sales of pottery in the shop itself.  But definitely with

6    respect to Mud Pie and Signature, those sales are in that shop.

7    So if they look at the gross revenue minus what the cost was,

8    that's the profit on it.

9           MR. WILLETT:  Judge, I think it's -- can you read the

10   last part of their question again?  I want to make sure that I

11   have that right.

12          It says based on the profited amount in Exhibit 32

13   and 34 or loss of revenue from sale of plaintiff during that

14   time.  And I think it's that they can use 32 and 34 to

15   determine the latter, the loss of profit, the loss of what they

16   would have sold during that time.

17          MR. MCLAUGHLIN:  I think that's not inaccurate.

18          MR. WILLETT:  It's the loss of their profit.

19          MR. GOODRUM:  Ken, did you say that was not an

20   inaccurate --

21          MR. MCLAUGHLIN:  That is not an inaccurate statement.

22   That is an accurate statement.  When he says an accurate

23   statement, I agree with that.

24          MR. WILLETT:  Okay.

25          MR. GOODRUM:  And I think that -- I mean, 32 and 34

1   are Signature and Mud Pie.  They're not Emerson Creek.

2           MR. MCLAUGHLIN:  Right.  So I think they can rely on

3   those two documents to calculate the profit that would have

4   been made from the sale of them, because we have the revenues

5   and we have the cost.  So I think that they would do the math

6   and that would be their number.

7           THE COURT:  Well, if I tell them:  You may refer to

8   Plaintiff's Exhibit 32 and 34 to determine the lost sales --

9           MR. MCLAUGHLIN:  It would be the profits off the lost

10  sales is what it would be.

11          THE COURT:  Is that it?

12          MR. WILLETT:  To determine the --

13          THE COURT:  Profit from the lost sale?

14          MR. MCLAUGHLIN:  So it would be revenue minus cost.

15  But I don't know if we can instruct them on that math.

16          MR. WILLETT:  The plaintiff's loss of profit from the

17  lost sales, right.

18          MR. GOODRUM:  Right.  It's damages and it's the lost

19  sales.  But it's also -- at the same time, it's defendants'

20  profits, because the transaction is the same.  The amount is

21  the same.  Ultimately, the big deal is not to double-count

22  those things.  But what we're saying is they can calculate the

23  damages from these sales using 32 and 34.  The data is there.

24          MR. MCLAUGHLIN:  One of them will understand the

25  profits.  I know there's a couple with sales experience.  I

1  don't want to put words in their mouth, but they have to

2  calculate the profits from the lost sales.  That would be the

3  answer, I think.

4         MR. GOODRUM:  So 32 and 34 are relevant to the

5  question.

6         THE COURT:  "You may refer to Plaintiff's Exhibits 32

7  and 34 to determine the plaintiff's loss of profit from the

8  lost sales."

9         MR. MCLAUGHLIN:  Yes.

10        MR. GOODRUM:  There might be other documents in

11 evidence going to Mud Pie and Signature as well which we could

12 direct them to, although maybe not.

13        MR. MCLAUGHLIN:  I think that the other ones had to

14 do with line items.  These are the two, to my knowledge, that

15 were the profit ones.  I mean, I think that those are the

16 relevant documents.

17        MR. WILLETT:  Judge, to that point Mr. Goodrum

18 raised, I think they could also look to Exhibit 34 to see that

19 -- I'm sorry, 31, which -- and that's Plaintiff's 31, which

20 reflects the -- it's their charting of what they were paying

21 for the plaintiff's product during that time period.  It also

22 has Signature on there as well.

23        THE CLERK:  Plaintiff's 31 is not in evidence

24 apparently.  It's not admitted.

25        MR. MCLAUGHLIN:  Because what they paid for Emerson

1    Creek Pottery pottery is already taken care of, because it's

2    already paid for.  That was just being sold off.  So it's a

3    wash.  Signature and Mud Pie, I think these are the numbers as

4    far as I know.

5                MR. WILLETT:  I'm sorry, it's Defendants' --

6                MR. GOODRUM:  They can also look at the tax returns

7    for Countryview.  Those tax returns contain the numbers, the

8    gross numbers.

9                MR. MCLAUGHLIN:  They don't with respect --

10               MR. GOODRUM:  32 and 34 are QuickBooks reports.  So

11   the data from the QuickBooks reports certainly went into the

12   tax returns for Countryview.

13               MR. MCLAUGHLIN:  The problem with them looking at

14   Countryview with respect to Signature and Mud Pie is the

15   Countryview numbers would include things beyond Signature and

16   Mud Pie.  So if you want to look at the actual numbers for

17   Signature and Mud Pie, 32 and 34 are the actual numbers.

18               MR. WILLETT:  Actually, there's one more thing,

19   Judge.  I think what they really should look at, in addition,

20   that would be Exhibit 225, which are the actual purchase orders

21   between the parties.  Those would have the documents for the

22   relevant time period for all purchase orders during that time

23   period so they could make the assessment for themselves.  And

24   it's Exhibit 225, Plaintiff's 225.

