**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION**

| | | |
|---|---|---|
| EMERSON CREEK POTTERY INC. | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 6:20-CV-0054-NKM |
| | ) | |
| v. | ) | |
| | ) | |
| COUNTRYVIEW POTTERY CO., | ) | |
| EMERSON CREEK EVENTS, INC., | ) | |
| CHRISTINA DEMIDUK, and | ) | |
| DAVID DEMIDUK | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF ITS RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, OR, ALTERNATIVELY, FOR A NEW TRIAL OR AMENDED JUDGMENT

Defendants Countryview Pottery Co., Emerson Creek Events Inc., Christina Demiduk, and David Demiduk, through counsel, file this memorandum in support of their Renewed Motion for Judgment as a Matter of Law under Federal Rules of Civil Procedure Rule 50(b) [1] or, alternatively, a Motion for a New Trial under Rule 59 or Amended Judgment in accordance with 15 U.S.C. § 1117. For the reasons set forth below, Defendants respectfully request that the Court grant Defendants' motion in its entirety.

---

[1] Defendants recognize that the Court's minutes order from February 25, 2022 stated that it denied Defendants' renewed motion for Judgement as a Matter of Law. However, at that time, Defendants had not yet filed such a motion and therefore did not have the opportunity to articulate the basis for the motion. In an abundance of caution, to ensure that Defendants have not waived appellate review of their arguments, this memorandum along with the associated motion is filed pursuant to Rule 50(b) as well as Rule 59 and 15 U.S.C. § 1117.

**INTRODUCTION**

Following the close of Plaintiff's case in the subject action on February 24, 2022,

Defendants moved for Judgment as a Matter of Law under Federal Rules of Civil Procedure Rule

50(a) on all counts. (Exhibit C: Trial Transcript Day 3 page 123, line 25 – page 125, line 10).

The Court denied that motion. (Exhibit C page 125, lines 11-14). Defendants now renew their

motion for Judgment as a Matter of Law or, in the alternative, move for a New Trial or Altered

Judgment.

**STANDARDS OF REVIEW**

A renewed motion for Judgment as a Matter of Law under Federal Rules of Civil

Procedure Rule 50(b) "sets forth the requirements for challenging the sufficiency of the evidence

after the jury verdict and entry of judgment." *United States ex rel. Cody v. ManTech Int'l, Corp.*,

746 F. App'x 166, 175 (4th Cir. 2018), citing *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 155

(4th Cir. 2012). That is, this rule allows for review of "whether the claim[s] should succeed or

fail because the evidence developed at trial was insufficient as a matter of law to sustain the

claim[s]." *Id.* When the case is tried to a jury, the motion challenges the sufficiency of evidence

to support the jury's verdict. *Id.*

A Rule 59 Motion for a New Trial may be granted, in the Court's discretion, when the

verdict is (1) against the clear weight of the evidence; (2) based upon false evidence; or (3) will

result in a miscarriage of justice. *Atlas Food Sys. and Serv., Inc. v. Crane Nat'l Vendors, Inc.*, 99

F.3d 587, 594 (4th Cir.1996). That is, in determining a motion for a new trial, the Court has the

discretion to "weigh the evidence and consider the credibility of witnesses." *Cline v. Wal–Mart*

*Stores, Inc.*, 144 F.3d 294, 301 (4th Cir.1998). If the verdict is against the weight of the evidence

or is excessive, a new trial should be granted. *Id.*

2

Under 15 U.S.C. § 1117, the Lanham Act authorizes the Court to amend the monetary award included in a jury's verdict based on "principles of equity." More specifically, "[i]f the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." In the Fourth Circuit, where the jury provides for a monetary award based on profits, such a verdict will be considered "advisory", and the Court has the authority to amend it as necessary to align with the circumstances of the case. *See Variety Stores, Inc. v. Walmart Inc.*, 852 F. App'x 711, 716–17 (4th Cir. 2021). *See Super Duper, Inc. v. Mattel, Inc.,* 382 F. App'x 308, 317 (4th Cir. 2010); *see also Exclaim Mktg., LLC v. DirecTV, LLC*, 674 F. App'x 250, 251 (4th Cir. 2016).

## ARGUMENT

The evidence presented at trial does not, as a matter of law, support the jury's finding of an express, oral agreement between Plaintiff and Defendants. Plaintiff's owner testified numerous times during trial that Defendants did not agree to the terms proposed by Plaintiff in relation to the alleged trademark licensing agreement. Moreover, had Defendants agreed to the alleged terms of the agreement, those terms are not certain, definite, and complete as required under Virginia law such that an oral agreement could be found.

Because there was not an oral trademark licensing agreement as a matter of law *based on Plaintiff's owner's testimony*, the only agreement that Plaintiff can purport to rely on is an implied license. Plaintiff's owner testimony on the relationship between Plaintiff and Defendants cannot support sufficient quality control of Defendants' services, as required by law, such that there could be a valid implied or valid oral license between the parties. Moreover, the jury did not determine at trial whether there was an implied license between the parties. Thus, if the Court

3

does not agree with Defendants that an implied license could not be found as a matter of law and finds that an implied license could have existed between the parties, a new trial is needed to determine this issue.

Regardless of the outcome of the above, the monetary award to Plaintiff is excessive in light of the circumstances of this case and principles of equity. Plaintiff had no part in Defendants' development or operation of their restaurant or events businesses, and even Plaintiff's version of the alleged agreement between the parties did not require Defendants to make *any payments* as royalties or otherwise to Plaintiff in relation to Defendants' restaurant or events services. Plaintiff has not suffered any actual damages as a result of Defendants use of the EMERSON CREEK mark. It would thus be inequitable under these circumstances to award a windfall of $2 million to Plaintiff.[2] The proper equitable remedy in this case is for a permanent injunction, which the Court has entered. Defendants request that the monetary award be set aside or amended to be more equitable under the circumstances.

