# EXHIBIT A

Trial Transcript Day 1 Excerpts

```
                   UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF VIRGINIA
                         Lynchburg DIVISION

* * * * * * * * * * * * * *
EMERSON CREEK POTTERY, INC.,* CIVIL ACTION 6:20-CV-00054
                            * FEBRUARY 22, 2022   9:38 A.M.
              Plaintiff,     * JURY TRIAL
                            * VOLUME I OF IV
vs.                          *
                            *
EMERSON CREEK EVENTS, INC., *
et al.,                      * Before:
                            * HONORABLE NORMAN K. MOON
              Defendant.    * UNITED STATES DISTRICT JUDGE
* * * * * * * * * * * * * *  * WESTERN DISTRICT OF VIRGINIA
APPEARANCES:

For the Plaintiff:     GARFIELD BERNARD GOODRUM, ESQUIRE
                       Garfield Goodrum, Design Law
                       90 Canal Street, 4th Floor
                       Boston, MA 02114

                       HENRY IRVING WILLETT, III, ESQUIRE
                       Christian and Barton, LLP
                       909 East Main Street, Suite 1200
                       Richmond, VA 23219


For the Defendants:    KENNETH S. McLAUGHLIN, JR, ESQUIRE
                       Law Offices of McLaughlin
                       & Associates, PC
                       1 E. Benton Street, Suite 301
                       Aurora, IL 60505

                       LAWRENCE E. LAUBSCHER, JR., ESQUIRE
                       Laubscher & Laubscher, PC
                       1160 Spa Road, Suite 2B
                       Annapolis, MD 21403



Court Reporter:        Judy K. Webb, RPR
                       210 Franklin Road, S.W., Room 540
                       Roanoke, Virginia 24011
                       (540)857-5100 Ext. 5333

            Proceedings recorded by mechanical stenography.
Transcript produced by computer.
```

Plaintiff's Opening Statement

1  effort and diligence started to show this confusion for the

2  purchasing public and particularly online.  For example, the

3  problem with destinations is that they're off the beaten path,

4  so in 2012, when people started using Google Maps to get to

5  Emerson Creek, they began to get confused, looking for Bedford

6  and being directed to Oswego and vice versa.  Not great for

7  either company.

8         Because defendants had already been referring to

9  themselves as Emerson Creek Pottery and Tearoom, as we saw

10  from the website URL, Mr. Leavitt directed defendants that

11  they needed to change their listing through Google Maps from

12  Emerson Creek Pottery to Emerson Creek Pottery and Tearoom,

13  the evidence will show this, and that the response was, "We

14  will do whatever we need to do," cooperative and agreed, and

15  ultimately worked with Google to make that name change for the

16  listing.

17         In 2014, a couple of years later, Mr. Leavitt began

18  to notice that Ms. Demiduk, the defendants, were buying less

19  pottery.  So you'll see this from the correspondence we'll

20  show.  Both of them were very diligent in looking at the

21  sizing of her orders and how much pottery she would buy each

22  year to sell in that shop in Oswego.  And Mr. Leavitt, you'll

23  see the evidence will show, noticed that at this time in 2014

24  there had been a dip, a fairly significant dip, and he asked

25  her specifically, "Are you selling third-party pottery?"  And

Plaintiff's Opening Statement

1   you'll see -- you get to read it for yourself; you don't have

2   to hear it from him or hear it from her -- a lengthy

3   explanation of the factors: implicating sales, the cost of

4   running a small business, but not a single word about selling

5   third-party pottery, not a single word about selling pottery

6   other than the handcrafted Emerson Creek Pottery.  Indeed,

7   we'll show you the websites during this time period where they

8   continued to tout the story behind the creation of this

9   pottery, the namesake pottery.

10          Moving forward, defendants' sales continued to lack

11   while both parties' Internet presence increased.  Indeed,

12   Mr. Leavitt's Internet and online sales became a bigger

13   portion of his overall sales, and the restaurant and events

14   business became a bigger portion of defendants' business, the

15   destination of Emerson Creek Pottery and Tearoom.

16          The evidence will show that when Mr. Leavitt's

17   daughter, Elena, who you will hear from, created an Instagram

18   account for Emerson Creek Pottery in 2016, she had to use

19   underscores because defendants were already using Emerson

20   Creek Pottery.  At that time, you will see the correspondence,

21   Mr. Leavitt reminded the defendants that they needed to use

22   the "and tearoom," just like it appeared on the URL, and that

23   they should use that with all aspects of Emerson Creek so that

24   the public could keep Oswego and Bedford straight.

