# EXHIBIT B

Trial Transcript Day 2 Excerpts

Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.,
6:20cv54, 2/23/2022

1                    UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF VIRGINIA
2                        LYNCHBURG DIVISION

3     ***************************************************************

4     EMERSON CREEK POTTERY, INC.  CIVIL CASE NO.:  6:20CV54
                                   FEBRUARY 23, 2022, 9:30 A.M.
5                                  JURY TRIAL, DAY 2
               Plaintiff,
6     vs.

7     EMERSON CREEK EVENTS, INC.,  Before:
      ET AL.,                      HONORABLE NORMAN K. MOON
8                                  UNITED STATES DISTRICT JUDGE
               Defendants.         WESTERN DISTRICT OF VIRGINIA
9
      ***************************************************************
10    APPEARANCES:

11    For the Plaintiff:          HENRY IRVING WILLETT, III, ESQUIRE
                                  Christian and Barton, LLP
12                                909 East Main Street, Suite 1200
                                  Richmond, VA  23219
13
                                  GARFIELD BERNARD GOODRUM, ESQUIRE
14                                Garfield Goodrum, Design Law
                                  90 Canal Street, 4th Floor
15                                Boston, MA  02114

16    For the Defendants:         KENNETH S. MCLAUGHLIN, JR., ESQUIRE
                                  Law Offices of McLaughlin &
17                                Associates, P.C.
                                  1 E. Benton Street, Suite 301
18                                Aurora, IL  60505

19                                LAWRENCE E. LAUBSCHER, JR., ESQUIRE
                                  Laubscher & Laubscher, PC
20                                1160 Spa Road, Suite 2B
                                  Annapolis, MD  21403
21

22    Court Reporter:   Lisa M. Blair, RPR, RMR, CRR, FOCR
                        255 West Main Street, Suite 304
23                      Charlottesville, Virginia  22902
                        434.296.9284
24
              PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25    TRANSCRIPT PRODUCED BY COMPUTER.

J. Leavitt - Direct

1   50-cent stamp would have been the only thing it would have

2   cost.

3   Q    When you say no royalty, why was that, sir?

4   A    Because I was -- I wanted to continue the relationship the

5   way it had been.  We didn't used to have a royalty.  They were

6   buying pottery, and that was sufficient.

7   Q    Heard reference to the word "royalty" yesterday in

8   opening.

9        Why didn't you have a royalty?

10  A    I felt the idea was to increase my brand and widen its

11  name.  I was going to be selling pottery to them and hopefully

12  making some money in the process.  So I didn't feel like I

13  needed to try to put a royalty on top of it.

14  Q    Also heard some talk yesterday about the idea of a term of

15  an agreement.

16       The handshake agreement, why didn't you put a specific

17  term on that?

18  A    We just assumed that it would renew or stay in effect

19  unless it was broken for some reason.

20  Q    And what do you mean by that, unless it was broken?

21  A    Well, if they had done something terrible that we didn't

22  like and didn't want them to use our name anymore.

23  Q    And if they -- and what would have happened if they had

24  just stopped selling Emerson Creek pottery?

25  A    I think we would have terminated the agreement because

J. Leavitt - Cross

1          MR. LAUBSCHER:  Mike, can you pull that up?

2          MR. FRETWELL:  Do you have the number, by any chance?

3    Do you happen to have the defense or plaintiff's number?

4          MR. LAUBSCHER:  Here's the exhibit list from

5    yesterday.

6          MR. FRETWELL:  Plaintiff's 57.

7     BY MR. LAUBSCHER:

8    Q    Mr. Leavitt, would you explain again your purpose for

9    creating this agreement?

10   A    Yeah.  Like I said, this is basically to memorialize the

11   agreement and conversations that we had when they came down and

12   met with me.

13   Q    And why did you make the agreement between Emerson Creek

14   Pottery and Ron Wehrli?

15   A    Because he was -- it was my understanding that he was the

16   financial backer of the enterprise.

17   Q    And I believe you testified yesterday that you either

18   faxed or emailed this agreement to Mr. Wehrli?

19   A    Yes, that's my recollection.

20   Q    Now, do you have any evidence that you faxed or emailed

21   it?