25               THE COURT:  How do they arrive at this?  I mean, I

1  don't know how to instruct them.

2         MR. MCLAUGHLIN:  They can't consider Emerson Creek

3  Pottery sales that have already been paid for.  The question

4  that they had was about Signature and Mud Pie.  32 and 34 are

5  the exact sales that were made.  It has -- the retail price is

6  what they were sold for, and then it has another category of

7  what they paid for.  So at the bottom of each of those

8  documents it shows the net amount that they earned.

9         THE COURT:  32 and 34?

10         MR. MCLAUGHLIN:  Right.  And with respect to Emerson

11  Creek Pottery sales themselves, obviously since it's already

12  been paid for, you can't recover profits for what you've

13  already been paid for.  So we can't factor in Emerson Creek

14  Pottery sales at all.

15         MR. WILLETT:  They can, because the problem with them

16  doing what they were doing, Your Honor, is that they were

17  selling to someone they shouldn't have sold to.  And what we

18  have with these purchase orders is all of the purchase orders

19  from November of 2007 forward.  So they can see the purchasing

20  history, and they can see when they start purchasing from them.

21         THE COURT:  How many documents do they have to look

22  at to do that?

23         MR. WILLETT:  Well, I think they have to pick the

24  relevant time period.  It's true it's big documents, but they

25  just have to pick the time period.  They've got the Signature

Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.,
6:20cv54, 2/25/2022

1  for a date range, and they can look at the purchase orders in

2  225, because the rule -- the statute says plaintiff's profits,

3  right?  That's the damage.

4          MR. MCLAUGHLIN:  I mean, if their questions are

5  specifically Signature and Mud Pie, those two documents are

6  Signature and Mud Pie.  It seems to me that's the answer.

7          THE COURT:  Well, that's what I'm going to do.

8          MR. MCLAUGHLIN:  That's the profits that they earned

9  from those sales.  And it would presume that they would have

10  sold their own stuff in lieu of those, right?  You can't

11  presume anything else.  You have a specific itemized sale.

12          THE COURT:  Well, my answer to the question is:  "You

13  may refer to Plaintiff's Exhibits 32 and 34 to determine the

14  plaintiff's loss of profits from the lost sales."

15          MR. GOODRUM:  From the lost sales; is that right,

16  Your Honor?

17          THE COURT:  Yes.

18          MR. GOODRUM:  Thank you.

19          (Pause.)

20          MR. WILLETT:  Judge, I'm sorry I didn't point out

21  earlier the other document that is relevant to this is we

22  actually have the -- so what we've given them are the sales

23  specifically for Mud Pie and Signature.  We have the total shop

24  sales for 2016, '17, and '18.  And I think they should be able

25  to look at those numbers to see the percentage that were Mud

1 Pie and to see what the lost profit to the plaintiff would be.

2 And I think it would make sense for them to have those

3 documents as part of Exhibit 30 -- Plaintiff's Exhibit 30.

4 MR. MCLAUGHLIN: The problem with '16, '17 and '18,

5 they're prior to a demand to stop selling. So '16, '17 and '18

6 aren't relevant.

7 What's relevant is with respect to sales that would

8 have occurred after the date of the demand, and they would have

9 made those sales. So like I said, they had the actual sales.

10 He can't go back in time forever.

11 MR. WILLETT: No, that's not correct, Judge. It's if

12 they breach the agreement, what would plaintiff's losses have

13 been? This would show for times of the breach. She testified

14 she breached as early as 2004. So this would certainly be in

15 the relevant time period. It would be relevant through the

16 termination of the agreement, but it would be relevant during

17 that time period, correct, Garfield?

18 MR. GOODRUM: Sounds right.

19 MR. WILLETT: So it would be the first three pages of

20 Exhibit 30 would also be relevant to this analysis.

21 Thank you, Judge.

22 MR. MCLAUGHLIN: How would they be able to use that

23 without being completely confused? I think what he's saying is

24 we want to give them all the financials and let them figure it

25 out.

1          MR. WILLETT:  No.  This is just for the shop.  This

2    is not giving them all the financials.  This is just for the

3    shop.

4          MR. MCLAUGHLIN:  Well, the problem with the shop is

5    the shop included Emerson Creek pottery sales for which they

6    had already received money, non-pottery sales, and it also

7    would include literally sales that had nothing to do with any

8    kind of good whatsoever.  And so that's why it's an imprecise

9    number.