## I.    Under Virginia law, an express trademark licensing agreement was not formed.

At trial, the jury found there to be an express trademark licensing agreement. (Exhibit D: Trial Transcript Day 4 page 214, lines 22-23). An express agreement can be either written or oral and is determined based on general principles of contract law. *See* McCarthy on Trademarks and Unfair Competition § 18:43 (5th ed.). Plaintiff does not contend that there was a valid written licensing agreement. (Exhibit D page 173, line 18 – page 175, line 4). Thus, for there to be an express trademark licensing agreement, there must be evidence to support an oral agreement.

---

[2] Under 15 U.S.C. § 1117 and in accordance with the jury instructions presented at trial, this $2 million award would relate to actual damages, profits and costs. Notably under the Lanham Act, costs do not include attorney's fees, which are to be separately determined when a case is deemed to be "exceptional", which Plaintiff can separately request through a motion with this Court.

For a valid and enforceable oral agreement under Virginia law, the terms of the alleged agreement "must be reasonably certain, definite, and complete to enable the parties and the courts to give the agreement exact meaning." *Richardson v. Richardson*, 10 Va. App. 391, 395, 392 S.E.2d 688, 690 (Va. Ct. App. 1990) (citing *Smith v. Farrell*, 199 Va. 121, 128, 98 S.E.2d 3, 7-8 (Va. 1957)). "Until the parties have a distinct intention common to both and without doubt or difference, there is a lack of mutual assent, and therefore, no contract." *See Persinger & Co. v. Larrowe*, 477 S.E.2d 506, 509 (Va.1996). And the parties must have agreed upon the terms for a valid and enforceable contract to exist. *Martin v. NAES Corp.*, No. 6:12-CV-00058, 2013 WL 5945655, at *3 (W.D. Va. Nov. 6, 2013), *aff'd*, 583 F. App'x 162 (4th Cir. 2014).

For the case at bar, Plaintiff contends that it entered into an oral agreement with Defendants and the jury found this to be supported by the evidence. The evidence, however, cannot support such a finding as a matter of law.

James Leavitt, owner of Emerson Creek Pottery, Inc., testified at trial that the parties formed an oral licensing agreement in 2001 and that he memorialized that agreement in a document entitled "Agreement Between Ron Wehrli and Emerson Creek Pottery" (the "Agreement"). (Exhibit B: Trial Transcript Day 2 page 76, lines 10 – 12). Plaintiff presented the Agreement during trial and stated that it represents the terms of the oral agreement. (Exhibit A: Trial Transcript Day 1 page 116, line 24 – page 118, line 5). However, as detailed below, Mr. Leavitt himself testified that the terms were unclear, and that Defendants never agreed to the terms. Thus, there cannot be an oral trademark license under Virginia law.

More specifically, when asked at trial under oath about the percentage of Plaintiff's pottery that Defendants were required to sell under the alleged agreement, Mr. Leavitt stated, "[m]y intention [] was that they would keep the store stocked with most of our pottery, and the

rest of it would be accessories that would go with the pottery." (Exhibit B page 87, lines 1 – 3). However, the Agreement states that the shop must be stocked with 75% of Plaintiff's products. (Exhibit E: Plaintiff's Exhibit No. 57). This document, which Mr. Leavitt prepared and which he relies on as a memorialization of the alleged oral agreement, contradicts his own position. In fact, according to the Agreement, there is no requirement that all pottery be Plaintiff's pottery. *Id.*

When questioned whether the Agreement would prevent Defendants from selling third-party pottery, Mr. Leavitt stated, "...it doesn't say that specifically, but I thought that was pretty obvious." (Exhibit B page 87, lines 6 – 7). And when asked whether Defendants ever explicitly stated they would sell only Emerson Creek Pottery, Mr. Leavitt stated, "No. Well -- no." (Exhibit B page 87, line 18). This term of the alleged agreement, from Mr. Leavitt's own representations, cannot be certain or definite. Moreover, according to Mr. Leavitt, the Defendants never even agreed that they would sell only Plaintiff's pottery. Importantly, *this is the alleged term that Plaintiff's contend Defendants violated which led to this litigation*. If this term is not certain and definite—the term that is the crux of the overall agreement—and if Defendants never agreed to it, *as stated by Plaintiff's owner*, there cannot be an express, oral license.

The above would be sufficient to find either that a reasonable jury could not find an express oral license or that the weight of the evidence is against there being an express oral license. The inquiry could stop there. However, Mr. Leavitt provided more insight during his testimony as to why an oral license cannot be found as a matter of law.

During direct questioning from Plaintiff's counsel, Mr. Leavitt was asked about terms of the agreement and why certain terms were not explicitly stated. (Exhibit B page 33, line 14 – 22). Mr. Leavitt stated that he assumed the agreement "would renew or stay in effect unless it was broken for some reason." *Id.* When asked what he meant by this, Mr. Leavitt stated, "[w]ell, if

6

they had done something terrible that we didn't like and didn't want them to use our name anymore." *Id.* What exactly "something terrible" might require is unclear. In Plaintiff's own words, the entirety of the terms of the agreement are uncertain, indefinite, and not complete.

The lack of certain, definite and complete terms continued throughout Mr. Leavitt's testimony. When asked about the pricing that was agreed to in the oral agreement, Mr. Leavitt testified that Defendants would receive a 30% or 40% discount on wholesale prices. (Exhibit A page 123, lines 5 – 7). However, the Agreement stated that the discount would be 30% off of retail price. (Exhibit E). When asked about this, Mr. Leavitt stated, "[w]ell yeah, [the document] does say that. But you know, it's basically the same thing," and, "[s]o I didn't say it right, but the intention was a discount off of the wholesale." (Exhibit B page 80, lines 7 – 18).

Again, these alleged terms cannot create an oral license. The actions of the parties over time may have created an implied license, but this cannot as a matter of law create a valid enforceable oral trademark licensing agreement. Numerous terms are indefinite, most important of which include the terms related to the sale of third party pottery and the discount Defendants would receive.