25          For 17 years Mr. Leavitt had communicated directly

Leavitt - Direct

1      I want to -- I talked a little bit about this in my

2  opening, and then Mr. Laubscher talked about it as well.  I

3  want to take you to the point in time where you first met

4  Ms. Demiduk and her then former boyfriend, Ron Wehrli, and ask

5  you what you can recall about that meeting.

6  A    Yeah, they both had approached me in -- I think it was

7  2001, so that -- I believe that Ron had a sister that lived at

8  Smith Mountain Lake, and so they came down here from time to

9  time.  And they had either heard of or seen our pottery, and

10 they came out to visit the store.  And they really liked the

11 experience of coming out to the country and having the old

12 farmhouse and the pottery.

13     And so they met with me and they proposed -- well, they

14 told me that they had a piece of land up near Chicago with an

15 old farmhouse and that they wanted to fix it up.  And they

16 proposed that they would open an Emerson Creek outlet type

17 store up there, where it would kind of duplicate that same

18 experience of driving out to the country, to a destination

19 point where you would be buying Emerson Creek Pottery.

20 Q    And what was it that you -- well, let me take that back.

21 What did you know about Ms. Demiduk or Mr. Wehrli when you had

22 that meeting?

23 A    Well, as part of that conversation, he indicated that he

24 was a developer of high-end houses in that area and that she

25 had extensive retail and marketing experience, I believe, with

Leavitt - Direct

1    Nordstrom and some other places.  So she knew how to market

2    and display and sell goods.  And so it seemed like they would

3    have the financial ability to carry it out, and then she

4    certainly seemed to have the capability to do a good job in

5    opening a store like that.

6    Q    Okay.  And what was the -- what was the benefit to you of

7    doing that?

8    A    Well, by multiple things.  Number one, it was a chance to

9    sell a lot of pottery.  Number two, I had a presence in an

10   area of the country that we didn't have that many stores in,

11   plus it would be a large store, another destination spot, so

12   it would help build my brand as well as help me sell pottery.

13   Q    All right.  You referenced earlier, you said the "outlet

14   type store."  What does that mean?

15   A    The general term "outlet" is, and what we do with our

16   store, for the most part, it's filled with seconds, or good

17   quality seconds, but they're still seconds.  And they're sold

18   below regular retail, and so people get a chance to get a

19   bargain, like going to an outlet mall.  And so I was going to

20   do the same kind of a deal with them where I would sell the

21   pottery at a good discount and they would be able to retail it

22   at less than wholesale, and by doing that do more sales

23   volume.

24   Q    Okay.  And what was the outcome of that meeting, sir?

25   A    We sold them a large number of flowerpots; we had an

Leavitt - Direct

1  overstock at that point.  And then once they got their store

2  rolling, they started buying a lot of pottery from us on a

3  regular basis.

4  Q    How did the meeting conclude?

5  A    With a handshake agreement, we agreed that they were

6  going to proceed with remodeling the farmhouse, and when it

7  was ready, they would start ordering more pottery.

8  Q    And who was part of that handshake agreement, sir?

9  A    It would have been Ron Wehrli and Chris.

10  Q    And yourself?

11  A    Well, yeah, and myself.

12  Q    You heard Mr. Laubscher talk earlier about the sample

13  licensing agreement.  Why didn't you use a sample licensing

14  agreement or a form agreement with them?

15  A    Well, primarily, I'm kind of a self-taught businessman.

16  I got into it -- I didn't get an MBA and learn all the tricks,

17  so to speak, but I've learned it by doing it over the years.

18  And I have dealt with many businesses over the years with a

19  handshake agreement where we all agree to certain things and

20  everybody keeps their word.  And I just assumed that that

21  would be fine in this case, and that's what we proceeded with.

22  Q    All right.  Now let me direct your attention to a

23  document that's been marked for identification purposes as

24  Exhibit 57.

25        MR. WILLETT:  And I will ask you to put that on the

Leavitt - Direct

1  screen.

2  BY MR. WILLETT:

3  Q    And if you can just tell me what this document is, sir.

4  A    That's a document that I drew up which basically

5  memorializes the points that were discussed at that meeting.

6  Q    All right.  And when did you prepare this document, sir,

7  if you know?

8  A    Well, it says March 23 of '01.

9  Q    And do you --

10        MR. WILLETT:  Let me ask you, Ashley, if you can

11  scroll down just a little bit.  No, the other way.  I'm sorry.

12  BY MR. WILLETT:

13  Q    Do you have an understanding -- well, let me ask you

14  this:  What is this document?  Was this a paper document?  An

15  electronic document?

16  A    Well, this is a copy of a paper document that I prepared

17  as a Word document.  So it was saved as a Word document, but

18  it was printed as a paper document.