22   A    No.

23   Q    Do you know whether you sent it return receipt requested?

24   A    I did not.

25   Q    Do you know whether you sent it by certified mail?

J. Leavitt - Cross

```
1   A     No.

2   Q     Did you send it to anyone?

3   A     No.

4   Q     Did Ms. Demiduk ever agree to the terms of this agreement?

5   A     Not directly, but it represented the conversation that we

6   all had and agreed to, and what we operated under all those

7   years.

8   Q     But I'm asking you if she ever acknowledged, either orally

9   or in writing, an agreement --

10  A     No.

11  Q     -- with those terms?

12  A     No.

13  Q     Did she ever tell you that she had even seen this

14  agreement?

15  A     No.

16  Q     Did Mr. Demiduk ever tell you that he had seen this

17  agreement?

18  A     No.

19  Q     So none of the defendants, to your knowledge -- to your

20  testimony have ever acknowledged either receipt of this

21  agreement or agreement to the terms of the agreement?

22  A     Not directly, no.

23  Q     It says in the first paragraph -- or item 1, I should say,

24  "products at a discount from regular retail prices."

25        Do you see that?
```

80

J. Leavitt - Cross

1  A    I do.

2           MR. LAUBSCHER:  And then could we scroll down, Mike,

3  so we can see the bottom.

4  Q    And then we have a discussion of the discount rate.  Do

5  you see that?

6  A    I do.

7  Q    I believe you testified yesterday that this was a discount

8  off of the wholesale price?

9  A    That's correct.

10 Q    But doesn't this agreement -- scroll back up, please --

11 say that it was a discount off of the regular retail prices?

12 A    Well, yeah, it does say that.  But, you know, it's

13 basically the same thing.

14 Q    Well, wait a minute.  Your regular retail prices and your

15 wholesale prices are the same thing?

16 A    No.  It's my understanding the regular retail price would

17 be twice wholesale.  So I didn't say it exactly right, but the

18 intention was discount off of the wholesale.

19 Q    But how would the defendants know what your intention was?

20 A    Because we discussed it when they had met with me.

21 Q    Item 2 says, "ECP agrees that RW will set up a corporation

22 in Illinois."

23     Do you know if RW actually set up a corporation in

24 Illinois?

25 A    Well, I don't know who physically did it, but they did do

J. Leavitt - Cross

1      When the defendants placed an order for pottery, did they

2 specify whether they wanted first-class pottery or high-end

3 pottery versus wholesale?

4 A    No.  They would place an order for what they wanted, and

5 we would bill it.  If we had some seconds, we might mix them

6 in.  But most of it was actually first quality because the

7 orders that they were placing were pretty large, and we didn't

8 have that many seconds.

9 Q    During the 17 years that they purchased pottery from you,

10 where would you say that the defendants ranked in the volume of

11 pottery purchased from you on an annual basis in relation to

12 your other accounts that purchased pottery from you for resale

13 to the public?

14 A    They would have been pretty high up for a great deal of

15 that time.

16 Q    Did you allow any of your other accounts to use Emerson

17 Creek Pottery as part of their store name?

18 A    No.

19 Q    How about any Emerson Creek marks?

20 A    No.

21 Q    Section 4 says that, "RW agrees to keep the store stocked

22 with a minimum of 75 percent ECP products in order to keep

23 using ECP name on the store."

24 A    Uh-huh.

25 Q    What does that mean?

J. Leavitt - Cross

1  A    My intention there was that they would keep the store

2  stocked with most of our pottery, and the rest of it would be

3  accessories that would go with the pottery.

4  Q    Does this section 4 state that they can't sell any pottery

5  under any other trademarks?

6  A    No, it doesn't say that specifically, but I thought that

7  was pretty obvious.

8  Q    Did you ever make it clear to the defendants that they

9  could only sell pottery from Emerson Creek Pottery in their

10  store?

11  A    Like I said, I thought it was obvious.  And during the

12  conversation when they were there, they were going to buy

13  Emerson Creek Pottery, and that's all they were going to sell.

14  So that was my understanding.

15  Q    It may have been obvious to you, but did you ever get any

16  positive statements from the defendants that they would only

17  stock the store with Emerson Creek Pottery purchased from you?

18  A    No.  Well -- no.

19  Q    Thank you.

20       Down in the appendix there is a reference to "licensed

21  designs."

22  A    Uh-huh.

23  Q    I know you went over this a little bit yesterday, but

24  could you just explain for me again what a licensed design was?