10          MR. WILLETT:  It's Exhibit 30, the first three pages.

11    It's identified as "2016 shop."  It's not Countryview.  It's

12    the shop.  That's what we're talking about.

13          MR. MCLAUGHLIN:  That's exactly what I'm talking

14    about.  In the shop itself in 2016, Emerson Creek pottery was

15    sold.  It was predominantly Emerson Creek pottery.  Those sales

16    were paid for to the plaintiff.  2017, the same.  2018.  If

17    they received those and said you can consider them, that would

18    literally give a windfall to the plaintiff to recover.

19          THE COURT:  I'm not going to instruct them further

20    unless they ask questions.

21          MR. WILLETT:  Then I would strongly note an objection

22    to that, Your Honor.  I think that is not answering their

23    question.

24          THE COURT:  Well, I sent the answer back.

25          MR. WILLETT:  The first three documents of Exhibit 30

1  are shop documents, and those documents should be -- they

2  should be informed of that.

3          MR. GOODRUM:  They're certainly relevant to it.

4          THE COURT:  You know, these are things that in

5  closing argument should have been pointed out to the jury.

6          (Recess.)

7          THE COURT:  Call the jury back.

8  **(Jury in, 5:55 p.m.)**

9          THE COURT:  You may have a seat.

10          Have you agreed upon a verdict?

11          FEMALE JUROR:  Yes, sir.

12          THE COURT:  Hand it to me.

13          (Pause.)

14          THE COURT:  All right.  You did not answer question

15  3, and I think that's -- Carmen, would you publish the verdict?

16          THE CLERK:  Ladies and gentlemen, is this your

17  verdict:  In the matter of Emerson Creek Pottery, Incorporated

18  versus Emerson Creek Events, Incorporated and others, Case

19  Number 6:20cv54, as to breach of licensing agreement claim,

20  Count Four, does plaintiff have a valid trademark in the mark

21  "Emerson Creek?"  Yes.

22          Question 2:  Did plaintiff and defendants enter into

23  an express licensing agreement?  Yes.

24          Question 3 was not answered.

25          Question 4:  What names were covered by the parties'

1  licensing agreement?  All boxes were checked:  Emerson Creek,

2  Emerson Creek Pottery, Emerson Creek Pottery & Tearoom, and

3  Emerson Creek Events.

4          Question 5:  What services were covered by the

5  licensing agreement?  Again, all boxes checked:  Gift shop

6  services, restaurant services, and event services.

7          Question 6:  Did plaintiff exercise adequate control

8  over the nature and quality of services offered by defendants

9  under the mark?  Yes.

10          Question 7:  Did defendants breach the licensing

11  agreement?  Yes.

12          Question 8:  What is the amount of damages for which

13  defendants are liable for their breach of licensing agreement?

14  The amount:  $5,119.51.

15          As to trademark infringement claims and false

16  suggestion of affiliation or sponsorship claim, Counts One,

17  Two, and Three, Question 9A:  Did defendants infringe

18  plaintiff's trademark, "Emerson Creek?"  Yes.

19          Question 9B:  Did defendants infringe plaintiff's

20  "Emerson Creek Pottery" trademark?  Yes.

21          Question 10:  Did defendants act willfully in

22  infringing plaintiff's trademarks, knowing they were infringing

23  or acting with indifference to plaintiff's trademark rights?

24  Yes.

25          Question 11:  Did plaintiff acquiesce to defendants'

Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.,
6:20cv54, 2/25/2022

1  infringement of plaintiff's trademark?  No.

2          Question 12:  Did defendants use the marks "Emerson

3  Creek" or "Emerson Creek Pottery" in a manner likely to cause

4  confusion or to cause mistake or to deceive as to the

5  affiliation, connection, sponsorship, or association by

6  defendant -- between defendants and plaintiff?  Yes.

7          Question 13:  What is the amount defendants should

8  pay for their infringement of plaintiff's trademark and their

9  unfair competition and false designation of origin?  The

10  amount:  $2 million, signed by your foreperson.

11          And I'm sorry, I can't read the name.  Is it

12  Elizabeth Masencup?

13          FEMALE JUROR:  (No verbal response.)

14          THE CLERK:  Thank you.

15          Do you and each of you agree upon this verdict, so

16  say you all?

17          ALL:  Yes.

18          THE COURT:  Any motions before the jury is

19  discharged?

20          MR. MCLAUGHLIN:  We'd ask for a motion for judgment

21  notwithstanding the verdict.

22          THE COURT:  I'm not going to talk about that in front

23  of the jury.

24          Members of the jury, you're excused now.  Thank you

25  very much for the attention you've paid and cooperation.  I'm

Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.,
6:20cv54, 2/25/2022

1  sorry we kept you here an hour longer than we promised, but

2  you've done a great job and a great service to perform as you

3  have in this case.  And so I'm going to allow you to be excused

4  now.  Thank you very, very much.