Not only were the terms not certain, definite and complete, Mr. Leavitt further testified that Defendants *never agreed to these terms*. (Exhibit B page 86, line 21 – page 87 line18). Again, as stated above, when asked whether Defendants every explicitly stated they would sell only Emerson Creek Pottery, Plaintiff stated that, no, they did not agree to this. *Id.* There is more. When asked directly whether any of the Defendants agreed to the terms of the Agreement, which memorialize the meeting between the parties from 2001, Mr. Leavitt stated, "Not directly, no." (Exhibit B page 79, lines 19 – 22).

The terms of the alleged agreement were not certain, definite and complete. This, on its own, prevents an oral trademark licensing agreement from being found. Moreover, Mr. Leavitt confirmed that Defendants never actually agreed to the alleged terms. Most important, Defendants never agreed to sell only Plaintiff's pottery. This is stated in Plaintiff's own words.

Whatever agreement may have been formed between Plaintiff and Defendants, it cannot be the express trademark licensing agreement Plaintiff contends existed. For that to be valid, both parties had to agree to the terms. As stated above, "[u]ntil the parties have a distinct intention common to both and without doubt or difference, there is a lack of mutual assent, and therefore, no contract." *Persinger* at 509. Mr. Leavitt stated unequivocally that the Defendants did not directly agree to his terms, most notably the term related to sales of third party pottery. There was no express agreement as a matter of law and no reasonable jury could have found there to be one.

II.   **Without an express trademark licensing agreement, Plaintiff may only rely on an implied license, the existence of which the jury did not decide, and which cannot be found as a matter of law.**

Without an express trademark licensing agreement between the parties, there must be an implied license for the jury's verdict to stand. Without an implied license, there could have been no breach of contract and there would be acquiescence as a matter of law.

An implied license can arise where no express license is found but where the objective conduct of the parties supports a license. *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134 (3rd Cir.1981). Importantly, though, for an implied license to exist, there must be both permission to use the mark and *exercise of reasonable control over use of the mark*. *Villanova Univ. v. Villanova Alumni Educ. Found., Inc.*, 123 F. Supp. 2d 293, 307 (E.D. Pa. 2000). The presence of these two elements will demonstrate, regardless of the actual existence of a license,

8

that both parties intended there to be a trademark license for the marks in question. *Id.* But, without both elements, an implied license does not exist. *Id.*

The Court previously determined in its memorandum supporting its order denying both parties' motions for summary judgment that there were factual issues in controversy regarding an implied license and whether Plaintiff exercised sufficient control such that an implied license was formed (Dkt. No. 87). At trial, the jury did not determine whether there was an implied license. Defendants contend that there could not have been an implied license as a matter of law because Plaintiff did not exercise sufficient control over Defendants' services, as discussed in detail in Section IV below. If, however, the Court does not find for Defendants on this issue, a new trial is required to determine whether an implied license was formed.

## III.   Without an implied license, Plaintiff's actions amount to acquiescence.

Acquiescence in trademark law occurs when the owner of a trademark knowingly allows another party to use its mark without objection. It arises through affirmative actions of the trademark owner, resulting in an implied consent to use the mark. *See What-A-Burger Of Virginia, Inc. v. Whataburger, Inc. of Corpus Christi, Tex.*, 357 F.3d 441, 452 (4th Cir. 2004)*; see also SunAmerica Corp. v. Sun Life Assur. Co. of Canada*, 77 F.3d 1325 (11th Cir. 1996). For acquiescence to be found, most courts have typically required three elements be present: 1) the senior user actively represented that it would not assert a right or claim; 2) the delay between the representation and the assertion of the right or claim was not excusable; and 3) the delay caused the junior user undue prejudice. *See SunAmerica Corp*, 77 F.3d 1325. The first two elements can be implied in a business relationship in which the senior user works directly with the junior user for an extended period of time without asserting rights over the mark, and in some instances even encouraging the junior user with its use of the mark. *Id*. Courts will find undue prejudice when a

9

defendant reasonably relies on the senior user's actions. *ProFitness Physical Therapy Center v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 67 (2d Cir. 2002).

In essence, a plaintiff cannot imply to a defendant that the defendant's use of a mark is acceptable, have the defendant rely on that implication, and then, at a later date, sue the defendant for infringement of the mark. *Dwinell-Wright Co. v. White House Milk Co.*, 132 F.2d 822, 825 (2d Cir. 1943).

For the case at bar, throughout the business relationship between both parties, Defendants informed Plaintiff of their business developments, first with the Countryview shop, and then with their tearoom/restaurant, and events businesses. (Exhibit A page 126, lines 1 – 12, page 157, lines 2 – 7, page 181, lines 8 – 13, page 183, lines 4 – 11, page 192, lines 4 – 16, page 194, lines 17 – 23; Exhibit B page 89, lines 8 – 18, page 114, line 16 – page 120, line 13, page 176, lines 5 – 22). Mr. Leavitt stated that Defendants informed him of their developments and uses of EMERSON CREEK with their marks. *Id.* Plaintiff did not object, and in fact stated that he approved of this. *Id.*

Accordingly, because neither an express or implied licensing agreement can be found as a matter of law, Plaintiff's representations over 17 years that Defendants could use EMERSON CREEK with its services amounts to acquiescence, and thus Plaintiff is estopped as a matter of law from bringing the causes of action present in this case.

**IV.   Had there been a trademark licensing agreement, Plaintiff's lack of control over the nature and quality of Defendants' services amounts to naked licensing.**

While the terms of a trademark licensing agreement may vary, one thing is required by all such agreements: the licensor must exercise quality control over the licensee's use of the licensed mark and the goods or services offered under the mark. *See Dawn Donut Co. v. Hart's Food*

*Stores, Inc.*, 267 F.2d 358 (2d Cir. 1959). If a trademark licensing agreement exists, quality control standards will be required under law. *Id.*

Though Defendants forcefully contend that there could not have been an oral or implied trademark licensing agreement as a matter of law, or at the very least under the weight of the evidence, even if there had been one, Plaintiff did not exercise quality control of Defendants' services as required under law. And where quality control is not adequately exercised, the result is a naked license and licensor's loss of rights in its mark. *Doeblers*, 442 F.3d 812.