19  Q    And what did you do with this once you prepared it?

20  A    I sent it -- I sent it to Ron Wehrli.

21  Q    And do you know how you sent it?

22  A    I probably -- you know, I originally was -- when this

23  whole thing came out, I thought I had e-mailed it.  But most

24  likely I faxed it or mailed it because I don't think people

25  were doing much e-mailing back in those days.

123

Leavitt - Direct

1   price?

2   A     Uh-huh.

3   Q     That's correct?

4   A     Correct.

5   Q     And then so the discount that you were giving to the

6   defendants here was then 40 or 30 percent off of that price?

7   A     Off of the wholesale price, that's correct.

8   Q     If you look at the next item there, Number 4.  If you

9   could read that for us.

10  A     "RW agrees to keep the store stocked with a minimum of

11  75 percent ECP products in order to keep using the ECP name on

12  the store."

13  Q     Okay.  And so what does that mean, sir?

14  A     The idea that she would sell Emerson Creek Pottery but

15  that she would keep the greatest majority of the store full of

16  pottery and not accessories, like linens, place mats, or

17  whatever, other things that might be sold.

18  Q     Well, you tell me, so the idea of that was that if she

19  didn't do that, then what was your ability?

20  A     Well, then the -- I believe the agreement says she

21  wouldn't be able to use my name.

22  Q     Take a look at the next item, Number 5.

23  A     "RW will allow ECP a reasonable amount of time between

24  placing orders and shipment."

25  Q     Did you understand -- have an understanding as to what

Leavitt - Direct

1  Q    Okay.  And so after your interactions with the Demiduks

2  in person and then you prepare this document, if you could

3  walk us through, how did the relationship go from there with

4  respect to them ordering pottery from you?

5  A    It went fine.  We both -- she opened their store, we sold

6  her pottery, she bought more pottery, we shipped it to her.

7  She kept me informed on a regular basis of how things were

8  going, sent me pictures of her store, the inside, the outside.

9  She discussed her marketing plans with me and ideas that she

10 had with trying to get people like Oprah interested in the

11 store and such like that.  And, basically, it went along in

12 that same manner for quite a few years.

13 Q    When did she start placing orders with you?  How soon

14 after the agreement was reached?

15 A    I can't -- I can't tell you an exact date.  It was right

16 after she got the store done, which is probably maybe a year

17 or less than a year.  I'm not sure.

18 Q    And then from there, was there a particular time of year

19 that she would typically order, or was it ongoing?

20 A    Yeah, she placed regular orders.  She was closed during

21 the winter, so she would place an order in the spring to get

22 her going in the spring.  And then they would get fill-in

23 orders during the year, and then they probably -- Christmas is

24 always a big, a big sales time, so we get another big order at

25 that time.

Leavitt - Direct

1   outlet store.

2   Q    The next sentence she says, "I have someone working on my

3   website, so I was wondering if he could just download some

4   pictures for the patterns and styles."  Do you see that?

5   A    Uh-huh, I do.

6   Q    Were you okay with that?

7   A    Yes.

8   Q    Look at the first sentence of the next paragraph.  "I

9   always tell customers they have to order online with your

10  website.  I do not ship or mail things.  Just want you to know

11  that."  Do you see that?

12  A    I do.

13  Q    And do you know what she's referring to there?

14  A    She's referring to the fact that we have an ecommerce

15  website at this time and that she's just reaffirming that

16  she's not shipping things, pottery that people buy away from

17  her store, so it wouldn't be competing with my website.

18  Q    Okay.  And you say "reaffirming."  Had you had

19  discussions with her along those lines previously?

20  A    We might have.  I don't remember exactly.

21  Q    And did you understand that for the entirety of your

22  business relationship with the defendants, are you aware of

23  them ever shipping or doing online sales?

24  A    No.  To my knowledge, they've never done that.

25  Q    Say that again.

Leavitt - Direct

1   to send her some.

2   Q    She goes on to say after some ellipses, "We lost our

3   domain name of ecreekpottery.com.  The guy who set it up had a

4   falling out with Ron and he owned the domain name because he

5   did not website six years ago so we have to change it."  Do

6   you see that?

7   A    I do.

8   Q    She goes on to say, "We are working on a new website.  I

9   believe the name is going to be ecreekpotteryandtearoom.com,

10  if that is okay."  Did I read that correctly?