25  A    At that time we were licensing a few designs from what we

J. Leavitt - Cross

1  Pottery & Tearoom, and Emerson Creek Events, and Emerson Creek.

2      Did you ever consider sending them a revised agreement

3  that would identify those specific marks that they could or

4  could not use?

5  A    No, I didn't consider it, no.  I felt like they were using

6  those terms with my permission under the agreement that we had

7  and the terms of business that we were doing.

8  Q    And before any of these changes in names were adopted by

9  the defendants, did they ask for your permission to do it, or

10  did they just do it and you were okay with it?

11  A    I believe there was -- I'm not sure that they asked

12  specifically, but I was aware of it in the emails or phone

13  calls.

14  Q    Right.  So after the fact you were aware of it, and you

15  were fine with it?

16  A    Or they may have discussed that they were going to do it

17  beforehand.  I don't remember the details of every conversation

18  I had.

19  Q    What was your understanding -- I think you testified about

20  this under questioning from Mr. Willett, but how long was this

21  agreement to be in effect?

22  A    Perpetually, unless the terms were violated.

23  Q    And where -- and what would happen if a term was violated?

24  A    We would tell them, like I did, that they had to stop

25  using my name.

J. Leavitt - Cross

1  would be associated with it.

2  Q    Did you put any parameters as to how the quality of the

3  services that were provided either through the tearoom or the

4  restaurant or the events business were being set?

5  A    I didn't put it in writing, but by my observation of what

6  they did with the photographs or the website that I could see,

7  I could see it was all very high quality.

8  Q    Well, it sounds like you were reacting to what they were

9  doing and approving it, rather than dictating to them what they

10 must do to use your mark?

11 A    Well, I wouldn't put it quite that way.

12 Q    Well, how would you put it?

13 A    I was -- I was allowing them to do that, and it was fine

14 with me at that point.

15 Q    Who are some of your competitors, your largest

16 competitors?

17 A    My largest competitors, East Fork Pottery, Bennington,

18 people like that.

19 Q    And these are all pottery manufacturers?

20 A    Correct.

21 Q    So are you aware of any restaurants or tearooms that are

22 competitors to yours -- of yours?

23 A    I'm not following you.

24 Q    Do you know of any restaurants or tearooms that are

25 competitors to you --

J. Leavitt - Cross

1   A   No.

2   Q   -- of your company?

3   A   No.  No.

4   Q   Do you know of any events businesses that are competitors

5   to you?

6   A   No.  No.

7   Q   So you would say that your competitors are pretty much in

8   the pottery field?

9   A   Correct.

10  Q   Pottery manufacturers?

11  A   Yes.

12  Q   Do you provide any other services beyond manufacturing and

13  selling pottery?

14  A   We have -- at our outlet store, we have offered snacks and

15  that sort of thing.

16  Q   I'm sorry, I didn't --

17  A   I said at our outlet store at the pottery we have offered

18  snacks and that sort of thing, but we don't actually have a

19  restaurant.

20  Q   Do you have like a vending machine or something?

21  A   Well, we did.  We used to keep stuff in the icebox that

22  people could buy and eat on the grounds.

23  Q   But as far as operating other businesses or selling other

24  products, right now -- and really since 1977 -- you've been a

25  pottery business?

J. Leavitt - Cross

1  A    Correct.

2         MR. LAUBSCHER:  Pull up the exhibit that shows the

3  earlier version of the mark -- the Emerson Creek Pottery mark

4  that Mr. -- the stylized version that Mr. Leavitt used.

5  Q    While they look for that, I believe you testified that you

6  revised your stylized mark?

7  A    Yeah, we've changed it from time to time, yes.

8  Q    And with regard to your trademark registrations, it's my

9  understanding you have one that we've seen on the word mark,

10 and then you have a second registration on the stylized mark

11 with the logo mark?

12 A    That's correct.

13 Q    And both of those registrations include the word

14 "pottery," correct?

15 A    I believe that's so.

16 Q    And I believe you testified that you were advised -- well,

17 let me strike that.

18      With regard to filing your Emerson Creek Pottery word

19 mark, why did you include the word "pottery"?

20 A    That's what we were putting on the bottom of our pots at

21 that time.