5  **(Jury out, 6:01 p.m.)**

6          THE COURT:  All right.  Well, I feel it was a jury

7  issue, but if you all want to file motions, I'm willing to

8  listen.

9          MR. MCLAUGHLIN:  You would like us -- do you want us

10  to file -- we would ask --

11          THE COURT:  I'm just saying if you want to file a

12  written --

13          MR. MCLAUGHLIN:  Sure.  We would.

14          THE COURT:  And I'll give you -- how many days do you

15  want to do that?

16          MR. MCLAUGHLIN:  Can we get three weeks, Your Honor?

17          MR. WILLETT:  Was it three weeks?

18          MR. MCLAUGHLIN:  Three weeks.

19          THE COURT:  How much response?

20          MR. WILLETT:  I mean, Judge, because there's the

21  other issue of the injunction that goes along with this, so

22  obviously we'd like that entered as quickly as possible.  We'd

23  prefer if the injunction goes ahead and enters, we're fine to

24  have it be three weeks and then three weeks on briefing.  But

25  if the injunction is not going to enter immediately, then we'd

1  ask for a more expedited briefing schedule.  And we're happy to

2  address this on Monday, because I do realize it's 6:00 on

3  Friday.

4           THE COURT:  Well, actually, the legal issues you've

5  all agreed to.  Just set forth what your argument is.

6           MR. MCLAUGHLIN:  Right.  Your Honor, we had brought a

7  number of issues before Your Honor on a motion for summary

8  judgment.  Then we'd ask for summary judgment at the end of

9  plaintiff's case in chief.  So those issues are still on the

10 table.  It was our belief that judgment should be entered in

11 favor of the defendant at that time.  So based on what we had

12 previously filed for a motion on summary judgment --

13          THE COURT:  All right.

14          MR. MCLAUGHLIN:  And then, of course, the damages

15 would be excessive, but that's an issue that would have to be

16 briefed separately, Your Honor.

17          MR. WILLETT:  And obviously the Court has considered

18 both sides' briefing on that and found summary judgment --

19          THE COURT:  I submitted the case to the jury, which I

20 thought was proper.  And as far as the verdict is concerned,

21 the damages issue I'm not -- whether it's excessive or not --

22 I'm surprised at the $2 million, but you'll have to brief it to

23 show that there was no way they could have arrived at that

24 amount of money, if you wanted to just on the damages issue.

25          MR. MCLAUGHLIN:  I think it would probably be all

Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.,
6:20cv54, 2/25/2022

1   together, I would think, because we'd have the --

2          THE COURT:  It would what?

3          MR. MCLAUGHLIN:  It would come all together because

4   there's the legal issues, and then we'd raise the damages as

5   well at the same time.  I wouldn't expect to bifurcate those

6   issues.

7          THE COURT:  No.  I will enter judgment on the jury

8   verdict.  I'm denying all your motions, except on the damages

9   issue I will entertain, because I'm not prepared to say -- to

10  answer whether it's excessive or not.

11         MR. WILLETT:  Understood, Your Honor.  So if they're

12  asking for three weeks on that, if we could have the same

13  amount of time to respond, that would be appreciated, on the

14  amount of the verdict.

15         THE COURT:  All right.

16         MR. WILLETT:  And then, Your Honor -- and obviously,

17  Garfield, if you need to speak to this as well.  We've

18  requested injunctive relief based on the infringement.  We

19  would ask if we could submit an order momentarily.  We'd ask

20  that that be entered consistent with the order of the jury.

21         THE COURT:  Do you want to submit that on Monday?

22         MR. WILLETT:  Yes, Your Honor, we will.

23         MR. GOODRUM:  Thank you, Your Honor.

24         THE COURT:  And send it to -- I mean, of course,

25  you'll --

1          MR. WILLETT:  Do the e-file, yes, we will.

2          THE COURT:  All right.  We'll recess court.

3  (Proceedings adjourned, 6:06 p.m.)

Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.,
6:20cv54, 2/25/2022

1                    C E R T I F I C A T E

2       I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3  the United States District Court for the Western District of

4  Virginia, appointed pursuant to the provisions of Title 28,

5  United States Code, Section 753, do hereby certify that the

6  foregoing is a correct transcript of the proceedings reported

7  by me using the stenotype reporting method in conjunction

8  with computer-aided transcription, and that same is a

9  true and correct transcript to the best of my ability and

10  understanding.

11       I further certify that the transcript fees and format

12  comply with those prescribed by the Court and the Judicial

13  Conference of the United States.

14       /s/ Lisa M. Blair              Date: March 9, 2022