Proper control requires there be actual quality control over the goods or services offered by the licensor. *Dawn Donut* at 368. In decisions related to quality control, courts have found there to be two acceptable paths to meeting this standard. The first is *actual control* by the licensor over the licensee's goods or services. *Id.* The second, which is applicable only in special circumstances where the parties have had a close working relationship, allows the licensor to rely on the licensee's own quality control standards. *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1121 (5th Cir. 1991). For the latter, importantly, there must have been a *prior* working relationship between the parties, such that the licensor knew firsthand of the quality and nature of the licensee's goods or services prior to entering into an agreement and thus could rely on the licensee's own quality control standards. *Id.* Courts have provided the following examples of close working relationships: (1) the parties had a close working relationship for many years prior to forming the alleged license; (2) the parties are family members with intimate knowledge of each other; (3) a licensor knew the licensee's employees well and thus could trust their standards; and (4) a licensor manufactured 90% of components sold by licensee and *had a 10 year prior working relationship* with licensee. *See Syntex Lab'ys, Inc. v. Norwich Pharmacal Co.*, 437 F.2d 566 (2d Cir. 1971); *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113,

11

1121 (5th Cir. 1991); *Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812 (3d Cir.

2006); *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001 (9th Cir. 1985); *Arner v.*

*Sharper Image Corp.,* 39 U.S.P.Q.2d 1282 (C.D.Cal.1995).

In each of the above instances, the alleged licensor and alleged licensee had a lengthy

prior relationship. There is not one instance in which a court found a "close working

relationship" between two parties where there had been no prior relationship. This is logical. If

any new relationship can amount to a close working relationship, the exception would swallow

the rule. Nearly every standard business relationship in which the parties communicate in the

normal course of doing business would be a "close working relationship", thus allowing a

licensor to solely rely on the licensee for quality control. If this were true, the standard "actual

control" requirement would rarely, if ever, apply.

The parties in this case had no working relationship prior to their initial meeting in 2001

when they first began to conduct business together. (Exhibit A page 115 – page 116 line 5).

Plaintiff had no firsthand knowledge of Defendants' abilities. *Id*. Plaintiff cannot rely on the fact

that Defendant Christina Demiduk had past experiences with sales and marketing because those

experiences *were not with Plaintiff*. Thus, Plaintiff cannot rely on Defendants own quality

control standards for its services in its gift shop, restaurant and events business. Plaintiff had to

exercise actual quality control over those services.

Plaintiff's owner Mr. Leavitt testified at trial that he was aware of the Defendants'

growth and their use of the many EMERSON CREEK iterations. (Exhibit A page 126, lines 1 –

12, page 157, lines 2 – 7, page 181, lines 8 – 13, page 183, lines 4 – 11, page 192, lines 4 – 16,

page 194, lines 17 – 23; Exhibit B page 89, lines 8 – 18, page 114, line 16 – page 120, line 13,

page 176, lines 5 – 22). He testified that he agreed with all of Defendants changes and that he

approved of them. *Id.* This is important. Every instance of Mr. Leavitt's testimony in which he states he approved of Defendants' expansion or of their use of a mark relates to permission. He permitted them to use the many iterations of EMERSON CREEK with their gift shop services, restaurant services and events services. But permission to *use* the mark with services is not control over the *quality of* those services.

In addition to permission, Mr. Leavitt must have also *exercised actual quality control over the services* offered by Defendants. *See Dawn Donuts*, 267 F.2d 358. Courts have stated on numerous occasions that what will be considered adequate control will vary from case to case, but actual quality control of the mark and of the goods and services associated with that mark is necessary. Actual control is found in two ways: (1) when a licensor creates express standards and guidelines related to usage of the mark and providing the underlying services; or (2) when a licensor does not create such standards, but monitors, tests or inspects the licensee's goods or services. *TMT North America, Inc. v. Magic Touch GmbH,* 124 F.3d 876, 885–86 (7th Cir.1997); *AmCan Enterprises, Inc. v. Renzi,* 32 F.3d 233, 235 (7th Cir.1994); *Barcamerica International USA Trust v. Tyfield Importers, Inc.,* 289 F.3d 589, 595–98 (9th Cir.2002); *Societe Comptoir De L'Industrie Cotonniere Etablissements Boussac v. Alexander's Dept. Stores, Inc.,* 299 F.2d 33, 35 (2d Cir.1962). This is not a suggestion but a requirement. *Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431 (7th Cir. 1989). If Plaintiff did not take at least one of these two approaches, Plaintiff will have engaged in naked licensing and lost the right to bring this action.

In an analogous case, *Dep't of Parks & Recreation for State of California v. Bazaar Del Mundo Inc.,* 448 F.3d 1118, 1131–33 (9th Cir. 2006), the Ninth Circuit found a lack of sufficient control over restaurant services when the alleged licensor did not supervise the "most critical aspects of building goodwill and value in the provision of restaurant services—the quality of the

13

food and service." The Court stated: "the State points to no evidence revealing any effort to monitor or sample the quality of Bazaar del Mundo's food and service. Nor is there any evidence that the State justifiably relied on Bazaar del Mundo's reputation or had established a close working relationship with it ...." *Id.*, citing *Barcamerica,* 289 F.3d at 597. This is exactly the case here. Plaintiff never set any standards or monitored the quality of the food and services offered at Defendants restaurant. Nor did Plaintiff inquire into the services provided in Defendants' gift shop or with Defendants' events business. There is not one document in evidence nor any testimony from Plaintiff that states otherwise.

In a similar case, the Ninth Circuit found insufficient quality control over the production of wine because the licensor did not have any "knowledge of the quality control procedures utilized by [licensor] with regard to testing wine," nor did the licensor have "any involvement whatsoever regarding the quality of the wine and maintaining it at any level." *Barcamerica* at 597. Again, this is directly analogous to the case at bar. Plaintiff has presented no evidence whatsoever related to quality control standards, whether with its own standards or with Defendants' standards. Plaintiff has presented no evidence of any involvement regarding the quality of the services offered by Defendants.