11  A    That's correct, yes.

12  Q    Was that okay with you?

13  A    Yes, it was.

14  Q    Do you know whether she indeed did switch to that URL?

15  A    Yes, I believe that's true.

16  Q    And we may have seen one iteration of this, but I'll go

17  quickly to 203.  And, again, this is another e-mail between

18  Ms. Barickman and yourself in June of 2009.  Do you see that?

19  A    Yes.

20  Q    And in this e-mail, if you look -- this may be the same

21  one, it may be different, so I'm not going to tell you one way

22  or another.  But it says, "I have someone working on my

23  website, so I was wondering if you could download some

24  pictures for the patterns and styles."  Do you see that?

25  A    Yes.

Leavitt - Direct

1      MR. WILLETT:  If you scroll down just a little bit,

2  Ashley, to get that full e-mail in.

3  BY MR. WILLETT:

4  Q   The first one dated May 11, 2009, it says, "Hi, Jim, do

5  you think you can put my new website page address on your

6  website?  We are working on it now with new pictures, et

7  cetera.  Our new address is www.ecreekpotteryandtearoom.com."

8  Do you see that?

9  A   Yes, I do.

10  Q   Were you okay with that?

11  A   Yes, I was.

12  Q   What did you do in response to that?  If Ashley will

13  scroll up a little bit.

14  A   Yeah, I think you'll see I forwarded that to the people

15  that were running my website at the time and asked them to

16  change that, that we had an image on our website, and I

17  believe a link to their website on our website.  So I was

18  asking him to correct that web address.

19  Q   And what does the Chicago outlet store refer to?

20  A   Chris's Emerson Creek Pottery outlet store.

21  Q   And next if we can go to Exhibit 14.

22      And if you could scroll down a little bit.  I'm just

23  going to ask -- stop there.  Go back up a little bit.

24      Are you familiar with this image, sir?

25  A   Yeah.  Yeah.  Mm-hm.

Leavitt - Direct

1   A     Yeah.  Yeah, right, for sure.

2   Q     And do you know any of the details, like where they got

3   married?

4   A     Yeah, she told me that they were renovating a barn that

5   was on the property and they were going to expand their events

6   into doing -- kind of doing a wedding venue, and they planned

7   to get married there once they got the renovations done.

8   Q     And were you okay with that?

9   A     Yes, I was, because it expanded my mark from doing the

10  restaurant services into events and it benefited my trademark.

11  It would have sold me more pottery, so, yeah, I was fine with

12  it.

13  Q     And at any point in time did you get an opportunity to

14  see what it looked like, where they were doing the weddings?

15  A     They would have sent me photographs, either e-mail or in

16  the mail; I don't remember which.

17  Q     And did you have an understanding as to where the

18  weddings were taking place?

19  A     Well, it was all right on the grounds, right together by

20  the shop.

21  Q     Meaning the --

22  A     The same property, yeah.

23        MR. WILLETT:  Okay.  Next if we can go to

24  Exhibit 235.  And, Ashley, if you will scroll through this

25  document for us.

194

Leavitt - Direct

1  Day in The Country," do you see that?

2  A     Uh-huh.

3  Q     Is that a "yes"?

4  A     Oh, yeah, I'm sorry, uh-huh.

5  Q     And then do you understand what that reference is below

6  the views and the date, what those are?

7  A     That would have been the number of people that had viewed

8  it as of October 2013.

9  Q     Now, let's go back to the beginning of this, and I just

10 want to walk you through a few of these photos.  It looks like

11 this is sort of the intro here.  Again, can you identify what

12 that red wagon is?

13 A     That's that same wagon at the entrance, yes.

14 Q     Keep going.  What's depicted here, sir?

15 A     That appears to be inside her store.  That's our pottery

16 everywhere as far as I can see.

17 Q     And were you okay with Ms. Demiduk having a video on

18 YouTube back in 2013 that depicted the pottery that --

19 A     Sure.  Why would I object to it?

20 Q     Well, tell me that, why were you okay with it?

21 A     Because if it was on YouTube and it got a lot of views,

22 that would have increased my brand awareness under my Emerson

23 Creek mark.

24       MR. WILLETT:  All right.  Ashley, if you will keep

25 flipping through.

212

Leavitt - Direct

```
 1            THE CLERK:  Yes.
 2            THE COURT:  So tomorrow morning, before 9:30, report
 3    in at the same location on floor A that you did today.
 4            Now, overnight do not discuss the case with anyone or
 5    allow anyone to discuss it with you, or remain within hearing
 6    of anyone discussing it.  And thank you and we'll see you in
 7    the morning.
 8        (Court recessed at 4:51 p.m.)
 9
10                          CERTIFICATE
11    I, Judy K. Webb, certify that the foregoing is a
12    correct transcript from the record of proceedings in
13    the above-entitled matter.
14
15    /s/  Judy K. Webb              Date: 3/5/2022
16
17
18
19
20
21
22
23
24
25
```