22 Q    How often have you used -- well, strike that.

23      There was an exhibit shown earlier where you had a display

24 piece with the words "Emerson Creek" on it?

25 A    Uh-huh.

J. Leavitt - Cross

1  Q    And I think that was back from the early 1980s?

2  A    Correct.

3  Q    And I think there was also evidence showing the bottom of

4  pots that were marked with Emerson Creek and the year?

5  A    Yes, that's correct.

6  Q    And most of those, I believe, were 1983?

7  A    Well, I think during that whole time frame.  But yeah,

8  uh-huh.

9  Q    So are you using Emerson Creek without the word "pottery"

10 as a trademark today?

11 A    We've referred to ourselves both as "Emerson Creek" and

12 "Emerson Creek Pottery" I think in our literature, and our

13 general reference to ourselves is both.

14 Q    So let me be a little bit more specific.  When I say a

15 trademark, I'm talking about using Emerson Creek in connection

16 with actual pottery products.

17      Do you do that?

18 A    Well, the stamp that we're using now says "Emerson Creek

19 Pottery."  It doesn't say "Emerson Creek," if that's what

20 you're --

21 Q    Right.  So you don't have any pottery that you sell that

22 just bears the words "Emerson Creek" without pottery?

23 A    Not at this time.

24 Q    And how long -- when was the last time that you marked

25 your products with "Emerson Creek" without "pottery"?

J. Leavitt - Cross

1  A    Probably sometime in the late '80s, possibly.  I'm not

2  sure.

3  Q    So it's been more than 20 years?

4  A    Yeah.

5  Q    And with regard to your store and your website -- in other

6  words, the retail outlets that you use to sell your pottery --

7  well, let me start -- rephrase this.

8       Are your retail store and the -- your website the only

9  ways that you as Emerson Creek Pottery sell your pottery

10 products?

11 A    Well, we sell them online.  We sell them wholesale.  We

12 sell them in the store.

13 Q    Right.  So you sell them through your store.  You sell

14 them online through your website, and then you sell them

15 through these accounts you have around the country that resell

16 them?

17 A    That's correct.

18 Q    And none of those accounts use Emerson Creek as a name for

19 a business that sells product?

20 A    Yes, that's correct.

21 Q    So the only ways that you -- where you sell product is

22 through your website and through your store.  And both of those

23 have Emerson Creek Pottery on them, correct?

24 A    Yeah, but I think in some of our literature and

25 advertisements and such, we refer to ourselves as Emerson

J. Leavitt - Cross

1   they were using your mark in connection with services that

2   previously had never been offered under your mark; is that

3   correct?

4   A    That's true.

5   Q    So don't you think it would have been worthwhile, if you

6   were going to control the nature and quality of those services,

7   that you go visit and see exactly what was being done?

8   A    Well, perhaps.  But I could tell from the images that I

9   was seeing that they were doing a good job.

10  Q    You could tell from how?

11  A    From looking at website images, images that she sent me,

12  that sort of thing.  I felt like they were doing a good job.

13  Q    So you basically approved of these services and what they

14  were doing?

15  A    I did.

16  Q    So speaking of monitoring the websites, I'm now going to

17  ask Mike to call up different exhibits showing defendants'

18  websites over various periods of time.

19       The first one I think we have is from 2002.  And we showed

20  you this exhibit before, or this -- and do you see on this

21  wagon --

22           MR. LAUBSCHER:  Can you blow it up a little, Mike?

23           THE CLERK:  Is this a previously admitted exhibit?

24           MR. LAUBSCHER:  I'm sorry?

25           THE CLERK:  Is this previously admitted?  I just want

J. Leavitt - Cross

1          MR. FRETWELL:  Sure.  It might take me a minute.  It
2     looks like ECP00657.

3          MR. GOODRUM:  Thank you.

4          MR. LAUBSCHER:  Okay.  Can you blow it up, Mike, so
5     that the logo in the middle there appears.

6     BY MR. LAUBSCHER:

7     Q    Okay.  Have you seen this logo before, Mr. Leavitt?

8     A    I've seen that website.

9     Q    And specifically, have you seen the logo shown on the
10    website?

11    A    Yes.

12    Q    Did you ever have any objections to it?

13    A    I did not.

14         MR. FRETWELL:  This is 39.

15         MR. LAUBSCHER:  Okay.  We ask that this be entered as
16    Defendants' Exhibit 39.

17         THE COURT:  Be admitted.

18         (Defense Exhibit 39 marked.)