Without having created actual quality standards, whether expressly stated or not, and holding a licensee to those standards through inspection or monitoring of the actual goods or services, quality control will not be met, any trademark license will be a naked one, and a court should find the trademark abandoned.

The only involvement with Defendants' businesses that Plaintiff demonstrated was with emails it received from Defendant Christina Demiduk in which Ms. Demiduk informed Plaintiff generally of the number of patrons that visited the restaurant and the number of weddings

provided with the events business. There is no evidence of control over the *quality* of the actual services.

This is highlighted throughout the closing arguments for Plaintiff. Counsel argued that Mr. Leavitt exhibited control. In support of this, counsel cited emails from Ms. Demiduk to Mr. Leavitt related to use of the EMERSON CREEK mark. (Exhibit D page 177, line 8 – page 179, line 4). Counsel notes that Ms. Demiduk asked to use "ecreekpotteryandtearoom.com" and Mr. Leavitt permitted that. (Exhibit D page 178, lines 11 – 16). Counsel notes that Mr. Leavitt told Ms. Demiduk to include "and tearoom" with uses of the mark and Ms. Demiduk agreed to do so. (Exhibit D page 178, lines 19 – 24). Counsel does not note one instance of control by Plaintiff over the *quality* of Defendants' services. That is because no such evidence exists. What counsel highlights in his closing demonstrates that Plaintiff permitted Defendants to use iterations of EMERSON CREEK with their services. Permission to use a mark is not control over the quality of the services offered under that mark. This is not, as a matter of law, quality control.

There is not one document in evidence nor any testimony from Mr. Leavitt in which he demonstrated actual control over Defendants' services, whether through standards developed by Plaintiff and provided to Defendants or through inspection or monitoring of the services. Defendants developed their own standards and operated without any input or oversight from Plaintiff. This is the essence of naked licensing. A licensor permits a licensee to use a mark, but the licensor does not control the goods or services offered under the mark. *See Sheila's Shine Prod., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114 (5th Cir. 1973). And when there is a long failure to exercise quality control over services offered under a mark, the result is that the licensor is estopped from bringing any action against the licensee. *Id.*

15

As a result of Plaintiff's actions, or lack thereof, it no longer has rights it can enforce against Defendants and is estopped from doing so. Some courts have found that such a lack of control results in a total loss of rights, and others have found it results in a loss of rights for specific goods or services or in specific territories. *See* McCarthy on Trademarks and Unfair Competition § 18:48 (5th ed.). It is unnecessary here to determine whether Plaintiff's lack of oversight results in a total loss of rights or a partial loss of rights. At the very least, it cannot enforce rights against Defendants to support any of the causes of action in this case.

No licensing agreement existed between the parties at any time during the parties' business relationship. But even if a licensing agreement did exist, Plaintiff did not, as a matter of law, exercise adequate quality control over Defendants' goods and services and thus is estopped from bringing this action.

## V.   Defendants did not infringe Plaintiff's trademark rights as a matter of law.

Notwithstanding the above, Defendants' use of their EMERSON CREEK marks with restaurant and event services does not infringe Plaintiff's EMERSON CREEK or EMERSON CREEK POTTERY marks. Plaintiff's EMERSON CREEK POTTERY trademark registration No. 4,835,568 recites "ceramic sculptures, vases, vessels, bowls, plates and pots, household containers for foods, mugs, serving platters, and tea pots". (Exhibit F: Plaintiff's Exhibit No. 232). Mr. Leavitt testified that, whether with EMERSON CREEK or EMERSON CREEK POTTERY, the only goods and services offered by Plaintiff are related to pottery. (Exhibit B page 92, line 12 – page 93, line 1).

Again, Defendants contend that Plaintiff acquiesced to Defendants' use of EMERSON CREEK with its gift shop, restaurant and events services. Thus Plaintiff cannot now allege infringement of its trademark rights. However, even if Plaintiff could bring such an action,

16

Defendants' restaurant and events services are not sufficiently related to Plaintiff's goods and services to cause a likelihood of confusion. Further, once Plaintiff demanded Defendants stop selling pottery under the EMERSON CREEK mark, Defendants took reasonable steps to stop selling pottery and sell off their inventory.[3]

For there to be an infringement of Plaintiff's mark, Plaintiff had to have proven the following: 1) it owns a valid mark; 2) Defendants used the mark in commerce with goods or services without Plaintiff's consent; and 3) that such use is likely to cause consumer confusion. 15 U.S.C. §§ 1114, 1125(a); *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 259-260 (4th Cir.2007). Consumer confusion will be found when there is an appreciable number of consumers that would be confused into making a purchasing decision they otherwise would not make. *Workers v. Winship Green Nursing Ctr.*, 103 F.3d 196, 41 U.S.P.Q.2d 1251 (1st Cir. 1996).

A likelihood of confusion analysis to determine whether use of a mark constitutes trademark infringement requires consideration of a number of factors. *See Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984); *Sara Lee Corp v. Kayser-Roth Corp.*, 81 F.3d 455, 463-64 (4th Cir. 1996).[4] These factors are not meant to be rigidly applied, but rather are a guide for assessing whether there is a likelihood of confusion. *Anheuser–Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 320 (4th Cir.1992). Of the many potential factors, those most relevant in this case are the similarity of the marks and the similarity of the goods/services.

---

[3] Emerson Creek Pottery inventory in Defendants' possession that was sold off after Plaintiff demanded Defendants stop selling pottery was pottery that Defendants had already purchased from Plaintiff. Moreover, Plaintiff sold it with a good faith belief that it could due to Plaintiff's acquiescence.

[4] In the Fourth Circuit, these factors often include: 1) the strength or distinctiveness of the mark; 2) the similarity of the two marks; 3) the similarity of the goods/services the marks identify; 4) the similarity of the facilities the two parties use in their businesses; 5) the similarity of the advertising used by the two parties; 6) the defendant's intent; 7) actual confusion; 8) the quality of the defendant's product; and 9) the sophistication of the consuming public.