19         (Defense Exhibit 39 admitted.)

20    BY MR. LAUBSCHER:

21    Q    And then we have a website from 2019.

22         And again, do you see that logo on there, Emerson Creek
23    Events?

24    A    Uh-huh.

25    Q    Have you seen that before?

J. Leavitt - Cross

1  A    I believe there was a back and forth between my attorney

2  and their attorney to try to resolve the matter.  And we were

3  unable to get anywhere.  And finally felt in order to keep them

4  from continuing to use our name and attempt to register our

5  trademarks, that we would have to take them to court.

6  Q    Okay.  And as we sit here today now in 2022, what impact

7  is the defendants' business having on your business?

8  A    The fact that they're using their name is causing harm to

9  me because it associates them with us where we no longer have

10 an association.

11 Q    And how are they associated with you?

12 A    Through using the Emerson Creek name.

13 Q    But does the public -- I mean, are you aware of any

14 association in the minds of general consumers that there is an

15 association between the defendants and you?

16 A    I think that that comes about from confusing Google

17 searches, social media, Instagram, that kind of thing.

18 Q    And how are you being damaged by that association?

19 A    Because they're assuming my name when they don't have a

20 right to.

21 Q    Are they -- are you losing any business because of this

22 alleged association?

23 A    I can't testify to that because I don't know what people's

24 behavior is on the website.  When they go do a Google search

25 for "Emerson Creek," for example, and they come up before me, I

123

J. Leavitt - Redirect

1   don't know if they're going to scroll down and find us, or if

2   they're just going to click away and I just lost a sale.  It's

3   hard -- I can't quantify that.

4   Q    But you can't lose a sale to the defendants because they

5   don't sell pottery?

6   A    No, but I could have lost a sale because somebody thought:

7   Oh, that's an event space; they don't sell pottery.

8   Q    And is there any other type of damage that's being

9   incurred by Emerson Creek Pottery by the actions -- current

10  activities of the defendants today?

11  A    I think the primary damage is the fact that there is this

12  false association that's implied by them using my marks.

13  Q    But you're not aware of any financial damages that you've

14  incurred?

15  A    I can't quantify that.

16        MR. LAUBSCHER:  No further questions, Your Honor.

17        THE COURT:  Any redirect?

18        MR. WILLETT:  Yes, Your Honor.  Just a few questions.

19                  REDIRECT EXAMINATION

20   BY MR. WILLETT:

21  Q    Mr. Leavitt, a few follow-up questions from the questions

22  that you just answered.

23        There were some questions about the use of Emerson Creek,

24  just Emerson Creek.

25        Do you recall those questions?

124

J. Leavitt - Redirect

1   A    I do.

2   Q    I'd like to direct your attention to a previously admitted

3   exhibit, Exhibit 22 -- I'm sorry, 222 -- and specifically

4   page -- go to pages 22 -- or page 22 of that document.

5        You testified a little bit earlier about this, what this

6   was.  But if you could remind the Court, what is this document?

7   A    It's a point-of-sale rack card for our store in Bedford.

8   Q    Okay.  And when you say a point-of-sale rack card, what

9   does that mean?

10  A    It would be displayed in places that -- like visitor

11  centers or stores that have racks where you put your cards for

12  tourists.

13  Q    And is it also utilized when actually selling the pottery?

14  A    Yeah, it's in the store too.  Uh-huh.

15  Q    And are both sides of this depicted?

16  A    Yes, that's correct.

17            MR. WILLETT:  If you can go to the next document or

18  the next page.

19  Q    The same, this is another version of that?

20  A    Yeah, it's a different year of the same -- exact same

21  thing.

22  Q    And do you still use point-of-sale cards?

23  A    We do, yes.

24  Q    Okay.  And do you know if these are the ones you still

25  use?