Plaintiff owns a U.S. registration for EMERSON CREEK POTTERY, providing it rights in that mark throughout the United States, and has potential common law rights in EMERSON CREEK, providing it rights in the territories in which it uses that mark. At trial, Plaintiff testified that it used EMERSON CREEK on pottery decades ago and currently uses EMERSON CREEK with point of sale cards in its shop in Bedford, Virginia. (Exhibit B page 94, line 21 – page 95 line 4, page 123, line 21 – page 125, line 2). Plaintiff's use of EMERSON CREEK without "POTTERY" thus is confined to Bedford, Virginia. Any broader rights it might have previously acquired through use of EMERSON CREEK on pottery have since been abandoned since Plaintiff's own evidence and testimony demonstrates that the mark was last used on pottery more than 20 years ago and is only now used with point of sale cards in its shop[5]. *Id.* Thus, for the infringement analysis, the only trademark rights which Plaintiff may enforce against Defendants' businesses in Oswego, Illinois is with the EMERSON CREEK POTTERY mark of the '568 registration.

While both parties' marks include EMERSON CREEK, Plaintiff's mark further includes the term POTTERY. Plaintiff's mark is a three-word mark, the third term describing Plaintiff's sole business. This difference is significant when construed in connection with the parties' respective businesses. Plaintiff provides few goods other than pottery and does not provide any services other than in connection with the sale of pottery. (Exhibit B page 92, line 12 – page 93, line 1).

Turning next to the similarities and dissimilarities of the goods and services provided by the parties. In a likelihood of confusion analysis, there are two considerations: 1) whether the parties are competitors who offer the same goods or services; and 2) if not competitors, whether

---

[5] Abandonment is presumed following three years of non-use of a trademark. 15 U.S.C. § 1127.

the goods or services are sufficiently related to cause an association between the parties and thus

a likelihood of confusion. *See Commc'ns Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245, 1252

(4th Cir. 1970). And finding a likelihood of confusion from such an association must include an

appreciable number of customers. *Workers* 103 F.3d 196. Clearly, the parties are not

competitors. Plaintiff stated as much at trial. (Exhibit B page 91, line 24 – page 92, line 11).

Thus, the relevant inquiry here is whether Plaintiff's pottery goods are sufficiently related to

Defendants' restaurant and events services such that an appreciable number of customers would

be confused and believe there was a connection between the parties.

Plaintiff did not present any evidence at trial demonstrating that events services are

related to pottery in the marketplace. Moreover, there was little evidence presented that

demonstrated any relatedness between pottery and restaurant services. This evidence alone is not

sufficient to demonstrate that Plaintiff's goods and Defendants' restaurant and events services

are related such that an appreciable number of consumers are likely to be confused into believing

there is a connection between the parties.

Plaintiff, however, alleged it has proof of actual confusion by consumers. The alleged

confusion presented at trial, though, consisted of a few instances in which consumers messaged

Plaintiff rather than Defendant. (Exhibit G: Plaintiff's Exhibit No. 76). Such "confusion" is de

minimis under law considering the two decades of concurrent use between the parties. *See Petro*

*Stopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 44 U.S.P.Q.2d 1921 (4th

Cir. 1997). Moreover, the nature of the evidence itself, including emails and social media posts,

results in insignificant instances of misdirected messages. Actual confusion is not found through

a misidentification or misdirected messages. *See Therma-Scan, Inc. v. Thermoscan, Inc.*, 295

F.3d 623, (6th Cir. 2002). It is found when a consumer is confused into making a purchasing

decision, whether by being confused into believing one business is the other business or into believing one business is associated with another resulting in a purchasing decision. *Id.* In fact, Plaintiff's lack of anything more than *de minimis* confusion in relation to Defendants' restaurant and events services, which have been provided for years, demonstrates that there is not a likelihood that consumers would be confused by Defendants' use of EMERSON CREEK. *CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263 (4th Cir. 2006).

Plaintiff further relied on their expert Townsend Belisle to demonstrate confusion. Mr. Belisle testified to search engine optimization efforts of Defendants and social media accounts owned by Defendants to allege that there was, or would be, confusion on the internet by services such as Google and social media website. (Exhibit C page 103, line 23 – page 104, line 10). It is unsurprising that a search for EMERSON CREEK would result in both businesses populating. And in fact, for every search presented by Mr. Townsend, both Plaintiff's and Defendants' business were at or near the top of the search results. If a customer were to enter the search term "Delta" with Google, both Delta Air Lines and Delta Faucets populate. (Exhibit H: Google Search). Delta Airlines is first and Delta Faucets is second. Delta Airlines may well spend more money on search engine optimization than Delta Faucets, or may simply be more popular causing it to appear first in search results. This does not constitute infringement. Mr. Townsend's "evidence" does not demonstrate confusion as it is defined in trademark law: that consumers will be confused into making a purchasing decision. It demonstrates that links to Defendants' website or social media accounts will be placed above Plaintiff's links in certain circumstances. It does not demonstrate that potential customers will be prevented from locating Plaintiff.

The differences between Plaintiff's goods and Defendants' restaurant services is such that there is no likelihood of confusion as a matter of law. At the very least, the weight of the evidence does not support such a finding.

Lastly, to the extent that a likelihood of confusion is found, the evidence at trial does not support willfulness on behalf of the Defendants. "[T]he primary consideration is whether the infringer, acting in good faith and upon due inquiry, had sound reason to believe that it had the right to act in the manner that was found to be infringing." *SRI Int'l, Inc. v. Advanced Tech. Labs.*, 127 F.3d 1462, 1464–65 (Fed.Cir.1997). Willfulness will not be found in such instances. Defendants continued to use the EMERSON CREEK marks after Plaintiff sent its demand letter in January of 2018 under a reasonable, good faith belief that, due to acquiescence, they could continue to use the mark with all of their services. This is not an intent to infringe.