J. Leavitt - Redirect

1  A    I think that's the one we're using.  We don't change it
2  that often.
3            MR. WILLETT:  Next if we could go to pages 42 to 44.
4  Q    And I think you identified this as well.  What do we have
5  depicted here?
6  A    You're going to have to scroll down.
7            MR. WILLETT:  Yeah, scroll down, Ashley.
8            THE WITNESS:  Yeah, that's -- it's a --
9            MR. WILLETT:  Go back up.
10           THE WITNESS:   I think it might have been from our
11 catalog.
12 Q    And the catalog was something that you did on --
13 A    We had a catalog, yeah.
14 Q    I didn't mean to interrupt you.
15 A    Oh, I say we used to do a printed catalog every year or
16 every couple of years.
17 Q    And I know we looked at a version yesterday.  I had handed
18 you the 2018 catalog.
19 A    Yes.  Correct.
20           MR. WILLETT:  What exhibit was that, Ashley?  Exhibit
21 2.
22 Q    But this was the same type of catalog?
23 A    Yes.
24 Q    You did that at least through 2018?
25 A    Yeah.

E. Leavitt - Direct

1    testify.

2          If she wants to testify that she had actually

3    downloaded these, that's a different question.  But it sounds

4    to me like she's going into the territory of how it's set up

5    and how it operates and those types of things, which I think is

6    beyond the foundation of this witness.

7          MR. WILLETT:  I'm just asking for her understanding

8    of what she's searching for when she does Yelp searches.

9          THE COURT:  What?

10         MR. WILLETT:  I'm just asking for her to explain her

11   understanding of how Yelp works.

12         THE COURT:  What is the point of this anyway?

13         MR. WILLETT:  This is -- these are the photos for

14   Emerson Creek Pottery & Tearoom.  And so for this one it's

15   going to show what comes up when someone goes to their page,

16   pictures that have been posted on a Yelp page for Emerson Creek

17   Pottery & Tearoom, which was their entity.

18         THE COURT:  And so --

19         MR. WILLETT:  And it goes to confusion, Your Honor.

20   It goes to the confusion that exists out there in the public.

21         THE COURT:  Okay.  Well, she can say what she found

22   when she searched, but --

23         MR. WILLETT:  Yeah, I was just going to ask her if

24   she searched Emerson Creek Pottery & Tearoom, and what she

25   sees, if this is replicated of what she sees.

Winkler - Cross

1  A    Correct.

2  Q    And they had engaged you in a substantial effort to remove

3  "pottery" and "tearoom," as we already talked about?

4  A    Yeah, there were several times that we were going through

5  and removing stuff.

6  Q    And in fact, you had testified that they had asked you in

7  February of 2019 to make those changes, correct?

8  A    Yes.

9  Q    So I want to show you what will be marked as Defendants'

10  Exhibit 55.

11        MR. MCLAUGHLIN:  So Mike, if you can pull that up.

12  What I want you to do is go to one that is dated January 30th.

13  I think it's the first one.

14        THE CLERK:  The Zoom witness can't see it.

15        MR. FRETWELL:  There's nothing I can do about that.

16        MR. MCLAUGHLIN:  Larry, why don't we do this:  Give

17  me my laptop.

18        We're working with technology, but we've got it.

19  Give me a second to pull it up on mine.  Then I can work with

20  you.

21  BY MR. MCLAUGHLIN:

22  Q    I want to direct your attention to what's been marked as

23  Defendants' Number 55 for identification.  And if you take a

24  look at that first page, can you see that, where it's a January

25  30th, 2018 email from Thomas Adams to yourself?

Winkler - Cross

1  A    Yes.

2  Q    That's an email you received in the ordinary course of

3  business?

4  A    Yes.

5  Q    And if you look down, those emails continue, and there are

6  actually a number of emails between yourself and Thomas; is

7  that correct?

8  A    Yes.

9         MR. MCLAUGHLIN:  I'd ask that Defense Exhibit Number

10  55 be admitted into evidence.

11         THE COURT:  Be admitted.

12         (Defense Exhibit 55 marked.)

13         (Defense Exhibit 55 admitted.)

14   BY MR. MCLAUGHLIN:

15  Q    So I want to focus on this first page on what's PDF

16  number -- or page 1.

17      And if you can take a look at that for a minute and read

18  that.  And hopefully you can read it, because --

19         THE CLERK:  The reason is they were connected to the

20  Zoom.  So that's why --

21         MR. MCLAUGHLIN:  It's not a problem.

22         THE CLERK:  Now the jury can only see the exhibit,

23  but not the witness testifying.  That's what's going to happen.