Defendants' good faith actions also covers the time and effort they put into search engine optimization for their business and purchasing of domain names. They believed in good faith that they could use EMERSON CREEK and thus took reasonable business steps to market their brand and secure domain names for their brand. Moreover, Plaintiff immediately took reasonable steps to dissociate themselves from pottery, including having their website developer remove all instances of pottery from their website and other marketing materials. (Exhibit B page 211, line 22 – page 215, line 12). Whenever instances of pottery were located and brought to Defendants' attention, they contacted their website developer and had those instances removed. The one instance of "pottery" being used in the HTML code of Defendants' website was an oversight. It had been used with the website when Plaintiff had no objections to Defendants' use of EMERSON CREEK and POTTERY. Again, ample evidence shows that Defendants requested

21

for their website developer to remove all instances of pottery. A single oversight does not constitute willfulness.

Defendants believed in good faith that they could continue to use EMERSON CREEK with all of their services. They took reasonable efforts to remove pottery from their marketing in an attempt to work with Plaintiff to resolve this dispute. The evidence does not demonstrate willful infringement. The jury's finding in this regard should be set aside as a matter of law.

## VI.    The jury's monetary award is excessive and inequitable under the circumstances.

In the case at bar, the jury was instructed on two forms of monetary damages: actual damages and Defendant's profits. (Exhibit D page 160, line 24 – page 162, line 5). To find actual damages, Plaintiff has the burden of proving both causation and the amount it has been damaged. *Fishman Transducers, Inc. v. Paul*, 684 F.3d 187, 194 (1st Cir. 2012). Plaintiff presented no evidence at trial of any actual damages suffered by Plaintiff that was caused by Defendants. Moreover, Plaintiff presented no evidence of any monetary loss related to Defendants' actions or money spent for corrective advertising. Plaintiff's allegations of actual damages are purely speculative. In fact, when asked how Plaintiff is being damaged, Mr. Leavitt testified that "...they're assuming my name when they don't have a right to." (Exhibit B page 122, lines 19 – 20). And when asked whether Defendants' actions have caused Plaintiff to lose business, Mr. Leavitt stated, "I can't testify to that...." (Exhibit B page 122, line 23). Further, related to financial damages, if any, that Plaintiff incurred, Mr. Leavitt stated: "I can't quantify that." (Exhibit B page 123, line 15).

Without any proof of actual damages caused by Defendants and evidence of monetary loss associated with that damage, actual damages cannot be found. *See Champion Spark Plug Co. v. Sanders, 331 U.S.* 125 (1947); *see also Skydive Arizona, Inc. v. Quattrocchi,* 673 F.3d

1105, 1109 (9th Cir. 2012). Thus, based on the evidence presented at trial and the jury

instructions, the jury's monetary award of $2 million must be based on Defendants' profits.

Historically, the decision whether to assess a monetary award for trademark infringement

was equitable. *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 132–33 (2d Cir. 2014). Under

trademark and unfair competition law, courts would typically transfer profits in instances when

the parties were direct competitors. *Monsanto Chem. Co. v. Perfect Fit Prod. Mfg. Co.*, 349 F.2d

389, 392 (2d Cir. 1965). In these instances, profits were relied on as a means of roughly

assessing sales that were diverted away from the plaintiff. *Polo Fashions, Inc. v. Craftex, Inc.*,

816 F.2d 145, 149 (4th Cir. 1987). Thus, an award of profits was essentially used to make the

plaintiff whole. When parties were not in competition, courts were reluctant to include profits in

a monetary award. *Raxton Corp. v. Anania Assocs.*, Inc., 668 F.2d 622, 625 (1st Cir. 1982).

Courts have since considered additional rationales for awarding profits, including to

prevent unjust enrichment and future infringements, but the award, regardless, should be based

on equities of the case. *Marshak v. Treadwell*, 595 F.3d 478, 495 (3d Cir. 2009). Federal law has

codified the equitable nature of monetary damages in the Lanham Act. *See* 15 U.S.C. § 1117.

Specifically, in determining a monetary award, the Court should do so "subject to the principles

of equity" and "according to the circumstances of the case." *Id.* Further, if the amount of the

recovery based on profits is excessive, the Court may, in its discretion, amend the award

accordingly. *See Super Duper* 382 F. App'x 308; *see also Exclaim* 674 F. App'x 250.

Importantly, as held in *Super Duper* and *Exclaim*, the Lanham Act provides the Court

with this authority following a jury verdict. *Id.* Because of the historically equitable nature of

monetary awards, courts have found that when a jury's verdict includes an award based on

profits, the award should be treated as merely advisory under Federal Rule of Civil Procedure

23

39(c). *See Variety Stores, Inc. v. Walmart Inc.*, 852 F. App'x 711, 716–17 (4th Cir. 2021). Again, the Fourth Circuit has agreed with this and upheld court orders amending the jury's monetary award. *See Super Duper* 382 F. App;x 308; *Exclaim* 674 F. App'x 250. The Court here should consider the specific circumstances of this case based on principles of equity when fashioning a final monetary award, regardless of the jury's initial award.

Though equity should be determined on a case-by-case basis under the circumstances, the Fourth Circuit has provided a six-factor test that can be applied for such a determination. *See Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 175 (4th Cir. 2006)*, citing Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 175 (3d Cir.2005), and *Quick Techs., Inc. v. Sage Group PLC*, 313 F.3d 338, 349 (5th Cir.2002). Those factors include: (1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off.

As to the first factor, Defendant has noted throughout this action that its continued use of EMERSON CREEK was based on the good faith belief that Plaintiff acquiesced to such use and, therefore, is now foreclosed from bringing this action. Further, following Plaintiff's demand letter from January of 2018, Defendant took immediate steps to dissociate itself from pottery, including removing the term "pottery" from is marketing and service mark. (Exhibit B page 211, line 22 – page 215, line 12). Defendants' remaining restaurant and events businesses did not directly compete with Plaintiff and thus Defendant believed in good faith that there would be no confusion between the parties. Defendants did not have an intent to confuse or deceive. This factor weights against a monetary award.

As to the second factor, there is no evidence of diverted sales, thus this factor weighs against a transfer of profits. Plaintiff did not present any evidence of sales it lost because of Defendants' actions. Again, Defendants' restaurant and events businesses do not compete with Plaintiff and, therefore, Defendants could not have diverted sales away from Plaintiff. Thus, profits need not be transferred from Defendants to Plaintiff to make Plaintiff whole.