24  That's the only way around it.

25         MR. MCLAUGHLIN:  Well, Lindsay, hopefully you're

213

Winkler - Cross

1  still there.

2          THE WITNESS:  Yeah, it's a little small, but I can

3  kind of read it.

4   BY MR. MCLAUGHLIN:

5  Q   I'm just going to read it just because of -- in the

6  interest of the technology issues we're having.

7      It says, "Lindsay, I work in the office at Emerson Creek,

8  and from time to time they ask me to make changes to the

9  website.  Dave is hoping to change the logo on the website.  I

10 attempted to do just that, but it looks to me like you're using

11 some plug-in that I'm not familiar with.  I have some

12 experience with WordPress, but I have always selected the logo

13 in the theme's appearance settings.  I attached the image for

14 the new logo.  He just wants to change it to events and

15 tearoom."  That's the first paragraph.

16     The second paragraph says, "I got the font pretty close to

17 yours.  It's Avenir font, but I still see some slight

18 differences.  It if it is easier for you to edit the original

19 or make a new one yourself, that's fine, whatever is easiest

20 for you.  Dave was hoping to have this done today or tomorrow

21 morning at the latest, but I had to let him know I couldn't

22 figure it out.  And I didn't want to go changing settings

23 without knowing what I was doing.  Sorry this is so last

24 minute.  I appreciate that."

25     Do you see that?

Winkler - Cross

1   A    Yes.

2   Q    And so if we go down, we see a number of -- a string of

3   emails between you and Thomas in which certain changes are

4   being requested on the website, correct?

5   A    Yes.

6   Q    And your business practice with Emerson Creek and Oswego

7   was to get instructions from them, and then you would actually

8   handle all the website changes; isn't that correct?

9   A    Yes.

10  Q    Okay.  And you were initially engaged for this most recent

11  iteration of the website in 2015, right?

12  A    Yes.

13  Q    And not only were you handling website design, but you

14  were handling social media and all aspects of the marketing,

15  right?

16  A    Not social media, but yeah, everything else with print and

17  marketing.

18  Q    And is that the kind of thing that can be done overnight?

19  A    No.

20  Q    And so when you began working with them on the changes,

21  approximately how long did it take, start to finish, to make

22  all the changes that were necessary to remove items like

23  "pottery" and "tearoom," those types of things?

24  A    It would take at least like a month or so, since there was

25  some back and forth, and then our time frame to be able to get

215

Winkler - Cross

1   stuff done.

2   Q    And in this case it was actually over a period of several

3   months, because from time to time you would see another change

4   that sort of was overseen, and you'd have to make that change

5   as well?

6   A    Yeah, there's different levels of changes.  But there was

7   like logos or text or images.

8   Q    Do you believe that Dave Demiduk and Chris Demiduk were

9   working diligently with you to make the changes that were

10  necessary to remove "pottery" and "tearoom" throughout this

11  entire process?

12  A    Yes, I do.

13  Q    Now, I want to show you again, if you can pull up -- let's

14  go to -- pull up 62 and 63.

15      I want to show you two documents that have been marked as

16  Defendants' 62 and Defendants' 63.  And first I'm going to have

17  us pull up 62.  I'm going to represent to you the first part

18  doesn't deal with you at all.  It's actually just a number of

19  marketing expenses.  But I want to scroll down or have Mike

20  scroll down until --

21          MR. WILLETT:  Which document are you on?

22          MR. MCLAUGHLIN:  Defendant's Number 62.

23          Just give me a second.  I'm going to get to the page

24  I want you to see.  All right.  I believe if you can take a

25  look, Mike, at Bates -- or excuse me, the PDF page 38 is the

244

Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc., et
al., 6:20cv54, 2/23/2022

1                    C E R T I F I C A T E

2      I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3  the United States District Court for the Western District of

4  Virginia, appointed pursuant to the provisions of Title 28,

5  United States Code, Section 753, do hereby certify that the

6  foregoing is a correct transcript of the proceedings reported

7  by me using the stenotype reporting method in conjunction

8  with computer-aided transcription, and that same is a

9  true and correct transcript to the best of my ability and

10  understanding.

11      I further certify that the transcript fees and format

12  comply with those prescribed by the Court and the Judicial

13  Conference of the United States.

14      /s/ Lisa M. Blair              Date: March 8, 2022

15

16

17

18

19

20

21

22

23

24

25