The adequacy of other remedies also weights against an award of profits. This Court has entered a permanent injunction preventing Defendants from, among other things, using any form of EMERSON CREEK with its services. This will be sufficient to ensure there is no confusion going forward. Because the parties do not directly compete, an injunction is the equitable remedy. When an injunction satisfies the equities of a case, a monetary award should be denied. *See Synergistic* at 176. As Plaintiff noted at trial, it never wished to receive any of Defendants profits from the restaurant or events business during the years that it allowed Defendants to use EMERSON CREEK with those businesses. (Exhibit B page 33, lines 3-13). Indeed, the alleged oral argument on which Plaintiff relies did not require Defendants to pay royalties for use of the mark with respect to those businesses. Thus, to now award profits from those businesses would be inequitable. An injunction is the proper remedy here. Awarding Defendants' profits in this instance would be more akin to a penalty, which is improper under 15 U.S.C. § 1117.

As to unreasonable delay, this also weighs in Defendants' favor, or at the very least is neutral. Plaintiff first inquired into whether Defendants were selling third-party pottery in 2014. (Exhibit A page 66, line 17 – page 67 line 6). As noted at trial, Defendant did not respond to this inquiry. Plaintiff then waited until the end of 2017 to investigate this further and visit Defendants' gift shop, at which time it noted third-party pottery being sold in the gift shop. Plaintiff then wait nearly three more years before bringing this action. During that six-year

period when Plaintiff first raised questions about the sale of third party pottery up to the filing of the present action, Defendants continually grew their restaurant and events businesses, making them more popular and more profitable. Had Plaintiff visited Defendants' facilities sooner and commenced with this action sooner, the available profits would have been significantly less. By awarding profits in this case, Plaintiff will effectively receive a windfall for dragging its feet. This factor weighs against Plaintiff receiving Defendants' profits.

As to the public interest, this factor requires the Court to balance the Plaintiff's right to be compensated for the infringement against the statutory right of Defendants to not be assessed a penalty. *See Synergistic* at 176. As noted above, Plaintiff has not presented any evidence of actual damages. Thus it need not be compensated to correct Defendants' infringement—the injunction provides the remedy Plaintiff needs. Considering this, in balancing public interest, a monetary award would be closer to an improper penalty than it would proper compensation to Plaintiff. This factor weighs against a monetary award.

Lastly, this is not a case of palming off, and thus this factor weighs against a monetary award. Defendants' restaurant and events services are not counterfeits of Plaintiff's services and Defendant did not represent that they were providing Plaintiff's retail store services. In fact, Plaintiff does not offer restaurant or events services. The parties do not compete and thus palming off does not apply here. This factor weighs against a monetary award.

When considering all six factors in their totality, it is evident that a monetary award is inappropriate in this case. An injunction provides an equitable remedy. An award of profits would have no relation to any harm done to Plaintiff or any profits improperly earned by Defendants. An award of profits in fact would more closely represent a penalty, which is improper under the Lanham Act.

26

Thus, Defendants request that if the Court does not find for Defendants on the issues presented above for Judgment as a Matter of Law or a New Trial, that the Court amend the judgment to maintain the injunction but set aside the monetary award. Doing so is in the purview of the court and would be the more appropriate under 15 U.S.C. § 1117 to ensure a just outcome in this action. To the extent that the Court does not agree with Defendants in setting aside the monetary award as discussed above, Defendants contend that a new trial, or in the alternative a remittitur, is necessary due to the excessive monetary award.

## CONCLUSION

As a matter of law, there was not an express trademark licensing agreement between the parties. Virginia law does not support a finding of an express licensing agreement nor does the weight of the evidence. Further, due to Plaintiff's lack of any control over Defendants' services, there cannot be an implied license under law. The lack of a licensing agreement leads to a finding that Plaintiff acquiesced to Defendants' use of EMERSON CREEK and, thus, the verdict must be set aside. If the verdict is not set aside, a new trial is needed to determine whether there was an implied license.

If, however, the Court finds that there was a valid license, Plaintiff's complete lack of any control over Defendants' services amounts to naked licensing and the loss of the right to bring this action. Though quality control standards vary from case-to-case, there must be some level of actual control over Defendants' services to meet this standard. Plaintiff did not present any evidence of control over Defendants' services, only authorization and permission to use EMERSON CREEK with the services. Naked licensing should be found as a matter of law and the verdict set aside. No reasonable jury could find otherwise.

Lastly, if the Court does not determine that the verdict must be set aside or a new trial ordered, the monetary award to Plaintiff should be discarded as inequitable or reduced as being excessive in light of the circumstances. Plaintiff provided no assistance to Defendants during Defendants' development and operation of its businesses. Plaintiff never requested or received any money from Defendants in relation to Defendants' restaurant and events businesses. To award Plaintiff $2 million after taking no part in developing or funding the restaurant and events businesses, would be unjust enrichment and amount to a windfall to Plaintiff. This is improper under trademark law. The proper remedy here is an injunction. That will make Plaintiff whole.

In light of the above, Defendants request that its motion for Judgment as a Matter of Law or, in the alternative, for a New Trial or Amended Judgment be granted in its entirety.

Respectfully submitted,

LAUBSCHER & LAUBSCHER, PC

_____/leljr/_____
Lawrence E. Laubscher Jr.
VSB No. 18680
llaubscher@laubscherlaw.com
1160 Spa Road, Suite 2B
Annapolis, MD  21403
(410) 280-6608 (Tel)
(410) 280-6758 (Fax)

Law Offices of McLaughlin & Associates, P.C.

_____/ksmjr/_____
Kenneth S. McLaughlin, Jr.
IARDC No. 6229828
1 E. Benton Street, Suite 301
Aurora, IL 60505
(630) 230-8434
(630) 230-8435 fax
kmclaughlin@ma-lawpc.com

*Attorneys for Defendants*

28

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 25, 2022, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

       /leljr/
       Lawrence E. Laubscher, Jr.
       Attorney for Defendants